**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| ROBERT O. WHITE, SR. | : | |
| | : | |
| Plaintiff, | : | Case No.: 1:08cv01138 (JR) |
| | : | |
| v. | : | |
| | : | |
| ROBERT C. TAPELLA | : | |
| Public Printer of the United States | : | |
| U.S. GOVERNMENT PRINTING OFFICE | : | |
| | : | |
| Defendant. | : | |

**NOTICE OF FILING OF EXHIBITS TO**
**COMPLAINT FOR RACIAL DISCRIMINATION**
**IN EMPLOYMENT AND REVIEW OF AGENCY DECISION**

**PLEASE TAKE NOTICE** that the Plaintiff Robert O. White, Sr., through his attorneys

HANNON LAW GROUP, LLP, hereby submit for filing with the Clerk of the Court the exhibits

in support of his Complaint for Racial Discrimination in Employment and Review of Agency

Decision.  Exhibit 5 shall be submitted to the Court on disk pursuant to LCvR 5.4(e) (1), as it

consists of videotape evidence.  A true copy of all Exhibits shall be served with the Complaint on

the Defendant in compliance with LCvR 5.1 via certified mail.

Dated August 14, 2008                    Respectfully submitted,

                                        HANNON LAW GROUP, LLP

                                        _____*/s/ J. Michael Hannon*_____
                                        J. Michael Hannon, #352526
                                        1901 18th Street, NW
                                        Washington, DC 20009
                                        (202) 232-1907
                                        Fax:  (202) 232-3704
                                        jhannon@hannonlawgroup.com
                                        *Attorney for Plaintiff Robert O. White, Sr.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY on this 14th day of August that a copy of the foregoing Notice of Filing of Exhibits to Plaintiff's Complaint for Racial Discrimination in Employment and Review of Agency Decision will be served via certified mail to:

ROBERT C. TAPELLA
Public Printer of the United States
U.S. GOVERNMENT PRINTING OFFICE
732 North Capitol Street, NW
Washington, D.C. 20401

UNITED STATES ATTORNEY
555 4th Street, NW
Washington, D.C. 20001

U.S. ATTORNEY GENERAL
Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530

_/s/ J. Michael Hannon_
J. Michael Hannon

# EXHIBIT 1

AS

## UNITED STATES OF AMERICA
## MERIT SYSTEMS PROTECTION BOARD
## WASHINGTON REGIONAL OFFICE

ROBERT O. WHITE, SR,
            Appellant,

      v.

GOVERNMENT PRINTING OFFICE,
            Agency.

DOCKET NUMBER
DC-0752-07-0729-I-1

DATE: September 7, 2007

J. Michael Hannon, Esquire, Hannon Law Group, LLP, Washington, D.C.,
    for the appellant.

Neal H. Fine, Esquire, Washington, D.C., for the agency.

### BEFORE
Elizabeth B. Bogle
Administrative Judge

### INITIAL DECISION

On June 20, 2007, the appellant filed an appeal from a decision of the agency to reduce him in grade and pay from the position of Lead Police Officer, PQ-0083-06 ($62,224), to the position of Police Officer, PQ-0083-05 ($57,430), and suspend him for 14 days. The Board has jurisdiction over the appeal. 5 U.S.C. §§ 7511(a)(1)(A), 7512(3)-(4).[1] For the following reasons, the agency action is AFFIRMED.

---

[1] When an otherwise non-appealable action such as a 14-day suspension is part of a unified penalty arising out of the same circumstances as an appealable action, the Board's jurisdiction includes the non-appealable action. *See Brewer v. American Battle Monuments Commission*, 779 F.2d 663, 664-65 (Fed.Cir.1985).

Background

The appellant was promoted to the Lead Police Officer position on April 22, 2001. Appeal File (AF) tab 4, subtab 4q. Beginning on August 28, 2006, the agency detailed the appellant for 89 days to a Supervisory Police Officer position. AF tab 4, subtab 4p. By notice dated February 6, 2007, LaMont Vernon, Chief of Security Services, proposed the appellant's reduction in grade and pay and 14-day suspension for "failure to perform the duties of [his] position in a satisfactory manner – failure to follow post orders." AF tab 4, subtab 4q. The appellant made oral and written replies. AF tab 4, subtabs 4d, 4e. On May 24, 2007, Rafael E. Landrau, Deputy Chief, Human Capital Officer, issued a decision to reduce the appellant in grade and pay and suspend him. AF tab 4, subtab 4c.

Legal standard

The agency must prove the charge contained in the proposal notice by a preponderance of the evidence. 5 U.S.C. § 7701(c); 5 C.F.R. § 1201.56(a)(1). A preponderance of the evidence is that degree of relevant evidence that a reasonable person, considering the record as a whole, would accept as sufficient to find that a contested fact is more likely to be true than untrue. 5 C.F.R. § 1201.56(c)(2). The agency also must demonstrate that disciplinary action will promote the efficiency of the service, *see Kruger v. Department of Justice,* 32 M.S.P.R. 71, 73-74 (1987), and that the penalty imposed was reasonable, *see Douglas v. Veterans Administration,* 5 M.S.P.R. 280, 306 (1981).

The charge is sustained

The agency charged as follows: On October 29, 2006, the appellant was acting sergeant for the second shift on relief/rove duty. At 5:30 p.m. he was assigned security duty on Government Printing Office (GPO) Police Post 41 which is GPO Building 4 where US Passports and US Postal cards are produced. This is GPO's most secure facility. At approximately 6:00 p.m. two females entered the lobby one of whom was carrying a purse. The appellant allowed the

3

women to pass through the magnetometer without placing the purse on the x-ray conveyer belt for examination. Neither woman displayed a GPO identification badge. The appellant did not visually inspect the purse held by one of the women. The appellant did not visually examine the contents of the purse. After an apparent discussion with GPO Police Officer Darnelle Everett, the appellant departed the building allowing the two unidentified women to remain in the lobby area. He did not refer the women to the main building at 732 North Capitol Street to obtain visitor badges.

Post Order 41, issued on October 20, 2006, states inter alia that the assigned officer is "responsible for the identification, inspection, and control[] of all persons, e.g., GPO employees, visitors, contractors, messengers, vendors, other Government agency employees, etc. entering and departing through the lobby area." The assigned officer "shall physically check and verify that each employee has their GPO credentials and access key card after entering the building. All other visitors are to be referred to Main GPO at 732 North Capitol Street." Individuals with other forms of identification cards "may be granted entry when authorized by the [Officer in Charge] or Shift supervisor." Post Order 41 further provides that "All persons entering through Post 41 will proceed through the Meteor 200 Metal Detector . . . If a person walks through and the indicator lights turn red, stop the person, direct them to a spot away from the archway and rescreen with a hand held magnetometer." Post Order 41 also provides that "All parcels, packages, suitcases, containers, purses, gymbags or any other item capable of carrying clothing and equipment shall be screened by x-ray machine prior to entry." AF tab 4, subtab 4j.

The appellant contends that he was not aware of Post Order 41 (revised and issued on October 20, 2006), so it does not apply to him. This contention is unavailing. First, the appellant offered no evidence that any previous order differed in any significant way from Post Order 41. And Mr. Vernon testified that the order was revised primarily to remove a requirement for an officer to

4

conduct periodic outside inspections. The agency presented evidence that Post Order 41 was e-mailed to the appellant and others for comment on August 23, 2006. AF tab 4, subtab 4m. The appellant's testimony that he does not read his e-mails is disingenuous and belied by agency evidence that he does. AF tab 10, exhibit 3. And Mr. Vernon testified that the appellant responded to the Post 41 e-mail with comments. For all these reasons, I find that the appellant was aware of and was covered by Post Order 41 on October 29, 2006.

The following facts are undisputed. On October 29, 2006, the appellant was assigned to relief/rove duty. At 5:30 p.m. he relieved Police Officer Darnelle Everett at Post 41 so that Everett could go to lunch. At approximately 6:00 p.m. Everett returned from lunch. The appellant lowered the bar for him to enter the lobby area. When Everett walked through the magnetometer, two women walked through closely behind him and one of them set off the red indicator lights. Neither the appellant nor Officer Everett asked the women for identification, screened them with a hand-held magnetometer or screened the bag one of them was carrying with the x-ray machine. Both the appellant and Everett testified the appellant asked where he had been (because he needed to leave Post 41 and relieve another officer). Everett replied, "Go ahead, I got it." Both Everett and the appellant understood this remark to mean that Everett was relieving the appellant from his assignment to Post 41, and the appellant left the area. Based on these undisputed facts, I find that Post Order 41 was not followed when the two women were allowed to enter the lobby area without showing proper identification, without being screened by a hand-held magnetometer (after the red indicator lights were set off), and without having their bag screened. To prove the charge, the agency must show that the appellant was responsible for Post 41 when the women entered, not Officer Everett.

Unfortunately, the agency has no formal procedures (other than a requirement for the relieved officer to radio his departure time and destination to the control center) explaining how one officer relieves another from an assigned

post of duty. The witnesses (including Mr. Vernon) generally agreed that Officer Everett could have relieved the appellant by saying, "I got it." Based on the testimony of Officer Everett and the appellant, and my review of the video-tape (AF tab 4, subtab 4i), it appears that Officer Everett made this statement to the appellant while he was still on the other side of the bars and had not cleared the magnetometer. At that point, he very clearly did not have actual control of the post. This is best illustrated by the fact that two women walked in behind him setting off the red indicator lights, and Officer Everett did not see the lights because he had his back to them. The appellant should have been able to see the lights, but when he was asked if he did, his response was evasive. Rather than answer the question directly, he testified that he was "gathering his things." Officer Everett, I find, did not have control of Post 41 when he made the statement, "I got it." And even though that statement may have been sufficient in other circumstances to relieve the appellant, in these circumstances where two women unknown to the appellant had followed Officer Everett into the lobby setting off the indicator lights, the statement was not sufficient. To hold otherwise would be to find that one officer may relieve another verbally even though he is not in control of the post and able to carry out post orders, leaving no one in actual control of the post. The appellant, I conclude, had not effectively been relieved when the two women entered the lobby behind Officer Everett. Therefore, he failed to follow Post Order 41 when he left the post without identifying and screening them.

The appellant may be arguing that he thought the women were guests of Officer Everett. In fact, Officer Everett did know both of the women but invited only one of them to accompany him to the building. The other one followed making threats and later assaulting Everett. Even if the appellant reasonably thought they were guests, however, Post Order 41 still was violated. For it provides that "visitors are to be referred to Main GPO at 732 North Capitol Street" and individuals "may be granted entry when authorized by the [Officer in

6

Charge] or Shift supervisor." Officer Everett was not an Officer in Charge or a Shift Supervisor, therefore he had no authority to escort anyone into the building.

The charge is sustained.

### The agency's alleged failure to produce at the reply stage all of the information it relied on in proposing the action

Under 5 U.S.C. § 7513, an employee generally is entitled to at least 30 days' advance written notice of any proposal to take an adverse action, to a reasonable time in which to reply both orally and in writing, to a written decision containing the specific reasons for the action, and, upon the employee's request, to copies of "any supporting material." An action may not be sustained on appeal if the employee establishes, by preponderant evidence, that the agency erred in applying these or other procedures, and that the error is likely to have caused the agency to reach a conclusion different from the one it would have reached in the absence or cure of the error. 5 U.S.C. § 7701(c)(2)(A); *Gilmore v. U.S. Postal Service*, 103 M.S.P.R. 290, 294 (2006).

The appellant alleges that the agency failed to produce "numerous critical and important documents" upon which it relied. AF tab 11. Specifically, he alleges that the agency "withheld documents and information regarding the Inspector General's investigation into this matter." He received these documents on August 6, 2007. As an initial matter, the appellant did not establish that the Inspector General's investigation or any of the other "withheld" documents were "supporting material" under section 7513(e). If he had, he would next be required to show that he requested the material and that the agency's failure to provide it to him was an error that likely would have caused the agency to reach a different conclusion. He has made no such showing. Therefore, he has not met his burden of proof on the allegation of harmful procedural error. *See Gilmore v. U.S. Postal Service*, 103 M.S.P.R. at 297.

### The deciding official was not a disinterested person

The appellant alleged that the deciding official, Rafael Landrau, was not a disinterested official. Specifically, he alleged that he was "intimately involved in the investigation of the incident" and was "privy to information not produced to Officer White during the disciplinary process." AF tab 11. It is a violation of due process to allow an individual's basic rights to be determined either by a biased decisionmaker or by a decisionmaker in a situation structured so that the "risk of unfairness is intolerably high." *See Svejda v. Department of the Interior,* 7 M.S.P.R. 36, 37 (1981). However there is "no general proscription" on the appointment of a deciding official who "is familiar with the facts of the case and has expressed a predisposition contrary to the appellant's interests." *Id.* Based on *Svejda,* I find that the appointment of Mr. Landrau to serve as deciding official was proper even if, as the appellant alleges, he was involved in the investigation and aware of information not produced to the appellant. In *House v. U.S. Postal Service,* 80 M.S.P.R. 138, 144-45 (1998), the Board considered as a mitigating factor in the penalty determination the fact that the deciding official was also an investigator and "may have been predisposed against the appellant." The reasonableness of the penalty imposed in the appellant's case is discussed below.

### The agency imposed disparate penalties because of the appellant's union membership

The appellant alleged that the agency imposed disparate penalties for the purpose of "union busting." He alleged that active members of the Fraternal Order of Police "have been discriminated against and retaliated against by supervisory personnel within the agency." The "goal of the agency" is to replace its police force with contract workers. In furtherance of this goal, the agency will "identify infractions that are otherwise negligible in character, and then "color and present them in such a way that they almost seem like legitimate, rational charges." AF tab 11.

8

A complaint of anti-union animus on the part of an agency may constitute an unfair labor practice charge under 5 U.S.C. § 7116 and, as such, is not a matter within the jurisdiction of the Board. *See Bodinus v. Department of the Treasury,* 7 M.S.P.R. 536, 542 (1981). Thus the Board is without authority to determine whether it is a "goal" of the agency to replace its police force with contract workers or whether the agency generally charges "negligible" infractions to further this goal. However, while the Board is without jurisdiction to adjudicate an unfair labor practice allegation based on anti-union animus, evidence of such animus may establish a retaliatory motive for an otherwise appealable adverse action taken in violation of section 5 U.S.C. § 2302(b)(9). The Board may properly consider appellant's evidence of anti-union animus if it is pertinent to showing his affirmative defense of a violation of section 2302(b)(9). *Id.*

For an appellant to prevail on an allegation of illegal retaliation, he has the burden of showing that: (1) he engaged in protected activity; (2) the accused official knew of the protected activity; (3) the adverse action under review could have been retaliation under the circumstances; and (4) there was a genuine nexus between the alleged retaliation and the adverse action. *Pleasant v. Department of Health and Human Services,* 98 M.S.P.R. 602, 611 (2005), *citing, Warren v. Department of the Army,* 804 F.2d 654, 656-58 (Fed.Cir.1986). In this case, the appellant testified that he last served as a union steward in 2001, but he remained a union member and was available to represent employees. He did not recall when he last filed a grievance or an unfair labor practice. Based on this testimony, I conclude that the appellant has engaged in protected activity. Mr. Landrau was not asked if he knew of the appellant's protected activity. While it seems likely that he knew or assumed the appellant was a union member, he may not have known of his 2001 service as a union steward because Mr. Landrau has served in his position only since October of 2005. Because the reduction in grade and pay and suspension actions were taken after Mr. Landrau likely knew of the appellant's union activity, they could have been retaliatory.

For the following reasons, I conclude that the appellant has not established a nexus between a retaliatory motive and the disciplinary actions. There is no evidence that the appellant engaged in any activity that alleged wrongdoing by Mr. Landrau or that resulted in a finding against Mr. Landrau or the agency. As such, Mr. Landrau is not shown to have had any motive to retaliate against the appellant for his union activity. *See Redschlag v. Department of the Army,* 89 M.S.P.R. 589, 626 (2001), *review dismissed,* 32 F.App'x 543 (Fed.Cir.2002). Next, the gravity of the misconduct as it appeared to Mr. Landrau at the time of his decision must be assessed. *Id.* In his testimony, he explained that he considered the misconduct especially serious because it happened in a secure facility where the agency produces U.S. Passports. Because Mr. Landeau is not shown to have had any motivation to retaliate and because he reasonably assessed the misconduct as serious, I find that the appellant has not established nexus. Therefore, he has not met his burden of proving illegal retaliation.

The appellant may be alleging that Mr. Landrau imposed a more severe penalty because of his union activity than he would have imposed on a non-union member. To establish disparate penalties, the appellant must show that the agency has imposed a lesser penalty in a case where the charged misconduct and circumstances surrounding the misconduct were substantially similar. *Whelan v. U.S. Postal Service,* 103 M.S.P.R. 474, 479-80 (2006), *aff'd,* No. 2007-3040 (Fed.Cir.2007) (NP), *citing, Archuleta v. Department of the Air Force,* 16 M.S.P.R. 404, 407 (1983). The appellant has not identified any disciplinary actions involving substantially similar misconduct. In his testimony, he referred to the case of an officer who was charged with being absent from his post and, as a result, a truck carrying passports was not properly sealed and passports fell out. According to the appellant, the officer was suspended for seven days. The extent of the employee's culpability is not apparent from the appellant's brief description of the incident. Nor is it clear that the employee served in the same work unit as the appellant and was supervised by the same individuals.

Apparently, Mr. Landrau was not the deciding official because he was not asked about this case. For these reasons, I find that the appellant has not shown that the charged misconduct and the circumstances surrounding the misconduct of this employee were substantially similar to his own. The consistency of a penalty with those imposed on other employees is only one factor to be considered in determining the reasonableness of the penalty. *Yeager v. General Services Administration,* 39 M.S.P.R. 147, 151 (1988). If the appellant had shown that his case was substantially similar to the other officer's, I would not find that a basis for mitigation because the penalty otherwise was entitled to deference. *Whelan v. U.S. Postal Service,* 103 M.S.P.R. at 480, *citing, Quander v. Department of Justice,* 22 M.S.P.R. 419, 423 (1984) *aff'd,* 770 F.2d 180 (Fed.Cir.1985) (Table).

## The agency discriminated against the appellant on the basis of his race (African-American)

While the necessary elements of a prima facie case vary according to the particular facts and circumstances at issue, a person claiming employment discrimination under Title VII carries the initial burden of showing actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were based on an impermissible criterion. *Spahn v. Department of Justice,* 93 M.S.P.R. 195, 201 (203), *citing Furnco Construction Corp. v. Waters,* 438 U.S. 567, 575-76, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978). However the precise requirements of a prima facie case can vary depending on the case. An appellant may prove discrimination by direct or indirect evidence. Direct evidence may be any statement made by an employer that 1) reflects directly the alleged discriminatory attitude and 2) bears directly on the contested employment decision. *See Arredondo v. U.S. Postal Service,* 85 M.S.P.R. 113, 120-21 (2000), *citing, Dorsey v. Department of the Air Force,* 78 M.S.P.R. 439, 448 (1998). By indirect evidence, an employee may establish a prima facie case of prohibited discrimination by introducing preponderant

evidence to show that he is a member of a protected group, he was similarly situated to an individual who was not a member of the protected group, and he was treated more harshly or disparately than the individual who was not a member of his protected group. *Buckler v. Federal Retirement Thrift Investment Board,* 73 M.S.P.R. 476, 497 (1997). When the employee has met his burden, the burden of going forward then shifts to the agency to articulate a legitimate, nondiscriminatory reason for its action; and, finally, the employee must show that the agency's stated reason is merely a pretext for prohibited discrimination. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-04 (1973). The appellant did not offer any direct evidence of race discrimination.

The appellant is a member of a protected group because he is African-American. He has not met the remaining elements of a prima facie case of race discrimination because he did not identify any similarly situated individuals not of his protected group who were treated less harshly or disparately than he was.[2] In his prehearing submission, he proposed to call Officers Abdula Jackson, Charles Beard, Keith Williams, Phillip Griffin, and Billy Stokes to testify "to the disparate treatment of African-American officers." I disapproved their testimony because it appeared that it would be based on their opinion of their treatment, but I ordered the agency to submit written evidence of the race of each officer, whether they were similarly situated, and what disciplinary action, if any, was taken in their cases. AF tab 12. The agency responded with information (not disputed by the appellant) that the identified officers are of the same protected group as the appellant. AF tab 17. Because the identified individuals are

---

[2] Sergeant William Williams (referred to in the appellant's prehearing submission – AF tab 11) is not a similarly situated individual because relevant aspects of his employment situation are not "nearly identical" to those of the appellant. *Spahn v. Department of Justice,* 93 M.S.P.R. 195, 202 (2003). Based on the appellant's description, Williams was a security officer supervisor who most likely served in a different work unit. While the appellant accuses him of "fail[ure] to respond to an officer in danger" (Officer Everett), he was not disciplined for any infraction.

members of the appellant's protected group, they are not appropriate comparator employees.[3]

<u>The penalty was reasonable</u>

The Board will give deference to an agency's decision regarding a penalty unless that penalty exceeds the range of allowable punishment specified by statute or regulation or unless the penalty is so harsh and unconscionably disproportionate to the offense that it amounts to an abuse of discretion. *Lavette v. U.S. Postal Service,* 96 M.S.P.R. 239, 246-47 (2004), *citing, LaChance v. Devall,* 178 F.3d 1246, 1251 (Fed.Cir.1999); *Parker v. U.S. Postal Service,* 819 F.2d 1113, 1116 (Fed.Cir.1987). This is because the agency has the primary discretion in maintaining employee discipline and efficiency. *Id., citing, Gmitro v. Department of the Army,* 95 M.S.P.R. 89, 92 (2003), *aff'd,* 111 F.App'x 610 (Fed.Cir.2004).

Mr. Landrau testified that the appellant's misconduct was extremely serious because Building 41 is a secure facility where U.S. Passports are produced. Because of the appellant's misconduct, unauthorized personnel were allowed into the lobby area without proper screening. He considered that at the time this occurred, the appellant was detailed to a supervisory position. He noted that the appellant had no prior discipline. He asked the agency's human resources office if there were other similar cases, but that office knew of none,

---

[3] The appellant objected to the agency's evidence as not responsive to my instruction. He argued that the agency had not responded to his discovery request for information about similarly situated employees and that my instruction allowed him to request that information after the prehearing teleconference. As provided by the hearing order, discovery concluded on the day of the prehearing teleconference. The appellant had not filed a motion to compel when discovery concluded, and my instruction during the prehearing teleconference was not an order to the agency to produce any evidence the appellant requested. My conference summary clearly stated that the appellant had identified several comparator employees in his prehearing submission and the agency was ordered to submit evidence concerning each of "them." The agency submission was responsive to my request.

and he was not aware of any based on his own experience. He selected a penalty that allowed for the appellant's rehabilitation but underscored the importance of his duties as a security guard.

The appellant objected to Mr. Landrau's characterization of him as a supervisor because he was only acting (on detail) in that capacity. [4]  AF tab 4, subtab 4p.  Supervisors may be held to a higher standard of conduct than non-supervisors because they hold positions of trust and responsibility. *Brown v. U.S. Postal Service,* 64 M.S.P.R. 425, 433 (1994).  And this may be true even where the employee is only an acting supervisor. *See Gebhardt v. Department of the Air Force,* 99 M.S.P.R. 49, 57-58 (2005), *aff'd,* 180 F.App'x. 951 (Fed.Cir.2006). Mr. Landrau, I conclude, properly could consider as part of his penalty determination the fact that the appellant was an acting supervisor.

I have considered the appellant's allegation that Mr. Landrau was involved in the investigation and aware of information not produced to the appellant.  In *House v. U.S. Postal Service,* 80 M.S.P.R. at 144-45, the Board found this to be a mitigating factor because it lent credence to the appellant's claim that the deciding official was engaged in an effort to "get rid of him."  The appellant has made no such allegation in this case and there otherwise is no evidence that Mr. Landrau took any action to build a case for discipline against the appellant.  Mr. Landrau's alleged role in the investigation and production of information to the appellant is not a mitigating factor.

---

[4] The appellant also appeared to claim that he was not serving as an acting supervisor for the second shift on October 29, 2006.  Because he was detailed to the supervisory position for 89 days without any indication that the detail only applied to certain shifts or assignments and because the appellant has not otherwise shown that he was not serving as a supervisor on the second shift, I conclude that he was an acting supervisor when the incident occurred.

14

Because Mr. Landrau considered appropriate mitigating factors and chose a penalty that is reasonable for the offense, the Board must defer to the agency's penalty selection.

## DECISION

The agency's action is AFFIRMED.

FOR THE BOARD:

Elizabeth B. Bogle
Administrative Judge

## NOTICE TO APPELLANT

This initial decision will become final on **OCT 1 2 2007**, unless a petition for review is filed by that date or the Board reopens the case on its own motion. This is an important date because it is usually the last day on which you can file a petition for review with the Board. However, if you prove that you received this initial decision more than 5 days after the date of issuance, you may file a petition for review within 30 days after the date you actually receive the initial decision. You must establish the date on which you received it. The date on which the initial decision becomes final also controls when you can file a petition for review with the Equal Employment Opportunity Commission (EEOC) or with a federal court. The paragraphs that follow tell you how and when to file with the Board, the EEOC, or the federal courts. These instructions are important because if you wish to file a petition, you must file it within the proper time period.

## BOARD REVIEW

You may request Board review of this initial decision by filing a petition for review. Your petition for review must state your objections to the initial

decision, supported by references to applicable laws, regulations, and the record. You must file your petition with:

The Clerk of the Board
Merit Systems Protection Board
1615 M Street, NW.,
Washington, DC 20419

A petition for review may be filed by mail, facsimile (fax), personal or commercial delivery, or electronic filing. A petition for review submitted by electronic filing must comply with the requirements of 5 C.F.R. § 1201.14, and may only be accomplished at the Board's e-Appeal website (https://e-appeal.mspb.gov).

If you file a petition for review, the Board will obtain the record in your case from the administrative judge and you should not submit anything to the Board that is already part of the record. Your petition must be filed with the Clerk of the Board no later than the date this initial decision becomes final, or if this initial decision is received by you more than 5 days after the date of issuance, 30 days after the date you actually receive the initial decision. If you claim that you received this decision more than 5 days after its issuance, you have the burden to prove to the Board the date of receipt. You may meet your burden by filing evidence and argument, sworn or under penalty of perjury (see 5 C.F.R. Part 1201, Appendix 4) to support your claim. The date of filing by mail is determined by the postmark date. The date of filing by fax or e-mail is the date of submission. The date of filing by personal delivery is the date on which the Board receives the document. The date of filing by commercial delivery is the date the document was delivered to the commercial delivery service. Your petition may be rejected and returned to you if you fail to provide a statement of how you served your petition on the other party. If the petition is filed by e-mail, and the other party has elected e-Filing, including the party in the address portion of the e-mail constitutes a certificate of service.

16

## EQUAL EMPLOYMENT OPPORTUNITY COMMISSION REVIEW

If you disagree with the Board's final decision on discrimination, you may obtain further administrative review by filing a petition with the EEOC no later than 30 calendar days after the date this initial decision becomes final. The address of the EEOC is:

Office of Federal Operations
Equal Employment Opportunity Commission
P.O. Box 19848
Washington, D.C. 20036

### JUDICIAL REVIEW

If you do not want to file a petition with the EEOC, you may ask for judicial review of both discrimination and nondiscrimination issues by filing a civil action. If you are asserting a claim under the Civil Rights Act or under the Rehabilitation Act, you must file your appeal with the appropriate United States district court as provided in 42 U.S.C. § 2000e-5. If you file a civil action with the court, you must name the head of the agency as the defendant. *See* 42 U.S.C. § 2000e-16(c). To be timely, your civil action under the Civil Rights Act, 42 U.S.C. § 2000e-16(c) must be filed no later than 30 calendar days after the date this initial decision becomes final. If you are asserting a claim under the Age Discrimination in Employment Act, your claim must be filed with the appropriate United States district court as provided in 29 U.S.C. § 633a(c). In some, but not all districts you may have up to 6 years to file such a civil action. *See* 28 U.S.C. § 2401(a).

If you choose not to contest the Board's decision on discrimination, you may ask for judicial review of the nondiscrimination issues by filing a petition with:

The United States Court of Appeals
for the Federal Circuit
717 Madison Place, NW.
Washington, DC 20439

You may not file your petition with the court before this decision becomes final. To be timely, your petition must be <u>received</u> by the court no later than 60 calendar days after the date this initial decision becomes final.

If you need further information about your right to appeal this decision to court, you should refer to the federal law that gives you this right. It is found in Title 5 of the United States Code, section 7703 (5 U.S.C. § 7703). You may read this law, as well as review the Board's regulations and other related material, at our website, <u>http://www.mspb.gov.</u>  Additional information is available at the court's website, <u>http://fedcir.gov/contents.html</u>.  Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's <u>Rules of Practice</u>, and Forms <u>5</u>, <u>6</u>, and <u>11</u>.

## NOTICE TO AGENCY/INTERVENOR

The agency or intervenor may file a petition for review of this initial decision in accordance with the Board's regulations.

## CERTIFICATE OF SERVICE

I certify that the attached Document(s) was (were) sent as indicated this day to each of the following:

<u>Appellant</u>

U.S. Mail

Robert O. White, Sr.
5509 Pioneer Drive
Baltimore, MD 21214

<u>Appellant Representative</u>

U.S. Mail

J. Michael Hannon, Esq.
HANNON LAW GROUP, LLP
1901 18th Street, N.W.
Washington, DC 20009

<u>Agency Representative</u>

U.S. Mail

Neal H. Fine
Government Printing Office
Office of the General Counsel
Stop GC, Room C-814
732 North Capitol Street, N.W.
Washington, DC 20401

_____
September 7, 2007
(Date)

_____
Clarinda Risher
Legal Assistant

UNITED STATES OF AMERICA
MERIT SYSTEMS PROTECTION BOARD

**2008 MSPB 61**

Docket No. DC-0752-07-0729-I-1

**Robert O. White, Sr,**

**Appellant,**

v.

**Government Printing Office,**

**Agency.**

March 14, 2008

<u>J. Michael Hannon</u>, Esquire, Washington, D.C., for the appellant.

<u>Neal H. Fine</u>, Esquire, Washington, D.C., for the agency.

**BEFORE**

Neil A. G. McPhie, Chairman
Mary M. Rose, Vice Chairman

**<u>OPINION AND ORDER</u>**

¶1      The appellant has filed a timely petition for review of the initial decision that affirmed his 14-day suspension and demotion. For the reasons discussed below, we GRANT the petition for review. We AFFIRM the part of the initial decision that finds that the agency proved its charge and that the appellant did not prove his affirmative defenses of harmful error and reprisal for union activity. We VACATE the part of the initial decision that addresses the appellant's affirmative defense of race discrimination and the penalty. We REMAND the appeal for further adjudication consistent with this Opinion and Order.

## BACKGROUND

¶2        Effective May 27, 2007, the agency suspended the appellant for 14 days and demoted him from Lead Police Officer, PQ-06, to Police Officer, PQ-05. Initial Appeal File (IAF), Tab 4, Subtabs 4a, 4b, 4c. The appellant was detailed as an Acting Supervisory Police Officer on October 29, 2006, the date of the charged misconduct. *See id.*, Subtabs 4g at 1 and 4p. The agency charged the appellant with failure to follow Post Orders by permitting two women to enter and remain in the lobby of a secure agency building without verifying that they had the required identity badges and without examining, either visually or by x-ray, the bag carried by one of them. *Id.*, Subtab 4g at 1-2. The appellant filed a timely Board appeal, asserting that he did not violate the post orders and that the agency committed harmful error, discriminated against him on the basis of his race, and retaliated against him for his prior union activity. IAF, Tab 1. Prior to the hearing requested by the appellant, he filed a motion to compel the agency to more fully comply with his discovery request concerning his affirmative defense of race discrimination. IAF, Tab 14. The administrative judge (AJ) denied the appellant's motion to compel based on her determination that discovery had concluded. IAF, Tab 16.

¶3        After the hearing, the AJ found that the agency had proven its charge by preponderant evidence, that the appellant had failed to prove his affirmative defenses of harmful error, race discrimination, and retaliation for union activity, and that the agency's unitary penalty of a 14-day suspension and demotion was reasonable and promoted the efficiency of the service.[1] Initial Decision (ID) at 4-7, 9-13. The appellant has filed a petition for review arguing that the agency

---

[1] Generally, the Board lacks jurisdiction over suspensions of only 14 days; however, it does have jurisdiction over reductions in grade and pay. 5 C.F.R. § 1201.3(a)(2). Where, as here, both actions are part of a unitary penalty arising from the same set of circumstances, the Board has jurisdiction over both actions. *See Brewer v. American Battle Monuments Commission*, 779 F.2d 663, 665 (Fed. Cir. 1985); *Campbell v. Department of Veterans Affairs*, 93 M.S.P.R. 70, ¶ 8 (2002).

did not show by preponderant evidence that he violated any post orders because it did not prove that he was in control of Post 41 at the time, and that the AJ erred by denying his motion to compel discovery. Petition for Review File (RF), Tab 1 at 4-8. The agency has responded in opposition to the petition. RF, Tab 3.

## ANALYSIS

### The agency proved its charge

¶4     The post orders for Post 41 require that the police officer in charge of Post 41 screen all persons entering the lobby of the Government Printing Office (GPO) building 4 by magnetometer, verify that all have GPO identification, and x-ray all bags. *See* IAF, Tab 4, Subtab 4j at 2-4. The appellant essentially admitted that those post orders were violated when two women entered Post 41, where the appellant was stationed, and neither he nor Officer Everett, who was accompanying the women, verified whether they had GPO identification, checked them with a hand-held magnetometer after they set off the walk-through magnetometer, or inspected the bag one of the women was carrying either visually or through the x-ray machine. Hearing Transcript (HT) at 168-71. The appellant asserted below that he had been relieved by Officer Everett upon Everett's arrival and so was no longer responsible for Post 41 and the screening of the two women. *Id.* He argues that the agency did not prove its charge because it did not produce any post orders concerning the transfer of control of the post and so did not show that he, and not Everett, was still responsible for the post. RF, Tab 1 at 5-6.

¶5     The AJ acknowledged that the agency has no formal procedures for how one officer relieves another from an assigned post and found that Everett's statement, "I got it," was insufficient to transfer responsibility for the post to Everett because at that time Everett was still outside the post area and so was not in a position to effectively view and control the post. ID at 4-5. We agree with the AJ that, at the time, Everett was not in a position to exercise control of the post

and the appellant has identified no evidence to undermine the AJ's findings in this regard. The appellant argues that the absence of post orders concerning the transfer of control of a post means that the agency did not prove its charge. RF, Tab 1 at 5-6. However, the appellant is not charged with violation of post orders regarding how he transferred control of the post; he is charged with failure to screen the two women as required by the post orders. The evidence in the record amply establishes that the appellant took none of the actions to screen the two women, as required by the post orders. He abdicated his responsibility, passing it to Everett, who was not in a position to take up control of the post. Therefore, the agency proved its charge.

¶6    The appellant does not raise any objection to the AJ's findings with regard to his affirmative defenses of harmful error and reprisal for union activity and we find no reason to disturb them. Accordingly, we affirm the initial decision with regard to the charge and the affirmative defenses of harmful error and reprisal for union activity.

The AJ abused her discretion by denying the appellant's motion to compel

¶7    The Board will not reverse an AJ's rulings on discovery matters absent an abuse of discretion. *Wagner v. Environmental Protection Agency*, 54 M.S.P.R. 447, 452 (1992), *aff'd*, 996 F.2d 1236 (Fed. Cir. 1993) (Table). The AJ denied the appellant's motion to compel "because discovery has concluded." IAF, Tab 16. As the AJ noted in the initial decision, she had set August 6, 2007, as the date for a telephonic prehearing conference and also the date for discovery to be completed. ID at 12 n.3; IAF, Tab 5 at 3. That telephonic prehearing conference was subsequently delayed until August 13, 2007, although the AJ did not specify whether the date for the conclusion of discovery was delayed also. IAF, Tab 9 at 1. The appellant's motion to compel was filed on August 15, 2007. IAF, Tab 14. The rules governing discovery in Board proceedings are set out in the Board's regulations at 5 C.F.R. §§ 1201.71-.75. These regulations require that "[d]iscovery must be completed within the time limit the judge designates."

5 C.F.R. § 1201.73(d)(5).  Regardless of whether the date for conclusion of discovery set by the AJ remained August 6 or extended to August 13, the appellant's motion to compel was filed after the deadline set by the AJ.

¶8          Initial discovery requests must be served within 25 days of the AJ's ordering the agency to produce its file and response.  5 C.F.R. § 1201.73(d)(1). The appellant's initial discovery request, dated July 17, 2007, was submitted within 25 days of the AJ's acknowledgment order of June 22, 2007.  *See* IAF, Tabs 2, 6.  The agency was required to respond to this request within 20 days, or by August 6, 2007.  *See* 5 C.F.R. § 1201.73(d)(2).  This was the date the AJ set for the conclusion of discovery.  Any motion to compel must be filed with the AJ within 10 days of either the date of service of the objections of the responding party or the date of the expiration of the time to respond.  5 C.F.R. § 1201.73(d)(4).  The appellant filed his motion to compel on August 15, 2007, arguing that the agency's responses and objections regarding the issue of race discrimination were insufficient and including with his motion a copy of his original discovery request and a copy of the agency's response, dated August 6, 2007.  IAF, Tab 14.  As the agency's response to the appellant's discovery request was not served until the last day it was due, August 6, the deadline for discovery, set for the same day by the AJ, effectively denied the appellant any opportunity to contest any of the agency's objections, file a motion to compel, or follow up with requests for further discoverable material based upon the agency's initial response.

¶9          The appellant's motion to compel was timely filed in accordance with the Board's regulations; therefore, the AJ erred by setting a more restrictive deadline and by denying the motion for the sole expressed reason that "discovery has concluded."  However, the Board will not find reversible error in an AJ's discovery rulings absent an abuse of discretion that prejudiced the appellant's substantive rights.  *See Davis v. Department of Defense*, 103 M.S.P.R. 516, ¶ 13 (2006); *McGrath v. Department of the Army*, 83 M.S.P.R. 48, ¶ 9 (1999).  The

appellant's initial discovery request and subsequent motion to compel sought discovery of the disciplinary records of other agency Police Officers for the purposes of proving his affirmative defense of race discrimination. IAF, Tab 14 at 6.  The appellant alleged in his motion to compel that other officers of a different race received lesser or no discipline for similar offenses. *Id.* at 7.  This discovery request is on its face directed at evidence that could be relevant and admissible concerning the appellant's affirmative defense of race discrimination and the appellant, as the party bearing the burden of proof on the claim, is entitled to obtain such evidence to support his claim.  *See Redd v. U.S. Postal Service*, 101 M.S.P.R. 182, ¶ 15 (2006).  As the appellant's motion to compel was reasonably calculated to lead to the discovery of admissible evidence, he was prejudiced in his ability to present his affirmative defense of race discrimination.  Therefore, the AJ abused her discretion and committed reversible error by denying the appellant's motion to compel.  *See id.*; *McGrath*, 83 M.S.P.R. 48, ¶¶ 9, 11, 14; *Beam v. Office of Personnel Management*, 71 M.S.P.R. 629, 632-33 (1996); *Kiser v. Department of Education*, 66 M.S.P.R. 372, 381-82 (1995).[2]

## ORDER

¶10    Accordingly, we VACATE the initial decision with regard to the appellant's affirmative defense of race discrimination and the penalty; the remainder of the initial decision is AFFIRMED.  We REMAND the appeal to the Washington Regional Office for further adjudication, consistent with this opinion, regarding the appellant's affirmative defense of race discrimination.  The AJ shall allow the appellant to complete discovery on his race discrimination claim and, if the

---

[2] The appellant also sought to compel the depositions of Officer Corey Richardson and Sergeant William Wilson. IAF, Tab 14 at 5-6.  However, the appellant's proffer as to the testimony of these witnesses does not establish that they are relevant fact witnesses concerning the charged misconduct or the appellant's defenses, and so the AJ did not abuse her discretion in denying the appellant's motion to compel with regard to these depositions.

7

appellant requests it, determine whether a hearing is warranted.[3]  The AJ shall issue a new initial decision addressing the discrimination claim and, if discrimination is not proved, may incorporate her prior findings with regard to the penalty.

FOR THE BOARD:

_____

William D. Spencer
Clerk of the Board
Washington, D.C.

---

[3] When there is no genuine dispute of material fact regarding discrimination, an evidentiary hearing on discrimination need not be conducted. *Redd*, 101 M.S.P.R. 182, ¶ 13.

UNITED STATES OF AMERICA
MERIT SYSTEMS PROTECTION BOARD
WASHINGTON REGIONAL OFFICE

ROBERT O. WHITE, SR,
               Appellant,

DOCKET NUMBER
DC-0752-07-0729-B-1

    v.

GOVERNMENT PRINTING OFFICE,
               Agency.

DATE: April 25, 2008

J Michael Hannon, Esquire, Washington, D.C., for the appellant.

Neal H. Fine, Esquire, Washington, D.C., for the agency.

**BEFORE**
Elizabeth B. Bogle
Administrative Judge

**INITIAL DECISION**

The Board vacated the initial decision in this appeal with regard to the appellant's affirmative defense of race discrimination and the penalty and affirmed the remainder of the initial decision. It remanded the appeal to the regional office to allow the appellant to complete discovery on his race discrimination claim and, if he requested it, to determine whether a new hearing was warranted. *White v. Government Printing Office,* 108 M.S.P.R. 355, ¶¶ 9, 10 (2008). For the following reasons, the agency action is again AFFIRMED.

Discovery

The Board held that the appellant's request and motion to compel disciplinary records of other police officers "could be relevant and admissible concerning the appellant's affirmative defense of race discrimination." The

appellant made the following requests for information concerning the disciplinary records of other officers: (1) all documents related to employee suspensions from January 2002 through present; (2) all cases in which any GPO officer has been disciplined for the manner in which he/she has relieved another officer from a post from January 1997 through present; and (3) any and all information and evidence as to other officers who have been proposed for certain discipline including ant discipline that was proposed but not issued.

The agency objected to the scope of the discovery sought by the appellant as "unreasonable." The agency requested that the scope of discovery be limited to the time period when the appellant was supervised by Lamont Vernon, proposing official, and Rafael Landreau, deciding official, and to disciplinary records of those police officers who had the same job descriptions and the same duties as the appellant and were charged by Mr. Vernon. The agency submitted the sworn declaration of Mr. Vernon stating he has proposed only two disciplinary actions since he entered on duty with the agency and identifying the employees involved (the appellant and another employee involved in the same incident).

An employee may establish a prima facie case of prohibited discrimination by introducing preponderant evidence to show that he is a member of a protected group, he was similarly situated to an individual who was not a member of the protected group, and he was treated more harshly or disparately than the individual who was not a member of his protected group. *Buckler v. Federal Retirement Thrift Investment Board*, 73 M.S.P.R. 476, 497 (1997). For other employees to be deemed similarly situated, the Board has held that all relevant aspects of the appellant's employment situation must be "nearly identical" to those of the comparator employee. *Spahn v. Department of Justice*, 93 M.S.P.R. 195, 202 (2003). Comparator employees must have reported to the same supervisor, been subjected to the same standards government discipline, and

engaged in conduct similar to the appellant's without differentiating or mitigating circumstances. *Id.*

By order dated April 2, 2008, I found that the appellant's requests for document production were overly broad and not reasonably calculated to lead to admissible evidence. I found that the appellant was entitled to copies of notices of proposed disciplinary actions for "failure to perform the duties of your position in an acceptable manner – failure to follow post orders" and the decisions on those actions taken against any employee serving in the position of Lead Police Officer, PQ-0083-06, during the three-year period that preceded the appellant's suspension (May 27, 2004 - May 27, 2007). I ordered the agency to furnish documents that were responsive to this revised request. The agency provided the sworn declaration of Kristina Kaptur, Human Capital Manager, stating that no Lead Police Officers were disciplined for that reason during the relevant time period.

The appellant has filed a motion for reconsideration arguing that discovery has been improperly limited and is contrary to a ruling contained in my summary of the prehearing teleconference. As an initial matter, the motion to compel was filed after the prehearing teleconference, and the conference summary did not contain a ruling on that motion. Because the appellant proposed to call as witnesses individuals whom he identified as comparator employees, I ruled (and summarized the ruling) that in lieu of testimony, the parties must submit agreed-upon evidence of the race of each employee, whether they were similarly situated, and what disciplinary action, if any, was taken in their cases. The parties were unable to submit this agreed-upon evidence because the appellant expanded the identified employees beyond those he originally proposed to call as witnesses. I have considered the appellant's argument that I improperly limited his discovery request. He argues that he has a "good faith belief" that discrimination exists based on "actual knowledge" that discipline was has been "executed disproportionately across races" beginning as far back as 2000. The appellant's

argument overlooks the fact that to prove that his suspension and reduction-in-grade was taken because of discrimination he must establish that he was treated more harshly or disparately than a similarly situated individual outside of his protected group.    Because the appellant's discovery requests do not seek information reasonably calculated to lead to admissible evidence of the agency's treatment of similarly situated individuals, the requests had to be revised.

The appellant, I find, has been allowed to complete discovery in accordance with the Board's remand order; however no documents were responsive to the discovery requests.    Therefore, I am unable to issue a new initial decision addressing the discrimination claim as instructed by the Board. The Board affirmed the part of the initial decision that found that the agency proved its charge and that the appellant did not prove his affirmative defenses of harmful error and reprisal for union activity.    The Board stated in the remand decision that if discrimination was not proved I could incorporate my prior penalty findings.    For the reasons contained in the initial decision and because there is no additional evidence of discrimination, I find that discrimination has not been proved.    I incorporate my prior findings with regard to the penalty and, for clarity, restate them below.

The penalty was reasonable

The Board will give deference to an agency's decision regarding a penalty unless that penalty exceeds the range of allowable punishment specified by statute or regulation or unless the penalty is so harsh and unconscionably disproportionate to the offense that it amounts to an abuse of discretion. *Lavette v. U.S. Postal Service*, 96 M.S.P.R. 239, 246-47 (2004), *citing, LaChance v. Devall*, 178 F.3d 1246, 1251 (Fed.Cir.1999); *Parker v. U.S. Postal Service*, 819 F.2d 1113, 1116 (Fed.Cir.1987).    This is because the agency has the primary discretion in maintaining employee discipline and efficiency. *Id., citing, Gmitro*

*v. Department of the Army,* 95 M.S.P.R. 89, 92 (2003), *aff'd,* 111 F.App'x 610 (Fed.Cir.2004).

Mr. Landrau testified that the appellant's misconduct was extremely serious because Building 41 is a secure facility where U.S. Passports are produced. Because of the appellant's misconduct, unauthorized personnel were allowed into the lobby area without proper screening. He considered that at the time this occurred, the appellant was detailed to a supervisory position. He noted that the appellant had no prior discipline. He asked the agency's human resources office if there were other similar cases, but that office knew of none, and he was not aware of any based on his own experience. He selected a penalty that allowed for the appellant's rehabilitation but underscored the importance of his duties as a security guard.

The appellant objected to Mr. Landrau's characterization of him as a supervisor because he was only acting (on detail) in that capacity. AF tab 4, subtab 4p. Supervisors may be held to a higher standard of conduct than non-supervisors because they hold positions of trust and responsibility. *Brown v. U.S. Postal Service,* 64 M.S.P.R. 425, 433 (1994). And this may be true even where the employee is only an acting supervisor. *See Gebhardt v. Department of the Air Force,* 99 M.S.P.R. 49, 57-58 (2005), *aff'd,* 180 F.App'x. 951 (Fed.Cir.2006). Mr. Landrau, I conclude, properly could consider as part of his penalty determination the fact that the appellant was an acting supervisor.

I have considered the appellant's allegation that Mr. Landrau was involved in the investigation and aware of information not produced to the appellant. In *House v. U.S. Postal Service,* 80 M.S.P.R. at 144-45, the Board found this to be a mitigating factor because it lent credence to the appellant's claim that the deciding official was engaged in an effort to "get rid of him." The appellant has made no such allegation in this case and there otherwise is no evidence that Mr. Landrau took any action to build a case for discipline against the appellant. Mr.

Landrau's alleged role in the investigation and production of information to the appellant is not a mitigating factor.

Because Mr. Landrau considered appropriate mitigating factors and chose a penalty that is reasonable for the offense, the Board must defer to the agency's penalty selection.

## DECISION

The agency's action is AFFIRMED.

FOR THE BOARD: _____

Elizabeth B. Bogle
Administrative Judge

## NOTICE TO APPELLANT

This initial decision will become final on **May 30, 2008**, unless a petition for review is filed by that date or the Board reopens the case on its own motion. This is an important date because it is usually the last day on which you can file a petition for review with the Board. However, if you prove that you received this initial decision more than 5 days after the date of issuance, you may file a petition for review within 30 days after the date you actually receive the initial decision. You must establish the date on which you received it. The date on which the initial decision becomes final also controls when you can file a petition for review with the Equal Employment Opportunity Commission (EEOC) or with a federal court. The paragraphs that follow tell you how and when to file with the Board, the EEOC, or the federal courts. These instructions are important because if you wish to file a petition, you must file it within the proper time period.

## BOARD REVIEW

You may request Board review of this initial decision by filing a petition for review. Your petition for review must state your objections to the initial decision, supported by references to applicable laws, regulations, and the record. You must file your petition with:

The Clerk of the Board
Merit Systems Protection Board
1615 M Street, NW.,
Washington, DC 20419

A petition for review may be filed by mail, facsimile (fax), personal or commercial delivery, or electronic filing. A petition for review submitted by electronic filing must comply with the requirements of 5 C.F.R. § 1201.14, and may only be accomplished at the Board's e-Appeal website (https://e-appeal.mspb.gov).

If you file a petition for review, the Board will obtain the record in your case from the administrative judge and you should not submit anything to the Board that is already part of the record. Your petition must be filed with the Clerk of the Board no later than the date this initial decision becomes final, or if this initial decision is received by you more than 5 days after the date of issuance, 30 days after the date you actually receive the initial decision. If you claim that you received this decision more than 5 days after its issuance, you have the burden to prove to the Board the date of receipt. You may meet your burden by filing evidence and argument, sworn or under penalty of perjury (*see* 5 C.F.R. Part 1201, Appendix 4) to support your claim. The date of filing by mail is determined by the postmark date. The date of filing by fax or e-mail is the date of submission. The date of filing by personal delivery is the date on which the Board receives the document. The date of filing by commercial delivery is the date the document was delivered to the commercial delivery service. Your petition may be rejected and returned to you if you fail to provide a statement of how you served your petition on the other party. If the petition is filed by e-mail,

and the other party has elected e-Filing, including the party in the address portion of the e-mail constitutes a certificate of service.

## EQUAL EMPLOYMENT OPPORTUNITY COMMISSION REVIEW

If you disagree with the Board's final decision on discrimination, you may obtain further administrative review by filing a petition with the EEOC no later than 30 calendar days after the date this initial decision becomes final.   The address of the EEOC is:

<div align="center">
Office of Federal Operations<br>
Equal Employment Opportunity Commission<br>
P.O. Box 19848<br>
Washington, D.C.  20036
</div>

## JUDICIAL REVIEW

If you do not want to file a petition  with the EEOC, you may ask for judicial review of both discrimination and nondiscrimination issues by filing a civil action.  If you are asserting a claim under the Civil Rights Act or under the Rehabilitation Act, you must file your appeal with the appropriate United States district court as provided in 42 U.S.C. § 2000e-5.  If you file a civil action with the court, you must name the head of the agency as the defendant. *See* 42 U.S.C. § 2000e-16(c).   To be timely, your civil action under the Civil Rights Act, 42 U.S.C. § 2000e-16(c) must be filed no later than 30 calendar days after the date this initial decision becomes final.  If you are asserting a claim under the Age Discrimination in Employment Act, your claim must be filed with the appropriate United States district court as provided in 29 U.S.C. § 633a(c).   In some, but not all districts you may have up to 6 years to file such a civil action. *See* 28 U.S.C. § 2401(a).

If you choose not to contest the Board's decision on discrimination, you may ask for judicial review of the nondiscrimination issues by filing a petition with:

The United States Court of Appeals
for the Federal Circuit
717 Madison Place, NW.
Washington, DC 20439

You may not file your petition with the court before this decision becomes final. To be timely, your petition must be <u>received</u> by the court no later than 60 calendar days after the date this initial decision becomes final.

If you need further information about your right to appeal this decision to court, you should refer to the federal law that gives you this right. It is found in Title 5 of the United States Code, section 7703 (5 U.S.C. § 7703). You may read this law, as well as review the Board's regulations and other related material, at our website, <u>http://www.mspb.gov.</u> Additional information is available at the court's website, <u>www.cafc.uscourts.gov</u>. Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's <u>Rules of Practice</u>, and Forms <u>5</u>, <u>6</u>, and <u>11</u>.

## NOTICE TO AGENCY/INTERVENOR

The agency or intervenor may file a petition for review of this initial decision in accordance with the Board's regulations.

# EXHIBIT 2

UNITED STATES OF AMERICA
MERIT SYSTEMS PROTECTION BOARD
NORTHEASTERN REGIONAL OFFICE

- - - - - - - - - - - - - - - - - x
                                   :
ROBERT O. WHITE, SR.               :
                                   :
          Appellant,               :
                                   :
     v.                            :   Docket No.
                                   :   DC-0752-07-0729-I-1
U.S. GOVERNMENT PRINTING OFFICE    :
                                   :   Before Administrative
          Agency.                  :   Law Judge Bogle
                                   :
- - - - - - - - - - - - - - - - - x

                         Hearing Room 1, Suite 205
                         1800 Diagonal Road
                         Alexandria, Virginia

                         Wednesday, 20 August 2007

          THE HEARING in the above-entitled matter commenced

at 10:37 a.m., pursuant to notice.

BEFORE:

          ELIZABETH BOGLE, Administrative Law Judge

Page 2

APPEARANCES:

On behalf of the Appellant:

        J. MICHAEL HANNON, ESQ.

        Hannon Law Group, LLP

        1901 18th Street, NW

        Washington, DC  20009

On Behalf of the Agency:

        NEAL H. FINE, ESQ.

        Special Assistant for Labor

        Office of the General Counsel

        U.S. Government Printing Office

        732 North Capitol Street, NW

        Washington, DC  29491

Page 3

C O N T E N T S

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Lamont Vernon | 5 | 30 | 68 | 70 |
| Rafael Enrique Landrau | 73 | 79 | | |
| Darnelle Everett | 101 | 111 | 122 | 123 |
| Robert O. White, Sr. | 126 | 159 | 185 | 186 |

| AGENCY EXHIBITS: | PAGES |
|---|---|
| 1  Daily activity log, number 302, shift 1 | 26 |
| 2  Unidentified | 164 |
| 4  Snapshot of Officer White's sent folder | 165 |

APPELLANT'S EXHIBITS:

None.

Page 4

1                    P R O C E E D I N G S

2            JUDGE BOGLE:  The Regional Office of the Merit

3    System Protection Board has before it an appeal filed by

4    Robert O. White, Sr., from an action taken by the Government

5    Printing Office.

6            My name is Elizabeth Bogle.  I am the

7    Administrative Judge.  Mr. White is represented by J. Michael

8    Hannon and the Agency by Neal H. Fine.  Before we went on the

9    record this morning, we had extensive settlement discussions

10   but were unable to reach agreement.  We had some discussion

11   concerning what both parties, I guess, regard as failure to

12   receive proper discovery responses.

13           However, as the hearing order states, discovery

14   closes on the day of pre-hearing conference, and I am

15   therefore not willing to entertain any further discovery

16   issues.

17           If either party feels they got improper responses

18   to discovery and then they were harmed by that, they can

19   explain that to me at the conclusion of the witness's

20   testimony and tell me what sanctions, if any, should be

21   imposed.

22           So are we ready for the testimony of our first

23   witness?

24           Do you have any objection to taking an oath?

25           THE WITNESS:  No.

Page 5

1            JUDGE BOGLE:  If you would stand please, and raise

2    your right hand.

3    Whereupon,

4                        LAMONT VERNON

5    was called as a witness and, having been first duly sworn,

6    was examined and testified as follows:

7            JUDGE BOGLE:  Please be seated and state your name

8    and your title.

9            THE WITNESS:  Lamont Robert Vernon, Director of

10   Security Programs.

11                   DIRECT EXAMINATION

12           BY MR. FINE:

13   **Q    Good morning, Mr. Vernon.**

14        **How long have you held the position at GPO of**

15   **Director of Security programs?**

16   A    I've held that position since 13 May 2007 -- that

17   current title.

18   **Q    Did you have a title at GPO before that?**

19   A    Yes, before I got promoted, sir, I was the security

20   officer for approximately one year.

21   **Q    And what's the difference between those two**

22   **positions?**

23   A    I took on some added responsibility.  I now oversee

24   the physical security branch.

25   **Q    And what is the physical security branch?**

Page 6

1     A     They oversee the alarms, locks, doors,

2   vulnerability assessments for GPO property.

3     **Q     And how big is the GPO property?**

4     A     It currently contains four buildings and we have

5   our ultimate coop location in Laurel, Maryland.

6     **Q     And prior to coming to GPO, I guess it's been**

7   **almost two years now.  What position did you hold before**

8   **that?**

9     A     I spent 20 years in the Air Force, and I obtained

10   the rank of chief master sergeant while I was the security

11   force manager.  I was responsible for all law enforcement

12   security, anti terrorism and administrative functions to

13   include training.

14     **Q     Was that a particular Air Force base?**

15     A     That was at Turkey, and Hill Air Force Base,

16   Incirlik Air Base, Turkey, and Hill Air Force Base, Utah, my

17   last two assignments.

18     **Q     And did you have a position at the Pentagon before**

19   **you came to GPO?**

20     A     Yes, sir.  I was a special agent, anti-terrorism

21   officer, physical security specialist at the Pentagon Force

22   Protection Agency for approximately 15 months.

23     **Q     And how many facilities were you responsible for**

24   **there?**

25     A     I was responsible for conducting threat

Page 7

1   vulnerability and criticality assessments for roughly 117 DoD

2   facilities not on a military installation in the national

3   capital region.

4        **Q    Now, Building 4 where GPO produces passports,**

5   **without disclosing anything that you feel is confidential,**

6   **has the security to that building been upgraded in the past**

7   **several years?**

8        A    Yes, in the past approximately six months it has

9   been dramatically upgraded.

10       **Q    In the lobby, has there been improvements in the**

11  **lobby to the security?**

12       A    Yes, what we did, we conducted a physical security

13  assessment of the facility and we determined there was some

14  vulnerabilities in the lobby in the way it was initially

15  established.  So what we were able to do, we were able to

16  move the monitor that is used during scanning all incoming

17  packages.  The monitor was in a bad location.  We were able

18  to move the monitor back to the actual desktop so the officer

19  wouldn't have to get up and move.

20            We also redid the entry escort procedures; who can

21  escort into the facility.  At one time, it was all

22  supervisors on the second floor.  Now we have a list of names

23  who can only authorize escort of personnel into that

24  facility.  We established their own escort official badge,

25  escort badge.  We have a visitor's badge, and we have a

Page 8

1    visitor's badge that requires an escort at all times.  And

2    then we have a visitor's badge that requires no access,

3    because they have a security clearance.

4            Those are some of the upgrades in the main lobby,

5    to include we added an additional person.

6        **Q    And there's a magnetometer in that lobby?**

7        A    Yes.  There's a magnetometer and an X-ray machine,

8    a scanner.

9        **Q    Now, those restrictions on visitors and badges.**

10   **Are those found in the main building across the street?**

11       A    Yes, sir; not the badges, but the X-ray machine and

12   the magnetometer.

13       **Q    Okay, but the requirements of who can go where and**

14   **what floors, those are not found, you said, in the main**

15   **building?**

16       A    No.  It's only on Building 4.  Those are the added

17   procedures for Building 4.

18       **Q    Now, on October 20, you issued new post orders**

19   **for -- you call it Post 41?**

20       A    Yes, sir.

21       **Q    Post 41 covers what post?**

22       A    It covers the access control point at Building 4.

23   It controls entry to that facility.

24       **Q    And those were revised post orders?**

25       A    Yes, sir.

1      **Q    For the record, we're talking about Agency Response**

2    **Exhibit 4J.  Why did you issue the new post orders?**

3      A    The new post orders that issued, there was an IG.

4    The Inspector General for the Agency conducted an inspection

5    of Post 41, an officer, because it was determined that he had

6    left his post.  And after they finished the inspection, they

7    gave me the package for corrective actions.  And I had

8    determined that the officer didn't do anything wrong.  As a

9    matter of fact, he was in compliance with his post orders.

10   The post orders needed to be changed, and the post orders

11   allowed the officer to leave the post every 20 minutes to

12   conduct random inspections outside, the outside environment

13   on G and Park Place.

14            And at that time he just happened to go out there

15   to do one of those random inspections, and somebody walked

16   into the facility.  So, I found the officer had done nothing.

17    The officer was not at fault and we had a bad post order, so

18   I had to re-write it.

19      **Q    And was the new post order that you issued on**

20   **October 20, was it dramatically different than the old post**

21   **order?**

22            MR. HANNON:  Objection.  They speak for themselves.

23            JUDGE BOGLE:  I'll permit it.

24            BY MR. FINE:

25      **Q    I'm sorry.  Your answer?**

Page 10

1     A    No, sir.

2         **Q    What was the difference?**

3     A    The major difference was I removed that statement

4    out of the post order that to do those random inspections

5    every 20 minutes outside the facility.  That was major, but

6    for the most part it was just cosmetics.  They hadn't been

7    updated in a while.  Their post orders were all in one set

8    and I was accustomed to where I came from in the Air Force.

9    Each post stands alone should only have to be a post order

10   for that post.  And there were post orders in the post order

11   that covered everything, posts that we no longer man, so I

12   determined that they all needed to be rewritten.  And I mean,

13   the post for that post just be only for that post.  You

14   shouldn't have 15 post orders for that one post.  You should

15   only have Post 41 post orders.

16        **Q    Now, did the old post order require that employees**

17   **and visitors go through a magnetometer?**

18   A    Yes, sir.

19        **Q    Did the old post order require that packages go**

20   **through an X-ray machine?**

21   A    Yes, sir.

22        **Q    And did it apply to everybody that came into the**

23   **building?**

24   A    All GPO employees, visitors, contractors,

25   messengers, vendors, so on and so forth; yes, sir.

1    **Q    Did the old post order require that visitors first**

2    **report to the main police office at 732 North Capital Street?**

3    A    I believe so, sir.

4    **Q    Were there any exceptions in the old post orders**

5    **for friends of officers?**

6    A    No, sir.

7    **Q    How did you develop these post orders?**

8    A    I was new to the Agency, sir.  So what I did is I

9    contacted the OICs and I said, you know, we're going to redo

10    the post orders because they're outdated.  I need some

11    assistance.  And what I recommend is that you help.

12        Your sergeants will help and then let's get a

13    representative from each shift to assist in writing the post

14    orders, because they have first knowledge.  They sit at that

15    post every day.

16        Who better can write the post orders than them,

17    themselves?  And the OICs from each shift provided me a name

18    to be my point of contact for that shift.

19    **Q    OIC is Officer-in-Charge?**

20    A    Officer-in-Charge, sir, the lieutenants or acting

21    lieutenants.  Yes, sir.

22    **Q    And on August 23, you sent an e-mail to**

23    **12 recipients, that's Agency Tab 4M.  Gregory Bennett, James**

24    **Oldach, Robert White, Everett Darnelle, Alvin Hardwick; those**

25    **names came from where, sir?**

Page 12

1    A    Well, Hardwick is the union president, so he's an

2    automatic, but the other names were given to me by the

3    officers in charge for the respective shifts.

4    Q    Okay.  Did Officer White provide you any feedback

5    to your request for comments and/or recommendations?

6    A    He provided some oral recommendations.  Yes he did,

7    sir.

8    Q    Did you adopt any of those?

9    A    I can't recall, but I can tell you that all the

10   recommendations that were provided were adopted.  All the

11   written recommendations that were provided were adopted,

12   because I was not familiar with the post.  They were.  So I

13   adopted them.  Yes, sir, if they made sense I adopted them.

14   Yes, sir.

15   Q    Okay, thank you.

16        Now, Mr. Hardwick, you said, was the union

17   president.  Did he provide feedback?

18   A    Yes, sir.  Post 34.  He basically rewrote it.

19   Post 34 round is the post order for the command center,

20   control center, and a lot of good input.  Yes, sir.

21   Q    Did Officer Hardwick file an unfamiliar practice

22   charge alleging bypassing the union when you went to the

23   employees?

24   A    No, sir.

25   Q    Did he file a grievance alleging that you had

Page 13

1    bypassed the union?

2        A    No, sir.

3        Q    Now, since you've been the chief of security, how

4    has final orders been communicated to the officers?

5        A    Through e-mail, sir.

6        Q    Have they been sent to all officers?

7        A    Yes, sir.

8        Q    Do all officers have e-mail accounts?

9        A    Yes, sir.

10       Q    Has any officers told you that they don't like to

11   use their e-mail accounts?

12       A    Yes, sir.

13       Q    Did Officer White ever advise you he does not use

14   e-mail and not to send him anything?

15       A    No, sir.

16       Q    Now, were the new post orders at Exhibit 4J, were

17   they printed up and distributed eventually to the new post?

18       A    Yes, sir.

19       Q    And how are they distributed?

20       A    Sgt. Dailey was instructed to deliver them to all

21   the posts, sir.

22       Q    How?

23       A    Because he was responsible for making the binders

24   and actually putting them in there, making them a nice neat

25   binder.

Page 14

1      Q    Okay, so these were dated October 20, 2006.  Were

2    they supposed to be in effect as of that date?

3      A    Yes, sir.

4      Q    You put out other post orders besides Post 41 on

5    that date?

6      A    Yes, sir.

7      Q    The key PO has a number of entrances where there

8    are police officers.  Is that correct, sir?

9      A    At that time, sir, yes, sir.

10      Q    Do all the entrances have magnetometers and X-ray

11    machines?

12      A    All but Post 50, sir.  Post 50 controls access to

13    the parking lot.

14      Q    So except for Post 50, are all visitors, employees,

15    subject to the same basic concept of going through an X-ray

16    machine, being X-rayed, showing ID?

17      A    Yes, sir.

18      Q    Could you tell us when you learned of the incident

19    that occurred on October 29, 2006, involving Officer White?

20      A    That following morning.

21      Q    And how were you advised of this incident?

22      A    I'm not sure if he was acting lieutenant, but it

23    was a Lt. Washington.  I was notified by him, sir.

24      Q    And what did he advise you?

25      A    That we had an incident in Building 4 that involved

Page 15

1   Officer Everett.  He was in an altercation with a girlfriend.

2        Q    **Was there a security breach that they took?**

3        A    I think that's all he told me.  I mean, that's all

4   I was informed of at that time.  He said I should look at the

5   videotape, the DVR tape.

6        Q    **And so what did you do then?**

7        A    I went downstairs, watched the DVR tape and

8   determined that I had a violation of my security policies and

9   procedures.

10        Q    **Now, when you say you went downstairs, where did**

11   **you go?**

12        A    To our control room center, sir.

13        Q    **Now, what does the control room have that would**

14   **allow you to look at a video?**

15        A    Okay.  It monitors all the alarms and the closed

16   circuit televisions that the Agency has that it utilizes.

17   That's where the DVR tapes, anything that happens with camera

18   coverage for 29 days is stored on a DVR tape.  And we would

19   be able to go down there with the assistance of the alarm

20   maintenance monitor individuals.  Because my offices at that

21   time didn't have the capacity to do that.  So it was password

22   protected.  So we utilized the individuals who basically

23   installed the system to review the tape format.

24        Q    **And so you looked at the video of the incident that**

25   **morning then?**

Page 16

1    A    Yes, sir.

2    **Q    By yourself?**

3    A    No.  I believe it was myself, Sgt. Dailey,

4  Cpl. Turner, Lt. Washington, my chief fiscal security

5  officer, Mr. Williams, and Mr. Landrau.

6    **Q    And who is Mr. Landrau?**

7    A    Mr. Landrau is my immediate supervisor.

8        MR. FINE:  Now, at this time, put in the tape we

9  have.

10        JUDGE BOGLE:  I have the first one in there.

11        MR. FINE:  We've got one in there already?

12        JUDGE BOGLE:  Is that what you want?

13        MR. FINE:  Yes.

14        JUDGE BOGLE:  All right.  Logistically, you want

15  him to view this and tell us what he is seeing?

16        MR. FINE:  Tell you what he is seeing, right.

17        JUDGE BOGLE:  Logistically, I'm not sure how we're

18  going to do this.  I apologize for not having a better system

19  here.

20        For the record, I have a laptop and a CD is in it.

21   Mr. Hannon, you are welcome to come up and join us.  I don't

22  have a way of showing it that will start it.  Do you need it?

23        MR. HANNON:  We need it to go back a ways.

24        (Pause while counsel adjusts computer.)

25        JUDGE FINE:  Everybody thinks they can do this

Page 17

1    better than I.

2            Let's go off the record while we see if we can't

3    get this up.

4            (Off the record.)

5            JUDGE FINE:  Can you see that?

6            THE WITNESS:  Yes, ma'am.

7            JUDGE FINE:  All right.  For the record, we are

8    putting the disk, both attorneys, the appellant and the

9    witness and I are viewing it.

10           Mr. Fine?

11           BY MR. FINE:

12       Q    **Okay, now, where would Officer White be at this**

13   **point in time?**

14       A    Well, the monitor, so we can monitor it.  But he

15   could monitor it where he is at.  With this scanner, it has

16   the ability to detect metal, metallic objects, and stop at

17   freeze frame.

18       Q    **Now, that desk that was sitting in the corner, is**

19   **that the officer's desk?**

20       A    Yeah, that's it.

21           MR. HANNON:  May I interrupt for just a moment,

22   Judge?

23           JUDGE BOGLE:  Yes.

24           MR. HANNON:  Because I think that we can make the

25   video full screen.

Page 18

1           JUDGE BOGLE:  Do you need it to be a full screen?

2           MR. HANNON:  I do.  We'd all be able to see it

3     easier.

4           JUDGE BOGLE:  Well, you have a copy of this.  So

5     all we need is for the witness to tell us what he sees here,

6     and you've got your own copy.  So, let's proceed.

7           This is the desk you were referring to?

8           THE WITNESS:  Yes.

9           JUDGE BOGLE:  All right, lower right hand corner.

10          MR. FINE:  Officer White is at that point here?

11          THE WITNESS:  He's sitting on his post.

12          MR. FINE:  Okay.

13          BY MR. FINE:

14     Q    **Back there is the magnetometer?**

15     A    The magnetometer with the turnstiles are up with

16     the X-ray machine off to the right.  The monitor is on top of

17     the X-ray machine.

18     Q    **Now, before you get to there, is that just the door**

19     **outside?  Or is there another lobby beyond that?**

20     A    No.  That's the outside door.  And then right here,

21     beyond the turnstile, is the lobby.  I get there from North

22     Capitol Street.

23     Q    **I see.  We know that Officer White -- do you know**

24     **what time he got to that post?**

25     A    No.

Page 19

 1            MR. FINE:  Will you stipulate Mr. Hannon that

 2    Mr. White had arrived at the post at 5:30?

 3            MR. HANNON:  I don't know, Mr. Fine.  What time are

 4    we showing up there?

 5            JUDGE BOGLE:  7:17.

 6            THE WITNESS:  7:17, we've got an employee that just

 7    got off.

 8            MR. HANNON:  I'm sorry.  8:07:17?

 9            JUDGE BOGLE:  It's the marker on the tape, 8:40.

10            THE WITNESS:  8:40, because I'm following this.

11    All right, and right now we have officer come through with

12    two females.

13            MR. FINE:  Can we stop it right there?

14            JUDGE BOGLE:  Do you need me to back up?

15            BY MR. FINE:

16        Q    Right.  So what we need to know is when he comes

17    through there are some red lights, I notice.  What were

18    those?

19        A    The red lights indicated there were some metallic

20    objects and the position of the individual walking through

21    where it was positioned at.  If it's high, it tells you it

22    was up in the shoulder area, depending on the height of the

23    individual walking through.  It kind of gives you an idea

24    where you should be searching for metallic objects.

25            JUDGE BOGLE:  You need it backed up.  Is that

Page 20

1    right?

2          MR. FINE:  Right, because that's the point in time

3    that you said earlier was undisputed as to when

4    Officer Everett and Officer White.

5          MR. HANNON:  Is this fine?

6          THE WITNESS:  Yes.  All right.  Officer Everett

7    just walked in with some hand-carried items with two female

8    individuals.  None of them had GPO entry credentials.  The

9    magnetometer did go off, so it determined that they had some

10   type of metallic objects in that location.  This individual

11   right here is carrying a purse that must go through the X-ray

12   scanner.

13         BY MR. FINE:

14     **Q    Now, Officer White was carrying this plastic bag**

15   **full of food?**

16     A    Yes.

17     **Q    Officer Everett Bennett?**

18     A    I'm not sure what it was.  I just know it was

19   hand-carried.

20     **Q    Should that have gone through the X-ray machine?**

21     A    Yes.  The policy on that, it doesn't go through the

22   X-ray machine.  When you get a visit, we open it up, and

23   that's what should have happened.

24     **Q    Now, where's Officer White all of the sudden?**

25     A    He was behind the podium.  He has since departed

Page 21

1    the facility.

2            MR. HANNON:  At this particular point in time?

3            THE WITNESS:  Yes.

4            MR. FINE:  Could you back up?

5            THE WITNESS:  There's Officer White.

6            MR. FINE:  The women are still there.

7            THE WITNESS:  He grabs his hat and departs the

8    facility.

9            MR. FINE:  All right.

10           MR. HANNON:  Whoever is at the desk, here's

11   Officer White.

12           THE WITNESS:  Here is Officer White right here, no

13   hat.

14           MR. HANNON:  He gets his hat.

15           THE WITNESS:  Right, he gets his hat and he departs

16   the facility.

17           MR. HANNON:  Okay, now he's gone, so that's as far

18   as we can tell.

19           JUDGE BOGLE:  Okay.  Let's continue, please.

20   Anything else for the witness?

21           MR. FINE:  Yes.

22           BY MR. FINE:

23       Q    Now, Mr. Vernon, we just watched the video.  What

24   should acting Sgt. White have done at that point in time when

25   Officer Everett and the two women came in?

Page 22

1       A    At the time?

2            MR. HANNON:  I'm going to object.  It calls for a

3   conclusion that he has some rules and regulations that apply.

4    I think it's for you to decide what he should have done.

5            JUDGE BOGLE:  I'll permit the question.

6            THE WITNESS:  He was the acting access.  He was the

7   controlling access to Building 4, and what he should have

8   done was identify individuals with Officer Everett through

9   their GPO credentials.

10           If they were visitors, had them remain in the

11  lobby, contacted the second floor and had a supervisor

12  respond to sign them in to the facility.  Now, once they went

13  past the turnstiles, their hand-carried items should have

14  been inspected.  And as they went through the magnetometer,

15  if it went off, he should have hand-wanded them for metallic

16  objects.

17           BY MR. FINE:

18      Q    Now, you just watched the video.  Did

19  Officer Everett hand-wand either of the two women?

20      A    No, sir.

21      Q    Does it show on the video that he checked any

22  identification of the two women?

23      A    No, sir.

24      Q    Does it show on the video that he X-rayed the purse

25  of either of the women?

Page 23

1      A    No, sir.

2      **Q    Okay, so on October 30, now, you've seen the video.**

3    **What did you do next?**

4      A    After seeing the video, I requested that the IG

5    Inspector General's office conduct an investigation of the

6    incident.

7      **Q    Why did you ask that the IG do this?**

8      A    My police department has no internal affairs

9    section and I didn't want to risk.  I didn't want to

10    investigate myself and give the appearance of something that

11    I was trying to cover up, so I requested the IG conduct the

12    investigation.

13      **Q    And did the IG produce an investigative report for**

14    **you?**

15      A    Yes, sir.

16      **Q    And did you eventually review that report?**

17      A    Yes, sir.

18      **Q    And was that report taken in consideration in**

19    **determining whether corrective action should be taken?**

20      A    Yes, sir.

21          MR. FINE:  Now, I'd like to show you what has been

22    marked as GPO Exhibit 1.  It's identified as a daily activity

23    log, number 302, shift 1.

24              (Agency Exhibit No. 1 was marked for

25              identification.)

Page 24

1          BY MR. FINE:

2      Q    **Could you tell us what the daily activity log**

3  **consists of and who does it?**

4      A    All right.  The daily activity log consists of a

5  chronological listing of events that happened throughout the

6  day.  It runs for 24 hours.  It starts on the first shift and

7  we close it up on the third shift.  The control center

8  corporal or office assigned to the control center is

9  responsible for producing it under the direction of the OIC

10  for that day or the sergeant.  It may be delegated down to

11  the sergeant.

12      Q    **Now, at the top of that daily log, who does it say**

13  **the officer in charge was?  First shift?**

14      A    Sgt. White.

15      Q    **Now, at 0700 there's a paragraph.  Could you read**

16  **that please for us?**

17      A    Yes.  "All officers were instructed to remain alert

18  at all times and report any suspicious activity or persons

19  that they may encounter or observe.  Any activity not covered

20  by instruction, the officer is to report immediately to the

21  OIC.  All vehicles and persons entering the facility are to

22  be inspected and/or screened.  All personnel are to possess

23  the proper identification as well as parking decal.

24      Q    **All right.  Now, who would have made that**

25  **statement?**

Page 25

1     A    The OIC.

2     Q    **Now, on second shift that day, who was the OIC?**

3     A    The RC was Lt. Cross.

4     Q    **Only he's listed as being absent.  Sgt. Wilson, is**

5  **he listed there?**

6     A    Sgt. Wilson is listed as the sergeant.  It's listed

7  as him being off, so the acting OIC was Sgt. Wilson.

8     Q    **And acting Sgt. White was still on duty on second**

9  **shift then?**

10    A    Yes, sir.

11    Q    **Are there written orders or procedures for the OIC?**

12    A    No, sir.

13    Q    **Under what circumstances would the OIC or should**

14 **the OIC leave the main building to provide aid to an officer**

15 **being assaulted?**

16    A    If an officer is being assaulted, he should respond

17 immediately.  And he should also have other available units

18 respond also for back-up.

19    Q    **Now, would it be proper for the OIC to leave the**

20 **main building unattended?**

21    A    No.  For diversionary tactics, he should never

22 leave a post that controls immediate access to the vicinity

23 unprotected.

24    Q    **Did the IG Investigation of the incident on**

25 **October 29, did that have any references to the actions of**

Page 26

1    **Sgt. Wilson that night?**

2              MR. HANNON:  Objection to the form of the question.

3              JUDGE BOGLE:  I'll permit it.

4              THE WITNESS:  No, sir.

5              BY MR. FINE:

6         **Q    Did you take any action against Sgt. Wilson for his**

7    **actions that night?**

8         A    No, sir.

9         **Q    Why not?**

10        A    It was found that he had done nothing wrong.  I'll

11   use it as a training opportunity, but as far as being neglect

12   in any of his actions, he had done nothing wrong.

13        **Q    I'd like to show you what is in the Agency's**

14   **responses Tab 4N.  It's called "entry departure register."**

15             **Could you identify that for us please?**

16        A    This entry departure looks like the log we log our

17   visitors into.  It has since changed.  So, I'm not sure.

18        **Q    Where was that kept?**

19        A    It's kept at the main lobby, and we have one also

20   on Building 4.

21        **Q    Now, it's got four entries in it.  The two women**

22   **enter at 6:13.  Is there an entry for two women around 6:13?**

23        A    No, sir.

24        **Q    Now, the building for post orders refer to have the**

25   **statement, "All other visitors are to be referred to main GPO**

1  at North Capitol Street."

2      A    Yes, sir.  There are times that an individual will

3  show up there and he needs to go across the street.  That

4  pertains to only visitors visiting Building 4.

5      Q    Okay.  And if the visitors, these two women, if

6  they had gone, would their names show up on that entry

7  visitor, entry departure register?

8      A    If they visited GPO, it would have.

9      Q    When you signed in, was a visitor given a badge of

10  some kind?

11      A    Yes, he was given a GPO visitor's badge.

12      Q    Now, after an employee or visitor comes through the

13  magnetometer into the lobby, is an employee aware of it going

14  in?

15      A    They go anywhere within Building 4 at that time.

16  They can go anywhere within Building 4.  Our passport

17  operation is produced on the second floor.  And if they have

18  access to the second floor, they can go to the second floor.

19   They have that access.

20      Q    Does the officer at the lobby, does he allow the

21  control the entrance to that second floor?

22      A    Yes, sir.  At the podium, to the right of the

23  podium on the wall there's a buzzer.  After they clear

24  through all the turnstiles, properly screened, properly

25  identified, is the buzzer to the door.  And at that point,

Page 28

1   they have access to the floors.

2       **Q    Now, on February 6, I'd like to show you a letter**

3   **dated February 6, 2007, to Officer Robert O. White.  Is this**

4   **the letter you sent to Officer White?  4-G, Your Honor.**

5       A    Yes, sir.

6       **Q    Why did you propose the discipline of**

7   **Officer White?**

8       A    He failed to enforce GPO standards and policies,

9   and I needed to hold him accountable.

10      **Q    What exactly do you believe he failed to do?**

11      A    He failed to properly identify, screen, the two

12  female individuals in Building 4.

13      **Q    And your proposal was for what form of discipline?**

14      A    Initially, it was for removal.

15      **Q    Now, this letter of February 6 was not for removal.**

16   **Why did you change your mind?**

17      A    I scheduled a meeting with the general counsel and

18  the human capital.  They provided me enough information to

19  make an informed decision; and, based on he had no prior

20  history of this type of behavior, I decided demotion was the

21  appropriate corrective action.

22      **Q    Why did you feel his actions were so serious prior**

23  **to demotion?**

24      A    The criticality of the assets that we are paid to

25  protect in Building 4.  I know for a fact there are human

Page 29

1   intelligence sources trying to gain access to that technology

2   and I need to send a clear message that this type of behavior

3   and dereliction of duty would not be tolerated.

4       **Q      Now, when you say that he created a passport, what**

5   **is that?**

6       A      It's the passport that we produced for Department

7   of State.  It's the new E-passport.  It replaced a legacy

8   passport, the old passport.  This passport now has a chip in

9   it -- new technology -- and there's a lot of people that

10  would like to get their hands on it that are not friendly to

11  the United States.

12      **Q      What weight did you place on Mr. White's race in**

13  **your deliberative process?**

14      A      What?  I'm sorry?

15      **Q      Race, r-a-c-e, race.**

16      A      None.

17      **Q      What weight did you place on Mr. White's membership**

18  **in the Fraternal Order of Police?**

19      A      None.

20      **Q      Prior to this incident, had Mr. White advised you**

21  **that his e-mail accounts were not working?**

22      A      No, sir.

23      **Q      On August 25, Officer White was detailed to a**

24  **supervisory police officer position for 89 days.  Is that**

25  **true?**

Page 30

1     A    Yes, sir.

2     **Q    Why was that done?**

3     A    To give him an opportunity for a potential

4  promotion, and it also filled a void I had.  I needed a

5  supervisor on first shift.

6     **Q    Was he detailed for just shift one, or how does**

7  **that work?**

8     A    He was detailed for 89 days, sir, all three shifts.

9     **Q    Regardless of the shift he worked?**

10    A    Yes, sir.

11    **Q    Were there limitations placed on his duties as**

12 **sergeant?**

13    A    No, sir.

14    **Q    So, you were sergeant, first shift and second**

15 **shift, on October 29.  Is that true?**

16    A    Yes, sir.

17         MR. FINE:  No further questions at this point, Your

18 Honor.

19         JUDGE BOGLE:  Mr. Hannon, any cross?

20         MR. HANNON:  Yes, Your Honor.

21                    CROSS-EXAMINATION

22         BY MR. HANNON:

23    **Q    Good morning, Chief Vernon.**

24    A    Good morning, sir.

25    **Q    We've met, have we not, sir?**

Page 31

1    A    Yes, sir.

2    **Q    Okay.  I just want to ask you a few questions about**

3    **your direct, and then we'll go into some other areas about**

4    **your testimony, if you can.**

5    A    Yes, sir.

6    **Q    You were talking about the security changes that**

7    **were made in the lobby of Post 41, and one of those changes**

8    **was to take the monitor above the X-ray machine and put it**

9    **over at the guard's desk.  Is that correct?**

10   A    Yes, sir.

11   **Q    Now, on the day that this incident, where was that**

12   **monitor?**

13   A    It was sitting on top of the X-ray machine.

14   **Q    So, that change had not been made on this date?**

15   A    No, sir.

16   **Q    And the reason that the monitor was moved over to**

17   **the guard's desk is so that the guard could maintain that**

18   **position while providing security at Post 41.  Is that**

19   **correct?**

20   A    It's a true statement; yes, sir.

21   **Q    Because he couldn't adequately see the monitor from**

22   **where the guard's desk is?**

23   A    He could see it, sir, but he could observe it

24   better in front of him.

25   **Q    Of course.**

Page 32

1      A    Yes, sir.

2      Q    **And in terms of whether there's a breach of the**

3   **magnetometer, I think you showed the judge that lights come**

4   **on.**

5      A    Yes, sir.

6      Q    **So, the guard being back at that desk can monitor**

7   **that issue as well.**

8      A    Yes, sir.

9      Q    **And there's 100% I.D. at Post 41, correct?**

10     A    Yes, sir.

11     Q    **So the individual who is coming in must present an**

12  **identification badge to the officer at post.  Is that right?**

13     A    Well, what he does, sir, he actually scans it on

14  the card reader.  And then what happens is -- use me for

15  example -- I'd scan my card and my picture will come up on

16  his monitor.  That monitor is on his desk.

17     Q    **And that's a new technology that had been developed**

18  **in terms of beefing up security?**

19     A    No, sir.  That was there previously, sir.

20     Q    **Was that operating on the day of this incident?**

21     A    Yes, sir.

22     Q    **Are you sure?**

23     A    I wasn't notified otherwise.  Yes, sir, it was

24  operational.

25     Q    **Well, what makes you believe it was?**

Page 33

1      A    Because we would have had to submit a work order if

2  it wasn't operational.  And at that point, I would have found

3  out.  My physical security branch -- one thing they do do is

4  keep me informed.  And if that monitor was not working, I

5  would have been informed immediately.  And I was not informed

6  of that.

7      **Q    Chief Vernon, in your investigation, did you**

8  **determine affirmatively that the identification system that**

9  **projects a picture of the employee at the monitor at the**

10 **guard's desk was actually working on the evening of Sunday,**

11 **October 29?**

12     A    Sir, I didn't do the investigation, but to answer

13 your question:  no.

14          But I can tell you this.  If it is not working,

15 then you've got to physically touch his entry credential.

16 You've got to see it, because now it's not working.  You've

17 got to see it now, if it's not working.

18     **Q    Correct; and in order to visualize the I.D., the**

19 **employee not only would have to use it to trigger the**

20 **magnetometer, but the employee would have to come within**

21 **sufficient distance of the guard so the guard could make**

22 **visual confirmation.  Correct?**

23     A    Correct.

24     **Q    Now, you've read the IG report.  Do you know**

25 **whether the IG conducted an investigation to determine**

Page 34

1    affirmatively whether the monitor for the I.D. strip was

2    functioning that day?

3        A    I can't recall, sir.

4        Q    I'm holding up Officer White's I.D. dated August 5

5    of 2009.  Is that a card that can be used to swipe the

6    magnetometer at Post 41?

7        A    No.

8        Q    Isn't it true that on October 29 there were

9    employees who did not have yet swipe cards?

10       A    Yes, sir.

11       Q    And could you tell the Judge how many

12   representative employees on October 29 did not have cards

13   that would activate the monitor bringing their picture up?

14       A    I would have no idea.

15            JUDGE BOGLE:  I don't think this is relevant,

16   anyway.

17            THE WITNESS:  Thank you.

18            MR. HANNON:  You'll see when we look further at the

19   tape, Your Honor.  It's also relevant to his credibility.

20            BY MR. HANNON:

21       Q    Now, you indicated that you had proposed a change

22   in Post order 41 as a result of the incident involving

23   Officer Sturgess.

24       A    Yes.

25       Q    And that's the incident where Officer Sturgess was

Page 35

1    out on the sidewalk and persons were going in behind him.

2    Correct?

3         A    Yes, sir.

4         Q    And there was no penalty imposed upon him?

5         A    I'm sorry.

6         Q    My understanding is there was no penalty imposed

7    upon him, because the post at that time required him to be

8    out there for certain periods?

9         A    Correct.

10        Q    And the purpose of requiring him to be out there

11   for certain periods of time was to ensure that employees

12   coming and going weren't subject to improper contact by some

13   of the people that tend to hang around that area.

14             Is that right?

15        A    No, sir.

16        Q    From what the post order stated, it stated that he

17   was to go outside and to a vet verbiage and conduct a cursory

18   inspection of the area.  It later goes on to say we shouldn't

19   allow employees to loiter outside the facility.  That's what

20   the post order states, sir.

21        Q    Well, Officer Sturgess has advised us there was

22   also sort of an understanding that they should do that when

23   employees were customarily coming into the building and

24   leaving the building to help provide them with some kind of

25   protection.

Page 36

1          MR. FINE:  Objection.  Officer Sturgess -- we have

2    no testimony from Officer Sturgess at this point in time.

3          JUDGE BOGLE:  How is this relevant, Mr. Hannon?

4          MR. HANNON:  Because, to Mr. White's particular

5    procedure, it's relevant.  Because Mr. Fine brought it up and

6    he talked about the fact that Sgt. Wilson, who was right

7    across the street when this particular instant occurred did

8    not come to the assistance of Officer Everett.

9          JUDGE BOGLE:  No, just stop right there.  We are

10   not going into all of that.  We discussed it at the

11   pre-hearing conference and I told you the second part of this

12   incident is not relevant to this action.  There's nothing in

13   the charges about it.

14         Mr. Fine did not bring it up.  He brought up the

15   change in orders because you are alleging, I believe, that

16   there was some confusion for the appellant when the orders

17   were changed.  So we had to take this witness and go over

18   what the change was.

19         If you want to ask him questions about the change

20   in orders, that's fine; the reason for the change, not

21   relevant.

22         MR. HANNON:  Very well.

23         BY MR. HANNON:

24     **Q    Did the new post orders prohibited the officer at**

25   **Post 41 from having a visitor?**

Page 37

1     A     Yes, sir.

2     **Q     Can you tell me where it says that?**

3     A     The post order itself does not say that, but the

4     visitor, once you enter the turnstile, sir, your purpose for

5     visiting GPO at that time is for official business only.

6     **Q     All right.**

7     A     For official business only; as me myself, and I'm

8     director of security, I don't have the authority to bring

9     anybody into that area.  I don't, let alone one of my

10    officers.  So, if it's written:  no.  It's not written that

11    says he can't have a visitor on that post, but it is said

12    they have to be properly screened, inspected, controlled, and

13    identified.  That's what the post order says, sir.

14    **Q     I'm sorry.  If a visitor to the officer is on post**

15    **on a weekend is properly screened, is that person permitted**

16    **to remain there with the officer for a certain period of**

17    **time?**

18    A     No.

19    **Q     Is there a policy or post order or general order**

20    **that advises uniformed officers they can't have visitors at**

21    **their post?**

22    A     No, sir.

23    **Q     Now, did the old post order prohibit the officer of**

24    **Post 41 from eating at his post?**

25    A     I don't recall the overall circumstances.

Page 38

1    Q    Did the new post order prohibit the officer from

2    eating at his post?

3    A    I believe it does, sir.

4    Q    You are aware, are you not, that there are uniform

5    officers who sometimes have visitors come to their post?

6         MR. FINE:  Objection.  There's not relevancy to the

7    issues before us.

8         JUDGE BOGLE:  I'll permit it.

9         BY MR. HANNON:

10   Q    You are aware, sir, since you've come to the GPO

11   that there are cases when uniform officers have visitors come

12   and visit them at their post?

13   A    Yes, sir.

14   Q    And how many of those officers have been

15   disciplined?

16   A    None, sir.

17   Q    How many such incidents are you aware of?

18   A    What type of incidents?

19   Q    Where a uniform officer has a visitor at his or her

20   post?

21        MR. FINE:  Objection; relevancy.  Officer White was

22   not disciplined for having a visitor on his post.

23        MR. HANNON:  Do I need to address that?

24        JUDGE BOGLE:  Yes.

25        MR. HANNON:  Officer Everett will testify that one

Page 39

1   of the women that came with him was someone who was going to

2   stay with him temporarily until her bus arrived.

3          JUDGE BOGLE:  Well, I don't know if you're

4   confusing the witness, but you're confusing me, because the

5   witness has said that visitors are appropriate but they have

6   to have badges.  They have to be sent to sign in and have a

7   badge.  So when you're just asking can they have visitors and

8   he tells you, yes, he's aware of that, you're missing the

9   point where they properly screen visitors.

10         MR. HANNON:  Let me make it clear.

11         JUDGE BOGLE:  All right.

12         BY MR. HANNON:

13    **Q    Are you aware of circumstances where officers have**

14   **visitors at their post who go nowhere else in the building**

15   **other than that location for a visitor?**

16    A    No.  I am not aware of that, sir.

17    **Q    So your position is that a visitor to a post would**

18   **be screened and given a visitor's badge?**

19    A    Yes, sir.

20    **Q    Solely for the purpose of going to visit a friend**

21   **who's on a post?**

22    A    Yes, sir.

23    **Q    And is what I just described to you permitted?**

24    A    If they are properly screened, it's permitted.

25    **Q    And if Officer Everett had such a visitor to him at**

Page 40

1   **Post 41, that visitor would have to go through the main**

2   **control center first?**

3          A     Let me explain Post 41.

4          **Q     Can I just ask the question first?**

5          A     Okay, yeah.  I'm sorry.

6          **Q     I think you said earlier, if a visitor to Post 41**

7   **wanted to go to visit the person at that post, that person**

8   **would have to go through the main building first, get**

9   **screened in and get a pass.  Is that correct?**

10         A     For 41, in addition to what you said?

11         **Q     Yes.**

12         A     They also can arrive outside the turnstiles and

13  we'd call the supervisor on the second floor to come down and

14  sign them in.

15         **Q     All right.**

16         A     But, only a supervisor on the second floor has the

17  authority to bring somebody past those turnstiles.

18         **Q     We're not talking about going through the secured**

19  **door.  We're talking about just visiting the officer at**

20  **Post 41.**

21         A     That's what I'm trying to get you to understand,

22  sir.  Once you enter those turnstiles you entered a secure

23  location.  At that point you need to have an escort official,

24  which is on the second floor.  So if that officer wanted a

25  visitor, he would have to get authority from the supervisor

Page 41

1    on the second floor for that post.

2        Q    I see.

3        A    Yes, sir.

4        Q    So the visitor in what you just described, could

5    not remain outside the magnetometer?

6        A    Yes, they could have.

7        Q    They could remain outside the magnetometer?

8        A    Outside the magnetometer, the turnstile system.

9        Q    But once they come through the magnetometer, it's

10   your position that a supervisor upstairs would have to

11   authorize them to be in that location.

12       A    Yes, sir.

13       Q    So, what you're saying is that the officer at the

14   post could not act as the escort for his or her own guest.

15   Is that what you're saying?

16       A    That's what I'm saying, sir.

17       Q    Okay.

18       A    Exactly.

19       Q    Now, there are occasions when you bring persons

20   through the GPO facility for various professional reasons.

21   Is that correct?

22       A    Yes, sir, but it's all been cleared.

23       Q    I understand.  I just want to ask you a few

24   questions.

25       A    Okay.

Page 42

1        Q    Now, you are the escort for those individuals.    Is

2    that right?

3              MR. FINE:   Objection, Your Honor.   This is beyond

4    the scope of relevance that I can understand here is to what

5    Mr. Vernon when he brings visitors into Building 41.   He's

6    the chief of security for the GPO and physical security here.

7              MR. HANNON:   It's well known that officers such as

8    Officer Everett can escort persons through secure locations.

9              MR. FINE:   There's no testimony that this is well

10    known.   You are asking the chief of security whether he

11    brings people in on official business.   That has nothing to

12    do with what Officer White was charged with.

13              MR. HANNON:   Chief Vernon will testify that when he

14    brings people through posts, he vouches for them on occasion

15    and there is no I.D. check of the persons who are with him.

16              JUDGE BOGLE:   But that's not relevant to this

17    situation.

18              MR. HANNON:   It's relevant to what Officer Everett

19    did initially in bringing these folks in, trying to

20    demonstrate to the Court that there's an ongoing policy and

21    procedure that permits Officer Everett to do exactly what he

22    did, to have his guests in that particular location, at which

23    point in time Officer White was relieved and he left.

24              So there's nothing wrong based upon the practice

25    and procedures actually followed at the GPO.   There's nothing

Page  43

1    wrong for an officer to escort someone into and through a

2    secured area to a post.

3              JUDGE BOGLE:  You have completely lost me.

4              First of all, he has testified rather emphatically

5    about what the required procedures are.  I don't think that

6    you're going to detract from that testimony that showing that

7    he, who is in a much different position than the appellant,

8    is allowed on occasion to follow different procedures.  That

9    just doesn't compute.

10             Let's move on.

11             MR. HANNON:  I would proceed from that to other

12   persons.

13             JUDGE BOGLE:  No.  We're not going to proceed to

14   other persons.

15             BY MR. HANNON:

16    **Q    Let me just ask, are you aware, Chief Vernon, that**

17   **there are circumstances when GPO employees and officials**

18   **basically sponsor people to go through checkpoints where they**

19   **don't have to show I.D.**

20             MR. FINE:  Objection.  There are 2200 GPO

21   employees.

22             JUDGE BOGLE:  I'll let him answer the question, and

23   then we're going to move on.

24             THE WITNESS:  I am not aware of anything that you

25   just described occurring.  However, I do know that if the

Page 44

1    public printer wants to bring somebody to Building 4 and he

2    doesn't want them inspected, then they don't get inspected.

3              MR. HANNON:  Let me give you a specific example.

4              JUDGE BOGLE:  No.  We're going to move on from

5    that.  It's not relevant at all.

6              BY MR. HANNON:

7         Q    **Is there a written procedure that sets forth that**

8    **new post orders shall be distributed through e-mail only?**

9         A    Can you repeat the question?

10        Q    **Yes, our uniform officers told that they will**

11   **receive notice of new post orders through e-mail transmittals**

12   **only.**

13        Q    **Sir?**

14        A    I'm trying to repeat the question in my head.

15             They were never told by me.

16        Q    **What is the written procedure at the GPO as to when**

17   **post orders become effective and must be obeyed by officers?**

18        A    I'm not sure, sir.

19        Q    **Now, Mr. Fine asked you who was responsible for**

20   **placing hard copies of the post orders out in the field?  Let**

21   **me ask you, first of all, is Post 41 one of the posts where**

22   **hard copies of the post orders must be kept?**

23        A    Yes, sir.

24        Q    **And that's so the individual at that post knows**

25   **exactly what his or her responsibility is.  Correct?**

Page 45

1      A    Yes, sir.

2      **Q    You indicated that Sgt. Dailey was given the**

3  **responsibility for distributing the hard copies of the new**

4  **post orders to the post.  Is that correct?**

5      A    Yes, sir.

6      **Q    And you know, don't you, that the new post order**

7  **for Post 41 dated October 20 of 2006 was not at that post on**

8  **the date of this incident, October 29?**

9      A    I was later informed of that.  Yes, sir.

10     **Q    Since you have arrived, has there ever been a**

11 **circumstance under which new post orders are announced at**

12 **roll call and hard copies are given to the officers who are**

13 **going to be held responsible to answer to them?**

14     A    No, sir.  I was told by Lt. Epley that when the

15 orders went out for first shift, he notified them that the

16 post orders were on-line and the post-orders, also hard

17 copies will be kept in the control center just in this case

18 they lose their copy, a complete set of the old post orders

19 are kept in our control center.

20          To answer your question, issued in roll call, no.

21 They weren't.  They were sent through e-mail.

22     **Q    Okay.  So you don't have a procedure at your**

23 **facility to make sure that there's a record that a new post**

24 **order has been announced at roll call and that each officer**

25 **signs off that he or she has received a copy of that post**

Page 46

1    order.  You don't do that?

2        A    No, sir.

3        Q    You've never heard of that happening at GPO?

4        A    I've heard of it happening after the facts.  After

5    this incident, I've heard of that.

6        Q    So, it seems to me the bottom line from your

7    testimony is the officers are not aware that there's a

8    specific procedure under which they are to be advised as to

9    when new post orders become effective?

10       A    So the OIC briefed them in their roll call.

11       Q    I'm sorry?

12       A    The officers in charge -- that was covered during

13   their roll call.  The union president was notified.

14       Q    I'm sorry.  New Post order 41 was announced at roll

15   call?

16       A    The post orders that went out that day went out in

17   roll call.  They were effective 20 -- I believe it was

18   20 October.

19       Q    And there's a record made of that roll call

20   announcement?

21       A    No, sir.

22       Q    There's not?

23       A    No.

24       Q    So, you don't have any evidence?

25       A    Other than what my OICs told me, no sir.

Page  47

1      **Q      Your who?**

2      A    The OICs, officers in charge.

3      **Q      So you relied on the officers in charge to announce**

4      **that new Post order 41 was becoming effective?**

5           JUDGE BOGLE:  Mr. Hannon, you have not established

6      to my satisfaction any significant difference in the new post

7      order.

8           MR. HANNON:  I understand.

9           JUDGE BOGLE:  Unless and until you do that, I am

10     not interested in any more testimony about who got it and

11     when.

12          MR. HANNON:  Understood.

13          BY MR. HANNON:

14     **Q      Did you become aware after this incident of a**

15     **complaint that was presented to you by Officer Paul Talbert**

16     **on behalf of himself in the union?**

17          MR. FINE:  Objection.  Not relevant.

18          JUDGE BOGLE:  Mr. Hannon?

19          MR. HANNON:  This is in connection with the

20     procedure for approving post orders.

21          MR. FINE:  The witness testified there was no

22     grievance or unfair practice filed by the president of the

23     union.

24          MR. HANNON:  It's at --

25          JUDGE BOGLE:  The Agency's objection is sustained.

Page  48

1                MR.  HANNON:   Document  for  the  record  is  at  4-D,

2    page  19.

3                BY  MR.  HANNON:

4        **Q      You  also  talked  to  the  Judge  about  other  security**

5    **at  Building  4  and  you  talked  about  magnetometers.**

6                **Post  42  is  down  the  side  of  the  building  where**

7    **vendors  arrive.   Is  that  correct?**

8                MR.  FINE:   Objection,  Your  Honor.   This  has  nothing

9    to  do  with  Post  41.   Or  he  raised  the  point  that  there  are

10   magnetometers.

11               I  did  not  raise  the  point  about  Post  42.   It  is  a

12   loading  dock.   It  is  totally  different.   It  is  a  block  away

13   from  what  we  are  talking  about.

14               MR.  HANNON:   Your  Honor,  if  I  may  raise  the  issue

15   about  the  magnetometers  being  at  all  locations  and  their

16   having  to  be  implemented.   And  he's  also  talked  about  the

17   criticality  of  Building  4  as  the  basis  for  the  severe

18   punishment  with  respect  to  Officer  White,  so  it's  important

19   to  take  into  consideration  indeed  how  serious  they  believe

20   that  Building  4  needs  critical  protection.

21               JUDGE  BOGLE:   You  know,  we're  pretty  far  afield

22   from  what  I  approved  him  for.   I  don't  usually  approve  of

23   proposing  unless  he's  a  fact  witness.   He's  not  really  a  fact

24   witness.   He  looked  at  the  same  tape  that  we  can  all  look  at.

25    I  approved  him  because  he  could  make  sense  of  the  tape  for

Page 49

1   us by explaining what in his view was happening on the tape,

2   which as you know has no audience.

3           We are way far afield from that, so I would like

4   you to return to reason for his approval and what

5   constituted, I think, the bulk of his direct testimony.

6           MR. HANNON:  I would proffer this.

7           JUDGE BOGLE:  By the way, it is not your witness.

8   You did not also call him.  So you are crossing him only on

9   what Mr. Fine asked him.

10          MR. HANNON:  I'm just crossing on the criticality

11  of Building 4.  I would just proffer --

12          JUDGE BOGLE:  Now, let's move on.

13          MR. HANNON:  I just would proffer that there are no

14  magnetometers at Post 42, and persons come in through that

15  post without showing I.D.

16          MR. FINE:  Objection.  There's no basis for that.

17          MR. HANNON:  That's just a proffer.

18          JUDGE BOGLE:  All right.  Let's move on.

19          BY MR. HANNON:

20   **Q     When you called Officer, then Cpl. White, to come**

21  **to see you because you wanted to ask him to take the**

22  **supervisory sergeant's position.  Is that correct?**

23          JUDGE BOGLE:  How is this relevant?  Again, he was

24  called to explain the video to us, the CD to us.

25          If you've got some questions about that, let's have

Page 50

1    those.

2              MR. HANNON:  Let's take a look at the letter of

3    proposed discipline, which is located --

4              I'll find mine.

5              JUDGE BOGLE:  4-D.

6              MR. HANNON:  4-E, Your Honor?

7              JUDGE BOGLE:  G.

8              MR. HANNON:  G, thank you.

9              BY MR. HANNON:

10       Q    Now, this is your letter of proposed discipline,

11   and it starts off by saying that "On October 29, 2006, you

12   were acting sergeant for the second shift on relief rove

13   duty."

14              Now, did you, Mr. Vernon, propose the level of

15   discipline that you did because of the fact that Cpl. White

16   was then acting as a sergeant and you held him to it?

17              JUDGE BOGLE:  You know, we have the deciding

18   official coming to testify, and he doesn't know what the

19   witness asked about the penalty decision.

20              MR. HANNON:  But this has to do with his factual

21   investigation, his allegations.

22              JUDGE BOGLE:  I don't want him examined concerning

23   the facts that he put in the proposal.  He is not a fact

24   witness.  He saw the same CD we did and he withdrew his own

25   conclusions.  And they are what they are.  I only allowed

Page 51

1  him, again, because he could make sense out of a CD for us.

2       MR. HANNON:  I want to ask him to clarify some

3  things that were in the log, which he testified to.

4       MR. FINE:  Which log are we talking about?

5       MR. HANNON:  The log for October 29.  Can you give

6  us a designation?

7       MR. FINE:  He's got that.

8       MR. HANNON:  I'm sorry?

9       MR. FINE:  The witness has that log.

10      MR. HANNON:  Can you give the Court and me a

11  designation as to where it is in the --

12      JUDGE BOGLE:  4-M?

13      MR. HANNON:  4-M, Your Honor?

14      JUDGE BOGLE:  Is that it?

15      MR. FINE:  This is an exhibit.

16      JUDGE BOGLE:  Okay.

17      MR. FINE:  The daily log as I submitted as

18  Exhibit 1.

19      MR. HANNON:  Oh, that is a 1.  I thought that was

20  a --

21      MR. FINE:  Do you have it, Your Honor?

22      JUDGE BOGLE:  I'll get it.  Go ahead.

23      MR. HANNON:  I have it as response to our request

24  for production of documents at 4.

25      MR. FINE:  Okay, well, Exhibit 1.

Page 52

1            BY MR. HANNON:

2        Q    **Now, the first page is the duty assignment for**

3    **Shift 1, correct?**

4        A    Correct.

5        Q    **Now, the officer in charge there is Sgt. White,**

6    **correct?**

7        A    Correct.

8        Q    **And that's a job that sergeants serve on weekends**

9    **when lieutenants have their days off, or other days.**

10       A    Correct.  Whenever there is not a lieutenant there.

11       Q    **All right.  And you've already told us that there's**

12   **no description of the duties of an officer in charge.**

13       A    Correct.

14       Q    **Now, this is not the shift in which this incident**

15   **occurred, is it?**

16       A    No, sir.

17       Q    **If we go to the third page of this exhibit, we get**

18   **to shift 2.**

19       A    Yes, sir.

20       Q    **And this is the shift on which this incident**

21   **occurred.  Correct?**

22       A    Correct, sir.

23       Q    **And the OIC listed here is Lt. Cross.**

24       A    We happened to be off that day, sir.

25       Q    **He was off that day.  So Sgt. Wilson served as the**

Page 53

1    officer in charge.  Is that correct?

2        A    Yes, sir.

3        Q    And was Sgt. Shaw on duty that day?

4        A    Yes, sir.  I believe he was drafted and volunteered

5    to work.

6        Q    Sgt. Shaw?

7        A    I mean Sgt. Shaw?  Oh, I'm sorry.  I was mistaken.

8     I meant to say Sgt. White.

9        Q    Sgt. White?

10       A    I'm not sure, sir.  I'm not sure.  They got Shaw

11   off that day.  He is listed as being off.

12       Q    Right.  So he wasn't.  According to this document,

13   he wasn't on duty.

14       A    That's correct, sir.

15       Q    And Sgt. White is listed as assigned to Post 32.

16   Correct?

17       A    Correct.

18       Q    Now, the only other sergeant on duty that day was

19   Sgt. Wilson.  Do you agree with that?

20       A    Yes, sir.

21       Q    And he was the officer in charge?

22       A    Yes, sir.

23       Q    And Sgt. White was drafted.  That means that

24   because you were short-handed, he was compelled to work the

25   next shift, right?

Page 54

1    A    Well, sir.  I'm not sure if he was drafted or he

2  volunteered.  It was one or the other.

3    **Q    But in any event he was working an unscheduled**

4  **shift and he was working at a post.  Correct?**

5    A    Yes, sir.

6    **Q    And sergeants do not work posts, do they?**

7    A    No.  I wouldn't say that, sir.

8    **Q    Pardon me?**

9    A    They'll pull a post if they have to, sir.

10    **Q    If they have to?**

11    A    Yes, sir.

12    **Q    In a situation where people are short-handed?**

13    A    Yes, sir.

14    **Q    So, it's an exception for a sergeant to work a**

15  **post, right?**

16    A    For the most part it is, am exception.

17    **Q    And it's also correct that a sergeant cannot be**

18  **drafted.  Correct?**

19    A    Correct.

20    **Q    So if Sgt. White was indeed drafted, which he will**

21  **testify to, how was it that he could be drafted if he were a**

22  **sergeant?**

23        MR. FINE:  Objection.  This goes into an area that

24  Sgt. White will testify that he drafted himself.  He was the

25  OIC.

Page 55

1          JUDGE BOGLE:  Objection sustained.  Let's get to

2    something relevant or I'm going to dismiss the witness.

3          MR. HANNON:  Okay.  If I could just establish that

4    a sergeant cannot be drafted.

5          JUDGE BOGLE:  This does not matter.  It's not

6    relevant.  Let's move on.

7          MR. HANNON:  All right, Judge.

8          BY MR. HANNON:

9      **Q    Are there any policies and procedures for the**

10   **manner in which one officer relieves another at a post?**

11     A    No, sir.  I mean, I'm just trying to run it through

12   all my general posts are in my head, but I don't believe so,

13   sir.

14     **Q    When you were in the military, were there orders**

15   **for how one relieves another officer at post?**

16         MR. FINE:  Objection.

17         JUDGE BOGLE:  Objection sustained.

18         BY MR. HANNON:

19     **Q    How does an officer at a post know when he or she**

20   **is relieved?**

21     A    I stand corrected.  I stand corrected.  Post order

22   34 states that when an officer is relieved, it should be

23   documented in the activity log.

24     **Q    That's Post order 34?**

25     A    That referenced the control center.

Page 56

1    Q    Right.  So when they hear a radio communication,

2    they should document that?

3    A    Not radio communication, sir.  Say you have an

4    officer on Post 32 and when he's relieving somebody, he's

5    being relieved for chow relief, they should notify the

6    control center.

7    Q    Okay, so they have to notify the post?

8    A    They should notify it, right.  And this way the OIC

9    will be familiar with who's on what post at all times.

10    Q    All right, but there are no regulations telling an

11    officer who's manning a post when he's relieved when he or

12    she is no longer responsible for that post?

13    A    Well, he is no longer responsible for that post

14    when he is off of it.  He is no longer assigned to it.

15    Q    Are there regulations that indicate when somebody

16    is relieving an officer for a break or relieving the breaking

17    officer.  At what point in time the officer going off that

18    post is no longer responsible for following those post

19    orders?

20    A    No, sir, in answer to your question.

21    Q    Now, it's correct that you proposed discipline of

22    Officer Everett and Officer White for not following the post

23    orders at Post 41.  Correct?

24    A    Yes, sir.  There were some different circumstances

25    with Officer Everett, but for the most part, yes, sir.

Page 57

1      Q     Part of his discipline is for not following the

2   post orders at Post 41?

3      A     Yes, sir.

4      Q     Okay, now, in the video, at what point in time was

5   Officer White relieved by Officer Everett, and no longer had

6   responsibility for enforcing the post orders at Post 41?

7      A     When Officer Everett came through the turnstile,

8   they should acknowledge each other that I hack, and that

9   point, Officer White has been properly relieved.  It's just a

10  nod, "I got it now, it's yours," at that point.  Yes, sir.

11     Q     Thank you.  And you know there's no audio on that

12  tape?

13     A     Yes, sir.

14     Q     And did you ever listen to the tape transmissions

15  of the radio communications as to when the officers were

16  leaving one another?

17     A     So that we have the capability, but it was

18  inoperable at that time.

19     Q     When did you learn that?

20     A     It hadn't been operable, sir.  I think that since

21  the day I started working.  I think my police chief, I

22  believe, has since fixed that.  But it wasn't operational due

23  to the fact that we were moving into the new control center.

24   And we went from the old control center to new control

25  center, and just it was done in such a haste that that was

Page 58

1    left off of someone's checklist.

2        Q    Are you aware of officers eating at their post?

3        A    I forbid.  Yes, I am aware of that.  Yes.

4        Q    Have you disciplined any officers for eating at

5    their post?

6        A    Never, because sometimes, we're so short-handed,

7    you have to eat at your post.

8        Q    The buzzer for the access to the second floor is in

9    a door back to the left on the video, right?  We can't see

10   it.

11       A    If I'm sitting at the turnstile right here.  You're

12   at the turnstile and I'm sitting here facing you, the buzzer

13   would be right her on the wall.

14       Q    And the door to the second floor is to your left?

15       A    To my left.

16       Q    Like that door?

17       A    Like the door right here, exactly.

18       Q    Okay.  And the buzzer has to be activated from that

19   location, right?

20       A    Yes, sir.

21       Q    You told Mr. Fine that you had selected the

22   proposed discipline for Officer White because you wanted to

23   send a clear message that the criticality of assets at

24   Building 4 needed to be given a high priority.  Is that a

25   fair summary of what you said?

Page 59

1    A   That's a fair summary.

2    **Q   Now, you also said that Officer White, then**

3 **Cpl. White, has never had any discipline?**

4    A   None, sir.

5    **Q   In fact, you've commended him, haven't you?**

6    A   I believe I have, sir.

7    **Q   Do you know how many commendations he has?**

8    A   He has a few.

9    **Q   Do you know that he reached the rank of major in**

10 **his prior employment?**

11    MR. FINE:  Objection.

12    JUDGE BOGLE:  How is that?

13    MR. FINE:  Beyond the scope of his direct

14 testimony.

15    MR. HANNON:  He said he wanted to send a clear

16 message.

17    MR. FINE:  Beyond the scope of the direct testimony

18 I never asked him concerning Officer White's background.

19    JUDGE BOGLE:  More importantly, in deciding on the

20 evidence in question, do you have anything else for this

21 individual?

22    MR. HANNON:  I do.  I wanted to follow-up and ask

23 him if he, based upon his knowledge of Officer White's

24 professionalism, believes that he could have sent a message

25 with a lesser penalty.

Page 60

1             JUDGE BOGLE:  He was not called to talk about the

2      penalty selection.  That is for the deciding official.

3             MR. HANNON:  Very well.

4             I want to look at the tape with him.

5             JUDGE BOGLE:  No.

6             MR. HANNON:  I'm sorry?

7             JUDGE BOGLE:  No, we did that once.

8             MR. HANNON:  But that was on direct examination.

9             JUDGE BOGLE:  No.  No, you have in your notes what

10     he said when he saw the tape.  We all have the same tape.  If

11     you have any questions you may ask them.

12            MR. HANNON:  Back over.

13            JUDGE BOGLE:  Back over the tape.

14            MR. HANNON:  Okay.

15            JUDGE BOGLE:  That's the reason I had you all up

16     here when we showed it the first time.

17            MR. HANNON:  Well, I would have asked questions

18     then.

19            BY MR. HANNON:

20        Q     **The two women that came in with Officer Everett,**

21     **they never went into a secure area of Building 4, did they?**

22        A     To the best of my knowledge, no, sir.

23        Q     **And you looked at the whole tape, and it's correct,**

24     **is it not, that the only people who came into the building**

25     **during the entire length of the tape were employees?**

1      A    Officer Everett?

2      Q    **During the entire time of the tape that you**

3  **reviewed all three tapes, the only people that came into**

4  **Building 4 from the door into the security area were**

5  **employees.**

6      A    Yes, sir.

7      Q    **Later on the tape, Officer Everett returns with the**

8  **two women.  Correct?**

9          MR. FINE:  I'm sorry.  Later, when?

10         MR. HANNON:  Later, in a tape we haven't looked at.

11         MR. FINE:  Well, then, it's not relevant.

12         JUDGE BOGLE:  How is that question relevant,

13 whether we've seen the tape or we haven't seen the tape?

14         BY MR. HANNON:

15     Q    **Well, let me ask you this.  Do you know which of**

16 **those women was a guest of Officer Everett?**

17     A    Sir, I never found out the identity of the two

18 women.  So, I'm not sure.  I'm not aware.

19     Q    **You didn't look at the arrest report for the women**

20 **that assaulted it?**

21     A    I think we had the name.  I don't recall her name.

22  I know we have the first and last name of one individual and

23 only the first name of one of the ladies.  So, I don't know

24 if we ever found out her last name.

25     Q    **You've explained to the Judge why you asked the**

Page 62

1   inspector general's office to conduct this investigation

2          Do you agree that the inspector general is

3   independent from your agency?

4     A    Yeah, I would definitely agree with that.

5     Q    And it's independent from the Human Capital office?

6     A    I definitely agree with that.

7     Q    And it's independent from Mr. Fine's office?

8     A    I agree with that, too.

9     Q    They have their own lawyers.

10    A    I don't know about that.

11    Q    The IG's office.

12    A    I'm not sure, sure.  I'm not sure if they have

13   their own orders.

14    Q    Well, they don't turn to the general counsel's

15   office for legal advice, do they?

16         JUDGE BOGLE:  How is this relevant?

17         THE WITNESS:  I'm not sure, sir.

18         MR. HANNON:  Let me get right to it.

19         MR. HANNON:  You were aware through the course of

20   your investigation that Mr. Fine was involved in a series of

21   e-mails with you to identify the assistant U.S. attorney, who

22   was --

23         MR. FINE:  This goes way beyond the scope of any

24   direct testimony that I've conducted, Your Honor.

25         JUDGE BOGLE:  Mr. Hannon, what's this about?

Page 63

1           MR. HANNON:  This is about --

2           JUDGE BOGLE:  It is not only beyond the scope of

3   Direct, I can't identify it up with any issue that you've

4   raised in the case.

5           MR. HANNON:  This is in connection with information

6   that wasn't provided in the course of the oral reply.  It

7   also is in connection with what I consider to be an abuse of

8   the investigative process for employee discipline.

9           Mr. Fine and Chief Vernon and an agent of the IG

10  were involved in developing evidence, basically used against

11  Officer Everett, but developing evidence against

12  Officer Everett that was never disclosed to us until we got

13  discovery.

14          MR. FINE:  This case involves Officer White.

15          JUDGE BOGLE:  I understand the argument now.  You

16  have an argument that he wasn't given everything he should

17  have been given in the reply process.  First of all, you need

18  to establish that this individual had something to do with

19  that.  Second of all, you need to tell me what document

20  you're talking about.

21          MR. HANNON:  This is in the submission that we

22  presented, which consists of the -- I'm sorry.  The documents

23  we submitted, Your Honor, Tab 9, these are responses to our

24  requests for production of documents.

25          JUDGE BOGLE:  The document is where?

Page 64

1          MR. HANNON:  We submitted as exhibits a series of

2  nine sets of documents presented to us in our response to our

3  request for production of documents?

4          JUDGE BOGLE:  How did you offer it to the Board?

5          MR. HANNON:  My office sent it in.

6          JUDGE BOGLE:  Is it an exhibit?

7          MR. HANNON:  It's a list of our exhibits.  I have

8  not seen what the Board received.  I am simply relying upon

9  what my office told me.

10          JUDGE BOGLE:  I don't understand what you're

11  saying.  It was not an exhibit attached to your pre-hearing

12  submission?

13          MR. HANNON:  No.  It was separately submitted as

14  exhibits on the date that exhibits were required.

15          MR. FINE:  Your Honor, could I take a two-minute

16  break while we're looking for this exhibit?

17          JUDGE BOGLE:  I would prefer to finish with this

18  witness and I think we can move on.  I don't know what you're

19  saying.  You submitted with your pre-hearing submission seven

20  proposed exhibits.  Is it one of those?

21          MR. HANNON:  If I may, it was a subsequent

22  submission of exhibits.

23          JUDGE BOGLE:  I don't have a subsequent admission

24  of exhibits.

25          MR. HANNON:  I could show him my copy of the

Page 65

1   document.

2          JUDGE BOGLE:  Well, I think you need to show it to

3   the Board if you're going to make this argument.  Does

4   Mr. Fine know what you're talking about?

5          MR. HANNON:  Yes, he provided it to us.

6          JUDGE BOGLE:  Do you know?

7          MR. FINE:  Are we talking about e-mail?

8          MR. HANNON:  Yes, the e-mail with respect to the

9   Assistant U.S. Attorney.

10          MR. FINE:  It involves Officer Everett and not

11   Officer White.  So why is this relevant to the case we are

12   dealing with now?

13          JUDGE BOGLE:  Show the witness the document that

14   you say was improperly not produced and ask him if he had

15   anything to do with the failure to produce it, because my

16   suspicion is that he did not.

17          MR. HANNON:  There's a series of e-mails here,

18   involving you and Mr. Fine in December of 2006.

19          JUDGE BOGLE:  All right, let's just get this area,

20   because I need to see what you are talking about.  This does

21   not sound like something that should have been produced at

22   the reply statement.

23          I don't have it in my record, and I want to see

24   what it is.  And then we'll decide if we're going to have any

25   testimony.  But do you have anything else to input?

Page 66

1          MR. HANNON:  Well, I do.  I can finish up.

2          JUDGE BOGLE:  Let's make it very quick.

3          MR. HANNON:  Yes, Your Honor.

4          BY MR. HANNON:

5      **Q    You indicated that you didn't take Officer White's**

6   **praise for union activities into consideration.  Were you**

7   **aware that in 2002 to 2007 among the nine disciplinary**

8   **actions there were only five against African-Americans, two**

9   **against white officers?**

10     A    I was not aware of that, sir.

11     **Q    During the oral presentation of Officer White, you**

12  **were present, were you not?**

13     A    Yes, sir.

14     **Q    And during that hearing, we made the point that the**

15  **new post order was not at Post 41 at the day of this**

16  **incident.  Do you recall that?**

17     A    I don't recall, sir.  I remember discussing it, but

18  I don't recall.

19     **Q    After the oral hearing, did you provide**

20  **Rafael Landrau additional information to show that you**

21  **had sent e-mails to Officer White regarding the new post**

22  **order?**

23     A    Yes, sir.

24     **Q    And do you know why that information wasn't**

25  **provided to Officer White in connection with that proceeding?**

Page 67

1      A    No, sir.

2      **Q    In posing or recommending discipline for**

3  **Officer White, did you hold him to the duties set forth in**

4  **the description of positions of a sergeant or at the lead**

5  **correction officer, a corporal.**

6      A    My recommendation was based on the position that he

7  held as the acting sergeant, and as lead corporal, that he

8  failed to uphold the security policies and procedures of the

9  Agency.

10     **Q    In your determination, did you conclude that**

11  **because he was the supervisory sergeant he had an obligation**

12  **to supervise Officer Everett?**

13          JUDGE BOGLE:  Once again, these are questions for

14  the deciding official.  Is there anything else for this one?

15   Mr. Hannon, anything?

16          MR. HANNON:  I'm almost finished looking at my

17  notes, Judge.

18          BY MR. HANNON:

19     **Q    This post now is protected by paid security guards.**

20  **Correct?**

21          MR. FINE:  Objection, Your Honor.  This is beyond

22  relevant.

23          JUDGE BOGLE:  Mr. Hannon?

24          MR. HANNON:  There are two of them there now.

25          MR. FINE:  Mr. Hannon now testified.

Page 68

1          MR. HANNON:  This has to do with union bias.  This

2    particular incident was used to try to convince congress to

3    get rid of a GPO law enforcement group and to put in place

4    contract employees.

5          MR. FINE:  Objection, Your Honor.  Mr. Hannon is

6    testifying.

7          JUDGE BOGLE:  It was a decision of congress and it

8    will be on the compliance of this deal.

9          MR. HANNON:  No.  I didn't say that congress made

10   that decision, that it was used as an argument by the GPO.

11   Congress did not accept it.

12         JUDGE BOGLE:  I understand that.  I don't think the

13   testimony will show anything else.

14         BY MR. HANNON:

15   **Q    In selecting the discipline, did you consider**

16   **other --**

17         JUDGE BOGLE:  Once again, he didn't select it.  He

18   proposed it.  The deciding official ultimately decided it,

19   and you can ask him all your questions.

20         MR. HANNON:  Very well, then, I have -- hold on a

21   moment.  Thank you, Judge.

22         JUDGE BOGLE:  Mr. Fine, did you find anything?

23                    REDIRECT EXAMINATION

24         BY MR. FINE:

25   **Q    You were saying when an officer relieves another**

Page 69

1    officer, it gets reported.  They have officers and

2    microphones there somehow?

3         A    Yes, they have radios.

4         Q    Okay, so they can communicate with the central?

5         A    Control Center.

6         Q    Control Center, okay.  So it says here on page 2 of

7    this exhibit, page 4, 1720, what does that mean?

8         A    It reports he is 1017 at Post 41 for Middleburg.

9         Q    What does that mean?

10        A    It means he is relieving that individual for a meal

11   break.

12        Q    So Sgt. White is relieving Officer Everett, then,

13   right?

14        A    Yes.

15        Q    And 1815 is what?

16        A    Sgt. White is 1018 from Post 41.

17        Q    So what did that mean?

18        A    The break is over.

19        Q    All right.  And then 1820?

20        A    Sgt. White is 1017 meal break.  Now, he is

21   relieving Post 50.

22        Q    So there we have the log of where the players were

23   at that particular point in time?

24        A    Yes, sir.

25             MR. FINE:  I have no further questions.

Page 70

1                        RECROSS EXAMINATION

2          BY MR. HANNON:

3      Q    And that log also shows that when Officer Everett

4    relieved Officer White, he was being directed, that is,

5    Officer White, by Sgt. Wilson, to go and relieve someone

6    else.  Correct?

7      A    Correct.

8      Q    So he was under instructions from the officer in

9    charge to go to relieve another officer.  Correct?

10     A    Yes, sir.

11          MR. HANNON:  Thank you.

12          JUDGE BOGLE:  All right, thank you.  You are

13   excused.

14          Let's take a ten-minute break.  I want to see the

15   documents that you were talking about with the witness a

16   moment ago.  I also want to tell you the next witness, I

17   presume, is the deciding official?

18          MR. FINE:  Yes.

19          JUDGE BOGLE:  The deciding official is not being

20   called to tell us why he found the charges sustained.  He is

21   being called to address the penalty only.

22          I expect these next witnesses to go much faster.

23          MR. FINE:  Thank you, Judge.

24          (A brief recess was taken.)

25          JUDGE BOGLE:  We're back on the record.  I have

1  been reviewing these papers you gave to me and I showed them

2  to Mr. Fine on a break so he would know what we were speaking

3  of.

4          Mr. Fine says he intends to argue that these are

5  not relevant to Mr. Dwight, that they in fact involve another

6  employee.  Is that correct, Mr. Fine?

7          MR. FINE:  Yes, they involve Officer Everett.

8          JUDGE BOGLE:  Okay, and Mr. Hannon, how is it that

9  you reviewed these e-mails should have been provided to

10 Mr. White along with the material relied on, I guess is what

11 you're arguing, yeah?

12         MR. HANNON:  Yes, Judge.

13         JUDGE BOGLE:  And why is that?

14         MR. HANNON:  Well, for a couple reasons.  First of

15 all, the inspector general report was provided and actually

16 provided late.  But this information included work by Sonya

17 Scott conducting an investigation as to who the U.S. attorney

18 was that papered this case.  And since the IG's report was

19 provided, that's what they provided.

20         Furthermore, my position is that it's violation of

21 due process for the GPO to use the inspector general's office

22 to generate evidence in disciplinary proceedings.  And you'll

23 see among the e-mails, our e-mails from Mr. Fine to Assistant

24 U.S. Attorney Stephen Kaufman telling him that we would like

25 to put together a lack-of-candor claim against

Page 72

1    Officer Everett.

2          And it's a due process violation for the general

3    counsel of the GPO in conducting an investigation of employee

4    discipline to utilize the resources of the inspector

5    general's office to do that.  And it's clear that that's what

6    was being done under these circumstances.

7          JUDGE BOGLE:  But you are well beyond what he was

8    entitled to at the reply stage, and you will note on page 2

9    of my conference summary I state, "An employee against whom

10   action is proposed has a right to review the material which

11   is relied on to support the reasons for the action."

12         First of all, it doesn't say he's entitled to be

13   provided the material in hard copy; and, second of all, this

14   does not appear to me to be material that was relied on to

15   support the reasons for the action.

16         So I will not accept the material we've discussed

17   off the record that somehow your office submitted it and mine

18   did not receive it.  I don't know what happened there.  It

19   may well be that the air is on our end.  I wouldn't doubt

20   that.  But since I don't have the material, I don't think it

21   supports your argument.  I will not accept it.  And, we are

22   ready for the deciding official's testimony.

23         Do you have any objections to taking an oath?

24         THE WITNESS:  No.

25         JUDGE BOGLE:  Would you stand, please, and raise

Page 73

1   your right hand?

2   Whereupon,

3                   RAFAEL ENRIQUE LANDRAU

4   was called as a witness and, having been first duly sworn,

5   was examined and testified as follows:

6           JUDGE BOGLE:  Please be seated and state your name

7   and your title.

8           THE WITNESS:  My full name is Rafael Enrique

9   Landrau, and my title is Deputy Chief, Human Capital

10  Officer at the U.S. GPO.

11          JUDGE BOGLE:  All right, Mr. Fine, keeping in mind

12  what I said a moment ago about the limits of his testimony,

13  please proceed.

14                  DIRECT EXAMINATION

15          BY MR. FINE:

16      **Q    Okay, just briefly, you are deputy chief of human**

17  **capital?**

18      A    Yes, sir.

19      **Q    How long have you held that position?**

20      A    Since October '05.

21      **Q    And just briefly what areas are you responsible**

22  **for?**

23      A    I have responsibility for security services, which

24  include police, personal, and physical security, the clinic

25  health and safety, the human resources office, workforce

Page 74

1   development in both training employee communications and the

2   leadership program.

3        Q    I'd like to show you a document dated May 4, 2007.

4    It's Agency Exhibit 4-C in the Agency Response.

5             Will you look at this letter and identify it for

6   us?

7        A    This is my letter as a deciding official.

8        Q    A letter you sent to Robert White?

9        A    Yes, sir.

10       Q    That's your signature at the end?

11       A    Yes, sir.

12       Q    Are you familiar with the Douglas factors

13   established by the Merit Systems Protection Board in the case

14   of Douglas v. Veterans Administration?

15       A    Yes, I am.

16       Q    And in your determination concerning Officer White,

17   were those factors taken into consideration?

18       A    Yes, sir.

19       Q    What information did you take into account in

20   reaching your decision?

21       A    Number one, I had an opportunity to look at the

22   video.  I had an opportunity to look at the IG report.  I had

23   an opportunity to both listen to the oral reply and read the

24   reply from the attorney.  That's inclusive of all the

25   locations.

1    **Q      Were you given a case file by the Human Capital**

2    **office?**

3    A     Yes, I was.  Yes.

4    **Q      Why did you determine that Officer White had**

5    **committed the offenses charged in the proposal letter of**

6    **failure to perform the duties of his position and failure to**

7    **follow the post orders?**

8    A     I believe that it was clearly stated that there

9    were policies regarding the specific procedures of entry and

10   exit into that and all buildings.  And he clearly neglected

11   to perform his duties related to that policy.

12   **Q      Why did you consider this a serious offense?**

13   A     Number one, because of the content, the material in

14   that building, the passport that I think that's a serious

15   national security issue, the possibilities of those passports

16   being lost.

17         Number two, at the time he was acting supervisor,

18   and it's critical that as a supervisor in that leadership

19   role that an example is set as it relates to what is it that

20   the policy is, therefore, and he should be the one setting

21   the example and following the policies and procedures that

22   are stated.

23   **Q      Did you review his disciplinary record?**

24   A     Yes, I did.  The access that I had, I looked at his

25   file and asked, just in case the file was incomplete, whether

Page 76

1    there were any disciplinary actions.

2         **Q    Was any prior discipline considered?**

3         A    No.

4         **Q    Why was his work record considered?**

5         A    Being a police officer and his record as, I

6    believe, it was the Bureau of Prisons where, number one, he

7    had responsibilities related to the police related to

8    establishing policy related to, I believe, if I remember

9    correctly, risk analysis.

10             I probably was critical that this wasn't something

11   that he just made a mistake.  This was something that he

12   should have known, the experience on his work showed that he

13   should have been able to act appropriately when a situation

14   like this presented itself and the risk that implied on not

15   acting.

16        **Q    Why was his ability to perform his duties, though,**

17   **one of the factors you considered?**

18        A    I thought it was critical, number one, that he, as

19   I mentioned before, not only reacted, but that he was able to

20   recognize at any time what risk is present in the

21   organization and what constitutes risk and, in this case, not

22   only the ability to follow instructions and follow policy,

23   but the ability to recognize something that it could be

24   endangering.  And as it proved in that night it developed

25   into more than just him not doing his job.

Page  77

1      Q    I'm sorry.  In what way did you prove to be?

2      A    Well, if you follow the sequence of events of that

3   night, at least up to the point, you will see that by him not

4   stopping those individuals, not checking the ID's of those

5   individuals, not checking the material of those individuals

6   who were carrying.

7           What happened later, individuals were actually in

8   control of the entry and exist of Building 4.  So that had

9   acting Sgt. White at the time done his job, all this would

10  have been prevented.

11     Q    Why did you consider the factor concerning his

12  knowledge of the rule?

13     A    Police, just like the military structure, has to

14  become a way of life, especially when we are considering

15  things that are of national security, like passports.  And

16  understanding of those policies is critical and more

17  importantly following and not disregarding those policies

18  becomes a critical factor on the success of the Agency in

19  support of its customers, in this case, the departmental

20  space and the passports.

21     Q    Why did you consider that his potential for

22  rehabilitation as a factor?

23     A    Well, number one, I believe everybody deserves a

24  chance.  I thought he would have an opportunity to

25  rehabilitate.  I thought that seeing the importance of his

1  job and the importance of performing his duties consistently

2  and effectively, and how it affects and how it links to the

3  mission of the GPO, I thought he would be able to understand

4  that in the future.  So, I thought, number one, this was a

5  critical thing.

6        The other part is not only should we always

7  consider that, but in our particular situation, the GPO is

8  limited on the number o officers.  So anytime that there is

9  an opportunity that we think that we have an opportunity to

10  rehabilitate an officer and reinforce positive conduct, we

11  want to take the opportunity to do that.

12      **Q    Why did you determine the penalty of demotion and**

13  **suspension would be appropriate?**

14      A    I thought the recommended penalty was appropriate.

15   I thought it was, as I stated before, an incredibly serious

16  offense.  Neglecting to follow the policies of the agencies,

17  it comes down to not linking the importance of the items that

18  you are entrusted to.  And that just cannot be tolerated.

19        Even though I said before there is an opportunity

20  for rehabilitation, that doesn't diminish the criticality of

21  the function of number one, the supervisor who is an example

22  for officers.  His actions tell all other officers, it is

23  okay to disregard policies.  His actions tell all other

24  officers it is okay not to follow instructions.  His actions

25  tell all other officers it is okay to bring individuals who

Page 79

1    are not authorized into this building to bring for personal

2    reasons or other reasons into this building.

3           So I thought the motion and suspension was the

4    appropriately recommending by the recommender of this.

5    **Q    What significance did you place on Officer White's**

6    **race when you made your decision?**

7    A    None whatsoever.

8    **Q    In what way did you take into account**

9    **Officer White's Union activities?**

10   A    In no way.

11   **Q    Prior to this action or decision, did you have any**

12   **involvement with Mr. White that may have biased your thinking**

13   **in any way?**

14   A    None, whatsoever.

15   **Q    At the oral reply, you were present, sir?**

16   A    Yes, I was.

17   **Q    Did Officer White express any remorse at the oral**

18   **reply?**

19   A    No.  I don't believe so.

20          MR. FINE:  No further questions.

21          JUDGE BOGLE:  Mr. Hannon, any cross?

22          MR. HANNON:  Yes, Your Honor.

23                      CROSS EXAMINATION

24          BY MR. HANNON:

25   **Q    Good afternoon to you sir.  We had spent**

Page 80

1    considerable time together, off and on.

2            Do you respect Officer White?

3        A    I do.

4        Q    People distrust lawyers.  I respect you, I think,

5    if you respect me.

6        A    Absolutely.

7        Q    Very good.  Let me just talk a little bit about the

8    procedure that you followed to decide whether the penalty

9    that was recommended to you and that you ultimately opposed

10   fit within similar penalties for similar misconduct.

11           What did you do as the deciding official to make up

12   your mind as to whether this penalty fit in with other

13   similar penalties?

14       A    I think the most critical part in my mind was the

15   impact of the actions of acting Sgt. White.  The penalty

16   range was wide in scope.  I believed that recommended actions

17   were appropriate in the sense that it linked both important

18   policy and importance of procedures and the importance of the

19   impact related to the mission of the organization directly.

20           We have a very critical mission to the Department

21   of State.  The Department of State requires arm officers

22   regarding the transport of the passport and we are the only

23   ones entrusted to do this.  So I thought that anything less

24   than a demotion or a suspension would be inappropriate in

25   this case.  And at the same time I did not think that this

Page 81

1    would be something that would ruin the life or the career of

2    acting Sgt. White at the time.  So, both were taken into

3    consideration, but, most importantly, the impact of his

4    action to the Agency and the Agency's mission.

5        **Q    I'm sorry.  I probably didn't make myself**

6    **completely clear.  The Government Printing Office has an**

7    **instruction regarding corrective actions, Instruction 655.4A.**

8    **You followed that, correct?**

9        A    Yes, I did.

10       **Q    And in Section 5E it states, "In all corrective**

11   **action cases, the principle of like penalties for like**

12   **offenses will normally apply."**

13           **What I'd like to know is what did you do to**

14   **determine what sort of penalties have been imposed by the GPO**

15   **for like offenses to that with which Officer White was**

16   **charged?  What did you do to review that data?**

17       A    I asked the Human Resources staff to give me an

18   idea on what actions have been taken, if any, that was

19   similar to this particular case in impact.  There were no

20   specific actions that were like this action, that they were

21   aware of that they provided to me.  So this action had to be

22   taken into consideration as a sign of, in my mind, as not

23   only the impact on the individual, but more importantly the

24   impact on the Agency.

25       **Q    Well, I'd like to try to be a bit more specific.**

Page 82

1    You went and spoke with Stevie Gray?

2        A    I communicated with Stevie Gray, and I believe I

3    also communicated with H.R. Operations Director, Vicki

4    Barber.

5        Q    Do you remember in your deposition at page 56,

6    line 18, I asked you the question: "Whom did you ask and what

7    were you told?"

8             Answer:  "I asked Stevie and I believe in the

9    conversation, it was Vicki Barber, the H.R. Operations

10   Director.  Those were the only two people that I checked with

11   and I asked whether the standards and punishment related to

12   this particular situation matched other incidents related to

13   officers in similar circumstances.  And what I was told was

14   that, "yes," that these appeared to be appropriate in lieu of

15   other actions in the GPO.

16            Is that accurate?

17       A    That is accurate, yes.

18       Q    Okay.  So beyond talking with those two

19   individuals, you personally did not ask for or review any

20   data regarding prior discipline of officers?

21       A    I did not.

22       Q    And you were not always the deciding official in

23   actions against GPO officers, are you?

24       A    No.  I was not.

25       Q    So in your experience as deciding official, is it

Page 83

1    fair to say that you don't have personal knowledge of the

2    scope of penalties that have been imposed for particular

3    types of misconduct from your personal knowledge?

4         A    Not that I would compare directly to this one.

5    That is a true statement.

6         Q    You've been with the GPO, 2005?

7         A    2005, October 2005.

8         Q    And do you have a recollection as to how many

9    disciplinary proceedings were officers you've been the

10   deciding official for?

11        A    I don't recall the exact number, but more than one.

12    I'm sure less than six.

13        Q    You were aware that as you've said earlier,

14   Officer White has never been disciplined for a security

15   breach prior to this incident.

16        A    I understand that to be the case, yes.

17             MR. HANNON:  And in reviewing --

18             May I question the witness?

19             JUDGE BOGLE:  Yes.

20             MR. HANNON:  And in reviewing Officer --

21             What?

22             MR. FINE:  What are you showing?

23             MR. HANNON:  This is part of his file.

24             MR. FINE:  Whose file?

25             MR. HANNON:  Did you review Officer White's

Page 84

1    personnel file?

2            THE WITNESS:  The OPF, I didn't look at the OPF.

3            BY MR. HANNON:

4    **Q    And did you review his performance evaluation?**

5    A    I glanced at them.  I did not read every word.  No.

6    **Q    Is this performance evaluation of August 3 --**

7            MR. FINE:  Is this the exhibit?  Can we look at it

8    too?

9            MR. HANNON:  I believe it's part of the personnel

10   file.

11           THE WITNESS:  It shouldn't be.

12           MR. HANNON:  I'm sorry?

13           THE WITNESS:  It shouldn't be part of the official,

14   personnel file.  It may be part of other files.

15           MR. HANNON:  Excuse me.  We're talking about the

16   exhibits here.  It was definitely contained in the documents

17   that I submitted to the Board and which I gave Mr. Fine

18   copies of on that Monday.

19           MR. FINE:  That as 75 pages there.  Which page are

20   we talking about?  There's 129 pages.  They were numbered by

21   you.  Tell me what page.

22           MR. HANNON:  Do you have the production that I gave

23   you?  I'll find it.

24           MR. FINE:  I have 129 pages.  Tell me what page,

25   and I'll find it.

Page 85

1          I am going to object on a question of relevancy.

2   This is not a performance-based action under 423.

3          MR. HANNON:  That's not the purpose of the

4   question.

5          MR. FINE:  You are not disputing his performance

6   standard.

7          JUDGE BOGLE:  Okay.  For the record, I did have in

8   the file that you gave me on the break, Mr. Hannon.  They

9   are, I believe, they are both in Exhibit 9.  So where will we

10  find the document that you are currently referring to?

11         MR. HANNON:  I am looking, Your Honor.

12         JUDGE BOGLE:  There is a performance appraisal

13  regarding the proposed, 8.

14         MR. HANNON:  Behind 8?

15         JUDGE BOGLE:  This is Exhibit 9 through Exhibit 11.

16         MR. HANNON:  Okay, I can use that document.

17         MR. FINE:  Before I forget, I'd like to move for

18  admission of GPO Exhibit 1.  I believe I forgot to do that.

19         JUDGE BOGLE:  Mr. Hannon, any objection?

20         MR. HANNON:  No.  I'm not going to have any

21  objection.

22         Let me use that document.  It's at Tab 8.

23         MR. FINE:  What particular page?

24         MR. HANNON:  I'm getting there.  It's at Tab 8, and

25  if you go to the second page, this is a valuation from

Page 86

1  October 11 of 2006 showing an outstanding rating.  And I want

2  to ask him about it.

3          MR. FINE:  Is there a page number?  It's paginated.

4   I don't have tabs, I have page numbers that you provided.

5          JUDGE BOGLE:  Mr. Hannon, let's move along.  He

6  said that he did not read it in great detail, so I am not

7  sure what you are going to ask him based on the documents.

8          THE WITNESS:  May I say something?

9          MR. FINE:  No.

10         MR. HANNON:  I have no objection.

11         JUDGE BOGLE:  Mr. Hannon, your question.

12         MR. HANNON:  Well, I can ask a general question.

13         BY MR. HANNON:

14  **Q    Are you aware that for evaluation purposes that an**

15  **officer is considered to be on track for a successful**

16  **performance if there are no more than one substantiated**

17  **incident of failing to follow security guidelines and**

18  **instructions relating to GPO property and harm to GPO**

19  **employees.**

20         MR. FINE:  Objection.  The witness testified he did

21  not look at his performance standard.

22         MR. HANNON:  I'm just asking if he knows.

23         THE WITNESS:  I don't.

24         MR. FINE:  It's not relevant to the matter at hand.

25   He said he did not consider performance standards and

Page 87

1    evaluations in this case.

2          JUDGE BOGLE:  It's not, Mr. Hannon.  Let's move on.

3          MR. HANNON:  So, let's talk about how you can

4    exercise your discretion to select an appropriate penalty

5    without examining the data on similar offenses and similar

6    penalties under the circumstances.

7          JUDGE BOGLE:  Mr. Hannon, you have a habit of

8    blowing his testimony out of order, and then coming back and

9    asking a question.  If you listen to what he said, he said he

10   asked the personnel people and he told them there were no

11   similar cases, and in his experience, he is not aware of any.

12         MR. HANNON:  Okay.

13         BY MR. HANNON:

14   **Q    You are aware, are you not, that a GPO employee,**

15   **Mr. Reese, brought a non-GPO employee.**

16         MR. FINE:  Objection, Your Honor.  This is not a

17   police officer, so it is not a comparative employee.  This is

18   a white-collar supervisor.  This is not a police officer.  We

19   are comparing.

20         JUDGE BOGLE:  Mr. Hannon, there is no sense asking

21   him about cases where the individual is not similarly

22   situated.

23         MR. HANNON:  It goes to the issue of the

24   criticality of the post.

25         JUDGE BOGLE:  Well, you can't go through everybody

Page 88

1    else's disciplinary actions and try to pull out of that some

2    evidence that in those cases the post was not considered

3    critical.  We're just not going to take that kind of time.

4             Now, back to the factors that he considered in

5    reaching the decision that he made in this case.

6             BY MR. HANNON:

7        **Q    Were you aware that an officer was disciplined at**

8    **Building 4 for allowing a truck to leave, the passports on**

9    **board, without being sealed by the officer on duty?**

10       A    I was not.

11       **Q    Were you aware of what the penalty was in that**

12   **event?**

13            JUDGE BOGLE:  He said he wasn't aware of it, Mr.

14   Hannon.  You've got to listen to him.

15            BY MR. HANNON:

16       **Q    Would you consider that to be something that you**

17   **should take a look at in determining an appropriate penalty**

18   **for the like?**

19            MR. FINE:  Objection.  Mr. Landau testified he

20   wasn't aware of it.  We have no idea when this occurred.

21            MR. HANNON:  Judge, I think it's completely

22   inadequate for a deciding official to simply rely on somebody

23   else telling them that this fits.

24            JUDGE BOGLE:  Mr. Hannon, I can tell you.  I've sat

25   in this chair for over 30 years.  It is invariably the case

Page 89

1   that the deciding official goes to the H.R. office and says

2   are there any similar cases.

3           I mean, I can appreciate how you feel it should be

4   done, but there's nothing wrong with the way it was done,

5   unless you have evidence that there were some similar cases

6   that should have been brought to his attention, we're just

7   not going to go there.

8           MR. HANNON:  Well, I do have evidence of that.

9   However, Mr. Fine stopped allowing us to look at the records

10  of that and didn't follow Your Honor's order to provide us

11  documentation of that.

12          JUDGE BOGLE:  We discussed that at the outset.  I

13  think that my order is in the record, in writing.  It

14  couldn't be clearer and I said what I meant to say and that

15  was that in lieu of calling witnesses who were going to

16  testify about their own disciplinary actions, I would order

17  the Agency to provide documentary evidence of those actions.

18          That's what Mr. Fine tried to do.  Instead, you

19  wanted a list of all actions against everybody for five

20  years.  That's discovery, and discovery was over by then.  I

21  was simply trying to narrow the testimony that we would have

22  to receive today by getting to the documents that would

23  demonstrate whether there were similarly situated employees

24  who were treated less harshly than the appellant.

25          MR. HANNON:  Understood.

Page 90

1          JUDGE BOGLE:  Anything else for this witness?

2          MR. HANNON:  Yes.

3          BY MR. HANNON:

4     **Q      Did you ask whether there had been any penalty**

5     **imposed for a breach of Building 4 as the one recommended**

6     **for --**

7          JUDGE BOGLE:  Mr. Hannon, as far as I'm concerned,

8     you have exhausted the issue of whether you became aware of

9     similar cases.  He said he was not personally aware and H.R.

10    did not bring it to his attention.

11         Let's move on.

12         MR. HANNON:  Your Honor, I can submit his

13    deposition to make my record with respect to the due process

14    issue, that is the use of the IG, rather than questioning

15    them on that, and submit it as a proffer.

16         JUDGE BOGLE:  What is the due process issue with

17    respect to the use of the IG?

18         MR. HANNON:  It's unlawful for the general

19    counsel's office to use the inspector general's office to

20    investigate complaints and proposed discipline against

21    employees.

22         JUDGE BOGLE:  And that was not in my conference

23    summary.  We've identified all of the issues in this case and

24    you were instructed to object, and you didn't agree with the

25    summary.  Did you do that?

Page 91

1           MR. HANNON:  I objected to the summary, but not on

2    the grounds that that wasn't an issue.

3           JUDGE BOGLE:  All right, then.  That is not an

4    issue.

5           BY MR. HANNON:

6       **Q    Mr. Landrau, you understand that the proposed**

7    **discipline to you was failure to follow post orders at**

8    **Post 41?**

9       A    Yes.

10      **Q    And you told the Judge that the primary reason for**

11   **your decision was that at the time Officer White was a**

12   **supervisory sergeant?**

13      A    That was part of what I said, yes.

14      **Q    You agree that at some point in time when**

15   **Officer Everett relieved Officer White, Officer White was no**

16   **longer responsible for enforcing the post orders at Post 41.**

17   **Do you agree with that?**

18          JUDGE BOGLE:  Mr. Hannon, you are asking him the

19   very thing that I told you both at the outset he was not

20   called to address, and that is why he decided to sustain the

21   charge.  He was called to tell us why he selected the penalty

22   he selected and that is all, and for any affirmative defenses

23   he might have testimony to.

24          MR. HANNON:  My position Judge is that Mr. Landrau

25   has made it clear that he has sustained the proposal and has

Page 92

1    imposed a penalty because of his view of Officer White's

2    acting in a supervisory capacity.  The documentation

3    indicates that he has been disciplined for violating post

4    orders at Post 41.  And our position is that the actual

5    reason that Mr. Landrau used is neither a reason charged nor

6    a reason that can be used, because Officer White was not

7    acting as a supervisory sergeant.

8            JUDGE BOGLE:  You may make that argument, but you

9    do not need testimony from this witness.

10           MR. HANNON:  Can I pursue this just a little bit?

11           JUDGE BOGLE:  No, you may not.  Mr. Hannon, I am

12   really tired of these long exchanges.  I have told you before

13   we even swore the witness in, very, very limited, quick

14   testimony concerning the penalty and the affirmative

15   defenses.  That's all.

16           BY MR. HANNON:

17   **Q    Are there standards, Mr. Landrau, that you looked**

18   **to conclude that Officer White had violated his obligation as**

19   **you indicated earlier to set an example in a leadership role?**

20           **Are there specific standards that the GPO has in**

21   **place that would advise Officer White what you would have**

22   **expected of him?**

23   A    I don't know their specific standards.  Maybe

24   Mr. Vernon can address that better.  Are you referring to

25   performance standards?  Or, I'm not sure I understand the

Page 93

1    question.

2        Q    **Any written procedures that state what a**

3    **supervisory sergeant should do under the circumstances that**

4    **were presented to Officer White?**

5        A    I don't know that I can answer that with certainty,

6    but normally the position descriptions and the performance

7    standards at the very least would cover the responsibility to

8    follow instructions and follow the policies of the Agency.  I

9    believe there is actually a standard directive in the Agency

10   that specifically says that all employees were responsible

11   for following all policies, whether read or not.

12       Q    **Okay.  You agree that at some point in time**

13   **Officer Everett became responsible for enforcing the post**

14   **orders at Post 41.**

15           JUDGE BOGLE:  Mr. Hannon, you're going right back

16   into the merits of the case.  We're not going there.

17           MR. HANNON:  All right, I'll move on.

18           BY MR. HANNON:

19       Q    **Given your knowledge of Officer White, by the way,**

20   **do you know how many GPO officers have advanced college**

21   **degrees?**

22           MR. FINE:  Objection, Your Honor, this is not

23   relevant to the issue at all, not stated by the witness, and

24   the testimony has issued that he considered as the number of

25   people with a college degree is not a requirement to be a GPO

Page 94

1   police officer.

2          MR. HANNON:  Officer White as Mr. Landrau does have

3   an advanced degree.  I just want to ask him why he believes

4   that some lesser penalty or lesser corrective action wouldn't

5   have remedied the problem from his standpoint.

6          JUDGE BOGLE:  Well, you can certainly ask the

7   second part of that.  His advanced degrees don't have

8   anything to do with it, though.

9          MR. HANNON:  Knowing Officer White, everything

10  about him is his background.

11         BY MR. HANNON:

12     **Q    Why choose such a severe penalty?**

13     A    I didn't choose the specific penalty.  I enforce

14  and acknowledge the penalty as a deciding official.  I

15  thought that, as I said before, the factors that I looked

16  into the penalty was, number one, is there a need to

17  understanding that no higher penalty could be recommended by

18  me.

19         At that time, is there a possibility that a lesser

20  penalty, which I believe is you are asking, serve the purpose

21  of rehabilitating or considering the behavior expressed by a

22  sergeant in either organization.  And when I looked at that,

23  what I thought was that a person in his position, in a

24  position of leadership, a person who is responsible for the

25  direction of others and that sets the example of what a

Page 95

1    sergeant is supposed to do, a person with his experience,

2    both before GPO and after GPO and in the law enforcement

3    arena should have known better.

4           And that was the main thing related to should a

5    lesser penalty be appropriate.  This individual has

6    significant experience in law enforcement, significant

7    experience on risk analysis which invariably to a person who

8    uses those expertise will lead them to believe that in

9    actions such as those that he saw on that particular night

10   will invariably lead to possibly more difficult or dangerous

11   situations.  And that is what he is expected to prevent

12   those.

13   **Q    It sounds to me as if you have penalized him for**

14   **failure to exercise a supervisory responsibility.  You're**

15   **holding him to a higher standard, are you not?**

16        A    The charge was violating the policy, and that's

17   what he was charged with.  He did not follow the procedures

18   and the policy.  The things that I took into consideration

19   related to the impact on not pursuing what's written on the

20   policy, the content on that policy has to be taken into

21   consideration on whether he is a brand new officer with no

22   experience or a senior officer with significant amount of

23   experience on risk analysis, difficult situations, and

24   supervisory experience, all the way to the management that he

25   has.

Page 96

1        So should he have known that this was going to be a

2   problem and the impact on the Agency, the answer to that is

3   yes.  Anything less than what recommended, I believe, would

4   send the wrong message and would encourage others to not

5   follow those procedures that are so carefully structured for

6   the Agency.

7        **Q    If the person who was in Officer White's role in**

8   **this incident did exactly the same thing that he did, yet was**

9   **an officer in his second year, would your discipline have**

10  **been less severe?**

11       MR. FINE:  Objection, Your Honor.  This is a

12  hypothetical. as opposed to what the witness was presented

13  with, which is a case file in a representation here.

14       JUDGE BOGLE:  I'll permit the question.

15       THE WITNESS:  I will answer the same way that I

16  answered your question in the deposition.

17       As a deciding official and with background in human

18  resources, you learn to understand to look objectively at the

19  situation at hand.  And the situation at hand at that point

20  was that a sergeant with significant experience was the one

21  making the decision.

22       It is possible that an officer with less experience

23  would make an outstanding decision as it happens every day,

24  so for me to speculate and assume that an officer with lesser

25  number of years and experience would necessarily be less

Page 97

1    effective when making decisions would probably hinder my

2    decisionmaking process, because it would take me into a loop

3    of what is.

4            If it was a private, would I have done the same

5    thing?  If it was a corporal, would I have done the same

6    thing?  No.  I was presented with a senior, experienced

7    officer where law enforcement and risk analysis experience

8    with many years who should have known better and did not.

9            BY MR. HANNON:

10       Q    In following up on that, do you believe in reaching

11   your decision that Officer White should have questioned

12   Officer Everett's conduct?

13       A    No.

14            JUDGE BOGLE:  Mr. Hannon, back to the merits.

15            MR. HANNON:  It goes to this issue, Your Honor.

16            JUDGE BOGLE:  No.

17            BY MR. HANNON:

18       Q    Do you recall stating in your deposition that in

19   your view "Officer White" -- this is at page 27 -- "should be

20   the one who is senior in that environment and who should be

21   held at a higher standard?"

22            Do you remember saying that?

23       A    I don't know if I used those words, but if it's

24   there, I'm sure I said it.

25       Q    But is that your view today?  The basis for your

Page 98

1    discipline is that you're holding him to a higher standard?

2       A    I believe that as you move off in responsibility,

3    when you have responsibility for people versus

4    non-responsibility for people.  When you have responsibility

5    for people versus non-responsibility for people; when you

6    have responsibility for programs or for organizations, you

7    are held to a higher standard.  That is a true statement,

8    yes.

9       Q    And at page 26, you stated at line 17: "I believe

10   that number one, he, Officer White, should have acknowledged

11   those individuals coming in.  He should have addressed

12   Officer Everett related to those individuals."

13            JUDGE BOGLE:  Mr. Hannon, we're right back where we

14   were five minutes ago.  Anything else on the penalty?

15            BY MR. HANNON:

16      Q    Do you understand that under 655.4A the purpose of

17   appropriate discipline is to maintain both discipline and

18   morale?

19      A    Absolutely.

20      Q    And are you aware that in this proceeding, a number

21   of officers have testified that they believe that the

22   penalties imposed upon African-American officers are

23   disparate?

24            MR. FINE:  Objection, Your Honor.  There's been no

25   such testimony while I've been in this room.

Page 99

1               JUDGE BOGLE:  Mr. Hannon, what's that all about?

2               MR. HANNON:  In discovery.

3               JUDGE BOGLE:  I'll sustain the Agency's objection.

4               MR. HANNON:  I'm sorry, Your Honor?

5               JUDGE BOGLE:  I will sustain the Agency's

6    objection.

7               MR. HANNON:  These are witnesses you wouldn't allow

8    us to call, Your Honor.

9               JUDGE BOGLE:  Well, I think that was a correct

10   ruling.  If they were going to tell me about their morale.

11              MR. HANNON:  No, they were going to tell you about

12   their impression of disparate treatment, including white

13   officers.

14              BY MR. HANNON:

15       **Q    Did you consult the schedule of offenses and**

16   **penalties for this incident?**

17       A    Yes.

18       **Q    And do you recall that the instruction 655.4A**

19   **states that "[T]he majority of penalties are not considered**

20   **serious enough to warrant removal.  Repeated violations may**

21   **warrant removal."**

22              **I with draw that question.**

23       **Q    I know that you have experience in the military.**

24   **Do you have experience in law enforcement?**

25              MR. FINE:  Objection, Your Honor.  This is not upon

Page 100

1    direct testimony.  He did not testify to military experience.

2              JUDGE BOGLE:  Well, he called this witness too, but

3    I don't find that at all the question.

4              MR. HANNON:  I'm sorry, I didn't hear, Your Honor.

5              JUDGE BOGLE:  I said you also called this witness

6    so you're technically not on cross examination.  But I don't

7    find that a relevant question.

8              MR. HANNON:  Very good.

9              I have nothing else.

10             JUDGE BOGLE:  Anything?

11             MR. FINE:  I have no further questions, Your Honor.

12             JUDGE BOGLE:  All right, thank you.  You're

13   excused.

14             THE WITNESS:  Thank you.

15             JUDGE BOGLE:  And we are now ready for the

16   appellant's witnesses, correct?

17             MR. FINE:  Yes.  Can we call?

18             JUDGE BOGLE:  No.

19             MR. FINE:  All right.

20             JUDGE BOGLE:  Well, certainly not in the middle of

21   a hearing.  At the end of the hearing, you can make the

22   request, but I don't grant very many of those.  So be

23   prepared to tell me specifically what the need would be.

24             And your first witness?

25             MR. HANNON:  Darnelle Everett.

Page 101

1          Could you walk right up to the chairs to the left

2    of Judge Bogle?

3          JUDGE BOGLE:  Do you have any objection to taking

4    an oath?

5          THE WITNESS:  No, ma'am.

6    Whereupon,

7                    DARNELLE EVERETT

8    was called as a witness and, having been first duly sworn,

9    was examined and testified as follows:

10          JUDGE BOGLE:  Please be seated and state your full

11    name and your title.

12          THE WITNESS:  Darnelle Everett.

13                    DIRECT EXAMINATION

14          BY MR. HANNON:

15    **Q     And your position with the GPO currently?**

16    A     Right now, I don't know.

17    **Q     And that's because you've been discharged?**

18    A     Right.

19    **Q     And you've been discharged in connection with the**

20    **incident involving Officer White.  Is that correct?**

21    A     Yes, sir.

22    **Q     Keep your voice up so that we can all hear you.**

23          **When did you start working at the GPO?**

24    A     29 August 1998.

25    **Q     1998.  And between 1998 and this incident,**

Page 102

1    **October 29, 2006, had you ever been proposed for discipline?**

2        A    No.

3        **Q    Prior to coming to work for the GPO, could you tell**

4    **the Judge what other employment experience have you had?**

5        A    I was working for the Naval Surface Warfare Center,

6    Carderock.    I was the security officer there for five years.

7        **Q    Any security work prior to that?**

8        A    I worked for Wackenhut for two years.

9        **Q    And prior to that?**

10       A    I was in the military.

11       **Q    What branch of the service were you in?**

12       A    United States Army.

13       **Q    How many years?**

14       A    Eleven.

15       **Q    What rank did you finish at?**

16       A    I finished at specialists.

17       **Q    And how long have honorably discharged?**

18       A    Yes.

19       **Q    And how many years of government service do you**

20   **have total?**

21       A    Right now, it would be 25.

22       **Q    Well, you know Officer White.**

23       A    Yes.

24       **Q    Now, we've already seen the videotape of the**

25   **incident of the evening of October 29 of 2006.**

Page 103

1          Could you tell the Judge what your assignment was

2  on that date?

3      A    My assignment was Post 41.

4      Q    And that's at Building 4?

5      A    Building 4, yes.

6      Q    And did there come a point in time when you were

7  relieved at Post 41?

8      A    Yes, I was relieved by Officer White to go to

9  lunch.

10     Q    And where did you go from there?

11     A    From there I went to get some money from

12 Officer Oldach because I hadn't planned on eating, and

13 Officer Oldach, I went to lunch for him, take his lunch up,

14 because he couldn't leave.

15     Q    Officer Oldach was working in the --

16     A    Control Center.

17     Q    The Communications Center, correct?

18     A    Right.

19     Q    He was on the radio?

20     A    Right.

21     Q    So you were going to buy food for him to eat at his

22 post.  Is that correct?

23     A    Right.

24     Q    And you did not?

25     A    Yes.

Page 104

1    Q    And then what did you do?

2    A    After I returned, I took his food to him.  Then I

3    proceeded back over to Post 41.

4    Q    And did you encounter anybody when you crossed

5    North Capitol Street to Post 41?

6    A    Yes.

7    Q    Who did you encounter?

8    A    I encountered Ms. Porter coming from Building 4,

9    but I went to 732, and I had met someone there and I was

10    walking back toward Post 41.

11    Q    Who was the person you met at 732?

12    A    A Wanda.

13    Q    How did you know that person?

14    A    I know her.  She works up at Massachusetts and

15    North Capitol at a hotel.  And I have met her like six, seven

16    months ago.

17    Q    So the two of you were crossing North Capitol

18    Street over to Building 4?  And why was Wanda coming with

19    you?

20    A    Well, Wanda stopped by to say hi, and her bus comes

21    that way.  And the bus stop is maybe 50 feet from Building 4.

22    And she was just going to talk to me, or whatever, until her

23    bus came.

24    Q    Now, as you were crossing North Capitol Street, you

25    encountered this woman, Monique Porter?

Page 105

1       A    Right.

2       Q    **And you knew her?**

3       A    Yeah, I knew her maybe eight years ago.

4       Q    **And had you had court proceedings that involved**

5    **her?**

6       A    For the last two years, yes.

7       Q    **You had gotten a stay-away order in Prince George's**

8    **County?**

9       A    Right.

10      Q    **Because of threats of violence to you and your**

11   **family?**

12      A    Right.

13      Q    **And when you and Wanda were coming across the**

14   **street to Building 4, what did Monique Porter do?**

15      A    Well, I didn't really see her until I got in the

16   middle of the street, and from there she started talking and

17   raving.  And so what I did, I told Wanda, let's go.  I wasn't

18   going to just leave her right there.  So we went for the

19   building and Ms. Porter followed us.

20      Q    **And what did you do when you got to the building?**

21      A    Well, I got between Wanda and Ms. Porter, because

22   Ms. Porter was talking.  Well, you know, when people make

23   threats, I don't pay no attention.  But I felt like, well,

24   because I knew her past, she might; and she might not.

25      Q    **All right.  And so when the three of you got to the**

Page 106

1    entrance to Building 4, then what happened?

2        A    Well, as we got to the entrance, I went inside, and

3    Cpl. White had started asking me where was I at, because

4    Wilson --

5        Q    Let me back up for a moment.  When you went inside

6    to Building 4, what had you told to Monique Porter?

7        A    I told her don't come in the building.

8        Q    And what happened?

9        A    She came in anyway.

10       Q    And what did you do with Wanda?

11       A    I told her to just go sit at the desk while I take

12   care of this situation here.

13       Q    And by situation, what do you mean?

14       A    Ms. Porter, trying to get her out of the building.

15       Q    Okay, so the three of you were in the lobby of

16   Post 41, correct?

17       A    Right.

18       Q    And could you tell us what happens then?

19       A    Well, when were in the lobby, Cpl. White was on the

20   other side and he had asked me where was I at, what happened,

21   because Sgt. Wilson had been calling and rushing, because

22   supposedly the guy at Post 50 had to be relieved for lunch.

23   And they said we are short.

24            So after he asked me that, I told him, well, I went

25   to get Oldach some lunch.  So then he said Wilson had just

Page 107

1   called and said that he needed to get out 50.  So I told him

2   to go ahead.  I got this and that's what he did.

3       **Q    What did Officer White do then?**

4       A    He left.

5       **Q    And at that point when you stated to him, I've got**

6   **it.  I've got this.  Go ahead --**

7            MR. FINE:  Objection.  The witness hasn't testified

8   to this.  Mr. Hannon is testifying at this point in time.

9            MR. HANNON:  I'm sorry.  I'm not going to try to

10  change what he said.

11           MR. FINE:  He didn't say it, Your Honor.  I object.

12   Mr. Hannon testifying for the past half-hour.

13           JUDGE BOGLE:  Let's ask the witness that he has

14  been leading.  Go ahead.

15           BY MR. HANNON:

16      **Q    Mr. Everett, could you tell the Court when it was**

17  **that you believed you were responsible for following the post**

18  **orders at Post 41 when you came to relieve Officer White?**

19      A    You mean, when I took back over the post?

20      **Q    Yes, sir.**

21      A    Yes.

22      **Q    When was that?**

23      A    Right after I told them I had it.

24      **Q    And what did he do after you told him that?**

25      A    He left.

Page 108

1     Q     Now, the part of the video that we've seen shows

2    the three of you in the area of the surveillance camera until

3    you escort Ms. Porter out.

4          Could you just tell the Judge what was going on

5    during the time that the three of you were there?

6     A     Well, at the time, Ms. Porter was making threats

7    about doing something to my car.  It was across the street,

8    something to the fact that she was going to do something to

9    Wanda when she came outside, and all of this.  So I told her

10   that she had to go, and that's what I tried to do, get her

11   out and tell her to go.

12         And I got her on the other side of the X-ray

13   machine and we were standing in the hallway.  I called on the

14   radio and said I had a disorderly.  I was told to call 9-1-1.

15    Q     You were told to call 9-1-1?

16    A     Yes, sir.

17    Q     Who told you that?

18    A     Sgt. Wilson.

19    Q     Did you call 9-1-1?

20    A     I couldn't.  I wasn't close to a phone.  Plus, I

21   didn't have my cell phone.  And I'm standing right there

22   confused because of the fact that we're supposed to be police

23   officers and you're asking me to call another police

24   department.

25    Q     So what did you do then?

Page 109

1   A   I just kept trying to get her out of the building.

2   **Q   Did you?**

3   A   I finally got her out, and then as I was shutting

4   the door, she hit me.

5   **Q   And then what happened?**

6   A   I proceeded to try to arrest her.

7   **Q   What happened in that altercation?**

8   A   Well, in that altercation we were outside.  I was

9   trying to handcuff her.  She was fighting me back.  I got on

10  the radio and I called for assistance, and nobody came.

11  Then, all of a sudden, Floyd Richardson came and helped me

12  get her in handcuffs.

13  **Q   Now, were you injured?**

14  A   Yes.

15  **Q   How were you injured?**

16  A   I had laceration to the nose and the mouth.  My

17  mouth got busted.

18  **Q   Were you wearing your service weapon?**

19  A   Yes.

20  **Q   What kind of a weapon was that?**

21  A   A C228 or 229.

22  **Q   And how was it secured in your holster?**

23  A   We have a secure holster.

24  **Q   Just a strap?**

25  A   A snap lock.

Page 110

1        Q    And anyone can unsnap it?

2        A    No.  You have to have a pressure on it, but, you

3    know, if you know anything about it, you can tell.

4        Q    Now, just a couple more questions.  I'm sorry.  Did

5    you make a second call for assistance?

6        A    Yeah, I called for assistance and nobody came.  So

7    then I got on the radio and by that time Richardson had

8    arrived.

9        Q    And where did he come from?

10       A    He came from Lot 50.

11       Q    Can you tell the Judge where Lot 50 is in relation

12    to this?

13            JUDGE BOGLE:  Aren't we significantly beyond the

14    part of this incident that concerns the appellant?  And if

15    this individual also has a case pending somewhere, would you

16    think he would want to go through this whole thing.

17            MR. HANNON:  I understand that.  I just want to

18    have the Court understand where Officer Richardson was and

19    then I want him to state where Sgt. Wilson and Officer Oldach

20    were.

21            MR. FINE:  Your Honor, I object to this.  This is

22    totally beyond the issue at hand of where Officer Wilson was

23    and where Officer Oldach was.

24            JUDGE BOGLE:  Yeah.  I don't see how that relates

25    to the part of this case that the appellant is charged with.

Page 111

1          MR. HANNON:  Well, I've stated my positions and you

2    disagree.  It has to do with in my view the penalties imposed

3    are based upon what are perceived to have been something

4    getting completely out of control.

5          JUDGE BOGLE:  Okay, but these cases are not joined

6    for consideration.

7          MR. HANNON:  No.  I understand that.

8          JUDGE BOGLE:  I only have the appellant's.

9          MR. HANNON:  I'll just proffer and I'll know the

10   questions.  I'll proffer that Sgt. Wilson was directly across

11   the street at the Control Center.

12          MR. FINE:  Objection, Your Honor, that's not a

13   question.  It's a statement by Mr. Hannon.

14          JUDGE BOGLE:  Anything else for the witness?

15          MR. HANNON:  No, but I just want to state my

16   proffer.

17          JUDGE BOGLE:  I don't believe it's relevant.  Mr.

18   Fine, anything?

19          MR. FINE:  Yes.

20                    CROSS EXAMINATION

21          BY MR. FINE:

22   **Q    Mr. Everett, now, you said in regards to this**

23   **friend, Wanda, of yours.  She was there only to catch a bus?**

24   A    Well, yeah, basically.

25   **Q    Now, you were telling the inspector general**

Page 112

1    investigator that your friend Wanda had called you and said

2    that she was going to bring you food for lunch?

3        A    Right.

4        Q    Well, was she coming to wait for the bus, or was

5    she coming to have lunch with you.

6        A    Well, she wasn't coming to have lunch.  She was

7    dropping it off and the bus is right there.  The bus, you

8    can't just jump on the bus until you see the bus, right?  The

9    bus has a schedule, right?

10       Q    Right.

11       A    So, you're coming from one place and you have

12    lapsed time for the bus.  She was bringing me the lunch, and

13    the bus stop was right there.  You could see the bus stop

14    from Building 4.

15       Q    All right.  So, when you entered the building, it

16    shows you holding a plastic bag.  You were carrying a bag of

17    food?

18       A    All right.

19       Q    So, you had taken a lunch break.  Is that correct,

20    sir?

21       A    Well, I took my lunch break to go get Oldach his

22    food, because he couldn't leave.

23       Q    Well, doesn't Oldach, doesn't he get relieved?

24       A    He cannot leave the Control Center.

25       Q    Wasn't Officer White's job that night at Post 32 to

Page 113

1   relieve officers so they could get lunch?

2        A    Supposedly, but Wilson kept crying about everybody

3   being late and taking too much time.  That goes back to the

4   lunch hour, because lunch hours didn't start on time.

5        Q    They started at 5:30 when you were relieved.  Isn't

6   that true, sir?

7        A    I guess, I don't know.

8        Q    Okay, so you had 30 minutes according to the

9   contract.  Isn't it true, sir?

10       A    No.

11       Q    No?

12       A    No.

13       Q    You're saying you get more than 30 minutes?

14       A    Usually on the weekends, that's the way they've

15  been doing it.  We get a whole hour because you get 30

16  minutes for lunch, 15-minute breaks, and instead of taking

17  the 15 minute breaks, you take the whole hour, because you

18  won't get a break that whole night.

19       Q    You know that's not true, sir.  The contract says

20  you get a half-hour.  Does it say in the contract that you

21  get an hour, sir?

22       A    Well, if it says in the contract, it might.  But

23  that ain't what we've been doing on the weekend.  That's how

24  they've been doing on the weekend.

25            You take the hour because you won't get another

Page 114

1    break the whole day.

2        Q    **When you came back into Post 41, didn't Mr. White**

3    **say to you, where have you been?**

4        A    Yeah.

5        Q    **All right.**

6        A    Because Wilson had been called to him.

7        Q    **So Wilson had been saying, where's Officer Everett,**

8    **right?**

9        A    I don't know.  I wasn't there.

10        Q    **Well, you have a microphone on, don't you?**

11        A    Excuse me?

12        Q    **You have a two-way radio that you wear on your**

13    **lapel, right?**

14        A    He never called me on the radio.

15        Q    **He never called?  Did you have your radio on?**

16        A    Yes.

17        Q    **Because that's paid time, that lunch period.  Isn't**

18    **it?**

19        A    Yes.

20        Q    **And you're supposed to have your radio on?**

21        A    It was on.

22        Q    **Well, then, Officer White knew that Wilson was**

23    **calling.  Why didn't you respond to Officer Wilson that you**

24    **were taking 45 minutes for lunch and not 30 minutes?**

25        A    Why did I what?

Page 115

1    Q    Why didn't you advise the officer in charge that

2  you were taking 45 minutes for lunch to go buy Mr. Oldach

3  lunch, and that's why you were gone beyond your 30 minutes?

4    A    Because he had already knew that I was going for

5  Oldach.  I had to go by him to get to Oldach.

6    Q    Why were Officer Wilson that had been calling and

7  saying where are you if he knew that you were buying lunch

8  for somebody else?

9    A    I don't know.  That's just how he is, because it

10  was on a Sunday.  Subway closes at four o'clock or five

11  o'clock on Sundays, or six o'clock, something like that.  He

12  always went to Subway, so I guess he was trying to rush me so

13  he could back so he could go to Subway to get his lunch.

14    Q    But it was Officer White's job to relieve officers

15  so they could get their lunch.  That wasn't your job, was it

16  sir?  You were on Post 41.

17    A    Right.

18    Q    You were given 30 minutes for lunch, weren't you,

19  sir?

20    A    But Officer White also had to cover because Wilson

21  had to go to lunch, too.

22    Q    And so he relieves each officer, gets a half hour

23  and relieves them in some kind of order, then.  Isn't that

24  true, sir?

25    A    Right.

Page 116

1    Q    All right.  So, your friend Wanda was bringing you

2    lunch, and you said you left her sitting at your desk when

3    you took Ms. Porter outside?

4    A    No.  I had to walk Ms. Porter to the door.

5    Q    Right, and then you left Wanda.  You said to Wanda,

6    you go sit at the desk.

7    A    Right.

8    Q    That's what you testified.  So you let Wanda then

9    be in charge of the security desk?

10   A    No.

11   Q    You told her to sit at the desk.  Isn't that true,

12   sir?

13   A    Sitting at the desk is not being in charge of

14   anything.  There's two chairs at the desk, one on this side,

15   one on that side.

16   Q    Did Wanda have an ID?  Was she approved?

17   A    I guess.

18   Q    A visitor's ID?

19   A    I guess.  She went to 732.  Sgt. Wilson was at 732.

20   I don't know if he gave her one or not.

21   Q    Well, if I showed you the visitor log that doesn't

22   show that she signed her name down, would you be surprised?

23   A    No, because I wouldn't be surprised if Sgt. Wilson

24   didn't have her signed in, because he already knew what she

25   was coming for.

Page 117

1    Q    So she comes on a frequent basis?  Is that not

2    true?

3    A    No.  No.

4    Q    Brian Weese said that he's seen Ms. Wanda sitting

5    at that desk four or five times.

6    A    No.  Brian Weese is lying, because he's never seen

7    her.

8    Q    So Brian Weese is lying now?

9    A    Yeah, how come Brian Weese is the only one that did

10   see her and not all the people that work in that building?

11   Q    All right.

12   A    He only comes down, at the most, once at night,

13   because I'm not at that post all the time.

14   Q    Now you said when you were outside and you were

15   told to call 9-1-1, you couldn't get to your phone.  Why is

16   that?

17   A    I didn't say I was outside.  I said while we were

18   standing in the doorway I called 9-1-1.  I was told to call

19   9-1-1.

20   Q    Right, so you had left your post then?

21   A    No.  I'm on the other side of the X-ray machine.

22   Q    Other side of the X-ray machine, but when you were

23   outside fighting with Ms. Porter, where were you, outside the

24   building?

25   A    Yes.

Page 118

1      Q    So you had abandoned your post.

2      A    I didn't abandon my post.  I'm standing right

3  outside the front door.  There's a flower pot in front of the

4  front door.  You know how the building is made.  The flower

5  pot is right there.  The door is right here.  If she hit me

6  in the doorway, what was I supposed to do?

7           JUDGE BOGLE:  Well, I think we're getting into his

8  case again.

9           MR. FINE:  All right.

10          BY MR. FINE:

11     Q    When you walked in the door and this person was

12  with you, did you tell Officer White, please remove her from

13  the building, she's not authorized to be here.  I don't want

14  her.  She's dangerous; she's making threats?

15     A    No.

16     Q    So you knowingly let somebody into the building

17  that was dangerous and making threats?

18     A    I didn't let her in.  She walked in on her own.

19     Q    Did you tell Officer White to please remove her

20  from the building when he left?

21     A    No, because at that time Wilson had come across the

22  radio telling White to hurry up and get back to 50.

23     Q    But you saw this as a dangerous individual?

24     A    I didn't see it as a danger, because I already knew

25  her.

Page 119

 1      **Q      And she had made threats?**

 2      A      She had made threats, yeah.  But I didn't ever pay

 3   her threats no attention, because I already figured about us

 4   being out.  But we already got out of court.  I figured she

 5   wasn't going to try anything because she knew I would take

 6   her back to Court.

 7      **Q      But you must have paid her threats some serious**

 8   **attention if you went and got a restraining order to get to**

 9   **Court, you said.**

10      A      No, that was a fact that she had damaged my

11   property.

12      **Q      So she is a dangerous person then?  You've got a**

13   **restraining order against her.**

14      A      Well, I did that, because every time my property

15   got damaged, I was never around.

16      **Q      So how do you know it was her?**

17      A      You would do the math and figure out who did it.

18   If it didn't happen before, but you knew who was calling and

19   telling you all this stuff, then you could pretty much figure

20   out the person who's trying to do you damage to your

21   property.  So I figured it was her.

22      **Q      So you knew she was dangerous then.  She made**

23   **threats and she carried them out?**

24      A      Well, she didn't make the threats to me.  She just

25   did damage to my property.

Page 120

1    Q    But you said you knew who was calling and then you

2    knew who was damaging your property.  You could do the math,

3    I think, was your statement.  So she called you, made a

4    threat, and then your car got damaged.  Is that the simple

5    one and one we're talking about?

6    A    It didn't get damaged the same time she made the

7    threat.  It could be three weeks later, two weeks later, a

8    month later.

9    Q    But you believed it was her?

10   A    Right, but I could never prove it.  But I just went

11   on and got a restraining order against her, because I knew

12   that you had told me you was going to do something, and then

13   a month or so later my car gets messed up or something, then

14   obviously it was you.

15        JUDGE BOGLE:  Did you find anything?

16        BY MR. FINE:

17   Q    So at the point you said that you told

18   Officer White I had it, I think that was your term, you were

19   inside the lobby area and Ms. Wanda -- doesn't seem to have a

20   last name -- and Ms. Porter were also in there with you

21   beyond where the gates are.  Is that correct, sir?

22   A    Right.

23   Q    Right.  So it wasn't until you were all the way at

24   that point right at the desk you were having a conversation

25   with Officer White.  He was telling me something about a

Page 121

1    computer.  Is that right?

2        A    I don't recall.

3        Q    Oh, you don't recall that?

4        A    No.

5        Q    But all three of you were inside the secure area

6    when you finally said, I have it?

7        A    No.  I think Ms. Porter had just bashed through the

8    gate when I said that.

9        Q    Ms. Wanda was already inside there at that point in

10   time?

11       A    Right, she had already walked in front of me.

12       Q    So, okay.  And did you hear the alarm go off?

13       A    What alarm?

14       Q    When you go over to the metal detector, the lights

15   go on, an audio too?

16       A    No.

17       Q    But the red lights went on.  Did you see that?

18       A    I don't recall.

19       Q    You weren't paying attention then, were you?

20       A    I don't recall.  I was going through, too.

21       Q    Okay.  So you weren't in full control of the post

22   or anything then.  The lights went off.  You didn't know what

23   was happening at that point in time.  You had two women in

24   the post that weren't supposed to be there and you weren't

25   paying any attention.  Is that not correct, sir?

Page 122

1        A     I can't recall.

2        Q     **Can't recall.  And you didn't ask for any aid from**

3   **Officer White, because I've got a dangerous person with me?**

4        A     She wasn't with me.  She came in --

5        Q     **She was a few feet behind you.  You didn't ask for**

6   **aid from Officer White, did you?**

7        A     No.

8              MR. FINE:  I have no further questions.

9              JUDGE BOGLE:  You redirect?

10                        REDIRECT EXAMINATION

11             BY MR. HANNON:

12       Q     **When you told Officer White, I've got it, why**

13  **didn't you ask him for help with Ms. Porter?**

14       A     Because at that time it wasn't really a big alarm

15  thing where I thought she might be hostile or anything

16  like that, because like I said, I dealt with her before.

17  And usually, I would just be firm and tell her go, just

18  a notice.  She would leave and nothing occur.  But, I

19  mean, you don't predict that somebody's going to just do

20  whatever.

21       Q     **So at that time were you taking responsibility for**

22  **the post, the people who were there?**

23       A     Right.

24             MR. HANNON:  I have no other questions, Judge.

25             JUDGE BOGLE:  Anything?

Page 123

```
 1                    RECROSS EXAMINATION

 2         BY MR. FINE:

 3    Q    You said as she walked across the street with you,

 4    Ms. Porter and Ms. Wanda, Ms. Porter was making threats and

 5    that's why you got between them.  Is that not true, sir?

 6    A    No.  I said when I came across the street she met

 7    us right in the middle of the street.

 8    Q    And then she started making threats?

 9    A    She may have thought of making threats, but it

10    wasn't a threat to her.  It was a threat to my car.

11    Q    Well, it was a threat to you.  She wasn't making

12    threats to Wanda?

13    A    No.  Not at that time.

14    Q    When was she making threats to Wanda?

15    A    When I told Wanda, let's go.

16    Q    Okay, so where were you?  You were still in the

17    middle of North Capitol?

18    A    We were still in the middle of North Capitol.

19    Q    All right, so you're in the middle of North Capitol

20    Street.  Ms. Porter is making threats to do something else to

21    your car, do some damage to your car, and she is making

22    threats to harm Ms. Wanda.  And you get inside the building

23    and Officer White is there and you say nothing to Office

24    White, this woman is making threats against this woman who is

25    my guest and against my car.  You told Officer White, you
```

Page 124

1    said I don't need any help.

2         A    No, because I didn't think I needed it, because it

3    was a personal matter that didn't really go.  When she made

4    threats, I don't take her threats seriously because of the

5    fact I dealt with her.

6         Q    Obviously, you don't deal with her very well if she

7    has damaged your car.

8         A    Well, that's what I'm saying.  I can't predict when

9    she is going to do something.  But I know that for that --

10        Q    She is capable of doing things.  Isn't that

11   correct?

12        A    She is capable, but I can't say you are going to do

13   it at that particular time, because she never came on my job

14   and did anything like that.

15        Q    But she knew where you were.  How did she know

16   where you were?

17        A    Everybody I know probably know where I work.

18        Q    And they know what shift you work?

19        A    Yeah, my family knows what kind of shift I work,

20   too.

21        Q    Your wife knows what shift you work?

22        A    I'm not married.

23             MR. FINE:  I have no further questions.  Thank you,

24   Mr. Everett.

25             JUDGE BOGLE:  Thank you.  You're excused.

Page 125

1              Are we ready for the Appellant's testimony?

2              MR. HANNON:  Yes, Your Honor, and after that I'll

3    discuss a third witness, but we don't need to discuss that

4    now.

5              JUDGE BOGLE:  All right.

6              Would you come up here, please?

7              Do you have any objection to taking an oath?

8              THE WITNESS:  No.

9              JUDGE BOGLE:  Stand, please, and raise your right

10   hand.

11   Whereupon,

12                   ROBERT O. WHITE, SR.

13   was called as a witness and, having been first duly sworn,

14   was examined and testified as follows:

15             JUDGE BOGLE:  Please be seated and state your full

16   name and your title.

17             THE WITNESS:  Yes.  Robert O. White, Sr.

18             MR. HANNON:  Thank you, Your Honor.  I would like

19   to show Officer White just one part of the tape, and I have

20   it up on my computer and I can bring it up to the bench.

21             JUDGE BOGLE:  All right.

22             (A videotape was viewed.)

23             MR. HANNON:  No, now that looks strange to me.

24             MR. FINE:  That was it; that over there.  That's

25   who?

Page 126

1          MR. HANNON:  Oops.  Okay.

2          MR. FINE:  An employee?

3          MR. HANNON:  This is at 8:18.

4                    DIRECT EXAMINATION

5          BY MR. HANNON:

6     Q    **Have you ever seen this?**

7     A    Yes.

8          JUDGE BOGLE:  Yeah, you mostly need the appellant

9     to see it and ask him about it.  You were kind of standing in

10    front of him.

11         MR. FINE:  All right.

12         MR. HANNON:  Now, I want to back it up a little

13    bit.

14         MR. FINE:  Which one is which?

15         MR. HANNON:  I am going to ask to back it up to

16    18:14, so we have Officer White explain what happens.

17         BY MR. HANNON:

18    Q    **All right.  You're sitting at the post, right?**

19    A    Yes, Ms. Wilson had called.

20    Q    **Tell the Judge what's happening now.**

21    A    When Everett came in, I was back here, and he

22    stopped there.  And he said man, where have you been?

23    Q    **He's talking to you?**

24    A    And he tells me, oh man, come here.  I got it.  I

25    let him through.  I was reaching over because I had a radio

Page 127

1    or something and I'm grabbing that.  I grab my hat.  I'm

2    telling him, hey look man, the computer system is down.  I

3    said, I've got it back up, but it was down.  And I got my

4    hat, because Sgt. Wilson was calling me, and calling me on

5    the phone.  And I exited that building and went to Post 50 to

6    relieve him.

7         When I got across the street, I asked him, I said,

8    "Do you want me to pick up Officer Oldach's?"  Because Oldach

9    had called me also because he had to go to the bathroom.  He

10   said, "No.  Oldach's got his food.  Just go ahead on to 50

11   and relieve Richardson."  And when I went out to relieve

12   Richardson, that's when I heard the calls come over the

13   radio.

14        Q    All right, that's you right there (indicating)?

15        A    Yes.  And that computer, if you don't use it for a

16   minute, it goes into a sleep mode.

17        Q    The computer that governs the alarms?

18        A    You have a base recognition on this desk right

19   here.

20        Q    Yes?

21        A    They had three screens: this one, that one was back

22   there; and then you had another one above you which is a four

23   split screen that something in the back goes on that shows

24   you the basement area.  If people come through the basement,

25   it has a strobe on it, and it's also audible.  So you have

Page 128

1    three screens that you deal with there.

2         **Q    And this is the monitor that they later moved back?**

3         A    Yeah, after the incident, they moved that one up on

4    the desk.  It was virtually impossible to monitor all three.

5         **Q    So that just showed Everett leaving, right?**

6    **Everett's gone now?**

7         A    So, I don't know.

8         **Q    Initially, but we can take this as an opportunity**

9    **to talk about what is here.**

10        **Was the face recognition technology available when**

11   **you were on post?**

12        A    We had just gotten owls for the police officers and

13   everybody who worked in this building that worked on the

14   first floor, that's how you got into the first floor.  They

15   didn't have face recognition.  There was a transitional

16   period they were bringing in from across the street to train,

17    so they didn't have face recognition either.  The only ID's

18   that they had was the one the record GPO ID.

19        And generally what the officers did when an

20   employee came in, the officer could not possibly identify

21   that person with their ID at this place, but they did not

22   have their ID's, and many of the other people did not have

23   the ID's, the base recognition.

24        Now, I want to add this also.  There are some flaws

25   in the system.  They tried to do too much.  If you come into

Page 129

1    this exit here and it works --

2         Q    **Which one are you talking about?**

3         A    Okay, if you come in to Post 41 and swipe the card.

4         Q    **Yes, sir?**

5         A    If someone is going into the Control Center seconds

6    before you, and they swipe their card, their face will show

7    up and your face will not.

8         Q    **You mean the Control Center across the street?**

9         A    Mm-hmm, and other points of entry that have that

10   system.

11        Q    **Well, where is it you swipe your card?**

12        A    It's in back.

13        Q    **Oh, it's in the other side then.  All right.**

14             **Now, so let me just understand.  When you were on**

15   **this post on October 29, were there employees that had to be**

16   **allowed through the gate, because they didn't have swipe**

17   **keys?**

18        A    Yes.

19        Q    **And what we saw earlier, this goes back to zero.**

20   **Okay.  All right.  Hold on a moment.  I just stopped at 18.**

21   **It looks to me like 18, 54 seconds.**

22             MR. FINE:  1812 and 54 seconds.

23             MR. HANNON:  We'll see.

24             MR. FINE:  Well, 18 is the hour.  Is that correct?

25             MR. HANNON:  That's the hour, sure.

Page 130

1          MR. FINE:  So then the 54 seconds, the minutes,

2    that's 1812 dot, double colon, 54 dot 765.  It goes to really

3    nanoseconds or something.  That's 18:14.

4          MR. HANNON:  You're right.  This is 13.  All right.

5          BY MR. HANNON:

6    **Q    So at this particular point in time, are you seeing**

7    **any other persons?**

8    A    No, I saw Everett, and people will come in

9    sporadic.  As you saw earlier, people were coming in.  They

10   were coming sporadically.  And when he came back, I said,

11   "Where have you been?"

12   **Q    Now, where was he when you had that conversation**

13   **with him?**

14   A    He was right here.  That's why I didn't drop the

15   gate right away.  I said, "Where have you been?"  "Oh, man,

16   don't worry about it.  I got it.  Go ahead."  I hit the

17   thing, he came in.  There were people behind him.  I'm under

18   the impression that these are other employees coming in,

19   because they're bringing new people across the street to

20   train.  He's telling me he's got it.  Wilson is calling me,

21   and Oldach is calling me.  I was telling them, "Look man, the

22   computer's been down.  I've got it up."  I reached back.  I

23   grabbed my hat and little radio I had, and I left to go to my

24   relief.

25          MR. HANNON:  Okay, I'm going to start running it.

Page 131

1          MR. FINE:  Okay, so we're at 18:14 now, right?

2          MR. HANNON:  I'm going to try to find out what the

3    time is when Officer Everett comes in.  All right, now, I've

4    got it at 12:49.  He comes in at 12:50.  He is standing,

5    12:55.

6          MR. FINE:  So he hasn't crossed the barrier yet.

7          MR. HANNON:  Right, he's outside the barrier.

8          MR. FINE:  At 18:14.

9          BY MR. HANNON:

10     **Q    Right.  You lower the arms at 14:03.  He comes sin**

11   **at 14:04, 14:05.  And then behind him, and I'll represent**

12   **that the first person is Wanda and the second person is**

13   **Monique Porter.  So you're conversing with him.**

14     A    About the system.

15     **Q    About the system; is the system there that he's**

16   **looking at?**

17     A    I can't read it because there's a screen right here

18   and there's another one above the head, and that was back

19   here.

20     **Q    Do you know whether these bags had food?**

21     A    That was a soda.  I remember that, but I'm telling

22   you about the system.  And then Wilson calling me, because

23   I'm trying to get myself together to get out of there to go

24   across the street.  I come around and I grab my hat and I

25   exit.

Page 132

1    Q    Now, persons in this area, for example, this porter

2  person, is there anywhere else in the building she can go to?

3    A    Not on their own; no.

4    Q    So the door up to the secure area with passports is

5  on a buzzer?

6    A    Yes.

7    Q    And the other first floor door is locked?

8    A    Well, that also, you know, has a swipe thing on it.

9  They had just put one of those.  That's a swipe, and they

10  put one there.  So you need to swipe card, and those people

11  who came in --

12    Q    Yeah, so hold on.  Here we see Ms. Porter going out

13  and Officer Everett is escorting her out.

14    A    I don't know anything about that.

15    Q    I understand that, but that's at 18:15:35,

16  something like that.

17          JUDGE BOGLE:  Do I understand that those bars have

18  to be lowered by the guards?  You can't push your way through

19  them?

20          THE WITNESS:  Yes, and the fallacy with that is you

21  have a button on the console that you lower, but at the same

22  time, a person can just do this, and it will fall down.  And

23  if you reverse to go back through there, if you stand in

24  front of it, it will lower by itself.  For clarity, when a

25  person comes in that door, it's 26 feet from the door to

Page 133

1   where the desk is where the officer is.

2          MR. HANNON:  Could I ask a question?

3          THE WITNESS:  Mm-hmm.

4          BY MR. HANNON:

5     **Q    When Officer Everett is standing there telling you**

6   **he's got it, who lowers the gate?**

7     A    I did.

8     **Q    But you're keeping it up for a while.**

9     A    Yeah.

10    **Q    Why did you keep it up for a while?  You were**

11  **annoyed?**

12    A    Well, because, you know, I've got stuff.

13         MR. FINE:  Well, it wasn't sort of.  The alarm goes

14  off at 18:14 back there when the two women go off.

15         MR. HANNON:  Are you talking about the red?

16         MR. FINE:  Right, that's the alarm.  The alarm goes

17  of when those two women walk through.

18         THE WITNESS:  But he had not told me that he got it

19  and he was calling me.  I mean, when we do that, the post is

20  turned over.

21         MR. HANNON:  Okay.

22         THE WITNESS:  I want to add something for clarity.

23         JUDGE BOGLE:  Ask your attorney, first.

24         MR. HANNON:  I'm going to let you go sit over

25  there.

Page 134

1          BY MR. HANNON:

2      **Q      Officer White, would you tell the Judge why you are**

3  **contesting these charges?**

4      A      Your Honor, there's no written policy or procedure

5  on how we relieve each other on a post.  There have been

6  times, on that very post, when I've been relieved and

7  relieved other officers.  I might have been at the hot-dog

8  card, and the officer, sometimes, we'd call him on the radio.

9   Go ahead man, I got it.  And they would do that to me.

10          I've relieved Post 50.  There's a walkway from

11  22 to 50.  I might be half way in sight of the officer there,

12  call him on a radio, go ahead man, I got it.  Or somebody

13  might call in and talk to me, ask directions or something,

14  and while I'm conversing with this person, I'll tell him, go

15  ahead man.  I got it.  I'll take care of this.

16          And the same would happen.  It's just like when I

17  relieved Richardson when I left Post 41.  When I relieved

18  Richardson, when I got it, "that's okay, I got it."  If an

19  employee was at fault, I would have had to do the incident

20  report, because I relieved.  I took control of the post.

21  Okay.  We don't have a formal, like amount of material type

22  of thing like the military have with guard duty.  It is not

23  something that I did.  This was the practice when I got

24  there, and it's actually still the practice today.

25          If an officer tells you, confirms that, "I got it."

1    That's it.  You go.  Now, there have been instances where

2    you go relieve an officer and that officer might stand there

3    and chat with an officer for a few minutes.  If something

4    occurs on that post, it's that officer's responsibility.

5        **Q    Tell the Judge about Chief Vernon's requesting that**

6    **you act in a supervisory sergeant's capacity.**

7        A    I was ready to go out on patrol, and actually I was

8    going to my radio call.  I'd been in and had to pick some

9    paper work up.  And he was coming in, and I guess it was a

10   little before nine, and he says, look.  I'm going to call you

11   around 10.  I want you to come up to the office.  Okay, so I

12   went back out on patrol, and a little after 10 he called me

13   to report.

14            And when I went up to the office at that time I

15   think Cdr. Packard and Sgt. Dailey and Mr. Vernon were in his

16   office.  And he says, "I need a supervisor on day shift, and

17   I'd like to know if you would take the position.  It's going

18   to be unpaid, but if you would take the position of

19   supervisor in an acting capacity, I would like it."  And I

20   said, yeah, I'd do it; and it became effective on the 28th.

21   I think that might have been the --

22       **Q    What did you get out of that, being the supervisory**

23   **sergeant?**

24       A    Well, in my mind, it would have been being in the

25   position and hopefully it would give you sort of an up on the

Page 136

1    promotion, when it came up, of having the experience.  And at

2    that time, it read that I would not exceed 89 days.  Now,

3    about a week after I was made, there was some anticipation,

4    for whatever reason, that they didn't ask anybody else.  So

5    the union may file a grievance.  So what Mr. Vernon did was

6    to have all off the corporals on all of the shifts placed in

7    an acting sergeant position so it wouldn't appear that he was

8    giving preferential treatment, so to speak.  And theirs were

9    only for 30 days, I think, and mine was not to exceed 89.

10        **Q     Why is that provision not to exceed 89?**

11        A     I think if it goes to 90 days, or something, you'd

12   have to get paid.

13        **Q     They have to pay you.**

14        A     Yes.

15        **Q     Were you paid sergeant's pay?**

16        A     No.

17        **Q     So, the rotating sergeants concept didn't come**

18   **until after you were selected.**

19        A     Yes.

20        **Q     Now, could you tell the Judge, before this incident**

21   **happened, what your duties were in the capacity of acting**

22   **supervisory sergeant?**

23        A     Well, I was the lead officer, but when I became

24   acting sergeant --

25        **Q     You need to explain that.  A legal officer is**

Page 137

1   **probably --**

2       A    A legal officer is a corporal.  And up until the

3   last seven, eight months, there were certain duties and

4   responsibilities at the corporal's head that the officer's

5   didn't have.  The corporals worked in the Communication

6   Center.  They just had extra responsibilities that the

7   regular PFCs didn't have.  That was one of the chief

8   responsibilities, and you also assisted the sergeant.  A lot

9   of times the sergeant had to go to a meeting, and the

10  lieutenant was out of the office.  They would pull the lead

11  officer in to hold the office down.

12      **Q    Let's talk about supervisory sergeant.  What things**

13  **did you do after the date when you received that assignment**

14  **in that capacity?**

15      A    Okay, well, about two days afterwards, they sent

16  Sgt. Revere over on the shift supposedly to work with me,

17  because there was some concern that, well, you have this

18  person, because this was the first time they'd done this.

19  You had this acting sergeant.  Now, there's some limitations

20  possibly where there might be some ramifications with the

21  union.

22          If I have to bring a disciplinary action on an

23  employee or make some other decisions they felt that might

24  adverse effect on the Agency, so they brought Sgt. Revere

25  over, supposedly to work with me.  And when he came over, his

Page 138

1    instructions were, "I don't want you doing any paper work.  I

2    want you to be strictly operational.  I want you outside with

3    the troops."

4            I acknowledged that, and I did that.  Right before

5    the two weeks ended, I was brought back in to do the

6    paperwork.

7        Q    **Now, in the first shift on the 29th, you were the**

8    **officer in charge.**

9        A    Yes.

10       Q    **Could you explain why as a supervisory sergeant you**

11   **were the officer in charge?**

12       A    Well, generally, if you have a lieutenant on the

13   shift, generally, and you have a sergeant, lieutenants may

14   have weekends off.  It's how the base may follow on it.  And,

15   well, either you rotate -- a lieutenant would work one

16   weekend and you would work the other weekend.  So, every

17   other weekend, you would have the duty.

18       Q    **On the morning when you were acting as officer in**

19   **charge, were there any other higher ranking uniform or**

20   **otherwise employees who were responsible for the security of**

21   **the GPO that morning?**

22       A    That was it.

23       Q    **You're it?**

24       A    For that seven to three shift.

25       Q    **And is there anyone who's on call?**

Page 139

1    A    Well, if a problem would have arose, I would

2    certainly have notified acting Cdr. Packard.  I would have

3    notified Mr. Vernon.

4    **Q    So that's the process.  You notified people up the**

5    **line if something occurred?**

6    A    Yes, because they have Blackberry's and I had a

7    list of them.

8    **Q    And the lieutenant would do that as well?**

9    A    Oh, yes.

10    **Q    Now, when you were running the first shift as the**

11    **sergeant officer in charge, were there any other sergeants**

12    **also working?**

13    A    No.

14    **Q    And why is that?**

15    A    We only had one supervisor on weekends on the

16    shift.

17    **Q    Now, why is it that you ended up working the next**

18    **shift, the shift on which this incident occurred?**

19    A    Because there's a shortage of staff and they have

20    been for some period of time.  And they have a draft list.  I

21    was drafted to work, because my name was at the top of the

22    lists.  But the thing about that is I'm the only supervisor

23    that's been drafted.

24    **Q    Are sergeants supposed to be eligible for draft?**

25    A    No.  They don't get drafted.  Now, the only time a

Page 140

1    sergeant would, and they don't refer to it as draft.  If

2    something on the scene happened, say, and the third shift

3    supervisor couldn't get in, then that supervisor on the

4    second shift would have to be held over and work for that

5    sergeant.

6        **Q    So, would be held over, but continue to work in a**

7    **sergeant's capacity?**

8        A    Yes, that's the way.

9        **Q    Now, are sergeants permitted to work posts?**

10       A    No.

11       **Q    And why is that?**

12       A    I don't know if it's a union issue or not, but

13   sergeants do not work posts.

14       **Q    And how is it that you could be drafted and forced**

15   **to work a post on the 29th when you were a supervisory**

16   **sergeant?**

17       A    Because, and somebody asks, I wasn't an official

18   sergeant.  I was just in an acting capacity.

19       **Q    Okay, now, let's address Mr. Landrau's reasons as**

20   **he stated them for the penalty in this instance.**

21          **Do you have any objection to his expectation that**

22   **you should exercise leadership?**

23       A    I don't have any problem with that.  No.

24       **Q    Well, why then did you not take action when you**

25   **were presented with the situation that is the subject of this**

Page 141

1    **discipline?**

2        A    Sir, because there was nothing out of the ordinary.

3    I had people coming in that were training.  People were

4    coming in to work.  There was nothing to arouse my suspicion.

5    I don't know everybody on the second shift.  I don't know

6    everybody who's in those programs.  I was there merely

7    relieving.  I don't work that post.

8            And there was nothing to tweak my attention to

9    think that anything was out of the way.  The officer comes

10   back, and I was a little peeved.  And I'm asking him, like,

11   where have you been.  And, you know, he said: "Look man, go

12   ahead, I got it," which is normal.  That is a normal thing

13   that we do.  And I let him know about the computers, and I

14   grabbed my hat and my other thing and I left the building to

15   go to make a sandwich.  And I was a little irritated that

16   Wilson kept calling me on the phone.  Kept calling me; where

17   is he.  I don't know where he is.  I'm here.

18       **Q    Well, why weren't you suspicious of these two**

19   **persons that came in behind Officer Everett?**

20       A    It is nothing unusual for police officers to talk

21   to employees.  Many of them have been there years together.

22   They know each other.  There was nothing going on that was

23   out of the ordinary.

24       **Q    Did you see that the alarm on the magnetometer**

25   **alerted when one of the women went in?**

Page  142

1      A    When Everett told me that he had it, I was

2  gathering my things to get out of there and I was talking to

3  him to tell him about the system, that the computer had been

4  down and gone to sleep.  I gathered my things and left,

5  because I had two people calling me.

6           Oldach wanted a bathroom break, and Wilson was

7  calling me and calling me to get to 11, and I asked to leave

8  the building.

9      **Q    Did it occur to you to question Officer Everett as**

10  **to who these two people were?**

11     A    No, sir, because there was nothing out of the

12  ordinary.  We don't question each other unless there's

13  something out of the ordinary, either visual or if he has

14  something going on.  They're posted to go to relieve, so

15  people talk to people.  I didn't see anything out of the

16  ordinary.  There was no arguments.  There was nothing that

17  other employees weren't doing when they come in.  They come

18  in, they talk to me.

19     **Q    Do you, Officer White, spontaneously react to**

20  **something that you see out of the ordinary?**

21     A    If there's a situation that's out of the ordinary,

22  yes, I do.

23     **Q    You've been involved, in fact, in some security**

24  **breaches at Building 4, have you not?**

25     A    Yes.

Page 143

1      Q      And could you tell the Judge about that?

2      A      Well, Building 4 consists of two manned posts, of

3   41 and 42.  And Post 42 is post area where you have civilian

4   truck drivers with deliveries and you have GPO truck drivers

5   bringing deliveries.  None of these people come in --

6             MR. FINE:  Your Honor, I'm going to object.

7   It's not being relevant to the charges that we are talking

8   about here.  Post 42 is a block away and it's a totally

9   different post than what we are talking about as Post 41.

10  Officer White was not charged with any malfeasance involving

11  Post 42 or any other GPO post.

12            JUDGE BOGLE:  I agree we do not need this in any

13  detail.  I think you simply wanted him to state that he had

14  been involved in other incidents and had reacted when

15  something was out of the ordinary.

16            MR. HANNON:  May I just direct him to an incident

17  involving persons on the roof?

18            JUDGE BOGLE:  Very quickly.

19            THE WITNESS:  Yes.  I had received an alarm that

20  had intruders on the roof of Building 4, and I got a team

21  together and put the cameras on them and confirmed it.  We

22  went up on the roof and we got them.  There were about six

23  Hispanics on the roof.  And what happened was, there's a

24  building that lets up to Building 4, and they were window

25  washers.  And they had lowered themselves down on the roof.

Page 144

1    And on the roof we have windows that run on top of the

2    building that run the whole length, pretty much, of the

3    building.  And the windows are like knee-high, so a person

4    don't necessarily need a rope.  They can come in through the

5    windows, and with the staging up there and the metal work,

6    just come on in, and they're right over top on the floor of

7    the passport section.

8           And I brought that to their attention many times.

9    We ran checks on those six people and they were released.

10   But because of the heightened security, even here of late

11   when making my security rounds and assessments, the windows

12   have been open.  I've called it in, called it in to the

13   Control Center to the point that they're telling me don't

14   call those in anymore.  They know the windows are open and

15   they want ventilation.

16          BY MR. HANNON:

17   **Q     How many years have you been at the GPO?**

18   A     I got there in 1998.

19   **Q     What is your experience in those nine years**

20   **regarding officers escorting persons through security**

21   **locations?**

22   A     If an officer is thought of as a person of

23   authority, and it is done all the time that the police

24   officer is escorting a person, he goes through the various

25   checkpoints.  That was the experience that you had.

Page 145

1    Q    Well, is their identification obtained by the guard

2  who's at that particular post when somebody is coming in

3  escorted by another police officer?

4    A    Most often, if the officer acknowledged that the

5  person is with them, no.

6    Q    And you were referring to circumstances in which

7  you've escorted me into the building?

8    A    Yes.

9    Q    And what has happened on those occasions?

10    A    You received a parking permit when you came in

11  to 50, and we got down to the next post, 22, you did put your

12  items on the belt, and the security person looked at you and

13  asked me, who is he.  He's with you?  Yes.  And we just

14  exited in.

15    Q    So no ID check?

16    A    No.

17    Q    And then when I went to the main counter to sign

18  in --

19        MR. FINE:  Do we have some testimony by the witness

20  as opposed to the onleading?

21        JUDGE BOGLE:  Yeah, I don't think we need a second

22  instance of this.

23        MR. HANNON:  Very good.

24        BY MR. HANNON:

25    Q    Have you had, prior to being the supervisory

Page 146

1    sergeant, prior experience acting as a supervisor in a law

2    enforcement capacity?

3        A    In a criminal justice capacity, yes.

4        Q    And what rank did you achieve at Jessup?

5        A    Well, I was promoted to lieutenant and then I was

6    promoted to captain, promoted to major.  And for a while I

7    was acting chief, shortly before I retired.

8        Q    So for how many years total were you in a

9    management and supervisory capacity at Jessup?

10       A    From 1982 until 1997 when I retired.

11       Q    And you retired from that position?

12       A    Yes.

13       Q    So you're double dipping, so to speak?

14       A    I drew a retirement, yes.

15       Q    And do you have prior military service?

16       A    Yes.

17       Q    And what was that?

18       A    United States Army.

19       Q    How many years?

20       A    Three active.

21       Q    And your education?

22       A    I have a bachelors degree in social science and a

23   masters degree in criminal justice administration.

24       Q    Where did you get those degrees?

25       A    Coppin State University in Baltimore.

Page 147

1      Q    And how many times have you been commended at the

2  Government Printing Office?

3      A    I have five commendations.

4      Q    And did you receive a commendation while you were

5  in fact working while this case was pending?

6      A    Yes.

7      Q    And what was that for?

8      A    It was for a candidate, Mr. Abono, a security

9  detail.  And, as a matter of fact, I just got another one

10  several weeks ago.

11          JUDGE BOGLE:  We need you to speak up.

12          THE WITNESS:  Okay.  An employee of the public

13  secretary had, so I found out on the sidewalk that she had

14  received some bad news and it just effected her that way.

15  And people were sort of walking by.  I came out, I saw her

16  laying on the pavement.  I went to investigate, and I spent a

17  little time with her.  I got her around and I picked her up

18  and took her in and placed her in the room away from the

19  employees and general public and got a hold of a nurse and a

20  doctor.

21          BY MR. HANNON:

22      Q    Your latest evaluation was excellent.  Is that

23  correct?

24      A    Yes.

25      Q    Is that the highest?

Page 148

1      A    Outstanding.

2      **Q    I'm sorry?**

3      A    Outstanding is the highest.

4      **Q    And what was yours?**

5      A    That was what it was.  That's what it was.

6      **Q    Outstanding?**

7      A    And what are the criteria regarding breaches of

8   security that you have to meet to be on track?

9           MR. FINE:  Your Honor, this is not a

10   performance-based case.

11          JUDGE BOGLE:  That's correct.

12          MR. HANNON:  It is not a performance-based case,

13   however.

14          MR. FINE:  And we're not interested in his

15   performance evaluations.

16          JUDGE BOGLE:  Well, I'm willing to take the

17   testimony about was his evaluations are as that might be a

18   mitigating or an aggravating factor, but I don't think we

19   need to know whether he has to do certain things to meet his

20   elements, because I don't think his rating took this incident

21   into consideration, so the two are not the same.

22          MR. HANNON:  I would just proffer that in order to

23   be on track, you can have a superior violation in your

24   record, and yet you're still on track for a proper

25   evaluation.  And I'd ask the Court to hear that in connection

Page 149

1    with the penalty imposed here.

2        **Q    Does the Library of Congress have any policies and**

3    **procedures regarding providing assistance to an officer in**

4    **trouble?**

5            MR. FINE:  Objection, Your Honor.  The Library of

6    Congress procedures are beyond relevance to the matter that I

7    have concern.

8            MR. HANNON:  Mr. Landrau, I think, and I think a

9    great deal of Mr. Landrau and his reasoning, and I think he

10   gave it to you is that in his opinion, had Officer White

11   intervened, then none of the things that transpired

12   thereafter would have occurred.  And one of the things that

13   transpired thereafter was there was an arrest, an assault on

14   another police officer.

15           And so given the facts in his view, I think that

16   that's very relevant.

17           JUDGE BOGLE:  The Agency's objection was sustained.

18           MR. HANNON:  Your Honor, the only other area that I

19   would go into with Officer White has to do with his knowledge

20   of prior incidents of discipline at Building 4 and elsewhere

21   where similar circumstances, such as his and additional

22   evidence regarding the disparate treatment of those persons

23   who are active in the union.  And the reason why I'm

24   proffering that to the Court is my understanding of your

25   prior ruling that given that we have not been allowed to

Page 150

1  complete the discovery of these offenses, which we were

2  originally told we would be able to do.

3          I thought my understanding of this proceeding was

4  based upon what you hear today.  You might leave the record

5  open for us to have the opportunity to complete that and get

6  that information to you; information that was previously made

7  available to us.

8          JUDGE BOGLE:  Based on what I've heard, I certainly

9  would not consider leaving the record open.  I don't know why

10  discovery wasn't completed, but once again, the first inkling

11  you had that you were not going to get what you wanted in

12  discovery, you should have filed a motion to compel.

13          Mr. Fine has described it another way.  He claims

14  he made this information available to you and for whatever

15  reason you didn't copy it, I believe is what he said, and

16  take it with you.  So, no.  There's no grounds here for

17  leaving the record open.

18          In terms of exploring this area with the appellant,

19  you'd have to lay an extremely complex foundation for me to

20  let the testimony proceed, because I fear that it's just

21  going to be based on what he's heard or what he thinks he's

22  heard or what his opinion is.

23          If he knows of some actions from some type of

24  personal experience, I suppose he can tell me about those,

25  although I don't know.  You know, you didn't ask the deciding

Page 151

1    official any of these questions, so we've lost the ability

2    even if you --

3            MR. HANNON:  You didn't permit me.

4            JUDGE BOGLE:  I didn't permit you to ask about

5    other similarly situated cases.

6            MR. HANNON:  Correct.

7            JUDGE BOGLE:  No, I think I did.  I think I did.

8            MR. HANNON:  When I started to ask him about other

9    cases.

10            JUDGE BOGLE:  Did you have any specifics that you

11    asked him about?  No.  You asked him if he went down to

12    personnel and asked about other cases, at least he said he

13    did.  And that wasn't good enough for you.  And you kept

14    asking him why he didn't do more, and I did turn you down at

15    that point.

16            I mean, that was not going to be useful testimony.

17     In terms of asking him, do you know of this case, why did

18    you decide it differently from the way you decided the

19    appellant's case, there was no question like that that I

20    recall.

21            MR. HANNON:  Well, I was starting on that.  You

22    might recall I asked him about Van Horn and there was an

23    objection because he wasn't similarly situated.  And then I

24    began to ask him about a violation that occurred at Post 42

25    on the loading dock, which resulted in only a seven-day

Page 152

1  suspension.

2        JUDGE BOGLE:  But you never laid any foundation

3  that would cause me to believe that these were similar

4  incidents where the employee was treated differently than the

5  appellant.

6        Now, in terms of the remainder of this witness's

7  testimony, if you can ask him specific questions, first of

8  all laying the foundation that this is in fact a similarly

9  situated case, and his knowledge of what the charge was and

10 what the penalty was is based on something other than what

11 he's heard other people tell him, if he's actually seen the

12 documents or has other personal experience, personal

13 knowledge, then you may proceed.

14        If this is going to be just, you know, do you know

15 of other incidents where people were treated better than you

16 were treated in this incident, no.

17        MR. HANNON:  I could do that.

18        BY MR. HANNON:

19 **Q    Officer White, would you tell the Judge about**

20 **incidents of which you have personal knowledge regarding**

21 **other violations of security at Building 4 and the outcome**

22 **from a disciplinary standpoint?  And you need to focus on**

23 **uniform officers.**

24        JUDGE BOGLE:  I don't think that meets my

25 requirements.  I mean, what incidents are these?  What was

Page 153

1    the conduct?

2           MR. HANNON:  Yes.

3           JUDGE BOGLE:  Was it in the same work unit?  Was it

4    proposing and deciding officials exactly the same they were

5    in his case?  All those factors have to be the same.

6           MR. HANNON:  He can testify to those things.

7           JUDGE BOGLE:  All right.

8           THE WITNESS:  Well, I didn't see a full

9    investigation paperwork, but from the person himself told me

10   that he was charged with not being at his post.  This is

11   Officer Curtis.  And there was a truck there to pick up the

12   passports and the officer was supposed to put a seal on the

13   truck, and the truck departed.  And the passports fell out of

14   the truck in downtown Washington, D.C., and a mideasterner

15   picked those passports up and they found their way back to

16   GPO.  And Officer Curtis told me he got a seven-day

17   suspension.

18          There was another person.

19          JUDGE BOGLE:  Wait a minute.  Was the proposing

20   official Mr. Burgess?

21          MR. FINE:  I can't understand what the man is

22   saying.

23          JUDGE BOGLE:  This is the problem, Mr. Hannon.  I'm

24   more than willing to take this kind of evidence, but this is

25   why I wanted to get documentary evidence in the record rather

Page 154

1  than testimonial evidence.  I don't think so is not going to

2  be helpful.

3       MR. HANNON:  Judge, the reason, well, I have some

4  other documentary evidence that was put together by the union

5  chairperson.  But the reason that we're in the position that

6  we're in is because Mr. Fine was playing in my view close to

7  the vest.

8       JUDGE BOGLE:  Okay, I think we've been all over it.

9       MR. HANNON:  And we have the opportunity to have --

10       MR. FINE:  Your Honor, I resent these outrageous

11  lies by Mr. Hannon.  The documentation was available to him,

12  as of August 6.  He had nobody come to my office until

13  August 10, and the Clerk was there for four hours on

14  August 13.  The evidence sat there for an entire day.  While

15  he was in deposition, the material was in the deposition

16  room, and Mr. Hannon did not have a Clerk with him.  So this

17  is just an outrageous accusation by this gentleman.

18       MR. HANNON:  The documents that were marked on the

19  first time we spent four hours going through them, Mr. Fine

20  refused to produce them.

21       MR. FINE:  Because they were outside the scope of

22  discovery.  They are from 1998 when Officer Curtis was

23  disciplined for his failure in receiving 30-day suspensions.

24       JUDGE BOGLE:  You know, the answer to this is very

25  simple.  This record does not contain a motion to compel

Page 155

1    discovery.  You were in voluntary discovery.  You may or may

2    not have treated each other fairly.  I don't know.

3         MR. HANNON:  I did file a motion to compel

4    discovery.

5         JUDGE BOGLE:  I don't see one.

6         MR. HANNON:  August 16, three days after discovery

7    ended.

8         JUDGE BOGLE:  Oh, well, the ones you filed

9    recently, yes.  Of course, but I told you during the

10   pre-hearing conference that discovery ended on that day.  You

11   asked me if I'd be willing to make a ruling and I said I

12   would not.

13        MR. HANNON:  Judge, after the pre-hearing, we

14   expected to be provided this information and we expected to

15   be provided --

16        JUDGE BOGLE:  Again, all I can say is, I don't know

17   whether you treated each other fairly or not, but you were in

18   voluntary discovery, and unless and until you filed a motion

19   to compel for me to rule on it, you didn't do that until

20   after discovery was ended.

21        MR. HANNON:  I didn't need to.

22        JUDGE BOGLE:  I'm sorry you didn't get the material

23   you wanted, but that's the fact of what occurred in this

24   case.  So, do you have anything else for this witness?  He

25   has told you he does not know about the situation he was just

Page 156

1    addressing, whether Mr. Vernon was the proposing official.

2    So I can't use that information.

3         Do you have anything else you want to ask him?  If

4    not, I'm going to turn him over to Mr. Fine.

5         MR. HANNON:  You're limited to cases where you know

6    Mr. Vernon was the proposing official?

7         MR. BOGLE:  And Mr. Landrau was the deciding

8    official.  And it didn't sound like either one of them had

9    been with the Agency for very long.  So that may be a very

10   small number of cases.

11        MR. HANNON:  I don't think that the Court's

12   limitation is appropriate given that we're not just talking

13   about the penalty.  But we're also talking about disparate

14   treatment based on race and union involvement.  Those

15   incidents do not have to meet the standards that we've set

16   out.

17        JUDGE BOGLE:  I believe they do, but nonetheless if

18   you give me information that you don't really know, I can't

19   use it.  That's why I wanted the documentary evidence.  And

20   for whatever reason we've gone over, each of you have a

21   different view but it didn't come in that way.  So I have to

22   limit his testimony that way for me to be able to use the

23   information.

24        Is there anything you want to ask him or not?

25        MR. HANNON:  Judge, just to complete the record on

Page  157

1    this, the pre-hearing order said that counsel were to

2    cooperate on producing that and that didn't happen.  And

3    perhaps Mr. Fine would like to make a statement on the record

4    as to why Officer Richardson and Sgt. Wilson were not made

5    available for deposition on Monday as promised?

6              JUDGE BOGLE:  I think we've gone far enough with

7    this, and as for what elements have to be true for a

8    discrimination claim to deal with at page 4 of my order, it's

9    all set out in boiler plate and there's nothing that the

10   appellant has told me that we need.

11             Anything else, then, before I turn you over to

12   Mr. Fine?

13             BY MR. HANNON:

14   **Q    Mr. White, other than the limitation on the**

15   **testimony that the Judge has just described, is there other**

16   **information you would like her to know before you're finished**

17   **your direct testimony?**

18   A    Well, there have been some security breaches at the

19   same post, on Post 41, again, about the civilian being

20   upstairs.

21   **Q    Right, but those other incidents are not going to**

22   **fit in, but this is your last opportunity to express yourself**

23   **to the Judge before you're finished on direct.**

24   A    Well, yeah, most of the cases came about probably

25   before Mr. Vernon came.  And probably most were decided, I'm

Page 158

1    not sure, but they'd be the Jackson case when they were

2    decided.  Because I am limited.

3              JUDGE BOGLE:  Okay, thank you.

4              Are you completed?

5              MR. HANNON:  Well, just one other question.

6              BY MR. HANNON:

7        **Q    Could you explain to the Judge in what ways you**

8    **have been active in the union?**

9        A    Well, I was a union representative for a period of

10   time and I have also accompanied employees.  An employee has

11   the right to have whomever represent them that they choose,

12   and we don't necessarily have to still be in the capacity of

13   an official of a union rep.

14             MR. HANNON:  I would just proffer, Your Honor, that

15   he would also testify that the people in supervisory

16   positions have stated to him that they can get two security

17   guards for everyone.

18             MR. FINE:  Objection, Your Honor.

19             MR. HANNON:  This is just a proffer, Mr. Fine.

20             MR. FINE:  Mr. Hannon has gone beyond the scope

21   here.

22             JUDGE BOGLE:  I didn't say you could make a

23   proffer.

24             Mr. Fine, do you have any cross?

25             MR. FINE:  Yes.

Page 159

1                          CROSS EXAMINATION

2            BY MR. FINE:

3       Q    **Mr. White, you were employed by GPO in 1998 the**

4  **first time?**

5       A    Yes.

6       Q    **And then you were removed from federal employment**

7  **by OPM for lying on your application.   Is that correct?**

8            MR. HANNON:  Objection, irrelevant.  This is

9  something that has --

10           MR. FINE:  You asked when he was hired, Mr. Hannon.

11           MR. HANNON:  Excuse me.  This is a prior matter

12  that has not resulted in any kind of misconduct or

13  discipline.

14           JUDGE BOGLE:  Well, I guess we better hear about

15  it.  At this point, I suppose it goes to his credibility.

16           THE WITNESS:  It had been alleged that I falsified

17  my application.  What happened was, before I retired, the

18  employees knew I was going to retire and I was going to

19  [inaudible].  And I was investigating a racial issue in

20  Jessup at the facility, which I have on the reports, and

21  there was an accusation made that I tape-recorded a

22  conversation of interviews.

23           Well, we did that, and we used the tape for our

24  notes.  But I was going to retire anyway, and when they came

25  to do the investigation, the person who was doing the

Page 160

1    background investigation talked to some of the very employees

2    that I was investigating.  And the conclusion of the

3    investigation was that yes, there was a problem and the

4    people were aware of the racial problem.

5           So when I came to the federal government, and I

6    just graduated from Flexy, it was about two weeks.  And I

7    came back, and I was called into the office and Mr. Fine was

8    there.  And he said, OPM has recommended you be removed for

9    falsifying an application, which I didn't do.  And I appealed

10   it and I received the paperwork.  And basically what it

11   indicated, because I didn't come to the hearing because right

12   before the hearing, the attorney at that time told me, he

13   said, well, give me $3,000.  And, you know, this is a good

14   case and you're going to win it.  And when we won the case,

15   you'll get your money back.  Well, I was out of a job and I

16   had $3,000, but I didn't have $3,000 to give someone.  So

17   then they came back and I have a copy of the order that there

18   was no wrongdoing on my part or from the government's part

19   and that I would stay out for, I think, a year or the date of

20   the Board and I would return.  And I went back to work for

21   the State of Maryland, Department of Juvenile Justice, and

22   when the year was up, almost to the date, I walked back in

23   the door of GPO and it was like I never left.

24           BY MR. FINE:

25      Q    **Mr. White, you appealed this debarment by OPM**

Page 161

1    to the Merit System Protection Board.  I'm going to show you

2    a document, and it says, "The reasons which are specified

3    by OPM and the decision dated August 7, 1998, and two of

4    the agency responses will not be used as a basis for any

5    further action.  All other aspects of the Agency's

6    suitability action set forth in Agency letter to the

7    appellant remain unchanged.

8              So, isn't it true that the settlement agreement was

9    with OPM that they took the debarment from two years, which

10   would expire on November 25, 2000.  Only you said it would

11   expire on February 25, 2000.  Otherwise, the charge of lying

12   remained.

13       A    That's not they way I interpret it.

14       Q    That's your signature on this, sir?  Robert White?

15       A    That is my signature.

16       Q    Thank you, sir.  I asked you one question.  That

17   was your signature.

18            MR. HANNON:  May I see the document?

19            MR. FINE:  That was Docket Number

20   PH-0731-99-0056-I-1 on that case.

21            MR. HANNON:  May I see the document?

22            MR. FINE:  I need it to show the signature.  He

23   verified the document.  I'm not bringing the document in as

24   an exhibit.  Do you want to see the document?

25            MR. HANNON:  Yes, sir.

Page 162

1          MR. FINE:  It's called, "settlement agreement,"

2    case of Robert White v. OPM, appealed before the Merit

3    Systems Protection Board.

4          JUDGE BOGLE:  Okay, let's continue while he looks

5    at it.  Go ahead.

6          BY MR. FINE:

7      **Q    All right, Mr. White, now when you were a major at**

8    **the Maryland State Penitentiary, you were in charge of**

9    **supervising supervisors and guards?**

10     A    Mm-hmm.

11          JUDGE BOGLE:  You have to answer.

12          BY MR. FINE:

13     **Q    Can you establish?**

14     A    Correction officers, yes.

15     **Q    Correction officers, right.  And you established**

16   **operating procedures at the prison?**

17     A    Yes.

18     **Q    And you stated at your deposition that you took**

19   **discipline when they violated those procedures?**

20     A    I didn't take it.  I recommended discipline.

21     **Q    You recommended discipline, but you expected them**

22   **to follow those procedures that were established?**

23     A    Our procedures were far more structured than

24   procedures that we had at GPO.

25     **Q    But they're still procedures and you expected**

Page 163

1    officers to follow them.  Correct?

2        A    Yes.

3        Q    Now, as a corporal in the Control Center, you used

4    a computer.  Is that correct, sir?

5        A    We used a computer to do the log, yes.

6        Q    And you've taken various computer courses at GPO,

7    six courses.  Is that correct, sir?

8        A    Yes.

9        Q    One of them was an introduction in 2005 to May 16,

10   2006, Introduction to Outlook?  That's what you learned,

11   e-mail?

12       A    Well, I don't think we learned e-mail.  It was

13   basically an intro course and it was going through

14   fundamentals.  I wanted to get that.

15       Q    But you took that course.  Is that correct, sir?

16       A    Yes.

17       Q    Okay.  And you had also taken other computer

18   courses?  Word, Windows, Access, and Excel and PowerPoint?

19       A    Yes.

20       Q    You are familiar with the computer.

21            MR. FINE:  I'd like to have introduced GPO

22   Exhibit 2.

23            JUDGE BOGLE:  Any objection?

24            MR. HANNON:  No.

25            JUDGE BOGLE:  All right, proceed.

Page 164

1              (Agency Exhibit No. 2 was marked for

2                  identification.)

3          BY MR. FINE:

4      **Q      And you stated in your deposition you used a**

5  **computer in regard to your teaching at Coppin State.  Isn't**

6  **that true, sir?**

7      A    I used a computer to do my lesson plans.

8      **Q      Now, when you made the acting sergeant, you were**

9  **officer in charge on many occasions.  Correct, sir?**

10     A    Yes.

11     **Q      And if there was overtime, you would send an**

12 **overtime report request to Mr. Vernon?**

13     A    It was a standard form.

14     **Q      Right, but you sent it by e-mail?**

15     A    Yeah.

16     **Q      Officer White, in August 23, I believe it was, you**

17 **were sent by Mr. Vernon a copy of the proposed post orders**

18 **for 41?**

19     A    I did not receive that, do not remember receiving

20 it, and what he sent was an e-mail in bulk to police

21 officers.  He didn't specifically send me the e-mail of

22 Post 41.

23     **Q      But you responded to him with suggestions, didn't**

24 **you, sir?**

25     A    I do not recall responding to them.

Page 165

1    **Q    So you're saying he's lying, sir?**

2    A    I said I do not recall responding to him.

3    **Q    But you said you received an e-mail that was bulk.**

4    **There was 12 people it was sent to.  You didn't open it up?**

5    A    I don't recall, sir.

6    **Q    Now, in October 20, you received another e-mail**

7    **saying Post 41 orders were in effect?**

8    A    Not that I recall.

9    **Q    You don't recall that e-mail?**

10    A    The first time that I saw post orders relative to

11    that date, I was out on administration leave and one of my

12    co-workers gave it to me.

13            MR. FINE:  I'd like to show you a document.  It was

14    submitted as a proposed GPO Exhibit 4 as a two-page document

15    from Barkell to myself, a snapshot of Officer White's "sent"

16    folder.

17            I'd like to have that introduced as Exhibit 4.

18            JUDGE BOGLE:  Any objection?

19            MR. HANNON:  No.

20            JUDGE BOGLE:  Received.

21                    (Agency Exhibit No. 4 was marked for

22                    identification.)

23            BY MR. FINE:

24    **Q    Now, Officer White, that shows that between the**

25    **dates of September 4, 2006 and October 26, 2004, you sent**

Page 166

1    40 e-mails, and 19 of those were to Mr. Vernon.

2        A    Probably the standard forms for overtime.

3        Q    So now you're saying that you sent 19 e-mails to

4    your director of security, but you didn't bother to look at

5    any of the e-mails he sent you?

6        A    Let me explain to you.  Oftentimes --

7        Q    I asked a question.  Did you not look at any of the

8    e-mails he sent you after sending him 19?

9        A    Oftentimes, we do not get a chance to check our

10   e-mails.  I did not check my e-mails on a daily basis.  No.

11       Q    So you didn't check your e-mails from September 4

12   all the way down to October 29?

13       A    I'm sure I checked them some time during that

14   period, yes.

15       Q    But you never looked at the e-mails sent to you by

16   your second-line supervisor?

17       A    What Mr. Vernon sent was bulk e-mails.

18       Q    How would you know if you didn't open it up that it

19   was a bulk e-mail?

20       A    Because you could tell what it was.

21       Q    You can tell it's a bulk e-mail without opening it?

22       A    I did not open my e-mails on a daily basis because

23   I wasn't able to.  I wasn't in there all the time.

24       Q    But you saw it was an e-mail from Mr. Vernon, but

25   you said it's not me specifically, so you said to yourself,

Page 167

1    I'm not going to bother with it?

2        A    No.

3        Q    All right.  I won't argue with you then.

4             Now, isn't it true, Mr. White, that basically the

5    duties were all the posts, except for 50, I guess, are

6    basically the same, that you are responsible for checking the

7    ID's, checking the packages, people going through metal

8    detectors?

9        A    In a germane sort of way, yes.

10       Q    Well, yes or no.  I mean, you have to check the

11   ID's at all the posts?

12       A    If you're assigned to that post, yes.

13       Q    And if there's a metal detector there, all the

14   people have to go through a metal detector?

15       A    If you are assigned to the post, yes.

16       Q    Well, I don't know when you're talking about posts

17   you're assigned to, obviously.  And, there's an X-ray machine

18   there.  Packages go through the X-ray machine.

19       A    If you're assigned to it.

20       Q    And those were the responsibilities at Building 4,

21   weren't they?

22       A    Yes.

23       Q    In fact, Building 4 is even more complicated

24   requirement, so you said I think there's three or four

25   screens we have to look at.  We've got a door to let people

Page 168

1    in.  Is that not correct, sir?

2         A    Yes.

3         Q    So it's a pretty complicated post for just one

4    person?

5         A    It's extremely.  It can be extremely.

6         Q    And you don't think that would be even more

7    complicated with an officer trying to run that post with two

8    guests there at the same time?

9         A    I don't know anything about guests.

10         Q    Well, on October 29, Officer Everett was coming

11    back.  He's got two guests with him and you've got three to

12    five screens to look at.  And you're just saying now that you

13    didn't think that would not have been complicated to operate

14    that post properly?

15         A    I had no idea they were guests.

16         Q    Did you ask, sir, at any one point in time?

17         A    No, because there was nothing to arouse me that

18    would be any different than any other employee.

19         Q    Okay, now, we saw the video and it shows that you

20    were in that lobby and the red lights have gone off.

21         A    I had been relieved, sir.

22         Q    So, you didn't decide it as, sergeant, you didn't

23    need to pay attention to anything going on?

24         A    I had been relieved from my duty.  It was the

25    normal course of duty the way we operate, operational, and I

Page 169

1    told him about the computers.  I got my hat and my other

2    device and I left the building to go relieve.  And that is

3    our normal operation.

4        Q    You felt it was important to tell him about the

5    computer though, that wasn't operational.

6        A    Yes.

7        Q    So then you still felt yourself responsible for the

8    post when he was at the desk talking to you.  You said, here,

9    let me show you where the computer isn't working?

10       A    Yes.

11       Q    And at that point in time, the video clearly shows

12   that the two women are standing right there.  Is that not

13   correct, sir?  We just saw that.

14       A    Yes, and that's not unusual.

15       Q    All right.  So you've had two women walk through.

16   The alarm lights have gone off.  You're still there behind

17   that desk trying to explain to Officer White that the

18   computer isn't working properly.

19            Is that correct, sir?

20       A    Yes, and there was no reason that I wouldn't

21   believe that he wouldn't wand, that I wouldn't believe that

22   he wouldn't wand or do what he had to do, because I was

23   relieved.

24       Q    Well, we're not talking about relief.  We're

25   talking about did you wand either one of those two women.

Page 170

1       A     No, sir.  I had been relieved.

2       Q     I asked you the question.  Did you wand either of

3    those two women?

4       A     No.  I had been relieved.

5       Q     Did you X-ray either of their packages?

6       A     No, sir.  I was relieved.

7       Q     Well, you're still telling him about the computer,

8    so you still were responsible for that post then,

9       A     No.  I was not.

10      Q     Then why were you even telling them about it?

11      A     It's an exchange of information, sir.

12      Q     All right, and you didn't feel it was an exchange

13   of information to say, who are these people with you?

14      A     It was not.  I wasn't there because other employees

15   were coming in.

16      Q     But you didn't know these were employees, did you?

17      A     No, sir.

18      Q     You didn't see any badge on them, did you?

19      A     We have other employees that came in that didn't

20   have badges too, so it wasn't out of the ordinary.

21      Q     Did you see a GPO badge on either of those two

22   women?

23      A     I was concerned with giving him his information and

24   getting to my post.

25      Q     I asked you a question.  Did you see the GPO badge

Page 171

1    **on either of those women?**

2        A    I do not recall, sir.

3        Q    **Now, you're saying you don't recall?**

4        A    That's what I said.

5        Q    **Can I remind you that August 10 you submitted**

6    **supplementary answers to requests for admissions and then in**

7    **regard to the question of admit or deny that on October 29**

8    **you did not check the identification of the two guests,**

9    **Porter and Wanda, when they entered the GPO building at 6:13.**

10    **Admit.  Appellant White did not check the identification of**

11    **two individuals.**

12            **Is that your statement, sir?**

13            MR. HANNON:  Is that number 3?

14            MR. FINE:  Yes.

15            MR. HANNON:  That's not the complete response.

16            MR. FINE:  You write, "admit."  Appellant White did

17    not check the identification of two individuals in question

18    because they were behind Officer Darnelle Everett, and

19    Officer Everett indicated to Appellant White that he had

20    control of the post.  And Appellant White understood that to

21    include the two women behind Officer Everett.

22            MR. HANNON:  Thank you.

23            BY MR. FINE:

24        Q    **You did not check their identification?**

25        A    I had been relieved, sir.

Page 172

1    Q    So is it your position that as you were still a

2    sergeant at that shift, weren't you?

3    A    I was in an acting capacity.  I was not acting as a

4    sergeant with that assignment, sir.  I was assigned as a

5    regular officer.

6    Q    You were asked that in your oral reply by Mr.

7    Landrau, but isn't it a fact that you were 89 days, 24/7 as

8    an acting sergeant, not for just shift 1.

9    A    I was assigned to one shift, my shift.

10   Q    As acting sergeant?

11   A    Yes.

12   Q    That's not what you said during your oral reply,

13   sir.

14   A    I was assigned the 7 to 3 shift, the same shift

15   that I'm on right now.

16   Q    But it didn't say that in the acting information,

17   did it, sir?  It said you made acting for up to 89 days.  It

18   didn't say for shift 1.

19   A    But nor did it say any other shift.

20   Q    But it didn't say a lot of things, but it did say

21   you were made acting sergeant for up to 89 days.  Is that

22   correct, sir?

23   A    That's correct.

24   Q    On October 29, 2006, you are the OIC on shift 1?

25   A    Yes.

Page  173

1      Q    And so you were responsible for the daily report

2   for shift 1?

3      A    Yes.

4      Q    And so you told your officers that morning they

5   should be -- "all vehicles and persons entering the facility

6   have to be inspected and/or screened.  All personnel are to

7   possess the proper identification as well as parking decal."

8      A    Yes.

9      Q    Yes.  Now, in regard to this alleged drafting, sir.

10   You were the OIC on shift 1.

11      A    Yes.

12      Q    And you said you were going to be short.  You

13   determined you were going to be short for someone to be on

14   shift 2?

15      A    I didn't make that determination.  Sgt. Wilson made

16   that determination.

17      Q    All right.  When did Sgt. Wilson?  He determined

18   that while you were still on shift 1?

19      A    Yes.

20      Q    All right.  So, did Officer Wilson then draft

21   somebody from Shift 1 to fill that position?

22      A    He wouldn't draft.  He would only draft from his

23   shift.  He wouldn't draft from another shift.

24      Q    Well, the contract allows that.

25      A    Well, that's not the way it's done.

Page 174

1    Q    The contract allows that.  Is that not true?

2    A    Sir?

3    Q    Does the contract allow for drafting people from

4    the prior shift?

5    A    Yes, and that's what he did.

6    Q    Yes, that's what I asked you.

7    A    Yes.

8    Q    All right, so you didn't have to be drafted.  You

9    volunteered to work shift 2.

10   A    No.  My name was at the top of the list to be

11   drafted.

12   Q    You testified before that sergeants are not

13   normally drafted.  It's officers that are in the bargaining

14   unit that are drafted, yes.

15   A    And that's why it was unique.

16   Q    But you weren't in the bargaining unit at that

17   point in time.  You were an acting sergeant.

18   A    No, I was still in the bargaining unit.

19   Q    Well, yeah, you were a sergeant or you were a

20   corporal.  You were acting sergeant for up to 89 days.  You

21   couldn't be both.

22   A    I was still in the bargaining unit, sir.

23   Q    You were detailed to be an acting sergeant.  Were

24   you, or not?

25   A    Sir, this was the first time that anyone had

Page 175

1   been --

2        Q    **Were you not?**

3        A    May I explain myself, please?

4        Q    **No.  I'm asking you whether you made an acting**

5   **sergeant on August 28.**

6             MR. HANNON:  Judge, may the witness answer the

7   questions?

8             JUDGE BOGLE:  No.  Well, you have to tell him, yes

9   or no.  That's what he wants and you can give a brief

10  explanation.

11            THE WITNESS:  Yes, and at the time, it was the

12  first time since I've been there that anyone had been placed

13  in the acting sergeant position.  I was still in the

14  bargaining unit and I was not acting as a sergeant on that

15  shift.  The supervisor was Sgt. Wilson.

16            BY MR. FINE:

17       Q    **You would agree that a sergeant is a supervisor,**

18  **wouldn't you, sir?**

19       A    Yes, I would.

20       Q    **All right.  And the contract excludes supervisors,**

21  **sir.  Is that correct?**

22       A    Sir, I was an acting supervisor.

23       Q    **I asked you a question.  Does this contract exclude**

24  **supervisors?**

25       A    Exclude them from what?

Page 176

1      Q    From the bargaining unit, because they're

2   supervisors.

3      A    Okay, yes.

4      Q    When you got to Post 41 on October 29, did you

5   follow the post procedures?

6      A    Yes.  And when I arrived, no one had worked that

7   day, except four people.  The supervisor was upstairs and

8   three other people, and that was one of the reasons why the

9   machinery had gone.

10     Q    My question was did you follow the post procedures

11  that day?

12     A    Yes.

13     Q    So you checked the idea of people coming in?

14     A    Yeah.

15     Q    They went through the magnetometer?

16     A    While I was on post, yes.

17     Q    While you were on post.  Did you read the post

18  orders that day?

19     A    No.

20     Q    No.  I believe you stated in your oral reply that

21  you had to be extra careful checking the ID's that they do in

22  the transition.  Is that correct, sir?

23     A    Yes.

24     Q    All right.  Some people have these facial ID's and

25  others didn't.

Page 177

1      A    That's correct.

2      Q    **You really had to be careful as to who you were**

3  **letting in the building.  Correct, sir?**

4      A    That's correct.

5      Q    **And it's true that non-GPO employees without**

6  **identification are not allowed in the lobby of Building 4.**

7  **Correct, sir?**

8      A    That's what the regulation states, but that's not

9  always what happens, sir.

10      Q    **So on certain occasions you don't follow the rules?**

11   **Is that what you're saying, Officer White?**

12      A    That's not what I said.

13      Q    **When you were running the post, did you allow**

14  **non-GPO employees into the area?**

15      A    No.  Not me.

16      Q    **So you followed the rules?**

17      A    Yes.

18      Q    **Now, when there's a metal detector there we saw on**

19  **the video.  When someone goes through there and they have**

20  **metal, isn't it true the lights go on?**

21      A    Yes.

22      Q    **And then if the lights go on, you're supposed to do**

23  **what?**

24      A    You wand that person.

25      Q    **Wand them by hand?**

Page 178

1    A    Yes.

2    Q    Did you wand either Ms. Porter or Wanda when the

3    lights went off?

4    A    No.  I didn't because I had been relieved.

5    Q    Did you make any attempt to go in front of the desk

6    and wand either of these two people?

7    A    I was gathering my things.  I had been released.

8    Q    According to Daily Log, you've got a microphone

9    that communicates between you or a telephone, rather, between

10   you and the Control office.  Right?

11   A    Mm-hmm.

12   Q    So when you go between one place to another, you

13   phone in to tell the person where you are?

14   A    Yes, either by phone or by radio.

15   Q    By radio, so when you are on that shift that you

16   went from one post to another, you would call in to

17   Officer Oldach and say, now I am going from this post to that

18   post?

19   A    Yes.

20   Q    And he would record the time on this daily log?

21   A    I suppose so, yes.

22   Q    All right, because it says at 18:15, Sgt. White is

23   10/8 from post 41.  What does that mean?

24   A    Well, that I've left.

25   Q    That you've left Post 41 at 18:15.

Page 179

```
 1      A    Mm-hmm.

 2      Q    All right.  And then at 18:20, it says that

 3   Sgt. White is 10/7 meal at Post 50.  What does that mean?

 4      A    I was at Post 50 relieving that office.

 5      Q    All right, so at that point at 18:20, you were in

 6   charge of Post 50.  Is that what that says?

 7      A    Yes.

 8      Q    All right.  And then at 18:15 you weren't in charge

 9   of Post 41.

10      A    I left.

11      Q    I'm sorry, what?

12      A    I left.

13      Q    Right, so that says at 18:15 you weren't in charge.

14      A    Right, I left.

15           MR. FINE:  Okay.  I believe the video will show

16   that at 18:14 the two women walked into the lobby of

17   Building 41.

18           THE WITNESS:  Well, I'm not in the --

19           MR. FINE:  Now, I didn't ask you a question, sir.

20           BY MR. FINE:

21      Q    Now, you contend you were a union steward, but the

22   designations by the FOP of who was to be the union

23   representative, show clearly that you weren't the union

24   representative in 2005, 6.  2, 3, 4, 5 or 6.  Isn't that

25   correct, sir?
```

Page 180

1      A    I don't know.  I don't recall the time I was the

2   steward.

3      Q    **Well, I showed you those at the deposition.  Do you**

4   **recall that, sir?**

5      A    Yeah.

6      Q    **And the only time it showed was you were a union**

7   **representative in 2001.**

8      A    Okay, but I was still representing people beyond

9   that.

10     Q    **But not as a union representative, sir.**

11     A    Yes.

12     Q    **That you remember, right?**

13     A    If an employee chooses another employee to

14   represent them, they allow that.

15     Q    **That's not in the grievance procedure.  It's not**

16   **allowed in the contract.  Is it, sir?**

17     A    Well, that's allowed at GPO.

18     Q    **That's not in the grievance procedure, is it, sir?**

19          **It says only the union represents somebody at the**

20   **grievance procedure.**

21     A    Well, I'm not sure.

22     Q    **I'm pretty sure.  I wrote the contract.**

23          MR. HANNON:  Are you testifying?

24          BY MR. FINE:

25     Q    **And it's true you testified you haven't filed a**

Page 181

1    grievance on behalf of yourself or another employee since

2    2003?

3         A    I can't recall when I last filed a grievance, sir.

4         Q    And it's true that you had filed an unfair labor

5    practice charge with the Federal Labor Relations authorities

6    since at least 2003 on behalf of yourself or another

7    employee?

8         A    Sir, I don't know.

9         Q    Well, in your response in the discovery to that

10   question, you responded none at this time.

11        A    I don't recall, sir.

12        Q    Well, you didn't write, I don't recall.  You wrote,

13   "None at this time."  And when I asked you a copy of all the

14   documents that support your contention you were disciplined

15   because of your membership in support of FOP, your response

16   was, "none at this time."  Is that correct, sir?

17        A    Because I just didn't have the documents.

18        Q    I'm sorry.  What?

19        A    I didn't have the documents, no.

20        Q    Okay.  And in response to the question of providing

21   a copy of all the grievances you filed since 2003 on behalf

22   of yourself or another employee, your response was, "None at

23   this time."

24        A    I didn't --

25        Q    You have to talk.

Page 182

1    A    I didn't have access to any information, sir.

2    Q    **You didn't have access to your own grievances you**

3    **filed?**

4    A    That's what I said, sir.

5    Q    **Now, you've put in your oral reply as an exhibit,**

6    **so you stand by everything that's in your oral reply, sir?**

7         **I'm sorry, you need to speak.**

8    A    Yes.

9    Q    **Yes.  Now, in your oral reply, you were asked by**

10   **Mr. Hannon.  He represented you, sir?**

11   A    Yes.

12   Q    **When you left Post 41, was there anyone including**

13   **Officer Everett standing at the inside of the gates and the**

14   **door.  And your answer was yes.  There were a couple people**

15   **that came in as I was getting my hat.  You just saw the**

16   **video, sir.  Is that correct?**

17   A    Yes, I did.

18   Q    **Who were the couple people that were coming in as**

19   **you were getting your hat?  I didn't see that.**

20   A    There were three people in that area.

21   Q    **Officer Everett.**

22   A    There was Everett and two other people.

23   Q    **Officer Everett and Wanda and Ms. Porter.**

24   A    Okay.

25   Q    **The video clearly shows they were already standing**

Page 183

1    at the desk when you finally took your hat and left the

2    lobby.

3         A    I was explaining to Officer Everett that the

4    computer system was malfunctioning, and I grabbed my

5    belongings and I left.

6         Q    But there wasn't anybody else coming in at that

7    point in time.  It was just the two women and

8    Officer Everett.  Correct, sir?

9         A    Well, sir, people were traversing back and forth

10   and people had been coming in.

11        Q    Well, when your counsel asked you, do you know

12   whether there were any other individuals that had come

13   through, you said, I didn't really pay attention to them.  So

14   you weren't paying any attention at that point in time.

15   Correct, sir?

16        A    There were three people there when I was explaining

17   to Officer Everett and I was gathering my belongings.  I was

18   explaining to him about the system malfunctioning, and I was

19   rushing to go relieve.

20        Q    Now, at your oral reply at page 49, or 48 and 49,

21   Mr. Landrau said to you, "Do you believe that noticing an act

22   that may not be conducive to the safety or security of those

23   in the GPO, assets or people, when noticing that, do you

24   believe it is the responsibility of an officer to act

25   according to training that being identified, searched, take

Page 184

1    **appropriate action.  Do you believe that's the appropriate**

2    **action?"  Your response, Cpl. White, "I certainly feel that**

3    **is the action that should be taken.  Yes."**

4        A    Yes.

5        Q    **Yes.  So we're back at the lobby of 41.  You've got**

6    **two women that have come in.  The alarm lights have gone off.**

7    **You have not identified them, but yet you decided I have no**

8    **responsibility even though I'm an acting Sergeant.  Is that**

9    **correct?  Is that your position, sir?**

10       A    Sir, I had been relieved from my post.  I was

11   gathering my things to go to the next post.

12       Q    **You were an experienced supervisor of law**

13   **enforcement.  Right, sir?**

14       A    Sir, that is true.

15            MR. FINE:  I have no further questions.

16            JUDGE BOGLE:  Mr. Hannon, any redirect?

17            MR. HANNON:  Just very briefly.  Is there a copy of

18   the Agency response available?  That's all right.  If I can

19   approach the witness, I'll expedite this.

20            Judge, I'm referring to 4-P at page 2.  4-P,

21   for the record, the first page is the August 25, 2006

22   memo from Chief Vernon indicating that Officer White is

23   being detailed to supervisory police officer.  And the

24   document that's on page 2 is the OPM form that evidences

25   that.

Page 185

1                        REDIRECT EXAMINATION

2              BY MR. HANNON:

3         Q    **Have you seen this before?**

4         A    Yes.

5         Q    **And this indicates that the position that you're**

6    **moving from.  What's that position?**

7         A    The police officer.

8         Q    **And is that known as a corporal?**

9         A    Yes.

10        Q    **And what's the position that you're being moved to?**

11        A    Well, here it's unestablished.

12        Q    **It says, "unestablished."  And from something Mr.**

13   **Fine said, I think he suggested that because the log at the**

14   **Communications Center reported that you had relieved**

15   **Officer Everett at a certain point in time, is that accurate**

16   **with respect to what we see on the tape?**

17        A     It may not be, because there are times that they

18   operator in the Control Center receive various calls, and how

19   he prioritizes those calls as far as logging them largely

20   depends on what's going on,  Someone else could be calling

21   him and he may be responding to another call.

22        Q    **How did he learn that?**

23        A    Sir?

24        Q    **How did Officer Oldach learn that you had been**

25   **relieved by radio?**

Page 186

1    A    By radio transmission.

2    **Q    And who made that communication?  Do you recall?**

3    A    When I left, I called him and told him that I was

4    10/8.

5    **Q    And when you made that call, where were you?**

6    A    En route.

7    **Q    So you were already out of the Post?**

8    A    Exactly, yeah.

9    **Q    And finally, your position is that the conversation**

10   **that you had with Officer Everett when he told you, "I've got**

11   **it," was when he was standing on the other side of the**

12   **magnetometer.**

13   A    Yes, sir.

14       MR. HANNON:  Thank you.  I don't have anything

15   else, Your Honor.

16       JUDGE BOGLE:  Any recross?

17                   RECROSS EXAMINATION

18       BY MR. FINE:

19   **Q    Now, Mr. White, you're not saying that you weren't**

20   **acting sergeant as of August 28, are you?**

21   A    Sir, I'm going on what the 50 states that there is

22   no specified position for acting sergeant.

23   **Q    Now, going back to your direct testimony, you said**

24   **you were called into Mr. Vernon's office.  He asked you if**

25   **you wanted to be an acting sergeant.  You thought about it**

Page 187

1    for a little while and you said yes.  Is that correct, sir?

2        A    Yes, that is true.

3        Q    You knew you were taking the job of an acting

4    sergeant.  Isn't that correct, Mr. White?

5        A    Yes.

6        Q    And you received a copy of this Exhibit 4-P, shows

7    that you were going to be detailed to supervisory police

8    officer for not to exceed 89 days.  Is that correct, sir?

9        A    Yes.

10        Q    And it shows on here that you received a copy of

11    that.

12        A    Yes.

13        Q    So you're just trying to play games, then.  You're

14    saying you didn't know that you were an acting sergeant.

15        A    I didn't, sir; I'm not playing games.  I'm merely

16    reflecting what the 50 says that came from your personnel

17    department, because there is no such position as acting

18    sergeant at GPO.

19            JUDGE BOGLE:  I thank you.  You're excused.

20            MR. HANNON:  Your Honor, for the record may I

21    recite the full context of the settlement agreement that was

22    used by Mr. Fine supposedly?

23            JUDGE BOGLE:  No.

24            We are ready for closing remarks and I'd like them

25    to be very brief in view of the lengthy time that we have

Page 188

1    been on the record here.

2            Mr. Fine, you go first.  I'm really only looking

3    for you both to tell me something that you want to bring to

4    my attention that we heard in the hearing today, rather than

5    giving me standard closing remarks.

6            So, Mr. Fine, if you have any remarks?

7            MR. HANNON:  Judge, may I just state something for

8    the record?

9            In light of my understanding of how the record

10   might be kept open, I have asked Alvin Hardwick to prepare

11   documentation regarding disparate treatment of union members

12   and African-Americans.  And I have a memo of August 20, 2007,

13   outlining information regarding disparate treatment of union

14   members.

15           JUDGE BOGLE:  I understand that you want to get

16   this information into the record, but the time to do that was

17   to attach it as an exhibit to your pre-hearing submission.

18   And I didn't get it then and there's no basis for holding the

19   record open now that I know of.

20           MR. HANNON:  I understand.  I just want to make a

21   record of what we would be doing and I'll submit these in a

22   supplemental pleading just for the record.

23           JUDGE BOGLE:  No, when the record is closed, it's

24   closed.

25           MR. HANNON:  No.  Not for the record for

Page 189

1   consideration by you, because I understand you won't consider

2   it, but I want the record to show that what we attempted to

3   present in evidence.

4          JUDGE BOGLE:  All right.  You submit it and I will

5   consider whether it should be added to the record.  I know of

6   no procedure for doing that.  When the record is closed, it's

7   closed for all purposes.

8          MR. HANNON:  Understood.

9          JUDGE BOGLE:  Mr. Fine?

10                        CLOSING STATEMENT

11         MR. FINE:  This case is really to some degree about

12  choice and chances.  Reading something that a professor sent

13  me the other day about the difference between choice and

14  chance.  And Officer White made a choice.  Choices are

15  conscious acts, and that's the difference between that and

16  chance, which we consider to be random.  And he made a choice

17  here.  I think the facts clearly show it; not to follow the

18  post orders and not to deal with the responsibilities of this

19  position.

20         The issue that the Agency had proposed was did the

21  preponderant evidence establish that appellant committed the

22  acts charged by the Agency.  We believe that the evidence and

23  testimony presented clearly establish he failed to perform

24  the duties of his position as a sergeant and/or corporal in a

25  satisfactory manner and he failed to file the post orders for

Page 190

1   Post 41, which provides security at GPO Building 4 where

2   passports are produced.

3         The video clearly showed that when the two women

4   entered the lobby of the building at 6:13 and 54 seconds and

5   they passed through the magnetometer and the alarm lights

6   went off, Officer White did not hand screen either woman to

7   determine if anyone was carrying contraband materials, guns

8   and knives or explosives.  The video shows that one of the

9   women was carrying a purse.  These items were not placed on

10  the X-ray machine to determine if they contain any contraband

11  materials.

12        The video also proves that the identities of the

13  two women were not checked by Sgt. White.  And Officer White

14  has admitted that in his answers in discovery and on the

15  stand here.  Both sets of post orders, whether it's the old

16  one or the new ones, require the screening of all individuals

17  with the Archway metal detector and the hand detector, if

18  necessary.

19        Both sets required visitors must be sent to the

20  main office for proper identification, and both sets provided

21  the officer responsible for controlling all persons, GPO

22  employees and visitors entering through the lobby to prevent

23  the introduction of explosives, incendiary devices, firearms

24  or contraband.  So there is no question that Officer White

25  committed the offenses in GPO's proposal letter of

Page 191

1    February 6, 2007.

2            The other issue ten is what's the penalty within

3    the tolerable bounds of reasonableness.  I believe that the

4    testimony of Mr. Landrau and Mr. Vernon that their penalty of

5    demotion to police officer and a 14-day suspension was

6    clearly not excessive, an abuse of discretion, and not

7    otherwise arbitrary, capricious or unreasonable.

8            Mr. Landrau testified that he carefully considered

9    all the evidence, carefully considered all the applicable

10   Douglas factors in reaching his conclusion, the

11   demotion- suspension were appropriate.

12           The Board has consistently held an employee in a

13   law enforcement position and one in a security officer

14   position should be held to a higher standard of conduct in

15   other employees.  One citation is Crawford v. Department of

16   Justice, 90 FMSR 5320.  The Board has also consistently found

17   that supervisor, police, law enforcement officers are held to

18   a higher standard of conduct.  Huntley v. VA, 83 FMSR 5320.

19           At the time of the incident, Mr. White had been

20   detailed since August 28, 2006, as an acting supervisor.  He

21   testified, and I believe the record shows, that he was a very

22   experienced in law enforcement, 16 years at the Maryland

23   prison system.  The contention that on the second shift on

24   that day he was not technically the OIC, but working overtime

25   as a police officer did not obviate his responsibilities as

Page 192

1    an acting sergeant for those 89 days.

2            The Agency has proven the total failure of

3    Officer White to perform the duties spelled out in the post

4    orders was very serious.  His actions or rather the lack of

5    actions placed in jeopardy the personnel and property in

6    Building 4.  The need to protect U.S. passports, especially

7    blank passports containing the new security, high tech

8    technology, is patently obvious.

9            Mr. White left the building without identifying the

10   two women or checking the contents of their bags or screening

11   them for contraband, not to rush to the aid of an officer who

12   was in physical jeopardy or to deal with an emergency such as

13   a fire, but merely to relieve another officer for lunch.

14   This was certainly an exigent situation, mitigating his

15   failure to follow the rules.

16           Mr. White's claims that he was disciplined for

17   union activities are totally baseless and not supported by a

18   single piece of evidence or in any testimony.  The only

19   evidence of his union activity occurred in 2001, three to

20   four years before either Mr. Vernon or Mr. Landrau were even

21   at the GPO.  His claim that the discipline was racially

22   biased and he was a victim of disparate treatment is not

23   supported by any evidence.  He cannot point to a single

24   employee who fits within the definition of a comparable

25   employee established by the Board or the EEOC.  Citing,

Page 193

1    Richards v. Department of Defense, 66 MSBR 146;

2    Harris v. Henderson, EEOC No. 01982575 (2000).

3         There are absolutely no comparative employees who

4    have engaged in similar conduct been subject to the same

5    supervisor and been subject to the same standards of conduct.

6    Botto v. Postal Service, 75 MSPR 471.  The Board in

7    Bess v. Department of the Navy, 46 MSPR 583, ruled that the

8    charges and circumstances surrounding the misconduct must be

9    substantially similar.  Mr. White was not able to testify to

10   any similar acts of discipline involving Building 4.

11        Finally, Mr. White has not met the burden of

12   showing that the reasons for the discipline was pre-textual.

13    He most show that the reasons for the action were false and

14   that discrimination was the real reason for the action,

15   citing then St. Mary's Honor Center v. Hicks, 113 S.Ct. 2742.

16        And finally the oral reply of Mr. White has not

17   evidenced the slightest indication that there was any

18   remorse.  He takes the stand even today that he has done

19   nothing wrong.  So the Agency submits that the discipline was

20   appropriate and must be sustained.

21        Thank you.

22        JUDGE BOGLE:  Thank you.  Mr. Hannon?

23        MR. HANNON:  Thank you, Your Honor.

24        May it please the Court, I wanted Your Honor to

25   hear from Officer White so that you could judge him from his

Page 194

1   own mouth and not based on any conduct by myself that has

2   caused a delay in this procedure.  And I know that he will.

3                          CLOSING STATEMENT

4        MR. HANNON:  Remorse is something that arises only

5   when somebody has in fact done something wrong.  I don't

6   understand this emphasis on remorse.

7        Officer White, I think that you can conclude, is a

8   proud individual.  He's proud of his service.  He's proud of

9   his experience.  He's proud of what he has learned.  The

10  deciding official in the May 24, 2007, letter stated that he

11  has imposed this punishment for failing to follow the post

12  orders at Post 41.  He has not in the letter stated that he

13  has disciplined Officer White for not performing the duties

14  of the supervisory sergeant.  He states simply that at page 2

15  as a supervisory police officer, you have the additional

16  responsibility to ensure that the rank and file strictly

17  adhered to these procedures, and you need to establish as a

18  role model this type of conduct.

19       Officer White does not shirk away from the

20  responsibilities of the supervisory sergeant.  The question

21  becomes did he violate the post orders at Post 41.

22  Chief Vernon stated that there is no specific policy

23  regarding the changing of the guard to determine when one man

24  or woman becomes responsible for the post orders of a

25  particular post.  He stated almost in the exact language of

Page 195

1    Officer Everett and Officer White that if the relieving

2    officer states, "I've got it" then that's it.  And at that

3    point the chief of security, Chief Vernon, stated that the

4    individual who's being relieved is no longer responsible for

5    that post.

6          We looked at the videotape, and the videotape shows

7    that before these two individuals came into Post 41 and

8    before they came through the magnetometer, Officer Everett

9    was standing on the other side of the magnetometer.  And,

10   clearly, you can see in the tape that he's looking at

11   Officer White and they are conversing.  And Officer White

12   stated that at that point he was telling Officer Everett that

13   he was upset at him.  "Where have you been.  You've been

14   late."  And Officer Everett said, "Don't worry.  I've got

15   it."  In the words of Chief Vernon, Officer White was

16   relieved.

17         After that point, Officer White assembles his

18   materials at his desk.  These two women come in behind

19   Officer Everett.  While he now is responsible for the post,

20   they come through the magnetometer, and Officer White briefs

21   Officer Everett on the problems that he had encountered with

22   the computer system, puts his hat on, and he leaves.

23   Officer Everett, himself, as you pointed out, having a case

24   that is going to be before the Board as well, came in here

25   and testified truthfully, consistent with exactly what

Page 196

1   Officer White stated.  And he stated that he was responsible

2   for those two individuals.

3         And, therefore, I am in a position where very early

4   in my acquaintance of Your Honor, you said that the issue is

5   a very, very narrow one here.  And representing my client, I

6   kept trying to expand the issue to address some things that I

7   thought were relevant that were overruled.  And now we're at

8   the point of decision where you're absolutely correct.  You

9   are absolutely correct.  Was Officer White responsible for

10   that post at the time that these two persons came in?  And

11   the answer to that is, unequivocally, no.  No.  No.

12         JUDGE BOGLE:  All right, thank you.

13         The hearing is closed at 3:35.

14         (Whereupon, at 3:35 p.m., the hearing was

15   concluded.)

16                  *   *   *   *   *

17

18

19

20

21

22

23

24

# EXHIBIT 3

## UNITED STATES OF AMERICA
## MERIT SYSTEMS PROTECTION BOARD
## WASHINGTON REGIONAL OFFICE

ROBERT O. WHITE, SR,                    DOCKET NUMBER
                    Appellant,           DC-0752-07-0729-I-1

            v.

GOVERNMENT PRINTING OFFICE,             DATE: August 13, 2007
            Agency.

### SUMMARY OF TELEPHONIC PREHEARING CONFERENCE

I conducted a prehearing teleconference on August 13, 2007, with J. Michael Hannon representing the appellant and Neal Fine representing the agency. The parties are still exchanging settlement offers and will keep me advised.

Hearing Procedures

The purpose of the hearing is to take evidence on questions of fact and to hear arguments on questions of law. All submissions to date, except for replies to discovery requests which may have been sent to the Board, are already part of the record and do not have to be reintroduced. Witnesses, except for the appellant, will be sequestered. The prehearing submissions and this summary identify the relevant and material issues. Opening statements will not be heard. New issues may not be raised at the hearing except for good cause shown. The agency will present its case first. For any witness requested by both parties, the appellant's representative must present direct examination at the time of cross examination of that witness. I will allow closing comments. Absent unusual circumstances, the record will close at the close of the hearing.

The parties are reminded that the hearing is scheduled for August 20, 2007, at 9:00 a.m. The hearing will be recorded. A written transcript will not be provided but may be purchased from the court reporter.

## Burdens of Proof

The agency must prove the conduct (reasons), upon which the adverse action was based, by a preponderance of the evidence. Any affirmative defenses must be proved by the appellant by a preponderance of the evidence. 5 C.F.R. § 1201.56. A preponderance of the evidence is: The degree of relevant evidence that a reasonable person, considering the record as a whole, would accept as sufficient to find that a contested fact is more likely to be true than untrue. 5 C.F.R. § 1201.56(c)(2).

The appropriateness of the action must be proved by the agency by only an arbitrary and capricious standard. *Douglas v. Veterans Administration*, 5 M.S.P.R. 280, 299 (1981). Due deference is given to the agency's discretion in exercising its obligation to maintain employee discipline and efficiency. *Richard v. Department of the Air Force*, 43 M.S.P.R. 303, 308 (1990).

## Affirmative Defenses

The appellant has identified four affirmative defenses: (1) The agency failed to produce at the reply stage information it had relied on in proposing the action; (2) The deciding official was not a disinterested witness; (3) The agency imposed disparate penalties because of the appellant's union membership; and (4) The agency discriminated against the appellant on the basis of his race (African-American).

The agency failed to produce at the reply stage information it had relied on in proposing the action – An employee against whom action is proposed has a right to review the material which is relied on to support the reasons for the action. 5 C.F.R. § 752.404(b). If the agency violates this regulatory right, the appellant would be required to show that the agency committed harmful

procedural error. Harmful procedural error is defined as error by the agency that is likely to have caused it to reach a conclusion different from the one it would have reached in the absence or cure of the error. 5 C.F.R. § 1201.56(c)(3).

The deciding official was not a disinterested witness – There is no general proscription of the appointment as a deciding official of a person who is familiar with the facts of the case and has expressed a predisposition contrary to the appellant's interests. However, it is a process violation to allow an individual's basic rights to be determined either by a biased decision maker or by a decision maker in a situation where the "risk of unfairness is intolerably high." *See Svejda v. Department of the Interior,* 7 M.S.P.R. 108, 111-12 (1981).

The agency imposed disparate penalties because of the appellant's union membership – To establish disparate penalties, the appellant must show that the charges and the circumstances surrounding the charged behavior are substantially similar. *Archuleta v. Department of the Air Force,* 16 M.S.P.R. 404, 407 (1983). An employee claiming disparate treatment must show that the comparison employee worked in the same organizational unit. *Mills v. Department of the Navy,* 30 M.S.P.R. 403, 407 (1986). Where an employee raises an allegation of disparate penalties in comparison to specified employees, the agency must prove a legitimate reason for the difference in treatment by a preponderance of the evidence. *Woody v. General Services Administration,* 6 M.S.P.R. 486, 488 (1981). An agency may refute a charge of disparate penalties by establishing a legitimate reason for the difference in treatment, either by showing that the offenses in question were not really equivalent, or that mitigating or aggravating factors justified a difference in treatment. *Butler v. Department of the Navy,* 23 M.S.P.R. 99, 100 (1984). The consistency of a penalty with those imposed on other employees for the same or similar offenses is only one factor to be considered in determining the reasonableness of an agency-imposed penalty. *Yeager v. General Services Administration,* 39 M.S.P.R. 147, 151 (1988). Where the punishment is appropriate to the seriousness of an employee's offense, an

allegation of disparate penalties is no basis for reversal or mitigation. *Quander v. Department of Justice*, 22 M.S.P.R. 419, 423 (1984), *aff'd*, 770 F.2d 180 (Fed. Cir. 1985) (Table).

The agency discriminated against the appellant on the basis of his race (African-American) - While the necessary elements of a prima facie case vary according to the particular facts and circumstances at issue, a person claiming employment discrimination under Title VII carries the initial burden of showing actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were based on an impermissible criterion. *Spahn v. Department of Justice*, 93 M.S.P.R. 195, 201 (2003), *citing Furnco Construction Corp. v. Waters*, 438 U.S. 567, 575-76, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978). However the precise requirements of a prima facie case can vary depending on the case.    An appellant may prove discrimination by direct or indirect evidence.    Direct evidence may be any statement made by an employer that 1) reflects directly the alleged discriminatory attitude and 2) bears directly on the contested employment decision. *See Arredondo v. U.S. Postal Service*, 85 M.S.P.R. 113, 120-21 (2000), *citing Dorsey v. Department of the Air Force*, 78 M.S.P.R. 439, 448 (1998). By indirect evidence, an employee may establish a prima facie case of prohibited discrimination by introducing preponderant evidence to show that he is a member of a protected group, he was similarly situated to an individual who was not a member of the protected group, and he was treated more harshly or disparately than the individual who was not a member of his protected group. *Buckler v. Federal Retirement Thrift Investment Board*, 73 M.S.P.R. 476, 497 (1997). When the employee has met his burden, the burden of going forward then shifts to the agency to articulate a legitimate, nondiscriminatory reason for its action; and, finally, the employee must show that the agency's stated reason is merely a pretext for prohibited discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). For other employees to be deemed similarly situated,

5

the Board has held that all relevant aspects of the appellant's employment situation must be "nearly identical" to those of the comparator employee. *Spahn v. Department of Justice*, 93 M.S.P.R. at 202. Comparator employees must have reported to the same supervisor, been subjected to the same standards government discipline, and engaged in conduct similar to the appellant's without differentiating or mitigating circumstances. *Id.* The appellant offered no direct evidence of discrimination. He identified several comparator employees, and proposed to call several of them as witnesses. Instead, I ordered the parties to agree-upon and submit written evidence of the race of each identified employee, whether they were similarly situated, and what disciplinary action, if any, was taken in their cases. This information must be submitted prior to the hearing.

Rulings on Requests for Hearing Witnesses

The following witnesses were approved: LaMont Vernon, Rafael Landrau, Sonja Scott (only as possible rebuttal), and Darnelle Everett. The remaining proposed witnesses of both parties were disapproved because their expected testimony was not shown to be relevant and material to the issues in the appeal. I reserved ruling on the proposed exhibits until the hearing.

Any exception to this summary must be filed prior to the hearing.

FOR THE BOARD:

Elizabeth B. Bogle
Administrative Judge
Phone: (703) 756-6250
Fax:    (703) 756-7112

## CERTIFICATE OF SERVICE

I certify that the attached Document(s) was (were) sent as indicated this day to each of the following:

### Appellant

U.S. Mail

Robert O. White, Sr.
5509 Pioneer Drive
Baltimore, MD 21214

### Appellant Representative

U.S. Mail

J Michael Hannon, Esq.
HANNON LAW GROUP, LLP
1901 18th Street, N.W.
Washington, DC 20009

### Agency Representative

U.S. Mail

Neal H. Fine
Government Printing Office
Office of the General Counsel
Stop GC, Room C-814
732 North Capitol Street, N.W.
Washington, DC 20401

__August 13, 2007__
(Date)

Elizabeth B. Bogle
Administrative Judge

# EXHIBIT 4

## COMPARATOR EMPLOYEES

1.    Abdula Jackson, African-American.  GPO Police Officer.

   20-day suspension 11-03-05 - 5 from duty and 15 on paper - for Violation of GPO Metrocheck Program.
        Deciding official:  Davita Vance-Cooks, Deputy Managing Director Customer Services.  African American.

2.    Charles Beard, African-American.  GPO Police Officer.  Corporal at time of discipline.

   Removal  7-1-02 - for Violation of Agency Standards of Conduct; Violation of GPO Pay Parking Program; Using a parking permit without authorization; Lying during investigation; Conduct unbecoming a Police Officer
        Deciding Official:  Raymond Garvey, Director, Office of Administrative Support.  White.
        Removal reduced to demotion to Police Officer, Grade 5, in Settlement Agreement.

   20-day suspension 12-5-05 - 10 from pay and 10 on paper for - Insubordination and insolent behavior; false statement; failure to follow orders.
        Deciding Official:  Rafael Landrau, Deputy Chief Human Capital Officer.  Latino.
        Suspensions withdrawn.

3.    Keith Williams, African American.  Security Clerk.

   Removed 3-27-06 - for leaving post of duty without permission; AWOL; and insubordination.
        Deciding Official:  LaMont Vernon, Security Officer.  African-American.

4.    Phillip Griffin.  African-American.  GPO Police Officer.  Sergeant.

   Removal 11-06 for - Lack of Candor during Investigation.
        Deciding Official:  Rafael Landrau, Deputy Chief Human Capital Officer, Latino.
        Removal withdrawn in Settlement Agreement.  Mr. Griffin resigned from GPO.

5.    Billy Stokes, African-American.  GPO Police Officer.  Sergeant.

   Proposed 1-day suspension 11-04-00 (never issued).
        30-day Suspension (2002) - 7 from pay and 23 on paper for being intoxicated while on duty in violation of agency's Alcohol Free Workplace Program.
        Deciding Official:  Raymond Garvey, Director Office of Administrative Services.  White

MORE
Page        1                                              07-07-23  14:50:17

                        GPO POLICE OFFICER UNIT
                         AS OF JANUARY 2002

| NAME | TITLE | PP GR | RACE | SCD |
|------|-------|-------|------|-----|
| ALLEN,HARTWELL W JR, | POLICE OFFICER | PG 05 | HISPA | 1988/10/24 |
| ATKINS,KEVIN R, | POLICE OFFICER | PG 05 | BLACK | 1991/03/27 |
| BAILEY,COLLINS L JR, | POLICE OFFICER | PG 05 | BLACK | 1995/03/17 |
| BAILEY,STEVEN D, | POLICE OFFICER | PG 05 | BLACK | 1982/12/18 |
| BEARD,CHARLIE S JR, | LEAD POLICE OFFICER | PG 06 | BLACK | 1998/08/03 |
| BENJAMIN,VERNELL M, | POLICE OFFICER | PG 05 | BLACK | 1985/06/17 |
| CHANDLER,WILLIAM R, | POLICE OFFICER | PG 05 | BLACK | 2000/03/13 |
| CHISOLM,JOHN H JR, | POLICE OFFICER | PG 05 | BLACK | 1991/08/22 |
| CRAWFORD,RAYMOND J, | LEAD POLICE OFFICER | PG 06 | BLACK | 1969/03/25 |
| CROSS,C STEVEN, | SUPERVISORY POLICE OFFICE | PG 09 | WHITE | 1978/07/23 |
| CURTIS,ROBERT K, | POLICE OFFICER | PG 05 | WHITE | 1993/04/19 |
| DAILEY,ALDUSTUS, | LEAD POLICE OFFICER | PG 06 | BLACK | 1989/10/21 |
| EPLEY,PAUL D, | SUPERVISORY POLICE OFFICE | PG 07 | WHITE | 1991/03/25 |
| EVANS,TYRONE K, | POLICE OFFICER | PG 05 | BLACK | 1982/06/09 |
| EVERETT,DARNELLE, | POLICE OFFICER | PG 05 | BLACK | 1984/07/19 |
| FOX,GREGORY A, | PERSONNEL SECURITY SPECIA | PG 12 | WHITE | 1985/07/06 |

GPO POLICE OFFICER UNIT
AS OF JANUARY 2002

| NAME | TITLE | PP | GR | RACE | SCD |
|------|-------|----|----|------|-----|
| GARVEY,RAYMOND J, | DIRECTOR, OFC OF ADMIN SU | PG | 15 | WHITE | 1958/05/12 |
| GAUTT,TERRY L, | POLICE OFFICER | PG | 05 | BLACK | 1968/04/12 |
| GILBERT,GREGORY J, | SUPERVISORY POLICE OFFICE | PG | 09 | BLACK | 1973/10/03 |
| GRAY,SHERMAN F, | LEAD POLICE OFFICER | PG | 06 | BLACK | 1970/06/17 |
| GRIFFIN,PHILIP, | POLICE OFFICER | PG | 05 | BLACK | 1994/10/10 |
| HARDWICK,ALVIN E II, | LEAD POLICE OFFICER | PG | 06 | BLACK | 1989/04/07 |
| HODGE,REBECCA S, | SECURITY ASSISTANT | PG | 07 | WHITE | 1984/06/25 |
| HULL,ALFRED L, | POLICE OFFICER | PG | 05 | BLACK | 1972/10/03 |
| JACKSON,ABDULA L, | POLICE OFFICER | PG | 05 | BLACK | 1999/02/16 |
| JACKSON,KINITA, | POLICE OFFICER | PG | 05 | BLACK | 1990/04/25 |
| JAMES,EDGAR A, | POLICE OFFICER | PG | 05 | BLACK | 2001/12/03 |
| MCCONNELL,GREGORY A, | POLICE OFFICER | PG | 05 | BLACK | 1974/12/21 |
| MARTZ,MATTHEW W, | POLICE OFFICER | PG | 05 | WHITE | 2001/10/15 |
| MORRIS,JOHN M, | SUPERVISORY POLICE OFFICE | PG | 07 | BLACK | 1981/10/29 |
| NENICHKA,WILLIAM J, | SUPVY PHYS SECURITY SPECI | PG | 13 | WHITE | 1997/01/05 |
| OHLSEN,RALPH J JR, | POLICE OFFICER | PG | 05 | WHITE | 1993/11/01 |

```
                        GPO POLICE OFFICER UNIT
                         AS OF JANUARY 2002
```

| NAME | TITLE | PP | GR | RACE | SCD |
|------|-------|----|----|------|-----|
| OLDACH,JAMES C JR, | POLICE OFFICER | PG | 05 | WHITE | 1983/01/16 |
| PACKARD,STEPHEN J, | SUPERVISORY POLICE OFFICE | PG | 07 | WHITE | 1993/05/11 |
| QUARLES,WILLIAM E, | SECURITY ASSISTANT | PG | 06 | BLACK | 1986/10/06 |
| RAY,FLORENCE M, | POLICE OFFICER | PG | 05 | BLACK | 1989/01/03 |
| REED,RICHARD B, | SUPERVISORY POLICE OFFICE | PG | 07 | BLACK | 1969/07/30 |
| REYNOLDS,SEAN T, | POLICE OFFICER | PG | 05 | AMERI | 1994/05/09 |
| RICHARDSON,COREY E, | POLICE OFFICER | PG | 05 | BLACK | 2001/10/22 |
| RIVERA,MANUEL J, | LEAD POLICE OFFICER | PG | 06 | HISPA | 1998/08/10 |
| ROBINSON,OLIVER S JR | LEAD POLICE OFFICER | PG | 06 | BLACK | 1967/04/13 |
| SHAW,TONY E, | POLICE OFFICER | PG | 05 | BLACK | 1980/10/09 |
| SHELLMAN,EDWIN D, | POLICE OFFICER | PG | 05 | BLACK | 1987/12/07 |
| SMITH,FRANKLIN JR, | SUPERVISORY POLICE OFFICE | PG | 07 | BLACK | 1966/01/02 |
| SPENCER,DARREN L, | POLICE OFFICER | PG | 05 | BLACK | 1993/01/21 |
| STOKES,BILLY S, | SUPERVISORY POLICE OFFICE | PG | 07 | BLACK | 1970/11/24 |
| STURGIS,CHARLES E, | POLICE OFFICER | PG | 05 | BLACK | 1979/09/19 |
| TALBERT,PAUL, | POLICE OFFICER | PG | 05 | BLACK | 1974/02/07 |

MORE
Page        4                                                    07-07-23   14:50:17

                        GPO POLICE OFFICER UNIT
                          AS OF JANUARY 2002

| NAME | TITLE | PP | GR | RACE | SCD |
|------|-------|----|----|------|-----|
| THOMSON,JOHN W II, | POLICE OFFICER | PG | 05 | WHITE | 1993/01/29 |
| TISDALE,CARL J, | POLICE OFFICER | PG | 05 | BLACK | 1992/06/08 |
| TURNER,PAUL J, | POLICE OFFICER | PG | 05 | BLACK | 1989/10/03 |
| TURNER,SABRINA D, | POLICE OFFICER | PG | 05 | BLACK | 2001/07/30 |
| WASHINGTON,KEVIN, | POLICE OFFICER | PG | 05 | BLACK | 1984/07/06 |
| WASHINGTON,MARVIN B, | POLICE OFFICER | PG | 05 | BLACK | 1991/10/13 |
| WHEELER,TOMMIE L, | SUPERVISORY POLICE OFFICE | PG | 09 | BLACK | 1966/02/14 |
| WHITE,ROBERT O SR, | LEAD POLICE OFFICER | PG | 06 | BLACK | 1996/11/20 |
| WILLIAMS,GEORGE K, | POLICE OFFICER | PG | 05 | BLACK | 1975/06/22 |
| WILLIAMS,KEITH B, | POLICE OFFICER | PG | 05 | BLACK | 1987/09/28 |
| WILSON,WILLIAM H, | POLICE OFFICER | PG | 05 | WHITE | 1998/03/15 |
| WRIGHT,JON R, | POLICE OFFICER | PG | 05 | BLACK | 1986/05/30 |

MORE
Page        1                                              07-07-23  14:47:55

GPO POLICE OFFICER UNIT
AS OF JANUARY 2007

| NAME | TITLE | PP | GR | RACE | SCD |
|------|-------|----|----|------|-----|
| ATKINS,KEVIN | POLICE OFFICER | PZ | 05 | BLACK | 1991/03/27 |
| BAILEY JR,COLLINS | POLICE OFFICER | PZ | 05 | BLACK | 1995/03/17 |
| BAILEY,STEVEN | POLICE OFFICER | PQ | 05 | BLACK | 1982/12/18 |
| BEARD JR,CHARLIE | POLICE OFFICER | PQ | 05 | BLACK | 1998/08/03 |
| BENJAMIN,VERNELL | POLICE OFFICER | PZ | 05 | BLACK | 1985/06/17 |
| BENNETT,GREGORY | POLICE OFFICER | PZ | 05 | HISPA | 2002/08/11 |
| VERNON,LAMONT | SECURITY OFFICER | PG | 14 | BLACK | 2005/02/22 |
| WILLIAMS,AARON | SUPVY PHYS SECURITY SPECI | PG | 13 | BLACK | 1992/09/26 |
| CHANDLER,WILLIAM | POLICE OFFICER | PQ | 05 | BLACK | 2000/03/13 |
| CROSS,C | SUPERVISORY POLICE OFFICE | PZ | 09 | WHITE | 1978/07/23 |
| CURTIS,ROBERT | POLICE OFFICER | PQ | 05 | WHITE | 1993/04/19 |
| DAILEY,ALDUSTUS | SUPERVISORY POLICE OFFICE | PQ | 07 | BLACK | 1989/10/21 |
| EPLEY,PAUL | SUPERVISORY POLICE OFFICE | PQ | 09 | WHITE | 1991/03/25 |
| EVANS,TYRONE | POLICE OFFICER | PQ | 05 | BLACK | 1982/06/09 |
| EVERETT,DARNELLE | POLICE OFFICER | PZ | 05 | BLACK | 1984/07/19 |
| FOX,GREGORY | PERSONNEL SECURITY SPECIA | PG | 12 | WHITE | 1985/07/06 |

GPO POLICE OFFICER UNIT
AS OF JANUARY 2007

| NAME | TITLE | PP | GR | RACE | SCD |
|------|-------|----|----|------|-----|
| GAUTT,TERRY | POLICE OFFICER | PZ | 05 | BLACK | 1968/04/12 |
| GORDON,NORMAN | LEAD POLICE OFFICER | PZ | 06 | BLACK | 1998/01/22 |
| HARDWICK II,ALVIN | LEAD POLICE OFFICER | PZ | 06 | BLACK | 1989/04/07 |
| HODGE,REBECCA | SECURITY ASSISTANT | PG | 07 | WHITE | 1984/06/25 |
| JACKSON,ABDULA | POLICE OFFICER | PQ | 05 | BLACK | 1999/02/16 |
| JAMES,EDGAR | POLICE OFFICER | PQ | 05 | BLACK | 2001/12/03 |
| LATORA,PETER | PHYSICAL SECURITY SPECIAL | PG | 12 | WHITE | 1984/02/21 |
| MCCONNELL,GREGORY | POLICE OFFICER | PZ | 05 | BLACK | 1974/12/21 |
| PRICE,NORRIS | PHYSICAL SECURITY SPECIAL | PG | 12 | WHITE | 1998/06/04 |
| OLDACH JR,JAMES | POLICE OFFICER | PZ | 05 | WHITE | 1983/01/16 |
| PACKARD,STEPHEN | SUPERVISORY POLICE OFFICE | PQ | 11 | WHITE | 1993/05/11 |
| QUEEN,RICHARD | SECURITY CLERK | PG | 04 | BLACK | 1971/02/28 |
| RAY,FLORENCE | POLICE OFFICER | PZ | 05 | BLACK | 1989/01/03 |
| RICHARDSON,COREY | POLICE OFFICER | PZ | 05 | BLACK | 2001/10/22 |
| RIVERA,MANUEL | SUPERVISORY POLICE OFFICE | PZ | 07 | HISPA | 1998/08/10 |
| RUTH SR,VINCENT | POLICE OFFICER | PZ | 05 | BLACK | 2002/11/04 |

GPO POLICE OFFICER UNIT
AS OF JANUARY 2007

| NAME | TITLE | PP | GR | RACE | SCD |
|------|-------|----|----|------|-----|
| SPENCER,DARREN | POLICE OFFICER | PZ | 05 | BLACK | 1993/01/21 |
| STURGIS,CHARLES | POLICE OFFICER | PZ | 05 | BLACK | 1979/09/19 |
| TALBERT,PAUL | POLICE OFFICER | PZ | 05 | BLACK | 1974/02/07 |
| TISDALE,CARL | POLICE OFFICER | PQ | 05 | BLACK | 1992/06/08 |
| TURNER,SABRINA | LEAD POLICE OFFICER | PQ | 06 | BLACK | 2001/07/30 |
| WALLER,THEODORE | POLICE OFFICER | PZ | 05 | BLACK | 1987/03/03 |
| WASHINGTON,MARVIN | SUPERVISORY POLICE OFFICE | PZ | 09 | BLACK | 1991/10/13 |
| WHITE SR,ROBERT | LEAD POLICE OFFICER | PQ | 06 | BLACK | 1996/11/20 |
| WILLIAMS,GEORGE | POLICE OFFICER | PZ | 05 | BLACK | 1975/06/22 |
| WILLIAMS,KEITH | SECURITY CLERK | PU | 04 | BLACK | 1988/03/29 |
| WILSON,WILLIAM | SUPERVISORY POLICE OFFICE | PZ | 07 | WHITE | 1998/03/15 |

MORE
Page        1                                                    07-07-23   14:52:58

GPO POLICE OFFICER UNIT
AS OF JULY 2007

| NAME | TITLE | PP | GR | RACE | SCD |
|------|-------|----|----|------|-----|
| ATKINS,KEVIN | POLICE OFFICER | PZ | 05 | BLACK | 1991/03/27 |
| BAILEY JR,COLLINS | POLICE OFFICER | PZ | 05 | BLACK | 1995/03/17 |
| BAILEY,STEVEN | POLICE OFFICER | PQ | 05 | BLACK | 1982/12/18 |
| BEARD JR,CHARLIE | POLICE OFFICER | PQ | 05 | BLACK | 1998/08/03 |
| BENJAMIN,VERNELL | POLICE OFFICER | PZ | 05 | BLACK | 1985/06/17 |
| BENNETT,GREGORY | POLICE OFFICER | PQ | 05 | HISPA | 2002/08/11 |
| VERNON,LAMONT | SECURITY OFFICER | PG | 15 | BLACK | 2005/02/22 |
| WILLIAMS,AARON | SUPVY PHYS SECURITY SPECI | PG | 13 | BLACK | 1992/09/26 |
| BABIN,JAMES | PERSONNEL SECURITY SPECIA | PG | 12 | WHITE | 2007/02/05 |
| BUTLER,JOHN | SECURITY OFFICER | PG | 13 | BLACK | 1985/11/19 |
| MILBURN,LATONYA | PHYSICAL SECURITY SPECIAL | PG | 09 | BLACK | 1992/11/08 |
| SHIRLEY,TIAUNDRA | INTERN | PG | 04 | BLACK | 2007/06/11 |
| CHANDLER,WILLIAM | POLICE OFFICER | PQ | 05 | BLACK | 2000/03/13 |
| CROSS,C | SUPERVISORY POLICE OFFICE | PZ | 09 | WHITE | 1978/07/23 |
| CURTIS,ROBERT | POLICE OFFICER | PQ | 05 | WHITE | 1993/04/19 |
| DAILEY,ALDUSTUS | SUPERVISORY POLICE OFFICE | PQ | 07 | BLACK | 1989/10/21 |

07-07-23  14:52:58

GPO POLICE OFFICER UNIT
AS OF JULY 2007

| NAME | TITLE | PP | GR | RACE | SCD |
|------|-------|----|----|------|-----|
| EPLEY,PAUL | SUPERVISORY POLICE OFFICE | PQ | 09 | WHITE | 1991/03/25 |
| EVANS,TYRONE | POLICE OFFICER | PQ | 05 | BLACK | 1982/06/09 |
| GAUTT,TERRY | POLICE OFFICER | PZ | 05 | BLACK | 1968/04/12 |
| GORDON,NORMAN | LEAD POLICE OFFICER | PZ | 06 | BLACK | 1998/01/22 |
| HARDWICK II,ALVIN | LEAD POLICE OFFICER | PZ | 06 | BLACK | 1989/04/07 |
| HODGE,REBECCA | SECURITY ASSISTANT | PG | 07 | WHITE | 1984/06/25 |
| JACKSON,ABDULA | POLICE OFFICER | PQ | 05 | BLACK | 1999/02/16 |
| JAMES,EDGAR | POLICE OFFICER | PZ | 05 | BLACK | 2001/12/03 |
| LATORA,PETER | PHYSICAL SECURITY SPECIAL | PG | 12 | WHITE | 1984/02/21 |
| MCCONNELL,GREGORY | POLICE OFFICER | PZ | 05 | BLACK | 1974/12/21 |
| PRICE,NORRIS | PHYSICAL SECURITY SPECIAL | PG | 12 | WHITE | 1998/06/04 |
| OLDACH JR,JAMES | POLICE OFFICER | PZ | 05 | WHITE | 1983/01/16 |
| PACKARD,STEPHEN | SUPERVISORY POLICE OFFICE | PZ | 09 | WHITE | 1993/05/11 |
| RAY,FLORENCE | POLICE OFFICER | PZ | 05 | BLACK | 1989/01/03 |
| RICHARDSON,COREY | POLICE OFFICER | PZ | 05 | BLACK | 2001/10/22 |
| RIVERA,MANUEL | SUPERVISORY POLICE OFFICE | PZ | 07 | HISPA | 1998/08/10 |

MORE
Page      3                                                        07-07-23  14:52:58

GPO POLICE OFFICER UNIT
AS OF JULY 2007

| NAME | TITLE | PP | GR | RACE | SCD |
|------|-------|----|----|------|-----|
| RUTH SR,VINCENT | POLICE OFFICER | PZ | 05 | BLACK | 2002/11/04 |
| SPENCER,DARREN | POLICE OFFICER | PZ | 05 | BLACK | 1993/01/21 |
| STURGIS,CHARLES | POLICE OFFICER | PZ | 05 | BLACK | 1979/09/19 |
| TALBERT,PAUL | POLICE OFFICER | PZ | 05 | BLACK | 1974/02/07 |
| TISDALE,CARL | POLICE OFFICER | PQ | 05 | BLACK | 1992/06/08 |
| TURNER,SABRINA | SUPERVISORY POLICE OFFICE | PQ | 07 | BLACK | 2001/07/30 |
| WALLER,THEODORE | POLICE OFFICER | PZ | 05 | BLACK | 1987/03/03 |
| WASHINGTON,MARVIN | SUPERVISORY POLICE OFFICE | PZ | 09 | BLACK | 1991/10/13 |
| WHITE SR,ROBERT | POLICE OFFICER | PQ | 05 | BLACK | 1996/11/20 |
| WILLIAMS,GEORGE | POLICE OFFICER | PZ | 05 | BLACK | 1975/06/22 |
| WILSON,WILLIAM | SUPERVISORY POLICE OFFICE | PZ | 07 | WHITE | 1998/03/15 |

# EXHIBIT 5

## Videotape evidence
## Submitted to the Court on disk

EXHIBIT 6

# Transcript of:**Tyrone Evans**

**Date:** August 13, 2007
**Volume:**

**Case:** White v. U.S. GPO

Neal R. Gross & Co., Inc.
Phone: 202-234-4433
Fax: 202-387-7330
Email: info@nealrgross.com
Internet: www.nealrgross.com

---

Page 1

UNITED STATES OF AMERICA
MERIT SYSTEMS PROTECTION BOARD
WASHINGTON REGIONAL OFFICE
|-----------------------
                               :
In the Matter of:             :
                               :
ROBERT O. WHITE, SR.,         :
                               :
        Appellant,            :
                               :
    v.                        : Docket No.
                               : DC-0752-07-0729-I-1
                               :
GOVERNMENT PRINTING           :
OFFICE,                       :
                               :
        Agency.               :
                               :
|--------------------=+
                    Monday, August 13, 2007
                    Washington, D.C.
DEPOSITION OF:
TYRONE KENNETH EVANS

called for examination by the counsel for the
Appellant, pursuant to notice of deposition,
at the Government Printing Office, 732 North
Capitol Street, N.W., Washington, D.C., when
were present on behalf of the of the
respective parties:

Neal R. Gross & Co., Inc.
(202) 234-4433

---

Page 2

APPEARANCES:

    On Behalf of the Appellant:

        J. MICHAEL HANNON, ESQ.

    of:   Hannon Law Group, LLP

        1901 18th Street, N.W.
        Washington, D.C. 20009
        (202) 232-1907

    On Behalf of the Agency:

        NEAL H. FINE, ESQ.

        Government Printing Office
        732 North Capitol Street, N.W.
        Washington, D.C. 20401
        (202 ) 512-0200

Also Present:

        ROBERT O. WHITE

Neal R. Gross & Co., Inc.
(202) 234-4433

---

Page 3

TABLE OF CONTENTS

WITNESS    DIRECT  CROSS  REDIRECT  RECROSS

Tyrone K. Evans  4

Ex.
NO.  DESCRIPTION              IDENTIFIED

    (None)

Neal R. Gross & Co., Inc.
(202) 234-4433

Page 4

```
 1              P R O C E E D I N G S
 2                                    (1:34 p.m.)
 3   Whereupon,
 4              TYRONE KENNETH EVANS
 5   was called as a witness by counsel for the
 6   Appellant and, having been first duly sworn,
 7   was examined and testified as follows:
 8              DIRECT EXAMINATION
 9              BY MR. HANNON:
10      Q    Good afternoon.  Could you tell us
11   your full name?
12      A    Tyrone Kenneth Evans.
13      Q    And what is your current position
14   at the GPO?
15      A    Federal police officer.
16      Q    How long have you worked at the
17   GPO?
18      A    Approximately going on eight
19   years.
20      Q    And how long have you been in law
21   enforcement all together?
22      A    All together as a police?
```

Page 5

```
 1      Q    Yes, sir.
 2      A    Twelve -- let me see.  Thirteen.
 3      Q    Was there a time when you were
 4   assigned to Post 41 at Building 4?
 5      A    Yes, that was my assigned post for
 6   a while, for a period of time, almost about
 7   approximately over a year.
 8      Q    A year?
 9      A    Probably a little over, a little
10   over a year.
11      Q    And what shift?
12      A    First shift.
13      Q    And is that the day shift?
14      A    Day shift.
15      Q    When you worked Post 41, when you
16   took the flag down or put the flag up, who
17   covered the post?
18      A    Well, the couple of times I did
19   it, just me.  Nobody else covered the post.
20      Q    Were your supervisors aware that
21   you had to be away from the post?
22      A    They had to be.
```

Page 6

```
 1      Q    Okay.
 2      A    They didn't send nobody over to
 3   relieve me.
 4      Q    Did you learn about the incident
 5   where Officer Everett had to make an arrest on
 6   about October 29th, on a Sunday evening in
 7   2006 outside of Post 41?  Did you become aware
 8   of that incident?
 9      A    Two thousand and six?
10      Q    Yeah.
11      A    I'm not too sure.  I might have
12   been off that day or --
13      Q    No, no.  I know you weren't here.
14      A    Yeah, okay.
15      Q    But did there come a time when you
16   heard about it?
17      A    I wonder if I really heard about
18   it.  I ain't too familiar.  I ain't too
19   familiar with it.
20      Q    Well, was there ever a point in
21   time when you were asked to go and check the
22   post orders at Post 41?
```

Page 7

```
 1      A    You mean check them as?
 2      Q    See which ones were there.
 3      A    Other than when they brought them
 4   over.  They brought the book over with the
 5   post orders and actually, you know, they
 6   wanted us to look through them.  They say it's
 7   a draft.  I looked through them and read them.
 8   That was just about it.
 9           I think they used to give us a
10   sheet.  I'm trying to remember if we had to
11   sign for it or not.  I'm not -- not too sure
12   on that.
13      Q    Well, do you recall ever receiving
14   new post orders for Post 41 in October of
15   2006?
16      A    Two thousand and six, new post
17   orders, new post orders.  Maybe it might have
18   been that rough draft.
19      Q    I'm not -- rough drafts are
20   usually distributed for comment.
21      A    Yeah.
22      Q    But they're not --
```

Page 8

```
1        A    I don't think, other than that was
2   already in that book.  Okay?
3        Q    Now, when new post orders are
4   issued, what's the procedure for informing
5   officers that the post orders have changed, in
6   your experience?
7        A    I don't -- well, in my experience,
8   they'll have you sign for it.  If they give
9   you one or two sheets, maybe some time during
10  roll call they'll give you one or two sheets
11  or how many sheets it is, and they'll have you
12  sign, have a list of all the officers' names
13  and have you sign.
14       Q    Okay.  Do you keep a set of post
15  orders that are given to you?
16       A    I think I got just about
17  everything they gave.
18       Q    Okay.  When you were at Post 41,
19  would you be relieved for a meal break?
20       A    Meal break, bathroom break,
21  anything administratively you want to be
22  relieved.
```

Page 9

```
1        Q    And what would be the procedure
2   for that?
3        A    Say if I called for a break, say,
4   a 15-minute, you know, bathroom break.  I call
5   control.  I either call them on the radio or
6   I'll call them on the phone and they'll
7   dispatch somebody to come relieve me.
8        Q    And then when that individual
9   would come to your post?
10       A    He'll take over.  He'll take over
11  the post.
12       Q    And he just says, "I've got it,"
13  and that's --
14       A    Yeah.
15       Q    Now --
16       A    Unless there's something I might
17  have to pass on, but most of the time, it's
18  nothing to pass on.
19       Q    You mean information.
20       A    Information-wise, yeah.
21       Q    So if you're being relieved when
22  there are a number of folks in the lobby --
```

Page 10

```
1        A    Yeah, it can be a number of folks
2   or nobody in the lobby.
3        Q    Okay, but suppose there are a
4   number of folks in the lobby.  The person
5   relieving you can take responsibility for
6   them.
7        A    Yeah.
8        Q    Okay.
9        A    Unless there's some instructions
10  you might want to pass on to them that, say,
11  it's like five people and it's about three
12  more that's on the way or something like that.
13       Q    Okay.  While you were working Post
14  41, did you ever become aware of any security
15  breaches regarding the passports anywhere in
16  or around that building?
17       A    Actually I never really worked --
18  you're talking about passports, transporting
19  and --
20       Q    Yeah, people getting up to the
21  passport area that shouldn't be.
22       A    Since I've been at the post?
```

Page 11

```
1        Q    Yes, sir.
2        A    No.
3        Q    Now, what about there's another
4   post, Post 42?
5        A    Forty-two, yeah.
6        Q    Where's that?
7        A    That's on the loading dock.
8        Q    And what --
9        A    That's off of G Street.
10       Q    Have you ever worked that post?
11       A    That might have been some years
12  ago.  That was a while.
13       Q    So do you know anything about the
14  kind of security that's provided at Building
15  4 for vendors that come in that --
16            MR. FINE:  Objection.
17            MR. HANNON:  Excuse me.
18            BY MR. HANNON:
19       Q    -- come in that entrance?
20            MR. FINE:  Direct the witness not
21  to respond.  This is a security issue, not
22  relevant.
```

Page 12

BY MR. HANNON:

1

2      Q      Okay.  When you were at Post 41,
3  were there ever times when things were slow
4  and you'd stand outside the front door?

5      A      Maybe in the beginning when they
6  didn't put all the security, put the wall up
7  and what do you call it?  The turnstile and
8  you've got to access and you can -- but after
9  they put all of that, put the wall up and the
10  turnstile and, you know, the magnetometer and
11  the X-ray machine, they didn't want you to be
12  out, out front.

13      Q      It was --

14      A      They want you to be in there.

15      Q      After the incident with Darnell
16  Everett on a Sunday, having to arrest a woman
17  who had assaulted you, do you remember Officer
18  White asking you to go to the post orders and
19  give him a copy of what was in the post
20  orders?

21      A      Yes.

22      Q      Do you recall that?

Page 13

1      A      Yes.

2      Q      And so where did you go to get
3  those post orders?

4      A      They're in a -- they're in a --
5  almost like in a binder like this, and they're
6  inside the drawer.  Sometime they might be
7  out, but they're mostly in the drawer, the
8  drawer area at Post 41.

9          MR. HANNON:  Okay.  Thank you.

10      I don't have any other questions.
11  Mr. Fine might.

12          MR. FINE:  No questions, sir.
13  Thank you very much.

14          MR. HANNON:  Thank you.

15          THE WITNESS:  That's it?

16          MR. HANNON:  You're done.

17      You have a right to check the
18  transcript to see if she has recorded your
19  answers properly or you can just trust her and
20  waive that.

21          THE WITNESS:  I'll waive it.

22          MR. HANNON:  Okay.  That's fine.

Page 14

1          THE WITNESS:  Yeah, yeah.

2          MR. HANNON:  Thank you.

3          THE WITNESS:  All right.

4          (Whereupon, at 1:43 p.m., the
5  deposition of Tyrone Kenneth Evans was
6  concluded.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Page 15

1

2

3                  CERTIFICATE

4

5      This is to certify that the foregoing
6  transcript in the matter of:

7

8

9

10  Deposition of Tyrone Evans

11

12

13

14  Date:              Monday, August 13, 2007

15

16

17

18  Place:             Washinton, D.C.

19

20

21

22

23  represents the full and complete proceedings of
24  the aforementioned matter, as reported and
25  reduced to typewriting.

26

27

28      _____

29              Neal Gross

**A**
about 5:6 6:4,6,16,17 7:8 8:16 10:11,18 11:3,13
access 12:8
actually 7:5 10:17
administratively 8:21
aforementioned 15:24
after 12:8,15
afternoon 4:10
Agency 4:10 2:10
ago 11:12
ain't 6:18,18
almost 5:6 13:5
already 8:2
AMERICA 1:1
another 11:3
answers 13:19
anything 8:21 11:13
anywhere 10:15
APPEARANCES 2:1
Appellant 1:6,18 2:2 4:6
approximately 4:18 5:7
area 10:21 13:8
around 10:16
arrest 6:5 12:16
asked 6:21
asking 12:18
assaulted 12:17
assigned 5:4,5
August 1:13 15:14
aware 5:20 6:7 10:14
away 5:21

**B**
bathroom 8:20 9:4
become 6:7 10:14
beginning 12:5
behalf 1:21 2:2,10
being 9:21
binder 13:5
BOARD 1:1
book 7:4 8:2
breaches 10:15
break 8:19,20,20 9:3,4
brought 7:3,4
building 5:4 10:16 11:14

**C**
C 4:1
call 8:10 9:4,5,6 12:7
called 1:17 4:5 9:3
Capitol 1:20 2:15
CERTIFICATE 15:3
certify 15:5
changed 8:5
check 6:21 7:1 13:17

come 6:15 9:7,9 11:15 11:19
commend 7:20
complete 15:23
concluded 14:6
CONTENTS 3:10
control 9:5
copy 12:19
counsel 1:17 4:5
couple 5:18
covered 5:17,19
CROSS 3:12
current 4:13

**D**
D 4:1
Darnell 12:15
Date 15:14
day 5:13,14 6:12
DC-0752-07-0729-I-1 1:8
deposition 1:15,18 14:5 15:10
DESCRIPTION 3:18
Direct 3:12 4:8 11:20
dispatch 9:7
distributed 7:20
dock 11:7
Dock 11:7
done 13:16
door 12:4
down 5:16
draft 7:7,18
drafts 7:19
drawer 13:6,7,8
duly 4:6
during 8:9
D.C 1:14,20 2:7,16 15:18

**E**
E 4:1,1
eight 4:18
either 9:5
enforcement 4:21
entrance 11:19
ESQ 2:3,12
Evans 1:15 3:14 4:4,12 14:5 15:10
evening 6:6
ever 6:20 7:13 10:14 11:10 12:3
Everett 6:5 12:16
everything 8:17
examination 1:17 4:8
examiner 4:7
Excuse 11:1
experience 8:6,7

**F**
familiar 6:18,19
Federal 4:15
fine 2:12 11:16,20 13:11,12,22
first 4:6 5:4,12
five 10:11
flag 5:16,16
folks 9:22 10:1,4
follows 4:7
foregoing 15:3
Forty-two 11:5
from 5:21
front 12:4,12
full 4:11 13:23

**G**
G 4:1 11:9
gave 8:17
getting 10:20
give 7:9 8:8,10 12:19
given 8:15
go 6:21 12:18 13:2
going 4:18
Good 4:10
Government 1:9,19 2:14
GPO 4:14,17
Greg 15:29
Group 2:4

**H**
H 2:12
Hannon 2:3,4 4:9 11:17 11:18 12:1 13:9,14,16 13:22 14:2
having 4:5 12:16
heard 6:16,17
her 13:19
He'll 9:10,10
him 12:17,19

**I**
IDENTIFIED 3:18
incident 6:4,8 12:15
individual 9:8
information 9:19
information-wise 9:20
informing 8:4
inside 13:6
instructions 10:9
issue 11:21
issued 8:4

**J**
J 2:3
just 5:19 7:8 8:16 9:12 13:19

**K**
K 3:14
keep 8:14
Kenneth 1:15 4:1,12 14:5
kind 11:14
know 6:13 7:5 9:4 11:13 12:10

**L**
law 2:4 4:20
learn 6:4
let 5:2
like 10:11,12 13:5,5
list 8:12
little 5:5,9
LLP 2:4
loading 11:7
lobby 9:22 10:2,4
long 4:16,20
look 7:6
locked 7:7

**M**
machine 12:11
magnedometer 12:10
make 6:5
many 8:11
matter 1:4 15:6,24
maybe 7:17 8:9 12:5
metal 8:19,20
mean 7:19:19
MERIT 1:1
MICHAEL 2:3
might 6:11 7:17 9:16 10:10 11:11 13:6,11
Monday 1:13 15:14
more 10:12
most 9:17
mostly 13:7
much 13:13

**N**
N 4:1
name 4:11
names 8:12
Neal 2:12 15:29
never 10:17
new 7:14,16,17 8:3
nobody 5:19 6:2 10:2
Nose 3:20
North 1:19 2:15
nothing 9:18
notice 1:18
number 9:22 10:1,4
N.W 1:20 2:6,15

**O**
O 3:5 2:22 4:1

**Objection** 11:16
October 6:6 7:14
off 6:12 9:11
Office 1:2,9,19 2:14
officer 4:15 6:5 12:17
officers 8:12
okay 6:1,14 8:2,14,18 10:5,8,13 12:2 13:9 13:22
once 8:9,10
one 8:7:2
orders 6:22 7:3,14,17 7:17 8:3,5,15 12:18 12:20 13:3
other 7:3 8:1 13:10
out 12:12,12 13:7
over 5:7,9,10 6:2 7:4,4 9:10,10

**P**
P 4:1
parties 1:22
pass 9:17,18 10:10
passport 10:21
passports 10:15,18
people 10:11,20
period 5:6
person 10:4
phone 9:6
Place 13:18
point 6:20
police 4:15,22
position 4:3,13
post 5:4,5,15,17,19,21 6:7,22,22 7:5,14,14 7:16,17 8:3,5,14,18 9:11,10 13:22 11:14 11:4,10 12:2,18,19 13:3,8
present 1:21 2:19
Printing 1:9,19 2:14
Probably 5:9
procedure 8:4 9:1
proceedings 15:23
property 13:19
PROTECTION 1:1
provided 11:14
pursuant 1:18
put 5:16 12:6,6,9,9
p.m 4:2 14:4

**Q**
questions 13:10,12

**R**
R 4:1
redo 9:5
read 7:7

really 6:17 10:37
recall 7:13 12:22
receiving 7:13
recorded 13:18
REKROSS 3:12
REDIRECT 3:12
reduced 15:25
regarding 10:15
REGIONAL 1:2
relevant 11:22
relieve 6:3 9:7
remember 9:12 9:21
relieving 10:5
remember 7:10 12:17
reported 13:16,24
represents 15:23
respective 1:22
respond 11:21
responsibility 10:5
right 13:17 14:3
ROBERT 1:5 2:22
roll 8:10
rough 7:18,19

**S**
S 4:1
says 9:12
security 10:34 11:14,23 12:6
see 5:2 7:2 13:18
seed 6:2
set 8:14
short 7:10
shorts 8:9,10,11
shift 5:11,12,13,14
sign 7:11 8:12,13
Since 10:22
sir 5:1 11:1 13:12
sit 6:9 7:16
slow 12:3
some 8:9 10:9 11:11
somebody 9:7
something 9:16 10:12
Sometime 13:6
SR 1:5
stand 12:4
STATES 1:1
street 1:20 2:6,15 11:9
Sunday 6:6 12:16
supervisors 5:20
suppose 10:3
sure 6:11 7:11
sworn 4:6
SYSTEMS 1:1

**T**
TABLE 3:10
take 9:10,10 10:5
talking 10:18

tell 4:10
testified 4:7
Thank 13:9,13,14 14:2
things 12:3
think 2:9 8:1,16
Thirteen 5:2
thousand 6:9 7:16
three 10:11
through 7:6,7
time 1:3,6 6:15,21 8:9 9:17
times 5:18 12:3
together 4:21,22
transcript 13:18 15:6
transporting 10:18
trust 13:19
trying 7:10
turnstile 12:7,10
Twelve 5:2
two 6:9 7:16 8:9,10
typewriting 15:25
typewritten 15:25
Tyrone 1:15 3:14 4:4 4:12 14:5 15:10

**U**
UNITED 1:1
Unless 9:16 10:9
used 7:9
usually 7:20

**V**
V 1:7
vendors 11:15
very 13:13

**W**
waive 13:20,21
wall 12:4,9
want 8:21 10:10 12:13 12:14
wasted 7:6
Washington 1:2,14,20 2:7,16
Washinton 15:18
way 10:12
well 5:18 6:20 7:11 8:7
were 1:21 5:3,20 6:21 7:2 8:18 10:13 12:2,3 12:3
weren't 6:13
while 5:6 10:13 11:12
White 1:5 3:22 12:18
witness 3:12 4:5 11:20 13:15,21 14:1,1,3
woman 12:16
wonder 6:17
worked 4:16 5:15 10:17 11:10
working 10:13

**X**
X-ray 12:11

**Y**
yeah 6:10,14 7:21 9:14 9:20 10:1,7,20 11:5 14:1,1
year 5:7,8,10
years 4:19 11:11

**1**
1:34 4:2
1:43 14:4
13:1:13 15:14
15-minute 9:4
18th 2:6
1901 2:6

**2**
20009 2:7
2006 6:7 7:15
2007 1:13 15:14
202 2:8,17
20401 2:16
222-19672 8
29th 6:6

**4**
43:14 5:4 13:15
41 5:4,15 6:7,22 7:14 8:18 10:14 12:2 13:8
42 11:4

**5**
512-0200 2:17

**7**
732 1:19 2:15

# Transcript of: Charles Sturgis

**Date:** August 13, 2007
**Volume:**

**Case:** White v. U.S. GPO

Neal R. Gross & Co., Inc.
Phone: 202-234-4433
Fax: 202-387-7330
Email: info@nealrgross.com
Internet: www.nealrgross.com

---

UNITED STATES OF AMERICA
MERIT SYSTEMS PROTECTION BOARD
WASHINGTON REGIONAL OFFICE
:---------------------+
                      :
In the Matter of:     :
                      :
ROBERT O. WHITE, SR., :
                      :
          Appellant,  :
                      :
     v.               : Docket No.
                      : DC-0752-07-0729-I-1
                      :
GOVERNMENT PRINTING   :
OFFICE,               :
                      :
          Agency.     :
                      :
:---------------------+
                    Monday, August 13, 2007
                    Washington, D.C.
DEPOSITION OF:
CHARLES E. STURGIS

called for examination by the counsel for the
Appellant, pursuant to notice of deposition,
at the Government Printing Office, 732 North
Capitol Street, N.W., Washington, D.C., when
were present on behalf of the of the
respective parties:

Neal R. Gross & Co., Inc.
(202) 234-4433

---

APPEARANCES:

     On Behalf of the Appellant:

          J. MICHAEL HANNON, ESQ.

     of:  Hannon Law Group, LLP

          1901 18th Street, N.W.

          Washington, D.C. 20009

          (202) 232-1907

     On Behalf of the Agency:

          NEAL H. FINE, ESQ.

          Government Printing Office

          732 North Capitol Street, N.W.

          Washington, D.C. 20401

          (202 ) 512-0200

     Also Present:

          ROBERT O. WHITE

Neal R. Gross & Co., Inc.
(202) 234-4433

---

TABLE OF CONTENTS

WITNESS     DIRECT  CROSS  REDIRECT  RECROSS

Charles E.

   Sturgis     4

Ex.

NO.  DESCRIPTION                    IDENTIFIED

   (None)

Neal R. Gross & Co., Inc.
(202) 234-4433

Page 4

```
 1              P R O C E E D I N G S
 2                               {4:28 p.m.}
 3   Whereupon,
 4              CHARLES E. STURGIS
 5   was called as a witness by counsel for the
 6   Appellant and, having been first duly sworn,
 7   was examined and testified as follows:
 8              DIRECT EXAMINATION
 9   BY MR. HANNON:
10      Q     Good afternoon.
11      A     Good afternoon, sir.
12      Q     Would you state your full name,
13   please?
14      A     My name is Charles Edward Sturgis.
15      Q     And how are you employed today?
16      A     Employed at GPO.
17      Q     Are you an officer?
18      A     Yes, sir, I am.
19      Q     How long have you been with GPO?
20      A     Twenty-eight years.
21      Q     Have you been with the Uniform
22   Officer Division all that time?
```

Page 5

```
 1      A     Yes, sir.
 2      Q     Officer White has been disciplined
 3   for an incident that took place on Sunday,
 4   October 29th of 2006, when Officer Darnell
 5   Everett was required to make an arrest.  Did
 6   you learn about that incident?
 7      A     Yes, sir, after coming back off
 8   vacation I learned about the incident.
 9      Q     How did you learn about it?
10      A     Well, there was -- when I got
11   back, that was the first thing they hit me
12   with, that he had an incident over there at
13   Building No. 4.
14      Q     Had you ever worked Post 41?
15      A     Yes, sir, I have.
16      Q     Have you worked Post 41 since the
17   enhancement of security over there?
18      A     Yes, I have.
19      Q     And where are the post orders for
20   Post 41?
21      A     In the desk drawer there behind
22   there.
```

Page 6

```
 1      Q     When was the last time you worked
 2   Post 41?
 3      A     That's a good question.  Well, I'd
 4   put it this way.  Since they put the SPOs over
 5   there, I have not been over there.  I can't
 6   give you the exact date they put them in
 7   there, but it's been since then.
 8      Q     Do you know if you worked at Post
 9   41 after the date of this incident?
10      A     Yes, sir, I did.
11      Q     Have you ever been notified that
12   orders at Post 41 have been changed?
13      A     Yes.
14      Q     When were you notified?
15      A     After that incident.
16      Q     And how were you notified?
17      A     That they re-writ (phonetic) the
18   post orders and they sent a letter copy over.
19      Q     How did you learn about that?
20      A     When I came back I checked the
21   book because someone was asking about what was
22   the post orders, what did they read, and I
```

Page 7

```
 1   looked at them, and I said, "These are not the
 2   original post orders that were assigned to
 3   that building prior to that incident."
 4      Q     Okay.  Now, did you ever see the
 5   new post orders?
 6      A     Yes, I did.
 7      Q     Under what circumstances?
 8      A     They were set out stating that
 9   they should be placed on the post permanently,
10   take out the old ones, put in the new ones.
11      Q     Did you do that?
12      A     I think their side did them.  When
13   you come on, you look at them, see what they
14   changed.
15      Q     And that's after the incident?
16      A     Yes, sir.
17      Q     What's the procedure for advising
18   an officer that new post orders have been
19   issued?
20      A     They tell you to check your E-mail
21   when you come on duty.  They say check E-mails
22   to see what has changed and what has not
```

Page 8

1  changed.  So when you come in, you check; when
2  you have the chance, you get to check your E-
3  mail or when you go to your post, the officer
4  on post will tell you that so-and-so has
5  happened, that there are new post orders
6  placed on this post as of such-and-such a
7  date.
8       Q    Was it part of the duty of the
9  officer at Post 41 to put up and take down the
10  flag?
11      A    Yes, sir.
12      Q    Did you do that?
13      A    Yes, sir.
14      Q    Who watched the post while you did
15  that?
16      A    Usually the guy that relieves you.
17  When you take your lunch break, you take down
18  the flags at the same time, before or either
19  after.
20      Q    Have you ever been a corporal?
21      A    No, sir.
22      Q    Okay.  Have you ever been

Page 9

1  disciplined in connection with your work in
2  Building 4?
3       A    Yes, sir.
4       Q    Can you tell me about that?
5       A    I had a prior incident to that
6  where I was standing outside, and people
7  entered the building.  I acknowledged them,
8  and they said that they went upstairs and
9  nobody challenged them.
10      Q    And so what happened?
11      A    Nothing happened.  I mean, there
12  was an investigation and so on and everything,
13  but the bottom line, nothing was done.
14      Q    You weren't disciplined?
15      A    No.
16      Q    So tell me the events of that
17  incident.
18      A    Okay.  On that date, I was --
19  first of all, 41 was my permanent post.
20      Q    I see.
21      A    I worked it every day.  So I'm
22  there.  It's about five, 5:15, somewhere in

Page 10

1  that line, where people are leaving.  See,
2  now, in the original post orders to when
3  people lave the building, they ask you to step
4  outside and watch them leaving to come to the
5  building to see that nothing happens to them.
6           At that time two of the IG
7  officers came over.  I acknowledged them.
8  They went in the building.  They went upstairs
9  and they came back down saying that nobody
10  challenged them.  So it was like I know
11  Officer White when I see him, and I know the
12  IG officers when I see them.  It's not that
13  they have to go through all of this.  I know.
14  Okay.  Go on into the building.
15          And the issue was that I did not
16  challenge them for their IDs.
17      Q    Did the prior post order state
18  that you were supposed to be outside when
19  people left?
20      A    It was not written, but it was a
21  practice that we did because we have so many
22  problems in this area, people getting robbed

Page 11

1  leaving the building, going to the parking
2  lots or either going to the Metro.  People
3  walk up; purses have been snatched, and so on.
4       Q    So there was this informal
5  procedure to provide some protection --
6       A    Yes, sir.
7       Q    -- for the persons, the actual --
8       A    For the employees leaving and
9  coming into the building.
10      Q    Okay.  And in the investigation,
11  did you get interviewed?
12      A    Yes, sir, I did.
13      Q    By whom?
14      A    IG Section.
15      Q    And what did they say to you?
16      A    They asked me what happened, and I
17  explained to them as I'm telling you what
18  happened that day, that I was there three to
19  four feet from the door.  I'm standing on that
20  little landing, and they walk up and I speak.
21           "Good evening," or "good
22  afternoon," whatever it was.  I acknowledged

Page 12

1  them and they went into the building.  They
2  went upstairs to the second floor and informed
3  the people up there, Mr. Richardson and other
4  people, that they were not challenged.
5       Q       So you weren't given a letter of
6  reprimand or anything?
7       A       No, sir.
8       Q       Did anybody tell you to do your
9  job any differently?
10      A       No, sir.  Well, then after that,
11 they changed the orders again.  They changed
12 the post orders saying they didn't want us
13 outside the building.
14      Q       Now, are you talking about in the
15 written post orders?
16      A       Yes, sir.
17      Q       Now, are those the old post orders
18 or --
19      A       No, the old post orders say that
20 you were supposed to every 20 minutes or so
21 step outside and take a look outside of the
22 building, right?  So which means when people

Page 13

1  leave the building at 4:30, five o'clock, I
2  make it a habit of being outside when they
3  leave.
4       Q       Okay.
5       A       All right?  So then after that
6  incident the orders were changed again,
7  stating that we were not allowed to step
8  outside of the building.
9       Q       And when did this happen?
10      A       With me?
11      Q       Yeah.
12      A       Gee, oh, boy, I can't remember.
13 It was prior to incident.  It was like
14 February, March, somewhere like that of '06,
15 something like that.
16      Q       Okay.  Was any paper work put into
17 your file?
18      A       No, sir.
19      Q       Have you been disciplined for any
20 other issues at Building 4?
21      A       No, sir.
22      Q       Are you aware of any security

Page 14

1  breaches at Building 4 for which people have
2  not been disciplined?
3       A       No, sir.
4       Q       Do you know about the situation
5  where Mr. Weese escorted Mr. Van Horn?
6       A       Yes, sir, I am.
7       Q       And how did you learn about that?
8       A       When you come in the day -- okay.
9  The next day when I come into work the word is
10 that the building of Building 4, security was
11 breached by Mr. Van Horn.
12      Q       And was there an investigation?
13      A       From my knowledge, yes.
14      Q       And who did the investigation?
15      A       I cannot say.  I think IG did it.
16      Q       Do you know what the outcome was?
17      A       No, sir.  It's still going on as
18 far as I know.
19      Q       Do you know if there was a guard
20 that let Mr. Van Horn in?
21      A       No.  Well, sir, put it this way.
22 The SPO over there, he does not have the

Page 15

1  authority to let anyone up unless someone
2  comes down and signs him in and escorts him
3  up.  Once you come in and I call upstairs or
4  Mr. Weese or Mr. Richardson, either one of
5  them come down or one of the secretaries up
6  there in the office come down and signs him
7  in, that's it.
8       Q       So the SPOs, by that you mean the
9  contract guards.
10      A       Yes, sir.
11      Q       The SPOs don't make a
12 determination as to whether --
13      A       No, sir.
14      Q       -- the person --
15      A       No, sir.
16      Q       -- is legitimately on premises.
17      A       No, sir, he doesn't.
18      Q       So the issue is whether Mr. Weese
19 did something wrong --
20      A       Yes.
21      Q       -- by signing him in.
22      A       Yes.

Page 16

1    Q    You ever worked Post 42?

2    A    Yes, sir.

3    Q    What are the procedures for

4   vendors to get into the building?

5    A    When the vendors -- you mean for

6   the people that service the machines upstairs?

7    A    We'll start with them.

8    Q    Okay.  when they come in, you

9   usually call upstairs to the second floor and

10  let them know that the vendor is downstairs.

11  They sign them in.  They will come down and

12  pick them up and take them upstairs so that

13  they can service the machines, and so on.

14  Then they bring them back down.

15   Q    Are the vendors always accompanied

16  while they're in the building?

17   A    Yes, sir.

18   Q    Okay.  What about deliveries?

19   A    As far as on that, they don't go

20  no further than the platform.

21   Q    Okay.  Are you aware of an

22  incident, I believe, involving Officer Curtis?

Page 17

1    A    Yes, sir.

2    Q    Can you describe that incident?

3    A    Oh, boy.  Okay.  In that incident

4   they had a delivery or they made a shipment of

5   passports.  I don't know if it was the Post

6   Office company truck that came to pick them

7   up, but the truck came and on the door, the

8   sliding door, there was not a spot there for

9   them to lock it and put a seal on it.  Okay?

10        The person that comes down with

11  the passport, they get on the truck with the

12  guy, and they go with him to deliver wherever

13  they're going, right?

14        In the process of going there, the

15  door came open and the passports fell out, but

16  that was it.

17   Q    And what was Officer Curtis'

18  involvement in that?

19   A    Well, he's -- his job is to put

20  the seal on it and write the seal number down,

21  truck number, driver's name, and so on, right?

22  The person that was from upstairs said that

Page 18

1   that was okay, that she was there and

2   everything was fine.  So it was out of his

3   hands.

4    Q    Where was Officer Curtis?

5    A    On the platform.

6    Q    Okay, and was he disciplined for

7   not putting a seal on?

8    A    Yes, he was.

9    Q    What did he get?

10   A    I think he got a letter of warning

11  or a couple days in the street.

12   Q    Have you heard of any other

13  unauthorized persons being escorted through

14  Building 4?

15   A    No, sir.

16   Q    Okay.  Is there a policy, a

17  written policy as to how you're supposed to

18  relieve another officer?

19   A    No, sir.

20   Q    Do officers sometimes eat at their

21  posts?

22   A    Sometimes.

Page 19

1    Q    Under what circumstances?

2    A    If they say they've got a small

3   lunch, they just go out and get a sandwich,

4   come back and eat a sandwich and they're

5   finished.

6    Q    What about on weekends at Post 41?

7    A    Same thing.  If he goes -- it

8   depends on what he wants to eat or where he

9   goes to eat, if he brings anything.  If he

10  doesn't bring it, then he may run get a

11  sandwich, eat the sandwich before he gets back

12  or may finish it there.  Once he comes back

13  and he says, "I'm back.  You can go," you're

14  relieved.

15        If the officer didn't relieve you,

16  he's going on about his business.

17        MR. HANNON:  Thank you sir.

18        THE WITNESS:  All right.

19        MR. HANNON:  Mr. Fine might have

20  some questions.

21        THE WITNESS:  Yes, sir.

22        MR. FINE:  No.  No questions.

Page 20

```
 1   Thank you, Officer Sturgis.
 2            MR. HANNON:  Officer, you can --
 3   this lady is going to make a transcript of
 4   what you said.  If you want to you can read it
 5   to make sure she accurately --
 6            THE WITNESS:  Okay.
 7            MR. HANNON:  -- reported what you
 8   had to say or you can trust her and waive that
 9   right.  Which do you wish to do?
10            THE WITNESS:  I'll take a quick
11   glance at it if you don't mind.
12            MR. HANNON:  Well, not right now.
13            THE WITNESS:  Okay.
14            MR. HANNON:  She'll have to
15   arrange for you to see it.
16            THE WITNESS:  Okay.  No problem.
17            MR. FINE:  Thank you, Officer.
18            THE WITNESS:  All right.
19            MR. HANNON:  Appreciate it.
20            (Whereupon, at 4:43 p.m., the
21   deposition of Charles E. Sturgis was
22   concluded.)
```

Page 21

```
 3                     CERTIFICATE

 5        This is to certify that the foregoing
 6   transcript in the matter of:

10   Deposition of Charles Sturgis

14   Date:                Monday, August 13, 2007

18   Place:               Washinton, D.C.

23   represents the full and complete proceedings of
24   the aforementioned matter, as reported and
25   reduced to typewriting.

                          Neal Gross
```

Page 22

[Transcript word index — alphabetical listing of words with page:line references, arranged in multiple columns.]

Page 23

[Transcript word index — alphabetical listing of words with page:line references, arranged in multiple columns.]

**2**

**20** 12:20
**20009** 2:8
**2006** 5:4
**2007** 1:13 21:14
**202** 2 9:18
**20401** 2:17
**232-1907** 2:9
**29th** 5:4

**4**

**43** 16:5 13 9:2 13:20
   14:1,10 18:14
**4:28** 4:2
**4:30** 13:1
**4:43** 20:20
**45** 5:14,16,20-6:2,9,12
   8:9 9:19 19:6
**47** 16:1

**5**

**5:15** 9:22
**512-4/200** 2:18

**7**

**732** 1:19 2:16

## Transcript of: **Charles Cross**

**Date:** August 13, 2007
**Volume:**

**Case:** White v. U.S. GPO

Neal R. Gross & Co., Inc.
Phone: 202-234-4433
Fax: 202-387-7330
Email: info@nealrgross.com
Internet: www.nealrgross.com

---

Page 1

UNITED STATES OF AMERICA
MERIT SYSTEMS PROTECTION BOARD
WASHINGTON REGIONAL OFFICE

|---------------------+

In the Matter of:      ¦

ROBERT O. WHITE, SR.,  ¦

           Appellant,  ¦

      v.               ¦ Docket No.
                       ¦ DC-0752-07-0729-I-1

GOVERNMENT PRINTING    ¦
OFFICE,                ¦

           Agency.     ¦

|---------------------+
                       Monday, August 13, 2007
                       Washington, D.C.

DEPOSITION OF:
CHARLES STEVE CROSS

called for examination by the counsel for the
Appellant, pursuant to notice of deposition,
at the Government Printing Office, 732 North
Capitol Street, N.W., Washington, D.C., when
were present on behalf of the of the
respective parties:

---

Page 2

APPEARANCES:

     On Behalf of the Appellant:

          J. MICHAEL HANNON, ESQ.

     of:  Hannon Law Group, LLP

          1901 18th Street, N.W.

          Washington, D.C. 20009

          (202) 232-1907

     On Behalf of the Agency:

          NEAL H. FINE, ESQ.

          Government Printing Office

          732 North Capitol Street, N.W.

          Washington, D.C. 20401

          (202 ) 512-0200

     Also Present:

          ROBERT O. WHITE

---

Page 3

### TABLE OF CONTENTS

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|

Charles Steve

     Cross           4

Ex.
NO.  DESCRIPTION                IDENTIFIED

     (None)

Page 4

```
1              P R O C E E D I N G S
2                                    (12:32 p.m.)
3    Whereupon,
4              CHARLES STEVE CROSS
5    was called as a witness by counsel for the
6    Appellant and, having been first duly sworn,
7    was examined and testified as follows:
8              DIRECT EXAMINATION
9    BY MR. HANNON:
10        Q    Good afternoon, sir.  My name is
11   Michael Hannon and I am the attorney for
12   office Robert White in a disciplinary
13   proceeding here the GPO.  Could you give us
14   your full name please?
15        A    Charles Steven Cross.
16        Q    And how do you spell your middle
17   name?
18        A    Steven, S-t-e-v-e-n.
19        Q    And what is your current position
20   here at GPO?
21        A    I'm the OIC Supervisor, Shift
22   Three, holding the rank of lieutenant.
```

Page 5

```
1         Q    How long have you been a
2    lieutenant?
3         A    I want to say approximately seven
4    years.
5         Q    How long have you been with GPO?
6         A    Twenty seven years.
7         Q    And when did you first begin to
8    work as a uniform employee?
9         A    I've always worked as uniform
10   police officer.
11        Q    And just briefly can you tell me
12   about your progress through the ranks?
13        A    Started out as a guard, went to
14   special police, PSC, corporal, sergeant, and
15   lieutenant progressively.
16        Q    Who promoted you to Lieutenant?
17        A    Michael Galante.
18        Q    Are you aware of the allegations
19   against Office Robert White?
20        A    Not the specifics.  I do know that
21   he's had some corrective action taken against
22   him.
```

Page 6

```
1         Q    Understanding you don't know all
2    of the specifics, what is the understanding
3    that you have as to the reason for the
4    corrective action?
5         A    That there was an incident that
6    transpired on Post 41 involving Officer
7    Everett and Office White had previously been
8    at Post 41.  The specifics of the incident
9    transpired on my night off.  I wasn't here.
10        Q    Were you aware that at the time
11   Steven Packard was the acting watch commander?
12        A    Yes.
13        Q    And he wasn't actually at the
14   facility.  Is that unusual?
15        A    No.
16        Q    Is that a weekend staffing
17   decision?
18        A    All supervisors have every other
19   weekend off, and consequently, they have days
20   off during the week.  So given this past
21   weekend as an example was my weekend off.  I
22   was not here.  This coming weekend I will be.
```

Page 7

```
1    I had days off during the week to compensate
2    for that.
3         Q    He was acting watch commander but
4    he was at home.  Does that mean that he had
5    the duty for that weekend and others didn't?
6         A    No, that means that it was his
7    weekend off.
8         Q    It was his weekend off.  I see.
9    And that's why Sergeant Wilson was the officer
10   in charge?
11        A    Correct.
12        Q    So there are cases of the weekends
13   when the officer in charge is a sergeant --
14        A    Correct.
15        Q    -- in order to give lieutenants
16   some leave?
17        A    Correct.
18        Q    And when the sergeant is the
19   officer in charge is there a protocol in place
20   as to when the sergeant is responsible for
21   contacting a lieutenant?
22        A    Depending -- excuse me --
```

Page 8

1  depending on the severity of a given situation
2  he may deem that the lieutenant needs to be
3  notified.
4      Q    In this incident we've been told
5  that Sergeant Wilson made a telephone report
6  to Lieutenant Packard that Officer Everett had
7  been arrested and had made an arrest.  Is that
8  the type of circumstance that you might expect
9  an officer in charge to make that kind of
10 report?
11     A    That would be the officer --
12 you're referring to Sergeant Wilson at this
13 point?
14     Q    Correct.
15     A    That would be his call.
16     Q    And why would he, on this
17 particular weekend, call Lieutenant Packard?
18 Do you know?
19     A    Do not know.
20     Q    When there's a sergeant acting as
21 officer in charge, there's not a designated
22 lieutenant who is to be contacted in

Page 9

1  extraordinary circumstance?
2      A    No.
3      Q    So if Sergeant Wilson thought it
4  was necessary to contact the lieutenant, he
5  could have contacted any lieutenant he was
6  aware was available.  Is that correct?
7      A    He could have, yes.
8      Q    Understood.  Summarizing a little
9  bit, the allegations against Officer White, as
10 I understand it, he had relieved Officer
11 Everett at Post 41 on a Sunday for Officer
12 Everett to take his meal break.  When Officer
13 Everett returned there were two women with
14 Officer Everett who came in with him.
15          Officer White had been directed to
16 relieve Officer Richardson at another post for
17 his meal break, and when Officer Everett
18 arrived he told Officer White, "I've got it,"
19 at which point Officer White left to go to
20 Officer Richardson's post.
21          Are you aware of any policies or
22 procedures, formal or otherwise, regarding the

Page 10

1  method by which one officer is to relieve
2  another officer at a post?
3      A    Officers relieve each other for a
4  30 minute lunch break.  That's how much time
5  they are designated, after which the officer
6  returns.  In this case Officer White would
7  then leave 41 and respond to his next relief,
8  which would have been Lot 50.
9      Q    Were you ever in the military?
10     A    Yes.
11     Q    What branch?
12     A    U.S. Army.
13     Q    There are specific procedures in
14 the U.S. Army as to how one relieves another
15 officer.  Is that correct?
16          MR. FINE:  Objection, relevancy.
17          BY MR. HANNON:
18     Q    Soldier.  Is that correct?
19     A    Correct.
20     Q    My understanding is there are no
21 such formula for the actual mechanics of
22 relieving, one officer relieving another at a

Page 11

1  post here at the GPO.
2      A    Correct.
3      Q    So, and this is in your
4  experience, there's no demarcation point or
5  moment or time at which the GPO is of the view
6  that the responsibility for Post 45 has passed
7  from Officer A to Officer B.  Is that fair to
8  say?
9      A    Yes.
10     Q    It's a rather informal process?
11     A    Correct.
12     Q    And, presumably, if the relieving
13 officer is at the post and states to the
14 officer who's currently on the post, "I've got
15 it," or words to that effect, the officer at
16 the post is relieved?
17     A    Correct.
18     Q    Are you aware of any policies or
19 procedures or orders that require an officer
20 who's not assigned to a particular post to
21 assist another officer at that post?
22     A    To assist --

Page 12

```
 1      Q      Yes.
 2      A      -- an officer at that post?
 3      Q      In doing that officer's job at
 4 that post.
 5      A      If it's a one man post?
 6      Q      Yes, sir.
 7      A      No.
 8      Q      Are you aware of any written
 9 policies and procedures regarding what is to
10 occur if an officer reports that he or she has
11 a disruptive individual at their post?
12      A      If there's a disruptive individual
13 on an officer's post, that's why they have
14 radios or they can use the telephone to call
15 their supervisor to report that they have a
16 disruptive individual and to seek assistance
17 if it's necessary.
18      Q      You're not aware of any post
19 orders or written procedures with respect to
20 what's to be done under those circumstances?
21      A      No.
22      Q      What about a circumstance in which
```

Page 13

```
 1 an officer puts out a radio communication that
 2 says he's in trouble and he needs assistance.
 3 Is there any written policy and procedure to
 4 what's to take place under those
 5 circumstances?
 6      A      To the best of my knowledge there
 7 is nothing written.
 8      Q      Have you ever, in your many years
 9 here at the GPO, been on duty in a
10 circumstance where an officer has put out a
11 radio alert, "Officer in trouble,"?
12             MR. FINE:  Objection, relevancy.
13             BY MR. HANNON:
14      Q      You can still answer the question.
15      A      Yes.
16      Q      And what was done in those
17 circumstances?
18             MR. FINE:  Objection, relevance.
19             BY MR. HANNON:
20      Q      You can still answer.
21      A      Response was initiated and on
22 occasion, myself included, had responded to
```

Page 14

```
 1 provide assistance.
 2      Q      And was this a situation where
 3 officers simply took the initiative of where
 4 they were directed to respond?
 5             MR. FINE:  Objection.  Mr. Hannon,
 6 we have a major problem here.  The Judge has
 7 ruled that she is not going to allow testimony
 8 in regard to the Everett incident.  This line
 9 of testimony is clearly solely related to the
10 Everett case, which is not before this Judge.
11 She wants to hear nothing in regard to the
12 Everett case.
13             You can go to the Judge and ask
14 her to order this deposition to involve the
15 Everett case, and she's available now until
16 three, but otherwise we are just wasting time.
17             MR. HANNON:  This is discovery and
18 a --
19             MR. FINE:  Then why don't we go to
20 the Judge and ask her --
21             MR. HANNON:  Excuse me.
22             MR. FINE:  -- and ask her if she
```

Page 15

```
 1 will allow this to be pursued.
 2             MR. HANNON:  Mr. Fine, please, you
 3 have to let me finish making my record.  This
 4 is a discovery deposition, and objections as
 5 to relevance are simply made and the answers
 6 are taken subject to the objection.
 7             We are not at a hearing, and we're
 8 not in front of the Judge.  And I'm just
 9 taking discovery and I know that you have your
10 position that this is evidence that can't be
11 presented to the Judge, but this is discovery.
12             MR. FINE:  But nor is relevance
13 that it is testimony that's going to lead to
14 evidence which can be produced at the hearing.
15 That's what 26(b) states, as you know very
16 well.
17             There is nothing in his testimony
18 concerning our rules of what to do in an
19 emergency that has anything to do with the
20 issues involved in Mr. White's case.  It has
21 something to do with your other cases, not
22 this case.
```

Page 16

```
 1              MR. HANNON:  The discovery rules
 2    permit you to object and instruct the witness
 3    not to answer only if the answer would involve
 4    a privilege, not because, in your opinion, you
 5    think it's not relevant.
 6              The answers to questions are taken
 7    subject to your objection except with respect
 8    to privilege.  That's so that the judicial
 9    officer is not contacted 28 times during a
10    deposition because one lawyer thinks that a
11    question isn't relevant, and we probably would
12    be finished by now if I'd been permitted to
13    ask my questions.
14         BY MR. HANNON:
15         Q    And I've lost my train of thought.
16    You had related an experience to us and I
17    wanted to know whether you responded on your
18    own initiative to the officer in trouble.
19         A    I have responded in the past on my
20    own initiative, and been dispatched by a
21    supervisor.
22         Q    On those occasions when you've
```

Neal R. Gross & Co., Inc.
(202) 234-4433

Page 17

```
 1    responded on your own initiative, have you
 2    been at a post?
 3         A    No, sir.  I was assigned either to
 4    a foot patrol position or to a vehicular
 5    patrol position.  Part of the duties of both
 6    of those would be to respond if needed.
 7         Q    So in a situation where you're
 8    manning a post, in your experience, you have
 9    not responded unless ordered to?
10         A    Correct.
11         Q    What about on a weekend when
12    generally there are only people here who are
13    assigned to posts?  Who responds then?
14         A    You would be dispatched.  Either
15    the supervisor would dispatch someone -- he
16    could either fill the post himself to free an
17    officer to respond or the supervisor could
18    respond.
19         Q    Well, aren't there circumstances
20    when the post might be left unattended to make
21    certain that the officer in trouble received
22    all necessary assistance?
```

Neal R. Gross & Co., Inc.
(202) 234-4433

Page 18

```
 1         A    No.
 2         Q    That wouldn't happen?
 3         A    No.
 4         Q    So the posts have to be manned
 5    regardless of the threat to the safety of an
 6    officer?
 7         A    The individual posts on weekend
 8    are the permitter posts and they are 24/7
 9    posts.  They would not be unmanned.
10         Q    Even if a officer was being
11    assaulted?
12         A    Supervisor would respond.
13         Q    And what if the supervisor in
14    responding is unable to provide sufficient
15    support to take care of the problem and he or
16    she also becomes in trouble?
17         A    He would then call the control
18    officer and have him to contact Metropolitan
19    or Capital Police to provide assistance.
20         Q    How many years were you in the
21    Army?
22         A    Two.
```

Neal R. Gross & Co., Inc.
(202) 234-4433

Page 19

```
 1         Q    Do you think that if uniform
 2    officers in the GPO are aware that they are in
 3    danger of life and limb, that there might only
 4    be one person who's going to come to their
 5    assistance?
 6              MR. FINE:  Objection, relevancy.
 7    He can't know what every single officer in the
 8    GPO knows.
 9              BY MR. HANNON:
10         Q    In your opinion, as the
11    supervisor?
12         A    I can't speak for what anybody
13    else thinks.
14         Q    As a lieutenant you told the
15    officers under your command that that's the
16    policy.  You're only going to get one person
17    coming to help you.  Maybe?
18              MR. FINE:  Objection, relevancy.
19              THE WITNESS:  I have not
20    personally informed my officers of that, no.
21              BY MR. HANNON:
22         Q    Would the circumstance be
```

Neal R. Gross & Co., Inc.
(202) 234-4433

Page 20

```
 1   different if the officer is reporting that
 2   there's an individual with a gun?
 3             MR. FINE:  Objection, relevancy.
 4             THE WITNESS:  If we don't have
 5   enough manpower, that would be the way that we
 6   would handle it.  We would contact MPD or
 7   Capitol Hill to provide assistance.
 8             BY MR. HANNON:
 9        Q    Did you become aware -- well, you
10   obviously have.
11             How did you become aware of this
12   incident?
13        A    After the fact.  Conversation
14   amongst officers, overhearing conversations.
15        Q    But it wasn't reported to you in
16   the course of your duties?
17        A    No.
18        Q    Did you have any conversations
19   with Rafael Landrau about the incident?
20        A    None that I recall.
21        Q    If you had would there be some
22   kind of a record of those conversations?
```

Page 21

```
 1        A    I don't know.
 2        Q    How about E-mail with Rafael
 3   Landrau?
 4        A    Possibly.
 5        Q    Under what circumstances would you
 6   and Mr. Landrau have exchanged E-mail?
 7        A    Through official channels.
 8        Q    Why would Mr. Landrau be looking
 9   into this incident?
10        A    He's in charge of Human Capital
11   and the Police Department falls under Human
12   Capital.
13        Q    But is it his job to investigate
14   incidents or is it his job to take action with
15   respect to things that are reported to him, in
16   your experience?
17        A    In my experience, he would not be
18   investigating.
19        Q    Have you had any conversations
20   with Lamont Jordan (phonetic) about this
21   incident?
22        A    Not that I recall.
```

Page 22

```
 1        Q    Is it possible that there are E-
 2   mail communications regarding this incident
 3   between you and him?
 4        A    Possibly.
 5        Q    What would his role be in
 6   investigating an incident such as this?
 7        A    He would not be the investigator.
 8   He would be the -- one of the officials -- I
 9   believe his position would be the deciding
10   official if corrective action were proposed.
11        Q    In this case the investigation was
12   assigned to the Inspector General's Office.
13   Do you know what circumstances under which
14   that's usually done?
15        A    No.
16        Q    In your experience is it unusual
17   to have an investigation of officer conduct
18   referred to the Inspector General's Office?
19        A    It's not unheard of, but it is
20   unusual.
21        Q    Does the Inspector General report
22   to Human Capital?
```

Page 23

```
 1        A    I'm not sure.  I don't think so.
 2        Q    Aren't they supposed to be
 3   independent?
 4        A    Yes.
 5        Q    Can you describe the circumstances
 6   under which you've interacted with Officer
 7   White since you've been promoted to
 8   lieutenant?
 9        A    Officer White has been in a
10   subordinate position.  He and I have had a
11   very good working relationship.
12        Q    When this incident occurred he had
13   been given a temporary assignment as a
14   sergeant -- I may be using the wrong language
15   -- a supervisory sergeant.  Do you recall
16   that?
17        A    Yes.  He was in an acting
18   sergeant's capacity.
19        Q    Do you recall why that was?
20        A    We had a limited number of
21   supervisors.  Two of our full time sergeants
22   had been placed in positions of acting
```

Page 24

```
1   lieutenants.  We had a shortage of full time
2   Sergeants and the corporals were being given
3   an opportunity to act in the capacity prior to
4   any further promotions to the sergeant's
5   position.
6       Q    And who made the selection of
7   Officer White to be an acting sergeant?
8       A    All of the corporals were given an
9   equal opportunity to act in the capacity.
10      Q    In a rotating basis or they were
11  given an equal chance to be selected?
12      A    They were being given an equal
13  opportunity for experience at the capacity of
14  sergeant.
15      Q    So at some point every corporal
16  had an opportunity to act as sergeant?
17      A    Correct.
18      Q    So that would make sure that there
19  was a level playing field for the promotion
20  process?
21      A    Correct.
22      Q    And how would the promotion
```

Page 25

```
1   process take place if management decided they
2   needed a permanent sergeant?
3           MR. FINE:  Objection, relevance.
4           BY MR. HANNON:
5       Q    You can answer.
6       A    The announcement would be posted
7   through personnel.  The corporals would apply
8   for the position based on their paperwork that
9   was presented, the recommendations, if
10  requested, by their immediate supervisors, and
11  the selection would then be made.
12      Q    Since October of 2006 when this
13  incident occurred, has any one been promoted
14  to sergeant to your knowledge?
15      A    Yes.
16      Q    Who's that?
17      A    Sergeant Turner, Sabrina.
18      Q    Anyone else?
19      A    I don't recall that anyone else
20  has, not to sergeant.
21      Q    Are you responsible for evaluating
22  the performance of Officer White?
```

Page 26

```
1       A    No.
2       Q    Who is?
3       A    His immediate supervisor.
4       Q    So that would be somebody who
5   answers to you?
6       A    No, sir.  That would be his shift
7   supervisors.
8       Q    And from your perspective, what is
9   your opinion as to Officer White's work ethic?
10      A    Officer White has always presented
11  himself to me as a competent, very
12  knowledgeable individual as far as his job is
13  concerned.
14          MR. HANNON:  Lieutenant, thank
15  you.  I don't have any other questions.  Mr.
16  Fine might have some questions.
17          MR. FINE:  I have no questions.
18          MR. HANNON:  This lady is going to
19  prepare a transcription of my questions and
20  your answers and you have a right to trust her
21  to do that accurately or if you wish you can
22  review it before it becomes final, as it suits
```

Page 27

```
1   you.  Most witnesses trust her.
2           THE WITNESS:  She has an honest
3   face.  I trust her.
4           MR. HANNON:  Ok, we're off the
5   record.
6           (Whereupon, at 12:57 p.m., the
7   deposition of Charles Steven Cross was
8   concluded, signature waived.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
```

Page 28

```
 1
 2
 3                    CERTIFICATE
 4
 5        This is to certify that the foregoing
 6   transcript in the matter of:
 7
 8
 9
10   Deposition of Charles Cross
11
12
13
14   Date:                 Monday, August 13, 2007
15
16
17
18   Place:                Washinton, D.C.
19
20
21
22
23   represents the full and complete proceedings of
24   the aforementioned matter, as reported and
25   reduced to typewriting.
26
27
```

Neal R. Gross & Co., Inc.
(202) 234-4433

---

28

Neal R. Gross & Co., Inc.
(202) 234-4433

---

Page 30

Neal R. Gross & Co., Inc.
(202) 234-4433

---

Page 31

Neal R. Gross & Co., Inc.
(202) 234-4433

| | | | |
|---|---|---|---|
| 15:12 25:3 | seven 5:3,6 | testified 4:7 | want 5:3 | 26(b) 15:15 |
| relevancy 10:16 13:12 | severity 8:1 | testimony 14:7,9 15:13 | wanted 16:17 | 28 16:9 |
| 19:6,18 20:3 | shift 4:21 26:6 | :15 17 | wants 14:11 |
| relevant 16:3,11 | shortage 24:1 | thank 20:14 | Washington 1:2,14,20 | **3** |
| relief 10:7 | signature 27:8 | their 12:11,15 19:4 | 2:8,17 | 30 10:4 |
| relieve 9:16 10:1,3 | simply 14:3 15:5 | 25:8,10 | Washinton 28:18 |
| relieved 9:10 11:16 | since 23:7 25:12 | things 21:15 | want t 6:9,13 20:15 | **4** |
| relieves 10:14 | single 19:7 | think 16:5 19:1 23:1 | wasting 14:16 | 4 3:16 |
| relieving 10:22,22 | sir 4:10 12:6 17:3 26:6 | thinks 16:10 19:13 | watch 6:11 7:3 | 41 6:6,8 9:11 10:7 |
| 11:12 | situation 8:1 14:2 17:7 | though 9:3 16:15 | way 20:5 | 45 11:6 |
| report 8:5,10 12:15 | Soldier 10:18 | threat 18:5 | week 6:20 7:1 |
| 22:21 | solely 14:9 | three 4:22 14:16 | weekend 6:16,19,21,21 | **5** |
| reported 20:15 21:15 | some 5:21 7:16 20:21 | through 5:12 21:7 23:7 | 6:22 7:5,7,8 8:17 | 50 10:8 |
| 28:24 | 24:15 26:16 | time 6:10 10:4 11:5 | 17:11 18:7 | 512-0200 2:18 |
| reporting 20:1 | somebody 26:4 | 14:16 23:21 24:1 | weekends 7:12 |
| reports 12:10 | someone 17:15 | times 16:9 | well 15:16 17:19 20:9 | **7** |
| represents 28:23 | something 15:21 | told 8:4 9:18 19:14 | went 5:13 | 732 1:19 2:16 |
| requested 25:10 | speak 19:12 | train 16:15 | were i 21:6 10:9,13 |
| require 11:19 | special 5:14 | transcript 28:6 | 10:9 14:4 18:20 |
| respect 12:19 16:7 | specific 10:13 | transcription 26:19 | 22:10 24:3,8,10,12 |
| 21:15 | specifics 5:20 6:2,8 | transpired 6:6,9 | we're 15:7 27:4 |
| respective 1:22 | spell 4:16 | trouble 13:2,11 16:18 | we've 8:4 |
| respond 10:7 14:4 17:6 | SR 1:5 | 17:21 18:16 | White 1:5 2:22 4:12 |
| 17:17,18 18:12 | staffing 6:16 | trust 26:20 27:1,3 | 5:15 6:7 9:9,13,18,19 |
| respondent 13:22 16:17 | Started 5:13 | Turner 25:17 | 10:6 23:7,9 24:7 |
| 16:19 17:1,9 | states 1:1 11:13 15:15 | Twenty 5:6 | 25:22 26:10 |
| responding 18:14 | Steve 1:15 3:14 4:4 | two 9:13 18:22 23:21 | White's 15:20 26:9 |
| responds 17:13 | Steven 4:15,18 6:11 | type 8:8 | Wilson 7:9 8:5,12 9:3 |
| Response 13:21 | 27:7 | typewriting 28:25 | wish 26:21 |
| responsibility 11:6 | still 13 14,20 | | witness 3:12 4:5 16:2 |
| responsible 7:20 25:21 | Street 1:20 2:6,16 | **U** | 19:19 20:4 27:2 |
| returned 9:13 | subject 15:6 16:7 | unable 18:14 | witnesses 27:1 |
| returns 10:6 | subordinate 23:10 | unattended 17:20 | women 9:13 |
| review 26:22 | sufficient 18:14 | under 12:20 13:4 19:15 | words 11:15 |
| Richardson 9:16 | suits 26:22 | 21:5,11 22:13 23:6 | work 5 8:26 9 |
| Richardson's 9:20 | Summersing 9:8 | understand 9:10 | worked 5:9 |
| right 26:20 | Sunday 9:11 | understanding 6:1,2 | working 23:11 |
| Robert 1:5 2:22 4:12 | supervisor 4:21 12:15 | 10:20 | wouldn't 18:2 |
| 5:19 | 16:21 17:15,17 18:12 | Understood 9:8 | written 12:8,19 13:3,7 |
| role 22:5 | 18:13 19:11 26:3 | unheard 22:19 | wrong 23:14 |
| rotating 24:10 | supervisors 6:18 23:21 | uniform 5 8:9 19:1 |
| ruled 14:7 | 25:10 26:7 | UNITED 1:1 | **Y** |
| rules 11:8 16:1 | supervisory 23:15 | unless 17:9 | years 3:4,6 13:8 18:20 |
| | support 18:15 | unmanned 18:9 |
| **S** | supposed 23:2 | until 14:15 | **1** |
| 8 4:1 | sure 23:1 24:18 | unusual 6:14 22:16,20 | 12:32 4:2 |
| Sabrina 25:17 | sworn 4:6 | use 12:14 | 12:57 27:6 |
| safety 18:5 | SYSTEMS 1:1 | using 23:14 | 13 1:13 28:14 |
| says 13:2 | S-t-e-v-e-n 4:18 | usually 22:14 | 18th 2:6 |
| see 7:8 | | U.S 10:12,14 | 1901 2:6 |
| seek 12:16 | **T** | | |
| selected 24:11 | TABLE 3:10 | **V** | **2** |
| selection 24:6 25:11 | take 9:12 13:4 18:15 | v 1:7 | 20000 2:8 |
| sergeant 5:14 7:9,13,18 | 21:14 25:1 | vehicular 17:4 | 2006 25:12 |
| 7:20 8 5,12,20 9:5 | taken 5:21 15:6 16:6 | very 15:15 23:11 26:11 | 2007 1 13 28:14 |
| 23:14,15 24:7,14,16 | taking 15:9 | view 11:5 | 202 2:9,18 |
| 25:2,14,17,20 | telephone 8:5 12:14 | | 20401 2:17 |
| sergeants 23:21 24:2 | tell 5:11 | **W** | 232-1907 2:9 |
| sergeant's 23:18 24:4 | temporary 23:13 | waived 27:8 | 24/7 18:8 |

# Transcript of: **James Oldach**

**Date:** August 10, 2007
**Volume:**

**Case:** White v. U.S. GPO

Neal R. Gross & Co., Inc.
Phone: 202-234-4433
Fax: 202-387-7330
Email: info@nealrgross.com
Internet: www.nealrgross.com

---

Page 1

UNITED STATES OF AMERICA
MERIT SYSTEMS PROTECTION BOARD
WASHINGTON REGIONAL OFFICE

```
|---------------------+
                      |
In the Matter of:     |
                      |
ROBERT O. WHITE, SR., |
                      |
          Appellant,  |
                      |
     v.               | Docket No.
                      | DC-0752-07-0729-I-1
                      |
GOVERNMENT PRINTING   |
OFFICE,               |
                      |
          Agency.     |
                      |
|---------------------+
```

Friday, August 10, 2007
Washington, D.C.

DEPOSITION OF:
JAMES C. OLDACH, JR.

called for examination by the counsel for the
Appellant, pursuant to notice of deposition,
at the Government Printing Office, 732 North
Capitol Street, N.W., Washington, D.C., when
were present on behalf of the of the
respective parties:

---

Page 2

APPEARANCES:

On Behalf of the Appellant:

J. MICHAEL HANNON, ESQ.

of:  Hannon Law Group, LLP
1901 18th Street, N.W.
Washington, D.C. 20009
(202) 232-1907

On Behalf of the Agency:

NEAL H. FINE, ESQ.
Government Printing Office
732 North Capitol Street, N.W.
Washington, D.C. 20401
(202 ) 512-0200

Also Present:

ROBERT O. WHITE

---

Page 3

TABLE OF CONTENTS

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| James C. Oldach, | | | | |
| Jr. | 4 | 33 | 37 | |

| Ex. | | |
|---|---|---|
| NO. | DESCRIPTION | IDENTIFIED |
| (None) | | |

Page 4

```
 1              P R O C E E D I N G S
 2                                      (4:30 p.m.)
 3   Whereupon,
 4              JAMES C. OLDACH, JR.
 5   was called as a witness by counsel for the
 6   Appellant and, having been first duly sworn,
 7   was examined and testified as follows:
 8              DIRECT EXAMINATION
 9      BY MR. HANNON:
10      Q    Good afternoon.  Would you tell us
11   your full name, please, and spell your last
12   name?
13      A    James C. Oldach, Jr., O-l-d-a-c-h.
14      Q    If I ask a question and you don't
15   understand, just let me know and I'll try and
16   straighten it out.
17      A    Okay.
18      Q    And what is your position today?
19      A    Police officer.
20      Q    And how long have you been with
21   GPO?
22      A    September of 1991.
```

Page 5

```
 1      Q    And your rank?
 2      A    PFC.
 3      Q    Were you -- did you become aware
 4   of an incident at Building 4 on October 29th
 5   of 2006 when Officer Everett was assaulted?
 6      A    Yes.
 7      Q    How did you learn about that?
 8      A    That night I was the control
 9   center operator and Officer Everett called on
10   the radio stating he had a disorderly conduct.
11      Q    And the control center is in the
12   lobby of 732; is that right?
13      A    No, sir.  It's -- how to explain
14   this -- it's in the building down the hallway.
15   It's the main lobby.  It would actually be
16   behind the main lobby.
17      Q    Okay.  So if I walked in from
18   North Capitol Street into the front of 732,
19   where would I go to get to the control center.
20      A    You would go through the lobby.
21   You would go left up a set of steps, turn
22   right; down that hallway.  You would turn
```

Page 6

```
 1   right again, and you would see the sign on the
 2   wall that said GPO police.
 3      Q    Okay, and what do you do as the
 4   control center operator?
 5      A    Type in the daily log, answer the
 6   radios, dispatch the officers, monitor the
 7   cameras and the alarm system.  If there's an
 8   alarm dispatch the officers to that.
 9      Q    For a Sunday shift, is that a one-
10   man post?
11      A    It's always -- it's a one-man post
12   seven days a week.
13      Q    And how often as of October 2006
14   had you worked that assignment?
15      A    Routinely.
16      Q    The camera monitors that you have
17   there, are the monitors for all of the cameras
18   located there?
19      A    All the cameras that I guess we're
20   assigned would be in that general room.
21      Q    Let me ask a different question.
22   After this incident there was a review of
```

Page 7

```
 1   tapes that were made by certain cameras.  One
 2   of the cameras was at Post 41, and then there
 3   were other cameras or a camera outside the
 4   building.
 5      A    That camera shows up in the
 6   control center.
 7      Q    Okay.  That's what I wanted to
 8   know.
 9           MR. HANNON:  Neal, I saw in a
10   number of the documents that -- I'm trying to
11   recall whether the tapes of the communications
12   that Officer Oldach was involved in have been
13   preserved.
14           MR. FINE:  No.  I was told audio
15   tapes were not preserved or they weren't
16   operable, one of the two.  I think it was not
17   operable was my response or that was the
18   response I was given.
19           BY MR. HANNON:
20      Q    Other than the taping system is
21   there any other method by which the radio
22   communications that the control center
```

Page 8

```
1    operators involved in are preserved?
2         A    That I don't know, how exactly the
3    equipment works.
4         Q    Do you know who has knowledge of
5    why the tape of those communications is not
6    available?  Who would know that?
7         A    Possibly the electric shop that
8    does the work in there setting up the
9    equipment.
10        Q    Well, who's -- do you know how
11   long those tapes are preserved?
12        A    The new control center from my
13   understanding is digital for the cameras.  For
14   audio I don't know.
15        Q    When you say the new control
16   center, was the control center in October 2006
17   the new control center?
18        A    Yes.  The old one would be right
19   off the lobby as you come in.
20        Q    Okay.  So who's responsible for
21   making sure, if you know, that the tape system
22   for the control center works?
```

Page 9

```
1         A    That's something I'm not 100
2    percent sure of who's physically responsible.
3         Q    Do you remember who advised you
4    that it was not operable?
5              MR. FINE:  Mr. Vernon.
6              BY MR. HANNON:
7         Q    Before today, did you know that
8    apparently the tape was not operable?
9         A    No.
10        Q    Before today have you listened to
11   the tape of any of the communications of the
12   day of this incident?
13        A    No, I haven't.
14        Q    To your knowledge, I mean, do you
15   have any knowledge as to whether the tape ever
16   existed?
17        A    No.
18        Q    About what time did you begin your
19   work as the control center operator on that
20   Sunday?
21        A    Three p.m.
22        Q    And do you do anything to
```

Page 10

```
1    determine whether the taping system is
2    functioning?
3         A    No.
4         Q    Is there any way for the control
5    center operator to know that the taping system
6    is functioning?
7         A    For audio I don't know.
8         Q    Okay.  But you know that the new
9    control center had a taping system for audio
10   communications.
11        A    Yes.
12        Q    And these are communications
13   between the control center and hand-held
14   radios?
15        A    Yes, sir.
16        Q    Okay.  And do you know whether the
17   audio taping system is digital?
18        A    No.
19        Q    You don't know how it operates?
20        A    No.  Video is supposed to be
21   digitally recorded.
22        Q    I asked you earlier about the
```

Page 11

```
1    audio and you talked about technicians or
2    something.  Do you know the name of a person
3    who you would go to if you wanted to find out
4    information about the taping system in the
5    control center?
6         A    Well, me, as an officer, I'd have
7    to contact my sergeant, like I say, if I have
8    a problem, and he would, in turn --
9         Q    I know that, but putting that
10   aside, do you know the names of any of the
11   folks who are responsible for the taping
12   system?
13        A    No.
14        Q    Okay.  So what do you remember
15   Officer Everett saying to you in the first
16   communication that you recall?
17        A    It was about 6:25.  Officer
18   Everett stated, "Control, I have a disorderly
19   at Post 41."
20        Q    How do you know it was 6:25?
21        A    I'm going by the best of my
22   knowledge.  I think that's what I had typed in
```

Page 12

```
1    the log.  It's 6:25.
2        Q    And did you try to type into the
3    log, as best you recall, the communication,
4    the nature of the communication, the words he
5    used?
6        A    I think I typed in, yeah, exactly
7    that.  "Officer, I have a report of disorderly
8    at Post 41."
9        Q    And what did you do?
10       A    Sergeant Wilson came on the radio
11   right after that and instructed me to dial 911
12   for MPD and ask for a unit to be sent.
13       Q    And did you do that?
14       A    Yes.
15       Q    And did an MPD unit ever arrive?
16       A    Yes, MPD and U.S. Capitol Police
17   arrived.
18       Q    Okay.  After the first call from
19   Officer Everett saying he had a disorderly at
20   Post 41, did you go on the air with any
21   information before Sergeant Wilson called in?
22       A    No.  Sergeant Wilson called me on
```

Page 13

```
1    the radio almost right after Officer Everett
2    stated his problem.
3        Q    So you assume he was monitoring
4    the radio?
5        A    Yes.
6        Q    Do you know where Sergeant Wilson
7    was at the time he called in?
8        A    Sergeant Wilson was in the main
9    office.
10       Q    Where is that located?
11       A    Right off the lobby, as you come
12   in 732, the big window.  That's our main
13   office.
14       Q    Just to the left.
15       A    Yes.
16       Q    And I assume you acknowledged
17   Sergeant Wilson's instruction to you.
18       A    Yes.
19       Q    And called 911.  What was the next
20   radio communication?
21       A    Officer Richardson came on the
22   radio saying he was responding from Post 50
```

Page 14

```
1    with a security screener.
2        Q    What does that mean?
3        A    they have -- at the time we had
4    unarmed security screeners that are stationed
5    in the main lobby and in the parking lot out
6    back.  In other posts, they run the X-ray
7    machines and check people coming into the
8    building.
9        Q    So that meant he was responding
10   from Post 50 with another individual?
11       A    What had happened was Sergeant
12   Wilson was monitoring the front office and the
13   main lobby, both.  The security screener had
14   left the main lobby to go give the security
15   screener in the parking lot their lunch break.
16   So the main lobby was empty, and Sergeant
17   Wilson was in the main office answering the
18   telephone and watching the main lobby.
19       Q    So that explains why Sergeant
20   Wilson didn't go across the street to help
21   Officer Everett.
22       A    He'd have to answer that, but I
```

Page 15

```
1    would assume, yes, he didn't --
2        Q    He didn't want to leave the lobby
3    unguarded.
4        A    Right.
5        Q    Did anyone direct Richardson to
6    respond to Post 41?
7        A    No.  Officer Richardson was
8    relieved by Officer White for lunch.  So he
9    was probably responding in anyway to start his
10   lunch.
11       Q    But Sergeant Wilson didn't order
12   Officer Richardson to respond to Officer
13   Everett, did he?
14       A    Officer Richardson -- when Officer
15   Everett called in, Sergeant Wilson told me to
16   call 911.  Officer Richardson came on the
17   radio right after that saying, "I'm responding
18   with a security screener."
19       Q    So Officer Richardson basically
20   took the initiative to go.
21       A    Yes.
22       Q    And that's because he wasn't on a
```

Page 16

```
 1   post.
 2      A     Correct.
 3      Q     And he was going on his lunch
 4   break.
 5      A     Yes.
 6      Q     And the security screener was at
 7   the post that Officer White was going to.
 8      A     No.  Officer White went out to Lot
 9   50, which is the first entrance to the parking
10   lot, to relieve Officer Richardson.  Between
11   Lot 50 and Lot 3 there's another booth, which
12   the security screener is in.  The security
13   screener went from the front lobby to that
14   booth to relieve their person.
15      Q     Okay.  The security screener that
16   Officer Richardson took with him, was that the
17   security screener on the lunch break or the
18   security screener in the booth?
19      A     The security screener that had
20   left the front lobby to go relieve was the
21   same one he brought back.  Evidently they were
22   both still there, and he said, "We have a
```

Page 17

```
 1   situation.  Come with me."
 2      Q     So Officer Richardson was starting
 3   his lunch break and the security screener that
 4   came with him was finishing his or her lunch
 5   break.
 6      A     Was just about to relieve the
 7   person out there for their break, yes.
 8      Q     Okay.  Now, how many other uniform
 9   officers were on duty that day besides
10   yourself, Sergeant Wilson, Officer Richardson,
11   Officer Everett, and Officer White?
12      A     None.
13      Q     How many security screeners were
14   there on duty?
15      A     To the best of my knowledge, there
16   was two, the one in the lobby and the one at
17   Post 22.
18      Q     And they're contract employees?
19      A     Yes.
20      Q     How soon after Wilson came on the
21   air and said, "Call 911," did Richardson come
22   on the air?
```

Page 18

```
 1      A     I don't think it was even a
 2   minute.  He waited until Sergeant Wilson was
 3   done, and I had acknowledged Sergeant Wilson
 4   saying, "Ten-four," and Officer Richardson
 5   came on the air right after that, that he was
 6   responding.
 7      Q     What was the next communication
 8   you remember?
 9      A     I believe Officer Richardson was
10   on scene.  He called the control center saying
11   Officer Everett was injured and we needed an
12   ambulance.  Sergeant Wilson came back on the
13   radio, told him to redial and get an ambulance
14   dispatched.
15      Q     Do you know where Sergeant Wilson
16   was when he made that second radio
17   communication to you?
18      A     I would say he was still in the
19   main office.
20      Q     All right.  What was the next
21   radio communication you recall?
22      A     I think Sergeant Wilson had made
```

Page 19

```
 1   it over to 41, and I was informed Capitol Hill
 2   and MPD were on the scene.
 3      Q     Did you ever physically go over to
 4   41?
 5      A     No.
 6      Q     Who relieves you for your meal
 7   break?
 8      A     I believe that night it would have
 9   been Officer White when he had got done with
10   Post 50.
11      Q     And what time -- oh, you mean it
12   would have been later on after the incident?
13      A     Well, normally it's a 30-minute
14   break.  Richardson would have taken a 30-
15   minute break.  Officer White would have got
16   done at Post 50 and probably came and got me.
17      Q     For an eight-hour shift, how many
18   breaks do you get?
19      A     You get your 30-minute lunch break
20   and, I mean, basically whatever you need.  I
21   mean, you could call two or three times, just
22   usually when you have to go get a drink or
```

Page 20

1  something.

2      Q    Is it sort of understood that you

3  get a 30-minute lunch and 15 minutes at some

4  other point in the day on a weekend tour?

5      A    Usually you can, yes.  You can

6  take a break when you need it.

7      Q    And do you ever put together your

8  30 and 15 to make 45?

9      A    No.

10     Q    You don't?

11     A    No, I tried that once and it

12 didn't work very well.

13     Q    Okay.  Did you see Officer Everett

14 in the main building at all before this

15 incident occurred?

16     A    No.

17     Q    Did anybody bring you any food

18 that day?

19     A    Let me see.  Actually let me

20 backtrack.  Everett brought me -- yeah,

21 Everett brought me food.

22     Q    Was it before the incident?

Page 21

1      A    Before, yes.

2      Q    And did he come into the control

3  center to deliver the food?

4      A    Yes.

5      Q    Was anyone with him?

6      A    No.

7      Q    And where had he gotten it, if you

8  recall?

9      A    Popeye's.

10     Q    And did you eat your food at your

11 post?

12     A    Yes.

13     Q    Now, you understood that there

14 were two women involved in this incident?

15     A    Yes.

16     Q    During that day did you ever see

17 any women in the main building?

18     A    No.

19     Q    Do you recall a radio

20 communication from Officer Everett after he

21 called in a disorderly, reporting that he

22 needed -- there was an officer in trouble; he

Page 22

1  needed assistance, a second communication?

2      A    I want to say when I was on the

3  phone with MPD Officer Everett did make a

4  radio transmission.  Exactly what was said I

5  don't know because I was on the phone with

6  Dispatch, but I believe Officer Everett was on

7  the radio.

8      Q    You don't recall as you sit here

9  exactly what he said?

10     A    No.

11     Q    Are the telephone communications

12 out of the control center in this case to MPD,

13 are those taped?

14     A    They're supposed -- our phones are

15 supposed to be recorded also.

16         MR. HANNON:  Is that something you

17 can look into, Neal, as well?

18         MR. FINE:  The telephone tapes?

19         THE WITNESS:  The telephones are

20 supposed to be recorded.

21         MR. HANNON:  They're supposed to

22 be.

Page 23

1          MR. FINE:  Lots of things are

2  supposed to be in this world.  Telephone tapes

3  for 10/29.

4      BY MR. HANNON:

5      Q    What do you remember telling the

6  MPD dispatcher?

7      A    We had a disorderly conduct in

8  front of our building.  The main thing I was

9  on the phone for so long was I don't think --

10 I've been here 16 years.  I don't think I have

11 the correct address for Building 4.  I don't

12 know if it's 735, seven -- so I was explaining

13 to her it was the warehouse building of GPO

14 located on North Capitol, and she said she

15 needed a physical address.

16         I told her it was across the

17 street from 732.  We finally -- we finally got

18 it ironed out, but I mean, I was on -- I was

19 on the phone longer than a normal 911 call.

20     Q    Did you have occasion to call MPD

21 back based upon the subsequent communication

22 from Everett, do you recall?

Page 24

1    A    I recalled 911 again for when
2  Officer Richardson stated Officer Everett was
3  injured.  I didn't get the same operator, but
4  they know -- they have a -- what's going on.
5  So they knew to dispatch EMS.
6    Q    But that second call was for an
7  ambulance.
8    A    Correct.
9    Q    Not to report to MPD, "Hurry up.
10  There's an officer in trouble"?
11    A    No.
12    Q    Okay.  Did you work the control
13  center the next day?
14    A    I want to say Monday was my day
15  off.
16    Q    Were you ever present when other
17  officers or officials watched the tapes, the
18  videotapes?
19    A    No.
20    Q    To your knowledge, did anyone
21  attempt to listen to the radio tapes?
22    A    Not to my knowledge.

Page 25

1    Q    Did you make any changes in the
2  log that you kept on that Sunday after that
3  date?
4    A    No.
5    Q    I've been asking everybody this
6  question.  Have you ever been the subject of
7  discipline as a GPO officer?
8    A    Yes.
9    Q    On how many occasions?
10         THE WITNESS:  Can you help me out
11  there?
12         MR. FINE:  I don't know.  It was
13  more than one.
14         THE WITNESS:  More than one.  I'd
15  have to go back and look.
16         BY MR. HANNON:
17    Q    What's the most serious penalty
18  you recall being imposed, if any?
19    A    I was accused of being asleep at
20  the main desk.
21    Q    Was there a penalty?
22    A    I was on a two-year, last chance

Page 26

1  agreement I guess you'd call it.
2    Q    Okay.  Any other penalties you
3  recall?
4    A    I believe a suspension in '94.
5    Q    Do you remember how many days?
6    A    Seven.
7    Q    Do you remember what it was for?
8    A    I think it was disrespect to my
9  supervisor.
10    Q    That's worth seven days.  Who was
11  the supervisor?
12    A    Sergeant Brown.  He's not here
13  anymore.  Oh, and then there was the famous
14  Shellman poster.
15    Q    Any discipline for that?
16    A    I think it was a paper suspension.
17    Q    Did Officer White actually relieve
18  you that day?
19    A    No.
20    Q    When Officer White had relieved
21  Officer Everett at Post 41, do you remember
22  any radio communications to Officer White to

Page 27

1  hurry up and go relieve Richardson?
2    A    No.
3    Q    You know that Darnell Everett has
4  been fired.
5    A    Yes.
6    Q    Do you know anything about the
7  allegations that I've made on behalf of
8  Officer Everett and Officer White regarding
9  their defense to their discipline?
10    A    No.
11    Q    Okay.  One of the defenses is that
12  Sergeant Wilson as the officer in charge
13  should have taken more drastic action to
14  provide assistance to Officer Everett, in
15  which case this incident never would have
16  happened, and Officer White, of course, is a
17  white officer.  And Officer White wasn't
18  disciplined for this.
19         We learned a few minutes ago that
20  Lieutenant Packard was advised about this
21  incident by you, I guess, by radio or
22  something -- no, Wilson.  Wilson advised him.

Page 28

1      A      No, Lieutenant Packard, I think,
2   was the acting commander at the time.
3      Q      Right.  Yeah, he was advised by
4   Sergeant Wilson that Officer Everett had been
5   assaulted because he was not -- he was the
6   acting commander off duty at the time.
7      A      Right.
8      Q      And you know, he didn't do
9   anything, and then when Officer Everett went
10  down to paper the case, Lieutenant Packard
11  didn't go down with him or send a supervisor
12  down with him.
13          And this is an opinion question.
14  Have you ever observed or ever suspected that
15  discipline for African American officers might
16  be a little bit different than discipline for
17  white officers?
18     A      In my opinion, I would say yes.
19     Q      Why do you think that?
20     A      I'm not actually sure why it's
21  that way.  I mean --
22     Q      No, I --

Page 29

1      A      -- I used to think it was fairly
2   harsh for me, myself, but --
3      Q      I'm not asking you to make a
4   comment on people's motives.  I'm just talking
5   about, you know, the numbers.  That seems to
6   be -- I mean, why do you have that impression?
7      A      Well, I mean, you know, from
8   working down there.  You pick up things that
9   happen or things that go on, things you just
10  don't feel is right.
11     Q      Let me ask you another question.
12  Have you been active in the union at all?
13     A      Since it started, yeah.
14     Q      Okay.  Have you aspired to any
15  leadership roles or ever worked as a steward
16  or represented anybody in a grievance?
17     A      No, I haven't.
18     Q      Okay.  Have you formed an opinion
19  that those officers who are union
20  representatives and most active on behalf of
21  the union are subject to more discipline than
22  others?

Page 30

1      A      I would say they're observed more
2   closely than the regular, normal, everyday
3   officer.
4      Q      You understand that the GPO has a
5   contract with some private security company to
6   provide --
7          MR. FINE:  Objection.  Totally
8   irrelevant to the issues before the MSPB.
9          MR. HANNON:  Let me finish my
10  question.
11          BY MR. HANNON:
12     Q      You're aware that the GPO has a
13  security contract with a private security
14  company to provide security at the facility,
15  correct?
16          MR. FINE:  GPO will so stipulate.
17          THE WITNESS:  Yes.
18          BY MR. HANNON:
19     Q      Okay.  And this again is another
20  opinion question.  Do you think the GPO is
21  trying to get rid of its uniformed officers?
22          MR. FINE:  Objection.  Irrelevant.

Page 31

1          MR. HANNON:  You can answer.
2          THE WITNESS:  It feels that way
3   because, you know, you would basically think
4   we should have more officers here.  If we had
5   more officers this incident might not have
6   happened.
7          BY MR. HANNON:
8      Q      And isn't it also true that
9   they're replacing officers at certain posts
10  with contract security guards?
11     A      Yes, posts that were normally run
12  by officers are now run by Knight Security.
13     Q      And have you ever heard anybody
14  comment on why they think the GPO is doing
15  that?
16     A      More cost effective.
17     Q      In your opinion, what's the most
18  important facility on the entire GPO grounds
19  in terms of providing security for it?
20     A      Building 4.
21     Q      Building 4, and that's because of
22  the passport being there?

Page 32

```
1       A    Yes.
2       Q    Okay, and do GPO uniform officers
3   protect Building 4 now?
4       A    No, we make basically two patrols
5   per shift.
6       Q    So who's manning Post 41 now?
7       A    Knight Security.
8       Q    Knight, K-n-i-g-t?
9       A    Yes, q-h-t.  K-n-i-g-h-t.
10      Q    Do you remember calling Officer
11  White on the telephone to go relieve
12  Richardson or to relieve you, I guess?
13      A    I called him out at 50 to see what
14  was going on.
15      Q    By telephone?
16      A    Yes.
17      Q    By cell phone.
18           MR. HANNON:  He may not remember.
19           BY MR. HANNON:
20      Q    Do you remember calling Officer
21  White at Post 41 on cell phone?
22      A    He could have been at 41.  I did
```

Page 33

```
1   call him reference a break.
2       Q    Do you remember -- for you?  A
3   break for you?
4       A    Right.
5       Q    And did you call him by cell phone
6   to relieve Richardson, do you recall?
7       A    No.
8       Q    Okay.
9       A    I don't recall.
10           MR. HANNON:  Anything else?
11           Mr. Fine.
12           MR. FINE:  Yes.
13              CROSS EXAMINATION
14           BY MR. FINE:
15      Q    Now that we've spent the past 45
16  minutes talking about Officer Everett, what
17  was the extent of Officer Everett's injuries
18  in this assault?
19      A    Officer Richardson said his face
20  was scratched and bleeding.
21      Q    Was he taken to the hospital for
22  emergency treatment?
```

Page 34

```
1       A    No.
2       Q    What did the ambulance emergency
3   techs do?
4       A    I wasn't there.  I can only assume
5   they cleaned his face, maybe gave him a
6   Bandaid.  I didn't -- I wasn't there.
7       Q    Did he work the rest of the night
8   then?
9       A    He went to -- U.S. Capitol
10  transported, and Officer Everett was assigned
11  the arrest.  So he went to do the paper work.
12      Q    So he wasn't injured that badly,
13  that he had to go home on sick leave or
14  anything?
15      A    No.
16      Q    You came in 1991.  How many police
17  officers did we have then?
18      A    If memory serves, I know we
19  probably -- at least 80.  I want to say at
20  least 80, 88, something like that.
21      Q    All right.  So since '91 then, we
22  have now 34-ish; is that correct?
```

Page 35

```
1       A    I think we have about 28 in
2   uniform.
3       Q    Well, plus office, plus
4   supervisors and stuff?
5       A    Plus the supervisors, yeah.
6       Q    Okay.  So all together it may be
7   34, 35?
8       A    Maybe, yeah.
9       Q    So is this reduction from 88 to
10  35-ish, has that occurred drastically or was
11  there a reduction in force of police officers
12  or was it by attrition?
13      A    I'd say by attrition.
14      Q    Okay.  All right.
15      A    You mean a government action, a
16  RIF?
17      Q    Right.
18      A    No, there was no RIF.
19      Q    No RIF.  So it just attrited down
20  as the -- in '91 the GPO work force was like
21  what, four or 5,000?
22      A    Right.
```

Q And now it's down to 2,000?
A Okay.
Q Okay. So it just attrited down as the whole work force has gotten smaller?
A As the work force got smaller, yeah, but GPO police force got smaller.
Q Okay. The number of posts has been reduced. There used to be more doors open and those have been closed to deal with the smaller number of officers?
A That's like a yes or no question. The number of posts, I would say the number of door posts, no. That hasn't been reduced. Forty-five was moved to Post 35, which used to be an officer's post. It now manned by Knight. Post 11 is still open, but it's manned by Knight instead of a police officer. The front lobby is still open. It's manned by Knight Security instead of the police, and 41 and 42 are still open, but it's manned by Knight instead of police.
MR. FINE: Fine. I have no other

questions. Thank you very much, Officer Oldach.
THE WITNESS: All right.
MR. HANNON: Mr. Hannon's curiosity has been piqued again.

REDIRECT EXAMINATION

BY MR. HANNON:
Q Have you seen any guidance rules lately?
A No.
MR. HANNON: Okay. Officer Oldach, you have an opportunity if you want to read your transcript to make sure that the court reporter has accurately transcribed your answers. That's all you can do, is just make sure she's accurate, or you can trust her and waive that right.
THE WITNESS: Are you a good court reporter?
MR. HANNON: She is.
THE WITNESS: We're fine.
MR. HANNON: Thank you.

MR. FINE: Thank you very much, Officer.
(Whereupon, at 5:08 p.m., the deposition of James C. Oldach, Jr. was concluded.)

CERTIFICATE

This is to certify that the foregoing transcript in the matter of:

Deposition of James Oldach, Jr.

Date: Friday, August 10, 2007

Place: Washinton, D.C.

represents the full and complete proceedings of the aforementioned matter, as reported and reduced to typewriting.

____________________

Neal Gross

A
about 5:7 9:18 10:22 11:1,4,17 17:6 27:6 27:20 29:5 33:16 35:1
accurate 37:16
accurately 37:14
accused 25:19
acknowledged 13:16 18:3
across 14:20 23:16
acting 28:2,6
action 27 13 35:15
active 29:12,20
actually 5:15 20:19 26:17 28:20
address 23:11,15
advised 9:3 27:20,22 28:3
aforementioned 39:24
African 28:15
after 6:22 12:11,18 13:1 15:17 17:20 18:5 19:12 21:20 25:2
afternoon 4:10
again 6:1 24:1 30:19 37:5
Agency 1:10 2:10
ago 27:19
agreement 26:1
air 12:20 17:21,22 18:5
alarm 6:7,8
allegations 27:7
almost 13:1
always 6:11
ambulance 18:12,13 24:7 34:2
AMERICA 1:1
American 28:15
another 14:10 16:11 29:11 30:19
answer 6:5 14:22 31:1
answering 14:17
answers 37:15
anybody 20:17 29:16 31:13
anymore 26:13
anyone 15:5 21:5 24:20
anything 9:22 27:6 28:9 33:10 34:14
anyway 15:9
apparently 9:8
APPEARANCES 2:1
Appellant 1:6,18 2:2 4:6
arrest 34:11
arrive 12:15
arrived 12:17
aside 11:10
asked 10:22
asking 25:5 29:3
asleep 25:19
aspired 29:14
assault 33:18
assaulted 5.5 28:5
assigned 6:20 34:10
assignment 6:14
assistance 22:1 27:14
assume 13:3,16 15:1 34:4
attempt 24:21
attrited 35:19 36:3
attrition 35:12,13
audio 7:14 8:14 10:7,9 10:17 11:1
August 1:13 39:14
available 8:6
aware 5:3 30:12
B
back 14:6 16:21 18.12 23:21 25:15
backtrack 20:20
badly 34:12
Bandaid 34:6
based 23:21
basically 15:19 19 20 31:3 32:4
become 5:3
before 9:7,10 12:21 20:14,22 21:1 30:8
begin 9:18
behalf 1:21 2:2,10 27:7 29:20
behind 5:16
being 25:18,19 31:22
believe 18:9 19:8 22:6 26:4
besides 17:9
best 11:21 12:3 17:15
between 10:13 16:10
big 13:12
bit 28:16
bleeding 33:20
BOARD 1:1
booth 16:11,14,18
both 14:13 16:22
break 14:15 16:4,17 17:3,5,7 19:7,14,15 19:19 20:6 33:1,3
breaks 19:18
bring 20:17
brought 16:21 20:20,21
Brown 26:12
building 5:4,14 7:4 14:8 20:14 21:17 23:8,11,13 31:20,21
32:3
C
C 1:15 3:14 4:1,4,13 38:4
call 12:18 15:16 17:21 19:21 23:19,20 24:6 26:1 33:1,5
called 1:17 4:5 5:9 12:21,22 13:7,19 15:15 18:10 21:21 32:13
calling 32:10,20
came 12:10 13:21 15:16 17:4,20 18:5,12 19:16 34:16
camera 6:16 7:3,5
cameras 6:7,17,19 7:1 7:2,3 8:13
Capitol 1:20 2:15 5:18 12:16 19:1 23:14 34:9
case 22:12 27:15 28:10
cell 32:17,21 33.5
center 5:9,11,19 6:4 7:6 7:22 8:12,16,16,17,22 9:19 10:5,9,13 11:5 18:10 21:3 22:12 24:13
certain 7:1 31.9
CERTIFICATE 39:3
certify 39:5
chance 25:22
changes 25:1
charge 27:12
check 14:7
cleaned 34:5
closed 36:9
closely 30:2
come 8:19 13:11 17:1 17:21 21:2
coming 14:7
commander 28:2,6
comment 29:4 31:14
communication 11:16 12:3,4 13:20 18:7,17 18:21 21:20 22:1 23:21
communications 7:11 7:22 8:5 9:11 10:10 10:12 22:11 26:22
company 30:5,14
complete 39:23
concluded 38:5
conduct 5:10 23:7
contact 11:7
CONTENTS 3:10
contract 17:18 30:5,13 31:10
control 5:8,11,19 6:4 7:6,22 8:12,15,16,17 8:22 9:19 10:4,9,13 11:5,18 18:10 21:2 22:12 24:12
correct 16:2 23.11 24:8 30:15 34:22
cost 31:16
counsel 1:17 4:5
course 27:16
court 37:14,18
CROSS 3:12 33:13
curiosity 37:5
D
D 4:1
daily 6:5
Darnell 27:3
date 25:3 39:14
day 9:12 17:9 20:4,18 21:16 24:13,14 26:18
days 6 12 26 5,10
DC-0752-07-0729-I-1 1:8
deal 36:9
defense 27:9
defenses 27 11
deliver 21.3
deposition 1:15,18 38:4 39:10
DESCRIPTION 3:19
desk 25:20
determine 10:1
dial 12:11
different 6:21 28:16
digital 8:13 10:17
digitally 10:21
direct 3.12 4:8 15:5
discipline 25:7 26:15 27:9 28:15,16 29:21
disciplined 27:18
disorderly 5:10 11:18 12:7,19 21:21 23:7
dispatch 6:6,8 22:6 24:5
dispatched 18:14
dispatcher 23:6
disrespect 26:8
Docket 1:7
documents 7:10
doing 31:14
done 18:3 19:9,16
door 36:13
doors 36:8
down 5:14,22 28:10,11 28:12 29:8 35:19 36:1,3
drastic 27:13
drastically 35:10
drink 19:22
duly 4:6
During 21:16
duty 17:9,14 28:6
D.C 1:14,20 2:7,16 39:18
E
E 4:1,1
earlier 10:22
eat 21:10
effective 31:16
eight-hour 19:17
electric 8:7
emergency 33:22 34 2
employees 17:18
empty 14:16
EMS 24:5
entire 31:18
entrance 16:9
equipment 8:3,9
ESQ 2:3,13
even 18:1
ever 9:15 12:15 19:3 20.7 21:16 24:16 25.6 28:14,14 29:15 31:13
Everett 5:5,9 11:15,18 12:19 13:1 14:21 15:13,15 17:11 18:11 20:13,20,21 21:20 22:3,6 23:22 24:2 26:21 27:3,8,14 28:4 28:9 33:16 34:10
Everett's 33:17
everybody 25:5
everyday 30:2
Evidently 16:21
Ex 3:18
exactly 8:2 12:6 22:4,9
examination 1:17 4:8 33:13 37:6
examined 4:7
existed 9:16
explain 5:13
explaining 23:12
explains 14:19
extent 33:17
F
face 33:19 34:5
facility 30:14 31:18
fairly 29:1
famous 26:13
feel 29:10
feels 31:2
few 27:19
finally 23:17,17
find 11:3

fine 2:13 7:14 9:5 22:18 23:1 25:12 30:7,16,22 33:11,12,14 36:22,22 37:21 38:1
finish 30:9
finishing 17:4
fired 27:4
first 4:6 11:15 12:18 16:9
folks 11:11
follows 4:7
food 20:17,21 21:3,10
force 35:11,20 36:4,5,6
foregoing 39:5
formed 29:18
Forty-five 36:14
four 35:21
Friday 1:13 39:14
from 5:17 8:12 12:18 13:22 14:10 16:13 21:20 23:17,22 29:7 35:9
front 5:18 14:12 16:13 16:20 23:8 36:18
full 4:11 39:23
functioning 10:2,6
G
G 4:1
gave 34:5
general 6:20
give 14:14
given 7:18
go 5:19,20,21 11:3 12:20 14:14,20 15:20 16:20 19:3,22 25:15 27:1 28:11 29:9 32:11 34:13
going 11:21 16:3,7 24:4 32:14
good 4:10 37:18
gotten 21:7 36:4
government 1:9,19 2:14 35:15
GPO 4:21 6:2 23:13 25:7 30:4,12,16,20 31:14,18 32:2 35:20 36:6
grievance 29:16
Gross 39:29
grounds 31:18
Group 2:5
guards 31:10
guess 6:19 26:1 27:21 32:12
guidance 37:8
g-h-t 32:9
H
H 2:13
hallway 5:14,22
hand-held 10:13
Hannon 2:3,5 4:9 7:9 7:19 9:6 22:16,21 23 4 25:16 30:9,11,18 31:1,7 32:18,19 33:10 37:4,7,11,20,22
Hannon's 37:4
happen 29:9
happened 14:11 27:16 31:6
harsh 29:2
having 4:6
heard 31:13
help 14:20 25:10
her 17:4 23:13,16 37:16
Hill 19:1
him 16:16 17:4 18:13 21:5 27:22 28:11,12 32:13 33:1,5 34:5
home 34:13
hospital 33:21
hurry 24:9 27:1
I
IDENTIFIED 3:19
important 31 18
imposed 25:18
impression 29:6
incident 5:4 6:22 9:12 19:12 20:15,22 21:14 27:15,21 31:5
individual 14:10
information 11:4 12:21
informed 19:1
initiative 15:20
injured 18:11 24:3 34:12
injuries 33:17
instead 36:17,19,21
instructed 12:11
instruction 13:17
involved 7:12 8:1 21:14 23:14
ironed 23:18
irrelevant 30:8,22
issues 30:8
J
J 2:3
James 1:15 3:14 4:4,13 38:4 39:10
Jr 1:15 3:16 4:4,13 38:4 39:10
just 4:15 13:14 17:6 19:21 29:4,9 35:19 36:3 37:15
K
kept 25:2
knew 24:5
Knight 31:12 32:7,8 36:16,17,19,21
know 4:15 7:8 8:2,4,6 8:10,14,21 9:7 10:5,7 10:8,16,19 11:2,9,10 11:20 13:6 18:15 22:5 23:12 24:4 25:12 27:3,6 28:8 29:5,7 31.3 34:18
knowledge 8:4 9:14,15 11:22 17:15 24:20,22
K-n-i-g-h-t 32:9
K-n-i-g-t 32:8
L
last 4:11 25:22
lately 37:9
later 19:12
Law 2:5
leadership 29:15
learn 5:7
learned 27:19
least 34:19,20
leave 15:2 34:13
left 5:21 13:14 14:14 16:20
let 4:15 6:21 20:19,19 29:11 30:9
Lieutenant 27:20 28:1 28:10
like 11:7 34:20 35:20 36:11
listen 24:21
listened 9:10
little 28:16
LLP 2:5
lobby 5:12,15,16,20 8:19 13:11 14:5,13,14 14:16,18 15:2 16:13 16:20 17:16 36:18
located 6:18 13:10 23:14
log 6:5 12:1,3 25:2
long 4:20 8:11 23:9
longer 23:19
look 22:17 25:15
lot 14:5,15 16:8,10,11 16:11
Lots 23:1
lunch 14:15 15:8,10 16:3,17 17:3,4 19:19 20:3
M
machines 14:7
made 7:1 18:16,22 27:7
main 5:15,16 13:8,12 14:5,13,14,16,17,18 18:19 20:14 21:17 23:8 25:20
make 20:8 22:3 25:1 29:3 32:4 37:13,15
making 8:21
man 6:10
manned 36:15,17,18,20
manning 32:6
many 17:8,13 19:17 25:9 26:5 34:16
matter 1:4 39:6,24
may 32:18 35:6
maybe 34:5 35:8
meal 19:6
mean 9:14 14:2 19:11 19:20,21 23:18 28:21 29:6,7 35.15
meant 14:9
memory 34:18
MERIT 1:1
method 7:21
MICHAEL 2:3
might 28:15 31:5
minute 18:2 19:15
minutes 20:3 27:19 33:16
Monday 24:14
monitor 6:6
monitoring 13:3 14:12
monitors 6:16,17
more 25:13,14 27:13 29:21 30:1 31:4,5,16 36:8
most 25:17 29:20 31:17
motives 29:4
moved 36:14
MPD 12:12,15,16 19:2 22:3,12 23:6,20 24:9 24:13
MSPB 30:8
much 37:1 38:1
myself 29:2
N
N 4:1
name 4:11,12 11:2
names 11:10
nature 12:4
Neal 2:13 7:9 22:17 39:29
need 19:20 20:6
needed 18:11 21:22 22:1 23:15
never 27:15
new 8:12,15,17 10:8
next 13:19 18:7,20 24:13
night 5:8 19:8 34:7
None 3:21 17:12
normal 23:19 30:2
normally 19:13 31:11
North 1:19 2:15 5:18 23:14
notice 1:18
number 7:10 36:7,10 36:12,12
numbers 29:5
N.W 1:20 2:6,15
O
O 1:5 2:22 4:1
Objection 30:7,22
observed 28:14 30:1
occasion 23:20
occasions 25:9
occurred 20:15 35:10
October 5:4 6:13 8:16
off 8:19 13:11 24:15 28:6
office 1:2,9,19 2:14 13:9,13 14:12,17 18:19 35:3
officer 4:19 5:5,9 7:12 11:6,15,17 12:7,19 13:1,21 14:21 15:7,8 15:12,12,14,14,16,19 16:7,8,10,16 17:2,10 17:11,11 18:4,9,11 19:9,15 20:13 21:20 21:22 22:3,6 24:2,2 24:10 25:7 26:17,20 26:21,22 27:8,8,12,14 27:16,17,17 28:4,9 30:3 32:10,20 33:16 33:17,19 34:10 36:17 37:1,11 38:2
officers 6:6,8 17:9 24:17 28:15,17 29:19 30:21 31:4,5,9,12 32:2 34:17 35:11 36:10
officer's 36:15
officials 24:17
often 6:13
oh 19:11 26:13
Okay 4:17 5:17 6:3 7:7 8:20 10:8,16 11:14 12:18 16:15 17:8 20:13 24:12 26:2 27:11 29:14,18 30:19 32:2 33:8 35:6,14 36:2,3,7 37:11
old 8:18
Oldach 1:15 3:14 4:4 4:13 7:12 37:2,12 38:4 39:10
once 20:11
one 6:9 7:1,16 8:18

16:21 17:16,16 25:13 25:14 27:11
one-man 6:11
only 34:4
open 36:9,16,18,20
operable 7:16,17 9:4,8
operates 10:19
operator 5:9 6:4 9:19 10:5 24:3
operators 8:1
opinion 28:13,18 29:18 30:20 31:17
opportunity 37:12
order 15:11
other 7:3,20,21 14 6 17:8 20:4 24.16 26:2 36:22
others 29:22
out 4:16 11:3 14:5 16:8 17:7 22:12 23:18 25:10 32:13
outside 7:3
over 19:1,3
O-l-d-a-c-h 4:13
P
P 4:1
Packard 27:20 28:1,10
paper 26:16 28:10 34:11
parking 14:5,15 16:9
parties 1:22
passport 31:22
past 33:15
patrols 32:4
penalties 26:2
penalty 25:17,21
people 14:7
people's 29:4
per 32:5
percent 9:2
person 11:2 16:14 17:7
PFC 5:2
phone 22:3,5 23:9,19 32:17,21 33:5
phones 22:14
physical 23:15
physically 9:2 19:3
pick 29:8
piqued 37:5
Place 39:18
please 4:11
plus 35:3,3,5
point 20:4
police 4:19 6.2 12 16 34:16 35:11 36:6,17 36:19,21
Popeye's 21:9
position 4:18
Possibly 8:7
post 6:10,11 7:2 11:19 12:8,20 13:22 14:10 15:6 16:1,7 17:17 19:10,16 21:11 26:21 32:6,21 36:14,15,16
poster 26:14
posts 14:6 31:9,11 36:7 36:12,13
present 1:21 2:19 24:16
preserved 7:13,15 8:1 8:11
Printing 1:9,19 2:14
private 30:5,13
probably 15:9 19:16 34:19
problem 11:8 13:2
proceedings 39:23
protect 32:3
PROTECTION 1:1
provide 27:14 30:6,14
providing 31:19
pursuant 1:18
put 20:7
putting 11:9
p.m 4:2 9:21 38:3
Q
question 4:14 6:21 25:6 28:13 29:11 30:10,20 36:11
questions 37:1
R
R 4:1
radio 5:10 7:21 12:10 13:1,4,20,22 15:17 18:13,16,21 21:19 22:4,7 24:21 26:22 27:21
radios 6:6 10:14
rank 5:1
read 37:13
recall 7:11 11.16 12:3 18:21 21:8,19 22:8 23:22 25:18 26:3 33:6,9
recalled 24:1
recorded 10:21 22:15 22:20
RECROSS 3:12
redial 18:13
REDIRECT 3:12 37:6
reduced 36:8,13 39:25
reduction 35:9,11
reference 33:1
regarding 27:8
REGIONAL 1:2
regular 30:2
relieve 16:10,14,20 17:6 26:17 27:1 32:11,12 33:6
relieved 15:8 26:20
relieves 19:6
remember 9:3 11:14 18:8 23:5 26:5,7,21 32:10,18,20 33:2
replacing 31:9
report 12:7 24:9
reported 39:24
reporter 37:14,19
reporting 21:21
representatives 29:20
represented 29:16
represents 39:23
respective 1:22
respond 15:6,12
responding 13:22 14:9 15:9,17 18:6
response 7:17,18
responsible 8:20 9:2 11:11
rest 34:7
review 6:22
Richardson 13:21 15:5 15:7,12,14,16,19 16:10,16 17:2,10,21 18:4,9 19:14 24:2 27:1 32:12 33:6,19
rid 30:21
RIF 35:16,18,19
right 5:12,22 6:1 8:18 12:11 13:1,11 15:4,17 18:5,20 28:3,7 29:10 33:4 34:21 35:14,17 35:22 37:3,17
ROBERT 1:5 2:22
roles 29:15
room 6:20
Routinely 6:15
rules 37:8
run 14:6 31:11,12
S
S 4:1
same 16:21 24:3
saw 7:9
saying 11:15 12:19 13:22 15:17 18:4,10
scene 18:10 19.2
scratched 33:20
screener 14:1,13,15 15:18 16:6,12,13,15 16:17,18,19 17:3
screeners 14:4 17:13
second 18:16 22:1 24:6
security 14:1,4,13,14 15:18 16:6,12,12,15 16:17,18,19 17:3,13 30:5,13,13,14 31:10 31:12,19 32:7 36:19
see 6:1 20:13,19 21:16 32:13
seems 29:5
seen 37:8
send 28:11
sent 12:12
September 4:22
sergeant 11:7 12:10,21 12:22 13:6,8,17 14:11 14:16,19 15:11,15 17:10 18:2,3,12,15,22 26:12 27:12 28:4
serious 25.17
serves 34:18
set 5:21
setting 8:8
seven 6:12 23:12 26:6 26:10
Shellman 26:14
shift 6:9 19:17 32:5
shop 8.7
shows 7:5
sick 34.13
sign 6:1
since 29:13 34:21
sir 5:13 10 15
sit 22:8
situation 17:1
smaller 36.4,5,6,10
some 20:3 30:5
something 9:1 11:2 20:1 22:16 27:22 34:20
soon 17:20
sort 20:2
spell 4:11
spent 33:15
SR 1:5
start 15:9
started 29:13
starting 17.2
stated 11:18 13:2 24:2
STATES 1:1
stating 5:10
stationed 14:4
steps 5:21
steward 29 15
still 16:22 18:18 36:16 36:18,20
stipulate 30:16
straighten 4:16
street 1:20 2:6,15 5:18 14:20 23:17
stuff 35:4
subject 25.6 29:21
subsequent 23:21
Sunday 6:9 9:20 25:2
supervisor 26:9,11 28:11
supervisors 35:4,5
supposed 10:20 22:14 22:15,20,21 23:2
sure 8:21 9:2 28:20 37:13,16
suspected 28:14
suspension 26:4,16
sworn 4:6
system 6:7 7:20 8:21 10:1,5,9,17 11:4,12
SYSTEMS 1:1
T
TABLE 3:10
take 20:6
taken 19:14 27:13 33:21
talked 11:1
talking 29:4 33:16
tape 8:5,21 9:8,11,15
taped 22:13
tapes 7:1,11,15 8:11 22:18 23:2 24:17,21
taping 7:20 10:1,5,9,17 11:4,11
technicians 11:1
techs 34:3
telephone 14:18 22:11 22:18 23:2 32:11,15
telephones 22:19
tell 4:10
telling 23:5
Ten-four 18:4
terms 31:19
testified 4:7
Thank 37:1,22 38:1
their 14.15 16:14 17:7 27:9,9
thing 23:8
things 23:1 29:8,9,9
think 7:16 11:22 12:6 18:1,22 23 9,10 26.8 26:16 28:1,19 29.1 30 20 31:3,14 35:1
three 9:21 19:21
through 5:20
time 9:18 13:7 14:3 19:11 28:2,6
times 19:21
today 4:18 9:7,10
together 20:7 35:6
told 7:14 15:15 18:13 23:16
Totally 30:7
tour 20:4
transcribed 37:14

transcript 37:13 39:6
transmission 22:4
transported 34:10
treatment 33:22
tried 20:11
trouble 21:22 24:10
true 31:8
trust 37:16
try 4:15 12:2
trying 7:10 30:21
turn 5:21,22 11:8
two 7:16 17:16 19:21 21:14 32:4
two-year 25:22
type 6:5 12:2
typed 11:22 12:6
typewriting 39:25
U
unarmed 14:4
understand 4:15 30:4
understanding 8:13
understood 20:2 21:13
unguarded 15:3
uniform 17:8 32:2 35:2
uniformed 30:21
union 29:12,19,21
unit 12:12,15
UNITED 1:1
until 18:2
used 12:5 29:1 36:8,14
usually 19:22 20:5
U.S 12:16 34:9
V
v 1:7
Vernon 9:5
very 20:12 37:1 38:1
Video 10:20
videotapes 24:18
W
waited 18:2
waive 37:17
walked 5:17
wall 6:2
want 15:2 22:2 24.14 34:19 37:12
wanted 7:7 11:3
warehouse 23:13
Washington 1:2,14,20 2:7,16
Washinton 39:18
wasn't 15:22 27:17 34:4,6,12
watched 24.17
watching 14:18
way 10:4 28:21 31:2
week 6:12
weekend 20:4
well 8:10 11:6 19:13 20:12 22:17 29:7 35:3
went 16:8,13 28:9 34:9 34:11
were 1:21 5:3 7:1,3,15 16:21 17:9,13 19:2 21:14 24:16 31:11
weren't 7:15
we're 6:19 37:21
we've 33:15
white 1:5 2:22 15:8 16:7,8 17:11 19:9,15 26:17,20,22 27:8,16 27:17,17 28:17 32:11 32:21
whole 36:4
Wilson 12:10,21,22 13:6,8 14:12,17,20 15:11,15 17:10,20 18:2,3,12,15,22 27:12 27:22,22 28:4
Wilson's 13:17
window 13:12
witness 3:12 4:5 22:19 25:10,14 30:17 31:2 37:3,18,21
women 21:14,17
words 12:4
work 8:8 9:19 20:12 24:12 34:7,11 35:20 36:4,5
worked 6:14 29:15
working 29:8
works 8:3,22
world 23:2
worth 26:10
X
X-ray 14:6
Y
yeah 12:6 20:20 28:3 29:13 35:5,8 36:6
years 23:10
1
10 1:13 39:14
10/29 23:3
100 9:1
11 36:16
15 20:3,8
16 23:10
18th 2:6
1901 2:6
1991 4:22 34:16
2
2,000 36:1
20009 2:7
2006 5:5 6:13 8:16
2007 1:13 39:14
202 2:8,17
20401 2:16
22 17:17
232-1907 2:8
28 35:1
29th 5:4
3
3 16:11
30 19:14 20:8
30-minute 19:13,19 20:3
33 3:16
34 35:7
34-ish 34:22
35 35:7 36:14
35-ish 35:10
37 3:16
4
4 3:16 5:4 23:11 31:20 31:21 32:3
4:30 4:2
41 7:2 11:19 12:8,20 15:6 19:1,4 26:21 32:6,21,22 36:19
42 36:20
45 20:8 33:15
5
5,000 35:21
5:08 38:3
50 13:22 14:10 16:9,11 19:10,16 32:13
512-0200 2:17
6
6:25 11:17,20 12:1
7
732 1:19 2:15 5:12,18 13:12 23:17
735 23:12
8
80 34:19,20
88 34:20 35:9
9
91 34.21 35:20
911 12:11 13:19 15:16 17:21 23:19 24:1
94 26 4

**Transcript of: Robert Schwenk**

**Date:** August 10, 2007
**Volume:**

**Case:** White v. U.S. GPO

Neal R. Gross & Co., Inc.
Phone: 202-234-4433
Fax: 202-387-7330
Email: info@nealrgross.com
Internet: www.nealrgross.com

---

Page 1

UNITED STATES OF AMERICA
MERIT SYSTEMS PROTECTION BOARD
WASHINGTON REGIONAL OFFICE

```
+----------------------+
                       :
In the Matter of:      :
                       :
ROBERT O. WHITE, SR.,  :
                       :
        Appellant,     :
                       :
    v.                 :  Docket No.
                       :  DC-0752-07-0729-I-1
                       :
GOVERNMENT PRINTING    :
OFFICE,                :
                       :
        Agency.        :
                       :
+----------------------+
```

Friday, August 10, 2007
Washington, D.C.

DEPOSITION OF:
ROBERT E. SCHWENK

called for examination by the counsel for the
Appellant, pursuant to notice of deposition,
at the Government Printing Office, 732 North
Capitol Street, N.W., Washington, D.C., when
were present on behalf of the of the
respective parties:

---

Page 2

APPEARANCES:

On Behalf of the Appellant:

    J. MICHAEL HANNON, ESQ.

of:  Hannon Law Group, LLP

     1901 18th Street, N.W.
     Washington, D.C. 20009
     (202) 232-1907

On Behalf of the Agency:

    NEAL H. FINE, ESQ.

    Government Printing Office
    732 North Capitol Street, N.W.
    Washington, D.C. 20401
    (202 ) 512-0200

Also Present:

    ROBERT O. WHITE

---

Page 3

TABLE OF CONTENTS

WITNESS      DIRECT   CROSS   REDIRECT   RECROSS

Robert E.

    Schwenk        4

Ex.
NO.  DESCRIPTION                    IDENTIFIED

    (None)

Page 4

```
 1            P R O C E E D I N G S
 2                                    (11:50 a.m.)
 3    Whereupon,
 4                ROBERT E. SCHWENK
 5    was called as a witness by counsel for the
 6    Appellant and, having been first duly sworn,
 7    was examined and testified as follows:
 8                DIRECT EXAMINATION
 9    BY MR. HANNON:
10        Q     Good morning.  Would you tell me
11    your full name and spell your name?
12        A     Okay.  My name is Robert E.
13    Schwenk, Robert, R-o-b-e-r-t, E. is for Earl.
14    I have a son here who's an R.  So be careful
15    you don't confuse them, and the last name is
16    Schwenk, S-c-h-w-e-n-k.
17        Q     How long have you worked here at
18    the GPO?
19        A     Forty-five years.  Forty-six in
20    the federal government.
21        Q     If I ask a question you don't
22    understand, let me know and I'll rephrase it.
```

Page 5

```
 1        A     Sure.
 2        Q     What do you do now?
 3        A     I'm the managing director of plant
 4    operations.  So I'm responsible for all of the
 5    manufacturing part of GPO's business.
 6        Q     How long have you held that
 7    position?
 8        A     About four or five years.
 9        Q     And the building across the street
10    where the re produced, how do you refer to
11    that building?
12        A     Building 4.  It's part of the same
13    business.  It's part of the print shop.  It'
14    just a more secure part of the business.
15        Q     And what are your responsibilities
16    with respect to Building 4?
17        A     The same as here.
18        Q     Can you give me just specifically
19    with respect to Building 4?  Can you give me
20    a layman's description of what your job is in
21    connection with what goes on over there?
22        A     Well, I'm a director with many
```

Page 6

```
 1    reports underneath me.  I have an assistant,
 2    a deputy.  I have a production manager.  The
 3    business basically falls under the realm of
 4    the production manager, who is two layers
 5    under me.
 6        Q     Who's the production manager?
 7        A     Stephen LeBlanc.
 8        Q     Do you have any role in the layout
 9    of the physical plant over there?
10        A     Yes.  Engineering people work for
11    me also.  So I have general knowledge any time
12    we implement anything as far as structure and
13    building changes, that type of thing.
14        Q     In this matter Mr. Fine has
15    indicated that there have been some security
16    changes over at that building since September
17    11th, 2001.
18        A     Yes.  Prior to September 11th,
19    passports have always been handled in a secure
20    environment.  My entire career here they've
21    been in a caged area, separated, handled
22    basically as a security product.
```

Page 7

```
 1              Since September 11th, the concerns
 2    for the value of a passport to anybody that
 3    has an interest in getting into the United
 4    States has been a lot greater.  So security
 5    has been generally enhanced.
 6        Q     Can you tell me what your role has
 7    been in that process?
 8        A     Nothing.
 9        Q     Oh, your role is nothing.
10        A     Enhancing the security of the
11    building?
12        Q     Yes, sir, yeah.
13        A     That's handled through Physical
14    Security Branch.
15        Q     And who was responsible for that?
16        A     I guess that would be Lamont
17    Vernon currently.  Prior to that there were
18    other people there.  I don't remember exactly
19    who was in.
20        Q     We have to take --
21        A     Let me just add a little bit to
22    that.  As far as physical enhancements to the
```

Page 8

1    structure, that would come under the
2    Engineering Division, which works for me.
3       Q    We need to take turns.
4       A    Sure.  I'm sorry.
5       Q    That's okay.
6            So let's talk about your knowledge
7    of the physical enhancements to security that
8    have taken place over there since 9/11.  Could
9    you describe those?
10           MR. FINE:  I'm going to object.
11   We're getting into an area that involves
12   security of the building and that has no
13   relationship to the charges that we have.
14   This is not information that GPO wants to make
15   public, and I'm going to direct Mr. Schwenk to
16   not answer questions involving physical
17   security issues.
18           We're talking about only the lobby
19   is where this incident took place.  What else
20   takes place on the second floor I have no
21   knowledge of because I have no need to know
22   it, and there's no need to be in the public

Page 9

1    record.
2            MR. HANNON:  Well, the problem
3    with that, Neal, is that the foundation for
4    the level of discipline is that this is the
5    most secure location and needs to be the most
6    secure location in the plant, and if it really
7    isn't and there are other more serious
8    breaches of security that have done
9    unpunished, then we need to know that.
10           MR. FINE:  You could ask Mr.
11   Schwenk if in his opinion this is the most --
12   Building 4 is the most secure location without
13   getting into the details of how he's enhanced
14   the security of Building 4.
15           MR. HANNON:  I can't do that.  I
16   can agree to a protective order with respect
17   to this transcript.
18           MR. FINE:  I know, but I don't see
19   that you have authorization to have this
20   knowledge.  I don't have authorization to this
21   knowledge.  You're technically a -- you've
22   admitted to being in the building improperly

Page 10

1    to begin with.  So I'm not going to give you
2    information about how we've spend money and
3    what the security arrangements are for
4    Building 4 beyond what's in the lobby where
5    this incident took place.
6            We will stipulate that on Building
7    4 we produce United States passports.
8            MR. HANNON:  That's just not
9    sufficient given the --
10           MR. FINE:  Well, then we're going
11   to have to deal with the --
12           MR. HANNON:  Excuse me.
13           MR. FINE:  -- Administrative Law
14   Judge on this because we're not --
15           MR. HANNON:  Let me --
16           MR. FINE:  -- dealing with this
17   anymore.
18           MR. HANNON:  Let's just take
19   turns, okay?  Because we need to make a
20   record.
21           At this stage I can either ask --
22   well, I'm going to ask a few questions, and

Page 11

1    you can object, and you can, if you feel it's
2    necessary, you can instruct him not to answer
3    and you can state the grounds so that we'll
4    have a record of exactly the parameters of
5    what I need to know and your objection so that
6    we're not dealing with this in a vacuum.
7            BY MR. HANNON:
8       Q    But let's start with the entrance
9    to Building 4 that's on North Capitol Street.
10   Can you tell me what physical changes you're
11   aware of that have taken place at that
12   entrance since 9/11?
13           THE WITNESS:  I answer that?
14           MR. FINE:  Physical changes, could
15   you define that, to the lobby?  I mean, are
16   you talking changes to the walls, to the
17   doors, to the ceiling?  Are we talking about
18   security changes?
19           There's two different things.
20           MR. HANNON:  I'm asking --
21           MR. FINE:  Mr. Schwenk said he
22   only -- he had nothing to do with security

Page 12

1  changes.  He had only -- he deals with
2  engineering changes.
3           BY MR. HANNON:
4      Q     Do you understand my question?
5      A     I can give you a general answer
6  that may help.
7      Q     Okay.
8      A     And that is the overall security
9  within that building has been changes
10  dramatically, and the security is just more
11  enhanced than it has been in the past.
12     Q     Let's talk about the lobby.  What
13  physical changes are you aware of that have
14  been made at the lobby since 9/11?
15     A     You're required to have proper
16  badging, and you have to go through a
17  turnstile that you have --
18     Q     Okay.  So there's a turn -- let's
19  talk about the physical stuff.  There's a
20  turnstile that's been added.
21     A     It's not exactly a turnstile.
22  It's drop -- drop finger.  I don't know what

Page 13

1  you call the machine, right?
2      Q     Okay.
3      A     But there's a secure passage that
4  you have to go through, and then you also go
5  through a metal detector as you go in.
6      Q     So turnstile, metal detector.
7  What else?
8      A     In order to have access to any
9  other parts of the building, you have to
10  receive authority either by badge to get into
11  non-secure areas or you have to be allowed in
12  by the officer on duty.
13     Q     So you can either get through with
14  the badge or be allowed --
15     A     You can -- you can go to non-
16  secure areas that -- you walk in the front
17  door.  You go through a secure passage.  You
18  walk through a metal detector.  To get
19  upstairs to passports, which is the secure
20  part of the building, you're required to be
21  let in by the guard.  He has a button that he
22  pushes to let you upstairs.

Page 14

1           You can go to the first floor with
2  a proper badging, which is not a secure area
3  as far as passports are concerned.
4      Q     So the guard has to release a
5  button for a person to enter regardless of
6  whether they have a badge.  In other words, a
7  visitor who doesn't have a badge like you
8  wear --
9      A     No, no one goes upstairs without a
10  badge.
11     Q     I'm talking about the first floor.
12  Let me ask about a visitor.  If a visitor
13  comes into Building 4, what's the process that
14  occurs there?
15     A     A visitor alone?
16     Q     Can a visitor enter alone?
17     A     No.
18     Q     All right.  So a visitor has to
19  have a --
20     A     You have to have permission, which
21  is a badge, to get upstairs, either a visitor
22  badge, and that has changed a couple of

Page 15

1  different ways, but they have to be escorted.
2      Q     So they have to be escorted,
3  number one, and they have to have a badge.
4      A     Yes.
5      Q     Number two.  Okay, and how do they
6  get the badge?
7      A     It's issued by the guard on duty.
8      Q     And where is the badge issued?
9      A     At the guard station.
10     Q     And was that true last year?
11     A     As far as I know it was.
12     Q     Okay.  Now, the badge, is it just
13  an identification badge like mine?
14     A     To get upstairs?
15     Q     No, sir.  We're still talking
16  first floor.
17     A     First floor?
18     Q     First floor.
19     A     We don't -- we have -- I don't
20  know about first floor.  I can't answer that.
21     Q     Okay.  Let me make sure I
22  understand.

Page 16

```
 1        A     We're only talking -- I thought we
 2   were only talking about entrance to the
 3   passport facility, which is the secure
 4   facility.
 5        Q     We're taking it one floor at a
 6   time.  The entrance from North Capitol Street,
 7   is that the first floor of the building?
 8        A     Yes.
 9        Q     Okay.  Now, I was given a yellow
10   visitor badge.  Is that the kind of badge that
11   a visitor is supposed to receive at Building
12   4?
13        A     Not to get upstairs.
14        Q     I'm just talking about the first
15   floor right now.  Okay?
16        A     Well, you'd have -- I don't know
17   what post orders for that.
18        Q     Okay.  Now, how many access
19   locations are there to the first floor in the
20   lobby of Building 4 on North Capitol Street?
21        A     One.
22        Q     And where is that located in
```

Page 17

```
 1   relation to the turnstile?
 2        A     You have to go through the
 3   turnstile and the metal detector before you
 4   can have access to that door.
 5        Q     And that's the --
 6        A     And that door has a HSPD-12 type
 7   badge reader on it.  Someone would have to let
 8   you into that door.
 9        Q     And the guard can do it with a
10   button?
11        A     Not that door.
12        Q     Okay.
13        A     He can only allow you upstairs.
14   He has a button to the upstairs door.
15        Q     So how many doors are there in the
16   lobby?
17        A     Two.
18        Q     And one door is access to the
19   first floor?
20        A     One door is to the first floor.
21   The other door is to the second floor, to open
22   the second floor door, the guard has to allow
```

Page 18

```
 1   you up there.
 2        Q     Now, the door to the first floor,
 3   is that outside the turnstile?
 4        A     No.
 5        Q     So you have to go through the
 6   turnstile --
 7        A     Yes.
 8        Q     We have to take turns.
 9              You have to go through the
10   turnstile in order to reach the door to the
11   first floor.
12        A     Yes.
13        Q     Is the door to the first floor
14   controlled?
15        A     Badge controlled.  That badge will
16   not allow you in there.
17        Q     So a visitor would need to have a
18   visitor's pass, and then someone to use their
19   badge to open the door to the first floor.
20        A     Yes.
21        Q     Okay.  Now, can the guard open
22   that door?
```

Page 19

```
 1        A     I have no idea.
 2        Q     Do you know whether the door to
 3   the first floor is on a button system?
 4        A     As far as I know, it i snot.
 5        Q     Is it locked?
 6        A     Yes.
 7        Q     Okay.  Now, when you go through
 8   the turnstile, in order to enter the door to
 9   the first floor, do you turn to your right?
10        A     Yes.
11        Q     And in order to enter the door to
12   the second floor, you'd walk straight ahead?
13        A     Yes.
14        Q     And when you walk straight ahead,
15   you would pass the guard's desk?
16        A     Yes.
17        Q     Now, the turnstile, that's --
18        A     Badge activated.
19        Q     Okay.  Or in the case of guests,
20   how does the guest go through the turnstile?
21        A     They have to be allowed through.
22   The guard can drop the arms.
```

Page 20

1    Q    And then how does the guard
2  monitor the turnstile in terms of knowing
3  whether it has identified a problem with the
4  person coming through?
5    A    Don't know.
6    Q    I mean, is it audible?  Is it some
7  kind of a monitor?
8        MR. FINE:  The witness testified
9  he doesn't know, and I'm going to object to
10  any further questions in regard to these kind
11  of security procedures.  They have nothing to
12  do with the matters at hand.
13        MR. HANNON:  Let me ask the
14  question and then you can do what you want.
15        BY MR. HANNON:
16    Q    Do you know whether the turnstile
17  -- do you know how does the turnstile register
18  a problem with the person that goes through,
19  if you know?
20    A    Do not know.
21    Q    I'm sorry?
22    A    Do not know.

Page 21

1    Q    Okay.  Now, there is also what you
2  called an X-ray machine.  Is that what we're
3  referring to it as?
4    A    It's a metal detector.
5    Q    Metal detector, and how does that
6  operate?
7    A    Don't know.
8    Q    Well, is it --  you've been
9  through that door, I take it.  Have you?
10    A    Several hundred times.
11    Q    Okay.  So is it like the one at
12  the main entrance where you put your materials
13  on a conveyor that goes through a machine?
14    A    Yes.
15    Q    Okay, and who monitors that
16  machine?
17    A    The guards.
18    Q    And where is the monitor?
19    A    At the guard station.
20    Q    Okay.  All right, and all of these
21  things that we've just described are physical
22  changes that have taken place since 9/11?

Page 22

1    A    Yes.
2    Q    And did you have any role in
3  selecting that security system?
4    A    No.
5    Q    What, if anything, did your
6  engineering folks have to do in the entrance
7  area of Building 4 on North Capitol in order
8  to improve the security from a physical
9  standpoint after 9/11?
10        MR. FINE:  Object as not being
11  relevant to the issues at the MSPB.  This has
12  been secure information and it has nothing to
13  do with the issues before us.
14        I ask the witness not to answer
15  anymore questions concerning enhancements of
16  security.  They're not relevant.
17        MR. HANNON:  Are you directing him
18  not to answer?
19        MR. FINE:  Yes, sir.
20        BY MR. HANNON:
21    Q    How many other -- I'm sorry.
22        Once you go through the door in

Page 23

1  the lobby that gives you access to the second
2  floor, where do you go to get to the second
3  floor from that door?
4    A    Up the staircase.
5    Q    And what does that staircase give
6  you access to?
7        THE WITNESS:  Are we getting into
8  the same issue again?
9        MR. FINE:  Yes, object again.  Now
10  we're way -- we're not even on the same --
11        THE WITNESS:  You're going further
12  into the elements of security that are then
13  put in place.
14        MR. FINE:  We will stipulate the
15  staircase gives you access to the second
16  floor.
17        (Pause in proceedings to respond
18  to a cell phone call.)
19        BY MR. HANNON:
20    Q    Are there additional -- after you
21  go through the door on the first floor at
22  least to the steps to the second floor, are

Page 24

```
1   there any further control points?
2          MR. FINE:  Objection.  Direct the
3   witness not to answer, not relevant, not
4   material to the question of discipline of
5   Officer White.
6          BY MR. HANNON:
7     Q    Well, if you enter the lobby and
8   go through the door to the first floor, what
9   officers are located and facilities are
10  located on the first floor?
11    A    The first floor is paper
12  warehouse, is an additional passport part of
13  the business there that is also controlled.
14    Q    Oh, I see.  So there are further
15  controls for passports on the first floor.
16         MR. FINE:  Objection.  This is not
17  information that needs to be made public.
18  This is information that is not relevant to
19  the matter at hand.  I'm going to ask the
20  witness -- direct the witness not to respond.
21  This is not information you need to know or
22  the witness needs to know or I need to know.
```

Page 25

```
1          MR. HANNON:  If you don't mind, I
2   understand that.  You can just tell him that
3   you're directing him not to answer on the
4   grounds of security or whatever so that we
5   don't have to spend too much time on this.
6          BY MR. HANNON:
7     Q    Other than the door in the lobby
8   area to the first floor, is there any other
9   outside access to the first floor, controlled
10  or otherwise?
11    A    My believe is that any further
12  answers to this line of questioning is going
13  to reveal security issues that I am
14  uncomfortable in answering.
15    Q    Mr. Schwenk, you're not the
16  lawyer.  He's the lawyer.
17    A    That's fine.  I'm not a lawyer.  I
18  understand that.
19         MR. FINE:  I'll direct the witness
20  not to respond.  I mean I don't know the
21  security arrangements for Building 4.  So I'm
22  at pains to tell him what exactly is
```

Page 26

```
1   confidential information.
2          BY MR. HANNON:
3     Q    Okay.  Are there any other points
4   of access to the second floor, secure or
5   not --
6          MR. FINE:  Objection.  Mr.
7   Schwenk, do not answer.
8          MR. HANNON:  Mr. Fine, I have to
9   finish the question so that there's a record
10  of the questions that you're not letting --
11         MR. FINE:  You're asking about
12  points of access to the second floor where the
13  passports are produced.
14         MR. HANNON:  That's correct, but I
15  need to finish the question so that the Judge
16  will know what the question is that you won't
17  let the witness answer.
18         BY MR. HANNON:
19    Q    Are there any other points of
20  access to the second floor, secure or not,
21  other than the door that's in the lobby?
22         MR. FINE:  The witness is directed
```

Page 27

```
1   not to answer.
2          We can expedite this whole process
3   by a broad objection to any other questions
4   involving the security access to Building 1.
5   It's not relevant -- Building 4.
6          MR. HANNON:  We can expedite this
7   by your simply saying, "Objection.  I direct
8   him not to answer on the grounds of
9   confidentiality and security issues."
10         But I have to pose the questions,
11  Mr. Fine so that the Administrative Law Judge
12  knows what I've asked to determine whether to
13  compel you to produce an answer.  That's why
14  I need to ask this.
15         BY MR. HANNON:
16    Q    So you're not going to answer that
17  on --
18    A    No.
19    Q    -- Mr. Fine's instruction?
20         Okay.  Now, on the week -- this
21  was a Saturday, this incident?
22    A    It happened -- I think it was on a
```

Page 28

1   Sunday.

2       Q    On a Sunday.  On a Sunday at 6:00

3   p.m., are there persons working in the

4   passport office?

5       A    I have no idea.

6       Q    Who would know that?

7            MR. FINE:  We will stipulate that

8   on that particular Sunday there were employees

9   working at the passport.

10           BY MR. HANNON:

11      Q    Who would know that?

12      A    We'd have to research records.

13  I'm not sure who directly was responsible for

14  that day.  The production manager would have

15  to research records.

16      Q    So if anyone was working there

17  that day, it would be under the direction of

18  someone who reports to you?

19      A    Yes.

20      Q    And under what circumstances might

21  employees be producing passports at 6:00 p.m.

22  on a Sunday?

Page 29

1       A    We currently work seven days a

2   week producing passports.  Whether they

3   specifically worked that day I don't know.

4       Q    Is that simply because of the

5   load?

6       A    Yes.

7       Q    Okay.  The demand, I guess.

8            What are the differences between

9   the security at Building 4 on days when

10  employees are producing passports?

11           MR. FINE:  Objection.  The witness

12  is directed not to respond on the grounds of

13  security.

14           BY MR. HANNON:

15      Q    Mr. LeBlanc is your production

16  manager?

17      A    Yes.

18      Q    L-e, capital B-l-a-n-c?

19      A    Right.  He's relatively new on the

20  job.  So I'm not sure on the dates.  Prior to

21  him was Jeffrey Bernazzoli.

22      Q    You'll need to spell that last

Page 30

1   name, if you can.

2       A    B-e-r-n-a-z-z-o-l-i.  Retired.

3       Q    How do vendors make deliveries to

4   Building 4?

5       A    It depends on the delivery.

6       Q    All right.  What kind of vendors

7   make deliveries to Building 4?

8       A    We have many different supplies

9   that bill to passport.

10      Q    Okay.

11      A    And depending on the size or

12  volume, there are several ways to get them

13  into the billing.

14      Q    Okay.  What are the several ways?

15           MR. FINE:  Objection as to not

16  material to the issues at hand, and this could

17  very well involve security, and I direct the

18  witness not to answer.

19           BY MR. HANNON:

20      Q    Do vendors make deliveries on

21  weekends?

22      A    I would say not normally.

Page 31

1       Q    Are there circumstances under

2   which they would?

3       A    Not that I know of.

4       Q    On work days, how are the

5   entrances for vendors controlled?

6            MR. FINE:  Objection.  Grounds of

7   security; not relevant, not material.  The

8   witness is directed not to answer.

9            BY MR. HANNON:

10      Q    Were you advised of the incident

11  which is the subject of the discipline of

12  Officer White?

13      A    Only second hand information.

14      Q    How did you get it second hand?

15      A    Just I don't even remember.  I

16  knew very little about the incident.

17      Q    Are security breaches at Building

18  4 reported to you?

19      A    Not necessarily.

20      Q    Under what circumstances would

21  they?

22      A    I can't remember any being -- yes,

Page 32

```
1   I can.  We had a rock thrown at a window that
2   was reported to me.
3        Q    By whom?
4        A    Security.
5        Q    Who in particular?
6        A    Don't remember.
7        Q    And it was reported to you because
8   you'd we responsible for fixing the window.
9        A    Yes.
10       Q    Okay.  So since September 11th,
11  that's the only security breach at Building 4
12  that you recall learning about?
13       A    That I've been officially advised
14  of, yes.
15       Q    So Physical Security is
16  responsible for security of that building?
17       A    Yes.
18       Q    And do you or someone on your
19  behalf interact with the Director of Physical
20  Security?
21       A    No.
22       Q    Was there a former supervisor of
```

Page 33

```
1   Building 4 by the name of Van Horn?
2        A    Yes.
3        Q    And what was his first name?
4        A    I think it was Butch.
5        Q    And what was his job?
6        A    He was a foreman, shop floor
7   foreman.
8        Q    Shop floor foreman?
9        A    Yes.
10       Q    Would that be working with
11  passports?
12       A    Yes.
13       Q    And he no longer works for the
14  GPO?
15       A    No.
16       Q    Do you know when he left?
17       A    Several years ago.
18       Q    Seven years ago?
19       A    Several.
20       Q    Several.
21       A    Not sure.
22       Q    And was his position filled by
```

Page 34

```
1   someone else?
2        A    At the foreman level I'm not sure.
3   There's a person that has his responsibility.
4   We've also made some changes in higher level
5   of supervision under there.
6        Q    Who's the person that has his
7   responsibilities today?
8        A    Day or night?
9        Q    We'll start with day.
10       A    IT would be Robert Allegar, who is
11  an assistant superintendent.
12       Q    And how about nights?
13       A    Having trouble with names.  It's
14  my age.  Eric, and I can't remember his last
15  name, is working second shift.
16       Q    Okay.  You just --
17       A    We basically have two shifts, two
18  12-hour shifts.
19       Q    You said there were some changes
20  recently?
21       A    In the last, say, six months we've
22  added higher levels of supervision.
```

Page 35

```
1        Q    Can you explain that?
2        A    You want names, ranks or --
3        Q    No, I don't need names.
4        A    -- or why?
5        Q    I just -- if you could just
6   explain to me what has been done in the last
7   six months to create increased levels of
8   supervision.
9        A    The number of employees has
10  probably doubled or tripled, and it has
11  required more direct supervision and more
12  oversight.
13       Q    And who is responsible for
14  implementing that?
15       A    We could go to the Public
16  Printer's Office, if necessary, all the way
17  down, and it's because of the increase in
18  demand for U.S. passports.
19       Q    Is there any -- you know, this is
20  a bureaucracy.  There's paper work where
21  somebody said, "We're going to do this."
22       A    It would all come from my office.
```

Page 36

```
1       Q     I'm sorry?
2       A     It would come from my office.
3       Q     So this was something that you
4  were responsible for implementing.
5       Q     And where did you get your
6  marching orders?
7       A     Strictly as the requirement of the
8  job to produce the number of books that we're
9  being asked to do today.
10      Q     Well, you can't add payroll.  How
11 did this get authorized?
12      A     It has been authorized at the
13 highest level within the Government Printing
14 Office in order to meet the demands.  Passport
15 production is totally financed by the State
16 Department.
17      Q     Okay, and when was it that this
18 increase in the level of supervision and
19 personnel was --
20      A     Gradual since the --
21      Q     -- implemented?
22      A     -- implementation of the
```

Page 37

```
1  electronic passport.
2       Q     And when was that implemented?
3       A     It's gradually come into play over
4  the last two years.
5       Q     And what, if anything, does this
6  have to do with security at Building 4?
7       A     My understanding would be that the
8  security is the same required for an E
9  passport as it was for a traditional passport.
10      Q     Since the date of this incident,
11 are you aware of any changes in security at
12 Building 4?
13      A     No.
14      Q     Do you know a Mr. Weese?
15      A     Brian Weese.  Brian is the second
16 shift or night side supervisor.  I mentioned
17 a gentleman named Eric.  I believe Eric works
18 for Brian.
19      Q     Was Mr. Butch Van Horn recently in
20 Building 4?
21      A     My understand --
22            MR. FINE:  Objection as to
```

Page 38

```
1  materiality to the issues at hand.
2            MR. HANNON:  Go ahead.
3            THE WITNESS:  My understanding is
4  yes.
5            BY MR. HANNON:
6       Q     Tell me what you know about that.
7       A     Very little other than he was
8  escorted in by a supervisor on night side.
9       Q     And who was that supervisor?
10      A     I believe it was Brian.
11      Q     Brian Weese?
12      A     Yes.
13      Q     And how did you learn about that?
14      A     The next day I was told about it.
15      Q     From whom?
16      A     Don't remember.
17      Q     How did Mr. Van Horn get in
18 Building 4?
19      A     He was escorted in as a visitor, I
20 believe.
21      Q     What time of day?
22      A     Have no idea.  Evening hours.
```

Page 39

```
1       Q     And what are the times of Mr.
2  Weese's shift?
3       A     Not sure.  He's a night side
4  employee.
5       Q     And when did this occur?
6       A     Not sure.
7       Q     Approximately.
8       A     A month ago.
9       Q     And why was this -- was this
10 reported to you as a security issue?
11      A     It was reported to security.
12      Q     Who reported it to security?
13      A     Don't know.  I don't know.
14      Q     And who reported it to you?
15      A     Don't remember.
16      Q     Was there an investigation as far
17 as you know?
18      A     Don't know.
19      Q     Do you know if Mr. Weese was
20 disciplined?
21      A     I don't believe he was.
22      Q     Do you know whether there was a
```

Page 40

1   guard on duty?

2        A     Do not know.

3        Q     Do you know what entrance Mr. Van

4   Horn came in?

5        A     Do not know.

6        Q     Was Mr. Van Horn on the second

7   floor?

8        A     Believe he was.

9        Q     Is there any way to get to the

10  second floor other than the lobby on North

11  Capitol Street?

12             MR. FINE:  Objection.  Security

13  issues.  Witness directed not to answer.

14             BY MR. HANNON:

15       Q     Are you aware that uniform

16  officers of the Government Printing Office are

17  no longer operating the secure entrance on

18  North Capitol Street

19             MR. FINE:  Objection.  Not

20  material to the issues at hand.

21             MR. HANNON:  You can answer.

22             THE WITNESS:  At my entrance to

Page 41

1   the building in the last months there have not

2   been GPO uniform police there.

3             BY MR. HANNON:

4        Q     They have contract --

5        A     Yes.

6        Q     -- security guards, correct?

7        A     Yes.

8        Q     There are two contract security

9   guards assigned to the North Capitol Street

10  entrance; is that correct?

11       A     When I enter the building, there

12  are always two there.

13       Q     And formerly when it was a uniform

14  officer at that location, there was only one,

15  correct?

16       A     I don't know that.

17       Q     From your own experience.

18       A     I've seen several there.  I've

19  seen one there.

20       Q     Well --

21       A     So I don't know what the

22  assignments were.

Page 42

1        Q     Other than the post at the

2   entrance of North Capitol Street, are there

3   any other posts that today are manned by

4   either contract security guards or GPO

5   officers?

6             MR. FINE:  Objection.  Not

7   material to -- this incident happened October

8   29th, 2006.  Security for today is not

9   relevant, and the witness does not need to

10  answer.

11             MR. HANNON:  Are you directing him

12  not to answer?

13             MR. FINE:  Yes.

14             BY MR. HANNON:

15       Q     On October 29th of 2007, other

16  than the --

17       A     Two thousand seven?

18       Q     -- other than the entrance on

19  North Capitol Street, were there any other

20  location -- 2006 -- were there any other

21  locations manned by contract guards or uniform

22  officers?

Page 43

1        A     I do not know.

2        Q     And who would be the person that

3   would have knowledge of the incident involving

4   Mr. Van Horn?

5        A     Lamont Vernon.

6             (Pause in proceedings.)

7             BY MR. HANNON:

8        Q     Have you been involved in the

9   decision to change from the use of uniform

10  officers at Building 4 to contract guards?

11       A     Absolutely not.

12       Q     Have you ever made a statement to

13  any GPO uniform officer to the effect that for

14  every GPO uniform officer who  is removed, the

15  GPO can get two contract security guards?

16       A     Absolutely not.

17       Q     Did you ever make any comment

18  along the lines that for budgetary reasons you

19  could get more contract security guards at

20  GPO?

21       A     Absolutely not.

22       Q     Have you ever made any statements

Page 44

```
1    such as that to Officer White?
2        A    No.
3        Q    Do you know Officer White?
4        A    We've had a casual relationship,
5    yes.
6        Q    I don't know what that means.
7    If --
8        A    Well, just conversation, casual
9    conversation.  That's all.
10       Q    You don't have any ax to grind
11   against him.
12       A    No, absolutely not.
13       Q    And as far as you know --
14       A    In fact, I thought we were on
15   pretty friendly terms for a long time.
16       Q    Okay, all right.  How about an
17   Officer Sturges?  Did you ever have a
18   conversation with an Officer --
19       A    I don't know who Sturges is.
20       Q    How about Officer Evans?
21       A    I don't know their names.
22       Q    More broadly, have you ever had a
```

Page 45

```
1    conversation with any uniform officers about
2    the use of contract security guards by the
3    GPO?
4        A    No.
5        Q    Have you ever been at a meeting
6    where that topic was discussed?
7        A    No.
8        Q    Have you ever seen any documents
9    at all, agenda items or information items that
10   have crossed your desk, discussing
11   transferring security responsibilities from
12   uniform officers to contract guards?
13       A    No.
14            MR. FINE:  Objection.  Not
15   material.
16            MR. HANNON:  Mr. Schwenk, thank
17   you.  I don't have any other questions I have
18   to ask you on the record.  I may ask you some
19   off the record.
20            MR. FINE:  I have no questions.
21   Thank you, Bob.
22            MR. HANNON:  You have the right if
```

Page 46

```
1    you wish to read the transcription of your
2    testimony simply to make sure that it's
3    accurate, or you can waive that and trust the
4    reporter, as you wish.
5            THE WITNESS:  I would like to read
6    it.
7            MR. HANNON:  Very good.  We will
8    read.
9            Thank you very much.  We're off
10   the record.
11           (Whereupon, at 12:33 p.m., the
12   deposition of Robert E. Schwenk was
13   concluded.)
14
15
16
17
18
19
20
21
22
```

Page 47

```
1
2
3               CERTIFICATE
4
5        This is to certify that the foregoing
6    transcript in the matter of:
7
8
9
10   Deposition of Robert E. Schwenk
11
12
13
14   Date:              Friday, August 10, 2007
15
16
17
18   Place:             Washinton, D.C.
19
20
21
22
23   represents the full and complete proceedings of
24   the aforementioned matter, as reported and
25   reduced to typewriting.
26
27
28   _____
29              Neal Gross
```

**A**

about 5:8,8:6,18 10:2
11:17 12:12,19 14:11
14:22 15:20 16:2,14
26:11 31:16 32:12
34:12 38:6,13,14
44:16,20 45:1
absolutely 43:11,16,21
44:12
access 13:8 16:18 17:4
17:18 23:1,6,15 25:9
26:4,12,20 27:4
accurate 46:3
across 5:9
activated 19:18
add 7:21 36:10
added 12:20 34:22
additional 23:20 24:12
Administrative 10:13
27:11
addressed 9:22
advised 31:10 32:13
aforementioned 47:24
after 22:9 23:20
again 23:8,9
against 44:11
age 34:14
Agency 1:10 2:10
agenda 45:9
ago 33:17,18 39:8
agree 9:16
ahead 19:12,14 38:2
Allegar 34:10
allow 17:13,22 18:16
allowed 13:11,14 19:21
alone 14:15,16
along 43:18
always 6:19 41:12
AMERICA 1:1
answer 8:16 11:2,13
12:5 15:20 22:14,18
24:3 25:3 26:7,17
27:1,8,13,16 30:18
31:9 40:13,21 42:10
42:12
answering 25:14
answers 25:12
anybody 7:2
anymore 30:17 32:15
anyone 28:16
anything 6:12 22:5
37:5
APPEARANCES 2:1
Appellant 1:6,18 2:2
4:6
Approximately 39:7
area 6:21 8:11 14:2
22:7 25:8
areas 13:11,16

arena 19:22
arrangements 10:3
25:21
asked 27:12 36:9
asking 11:20 26:11
assigned 41:9
assignments 41:22
assistant 6:1 34:11
audible 20:6
August 1:13 47:14
authority 13:10
authorization 9:19,20
authorized 36:11,12
aware 11:11 32:15
37:11 40:15
as 44:10
a.m 4:2

**B**

badge 13:10,14 14:6,7
14:10,23,22 15:3,6,8
15:12,13 16:10,10
17:7 18:15,17,19
19:18
badging 12:16 14:2
basically 6:3,22 34:17
before 17:3 22:13
begin 10:1
behalf 2:2,6 4:10
32:19
being 6:22 22:10 31:22
36:9
believe 25:11 37:17
38:10,20 39:21 40:8
Benazzoli 29:21
between 29:8
beyond 10:4
bill 30:9
billing 30:13
bit 7:21
BOARD 1:1
Bob 45:21
books 30:8
Branch 7:14
breach 32:11
breaches 8:11 31:17
Brian 37:15,15,18
38:10,11
broad 27:3
broadly 44:22
budgetary 43:18
building 5:9,11,12,16
5:19 6:13,16 7:1 6
8:12 9:12,14,22 10:4
10:6 11:9 12:9 13:9
13:20 14:13 16:7,11
16:20 22:7 25:17
27:4,5 29:9 30:4,7
31:17 32:11,16 33:1

36:12,20 38:18 41:1
41:11 43:10
harassaracy 31:20
business 5,3,13,14 6:3
24:13
Butch 33:4 37:19
button 13:21 14:5
17:10,14 19:3
Be-r-a-a-a-c-o-i 30:2
B-l-a-n-c 29:18

**C**

C 4:1
caged 6:21
call 13:1 23:18
called 1:17 4:5 21:2
came 40:4
capital 29:18
Capitol 1:20 2:15 11:9
16:6,20 22:7 40:11,18
41:9 42:2,19
career 6:20
careful 4:14
case 19:19
casual 44:4,8
ceiling 11:17
cell 23:18
CERTIFICATE 47:3
certify 47:5
change 43:9
changed 14:22
changes 6:13 16:11,20
11:14,16,18 12:1,2,9
12:13 21:22 34:4,19
37:11
charges 8:1,2
circumstances 28:20
31:1,20
come 8:1 35:22 36:2
37:3
comes 14:13
coming 20:4
command 43:17
compel 27:13
complete 47:23
concerned 14:3
concerning 22:15
concerns 7:1
concluded 46:13
confidential 26:1
confidentiality 26:2
confuse 4:15
connection 5:21
CONTENTS 3:10
contract 41:4,8 42:21
43:10,15,19 45:2,12
control 24:1
controlled 18:14,15
24:13 25:9 31:5

controls 24:15
conversation 44:8,9,18
45:1
conveyor 21:13
correct 26:14 41:6,10
41:15
counsel 1:17 4:5
couple 14:22
create 35:7
CROSS 3:12
crossed 45:10
currently 7:17 24:7

**D**

D 4:1
date 37:10 47:14
dates 39:20
day 28:14,17 29:3 34:8
34:9 38:14,21
days 29:1,9 31:4
DC-0752-07-0725-I-1
1:8
deal 10:11
dealing 10:16
deals 7:1
decision 43:9
definé 11:15
deliveries 30:3,7,20
delivery 30:3
demand 25:7 35:18
demands 36:14
Department 36:16
depending 30:11
depends 30:5
deposition 1:15,18
46:12 47:10
deputy 6:2
describe 8:9
described 21:21
descriptions 3:19 5:20
desk 19:15 45:10
details 9:13
detector 13:5,6,18 17:3
21:4,5
determine 27:12
differences 29:8
different 31:19 33:1
30:8
direct 5:12 4:8 8:15
direction 26:17 29:17
30:17 35:11
directly 26:18
directory 43:12,17,22
44:17

31:11
disciplined 39:20
discussed 45:6
discussing 45:10
Division 8:2
Docket 1:7
document 47:8
done 13:17 37:4,6,8,11
dont 13:17 17:4,6,8,1
17:14,18,20,21,22
18:2,10,13,20,13 19:2
19:8,11,21 9:22
20:22 21:3 24:8 25:7
26:21
doors 11:17 17:15
doubled 35:10
down 35:17
dramatically 12:10
drop 12 22,22 19:22
duly 4:6
duty 13:12 15:7 40:1
D.C 1:14,20 2:7,16
47:18

**E**

E 1:15 3:14 4:1,4,12
4:13 37:8 46:12
47:10
Earl 4:13
effect 43:13
either 10:21 13 10,13
14:2142:4
elaborate 37:1
elements 23:12
employee 39:4
employees 28 8,21
29:10 35:9
engineering 6:10 8:2
8:12
equally 22:6
enhancements 7:22 8:7
22:15
Enhancing 7:10
enter 14:5,16 19:8,11
entrance 11:6,18 12:8,8
21:12 22:6 40:3,17,22
41:1,10 42:2,18
entrances 11:5
environment 6:20
Eric 34:16 37:17,17
escorted 15:1,2 38:8,19
ESQ 2:3,12
Evans 44:20
even 23:10 31:13
Evening 38:22
ever 43:12,17,22 44:17

44:22 45:5,8
every 43:14
Ex 1:18
exactly 7:18 11:4 12:21
25:22
examination 1:17 4:8
examined 4:7
Excuse 10:12
expedite 27:2,6
experience 41:17
explain 35:1,6

facilities 24:9
facility 15:1 44:14
fact 44:13
fails 6:3
fair 5:12 7:22 34:8
fake 19:15
fall 4:11 47:23
farther 20:19 23:11
24:1,14 25:14

**G**

G 4:1
general 6:11 12:5
generally 7:5
gentleman 37:17
getting 7:3 8:11 9:13
22:3
given 10:9 16:9
gives 23:13
go 12:16 13:4,8,9,15,17
14:1 17:2 18:5,9 19:7
19:20 22:10 23:3,21
24:8 35:15 38:2
goes 5:21 13:19
going 8:10,15 10:1,10
10:22 20:9 23:11
24:19 25:12 27:16
38:2
good 4:10 46:7
government 1:9 39
2:14 4:20 36:13
grab 40:16
great 35:20
GPO 6:18,14 33:14
41:2 42:9 43:13,14,18
43:20 45:3
GPO's 5:5
Gradual 30:22
gradually 37:3
greater 7:4
grind 44:10
Group 4:20
grounds 11:3 25:4 27:8
29:12 31:6
Group 2:6
guard 13:21 14:4 15:7
15:9 17:9 22 18:21
19:3,5 23:4 38:8,19
32:12 24:1 37:18,21
38:8 40:16
guard's 19:15

**H**

H 2:12
hand 20:12,24 30:16
31:13,14 38:1 40:20
handed 6:19 21:7,19
Hansson 2:3,4 4:9 9:2
9:15 10:8,12,15,18
11:7,20 12:3 20:13,15
23:13 24:8 25:6,16
26:5,16 27:6 29:11
27:6,6 32:3 37:8
40:4 46:4 5
hours 38:22
HSPD-12 17:6
hundred 31:10

**I**

idea 19:1 28:3 38:22
identification 15:13
identified 3:19 20:5
implemented 6:12
implementation 36:22
37:2
implementing 35:14
36:4
improperly 9:22
improve 22:8
incident 8:19 10:3
27:1 31 10,10 37:10
42:7 43:1
increase 35:17 36:18
increased 35:7
indicated 6:15
indication 8:14 10:2
22:12,14 17,18,21
26:13 23:11 45:9
instruct 11:2
instruction 27:19
instructions 31:16
interact 32:21
interest 7:3

investigation 39:16
involve 30:17
involved 43:8
involving 8:16 27:4
its 43:3
issue 23:8 39:10
issued 5:3 35:8
issues 8:17 22:11,15
23:13 27:9 30:16
38:1 40:13,20
items 45:9

**J**

J 2:3
Jeffrey 39:21
job 5:20 29:20 33:5
41:18 42:4 47:5 16,22
Judge 10:14 26:15
27:13
just 5:14,18 7:21 10:8
10:18 12:10 15:12
16:14 23:1 25:2
31:15 34:15 35:5,9
37:14

**K**

kind 16:10 20:7 30:16
keep 5:14
kept 34:1
key 18:20
keys 17:14
kind 16:9 17:18,22
18:5 23:1 35:6
know 4:22 6:21 9:9,18
11:5 12:22 13:11,20
16:9,22 22:9 23:8
35:2 37:14
knowing 30:2
knowledge 6:11 8:6,21
9:20,21 47:3
knows 23:8

**L**

Lamont 7:16 43:5
last 4:15 15:10 19:21
34:11,21 35:16 37:4
lawyer 25:16,16,17
layers 8:6
layout 6:8
learn 38:13
learning 5:12
least 23:22
LeBlanc 6:7 29:15

left 33:16
let 4:22 7:21 10:15
13:21,22 14:12 15:21
17:7 21:13 26:17
letting 26:10
let's 8:6 10:18 11:8
12:18,22 16:8,11
levels 34:22 35:7
like 14:7 15:14 29:11
46:5
lines 21:13
little 7:21 31:16 38:7
LLP 2:4
load 29:5
lobby 8:18 10:4 11:15
12:12,14 16:20 17:15
23:1 28:7 25:7 26:21
42:22
located 16:22 34:9,10
location 5:22
42:20
locations 16:19 42:21
locked 19:5
long 4:17 5:6 44:15
longer 33:13 40:17
L-e 29:18

**M**

machine 13:1 21:2,13
17:16
made 12:14 24:17 34:4
37:11
make 8:10 12:9,13
30:3,7,20 43:17 44:1
manager 6:2,6,6,14
41:2 45:3
managing 5:5
master 5:22 16:18 17:15
30:17,20 43:17,21 44:1
matter 1:6 14:22
matters 20:12
may 12:6 45:18
maybe 11:15 26:6 27:20
means 46:6
meet 36:14

meeting 45:5
mentioned 37:16
MERIT 1:1
metal 13:5,6,18 17:3
21:4,5
MICHAEL 2:3
might 26:20
mind 25:1
mine 15:13
money 30:2
monitor 20:2,7 31:18
monitors 21:15
mouth 39:8
months 34:21 35:7 44:1
more 5:18 7:1 22:10
35:11,11 43:19 44:22
MSPB 22:11
much 23:5 46:9

**N**

N 4:1
name 4:11,11,12,15
30:1 33:1,3 34:15
named 37:17
names 34:13 35:2,3
42:4
Neal 2:19 4:9 5:9 32
11:21 31:12 45:14
need 8:3,21,22 9:9
10:19 11:1,18 17:2
24:11,22 26:13 27:14
29:22 35:5 42:9
needs 9:5 24:17,22
News 36:13
night 34:8 37:16 38:18
38:18 39:22 36:14
nights 34:12
non 25:11,12
None 3:21
not-secure 13:11
normally 30:22
North 1:19 2:15 11:8
16:6,20 22:7 40:11,18
41:9 42:2,19
nothing 7:8,9 11:22
20:11,22 24:7
notice 1:17
number 15:3,5 35:9
36:8
N.W 1:20 2:6,15

**O**

O 1:5 2:22 4:1
object 8:10 11:13 20:9
22:10 23:9

objection 11:5 24:2,16
26:6 27:3,7 29:11
30:15 31:6 37:22
40:12,19 42:6,15 44
occer 39:5
October 47:15
off 45:19 46:9
office 1:12,19,21 34:12
28:4 35:16,20 36:14
37:1,9,9
passport 7:12 16:3 34:12
28:4,20 6:13 36:14,22
37:1,9,9
passports 6:19 10:7
13:19 14:3,21 15:21
26:13 28:21 29:21
33:11 40:18
part 12:11
passports 33:11
past 12:11
Pause 23:17 43:6
payroll 36:16
people 6:17 7:18
permission 14:20
person 14:5,20 4:18
33:1,4 34:8
personnel 36:19
persons 28:3
phone 44:11,18
physical 6:9 7:13,22
8:17,16 11:10 14:22
12:19 21:21 22:8
33:5,22,19
pile 21:1
place 8:8 39:20 10:5
11:11,21 23:13 31:13
40:4
placement 7:22
pointed 17:6,10
pointing 17:4
police 41:2
porter 40:2
pornography 6:13 37:3
position 5:7 33:12
post 16:17 40:1
posts 42:1
possible 34:16
posted 42:1
power 41:19,20 43:22
present 2:21 34:10
pretty 44:15
Printing 5:19,21 14
16:13 40:16
police 6:18 17:21 20
probably 35:18
problem 9:2 20:3,18
procedure 20:11
proceedings 23:17 45:6
46:13
40:4
process 7:7 14:13 37:2
produce 10:7 27:13
36:8
produced 5:20 26:13
producing 28:1 29:2
29:10
proper 19:8,11 24:17
reporter 46:1

production 6:2,4,6
28:18 29:15 36:15
proper 12:15 14:2
PROTECTION 1:1
protective 9:16
public 8:15,22 24:17
26:5 38:8
pursuant 1:18
pushes 13:22
put 21:12 24:18 36:8
39:2
Pu 28:3,21 46:11

**Q**

question 4:21 12:4
22:14 26:4 36:9 18
questioning 25:12
questions 8:16 10:22
Q-u-i 18:9

**R**

R 4:1,14
ranks 35:2
re 5:10
reach 10:10
read 46:1,5,8
reader 17:7
really 9:6
realize 8:3
reasonable 7:2 8:22
recall 32:12
receive 13:22 14:1,14
recently 34:20 37:19
receptionist 6:1
RECROSS 3:12
REDIRECT 3:12
reduce 26:9
refer 5:10
referring 21:3
regard 20:10
regardless 14:5
REGIONAL 1:2
register 20:17
related 30:14
relationship 8:13 44:4
relationships 44:16,19
relatively 29:19
release 14:4
relevant 22:11,16 24:3
24:20 27:5 31:7 42:3
44:21
remainder 6:22
remind 4:20
removed 43:14
rephrase 4:22
reported 31:18 32:2,7
39:10 11,12 14 47:8,9
reporter 46:1

reports 6:1 28:18
represents 47:21
request 10:7,9 29:10
requesting 12:18 13:10
35:11 37:8
requirement 36:7
research 28:12,15
respect 5:16,19 9:16
respective 33:13 41:4,8
respond 23:17 24:20
25:20 29:12
responsibilities 5:15
34:7 45:11
responsibility 34:3
responsible 5:4 7:15
28:3,13 6,16 29:22
36:4
Retired 30:2
reveal 25:15
right 13:1 14:18 16:15
19:9 24:20 39:19 40:4
30:6 44:16 45:21
Robert 1:5,18 2:22
3:14 4:4,12,13 34:10
44:10 47:11 10
rock 32:3 33:4,8,9
role 6:5 7:6,9 8:7,22
R-o-c-k-e-r-b 33:4

**S**

S 4:1
same 5:12,17 23:8,18
sat 7:18
Saturday 29:1
saying 27:7
Schwenk 1:15 3:14 4:4
4:5,13,16 8:9 9:11
11:22 12:15 20:14
23:14 24:9 25:17
26:6,16 27:7 29:12
33:21 37:5 46:4 12
47:11
saw 28:3 32:19
say 21:15 23:1 24:15
34:1 39:8 44:1
scope 44:22
searched 28:1 31:3,19
SEC 4:13
secretary 6:1
section 16:13
secure 13:12,13 15:4,17
18:5 19:7 21:17
security 5:5,13 8:8,18
9:16 10:3,5 11:11
22:22 24:11,18 25:9
33:5,19 36:19,22
send 35:15 43:22
senior 7:16
sensitive 23:3
sent 30:16
sentence 18:12
separate 16:10 33:7
set 47:13

sergeant 40:2
series 35:21
serious 39:18
service 28:3 36:11,13
set 35:9,10 47:13
setting 41:3
shift 34:17,18
shop 5:13 33:8,8
short 7:5 46:2
side 37:15 38:5
simply 27:7 29:6 46:7
since 6:16 7:19 12:2
12:14 33:18
single 7:20 8:19 16:6
15:11 16:16 17:18
sit 20:7
size 20:3
some 6:15 23:13 38:12
someone 17:7 18:18
29:2,5 38:9
something 36:3
sometimes 28:18 29:4
30:16
sorry 8:5,20,21 23:21
specific 41:2,5 43:20
44:2
specifically 5:18 43:17
spell 4:11 29:16 32:21
spent 5:6 41:17
sitting 6:4
staff 12:10,10 14 15
staffing 36:18
stamp 37:10
stand 20:4,16 23:4
standard 22:8
stands 18:10
stanton 34:2 37:20
start 39:2
started 19:12
starting 6:8
state 4:11
stated 36:21
Staten 1:7 4:13 36:7
statements 43:13
States 1:7 17:6 36:7
station 41:3 42:1
Stephen 6:7
Steve 33:2
step 15:18
still 15:13
stipulate 10:20 25:6,14
28:7
straight 19:12,14
street 1:21 2:6,15 40
1:21 9:3,15,20 11 45:2
9 11:2,7,9 15:10 14
17:18,20 18:7 19:21
12 11:18 22:22 9:20
substantial 34:11
stuff 37:16
Stuges 44:17,20
strong 16:5 18:5
super 19 13:10 40:21
tasks 39:18 20:13 47:6

**T**

T 4:1
TABLE 3:10
table 7:20,8 31:10 3:8
21:11 23:1 24:13
taken 1:20
taking 16:5
talk 8:4 23:12 22,11
talking 8:18 11:16,17
14:16 15:2 16:2,14
technically 9:21
tell 9:11 15:18 25:17 2
39:5
temporary 34:15 5:13
terms 20:12 44:15
terrified 4:7 20:8
thank 45:16,18 46:9,10
thing 6:13
things 18:11 38:20
think 37:19
thought 16:1 23:14 7
three 24:2 29:18
throughput 21:2 22:9
three 6:16 34:20,22
35:3 44:1
time 4:20 5:6 9:12 1 10
14:1 28:3,16 37:3 40:4
times 29:4 31:10,13
today 4:17 41:15
together 38:12
told 32:20 35:16 36:4
tomorrow 20:21
too 37:10
took 34:17
top 34:1
TPO 42:4
transcribed 47:4
transcript 46:5
transition 37:2
turning 43:1
two 5:9 6:17 8:5 14:22
sufficient 36:6 35:7,7
Sunday 28:1,22 8:4
superintendent 34:1 4
supposed 36:12 9:20
supervision 34:5,22

weekends 30:21
Werse 37:14,15 38:1
39:19
Werse's 39:2
wet 5:2 9:2 39 10,22
16:16 21:8 24:7
30:17 36:8 41:21
went 1:21 7:17 16:2
28:8 31:16 34:9
what's 22:12 35:6
whether 22:21 23:2
47:18
White 4:12,13
who's 34:7
whole 9:11 31:1 3
why 26:12 31:13
winter 19:22
wish 8:4 23:19
withdraw 4:3
witness 4:6 23:16 43:3
46:2 47:6,13
word 14:22
words 16:14 31:4
work 5:16 28:1 31:3,14
worked 41:7 42:9
working 28:3,9,16
33:18 34:5
works 37:20 41:14
would 5:21 10:14,17,17
11:7,17 12:2 13:2,20
17:5 18:7 20:16 24:13
24:17 33:2,21 35:21
42:8
written 8:10 15:6,22
wrong 16:15

**X**

X-ray 21:2

**Y**

yeah 7:12
year 15:10
years 5:9 6:16 33:16,17
33:18 39:8
yellow 16:9 19:15

**Z**

Z

**Numbers**

1 27:4
10 10:13 47:14
11 2:6 22:22 11:12 14
12 10:13 17:6 27:11
20000 2:7
2001 6:17
2006 42:8 9,20
2007 1:13 47:15 47:14
22,40 47:14
28401 2:16
232-1907 2:8
28th 33:18

3
43:16 5:12,16,19 9:12
9:14 10:6 16:20 17:6
17:18 21:22 22:7
32:11 38:18 40:11
5:8,2 9:5 31:18 34:9
37:16 39:22
9:12,20 11:2,9 15:10
14 17:18,20 18:7 14

4
43:16 47:14
5
512-0200 2:17
6
6:00 28:2,22
7
722 1:19 2:15
9
9/11 8:18 11:11 12:14
31:1,21 22:22 32:19

(Index continues — numeric and final entries)

Transcript of: **Aldustus Dailey**

**Date:** August 10, 2007
**Volume:**

**Case:** White v. U.S. GPO

Neal R. Gross & Co., Inc.
Phone: 202-234-4433
Fax: 202-387-7330
Email: info@nealrgross.com
Internet: www.nealrgross.com

---

Page 1

UNITED STATES OF AMERICA
MERIT SYSTEMS PROTECTION BOARD
WASHINGTON REGIONAL OFFICE
¦----------------------+
                                          ¦
In the Matter of:                         ¦
                                          ¦
ROBERT O. WHITE, SR.,                     ¦
                                          ¦
            Appellant,                    ¦
                                          ¦
      v.                                  ¦ Docket No.
                                          ¦ DC-0752-07-0729-I-1
                                          ¦
GOVERNMENT PRINTING                       ¦
OFFICE,                                   ¦
                                          ¦
            Agency.                       ¦
                                          ¦
¦----------------------+
                          Friday, August 10, 2007
                          Washington, D.C.
DEPOSITION OF:
ALDUSTUS DAILEY, JR.

called for examination by the counsel for the
Appellant, pursuant to notice of deposition,
at the Government Printing Office, 732 North
Capitol Street, N.W., Washington, D.C., when
were present on behalf of the of the
respective parties:

Neal R. Gross & Co., Inc.
(202) 234-4433

---

Page 2

APPEARANCES:

     On Behalf of the Appellant:
            J. MICHAEL HANNON, ESQ.

     of:   Hannon Law Group, LLP

            1901 18th Street, N.W.
            Washington, D.C. 20009
            (202) 232-1907

     On Behalf of the Agency:

            NEAL H. FINE, ESQ.

            Government Printing Office
            732 North Capitol Street, N.W.
            Washington, D.C. 20401
            (202 ) 512-0200

Also Present:

            ROBERT O. WHITE

Neal R. Gross & Co., Inc.
(202) 234-4433

---

Page 3

TABLE OF CONTENTS

WITNESS      DIRECT  CROSS  REDIRECT  RECROSS

Aldustus Dailey,

     Jr.       4     54      55        56

Ex.

NO.  DESCRIPTION                  IDENTIFIED

     (None)

Neal R. Gross & Co., Inc.
(202) 234-4433

Page 4

```
 1              P R O C E E D I N G S
 2                                    (12:46 p.m.)
 3   Whereupon,
 4              ALDUSTUS DAILEY, JR.
 5   was called as a witness by counsel for the
 6   Appellant and, having been first duly sworn,
 7   was examined and testified as follows:
 8              DIRECT EXAMINATION
 9         BY MR. HANNON:
10     Q    Sergeant, good afternoon.
11     A    Good afternoon.
12     Q    My name is Michael Hannon, and as
13   you probably know, I present Officer Robert
14   White in this appeal of a disciplinary action
15   against him.
16     A    Yes, sir.
17     Q    And I also represent Darnell
18   Everett, who was recently removed and we'll be
19   pursuing an appeal of that, and these
20   incidents, these matters both arise out of an
21   incident that occurred in October of last year
22   over at Building 4.
```

Page 5

```
 1              Just some background information
 2   if I may.  Could you tell me what your
 3   background is to prepare you for your work in
 4   law enforcement?
 5     A    I was a 20-year veteran in the
 6   United States Marine Corps; spent five years
 7   at the U.S. Department of State as a security
 8   officer prior to coming here.
 9     Q    When did you come to the GPO?
10     A    I believe it was June of 1997.
11     Q    And what rank did you begin at?
12     A    As an officer, regular officer,
13   police officer.
14     Q    And when were you promoted to
15   sergeant?
16     A    Two years ago.
17     Q    And could you just describe in
18   general your professional relationship with
19   Officer White?
20     A    It's one here on the job, strictly
21   professional.  We were both officers together
22   and also corporals together and until I got
```

Page 6

```
 1   promoted by former Chief Monroe to sergeant.
 2     Q    And as a sergeant are there times
 3   when you supervisor Officer White?
 4     A    That's correct, sir.
 5     Q    Okay, and in your professional
 6   opinion, what kind of an officer has  Officer
 7   White demonstrated himself to be?
 8     A    He's been an excellent officer.  I
 9   have experienced no problems with him.  Any
10   disagreements we might have have been
11   professional, but he's always carried out
12   orders.
13     Q    To whom do you report?
14     A    At the present time I report to
15   Lieutenant Washington, Marvin Washington, as
16   the shift commander.
17     Q    And in October of 2006, to whom
18   did you report then?
19     A    At that time I reported then to
20   Commander Steven Packard.
21     Q    What's Packard's position now?
22     A    He's a shift supervisor.  At the
```

Page 7

```
 1   time he was the overall commander of the force
 2   at the time serving in a temporary billet.  We
 3   have three shifts.
 4     Q    Yeah.
 5     A    Each shift has a commander.  He
 6   was the overall commander of all three shifts
 7   at that time.
 8     Q    And what's his position now?
 9     A    He's a shift two shift commander.
10     Q    So a demotion?
11     A    No.  The position he filled was
12   temporary until we got a police chief in
13   place.
14     Q    So when Mr. Jordan came in?
15     A    Mr. -- not Jordan, but Mr. --
16   Chief Butler.
17     Q    Okay.  I've met Chief Butler.
18   Okay.  I understand.  How did you learn about
19   the incident, Building 4, that has led to the
20   discipline of Officer White?
21     A    I was in a discussion with
22   Commander Packard the money after the
```

Page 8

```
1   incident.  We were reviewing the log and he
2   was filling me in on an incident that happened
3   that night prior that happened to be the
4   incident that we were talking about.  That's
5   how I found out about it.
6        Q     And was that a briefing that was
7   in the ordinary course of your duties or was
8   this something that he wanted to bring to your
9   attention?
10       A     Ordinary course of duties.  We
11  collaborated each morning on highlighted
12  events, things of that nature, regardless of
13  which shift they were on.
14       Q     And what sort of things did you
15  review with Steven Packard?
16       A     We reviewed the incident as it was
17  read out in the log, and later on that day, we
18  reviewed videotapes of the -- both inside and
19  outside of  Building 4, what could be captured
20  on film.
21       Q     In viewing the videotapes, you
22  also saw the video taken from outside?
```

Page 9

```
1        A     It was grainy, but, yes, sir.
2        Q     Were you able to see the assault
3   on Officer Everett?
4        A     What we saw were what we believed
5   to be Officer Everett and an unidentified
6   individual struggling on the outside of
7   Building 4.
8        Q     Well, you understand that she was
9   arrested?
10       A     Correct, sir.
11       Q     Okay.  Who else was present when
12  you were looking at the video?
13       A     Myself, Commander Packard, Mr.
14  Vernon, our Security Director, and Mr.
15  Landrau, the Deputy Chief of Human Capital.
16       Q     Rafael Landrau?
17       A     Yes, sir.
18       Q     And where were you all when you
19  were reviewing these videotapes?
20       A     At the new control center, sir.  I
21  believe it's C-147, Room C-147.
22       Q     How long did this review take
```

Page 10

```
1   place?
2        A     It was quite lengthy.  I really
3   can't remember the exact amount of time.  At
4   least 45 minutes.
5        Q     And what were the discussions
6   while the review was taking place?
7        A     My discussions were primarily with
8   the commander.  We were trying to establish a
9   time line of events.
10       Q     Do you know -- did you know at the
11  time whether any disciplinary action had been
12  taken against either Officer Everett or
13  Officer White?
14       A     At the time of the incident?
15       Q     No, at the time of the review of
16  the tapes.
17       A     No.  I didn't know.
18       Q     Okay.  Was there any discussion by
19  others that you ever heard about whether
20  Officer Everett and Officer White and Officer
21  Everett conducted themselves properly?
22       A     No, sir.  The reason we were in
```

Page 11

```
1   there was to review the tape to see if there
2   was anything out of the ordinary that each one
3   of them did or didn't do.
4        Q     I see.  That makes sense to me,
5   but I've got to ask you.  I mean, how did you
6   know that, that the purpose of all of you
7   looking at it was to review the conduct of the
8   officers?
9        A     When I went in to discuss the
10  incident with them, the commander at the time,
11  Commander Packard, said, "Grab a pen and piece
12  of paper and let's go down and try to
13  establish a time line to see exactly what
14  happened and when it happened."
15             That was the bulk of my actions
16  down there.  That's why I was down there.
17       Q     Okay.  So it was Packard,
18  yourself, Rafael Landrau, and Lamont Vernon?
19       A     Yes, sir.
20       Q     And why were -- why was Lamont
21  Vernon there?
22       A     He's Director of Security
```

Page 12

```
1   Services.  So I knew he would probably be
2   down.  He came in with Mr. Landrau.
3        Q     The two of them came together?
4        A     Yes, sir.
5        Q     Okay, and what was your
6   understanding as to why Mr. Landrau was here?
7        A     I don't know, sir.
8        Q     So was there discussion that you
9   overheard from others, not yourself,
10  commenting on whether they thought that
11  Officer Everett or Officer White had done
12  anything wrong?
13       A     No.  Mr. Landrau and Mr. Vernon
14  were off to the side in the corner behind us.
15  Myself and the commander were actually sitting
16  at counsel reviewing the tape, whatever.
17  There was discussion going on, but I couldn't
18  tell what it was they said one way or another.
19       Q     They were at another monitor?
20       A     No, they were about right over
21  here.  Their discussion was low whispers.  It
22  wasn't anything that I could overhear.
```

Page 13

```
1        Q     But they -- they could come back
2   and forth to watch the tape?
3        A     Yes, sir.
4        Q     Okay.  Could they see the tape
5   from where they were talking?
6        A     Yes, they could.
7        Q     Okay.  Has anyone commented to you
8   since you first learned of this incident on
9   whether Officer White or Officer Everett did
10  anything improper?
11       A     Could you ask that question again?
12  I'm not --
13       Q     I'm sorry.  Has anyone at the GPO,
14  since you learned of this event, commented to
15  you on whether they think that Officer Everett
16  or Officer White did anything improper?
17       A     No.  It's been some general
18  comments about officers, but as far as
19  officials, no.
20       Q     Has Mr. Landrau ever commented to
21  you about this incident?
22       A     No, sir, not Mr. Landrau, no.
```

Page 14

```
1        Q     Mr. Lamont Vernon?
2        A     Only that they were going to be
3   looking into the incident and it was going to
4   be investigated by the IG.
5        Q     And were you interviewed by the
6   IG?
7        A     No, I was not.
8        Q     Have you had discussions with Mr.
9   Fine about the incident?
10       A     No, I very rarely see Mr. Fine.
11       Q     I want to ask you some general
12  questions from your experience because as you
13  know, both Officer White and Officer Everett
14  have been charged with violating standards
15  that apply to police officers, that apply to
16  you, too, and I take it you're also subject to
17  the disciplinary process here at GPO.
18       A     Yes, I am.
19       Q     And to whom do you answer?
20       A     I answer to my immediate
21  supervisor, which is Lieutenant Washington.
22       Q     Okay.  Is there, to your
```

Page 15

```
1   knowledge, any order that describes the manner
2   in which one officer is to relieve another at
3   a particular post?
4        A     No.  No, there's not.
5        Q     Are there occasions when you've
6   either observed or heard of officers eating in
7   the building?
8        A     Yes, sir.
9        Q     Have you ever observed or heard of
10  instances where officers were eating at their
11  post?
12       A     Yes, sir.
13       Q     Is there an eating facility that's
14  available to uniform officers in the building?
15       A     You can purchase food at the
16  cafeteria that's located on this floor, but
17  generally the officer is supposed to be eating
18  in the break room, which is located at Room C-
19  109, the bottom floor.
20       Q     And do officers use the break room
21  for eating?
22       A     That's correct, sir.
```

1    Q    But you're aware of officers

2  eating at their post?

3    A    They have been occasionally

4  observed eating at their post.

5    Q    And eating at other locations in

6  the building besides their post or the break

7  room?

8    A    Yes, sir.

9    Q    Have you observed or been aware of

10  officers having friends or family members in

11  the building while they're on duty?

12    A    In what -- while they're actually

13  act a post?

14    Q    We'll start with that.  While

15  they're at post, having someone visit them at

16  a post.

17    A    Officers on occasion have people

18  actually visit them at a post.  How often it

19  happens I'm not sure.

20    Q    Are there occasions that you're

21  aware of or have observed where friends and

22  family of officers come into the building,

1  make contact with the officer at post and then

2  the officer may be relieved and then they can

3  go and speak?

4    A    Generally that takes place at the

5  front office if that happens.

6    Q    So there are instances in which

7  officers are relieved because a friend or

8  family member has come?

9    A    They can request it.  Now,

10  operational commitments dictate whether that

11  happens or not.

12    Q    Understood.  Have you ever worked

13  Post 41?

14    A    I work it as an officer.

15    Q    That's what I mean.

16    A    Right, un-huh.

17    Q    Okay, and when you worked Post 41

18  was it configured the way it is today in terms

19  of the turnstile and the security machine and

20  the monitor back at the desk?

21    A    We didn't have turnstiles back at

22  that time.  The lobby area is different,

1  configured different.

2    Q    How is it different?

3    A    There's been enhancements, but

4  that's a security issue that I can't get into,

5  but it's different.

6    Q    Did somebody tell you not to get

7  into the security issue?

8    A    No, that's a secure building, and

9  if I give you configurations, then it's up to

10  general knowledge.

11    Q    Okay.  When were the changes made?

12  Just when.

13    A    Generally about a  year ago the

14  changes were made, about a year.

15    Q    And were you made aware of those

16  changes?

17    A    After the changes, after the

18  construction or whatever changes were made, we

19  were made aware of it, but not during, not

20  before, no.

21    Q    After you -- I'm sorry.  So the

22  changes were made after you were a sergeant,

1  right?

2    A    (Nodding.)

3    Q    You have to answer.

4    A    Oh, I'm sorry.  Yes, sir.

5    Q    That's okay.  This is sort of not

6  ordinary human discourse.

7    A    Okay.

8    Q    So you haven't worked the post

9  since the changes have been made.

10    A    No, I have not.

11    Q    In your supervisory

12  responsibilities have you had to oversee

13  another officer working the post?

14    A    Yes.

15    Q    When you came in and looked at the

16  tapes with Commander Packard and others, did

17  you know then that there had been a change in

18  the post orders for Post 41?

19    A    No, not to my knowledge.

20    Q    Okay.  Did you ever go over to

21  Post 41 after you looked at the tapes, go over

22  to Post 41 and look at the book that contains

---

Here it is:

---

OK.

**Page 20**

1 the post orders?
2 A Actually what I did, I went
3 downstairs. We have a copy of the post orders
4 downstairs, and I grabbed that and brought
5 that back upstairs, and myself and Commander
6 Packard reviewed Post 41 post orders.
7 Q And what did you discover?
8 A It was the same post order that I
9 had since when I came here originally as
10 a private, which was in '97.
11 Q And why did you go down to get the
12 post orders?
13 A There was some question about what
14 was allowed or not allowed on the post, and we
15 wanted to check to see if that had actually
16 been contained in the post order.
17 Q Who raised that issue?
18 A Commander Packard, and the subject
19 was visitors.
20 Q And after you went down and got
21 the post orders, did you learn that there had
22 been a change?

**Page 21**

1 A No, there was no change. It was
2 still an old post order. That was the old
3 post order we were reviewing.
4 Q I see. Now, the location that you
5 went to get the old post orders, is that in
6 this building?
7 A That's in this building, Room C-
8 109. That's in the police office. We keep a
9 copy of the post orders in the lieutenant's
10 office. I went down and grabbed that copy and
11 brought it back up to the commander.
12 Q Are post orders also at each post?
13 A Supposed to be at each post, sir.
14 Q Okay. Did you ever check the
15 actual post orders at Post 41 after you became
16 aware of this incident?
17 A I did not check the ones at 41,
18 no, sir.
19 Q Do you know if anyone else did?
20 A I'm not sure.
21 Q So you never heard -- as you sit
22 here today, you're not aware of whether the

**Page 22**

1 post orders that were at 41 when you were an
2 officer are still the post orders for 41.
3 A There has been a new set of post
4 orders established. I can't remember. I
5 think it was some time in the beginning of the
6 first of the year. I think it may be January
7 20th. I'm not really sure about that date,
8 but some time at the first of the year that we
9 got new post orders.
10 Q Okay, and how did you learn -- how
11 does that happen?
12 A We received a copy for review in
13 the beginning, and then once they were set
14 back upstairs for clearance, then they're
15 signed off on and given a date, a date that
16 they're actually going into effect. It's
17 called an effective date for the post orders.
18 Q And what is done to acquaint the
19 officers with new post orders?
20 A Well, after they're completed, a
21 copy is given to each officer on the new post
22 order. A copy was given to them in paper

**Page 23**

1 form, and some of them, at least the drafts
2 were E-mailed to all the officers.
3 Q Were you given the new Post 41
4 post orders in paper form?
5 A Yes, sir, I was.
6 Q And do you keep your own set of
7 post orders when they're given to you?
8 A I have several sets of post orders
9 in drafts. It's quite a few of them, but I
10 have them.
11 Q Okay. So do you think that you
12 have the paper post orders for Post 41 that
13 were given you?
14 A I'd have to look.
15 Q Okay.
16 A I'd have to look.
17 Q How do you get them? I mean, are
18 they just put in a box or is there something
19 at roll call?
20 A Generally, at that time Mr. Vernon
21 would send out in an E-mail this is an order
22 for review, and it would have whatever post,

Page 24

```
 1   a general order, and it would have said, "Have
 2   questions and comments back no later than,"
 3   and it would give a date.
 4            After that date was complete, it
 5   would go back to Mr. Vernon for final review,
 6   and after everything is cleaned up and all
 7   mistakes and corrections are made, then he
 8   signs off on this as being the post order or
 9   general order for the police department.
10        Q    How do you know the effective
11   date?
12        A    It should be in the block, lower
13   right-hand corner; should be effective date
14   and "reviewed by" or "issued by" block on the
15   front page.
16        Q    What is the responsibility of a
17   GPO officer for the safety of persons who come
18   onto the property?  In other words, as opposed
19   to protection of the physical plan, what
20   responsibilities do the officers have to
21   protect human beings who come in the area of
22   their post?
```

Page 25

```
 1        A    Well, we have a statute that
 2   really sets our responsibilities as police
 3   officers, protection of persons and
 4   properties, but then -- and that to include
 5   the post that the person is on.
 6            Generally, anybody that comes in
 7   contact with a GPO police officer in the
 8   building is under protection of a GPO police
 9   officer at that point.
10        Q    And you understand as a federal
11   law enforcement officer you have an obligation
12   to enforce the laws.
13        A    That's correct.
14        Q    And to take action if a crime is
15   being committed in your presence.
16        A    That's correct, sir.
17        Q    Okay.  Now, you were a U.S.
18   Marine.  What rank were you when you finished
19   your service, sir?
20        A    I was a gunnery sergeant.
21        Q    So you ran the Marines.
22        A    Yes, sir, I did.
```

Page 26

```
 1        Q    We'll talk about that a little
 2   later.  Since you've been with the GPO, have
 3   you ever been on duty when an officer in
 4   trouble alert has gone out?
 5        A    Yes, sir.
 6        Q    And is there a policy for officers
 7   at GPO as to what to do when that occurs, a
 8   policy?
 9        A    A written policy?
10        Q    Yes, sir.
11        A    No.
12        Q    Okay.  So how do you know what to
13   do?
14        A    Generally what we've been going on
15   is our experiences at other agencies or
16   previous employment, whatever.
17        Q    Or military.
18        A    Or military.
19        Q    And in your experience, what do
20   you do?
21        A    You send people or you respond
22   there immediately, depending on what action is
```

Page 27

```
 1   occurring; gather the information; get the
 2   location; and you dispatch people, depending
 3   on how big, how bad, or how serious it is.
 4        Q    Since you've been here, have you
 5   been aware of any officers being the victims
 6   of an assault?
 7        A    A couple, a couple of officers
 8   have been assaulted, been on -- since I've
 9   been at GPO.
10        Q    And do you recall what the
11   response was from other officers to that
12   problem?
13        A    The response was that they were --
14   at least two officers were dispatched to that
15   location to assist the officer.
16        Q    Two were?
17        A    Correct, sir.
18        Q    And who was responsible for making
19   that disposition?  Who gave that order?
20        A    The on duty supervisor or shift
21   commander would make that decision.
22        Q    Okay.  Why only two?
```

Page 28

```
1        A      As a general rule, you never send
2   an officer by themselves to respond to an
3   officer in trouble.  It all depends on how the
4   response comes over the air.  Officer down and
5   officers -- or gun or something, you send most
6   of the available units.  So it all depends on
7   how it comes across the air.
8        Q      So in your experience it would be
9   you would want to send a minimum of two.
10       A      A minimum of two.
11       Q      And perhaps more, depending upon
12  the circumstances.
13       A      That's correct.
14       Q      All right.  You carry a radio?
15       A      Yes, sir.
16       Q      Do all officers on post have
17  radios?
18       A      All officers have radios.
19       Q      Okay, and do your radios
20  communicate with MPD?
21       A      The officers don't communicate
22  with MPD.  There was a feature on the
```

Page 29

```
1   supervisor's radio that we could monitor MPD
2   radio transmissions, but since the turnover of
3   the radios, I'm not sure whether that function
4   still works or not.
5        Q      How does an officer on a post
6   request notification  of MPD of the problem?
7        A      The problem?  Telephone or radio.
8        Q      Well, what telephone would the
9   officer use?
10       A      We have a telephone at each post.
11       Q      Do you carry a cell phone as well?
12       A      I have a Blackberry, sir.
13       Q      Do most officers carry cell phones
14  or Blackberries?
15       A      I'm not really sure.  Some do;
16  some don't.  So it's hit or miss on that.
17       Q      Do you use your Blackberry in the
18  performance of your duties?
19       A      Yes, sir, I do.
20       Q      Has anyone discussed the issuance
21  of Blackberries to officers as a security
22  measure?
```

Page 30

```
1        A      It was briefly discussed over a
2   year ago, but nothing definitive has come down
3   since that time.
4        Q      Did you know that when Officer
5   Everett made his call that he was having
6   problems with a person that he was told to
7   call 911?
8        A      That's what I heard, but I wasn't
9   there at the time.  So I don't know whether
10  that actually occurred or not.
11       Q      You haven't ever heard any
12  protocol where an officer in trouble is told
13  to call 911?
14       A      Normally you'd dispatch officers
15  to that location, that's been past
16  practice with this department.
17       Q      Before you became a sergeant, were
18  you ever interested in pursuing leadership
19  positions in the FOP?
20       A      No.
21       Q      So you didn't have any
22  representational duties?
```

Page 31

```
1        A      I served briefly as a Secretary
2   because our guy left, I think, Corporal
3   Robertson.  I did that for about six months.
4   Other than that, no.
5        Q      Post 41 now is manned by contract
6   employees; is that right?
7        A      That's correct, sir.
8        Q      And how did you learn that that
9   transition was going to occur?
10       A      I had some general knowledge that
11  there were going to be contractors coming in.
12  The date was still in question when we got to
13  work that they were going to actually send
14  contractors over to Building 4.  I can't
15  remember exactly what time frame that was.
16       Q      When you first learned about
17  contract employees coming on, was it also
18  discussed what posts they might go to or was
19  it just a general discussion?
20       A      Generally it was said that they
21  were going to occupy Building 4.  After they
22  showed up, they were put on all posts.  So
```

Page 32

```
1   that was a little bit of a surprise to us.
2       Q      So do all posts now have contract
3   employees?
4       A      The fixed posts we have, all but
5   two are manned by the contract employees.
6       Q      How are they supervised?
7       A      They have a lead officer that
8   actually is supposed to supervise them.  As a
9   general rule, either the shift commander or
10  the supervisor conduct post inspections and
11  make sure equipment is there and stuff like
12  that, but under normal circumstances the lead
13  contract employee supervises the contract
14  employees.
15      Q      Well, what's the reporting
16  relationship, if any, between the contract
17  employees, contract supervisors, and the GPO
18  officers and their chain of command?
19      A      Normally, any contact with the GPO
20  chain of command is done via the lead contract
21  employee or SPO, which is special police
22  officer.  If there's a problem or there's an
```

Page 33

```
1   issue at hand, it goes from the contract
2   employee to the lead officer.  The lead
3   officer brings it to me or the lieutenant.
4       Q      So the lead officer needs to bring
5   in -- so you need to deal with the lead
6   officer, and you have to be sergeant or above
7   to --
8       A      Generally it's done with sergeant
9   or above.  If there's an immediate problem,
10  what will happen is they'll contact an
11  officer.  An officer will call and explain
12  what the problem is.  If it's a small problem,
13  the officer will solve it and inform us that
14  it's taking place.  If it's a major problem,
15  he'll call and tell us and we'll find out what
16  the problem is and take care of it.
17      Q      Were you required to go through
18  training in FLETC?
19      A      That's correct, sir.
20      Q      Are you aware of any on-site
21  training that's conducted for the contract
22  security guards?
```

Page 34

```
1       A      The only on-site training that I
2   personally know of is some X-ray training that
3   was given to them over a year ago by our
4   people.  Other than that, I don't know of any.
5       Q      Now, the post orders and other
6   statutory requirements for your job and that
7   of other uniform officers, are the contract
8   employees held to those same standards to your
9   knowledge?
10      A      No, not to the same standards as a
11  police officer, no.
12      Q      Here at the GPO, do the SPOs have
13  arrest authority?
14      A      They have the authority to detain
15  as such until the police officers arrive.
16      Q      And do they have radios?
17      A      That's correct.
18      Q      Do you know Darnell Everett?
19      A      Yes, sir, I do.
20      Q      And, again, as with Officer White,
21  your experience with him professionally, do
22  you have an opinion as to whether he's a good
```

Page 35

```
1   officer?
2           MR. FINE:  Objection.  There's no
3   materiality to the issues here.
4           MR. HANNON:  You can answer the
5   question.
6           THE WITNESS:  I had no problem
7   with Darnell.  I just didn't.
8           BY MR. HANNON:
9       Q      Do you know Steven Cross?
10      A      Yes, sir.  He's the shift
11  commander for shift three.
12      Q      To your knowledge, has he ever
13  been disciplined?
14      A      Not to my knowledge.
15      Q      Do you know Robert Curtis?
16      A      Yes, sir.
17      Q      To your knowledge, has he ever
18  been disciplined?
19      A      Yes, sir, he has.
20      Q      To your knowledge, has Paul Epley
21  ever been disciplined?
22      A      Yes, sir, he has.
```

Page 36

```
 1        Q      Gregory Fox?
 2        A      Gregory Fox was a personnel
 3  security person.  I don't know whether he's
 4  been disciplined or not.
 5        Q      Okay.  Other than Officer White
 6  and Everett, are you aware of any other
 7  persons being disciplined as a result of the
 8  incident that took place at Building 4?
 9        A      For that night?
10        Q      Yes, sir.
11        A      No, sir.
12        Q      Have you ever personally had to,
13  as they say, paper a case with the U.S.
14  Attorney's Office?
15        A      Yes, I have.
16        Q      Okay.  And were you an officer at
17  the time or a sergeant?
18        A      I was an officer at the time.
19        Q      And where you trained in what you
20  are required to do to paper a case?
21        A      Actually, a more seasoned officer
22  was sent down with me to help me walk me
```

Page 37

```
 1  through the papering process.
 2        Q      What kid of case was it?
 3        A      Actually it was a case concerning
 4  a theft and a break-in of a car on Lot 55.
 5        Q      It wasn't your car, was it?
 6        A      No.  No, it wasn't my car.
 7        Q      Was it an employee's car?
 8        A      It was.  We observed them on the
 9  CCTV camera attempting to break into a mini
10  van.
11        Q      And who was sent with you to paper
12  the case?
13        A      It was at that time Officer
14  Rivera.  He's now Sergeant Rivera.
15        Q      Prior to that experience though
16  had there been any training or instruction of
17  papering a case?
18        A      No.
19        Q      So when you made the lock-up, were
20  you wondering what next?
21        A      Yes, and I asked them what happens
22  now.  I know we've got this guy under arrest.
```

Page 38

```
 1  So how do we do this if there's anybody that's
 2  done this before.
 3        Q      And to whom did you address that?
 4        A      To the supervisor.  Rivera was in
 5  the -- he was retired from the Metropolitan
 6  Police Department, and he volunteered to go
 7  down with me to help me paper the case.
 8        Q      Any other cases you papered?
 9        A      A couple, but nothing as sexy as
10  the break-in, but the process is still the
11  same.  You have to go down, get your folder,
12  see --
13        Q      I was a prosecutor.
14               So for the other two cases did you
15  also have another officer go with you?
16        A      Yes, I did.
17        Q      Just to make sure the --
18        A      Just to make sure, right.
19        Q      Are you aware as to whether there
20  is a policy at the GPO or who's supposed to
21  paper a case when an officer is the victim,
22  for example, the victim of an assault?
```

Page 39

```
 1        A      There's no GPO policy, no.
 2        Q      Do you know whether in the
 3  circumstances I just described where a uniform
 4  officer is the victim of an assault, whether
 5  the U.S. Attorney's Office requires that a
 6  supervisor go along when the case is papered?
 7               Do you know that?
 8        A      No, that's not.
 9        Q      So do you know of your own
10  knowledge as to whether the procedure for
11  papering a case when the officers and the
12  victim of an assault is any different from
13  what you learned through experience from
14  Sergeant Rivera?
15        A      As far as I know, it is no
16  different.
17        Q      And you're not aware of any
18  training or instruction that's been given to
19  officers about how they're supposed to
20  interact with the United States Attorneys,
21  Assistant United States Attorneys that are
22  down at the courthouse?
```

Page 40

```
 1      A     No, sir.
 2      Q     Other than this incident, are you
 3   aware of any other security incidence arising
 4   at Building 4?
 5      A     Yes, sir, I am.
 6      Q     How many?
 7      A     At least two that I know of.
 8      Q     Can you describe those two?
 9      A     One was a problem with a vehicle
10   leaving without certain security measures.
11   Another was an officer being outside Building
12   4 and away from his desk.  Those are the two
13   I remember.
14      Q     Okay.  Let's talk about the
15   vehicle.  What happened?
16      A     The vehicle left without an
17   officer checking it and putting a seal on it.
18      Q     And what was the consequence?
19      A     The officer was disciplined.
20      Q     But was there any adverse -- I
21   mean, did anything bad happen?  They
22   discovered that it wasn't properly sealed?
```

Page 41

```
 1      A     They discovered it wasn't properly
 2   sealed, and we couldn't find him on the tape,
 3   and so he received disciplinary action for
 4   that.
 5      Q     Okay, and so he wasn't present on
 6   the tape --
 7      A     Right.
 8      Q     -- to seal the vehicle.
 9      A     Right.
10      Q     And who was that officer?
11      A     That was Officer Curtis.
12      Q     And when did that happen?
13      A     A couple of years ago.  I can't
14   remember the exact date.  Two to three years
15   ago, as a matter of fact.
16      Q     And what was your involvement in
17   that investigation?
18      A     At that time I was a corporal, and
19   I just noted that it was noted in the log that
20   that had happened.
21      Q     Did you review the tape?
22      A     No, no, I did not.
```

Page 42

```
 1      Q     And what was Officer Curtis'
 2   discipline, to your knowledge?
 3      A     To my knowledge, I believe he
 4   received five days at what we call five days
 5   in the street.
 6      Q     Right.  And it sounds as if the
 7   information that came to you -- and I know
 8   it's second hand -- was that he appeared not
 9   to be where he was supposed to be --
10      A     Correct.
11      Q     -- when the vehicle left.
12      A     That's right.
13      Q     And to your knowledge was it ever
14   learned where he was?
15      A     To my knowledge, no, sir, it never
16   was learned where he was.
17      Q     And then the other incident, you
18   said an officer was away from his post?
19      A     Which is in front, Post 41.
20      Q     Okay, and who was that officer?
21      A     Officer Sturgis, sir.
22      Q     And how did you become aware of
```

Page 43

```
 1   that?
 2      A     I was off duty, coming off duty,
 3   and the second shift commander, Commander
 4   Packard was discussing it with his sergeant.
 5      Q     Who was his sergeant?
 6      A     I can't remember at the time.
 7   IT's been so long ago, and I'm really not
 8   sure.  We've had a couple of different
 9   sergeants there this year.
10      Q     Approximately when was that?
11      A     A year and a half, year and
12   a half, somewhere in there.  About a year and
13   a half.
14      Q     And what was the -- to your
15   understanding what was -- what did the officer
16   do?
17      A     He was outside away from the desk,
18   and they had employees and an IG employee come
19   in behind him without him being at the desk.
20      Q     And when you say outside, was he
21   just out --
22      A     He was physically outside of the
```

Page 44

1    building but in front of the building.

2    Q    And the employees who went behind

3    him, I take it, gained access to the building.

4    A    Correct, sir.

5    Q    And some of those employees, I

6    take it, had badges that would activate the

7    gate or allow them access.

8    A    If I remember correctly at that

9    time, the gate wasn't there

10    Q    I see, and was there anything that

11    prohibited at that time persons entering

12    Building 4 from North Capitol Street from

13    going in either of the two doors?

14    A    No, the doors are the same.  Once

15    they got behind the officer, they could just

16    open it up and walk into the building, either

17    go upstairs or into the warehouse area.

18    Q    Okay.  The door at the end leads

19    upstairs?

20    A    They could go into either door.

21    Q    And the information that you

22    learned was second hand?  You weren't involved

Page 45

1    in an investigation?

2    A    No, I was not involved in an

3    investigation.

4    Q    And do you know what discipline,

5    if any, Officer Sturgis received?

6    A    The lieutenant said he received a

7    letter.

8    Q    A letter counseling?

9    A    I'm not sure whether it was a

10    letter of counseling or a letter of warning,

11    but he said he received  letter.

12    Q    Are you are of -- what's Wilson's

13    rank?

14    A    William Wilson is a sergeant, the

15    same rank as me, sir.

16    Q    Sergeant Wilson.

17    A    Un-huh.

18    Q    It's William Wilson?

19    A    That's correct, sir.

20    Q    And he was -- to your knowledge,

21    was he on duty the day of this incident,

22    Building 4?

Page 46

1    A    According to the log, sir, William

2    Wilson OIC for that day, and I believe that

3    was on a Sunday.

4    Q    An OIC is Officer in Charge?

5    A    That was the weekend duty he was

6    on.

7    Q    And to your knowledge, has

8    Sergeant Wilson ever been disciplined?

9    A    Not to my knowledge.

10    Q    Other than Sergeant Wilson, to

11    your knowledge on the day of the incident was

12    there anyone else on duty above the rank of

13    corporal?

14    A    No.  Wilson was the senior man in

15    charge.

16    Q    So there were no lieutenants or

17    commanders.

18    A    Not that day, no, sir.

19    Q    Is that unusual for Sunday?

20    A    Normally the weekend duties are

21    rotated.  Either there's a sergeant on or a

22    lieutenant on, and there's a weekend

Page 47

1    on/weekend off type thing, either a sergeant

2    and/or lieutenant.

3    Q    In this case, Officer White is

4    asserting that the chain of command failed in

5    responding properly to Officer Everett's call

6    for assistance, and he's asserting that

7    Sergeant White, rather than sending someone to

8    the aid of Officer Everett or going himself

9    because he was in the control center, first

10    told Officer Everett to call 911.

11    A    Sergeant White or Sergeant Wilson?

12    Q    Sergeant Wilson.  I'm sorry.

13    Yeah, thank you.

14    And that no assistance was

15    provided to Officer Everett until another

16    officer, I believe, Richardson ran from the

17    post on the other side of the building over to

18    North Capitol Street, at which point in time

19    Officer Everett had been injured, was

20    bleeding, and was still in a struggle with a

21    woman who was subsequently arrested.

22    And Officer White has asserted

Page 48

1   that this whole incident never would have
2   happened if Sergeant Wilson would have done
3   what he should have done.
4           And Sergeant Wilson is white and
5   has not been disciplined.  I need to ask you
6   whether in your opinion  you have observed any
7   disparities in the incidence and severity of
8   disciplinary actions brought against officers
9   who are African American versus those who are
10  white.
11      A    Tough question.  My opinion?
12  There's some inconsistencies, and I think that
13  comes from like of following policies and
14  procedures, and I can't hazard to guess what
15  the people in charge of thinking one day hand
16  out the disc.  That's just been my personal
17  observation.
18      Q    Let me see if I understand a
19  little bit.  Where there are clear policies
20  and procedures, it's pretty easy to determine
21  whether someone has done something wrong or
22  right.

Page 49

1       A    That's correct, sir.
2       Q    Where there aren't clear policies
3   and procedures, that determination becomes a
4   bit more subjective.
5       A    That's correct.  Very, very
6   subjective.
7       Q    And while one might agree that in
8   the area that falls into the subjective realm,
9   that is, where it's not necessarily spelled
10  out what something -- what should have been
11  done, there are  plenty of times when a
12  professional law enforcement person would
13  agree that something was done wrong.
14      A    Right.
15      Q    Even thought there's not --
16      A    I understand what you're saying.
17      Q    -- a rule that says you can't do
18  this.  So in those circumstances it's very
19  important for leadership to try to make
20  certain that on the penalty side of things,
21  they demonstrate consistency; is that correct?
22      A    That's correct.

Page 50

1       Q    And is it fair to say that I
2   interpret what you say as meaning that in that
3   particular type of context your perception,
4   your perception, your opinion is that  there's
5   not enough consistency perhaps in the penalty.
6       A    That's correct.
7       Q    And do you think that that is --
8   I'm not talking about intent here at all --
9   but is it your view that that is reflected in
10  the disparity of penalties between African
11  American officers and white officers and
12  supervisors?
13      A    If how you're going to discipline
14  somebody is left entirely up to the
15  individual, you're always going to have
16  problems.  There have to be parameters that
17  govern how and when and to what severity
18  somebody should be disciplined.  That
19  shouldn't be left up to how a person may or
20  may not feel or how a person may or may not
21  view an officer or in my case a supervisor.
22          If you don't have those things in

Page 51

1   place there's always going to be a wide range
2   of things that go on as far as discipline is
3   concerned, and they might get into the realm
4   of the personal.  If you have strict policies
5   and procedures in place, that very rarely
6   happens.  That's been my opinion.  That's been
7   my case.  It just very rarely happens.
8       Q    Without commenting on motives or
9   personal opinions, in that kind of discipline
10  that we're talking about here at the GPO, have
11  you seen a difference based on race?
12      A    Occasionally, yes.
13      Q    Okay.  One last thing.
14      A    Yes, sir.
15      Q    Were you aware that Brian Weese
16  escorted Mr. Van Horn, who might have predated
17  you, who worked over in Building 4, escorted
18  him into the secure area of Building 4 on an
19  evening?
20      A    What was the guy's name again?
21      Q    Weese, Brian Weese, escorted a
22  fellow named Van Horn who no longer is

Page 52

1  associated, is retired, and there was a --
2      A     Well, I know Mr. Van Horn is
3  retired, but Weese I don't know.
4      Q     Were you aware that somebody had
5  brought Van Horn into Building 4 recently?
6      A     That's what I was told.  There was
7  -- I can't recall what it said in the log, but
8  there was some mention of that.
9      Q     It was in the log?
10     A     Don't quote me on that.  I'm not
11  sure.
12     Q     And to your recollection -- let me
13  ask it differently.  Is Post 41 manned at all
14  times, 24 hours a day?
15     A     Twenty-four hours a day.
16     Q     Do you know who was on duty when
17  Van Horn went into Building 4?
18     A     That was a contract security
19  employee.
20     Q     Do you know whether that employee
21  was disciplined?
22     A     I haven't heard anything about any

Page 53

1  discipline for that employee.
2      Q     Have you observed or are you aware
3  of employees -- I'm sorry.  Let me change
4  that.
5            Have you observed or are you aware
6  of officers of escorting persons through
7  security check points and advising the person
8  protecting that location that the guest is
9  with the officer and as a consequence the
10  person providing security doesn't see any need
11  to check ID?
12     A     Occasionally that happens on what
13  we call sight recognition, people that might
14  have gotten their badges and we know for a
15  fact that this person does have a badge, and
16  the officer will escort the person up.  In
17  that case, no, they don't check their ID.
18            MR. HANNON:  Sergeant, those are
19  the only questions that I have.  Mr. Fine may
20  have some questions.  I don't know.
21            MR. FINE:  Just two, Officer or
22  Sergeant Dailey.

Page 54

1            CROSS EXAMINATION
2            BY MR. FINE:
3      Q     The Blackberry, that's an official
4  GPO Blackberry?
5      A     That's correct.
6            MR. HANNON:  Oh, they did give you
7  a Blackberry.
8            THE WITNESS:  Yeah, the
9  supervisor, they did.  Officers, it was like
10  I said a brief discussion, but nothing else
11  has come down.
12            MR. HANNON:  Okay.  Well, glad to
13  hear that.  Anything else?
14            MR. FINE:  Yes.
15            BY MR. FINE:
16     Q     Would it be your understanding of
17  the procedures for Building 41 that a guest
18  operating the buzzer that's behind the desk,
19  would that be a violation of the procedures?
20     A     There should be no gas operating,
21  any GPO equipment.  That's for the officer and
22  now for the contract employee.

Page 55

1      Q     It's just a guest of a friend of
2  an officer.  Should they ever be sitting
3  behind the desk?
4      A     No, sir.
5      Q     Between the doors for --
6      A     No, sir.
7            MR. FINE:  Okay.
8            REDIRECT EXAMINATION
9            BY MR. HANNON:
10     Q     Okay.  Sergeant, do you know who
11  was responsible last year for putting the flag
12  up and taking the flag down in that building
13  for?
14     A     I know before the change-over that
15  the GPO police were -- as it sounds now I'm
16  really not sure how we do that.  Occasionally
17  I have to send people out to do it, but
18  originally the contract security officers were
19  supposed to do that.  There seemed to be some
20  problem with their knowledge of how to handle
21  a flag.
22     Q     And before the contract officers

took over that responsibility, would it have been the GPO officer at Post 41 who put it up and took down the flag?

A That's correct, sir.

Q And so that officer would have to leave his post to do that?

A That's what was done, yes, sir.

Q And was that officer relieved for that purpose?

A No, generally he was not relieved.

Q Nobody was disciplined for putting the flag up or taking it down?

A No, sir.

MR. HANNON: Thank you, Sergeant.

MR. FINE: Could I have those two posters?

RECROSS EXAMINATION

BY MR. FINE:

Q In regard to Mr. Hannon's last question, flying the flag was a duty of the police officer on Post 41, wasn't it?

A That's correct.

Q So that's why no one was disciplined, because he was following the post order, right?

A Un-huh.

MR. HANNON: Lunch break?

MR. FINE: Yes, unless you have some other questions you want.

MR. HANNON: Before we go off the record, Sergeant, you have the right before your testimony becomes final to review the transcript of the reporter just to see if she has accurately recorded the questions and answers. Most people will just waive that and trust the reporter. Which do you want to do?

THE WITNESS: Can I review it?

MR. HANNON: Sure.

THE WITNESS: Okay.

MR. HANNON: We'll go off the record.

(Whereupon, at 1:44 p.m., the deposition of Aldustus Dailey, Jr., was concluded, signature being exercised.)

CERTIFICATE

This is to certify that the foregoing transcript in the matter of:

Deposition of Aldustus Dailey, Jr.

Date: Friday, August 10, 2007

Place: Washinton, D.C.

represents the full and complete proceedings of the aforementioned matter, as reported and reduced to typewriting.

____________________________

Neal Gross

**A**
**able** 9:2
**about** 7:18 8:4,5 10:19 12:20 13:18,21 14:9 18:13,14 20:13 22:7 26:1 31:3,16 39:19 40:14 43:12 50:8 51:10 52:22
**above** 33:6,9 46:12
**access** 44:3,7
**According** 46:1
**accurately** 57:12
**acquaint** 22:18
**across** 28:7
**act** 16:13
**action** 4:14 10:11 25:14 26:22 41:3
**actions** 11:15 48:8
**activate** 44:6
**actual** 21:15
**actually** 12:15 16:12,18 20:2,15 22:16 30:10 31:13 32:8 36:21 37:3
**address** 38:3
**adverse** 40:20
**advising** 53:7
**aforementioned** 58:24
**African** 48:9 50:10
**after** 7:22 18:17,17,21 18:22 19:21 20:20 21:15 22:20 24:4,6 31:21
**afternoon** 4:10,11
**again** 13:11 34:20 51:20
**against** 4:15 10:12 48:8
**agencies** 26:15
**Agency** 1:10 2:10
**ago** 5:16 18:13 30:2 34:3 41:13,15 43:7
**agree** 49:7,13
**aid** 47:8
**air** 28:4,7
**Aldustus** 1:15 3:14 4:4 57:21 58.10
**alert** 26:4
**allow** 44:7
**allowed** 20:14,14
**along** 39:6
**always** 6:11 50:15 51:1
**AMERICA** 1:1
**American** 48:9 50:11
**amount** 10:3
**and/or** 47:2
**another** 12:18,19 15:2 19:13 38:15 40:11 47:15
**answer** 14:19,20 19:3 35:4
**answers** 57:13
**anybody** 25:6 38:1
**anyone** 13:7,13 21:19 29:20 46:12
**anything** 11:2 12:12,22 13:10,16 40:21 44:10 52:22 54:13
**appeal** 4:14,19
**APPEARANCES** 2:1
**appeared** 42:8
**Appellant** 1:6,18 2:2 4:6
**apply** 14:15,15
**Approximately** 43:10
**area** 17:22 24:21 44:17 49:8 51:18
**arise** 4:20
**arising** 40:3
**arrest** 34:13 37:22
**arrested** 9:9 47:21
**arrive** 34:15
**asked** 37:21
**assault** 9:2 27:6 38:22 39:4,12
**assaulted** 27:8
**asserted** 47:22
**asserting** 47:4,6
**assist** 27:15
**assistance** 47:6,14
**Assistant** 39:21
**associated** 52:1
**attempting** 37:9
**attention** 8:9
**Attorneys** 39:20,21
**Attorney's** 36:14 39:5
**August** 1:13 58:14
**authority** 34:13,14
**available** 15:14 28:6
**aware** 16:1,9,21 18:15 18:19 21:16,22 27:5 33:20 36:6 38:19 39:17 40:3 42:22 51:15 52:4 53:2,5
**away** 40:12 42:18 43:17
**B**
**back** 13.1 17:20,21 20:5 21:11 22:14 24:2,5
**background** 5:1,3
**bad** 27:3 40:21
**badge** 53:15
**badges** 44:6 53:14
**based** 51:11
**became** 21:15 30:17
**become** 42:22
**becomes** 49:3 57:10
**before** 18:20 30:17 38:2 55:14,22 57:8,9
**begin** 5:11
**beginning** 22:5,13
**behalf** 1:21 2:2,10
**behind** 12:14 43:19 44:2,15 54:18 55:3
**being** 24:8 25:15 27:5 36:7 40:11 43:19 57:22
**beings** 24:21
**believe** 5:10 9:21 42:3 46:2 47:16
**believed** 9:4
**besides** 16:6
**between** 32:16 50:10 55:5
**big** 27:3
**billet** 7:2
**bit** 32:1 48:19 49:4
**Blackberries** 29:14,21
**Blackberry** 29:12,17 54:3,4,7
**bleeding** 47:20
**block** 24:12,14
**BOARD** 1:1
**book** 19:22
**both** 4:20 5:21 8:18 14:13
**bottom** 15:19
**box** 23:18
**break** 15:18,20 16:6 37:9 57:5
**break-in** 37:4 38:10
**Brian** 51:15,21
**brief** 54:10
**briefing** 8:6
**briefly** 30:1 31:1
**bring** 8:8 33:4
**brings** 33:3
**brought** 20:4 21:11 48:8 52:5
**building** 4:22 7:19 8:19 9:7 15:7,14 16:6,11 16:22 18:8 21:6,7 25:8 31.14,21 36:8 40:4,11 44:1,1,3,12 44:16 45:22 47:17 51:17,18 52.5,17 54:17 55:12
**bulk** 11:15
**Butler** 7:16,17
**buzzer** 54:18
**C**
**C** 4:1 15:18 21:7
**cafeteria** 15:16
**call** 23:19 30:5,7,13 33:11,15 42:4 47:5,10 53:13
**called** 1:17 4:5 22.17
**came** 7:14 12:2,3 19:15 20:9 42:7
**camera** 37:9
**Capital** 9:15
**Capitol** 1:20 2:15 44:12 47:18
**captured** 8:19
**car** 37:4,5,6,7
**care** 33:16
**carried** 6:11
**carry** 28:14 29:11,13
**case** 36:13,20 37:2,3,12 37:17 38:7,21 39:6,11 47:3 50:21 51:7 53:17
**cases** 38:8,14
**CCTV** 37:9
**cell** 29.11,13
**center** 9:20 47:9
**certain** 40:10 49:20
**CERTIFICATE** 58:3
**certify** 58:5
**chain** 32 18,20 47:4
**change** 19:17 20:22 21:1 53:3
**changes** 18:11,14,16,17 18:18,22 19:9
**change-over** 55:14
**charge** 46:4,15 48:15
**charged** 14:14
**check** 20:15 21:14,17 53:7,11,17
**checking** 40:17
**chief** 6:1 7:12,16,17 9:15
**circumstances** 28:12 32:12 39:3 49:18
**cleaned** 24:6
**clear** 48:19 49:2
**clearance** 22:14
**collaborated** 8:11
**come** 5:9 13:1 16:22 17:8 24:17,21 30:2 43:18 54:11
**comes** 25:6 28:4,7 48:13
**coming** 5:8 31:11,17 43:2
**command** 32:18,20 47:4
**commander** 6:16,20 7:1,5,6,9,22 9:13 10:8 11:10,11 12:15 19:16 20:5,18 21:11 27:21 32.9 35:11 43:3,3
**commanders** 46:17
**commented** 13:7,14,20
**commenting** 12:10 51:8
**comments** 13:18 24:2
**commitments** 17:10
**committed** 25:15
**communicate** 28:20,21
**complete** 24:4 58:23
**completed** 22:20
**concerned** 51:3
**concerning** 37:3
**concluded** 57:22
**conduct** 11:7 32:10
**conducted** 10:21 33:21
**configurations** 18:9
**configured** 17:18 18:1
**consequence** 40:18 53:9
**consistency** 49:21 50:5
**construction** 18:18
**contact** 17:1 25:7 32:19 33:10
**contained** 20:16
**contains** 19:22
**CONTENTS** 3:10
**context** 50:3
**contract** 31:5,17 32:2,5 32:13,13,16,17,20 33:1,21 34:7 52:18 54:22 55:18,22
**contractors** 31:11,14
**control** 9:20 47:9
**copy** 20:3 21:9,10 22:12,21,22
**corner** 12:14 24:13
**corporal** 31:2 41:18 46:13
**corporals** 5:22
**Corps** 5:6
**correct** 6:4 9:10 15:22 25:13,16 27:17 28:13 31:7 33:19 34:17 42:10 44:4 45:19 49:1,5,21,22 50:6 54:5 56:4,22
**corrections** 24:7
**correctly** 44:8
**counsel** 1:17 4:5 12:16
**counseling** 45.8,10
**couple** 27:7,7 38:9 41:13 43:8
**course** 8:7,10
**courthouse** 39:22
**crime** 25:14
**Cross** 3:12 35:9 54:1
**Curtis** 35:15 41:11 42:1
**C-147** 9:21,21
**D**

D 4:1
Dailey 1:15 3:14 4:4 53:22 57:21 58:10
Darnell 4:17 34:18 35:7
date 22:7,15,15,17 24:3 24:4,11,13 31:12 41:14 58:14
day 8:17 45:21 46:2,11 46:18 48:15 52:14,15
days 42:4,4
DC-0752-07-0729-I-1 1:8
deal 33:5
decision 27:21
definitive 30:2
demonstrate 49:21
demonstrated 6:7
demotion 7:10
department 5:7 24:9 30:16 38:6
depending 26:22 27:2 28:11
depends 28:3,6
deposition 1:15,18 57:21 58:10
Deputy 9:15
describe 5:17 40:8
described 39:3
describes 15:1
DESCRIPTION 3:19
desk 17:20 40:12 43:17 43:19 54:18 55:3
detain 34:14
determination 49:3
determine 48:20
dictate 17:10
difference 51:11
different 17:22 18:1,2,5 39:12,16 43:8
differently 52:13
DIRECT 3:12 4:8
Director 9:14 11:22
disagreements 6:10
disc 48:16
disciplinary 4:14 10:11 14:17 41:3 48:8
discipline 7:20 42:2 45:4 50:13 51:2,9 53:1
disciplined 35:13,18,21 36:4,7 40:19 46:8 48:5 50:18 52:21 56:11 57:2
discourse 19:6
discover 20:7
discovered 40:22 41:1
discuss 11:9
discussed 29:20 30:1 31:18
discussing 43:4
discussion 7:21 10:18 12:8,17,21 31:19 54:10
discussions 10:5,7 14:8
disparities 48:7
disparity 50:10
dispatch 27:2 30:14
dispatched 27:14
disposition 27:19
Docket 1:7
done 12:11 22:18 32:20 33:8 38:2 48:2,3,21 49:11,13 56:7
door 44:18,20
doors 44:13,14 55:5
down 11:12,16,16 12:2 20:11,20 21:10 28:4 30:2 36:22 38:7,11 39:22 54:11 55:12 56:3,12
downstairs 20:3,4
drafts 23:1,9
duly 4:6
during 18:19
duties 8:7,10 29:18 30:22 46:20
duty 16:11 26:3 27:20 43:2,2 45:21 46:5,12 52:16 56:20
D.C 1:14,20 2:7,16 58:18

E
E 4:1,1
each 7:5 8:11 11:2 21:12,13 22:21 29:10
easy 48:20
eating 15:6,10,13,17,21 16:2,4,5
effect 22:16
effective 22:17 24:10 24:13
either 10:12 15:6 32:9 44:13,16,20 46:21 47:1
employee 32:13,21 33:2 43:18 52:19,20 53:1 54:22
employees 31:6,17 32:3 32:5,14,17 34:8 43:18 44:2,5 53:3
employee's 37:7
employment 26:16
end 44:18
enforce 25:12
enforcement 5:4 25:11 49:12
enhancements 18:3
enough 50:5
entering 44:11
entirely 50:14
Epley 35:20
equipment 32:11 54:21
escort 53:16
escorted 51 16,17,21
escorting 53:6
ESQ 2:3,12
establish 10:8 11:13
established 22:4
Even 49 15
evening 51:19
event 13:14
events 8:12 10:9
ever 10:19 13:20 15:9 17:12 19:20 21:14 26:3 30:11,18 35:12 35:17,21 36:12 42:13 46:8 55:2
Everett 4:18 9:3,5 10:12,20,21 12:11 13:9,15 14:13 30:5 34:18 36:6 47:8,10,15 47:19
Everett's 47:5
everything 24:6
Ex 3:18
exact 10:3 41:14
exactly 11:13 31:15
examination 1:17 4:8 54:1 55:8 56:17
examined 4:7
example 38:22
excellent 6:8
exercised 57:22
experience 14:12 26:19 28:8 34:21 37:15 39:13
experienced 6:9
experiences 26:15
explain 33:11
E-mail 23:21
E-mailed 23:2

F
facility 15:13
fact 41:15 53:15
failed 47:4
fair 50:1
falls 49:8
family 16:10,22 17:8
far 13:18 39:15 51:2
feature 28:22
federal 25:10
feel 50:20
fellow 51:22
few 23:9
filled 7:11
filling 8:2
film 8:20
final 24:5 57:10
find 33:15 41:2
Fine 2:12 14:9,10 35:2 53:19,21 54:2,14,15 55 7 56 15,18 57:6
finished 25:18
first 4:6 13:8 22:6,8 31:16 47:9
five 5:6 42:4,4
fixed 32:4
flag 55:11,12,21 56:3 56:12,20
FLETC 33:18
floor 15:16,19
flying 56:20
folder 38:11
following 48:13 57:2
follows 4:7
food 15:15
FOP 30:19
force 7:1
foregoing 58 5
form 23:1,4
former 6:1
forth 13:2
found 8:5
Fox 36:1,2
frame 31:15
Friday 1:13 58:14
friend 17:7 55:1
friends 16:10,21
from 8:22 12:9 13:5 14:12 27:11 33:1 38:5 39:12,13 40:12 42:18 43:17 44:12,12 47:16 48:13
front 17:5 24:15 42:19 44:1
full 58:23
function 29:3

G
G 4:1
gained 44:3
gas 54:20
gate 44:7,9
gather 27:1
gave 27:19
general 5:18 13:17 14:11 18:10 24:1,9 28:1 31:10,19 32:9
generally 15:17 17:4 18:13 23:20 25:6 26:14 31:20 33:8 56:10
give 18:9 24:3 54:6
given 22:15,21,22 23:3 23:7,13 34:3 39:18
glad 54:12
go 11:12 17:3 19:20,21 20:11 24:5 31:18 33:17 38:6,11,15 39:6 44:17,20 51:2 57:8,18
goes 33:1
going 12:17 14:2,3 22:16 26:14 31:9,11 31:13,21 44:13 47:8 50:13,15 51:1
gone 26:4
good 4:10,11 34:22
gotten 53:14
govern 50:17
Government 1:9,19 2:14
GPO 5:9 13:13 14:17 24:17 25:7,8 26:2,7 27:9 32:17,19 34:12 38:20 39:1 51:10 54:4,21 55:15 56:2
Grab 11:11
grabbed 20:4 21:10
grainy 9:1
Gregory 36:1,2
Gross 58:29
Group 2:4
guards 33:22
guess 48:14
guest 53:8 54:17 55:1
gun 28:5
gunnery 25:20
guy 31:2 37:22
guy's 51:20

H
H 2:12
half 43:11,12,13
hand 33:1 42:8 44:22 48:15
handle 55:20
Hannon 2:3,4 4:9,12 35:4,8 53:18 54:6,12 55:9 56:14 57:5,8,16 57:18
Hannon's 56:19
happen 22:11 33:10 40:21 41:12
happened 8:2,3 11:14 11:14 40:15 41:20 48:2
happens 16:19 17:5,11 37:21 51:6,7 53:12
having 4:6 16:10,15 30:5
hazard 48:14
hear 54:13

heard 10:19 15:6,9 21:21 30:8,11 52:22
held 34:8
help 36:22 38:7
he'll 33:15
highlighted 8 11
him 4:15 6:9 34:21 41:2 43:19,19 44:3 51:18
himself 6:7 47:8
hit 29:16
Horn 51:16,22 52:2,5 52:17
hours 52:14,15
human 9:15 19:6 24:21

I
ID 53:11,17
IDENTIFIED 3:19
IG 14:4,6 43:18
immediate 14:20 33:9
immediately 26:22
important 49:19
improper 13:10,16
incidence 40:3 48:7
incident 4:21 7:19 8:1,2 8:4,16 10:14 11:10 13:8,21 14:3,9 21:16 36:8 40:2 42:17 45:21 46:11 48:1
incidents 4:20
include 25:4
inconsistencies 48:12
individual 9:6 50:15
inform 33:13
information 5:1 27:1 42:7 44:21
injured 47:19
inside 8:18
inspections 32:10
instances 15:10 17:6
instruction 37:16 39:18
intent 50:8
interact 39:20
interested 30:18
interpret 50:2
interviewed 14:5
investigated 14:4
investigation 41:17 45:1,3
involved 44:22 45:2
involvement 41:16
issuance 29:20
issue 18:4,7 20:17 33:1
issued 24:14
issues 35:3

J
J 2:3
January 22:6
job 5:20 34:6
Jordan 7:14,15
Jr 1:15 3:16 4 4 57:21 58:10
June 5:10
just 5:1,17 18:12 23:18 31:19 35:7 38:17,18 39:3 41:19 43:21 44:15 48:16 51:7 53:21 55:1 57:11,13

K
keep 21:8 23:6
kid 37:2
kind 6:6 51:9
knew 12:1
know 4:13 10:10,10,17 11:6 12:7 14:13 19:17 21:19 24:10 26:12 30:4,9 34:2,4 34:18 35:9,15 36:3 37:22 39:2,7,9,15 40:7 42:7 45:4 52:2,3 52:16,20 53:14,20 55:10,14
knowledge 15:1 18:10 19:19 31:10 34:9 35:12,14,17,20 39:10 42:2,3,13,15 45:20 46:7,9,11 55:20

L
Lamont 11:18,20 14:1
Landrau 9:15,16 11:18 12:2,6,13 13:20,22
last 4:21 51:13 55:11 56:19
later 8.17 24:2 26:2
law 2:4 5:4 25:11 49:12
laws 25:12
lead 32:7,12,20 33:2,2 33:4,5
leadership 30:18 49:19
leads 44:18
learn 7:18 20:21 22:10 31:8
learned 13:8,14 31:16 39:13 42:14,16 44:22
least 10:4 23:1 27:14 40:7
leave 56:6
leaving 40:10
led 7:19
left 31:2 40:16 42:11 50:14,19
lengthy 10:2
let 48:18 52:12 53:3
letter 45:7,8,10,10,11
let's 11:12 40:14
lieutenant 6.15 14:21 33:3 45:6 46:22 47:2
lieutenants 46:16
lieutenant's 21:9
like 32:11 48:13 54:9
line 10:9 11:13
little 26:1 32:1 48:19
LLP 2:4
lobby 17:22
located 15:16,18
location 21:4 27:2,15 30:15 53:8
locations 16:5
lock-up 37:19
log 8:1,17 41:19 46:1 52:7,9
long 9:22 43:7
longer 51:22
look 19:22 23:14,16
looked 19:15,21
looking 9:12 11:7 14:3
Lot 37:4
low 12:21
lower 24:12
Lunch 57:5

M
machine 17:19
made 18:11,14,15,18 18:19,22 19:9 24:7 30:5 37:19
major 33 14
make 17:1 27:21 32:11 38:17,18 49:19
makes 11:4
making 27:18
man 46:14
manned 31:5 32:5 52:13
manner 15:1
many 40:6
Marine 5:6 25:18
Marines 25:21
Marvin 6:15
materiality 35:3
matter 1:4 41:15 58:6 58:24
matters 4:20
may 5:2 17:2 22:6 50:19,20,20,20 53:19
mean 11:5 17:15 23:17 40:21
meaning 50:2
measure 29:22
measures 40:10
member 17:8
members 16:10
mention 52:8
MERIT 1:1
met 7:17
Metropolitan 38:5
Michael 2:3 4:12
might 6:10 31:18 49:7 51:3,16 53:13
military 26:17,18
mini 37:9
minimum 28:9,10
minutes 10:4
miss 29:16
mistakes 24:7
money 7:22
monitor 12:19 17:20 29:1
Monroe 6:1
months 31:3
more 28:11 36:21 49:4 39:5
morning 8:11
most 28:5 29:13 57:13
motives 51:8
MPD 28:20,22 29:1,6
myself 9:13 12 15 20:5

N
N 4:1
name 4:12 51:20
named 51:22
nature 8:12
Neal 2:12 58:29
necessarily 49:9
need 33:5 48:5 53:10
needs 33:4
never 21:21 28:1 42:15 48:1
new 9:20 22:3,9,19,21 23:3
next 37:20
night 8:3 36:9
Nobody 56:11
Nodding 19:2
None 3:21
normal 32:12
Normally 30:14 32:19 46:20
North 1:19 2:15 44:12 47:18
noted 41:19,19
nothing 30:2 38:9 54.10
notice 1:18
notification 29:6
N.W 1:20 2:6,15

O
O 1:5 2:22 4:1
Objection 35:2
obligation 25:11
observation 48:17
observed 15:6,9 16:4,9 16:21 37:8 48:6 53:2 53:5
occasion 16:17
occasionally 16:3 51:12 53:12 55:16
occasions 15:5 16:20
occupy 31:21
occur 31:9
occurred 4:21 30:10
occurring 27:1
occurs 26:7
October 4:21 6:17
off 12:14 22:15 24:8 43:2,2 47:1 57:8,18
office 1:2,9,19 2:14 17:5 21:8,10 36:14 39:5
officer 4:13 5:8,12,12 5:13,19 6:3,6,6,8 7:20 9:3,5 10:12,13,20,20 10:20 12:11,11 13:9,9 13:15,16 14:13,13 15:2,17 17:1,2,14 19:13 22:2,21 24:17 25:7,9,11 26:3 27:15 28:2,3,4 29:5,9 30:4 30:12 32:7,22 33:2,3 33:4,6,11,11,13 34:11 34:20 35:1 36:5,16,18 36:21 37:13 38:15,21 39:4 40:11,17,19 41:10,11 42:1,18,20 42:21 43:15 44:15 45:5 46:4 47:3,5,8,10 47:15,16,19,22 50:21 53:9,16,21 54:21 55:2 56:2,5,8,21
officers 5:21 11:8 13:18 14:15 15:6,10,14,20 16:1,10,17,22 17:7 22:19 23:2 24:20 25:3 26:6 27:5,7,11 27:14 28:5,16,18,21 29:13,21 30:14 32:18 34:7,15 39:11,19 48:8 50:11,11 53:6 54:9 55:18,22
official 54:3
officials 13:19
often 16:18
Oh 19:4 54:6
OIC 46:2,4
okay 6:5 7:17,18 9:11 10:18 11:17 12:5 13:4,7 14:22 17:17 18:11 19:5,7,20 21:14 22:10 23:11,15 25:17 26:12 27:22 28:19 36:5,16 40:14 41:5

42:20 44:18 51:13 54:12 55:7,10 57:17
old 21:2,2,5
once 22:13 44:14
one 5:20 11:2 12:18 15:2 40:9 48:15 49:7 51:13 57:1
ones 21:17
only 14:2 27.22 34:1 53:19
onto 24:18
on-site 33.20 34:1
on/weekend 47:1
open 44:16
operating 54:18,20
operational 17:10
opinion 6:6 34:22 48:6 48:11 50:4 51:6
opinions 51·9
opposed 24:18
order 15:1 20:8,16 21:2 21:3 22:22 23:21 24:1,8,9 27:19 57:3
orders 6:12 19:18 20:1 20:3,6,12,21 21:5,9 21:12,15 22:1,2,4,9 22:17,19 23:4,7,8,12 34:5
ordinary 8:7,10 11:2 19:6
originally 20:9 55:18
other 16:5 24:18 26:15 27:11 31:4 34:4,5,7 36.5,6 38:8,14 40:2,3 42:17 46:10 47:17 57:7
others 10:19 12:9 19:16
out 4:20 6:11 8:5,17 11:2 23:21 26:4 33:15 43:21 48:16 49:10 55:17
outside 8:19,22 9:6 40:11 43:17,20,22
over 4:22 12:20 19:20 19:21 28:4 30:1 31:14 34:3 47:17 51:17 56 1
overall 7:1,6
overhear 12:22
overheard 12:9
oversee 19:12
own 23:6 39:9

P
P 4:1
Packard 6:20 7:22 8:15 9:13 11:11,17 19:16 20:6,18 43:4
Packard's 6:21
page 24:15
paper 11:12 22:22 23:4 23:12 36:13,20 37:11 38:7,21
papered 38:8 39:6
papering 37:1,17 39:11
parameters 50:16
particular 15:3 50:3
parties 1:22
past 30:15
Paul 35:20
pen 11:11
penalties 50:10
penalty 49:20 50:5
people 16:17 26:21 27:2 34:4 48:15 53:13 55:17 57:13
perception 50:3,4
performance 29:18
perhaps 28:11 50:5
person 25:5 30:6 36:3 49:12 50:19,20 53:7 53:10,15,16
personal 48:16 51:4,9
personally 34:2 36:12
personnel 36:2
persons 24:17 25:3 36:7 44:11 53:6
phone 29:11
phones 29:13
physical 24:19
physically 43:22
piece 11:11
place 7:13 10:1,6 17:4 33:14 36:8 51:1,5 58:18
plan 24:19
plenty 49:11
point 25:9 47:18
points 53:7
police 5:13 7:12 14:15 21:8 24:9 25:2,7,8 32:21 34:11,15 38 6 55:15 56:21
policies 48:13,19 49:2 51:4
policy 26:6,8,9 38:20 39:1
position 6:21 7:8,11
positions 30:19
post 15:3,11 16:2,4,6 16:13,15,16,18 17·1 17:13,17 19:8,13,18 19:18,21,22 20:1,3,6 20:6,8,12,14,16,21 21:2,3,5,9,12,12,13 21·15,15 22:1,2,3,9 22:17,19,21 23:3,4,7 23:8,12,12,22 24:8,22 25:5 28:16 29:5,10 31:5 32:10 34:5 42:18,19 47:17 52:13 56:2,6,21 57:2
posters 56:16
posts 31:18,22 32:2,4
practice 30:16
predated 51:16
prepare 5:3
presence 25:15
present 1:21 2:19 4:13 6:14 9:11 41:5
pretty 48:20
previous 26 16
primarily 10:7
Printing 1:9,19 2:14
prior 5:8 8:3 37:15
private 20:10
probably 4:13 12:1
problem 27:12 29:6,7 32:22 33:9,12,12,14 33:16 35:6 40:9 55:20
problems 6:9 30:6 50:16
procedure 39:10
procedures 48:14,20 49:3 51:5 54:17,19
proceedings 58:23
process 14:17 37:1 38:10
professional 5:18,21 6:5,11 49:12
professionally 34.21
prohibited 44:11
promoted 5:14 6:1
properly 10:21 40:22 41:1 47:5
properties 25:4
property 24:18
prosecutor 38:13
protect 24:21
protecting 53 8
protection 1:1 24:19 25:3,8
protocol 30:12
provided 47·15
providing 53:10
purchase 15:15
purpose 11:6 56:9
pursuant 1:18
pursuing 4 19 30 18
put 23:18 31:22 56:2
putting 40:17 55:11 56:11
p.m 4:2 57:20

Q
question 13:11 20:13 31:12 35:5 48:11 56:20
questions 14:12 24:2 53:19,20 57:7,12
quite 10:2 23:9
quote 52:10

R
R 4:1
race 51:11
radio 28:14 29:1,2,7
radios 28:17,18,19 29:3 34:16
Rafael 9:16 11:18
raised 20:17
ran 25:21 47:16
range 51:1
rank 5:11 25:18 45:13 45:15 46:12
rarely 14:10 51:5,7
rather 47:7
read 8:17
really 10:2 22:7 25:2 29:15 43:7 55:16
realm 49:8 51:3
reason 10:22
recall 27:10 52:7
received 22:12 41.3 42:4 45:5,6,11
recently 4:18 52:5
recognition 53:13
recollection 52:12
record 57:9,19
recorded 57:12
RECROSS 3:12 56:17
REDIRECT 3:12 55:8
reduced 58:25
reflected 50:9
regard 56:19
regardless 8:12
REGIONAL 1:2
regular 5:12
relationship 5:18 32 16
relieve 15:2
relieved 17:2,7 56:8,10
remember 10:3 22.4 31:15 40:13 41:14 43:6 44:8
removed 4:18
report 6:13,14,18
reported 6.19 58:24
reporter 57:11,14
reporting 32:15
represent 4 17
representational 30:22
represents 58:23
request 17:9 29:6
required 33:17 36:20
requirements 34:6
requires 39:5
respective 1:22
respond 26:21 28:2
responding 47:5
response 27:11,13 28:4
responsibilities 19:12 24:20 25:2
responsibility 24:16 56:1
responsible 27:18 55:11
result 36:7
retired 38:5 52:1,3
review 8:15 9:22 10:6 10:15 11:1,7 22:12 23:22 24:5 41:21 57 10,15
reviewed 8:16,18 20:6 24:14
reviewing 8:1 9:19 12:16 21:3
Richardson 47:16
right 12:20 17:16 19:1 28:14 31:6 38:18 41:7,9 42:6,12 48:22 49:14 57:3,9
right-hand 24:13
Rivera 37:14,14 38:4 39:14
Robert 1:5 2:22 4:13 35:15
Robertson 31:3
roll 23:19
room 9:21 15:18,18,20 16:7 21:7
rotated 46:21
rule 28:1 32:9 49:17

S
S 4:1
safety 24:17
same 20:8 34:8,10 38:11 44.14 45:15
saw 8:22 9:4
saying 49:16
says 49:17
seal 40:17 41:8
sealed 40:22 41:2
seasoned 36:21
second 42:8 43:3 44:22
Secretary 31:1
secure 18:8 51:18
security 5:7 9:14 11:22 17:19 18.4,7 29:21 33.22 36.3 40:3,10 52:18 53:7,10 55:18
see 9:2 11:1,4,13 13:4 14:10 20:15 21:4 38:12 44:10 48:18

53:10 57:11
seemed 55:19
seen 51:11
send 23:21 26:21 28:1,5 28:9 31:13 55:17
sending 47:7
senior 46:14
sense 11:4
sent 36:22 37:11
sergeant 4:10 5:15 6:1 6:2 18:22 25:20 30:17 33:6,8 36:17 37:14 39:14 43:4,5 45:14,16 46:8,10,21 47:1,7,11,11,12 48:2 48:4 53:18,22 55:10 56:14 57:9
sergeants 43:9
serious 27:3
served 31:1
service 25:19
Services 12:1
serving 7:2
set 22:3,13 23:6
sets 23:8 25:2
several 23:8
severity 48:7 50:17
sexy 38:9
shift 6:16,22 7:5,9,9 8:13 27:20 32:9 35:10,11 43:3
shifts 7:3,6
showed 31:22
side 12:14 47:17 49:20
sight 53:13
signature 57:22
signed 22:15
signs 24:8
since 13:8,14 19:9 20:9 26:2 27:4,8 29:2 30:3
sir 4·16 6:4 9:1,10,17 9:20 10:22 11:19 12:4,7 13:3,22 15:8 15:12,22 16:8 19.4 21:13,18 23:5 25:16 25:19,22 26:5,10 27:17 28:15 29:12,19 30:15 31:7 33:19 34:19 35:10,16,19,22 36:10,11 40:1,5 42:15 42:21 44:4 45:15,19 46:1,18 49:1 51:14 55:4,6 56.4,7,13
sit 21:21
sitting 12:15 55:2
six 31:3
small 33:12
solve 33:13
some 5:1 13·17 14:11 20:13 22:5,8 23:1 29:15,16 31:10 34:2 44:5 48:12 52:8 53:20 55:19 57:7
somebody 18:6 50:14 50:18 52:4
someone 16:15 47:7 48:21
something 8:8 23:18 28:5 48:21 49:10,13
somewhere 43:12
sorry 13:13 18:21 19:4 47:12 53:3
sort 8:14 19:5
sounds 42:6 55:15
speak 17:3
special 32:21
spelled 49:9
spent 5 6
SPO 32:21
SPOs 34:12
SR 1:5
standards 14:14 34:8 34:10
start 16:14
State 5:7
States 1:1 5:6 39:20,21
statute 25:1
statutory 34:6
Steven 6:20 8:15 35:9
still 21:2 22:2 29:4 31:12 38:10 47:20
street 1.20 2:6,15 42:5 44:12 47:18
strict 51:4
strictly 5:20
struggle 47:20
struggling 9:6
stuff 32:11
Sturgis 42:21 45:5
subject 14:16 20:18
subjective 49:4,6,8
subsequently 47:21
Sunday 46:3,19
supervise 32:8
supervised 32:6
supervises 32:13
supervisor 6:3,22 14:21 27:20 32:10 38:4 39:6 50:21 54:9
supervisors 32:17 50:12
supervisory 19:11
supervisor's 29:1
supposed 15:17 21:13 32:8 38:20 39:19 42:9 55:19
sure 16:19 21:20 22:7 29:3,15 32:11 38:17 38:18 43:8 45:9 52:11 55:16 57:16
surprise 32:1
sworn 4:6
SYSTEMS 1:1

T
TABLE 3:10
take 9:22 14:16 25:14 33:16 44:3,6
taken 8:22 10:12
takes 17:4
taking 10:6 33:14 55:12 56.12
talk 26:1 40:14
talking 8:4 13:5 50:8 51:10
tape 11:1 12:16 13:2,4 41:2,6,21
tapes 10:16 19:16,21
telephone 29·7,8,10
tell 5:2 12:18 18:6 33:15
temporary 7:2,12
terms 17:18
testified 4:7
testimony 57:10
thank 47:13 56:14
theft 37:4
their 12:21 15:10 16:2 16:4,6 24:22 32:18 53:14,17 55:20
themselves 10:21 28:2
thing 47:1 51:13
things 8:12,14 49:20 50:22 51:2
think 13:15 22:5,6 23:11 31:2 48:12 50:7
thinking 48:15
though 37:15
thought 12:10 49:15
three 7:3,6 35:11 41:14
through 33:17 37:1 39:13 53:6
time 6:14,19 7:1,2,7 10:3,9,11,14,15 11:10 11:13 17:22 22:5,8 23:20 30:3,9 31:15 36:17,18 37:13 41:18 43:6 44:9,11 47:18
times 6:2 49:11 52:14
today 17:18 21:22
together 5:21,22 12:3
told 30:6,12 47:10 52:6
Tough 48:11
trained 36:19
training 33:18,21 34:1 34:2 37:16 39:18
transcript 57:11 58:6
transition 31:9
transmissions 29:2
trouble 26:4 28:3 30:12
trust 57:14
try 11:12 49:19
trying 10:8
turnover 29:2
turnstile 17:19
turnstiles 17:21
Twenty-four 52:15
two 5:16 7:9 12:3 27:14 27:16,22 28:9,10 32:5 38:14 40:7,8,12 41:14 44:13 53:21 56:15
type 47:1 50:3
typewriting 58 25

U
under 25:8 32:12 37:22
understand 7:18 9:8 25:10 48 18 49:16
understanding 12:6 43:15 54:16
Understood 17·12
unidentified 9:5
uniform 15:14 34:7 39:3
United 1:1 5:6 39:20,21
units 28:6
unless 57:6
until 5:22 7:12 34:15 47:15
unusual 46:19
un-huh 17:16 45:17 57:4
upstairs 20:5 22:14 44:17,19
use 15:20 29:9,17
U.S 5:7 25:17 36:13 39:5

V
v 1:7
van 37:10 51.16,22 52:2,5,17
vehicle 40:9,15,16 41:8 42:11
Vernon 9:14 11:18,21 12·13 14:1 23:20 24:5
versus 48:9
very 14:10 49:5,5,18 51:5,7
veteran 5:5
via 32:20
victim 38:21,22 39:4,12
victims 27:5
video 8.22 9:12
videotapes 8:18,21 9:19
view 50:9,21
viewing 8:21
violating 14:14
violation 54:19
visit 16:15,18
visitors 20:19
volunteered 38 6

W
waive 57:13
walk 36:22 44:16
want 14:11 28:9 57:7 57:14
wanted 8:8 20:15
warehouse 44:17
warning 45:10
Washington 1:2,14,20 2:7,16 6:15,15 14:21
Washinton 58:18
wasn't 12:22 30:8 37:5 37:6 40:22 41:1,5 44:9 56:21
watch 13:2
way 12.18 17:18
weekend 46:5,20,22
Weese 51:15,21,21 52:3
well 9:8 22:20 25:1 29:8,11 32:15 52:2 54:12
went 11:9 20:2,20 21:5 21:10 44:2 52:17
were 1:21 5:14,21 8:1,4 8:13 9:2,4,12,18,19 10:5,7,8,22 11:20 12:14,15,19,20 13:5 14:2,5 15·10 18:11,14 18:15,18,19,22,22 21:3 22:1,1,13 23:2,3 23:13 25:17,18 27:13 27:14,16 30:17 31 11 31:13,21,22 33:17 36:16 37:19 46:16 51:15 52:4 55:15,18
weren't 44:22
we'll 4:18 16:14 26.1 33:15 57:18
we're 51:10
we've 26:14 37:22 43:8
while 10:6 16:11,12,14 49:7
whispers 12:21
white 1:5 2:22 4:14 5:19 6:3,7 7:20 10:13 10:20 12:11 13:9,16 14:13 34:20 36:5 47:3,7,11,22 48:4,10

| | |
|---|---|
| 50:11 | 22:1,2 23-3;12 31:5 |
| **whole** 48:1 | 42:19 52:13 54:17 |
| **wide** 51:1 | 56:2,21 |
| **William** 45:14,18 46:1 | **45** 10:4 |
| **Wilson** 45:14,16,18 | |
| 46:2,8,10,14 47:11,12 | **5** |
| 48:2,4 | **512-0200** 2:17 |
| **Wilson's** 45:12 | **54** 3:16 |
| **witness** 3:12,4:5 55:6 | **55** 3:16 37:4 |
| 54:8 57:15,17 | **56** 3:16 |
| **woman** 47:21 | |
| **wondering** 37:20 | **7** |
| **words** 24:18 | **732** 1:19 2:15 |
| **work** 5:3 17:14 31:13 | |
| **worked** 17:12,17 19:8 | **9** |
| 51:17 | **911** 30:7,13 47:10 |
| **working** 19:13 | **97** 20:10 |
| **works** 29:4 | |
| **written** 26:9 | |
| **wrong** 12:12 48:21 | |
| 49:13 | |
| | |
| **X** | |
| **X-ray** 34:2 | |
| | |
| **Y** | |
| **Yeah** 7:4 47:13 54:8 | |
| **year** 4:21 18:13,14 22:6 | |
| 22:8 30:2 34:3 43:9 | |
| 43:11,11,11,12 55:11 | |
| **years** 5:6,16 41:13,14 | |
| | |
| **J** | |
| **1:44** 57:20 | |
| **10** 1:13 58:14 | |
| **109** 15:19 21:8 | |
| **12:46** 4:2 | |
| **18th** 2:6 | |
| **1901** 2:6 | |
| **1997** 5:10 | |
| | |
| **2** | |
| **20th** 22:7 | |
| **20-year** 5:5 | |
| **20009** 2:7 | |
| **2006** 6:17 | |
| **2007** 1:13 58:14 | |
| **2008** 2:8,17 | |
| **20401** 2:16 | |
| **232-1907** 2:8 | |
| **24** 52:14 | |
| | |
| **4** | |
| **43**:16 4:22 7:19 8:19 | |
| 9:7 31:14,21 36:8 | |
| 40:4,12 44:12 45:22 | |
| 51:17,18 52:5,17 | |
| **41** 17:13,17 19:18,21 | |
| 19:22 20:6 21:15,17 | |

Transcript of: **Rafael Landrau**

**Date:** August 13, 2007
**Volume:**

**Case:** White v. U.S. GPO

Neal R. Gross & Co., Inc.
Phone: 202-234-4433
Fax: 202-387-7330
Email: info@nealrgross.com
Internet: www.nealrgross.com

---

Page 1

UNITED STATES OF AMERICA
MERIT SYSTEMS PROTECTION BOARD
WASHINGTON REGIONAL OFFICE
|----------------------+

In the Matter of:       :
                        :
ROBERT O. WHITE, SR.,   :
                        :
            Appellant,  :
                        :
        v.              : Docket No.
                        : DC-0752-07-0729-I-1
                        :
GOVERNMENT PRINTING     :
OFFICE,                 :
                        :
            Agency.     :
                        :
|----------------------+
                        Monday, August 13, 2007
                        Washington, D.C.
DEPOSITION OF:
RAFAEL E. LANDRAU

called for examination by the counsel for the
Appellant, pursuant to notice of deposition,
at the Government Printing Office, 732 North
Capitol Street, N.W., Washington, D.C., when
were present on behalf of the of the
respective parties:

Neal R. Gross & Co., Inc.
(202) 234-4433

---

Page 2

APPEARANCES:

    On Behalf of the Appellant:

        J. MICHAEL HANNON, ESQ.

    of:   Hannon Law Group, LLP

        1901 18th Street, N.W.

        Washington, D.C. 20009

        (202) 232-1907

    On Behalf of the Agency:

        NEAL H. FINE, ESQ.

        Government Printing Office

        732 North Capitol Street, N.W.

        Washington, D.C. 20401

        (202 ) 512-0200

    Also Present:

        ROBERT O. WHITE

Neal R. Gross & Co., Inc.
(202) 234-4433

---

Page 3

TABLE OF CONTENTS

WITNESS        DIRECT CROSS REDIRECT RECROSS

Rafael E.

    Landrau        4

Ex.

NO.  DESCRIPTION                IDENTIFIED

    (None)

Neal R. Gross & Co., Inc.
(202) 234-4433

Page 4

```
 1              P R O C E E D I N G S
 2                              (2:33 p.m.)
 3   Whereupon,
 4              RAFAEL E. LANDRAU
 5   was called as a witness by counsel for the
 6   Appellant and, having been first duly sworn,
 7   was examined and testified as follows:
 8              DIRECT EXAMINATION
 9   BY MR. HANNON:
10      Q     State your full name, please, and
11   spell your names for this lady.
12      A     Sure.  My full name is Rafael, F-
13   a-f-a-e-l, middle initial E. for Enrique, E-n-
14   r--i-q-u-e, last name Landrau, L-a-n-d-r-a-u.
15      Q     And what is your position here at
16   the GPO?
17      A     Current position is Deputy Chief
18   Human Capital Officer for the GPO.
19      Q     And how long have you held that
20   position?
21      A     Since October 17th, I believe,
22   2005.
```

Page 5

```
 1      Q     In that position, do you have any
 2   responsibility for the Inspector General's
 3   Office?
 4      A     No.
 5      Q     How is a decision made as to
 6   whether the Inspector General will investigate
 7   an incident here involving an employee?
 8      A     I don't know.  I don't know the
 9   intricacies of the IG.
10      Q     So that's not something that you
11   can instigate?
12      A     No.
13      Q     And in your position do you have
14   counsel here that you can turn to for legal
15   advice if you need it?
16      A     I don't understand.  Personally
17   or --
18      Q     No, no, no.  To counsel you in
19   your job.  You know, if you need legal advice
20   to do your job, is there someone at the GPO --
21      A     The OGC, the Office of General
22   Counsel, exists to support the agency.  I
```

Page 6

```
 1   guess that's what I mean.  I basically am
 2   not sure.
 3      Q     That's what I mean.
 4      A     Okay.  Yes.
 5      Q     So if you needed legal information
 6   in support of your mission, you would turn to
 7   the Office of General Counsel.
 8      A     I'm not sure I understand exactly.
 9      Q     Well, who's the lawyer for -- the
10   Office of General Counsel provides legal
11   advice to the GPO.
12      A     Yes.
13      Q     Is that correct?
14      A     That's correct.
15      Q     And that would include the Office
16   of Human Capital, if necessary.
17      A     Yes.
18      Q     That's all I --
19      A     Okay.
20      Q     I just wanted to know --
21      A     I'm sorry.  I just wasn't --
22      Q     No, not personal.  I just wanted
```

Page 7

```
 1   to know where you would go for legal advice.
 2      A     Okay.
 3      Q     Now, in your role, such as the one
 4   you had in this case, you were the final
 5   decision maker.
 6      A     Deciding official.
 7      Q     The deciding official.  What is
 8   your understanding as to how you're supposed
 9   to conduct yourself as the deciding official?
10      A     I see it as an independent
11   reviewer of what has been recommended by
12   normally someone in my chain of command after
13   an appropriate opportunity has been given for
14   all parties to present their views.  That's
15   when my role comes into play as a deciding
16   official.
17      Q     In your role as a deciding
18   official, do you have any responsibility to
19   investigate an incident?
20      A     I'm not sure I understand the part
21   "investigate."
22      Q     Yes.
```

Page 8

1     A     But if -- let me see if I am
2  answering.  If I find that there is a need for
3  clarification while I'm doing the review of
4  the facts, then I have the responsibility to
5  clarify those facts.
6     Q     What about before there's any
7  proposal for discipline that comes to you?  Do
8  you ever participate in the actual
9  investigation as to whether an employee has
10  engaged in misconduct?
11     A     No, I do not conduct
12  investigations.
13     Q     Is it fair to say that when you're
14  -- I'm sorry.  Are you always the deciding
15  official?
16     A     No.
17     Q     Under what circumstances would you
18  not be the deciding official?
19     A     If the person who is recommending
20  is not my direct subordinate, then it's
21  unlikely that I would be the deciding
22  official.

Page 9

1     Q     So in this case the recommending
2  official was Lamont Jordan.
3     A     Yes.
4     Q     So that means that --
5     A     Vernon.
6     Q     Lamont Vernon.  So that means that
7  you would be the deciding official.
8     A     Yes, sir.
9     Q     Now, in this case, this matter was
10  investigated by the Office of the Inspector
11  General.  Do you know that?
12     A     Yes.
13     Q     Okay, and do you know how it was
14  determined that the Office of the Inspector
15  General conduct this investigation?
16     A     I have no idea.
17     Q     Okay.  Would Lamont Vernon be
18  permitted to direct the Inspector General's
19  Office to conduct an investigation of employee
20  misconduct?
21     A     Not to direct, no.
22     Q     Could he request?

Page 10

1     A     He could just like any other
2  employee, could bring matters to the IG that
3  they deem that require review by the Inspector
4  General.
5        But you don't know how this matter was
6  referred to the IG?
7     A     I don't know how the IG got the
8  information to review this case.
9     Q     Do you know whether the IG relies
10  upon the Office of General Counsel for legal
11  advice and assistance?
12     A     I don't know that.
13     Q     Did you know that Mr. Fine
14  participated in the investigation conducted by
15  the Inspector General's Office in the case?
16     A     I have no idea.
17     Q     The first proposal for discipline
18  of Mr. White was that he be discharged as an
19  officer.  Do you recall that?
20     A     No, I don't.  Discharge?
21     Q     Yes.  The first proposal was a
22  proposal for removal, and then for some reason

Page 11

1  Lamont Vernon called Officer White in and gave
2  him a new proposal which was for 14 days'
3  suspension and reduction of rank.
4     A     Okay.  That's what I remember.
5  I'm not sure.  I mean, a lot of time have
6  elapsed.
7     Q     Right.
8     A     But that's what I remember.
9     Q     Well, do you know why the
10  proposing official changed the proposal from
11  removal to suspension?
12     A     I don't know.
13     Q     Have you ever know that to occur
14  before in your experience?
15     A     Probably has happened before,
16  yeah, that recommending officials change their
17  mind versus based on as findings are
18  discovered.  I really don't know how it
19  happens, but --
20     Q     Do you recall if you had any
21  discussions with Lamont Vernon about his
22  hanging the proposed discipline?

Page 12

```
 1      A      I did not discuss with Mr. Vernon
 2   that matter, no.
 3      Q      Have you been advised as to the
 4   nature of the evidence that's been produced in
 5   the depositions that have taken place here --
 6      A      No.
 7      Q      -- so far?
 8      A      No.
 9      Q      Okay.  I want to report to you
10   that Sergeant Dailey testified under oath that
11   he has perceived a disparity in penalties
12   imposed based upon race among GPO officers.
13   Did you know if any officers particularly or
14   sergeant held that view?
15      A      No, I do not know that.
16      Q      Okay.  In reference to this
17   particular case, your decision removing
18   Officer White was based upon his not
19   following --
20      A      Not removing.
21      Q      I'm sorry.  Thank you.
22             -- suspension and reduction in
```

Page 13

```
 1   grade.
 2      A      Right.
 3      Q      Was based upon his not following
 4   the post orders at Post 41.  You became aware
 5   in the disciplinary case of Officer Everett
 6   that Officer Everett admitted that he relieved
 7   Officer White while the two women were with
 8   him; isn't that correct?
 9      A      I heard that in his testimony he
10   stated that he used the words, "I've got it."
11      Q      And do you recall that Officer
12   Everett admitted that when he stated, "I've
13   got it," he had relieved Officer White?
14      A      I believe that's his
15   understanding, yes.
16      Q      And at that point Officer Everett
17   was responsible for Post 41, correct?
18      A      That's correct.
19      Q      And he would then be responsible
20   for the two persons who were with him, who had
21   accompanied him into Post 41?
22      A      He would be responsible for the
```

Page 14

```
 1   post.  That's true, yes.
 2      Q      Now, there's also been testimony
 3   that there are no formal procedures regarding
 4   how one officer relieves another at a post; in
 5   other words, I don't know if you have any
 6   military experience.
 7      A      I do.
 8      Q      Well, you understand in the
 9   military there are strict procedures so that
10   it's clear who has responsibility for a post
11   at a particular moment.  Do you understand
12   that?
13      A      I do.
14      Q      And there's been plenty of
15   testimony here that there are no such orders
16   at the GPO.  So the reason I raise that is one
17   of the things that Sergeant Dailey testified
18   to, and he's a 24-year Marine Corps veteran,
19   a gunnery sergeant at his retirement; he said
20   that in circumstances where the orders that
21   apply to the conduct of a police officer are
22   not specific, he felt that in those
```

Page 15

```
 1   circumstances there was a clear disparity
 2   between the penalties imposed upon black
 3   officers versus white officers.
 4             Do you have a view as to whether
 5   there's a disparity of penalties under those
 6   circumstances?
 7      A      No, I do not.
 8      Q      His explanation, for example, in
 9   this case, is that whereas in the military an
10   officer knows exactly when he's become
11   responsible for the post.  At GPO that's not
12   completely clear.  Do you understand that?
13      A      I understand what you said.  I
14   don't define what constitutes properly relieve
15   in the post within the services, but that's
16   something that obviously should be addressed.
17      Q      I agree.  Did you make up your own
18   mind -- and it may not have even occurred to
19   you -- but did you make up your own mind as to
20   at what moment Officer White had been relieved
21   of his responsibilities at Post 41 by Officer
22   Everett?
```

Page 16

```
 1        A    I saw the situation as described
 2   as a fluid situation.  I did not see a certain
 3   point in time or space in which one ceases to
 4   have responsibility for actions in its
 5   location or surrounding environment.
 6        Q    You understand that Post 41 was a
 7   one-person post at the time?
 8        A    Yes.
 9        Q    Do you recall whether part of your
10   reasons for removing Officer Everett was that
11   he had failed to follow the post orders at
12   Post 41 in terms of screening personnel?
13        MR. FINE:  Objection.  This is not
14   relevant to the issue of what's concerning
15   Officer White's demotion.
16        MR. HANNON:  You can answer that.
17        THE WITNESS:  Do I answer it,
18   Dave?
19        MR. FINE:  You have to answer.
20   It's an irrelevant question.
21        THE WITNESS:  The reason on the
22   recommendation and sustainment in my part for
```

Page 17

```
 1   dismissal was larger than the mere following
 2   the post orders for the GPO.
 3        BY MR. HANNON:
 4        Q    For Officer Everett?
 5        A    I'm sorry.  For Officer Everett.
 6   Is that not what I said?
 7        Q    Yes, that's what I was asking.
 8        A    Right.
 9        Q    But part of the reason for his
10   removal was his failure to follow post orders
11   as well.
12        A    That's one of the aspects of, yes.
13        Q    Okay.  So the concern that I have
14   is -- and I understand there are other issues
15   with respect to Officer Everett -- the concern
16   that I have is that you are holding two
17   officers responsible for following the post
18   orders at Post 41 in essence at the same
19   moment in time, when it was clear between the
20   two officers at what point one was being
21   relieved by the other.
22        And since you understand that
```

Page 18

```
 1   Officer Everett has acknowledged relieving
 2   Officer White, Officer White doesn't
 3   understand why he's being disciplined for
 4   leaving the post to Officer Everett without
 5   taking further action to screen the two
 6   individuals who clearly were with Officer
 7   Everett.
 8        Can you explain your thinking in
 9   disciplining Officer White under those
10   circumstances?
11        A    Sure.  Officer White, at the time
12   Acting Sergeant White, supervisor in charge,
13   and I understand that during your oral reply
14   you made a distinction of the terms of officer
15   in charge, but he is the supervisor.  He is
16   the sergeant.  He holds the position of
17   authority.  He holds the position which is to
18   be emulated and followed by all of the other
19   officers.  He sets the standards of excellence
20   for how to appropriately manage a post.
21        I saw the situation, as every
22   situation, as fluid.  I did not look at the
```

Page 19

```
 1   situation as of our X minute, X second, X one
 2   is no longer responsible for the situation.
 3   The post is the post.  Sergeant White had
 4   responsibility for the circumstances
 5   surrounding that post.  He is the senior
 6   officer between the two individuals at that
 7   time managing that post.
 8        If that junior officer does not
 9   follow a certain step, certain direction, it
10   is the expectation of that supervisor to set
11   the standard, set the examples.  And what I
12   considered most was if Acting Sergeant White
13   at the time had taken appropriate actions, all
14   of the following actions resulting in that
15   evening would have been avoided.
16        Q    And what action was it that you
17   felt that Officer White should have taken?
18        A    I felt like if he saw two
19   individuals whom he did not recognize or even
20   if he recognized them, he should have
21   appropriately identified those individuals by
22   asking them for their ID cards.  He should
```

Neal R. Gross & Co., Inc.
(202) 234-4433

Page 20

```
 1   have seen those ID cards, and he should have
 2   insisted that appropriately those -- if they
 3   were government employees and they needed to
 4   come through, that those items that they were
 5   carrying would have been placed through the X-
 6   ray machine.
 7         If they were not government
 8   employees as the case was, he should have
 9   taken appropriate action, and those
10   individuals should not have trespassed to a
11   federal government installation where non-
12   government employees are not authorized unless
13   under specific circumstances.
14   Q    If Officer White were not in a
15   temporary supervisory sergeant position, would
16   you have disciplined him?
17   A    If I was aware of the situation
18   and the recommending official would have made
19   recommendations and I was the deciding
20   official, I would review those under those
21   circumstances.
22   Q    But I'm talking about everything
```

Page 21

```
 1   being exactly the same, except Officer White
 2   was not at the time a supervisory acting
 3   sergeant.  Would you still have imposed
 4   discipline on him?
 5   A    I think that borders the
 6   definition of speculation that I would rather
 7   not do at this point.  He was an acting
 8   sergeant, and those were the circumstances at
 9   the time on that day.  So that's all that I
10   can evaluate at that time.
11   Q    Well, the reason I asked that is
12   because if the individual being relieved was
13   simply an officer and the person relieving
14   them was simply an officer, it seems to me
15   that neither one of them has the obligation,
16   as you say, to monitor the conduct of the
17   other.
18         And in this circumstance, it seems
19   to me as if you are imposing upon Officer
20   White an obligation to review the conduct of
21   Officer Everett and question the conduct of
22   Officer Everett when Officer Everett
```

Page 22

```
 1   represents that these two persons are with him
 2   and he has the post.
 3         So if that's your thinking, that
 4   you're imposing a higher standard on Officer
 5   White because he was a supervisor, then to me
 6   it stands to reason that if he were not a
 7   supervisor, there wouldn't be a basis for
 8   discipline.
 9   A    You're asking me or --
10   Q    Yes.
11   A    And what is the question?  What is
12   the question exactly?
13   Q    Well, the question, it's by way of
14   explaining my question to you that if Officer
15   White were not in a supervisory capacity, you
16   would not have imposed this discipline because
17   the essence of your letter talks about him
18   being in a supervisory capacity.
19   MR. FINE:  Objection.  He just
20   answered that question and said it was
21   speculative.
22   MR. HANNON:  You can answer it.
```

Page 23

```
 1   THE WITNESS:  As I said before, I
 2   can only review -- I'm the deciding official.
 3   I can only review what is presented to me, and
 4   in this particular case, it was presented to
 5   me the situation based on Sergeant White,
 6   acting sergeant at the time, who had the
 7   responsibility for that post, and a larger
 8   responsibility as a supervisor for the conduct
 9   of the agency and the agency officers, not
10   only of less rank, but of equal rank.
11         And at the same time, even if we
12   disregarded his relationship with the officer,
13   he has also responsibility to represent the
14   agency and independent of what any other
15   officer does.  He has a responsibility to take
16   action when action is required, and I believe
17   he did not.
18   Q    Why do you think action was
19   required?
20         Well, let me back up just for a
21   moment.  Let's make sure that I understand
22   your views about Officer Everett's conduct.
```

Page 24

1  Do you agree that Officer Everett made clear
2  to Officer White when he said, "I've got it,"
3  that he was relieving him at the post?
4      A    It was his testimony that he used
5  the words "I've got it," and that that's what
6  he said, yes.
7      Q    And Officer White testified that
8  based on that, he concluded he was relieved.
9      A    You're telling me that that's what
10 he concluded?
11     Q    Yes.
12     A    Okay.
13     Q    That makes sense to you?  Do you
14 dispute that?
15     A    I don't dispute that that's what
16 he believed.  That, I think, is part of the
17 error on the ways of a sergeant to make a
18 decision that seen an incident that requires
19 our action, that because he perceived being
20 relieved, that he will decide to walk away.
21     Q    We'll get to the reasons why you
22 think Officer White should have acted, but I

Page 25

1  want to make sure I understand what in your
2  mind transpired between him and Officer
3  Everett first.
4           The second thing I wanted to ask
5  you was did you conclude that Officer White --
6  it was clear that the two women were with
7  Officer Everett?
8      A    I can't speak for Sergeant White.
9  I mean, I don't know what he thought.
10     Q    Well, he testified to that in
11 front of --
12     A    Then that's his belief.  What I'm
13 saying is I cannot speak to that.
14     Q    Well, but he testified to that,
15 and Officer Everett also stated that the two
16 of them were with him.  Do you accept that?
17     A    I would accept it.  That's what
18 they said, yes, sir.
19     Q    All right, and you understand that
20 Officer White was being directed from repeated
21 telephone communications to go and relieve
22 Officer Richardson.

Page 26

1      A    Yes.  That was -- yes.
2      Q    And that those communications were
3  coming into Officer White before Officer
4  Everett had returned from his break.
5      A    Yes.
6      Q    So Officer White, when Officer
7  Everett said to him, "I've got it," Officer
8  White was under orders to relieve Officer
9  Richardson.  You understand that.
10     A    I understand that.
11     Q    Okay.  Now, what are the
12 circumstances that you believe required
13 Officer White to do something more than to
14 believe that he had been relieved and that
15 Officer Everett was not responsible for the
16 two persons who were at Post 41?
17     A    I believe that, number one, he
18 should have acknowledged those individuals
19 coming in.  He should have addressed Officer
20 Everett related to those individuals, and he
21 should have insured the security of the
22 building and people by making sure that those

Page 27

1  people remained in the appropriate area,
2  outside of the secure area of the GPO.
3      Q    But if we agree that Officer
4  Everett had relieved Officer White, everything
5  that you just described is Officer Everett's
6  job, correct?
7      A    No, that is one of the officer's
8  job.  That is true.  If one of the officers
9  does not do that, the higher responsibility is
10 that of that higher senior NCO sergeant that
11 is in place to make sure that that takes place
12 because he should be the one with the most
13 experience.  He should be the one who is
14 senior in that environment and who should be
15 held at a higher standard.
16     Q    But, Mr. Landrau, what was there
17 about the events that were occurring at Post
18 41 that imposed upon Officer White some
19 obligation to believe that Officer Everett was
20 not doing what was necessary with respect to
21 the two people that came in with him?
22     A    The fact that nothing was done.

1    Q    The fact that nothing was done?

2    A    Nothing was done.

3    Q    But they were still in the foyer

4  area, and Officer Everett was relieving

5  Officer White. There wasn't anything to be

6  done at that moment.

7    A    The clearance of those

8  individuals, the checking of the IDs of those

9  individuals and the appropriate checking of

10  those bags that those individuals were

11  carrying into the building.

12    Q    Yes, but Officer Everett was

13  writing right there. Why should Officer White

14  assume that upon his departure from the post

15  that Officer Everett would not properly

16  process these individuals?

17    A    I don't know why he would assume

18  one way or the other. His responsibility as

19  a sergeant is to make sure that that happens.

20  Assumptions don't play a role on his

21  responsibilities.

22    Q    But, Mr. Landrau, if it were

1  somebody else relieving Officer Everett and

2  Sergeant or Acting Supervisory Sergeant White

3  were elsewhere, you're saying that he has the

4  same responsibility to make sure that Officer

5  Everett does his job when he is relieving the

6  other officer at Post 41?

7    A    I don't understand your question.

8  Where is he? Will you repeat your question?

9    Q    Yeah. If Officer White were

10  somewhere else --

11    A    Okay. He's outside of the

12  building.

13    Q    -- and some other officer was

14  relieving Officer Everett, would Officer

15  White, because he's in a supervisory capacity,

16  have a responsibility to make sure that those

17  two officers did more than was done at that

18  location?

19         He wouldn't.

20    A    Well, that, too, is speculating on

21  a situation where a sergeant is in one

22  location. I mean, I can only deal with the

1  facts. My responsibility, which is, I think,

2  the most critical question that you asked me

3  today, my responsibilities as a deciding

4  official; my responsibilities as a deciding

5  official is to deal with the facts presented

6  to me based on the specific circumstances of

7  that time and effort that took place.

8         That's what I did. I cannot

9  speculate of what could happen, what should

10  happen. I only saw what happened, read what

11  happened, read the testimony, read everybody's

12  parez (phonetic), and I believe Sergeant --

13  Acting Sergeant White at the time acted

14  inappropriately when he did not manage that

15  post.

16    Q    Okay. Let me just ask: do you

17  believe there is anything about the events

18  that occurred at Post 41 before Officer

19  Everett said to Officer White, "I've got it.

20  I'm relieving you," that should have alerted

21  Officer White that Officer Everett wasn't

22  going to properly process these two people?

1    A    I believe Sergeant White should

2  have had the forward thinking ability to see

3  that two people are coming into the building.

4  He doesn't know who they are. There is

5  another officer in the location that is coming

6  to relieve him of that location.

7         As you describe, both these

8  officers have sufficient experience to

9  understand that a proper relief, even if not

10  stated in specificity as it was in the Army or

11  the military as you describe, those two

12  officers, especially a sergeant, should have

13  great sense to be able to say, "Who is with

14  you?"

15         That would trigger an answer of

16  two friends, two whatever.

17         "Well, you understand that these

18  individuals are not authorized to be within

19  this building. If you have personal issues,

20  you need to handle those personal issues

21  outside of the building."

22         That right there is what I

Page 32

1  expected of Acting Sergeant White at the time,
2  to be proactive, to be a leader, to be the
3  supervisor that he's paid for.
4      Q    Mr. Landrau, quite frankly, I
5  think that's hindsight because the facts
6  presented to Officer White were that the
7  officer in charge of the post was returning,
8  was relieving him, and there were two persons
9  with that officer whom Officer White didn't
10  know one way or the other.  He didn't know
11  whether they were, as some people have
12  suggested, girlfriends or former girlfriends
13  of Officer Everett.  All he perceived was that
14  they were with another uniformed officer.
15          And what I understand you to say
16  is for some reason you believe that he should
17  have made an inquiry of Officer Everett as to
18  whether Officer Everett was doing his job and
19  would do his job.
20          And I simply don't understand the
21  circumstances that faced Officer White at that
22  point in time that should have alerted him to

Page 33

1  what you would have wanted him to do.
2      A    Okay.  You asked me about my
3  position as a deciding official.  I have to
4  look at what happened.  I'm not looking at
5  hindsight.  I'm looking at the facts.
6          If sergeant White confronted,
7  consulted, communicated with that officer,
8  other than what you describe as a  pass by
9  "I've got it," if he had done just a little
10  bit more than that, all of the future actions
11  would have been avoided.  Those individuals
12  would not have entered the building.  We would
13  not have had a civilian unauthorized
14  individual managing an controlling the entry
15  of employees into the building.  All of those
16  things would have been avoided if Sergeant
17  White had done his job as a supervisor at the
18  time that he was supposed to do his job or
19  "Why are you bringing people here?"  At the
20  very least that.
21      Q    Well, so if he's to say, "Who are
22  they?  Why are you bringing people here?" and

Page 34

1  Officer Everett were to say, "Don't worry.
2  They're with me," would you expect Officer
3  White to take further steps?
4      A    Again, I can only look --
5      Q    Please answer my question because
6  what you've said is you've said that if
7  Officer White had made even the smallest of
8  inquiry, what transpired thereafter would not
9  have occurred, and you're talking about
10  speculation.  I think you're speculating.
11          So that's why I'm going further.
12  If Officer Everett said to Officer White,
13  "Bear with me.  I've got it," why should
14  Officer White at that point do anything
15  further?
16      A    Because there are no civilians
17  without an ID card that are authorizing to
18  that building.
19      Q    But if Officer -- suppose he
20  said --
21      A    Even if he said he's got it.
22      Q    Suppose he said, "Well, who are

Page 35

1  they," and he said, "Bear with me and I will
2  check them in," or, "I will check their
3  status."  Why should -- here's what I'm
4  driving at.  You are held to standards in your
5  employment.  You've always been held to
6  standards in your employment, and you know
7  those standards and you will either be
8  rewarded or  disciplined based upon your
9  compliance with those standards.
10          And I can understand the
11  expectations of the exercise of leadership by
12  someone who is temporarily assigned to a
13  sergeant's position.
14          However, in expecting a sergeant
15  to exercise discretion, and we are talking
16  about discretion because there are no rules
17  about what he should do here, in expecting a
18  sergeant to exercise discretion in the proper
19  way, you have to evaluate those facts as
20  presented to the sergeant at the time and
21  place when they were presented to him to make
22  a judgment as to whether you think he

Page 36

1  exercised his discretion properly.

2          And I'm asking you this. Do you

3  see that, on the one hand, Officer White, who

4  wants to be a sergeant, sees a circumstance

5  where Officer Everett has taken a 30 minutes

6  plus 15 minutes for his break, and has been

7  called on several occasions to go relieve

8  Officer Richardson, and when Officer Everett

9  comes in, whom he knows is a good officer, and

10 we know that because he hasn't had any

11 sanctions and he served in the military for

12 many years; when that officer comes in and

13 says, "I've got it," can't one reasonably

14 conclude that that was a prudent judgment that

15 he made and that that was his judgment, and

16 that there's not anything clearly wrong with

17 that, whereas had he acted the way that you

18 would want him to have acted, that too would

19 have been prudent and would have been a good

20 judgment.

21         But my point is that between those

22 two judgments, there's not sufficient evidence

Page 37

1  that one must make one decision as opposed to

2  the other under these circumstances because we

3  are talking strictly about the exercise of

4  discretion. And all I'm suggesting is that in

5  these circumstances one might sit down with an

6  employee and say, "I think that you exercised

7  your discretion inappropriately here. Let's

8  talk about this," and come to an understanding

9  as to how one expects these kinds of judgments

10 to be made in the future.

11         But to me I don't see a sufficient

12 demarcation of duty here as opposed to an

13 exercise of judgment. The letter that was

14 proposed to you and your letter says that

15 Officer White intentionally violated the

16 regulations of Post 41, and I Don't think even

17 you believe that.

18         MR. FINE:  Objection. What was

19 the question?

20         MR. JOHNSON:  I'll ask a question.

21         BY MR. HANNON:

22     Q     Do you understand? Do you

Page 38

1  understand our position in contesting the

2  decision that you've made?

3          And I understand that when you

4  made the decision you made it in good faith

5  and you looked at all of the facts. I'm just

6  asking you whether if you put yourself in

7  Officer White's shoes, whether you believe he

8  intentionally turned his back on the

9  obligation to enforce the post orders or made

10 a decision that things were acceptable and

11 that he needed to go to his next assignment.

12     A     I believe that he definitely

13 turned his back as to what he should have done

14 at the time.

15     Q     And how would Officer White know

16 when confronted with the circumstances that

17 were before him that you would expect him to

18 act the way that you now say he should have?

19 How would he know that?

20     A     Well, he should have known at the

21 time that no unauthorized individuals are

22 allowed within the premises of Building 41;

Page 39

1  that only those individuals, number one, with

2  an ID card and, number two, with the specific

3  ID card that allows them to enter that

4  building because there is a distinction

5  between anybody with a GPO ID card and

6  individuals who have an ID card to enter that

7  building.

8          I believe that the materials

9  control within that building are of great

10 sensitivity, and that the charge of being

11 responsible for the control entering into that

12 building is a critical function for the

13 sustainment of the mission of the GPO, and

14 because of that, I think that the actions of

15 Sergeant White at the time were inappropriate

16 and completely unbecoming of what the

17 expectation of an officer in the GPO or any

18 force is to have So yes.

19     Q     So had he not been in a

20 supervisory sergeant's position, you would

21 have a different opinion about his conduct.

22     A     I believe that in any

Page 40

1  circumstances you have to take into
2  consideration years of experience, experience
3  on the force, you know, other actions. You
4  have to take everything into consideration at
5  that time based on those facts.
6      Q    But in this situation, both in
7  your written decision and in what you've said
8  today, you are really emphasizing the fact
9  that he was a supervisory sergeant and he
10 failed to exercise the kind of supervision
11 that you would expect.
12          That's why I asked. Had he not
13 been in a supervisory sergeant's position, the
14 outcome of your decision might have been
15 different. The penalty might have been
16 different or there might have been no finding
17 of a violation.
18     A    I believe that at the time a
19 deciding official has to review all of the
20 facts in front of him or her. I believe that
21 if the case is of an inexperienced officer
22 making mistakes or appropriate to an

Page 41

1  inexperienced officer, those actions will be
2  looked at differently.
3          I believe that once you are not
4  only paid, but you hold the position of
5  leadership that comes with being a supervisor
6  in the police force guarding the treasures of
7  entering to the nation of the United States,
8  I believe that puts you at a higher level than
9  the rest of the people, and the expectation is
10 higher, yes.
11     Q    Okay. You understand, do you not,
12 that sergeants are not part of the negotiated
13 unit covered by the collective bargaining
14 agreement.
15     A    That is true.
16     Q    So had he, in fact, been a
17 sergeant, you could not have disciplined him
18 as well, correct?
19     A    I don't understand. Why would I
20 not be able to discipline a sergeant.
21     Q    Well, not through the procedures
22 that you've implemented here because sergeants

Page 42

1  are not members of the collective bargaining
2  agreement, right?
3      A    Sergeants are not members of the
4  collective bargaining agreement. That's true.
5      Q    So for your discipline with
6  Officer White, in part, you've held him to the
7  standard of a sergeant.
8      A    Yes. He was paid as a sergeant.
9  He was holding the position as a sergeant.
10     Q    Do you understand that the
11 position of acting sergeant was rotated among
12 all corporals?
13     A    I can't attest to that. I imagine
14 it could be that it was rotated. We are -- we
15 are a small police force. So I would not
16 doubt that that's one of the practices.
17     Q    Well, let me pose it to you this
18 way. Whenever there's an opportunity to serve
19 in a supervisory sergeant's position with the
20 expectation down the road that people are
21 going to compete for the position, in order to
22 be fair to all of the corporals, they have to

Page 43

1  be permitted to rotate so that one who isn't
2  given that opportunity can't complain that
3  they haven't been given an adequate
4  opportunity to complete.
5      A    Right.
6      Q    So the point I'm making simply is
7  that every one of the corporals at some point
8  in time was an acting supervisory sergeant.
9  In other words, they were, in a sense --
10 what's the expression? -- auditioning for the
11 position.
12          And by the way, they weren't paid
13 because the number of days that they were
14 detailed was less than the number of days at
15 which obligation to pay is triggered. So he
16 wasn't being paid to be a sergeant.
17          So you're holding him to the
18 standard of a sergeant, but he wasn't paid for
19 it.
20          Your letter of discipline
21 indicated that -- and I'll read this. I'll
22 show it to you if you wish.

A Okay.
Q Quote, "your intentional neglect with a newly revised and enhanced security procedures for Post 41 and the rules, regulations, and policies you are responsible for enforcing has severely undermined my trust in your ability to perform the essential functions of your position. As a supervisory police officer, you had the additional responsibility to insure the rank and file officers strictly adhered to the security policies and procedures, especially those concerning Building 41."
Do you want to look at that?
A No.
Q What did you mean by the enhanced security procedures for Post 41?
A Well, Post 41 is a post, as I mentioned before -- everybody at the GPO has a regular ID card. Individuals who have the need to access Building 4 have a distinct ID card that allows them access to that building.

So access to that building is on the need to know, need to entry only, or as a company, as appropriate to enter the building.
Q Okay. Was that part of the new post order?
A What part?
Q That there were new security badges for Post 41.
A No. You asked me what did I mean by the statements that I made.
Q No, I --
A I said that Post 41's importance is emphasized even by the distinction of the individuals who can enter into that building, which Acting Sergeant White at the time is fully aware of; that not everybody can just decide to go to Building 4 and enter Building 4.
Q Well, but you don't have to have a special badge to go under the first floor --
A No, no.
Q -- of Building 4.

A No, you're right.
Q So I don't understand the difference. If the same types of badges can enter the initial area.
A Yes, yes. You asked me what did I mean by my statement. I said that the distinction of Building 4 is what I'm emphasizing. Building 4 is where the passports are created.
A further distinction is made of those individuals who entered the passport area who have a distinct ID card.
Q When you say "newly revised" and "enhanced security procedures," are you talking about the pass?
A The systems that have been put in place.
Q Okay.
A The pass.
Q The X-ray machine?
A Right, and all of that.
Q All right. I understand. I

thought you were referring to the revised post orders. You refer to the revised post orders later on when you talked about mitigation, and you say in the second page that Officer Alvin Hardwick, President of the FOP Lodge, and Officer White, along with you, were provided the opportunity provide comments and recommendations on the changes, August 23rd, 2006, to the post orders for Post 41 prior to their promulgation. After careful consideration I've decided that the 14-day suspension and demotion are appropriate.
You remember part of the oral presentation to you was that the post orders at Post 41 that day were not the revised post orders. Do you recall that?
A I recall the statements that the physical orders located at that specific location was stated that those were not the updated orders. That's true. I remember that.
Q And in the oral hearing at that

**Page 48**

1  moment, Lamont Vernon whispered in your ear.

2  Do you remember that?

3      A    He probably did, yeah.

4      Q    And he basically said to you, you

5  know, "We mailed out the provisions. They

6  reviewed them, and then the final orders were

7  E-mailed out before that date," something to

8  that effect.

9      A    Right.

10          MR. FINE:  Objection.  You have no

11  idea what he whispered in his ear.

12          MR. HANNON:  Something to that

13  effect.

14          BY MR. HANNON:

15      Q    And so after the oral hearing, you

16  were provided with information by Lamont

17  Vernon to that effect.  He told you that we E-

18  mailed the orders to Officer White.  He had an

19  opportunity to comment upon them, and

20  presumably he told you that the new orders

21  were final on that day.  Is that true?

22      A    I had an opportunity to review the

**Page 49**

1  statements.  I had an opportunity to inquire

2  about how officers had found out about those

3  orders.  I understand how Mr. Vernon normally

4  promotes the orders and promotes the

5  communication, and he further validated that

6  with the mention and copy of the E-mail that

7  was sent to all the officers that needed to

8  have the opportunity to comment related to

9  that issue.

10      Q    Okay.  So what did you conclude

11  with respect to whether Officer White was

12  aware of the new post orders?

13      A    I concluded that he had received

14  it.  He had an opportunity to review it, and

15  he had an opportunity to ask questions if he

16  did not understand any of the statements in

17  there.  He had an opportunity to contribute

18  and enhance that order being the experienced

19  officer that he is.  I would have hoped that

20  if he had something to say he would have made

21  the statement at the time.

22      Q    Did you conclude that Officer

**Page 50**

1  White had been provided with the final version

2  of the Post 41 order when it became effective?

3      A    I concluded that Officer White,

4  Acting Sergeant White at the time, had an

5  opportunity to comment and that if there was

6  a distinction between what was sent on that

7  statement only changes of those individuals

8  who had opportunity to comment would have been

9  made, and that would have been communicated

10  appropriately to all of the officers.

11      Q    You agree that an officer does not

12  have to follow a post order until it is

13  accepted and adopted by the Chief of Security.

14  Would you agree with that?

15      A    I believe that the Chief of

16  Security will communicate the orders that need

17  to be followed as necessary, and they have the

18  responsibility to follow those orders, yes.

19      Q    Could you answer my question?  Do

20  you agree that an officer is not obligated to

21  follow a new post order until the Chief of

22  Security signs off on it and says when it

**Page 51**

1  becomes effective?

2      A    I believe that any time in an

3  organization that there is a need for an

4  order, a procedure that needs to be followed,

5  the security -- the Director of Security

6  Services will communicate that.  I don't

7  believe that a mere signature would exempt

8  common sense already established by that

9  organization, would exempt any officer from

10  the following of those instructions.

11      Q    Do you know when the new post

12  orders for Post 41 became effective?

13      A    I don't have that date.  I don't

14  know.

15      Q    Do you agree that the new post

16  order for Post 41 was not at Post 41 on the

17  day of this incident?

18      A    I have no way of validating that.

19  I trust that if the officers stated that at

20  that time they didn't have a physical piece of

21  paper that told them these are the new orders,

22  that that's what they believed.

Page 52

1              That is, that again would have me
2    question experienced officers, professional
3    officers who are leaders and have the
4    experience as an officer who have received the
5    opportunity to comment on an order, who
6    understand the importance of those orders.
7    That would be a discrepancy in my mind to
8    acknowledge both of those things.
9        Q    You recall, I hope, that in our
10   presentation you were advised that the next
11   day after this incident personnel went to the
12   post orders that were at Post 41 and found
13   that the post order there was the old post
14   order.  You recall that.
15       A    That was mentioned, yes, sir.
16       Q    Did you accept that?
17       A    I have no reason to doubt that.
18   So yes.
19       Q    Okay.  After the oral hearing,
20   Chief Vernon never said to you, "That's not
21   true.  The new post orders were actually
22   there."  He never advised you that, did he?

Page 53

1        A    I don't remember him saying that.
2        Q    Okay.  All he did is he told you
3    that he sent out an E-mail with the proposed
4    new post order for comment.
5        A    That's a true statement.  That
6    actually happened, yes.
7        Q    Okay.  And did Officer Vernon ever
8    tell you that the post order became final and
9    effective on a particular day?
10       A    He did not express that it was
11   signed effective on a certain day.  He did say
12   that it was communicated and should be
13   followed from that point.
14       Q    I'm sorry.
15       A    I Don't remember what that point
16   was.
17       Q    I'm sorry.  Chief Vernon told you
18   that he had advised Officer White that he was
19   supposed to follow the new Post 41 order
20   before the day of the incident?
21       A    No.  No, he did not tell me that
22   he --

Page 54

1        Q    Okay.
2        A    No.
3        Q    All right.  I just want to
4    understand.
5        A    Okay.
6        Q    And do you know that either two or
7    three uniform officers including a sergeant
8    testified on Friday of last week that they're
9    still not aware of any new post orders for
10   Post 41?
11       A    I'm not aware of that.
12       Q    Do you know that the procedure for
13   issuing new post orders is to give a hard copy
14   to the officer and have him sign off that he
15   has received those orders?
16       A    I'm not familiar that that's the
17   exact process.
18       Q    Well, do you know that there's no
19   record of Officer White having signed off or
20   otherwise acknowledged receipt of the new post
21   orders for Post 41?
22       A    That's probably true.

Page 55

1        Q    Okay.  Are you telling me that as
2    the decision maker you nevertheless hold him
3    responsible for following post orders that had
4    not either become effective or communicated to
5    him?
6        A    Absolutely because those post
7    orders, new or old, had the same message in
8    it, and that is to evaluate those individuals
9    coming into the organization and to validate
10   that those were the authorized individuals to
11   enter the building.
12            So whether old or new, the
13   requirement doesn't change.
14       Q    Well, that's a different -- that's
15   a different issue.
16       A    I mean, I answer your questions as
17   you ask them.  I'm going to tell the truth,
18   but at the same time, you ask me as a deciding
19   official whether I held to that standard, and
20   the answer to that is yes, because the
21   requirement is the same whether the order has
22   a date of 1988 or has a date of 2007.

Page 56

1    Q    All right.

2    A    It did not change.

3    Q    All right. Now I understand. The
4    information that you obtained after the oral
5    hearing from Chief Jordan, you never --

6    A    Vernon.

7    Q    Chief Vernon, you never provided
8    that information to Officer White before your
9    final decision, did you?

10    A    I did not, no.

11    Q    Okay. Now, did you review the
12    penalties that have been imposed for other
13    violations of security at Building 4 by other
14    officers in reaching your decision?

15    A    Yes. I asked the question of the
16    Human Resources people. I did not look
17    through files specifically.

18    Q    Okay. Whom did you ask and what
19    were you told?

20    A    I asked Stevie and, I believe, in
21    the conversation it was Vicki Barber, the HR
22    Operations Director. Those were the only two

Page 57

1    people that I checked with, and I asked
2    whether the standards and punishment related
3    to this particular situation, matched other
4    incidents related to officers in similar
5    circumstances, and what I was told was that,
6    yes, that these appeared to be appropriate in
7    lieu of other actions in the GPO.

8    Q    And what did that mean to you?

9    A    That meant to me that there was no
10    disparity on the recommended discipline to
11    Sergeant White as it relates to other
12    employees of the GPO.

13    Q    Did you check to see whether there
14    were any violations of security of Building 4
15    that had not resulted in discipline?

16    A    No, I did not.

17    Q    Have you become aware that an
18    employee at Building 4 by the name of Weese
19    escorted a former employee by the name of Van
20    Horn through Building 4?

21    A    I heard of that statement. I
22    believe that was not long ago. I don't know

Page 58

1    what the situation is on that as of today.

2    Q    So you don't know what, if any,
3    discipline has been imposed.

4    A    I don't know.

5    Q    And you agree that a non-GPO
6    employee should not be on the second floor of
7    Building 4?

8    A    I agree 100 percent, unless
9    properly identified as having the need. I
10    mean, if you said a non-GPO employee, we do
11    have possibly a contractor that needs to
12    operate.

13    Q    This is a former employee of the
14    GPO who was involved in the production of
15    passports, and my understanding is that it was
16    sort of a busman's holiday, and he was given
17    a tour of how things were being done today.

18    A    I don't have that level of detail.
19    You know more than me then.

20    Q    And for all we know, this former
21    loyal employee had been expropriated by Al
22    Qaeda and was conducting an inspection of your

Page 59

1    facility.

2    A    That's why it's so important that
3    sergeants take that extra step, follow the
4    steps and procedures delineated in the
5    policies and go above and beyond, rather than
6    sit back and assume that something has been
7    done.

8    Q    So presumably, the person
9    responsible for allowing Mr. Van Horn will be
10    facing the same discipline.

11    A    I would hope that if the
12    circumstances arise that appropriate
13    discipline will be taken, yes.

14    Q    What other breaches of security at
15    Building 4 are you personally aware of?

16    A    I'm not aware of any other
17    breaches of security.

18    Q    What do you know about the
19    security that's provided regarding the
20    location where vendors and suppliers come to
21    Building 4?

22    MR. FINE: Objection. Witness is

directed not to respond.

BY MR. HANNON:

Q Do you know anything about what the security is there?

MR. FINE: Objection. The witness is directed not to respond. Not relevant.

BY MR. HANNON:

Q Would you consider it relevant to your determination of an appropriate penalty to know whether vendors are allowed to bring unauthorized persons into Building 4 without escort?

A I believe that all information related to the case will be provided to me, and at that time as the deciding official, I will make judgment based on the information in front of me.

Q The problem that we have here is that in reviewing the discipline that has been taken in the past, there's included in that constellation of information -- are not breaches of security that didn't result in

discipline.

Do you understand me?

A I understand what you just said.

Q So how are we to learn or how are you to be able to learn as the deciding official whether there have been lapses in security that have not been either investigated or punished?

A I don't know. It is not within my purview to control that.

Q Well, so if your review for penalty purposes is only of those matters that have actually risen to the level of discipline, there's no way for you to know whether, in fact, there's a practice and procedure of ignoring violations.

A That's probably a true -- that seems to have true logic, yes.

Q Yeah, and do I assume that when you asked Stevie Gray and Vicki Barber whether the proposed discipline in Officer White's case was appropriate, did you assume that

there were probably other officers who had been demoted for violations of security?

A I assumed that they did their due diligence and that their response will be complete.

Q Well, did they provide you with the data as to all other types of discipline imposed for violations of security of Building 4?

A No.

Q As far as I'm aware, this is the most severe penalty that's ever been imposed on anyone for a breach of security of Building 4. The most significant penalty that I've been made aware of -- and Mr. Fine has an obligation to provide this to us -- is, I believe, a seven-day suspension when an employee who was supposed to be available to seal a truck containing passports was nowhere to be found, and a truck left without a seal, and the video disclosed that the person was AWOL.

I've been advised of another circumstance where the officer for Post 41 was on the sidewalk in front of the building, and persons went in the building behind him, including an employee of the Inspector General's Office, and that issue was investigated, and that individual received a letter. I don't know whether it was a letter of reprimand or a letter of counseling or what, but we'll certainly take a look at that.

And I also understand that there was a circumstance where -- and you may have a better recollection of this -- a number of passports were sort of left on the streets of Washington.

A Never heard that before.

Q You haven't heard that? Well, we're still in the process of either asking Mr. Fine to help us search through more thoroughly these penalties or do it ourselves if he won't do that, and we'll certainly present that to you for your consideration.

Page 64

1              I don't believe relying upon your
2     assistance under these circumstances is
3     sufficient, but that's just my opinion,
4     particularly when you're dealing with a man's
5     career.
6              Do you agree that the more
7     specific the instructions are for the
8     performance of an officer's duty, the easier
9     it is to expect compliance and impose
10    discipline when necessary?
11       A    I can agree with that.
12       Q    And so in this case, for example,
13    you've indicated -- and I agree with you --
14    that there perhaps could be policies and
15    procedures regarding the process for relieving
16    an officer at a post?
17       A    I can agree with that.  Yes, sir.
18       Q    And are you aware of any
19    description of the duties and responsibilities
20    of an acting sergeant?
21       A    I believe they will be the same as
22    a sergeant.  The fact that you're acting is a

Page 65

1     matter of permanence rather than function and
2     duties.
3        Q    That makes sense to me.  Do you
4     know whether it's made clear to somebody who's
5     an acting sergeant that you're being held to
6     these standards and here's a copy of the
7     standards?
8        A    Absolutely.
9        Q    You think that happens?
10       A    I think that's what happened, yes.
11       Q    Okay, and who's responsible for
12    doing that?
13       A    The supervisor.
14       Q    And I'm sure that it is of concern
15    to you that it's the opinion -- and I
16    acknowledge it's the opinion -- of Sergeant
17    Dailey and actually the opinion of a white
18    officer, Officer Oldach, that there is a
19    disparity of penalties imposed among officers
20    based upon race.  That's their perception.
21    I'm sure that is of concern to you.
22       A    Absolutely.

Page 66

1        Q    So would you agree then that given
2     the potential for abuse where we're talking
3     about the exercise of discretion, it's very,
4     very critical to carefully examine the
5     penalties across the board that have been
6     imposed in the past?
7        A    I believe the agency has a
8     responsibility to communicate clearly and to
9     have policies relating to non-discriminatory
10    actions, yes.
11       Q    And would you agree with me that
12    it's beneficial to the operation of the
13    Government Printing Office for there to be a
14    high level of confidence among the uniform
15    officers that they are aware of the rules and
16    are aware of what are just penalties should
17    they be found to violate the rules?
18       A    I agree with that.  At the same
19    time, every employee understands that they
20    are, just like I am, responsible for all laws,
21    policies, regulations, read or unread, within
22    the organization.

Page 67

1        Q    Understood, but that a perception,
2     real or not, and certainly if it is real, that
3     a disparity in enforcement would adversely
4     affect morale.
5        A    That's -- I would agree with that.
6     That's a likely outcome, yes.
7        Q    Are you aware that since this
8     incident, Chief Butler has instituted training
9     for officers with the United States Attorney's
10    Office in terms of how they are to go and
11    paper cases?
12            MR. FINE:  Objection.  Not
13    relevant to the issue involving Mr. White.
14            MR. HANNON:  You can answer.
15            BY MR. HANNON:
16       Q    Are you aware of that?
17       A    I'm aware of that.  I am not sure
18    that it had anything to do with this case.
19    Mr. Butler is an experienced police officer,
20    and from day one when he got here he had
21    specific plans related to the training of the
22    organization.  He established relationships

Page 68

```
1   with MPD.  He established relationships with
2   the counsel, and with other organizations.  So
3   I didn't link completely his professional
4   behavior and desire for officers to be better
5   trained as associating him with this case.
6       Q    No, I'm not suggesting that
7   there's a cause and effect.  It doesn't matter
8   because it's clear when we get to Officer
9   Everett's case that there was a complete lack
10  of training or understanding as to how to
11  paper a case.
12           Were you advised in the course of
13  your work that -- and we're talking about when
14  Everett went over to the U.S. Attorney's
15  Office to paper the case -- that the Assistant
16  U.S. Attorney over there had been interviewed
17  by Mr. Fine and by Steven Packard?
18      A    No.
19           MR. FINE:  Objection.
20           BY MR. HANNON:
21      Q    You were not made aware of that?
22      A    No.  Who's Steven Packard?  Oh,
```

Page 69

```
1   Lieutenant Packard?
2       Q    Lieutenant Packard.
3       A    No.
4            MR. HANNON:  I'm looking for a
5   document.
6            (Pause in proceedings.)
7            BY MR. HANNON:
8       Q    Is the Inspector General used to
9   make cases for discipline of officers?
10      A    No, not at all.
11           MR. HANNON:  Do you have a copy,
12  Neal, of your acknowledgement packet with
13  Exhibit 4(m) here in the room with you?
14           MR. FINE:  The E-mail?
15           MR. HANNON:  Yes.
16           MR. FINE:  Yeah.
17           MR. HANNON:  May I take a look at
18  them?  Because ours are being processed for
19  the hearing.  I wanted to read a couple of the
20  E-mails to Mr. Landrau.
21           Thank you.  I'll ignore your
22  yellow highlights.
```

Page 70

```
1            I'm looking for the E-mails
2   regarding the interview with Steven Kaufman.
3   Do you happen to recall what tab those are at?
4            MR. FINE:  I don't recall.
5            MR. HANNON:  I'm sorry?
6            MR. FINE:  Thirty-odd tabs.  I
7   haven't memorized which ones are which.
8            MR. HANNON:  Okay.
9            THE WITNESS:  Do I know who Steven
10  Hoffman is?  Should I know who Steven Hoffman
11  is?
12           MR. HANNON:  Kaufman.  No.
13           THE WITNESS:  Kaufman?  Okay.
14           MR. HANNON:  You might, but I'm
15  not sure if you should know.
16           THE WITNESS:  No.
17           (Pause in proceedings.)
18           MR. HANNON:  Maybe it was
19  contained in your response to our request for
20  production of documents, but I thought for
21  sure it was in 4(m).  It was in my set in
22  4(m).  Do you have your response to our
```

Page 71

```
1   document request?
2            I would rather not --
3            MR. FINE:  Anything else you want
4   me to do besides provide you all of my
5   documents?
6            MR. HANNON:  Yeah, I'd like you to
7   provide the witnesses for deposition that
8   you're supposed to provide today.
9            I'll try to paraphrase, if you
10  don't -- if you don't mind.
11           BY MR. HANNON:
12      Q    You may not recall this, but we
13  had to continue Darrell Everett's -- Darnell
14  Everett's hearing a number of times because we
15  didn't get the IG's report, and then there was
16  an issue about who the Assistant U.S. Attorney
17  was that he met with.
18      A    I remember the first part, when he
19  came to the oral reply, that you had not
20  received the --
21      Q    Right.
22      A    -- or that afternoon, I believe,
```

Page 72

1   you got the reports.

2       Q      Right.

3       A      I remember that.  I'm not familiar

4   with the other statements.

5       Q      Okay.  We were trying to find out

6   who Officer Everett met with when he went to

7   the U.S. Attorney's Office to paper the case.

8   I don't know if you know the procedures over

9   there.  I mean, I used to do that, but an

10  officer who papers the case sits down with an

11  Assistant U.S. Attorney, and you might recall

12  that Officer Everett was charged with lack of

13  candor under those circumstances.

14      So obviously it was important for

15  me to talk to that person, to see what led him

16  to believe that there was a problem with

17  Officer Everett, particularly because no

18  supervisor went with him.

19      And last week when we got

20  documents from Mr. Fine, we discovered a

21  number of E-mails in December and January,

22  December of last year; I think they began in

Page 73

1   November of last year, up until January, among

2   Mr. Fine, Sonja Scott -- do you know who she

3   is?  She's a Special Agent with the

4   Inspector --

5       A      With the IG?

6       Q      With the IG's Office, and this

7   gentleman, Steven Kaufman.

8       Now, Sonja Scott  found who the

9   Assistant U.S. Attorney was who met with

10  Darnell Everett, and that was Steven Kaufman,

11  and she arranged for an interview between Mr.

12  Kaufman and Mr. Fine.

13      And as it turns out, Lieutenant

14  Packard had also had a telephone conversation

15  with him the day of the papering, and he

16  prepared a memo explaining it all, which he

17  gave to Mr. Vernon.

18      Now, we never got that memo until

19  we talked to Lieutenant Packard last Friday,

20  and it described to the Assistant U.S.

21  Attorney some opinions about Officer Everett

22  that were very important to that case.

Page 74

1       But the crux of this is that in

2   the midst of this Inspector General's

3   investigation, one of the E-mails or a number

4   of the E-mails from Mr. Fine say that -- I

5   think he sends an E-mail to the  Assistant

6   U.S. Attorney saying, "I'd like to have a

7   telephone conversation with you.  We'd like to

8   see if we can make out a case of lack of

9   candor against Officer Everett."

10      Now, this is just in the middle of

11  an IG investigation, and then there is an E-

12  mail from Mr. Fine to IG Special Agent Sonja

13  Scott who is supposed to be doing an IG

14  investigation, and Mr. Fine says words to the

15  effect that "great, it looks like we're going

16  to be able to make out a lack of candor charge

17  against Darnell Everett."

18      Now, I raise these because I'm

19  going to be arguing to the judge at the Merit

20  Systems Protection Board next Monday that

21  that's a completely inappropriate use of the

22  IG's Office and that none of this evidence

Page 75

1   that had been collected at that point in time

2   was given to us.

3       My question to you is:  do you

4   know anything about this?

5       A      No.

6       Q      And I take it you agree with me

7   that it's inappropriate to use the IG's Office

8   to put together disciplinary cases against

9   employees.

10      A      I don't think that's the job of

11  the IG.

12      Q      Right, and nor would it be the job

13  of the General Counsel's office to be working

14  with an inspector, a Special Agent in the IG's

15  Office to be putting together disciplinary

16  charges.

17      MR. FINE:  Objection.  There's no

18  question here.  These are just your opinions,

19  Mr. Hannon.

20      BY MR. HANNON:

21      Q      Do you agree with that?

22      A      I can't attest to any of that.  I

Page 76

```
 1   mean, I don't direct the Office of the General
 2   Counsel.  I don't direct the Office of IG.
 3   So --
 4       Q      You rely upon the Office of
 5   General Counsel to do what's right under the
 6   law.
 7       A      Absolutely.
 8       Q      Okay, and just to be clear, you
 9   don't recall ever being provided information
10   about what the Assistant U.S. Attorney said to
11   Mr. Fine
12       A      Absolutely not.
13       Q      Or what the U.S. Attorney said to
14   Lieutenant Packard.
15       A      Absolutely not.
16       Q      Okay, and do you recall that we
17   were unaware at the time of Officer Everett's
18   hearing with you who the Assistant U.S.
19   Attorney was?  You may not recall.
20       A      I don't.  This is the first time
21   that I heard any conversations related to the
22   Assistant General -- Attorney General --
```

Page 77

```
 1   whatever the title, anyway.
 2       Q      Okay.  The point I'm just making
 3   is we never had an opportunity to know this
 4   information and to talk to this gentleman
 5   ourselves.
 6              And then finally --
 7       A      But hopefully you understand that
 8   I, number one, didn't have any knowledge of
 9   it.
10       Q      Yes.
11       A      Nor did I take that into
12   consideration in any of my deliberation.
13       Q      Well, if you didn't have the
14   information, you couldn't have taken it into
15   consideration.  However, it certainly formed
16   the basis of the proposed action because a
17   memo from Lieutenant Packard went to the
18   Lamont Vernon back in October, and I believe
19   that -- I can't say.  I'd be surprised of
20   Lamont Vernon wasn't aware that we are trying
21   to find out who that Assistant was.
22              Finally, with respect to policies
```

Page 78

```
 1   and procedures, are you aware of your own
 2   personal knowledge whether the GPO Uniform
 3   Services Division requires a supervisor to go
 4   to the U.S. Attorney's Office when an officer
 5   papers a case?
 6              MR. FINE:  Objection.  Not
 7   relevant to the case involving Mr. White.
 8              THE WITNESS:  You mentioned that
 9   during the oral reply the last time.  You were
10   aware of it, but --
11              BY MR. HANNON:
12       Q      You're not?
13       A      -- I'm not at that level of
14   detail, no.
15              MR. HANNON:  Okay.  Let me ask --
16   I'm going to consult with Mr. White just for
17   a second and I think we'll be done.
18              THE WITNESS:  Okay, sure, okay.
19              MR. HANNON:  We'll be right back.
20              (Whereupon, the foregoing matter
21              went off the record at 4:02 p.m.
22              and went back on the record at
```

Page 79

```
 1              4:04 p.m.)
 2              MR. HANNON:  I don't have any
 3   other questions.  Mr. Fine might have some
 4   questions.
 5              THE WITNESS:  Okay.
 6              MR. FINE:  I have no questions.
 7              MR. HANNON:  You can review the
 8   transcript before it becomes final to make
 9   sure she has accurately transcribed your
10   testimony or you can trust her and waive, as
11   you wish.
12              MR. FINE:  We'll make sure it's
13   accurate.
14              MR. HANNON:  I'm sorry?
15              MR. FINE:  He will do that and
16   make sure it's accurate.
17              MR. HANNON:  He'll read.
18              We're off the record.
19              (Whereupon, at 4:40 p.m., the
20   deposition of Rafael E. Landrau was concluded,
21   signature being exercised.)
22
```

Page 80

```
 1
 2
 3                    CERTIFICATE
 4
 5        This is to certify that the foregoing
 6   transcript in the matter of:
 7
 8
 9
10   Deposition of Rafael Landrau
11
12
13
14   Date:              Monday, August 13, 2007
15
16
17
18   Place:             Washinton, D.C.
19
20
21
22
23   represents the full and complete proceedings of
24   the aforementioned matter, as reported and
25   reduced to typewriting.
26
27
28                    _____
29                    Neal Gross
```

Page 81

[Index pages 81, 82, and 83 contain dense alphabetical word indices of the transcript; individual entries are not legibly transcribable.]

Page 82

Page 83

job 5:19,20 27:6,8 29:5 32:18,19 33:17,18 75:10,12
JOHNSON 37:20
Jordan 9:2 56:5
judge 74:19
judgment 35:22 36:14 36:15,20 37:13 60:16
judgments 36:22 37:9
junior 19:8
just 6:20,21,22 10:1 22:19 23:20 27:5 30:16 33:9 38:5 45:16 54:3 61:3 64:3 66:16,20 74:10 75:18 76:8 77:2 78:16

K

Kaufman 70:2,12,13 73:7,10,12
kind 40:10
kinds 37:9
know 5:8,8,19 6:20 7:1 9:11,13 10:5,7,9,12 10:13 11:9,12,13,18 12:13,15 14:5 25:9 28:17 31:4 32:10,10 35:6 36:10 38:15,19 40:3 45:2 48:5 51:11 51:14 54:6,12,18 57:22 58:2,4,19,20 59:18 60:3,10 61:9,14 63:8 65:4 70:9,10,15 72:8,8 73:2 75:4 77:3
knowledge 77:8 78:2
known 38:20
knows 15:10 36:9

L

lack 68:9 72:12 74:8,16
lady 4:11
Lamont 9:2,6,17 11:1 11:21 48:1,16 77:18 77:20
Landrau 1:15 3:16 4:4 4:14 27:16 28:22 32:4 69:20 79:20 80:10
lapses 61:6
larger 17:1 23:7
last 4:14 54:8 72:19,22 73:1,19 78:9
later 47:3
law 2:4 76:6
laws 66:20
lawyer 6:9
leader 32:2
leaders 52:3
leadership 35:11 41:5
learn 61:4,5
least 33:20
leaving 18:4
led 72:15
left 62:20 63:14
legal 5:14,19 6:5,10 7:1 10:10
less 23:10 43:14
let 8:1 23:20 30:16 42:17 78:15
letter 22.17 37 13,14 43:20 63:8,8,9
Let's 23:21 37:7
level 41:8 58:18 61:13 66:14 78:13
lieu 57:7
Lieutenant 69:1,2 73:13,19 76:14 77:17
like 10:1 19:18 66:20 71:6 74:6,7,15
likely 67:6
link 68:3
little 33:9
LLP 2:4
located 47:18
location 16:5 29:18,22 31:5,6 47:19 59:20
Lodge 47:5
logic 61:18
long 4:19 57:22
longer 19:2
look 18:22 33:4 34:4 44:14 56:16 63:10 69:17
looked 38:5 41:2
looking 33:4,5 69:4 70:1
looks 74:15
lot 11:5
loyal 58:21
L-a-n-d-r-a-u 4:14

M

machine 20:6 46:20
made 5:5 18:14 20:18 24:1 32:17 34:7 36:15 37:10 38:2,4,4 38:9 45:10 46:10 49:20 50:9 62:15 65:4 68:21
mail 74:12
mailed 48:5,18
make 15:17,19 23:21 24:17 25:1 27:11 28:19 29:4,16 35:21 37:1 60:16 69:9 74:8 74:16 79:8,12,16
maker 7:5 55:2
makes 24:13 65:3
making 26:22 40:22 43:6 77:2
manage 18:20 30:14
managing 19:7 33:14
many 36:12
man's 64:4
Marine 14:18
matched 57:3
materials 39:8
matter 1:4 9:9 10:5 12:2 65:1 68.7 78:20 80:6,24
matters 10:2 61:12
may 15:18 63:12 69:17 71:12 76:19
Maybe 70:18
mean 6:1,3 11.5 25:9 29:22 44:16 45:9 46:6 55:16 57:8 58:10 72.9 76:1
means 9:4,6
meant 57:9
members 42:1,3
memo 73:16,18 77:17
memorized 70:7
mention 49:6
mentioned 44:19 52:15 78 8
mere 17:1 51:7
Merit 1:1 74:19
message 55:7
met 71:17 72:6 73:9
MICHAEL 2:3
middle 4:13 74:10
midst 74:2
might 37:5 40:14,15,16 70:14 72:11 79:3
military 14:6,9 15:9 31:11 36:11
mind 11:17 15:18,19 25:2 52:7 71.10
minute 19:1
minutes 36:5,6
misconduct 8:10 9:20
mission 6:6 39:13
mistakes 40:22
mitigation 47:3
moment 14:11 15:20 17:19 23:21 28:6 48:1
Monday 1:13 74:20 80:14
monitor 21:16
morale 67:4
more 26:13 29:17 33:10 58:19 63:19 64:6
most 19:12 27:12 30:2 62:12,14
MPD 68:1
must 37:1

N

N 4:1
name 4:10,12,14 57:18 57:19
names 4:11
nation 41:7
nature 12:4
NCO 27:10
Neal 2:12 69:12 80:29
necessary 6:16 27:20 50:17 64:10
need 5:15,19 8:2 31:20 44:21 45:1,2 50:16 51:3 58:9
needed 6:5 20:3 38:11 49:7
needs 51:4 58:11
neglect 44:2
negotiated 41:12
neither 21:15
never 52:20,22 56:5,7 63:16 73:18 77:3
nevertheless 55:2
new 11:2 45:4,7 48:20 49:12 50:21 51:11,15 51:21 52:21 53:4,19 54:9,13,20 55·7,12
newly 44:3 46:13
next 38:11 52:10 74:20
non 20:11
none 3:21 74:22
non-discriminatory 66:9
non-GPO 58:5,10
normally 7:12 49:3
North 1:19 2:15
nothing 27:22 28:1,2
notice 1:18
November 73:1
nowhere 62:19
number 26:17 39:1,2 43:13,14 63:13 71:14 72:21 74:3 77 8
N.W 1:20 2:6,15

O

O 1:5 2:22 4:1
oath 12:10
Objection 16:13 22:19 37:18 48:10 59:22 60:5 67:12 68:19 75:17 78:6
obligated 50:20
obligation 21:15,20 27:19 38:9 43:15 62:16
obtained 56.4
obviously 15:16 72:14
occasions 36:7
occur 11:13
occurred 15:18 30:18 34:9
occurring 27:17
October 4:21 77:18
off 50:22 54:14,19 78:21
office 1:2,9,19 2:14 5:3 5:21 6:7,10,15 9:10 9:14,19 10:10,15 63:6 66:13 67:10 68:15 72:7 73:6 74:22 75:7 75:13,15 76 1,2,4 78:4
officer 4:18 10:19 11:1 12:18 13:5,6,7,11,13 13:16 14:4,21 15:10 15:20,21 16:10,15 17:4,5,15 18:1,2,2,4,6 18:9,11,14 19:6,8,17 20:14 21:1,13,14,19 21:21,22,22 22:4,14 23:12,15,22 24:1,2,7 24:22 25:2,5,7,15,20 25:22 26:3,3,6,6,7,8 26:13,15,19 27:3,4,5 27:18,19 28:4,5,12,13 28:15 29:1,4,6,9,13 29:14,14 30:18,19,21 30:21 31:5 32:6,7,9,9 32:13,14,17,18,21 33:7 34:1,2,7,12,12 34:14,19 36:3,5,8,8,9 36:12 37:15 38:7,15 39:17 40:21 41:1 42:6 44:9 47:4,6 48:18 49:11,19,22 50:3,11,20 51:9 52:4 53:7,18 54:14,19 56:8 61:21 63:2 64:16 65:18,18 67:19 68:8 72:6,10,12,17 73:21 74:9 76:17 78:4
officers 12:12,13 15:3,3 17:17,20 18:19 23:9 27:8 29:17 31:8,12 44:11 49:2,7 50:10 51:19 52:2,3 54:7 56:14 57:4 62:1 65:19 66:15 67:9 68:4 69:9
officer's 27:7 64:8
official 7:6,7,9,16,18 8:15,18,22 9:2,7 11:10 20:18,20 23:2 30:4,5 33:3 40:19

55:19 60:15 61:6
officials 11:16
OGC 5:21
Oh 68:22
okay 6:4,19 7:2 9:13,17 11:4 12:9,16 17:13 24:12 26:11 29:11 30:16 33:2 41:11 44:1 45:4 46:18 49:10 52:19 53:2,7 54:1,5 55:1 56:11,18 65:11 70:8,13 72:5 76:8,16 77:2 78:15,18 78:18 79:5
old 52:13 55:7,12
Oldach 65:18
once 41:3
one 7:3 14:4,16 16:3 17:12,20 19:1 21:15 26:17 27:7,8,12,13 28:18 29:21 32:10 36:3,13 37:1,1,5,9 39:1 42:16 43:1,7 67:20 74:3 77:8
ones 70:7
one-person 16:7
only 23:2,3,10 29:22 30:10 34:4 39:1 41:4 45:2 50:7 56:22 61:12
operate 58:12
operation 66:12
Operations 56:22
opinion 39:21 64:3 65:15,16,17
opinions 73:21 75:18
opportunity 7:13 42:18 43:2,4 47:7 48:19,22 49:1,8,14,15,17 50:5 50:8 52:5 77:3
opposed 37:1,12
oral 18:13 47:13,22 48:15 52:19 56:4 71:19 78:9
order 42:21 45:5 49:18 50:2,12,21 51:4,16 52:5,13,14 53:4,8,19 55:21
orders 13:4 14:15,20 16:11 17:2,10,18 26:8 38:9 47:2,2,9,14,16 47:18,20 48:6,18,20 49:3,4,12 50:16,18 51:12,21 52:6,12,21 54:9,13,15,21 55:3,7
organization 51:3,9 55:9 66:22 67:22
organizations 68:2
other 10:1 14:5 17:14
17:21 18:18 21:17 23:14 28:18 29:6,13 32:10 33:8 37:2 40:3 43:9 56:12,13 57:3,7 57:11 59:14,16 62:1,7 68:2 72:4 79:3
otherwise 54:20
ourselves 63:20 77:5
out 48:5,7 49:2 53:3 72:5 73:13 74:8,16 77:21
outcome 40:14 67 6
outside 27:2 29:11 31:21
over 68.14,16 72:8
own 15:17,19 78:1

P

P 4:1
Packard 68:17,22 69·1 69:2 73:14,19 76:14 77:17
packet 69:12
page 47:4
paid 32:3 41:4 42:8 43:12,16,18
paper 51:21 67:11 68:11,15 72:7
papering 73:15
papers 72:10 78:5
paraphrase 71:9
parez 30:12
part 7:20 16:9,22 17:9 24:16 41:12 42:6 45:4,6 47:13 71:18
participate 8:8
participated 10:14
particular 12:17 14:11 23:4 53:9 57:3
particularly 12:13 64:4 72:17
parties 1:22 7:14
pass 33:8 46:15,19
passport 46.11
passports 46:9 58:15 62:19 63:14
past 60:20 66:6
Pause 69:6 70:17
pay 43:15
penalties 12:11 15:2,5 56:12 63:20 65:19 66:5,16
penalty 40:15 60:9 61:12 62:12,14
people 26:22 27:1,21 30:22 31:3 32:11 33:19,22 41:9 42:20 56:16 57:1
perceived 12:11 24:19
32:13
percent 58:8
perception 65:20 67:1
perform 44:7
performance 64:8
perhaps 64:14
permanence 65:1
permitted 9:18 43:1
person 8 19 21:13 59:8 62:21 72:15
personal 6:22 31:19,20 78:2
personally 5:16 59:15
personnel 16:12 52.11
persons 13:20 22:1 26:16 32:8 60:11 63:4
phonetic 30:12
physical 47:18 51:20
piece 51:20
place 12:5 27:11,11 30:7 35:21 46:17 80:18
placed 20:5
plans 67:21
play 7:15 28:20
please 4:10 34:5
plenty 14:14
plus 36:6
point 13:16 16:3 17:20 21:7 32:22 34:14 36:21 43:6,7 53:13,15 75:1 77:2
police 14:21 41:6 42:15 44:9 67:19
policies 44:5,12 59:5 64:14 66:9,21 77:22
pose 42:17
position 4:15,17,20 5:1 5:13 18:16,17 20:15 33:3 35:13 38:1 39:20 40:13 41:4 42:9,11,19,21 43:11 44:8
possibly 58:11
post 13:4,4,17,21 14:1 14:4,10 15:11,15,21 16:6,7,11,12 17:2,10 17:17,18 18:4,20 19:3 19:3,5,7 22:2 23:7 24:3 26:16 27:17 28:14 29:6 30:15,18 32:7 37:16 38:9 44:4 44:17,18,18 45:5,8,12 47:1,2,9,9,14,15,15 49:12 50:2,12,21 51:11,12,15,16,16 52:12,12,13,13,21 53:4,8,19 54:9,10,13
54:20,21 55:3,6 63:2 64:16
potential 66:2
practice 61:15
practices 42:16
premises 38:22
prepared 73:16
present 1:21 2:19 7 14 63:22
presentation 47:14 52:10
presented 23:3,4 30:5 32:6 35:20,21
President 47:5
presumably 48:20 59:8
Printing 1:9,19 2:14 66:13
prior 47:9
proactive 32:2
probably 11:15 48:3 54:22 61:17 62:1
problem 60:18 72:16
procedure 51:4 54:12 61:16
procedures 14:3,9 41:21 44:4,12,17 46:14 59:4 64:15 72:8 78:1
proceedings 69:6 70:17 80:23
process 28:16 30:22 54:17 63:18 64:15
processed 69:18
produced 12:4
production 58:14 70:20
professional 52:2 68:3
promotes 49:4,4
promulgation 47:10
proper 31:9 35:18
properly 15:14 28:15 30:22 36:1 58:9
proposal 8:7 10:17,21 10:22 11:2,10
proposed 11:22 37:14 53:3 61:21 77:16
proposing 11:10
Protection 1.1 74:20
provide 47:7 62:6,16 71:4,7,8
provided 47:6 48:16 50:1 56:7 59:19 60:14 76:9
provides 6:10
provisions 48:5
prudent 36:14,19
punished 61:8
punishment 57:2
purposes 61:12
pursuant 1:18
purview 61:10
put 38:6 46:16 75:8
puts 41:8
putting 75:15
p.m 4:2 78:21 79:1,19

Q

Qaeda 58:22
question 16:20 21:21 22:11,12,13,14,20 29:7,8 30:2 34:5 37:19,20 50:19 52:2 56:15 75:3,18
questions 49:15 55:16 79:3,4,6
quite 32:4
Quote 44:2

R

r 4:1,14
race 12:12 65:20
Rafael 1:15 3:14 4:4,12 79:20 80:10
raise 14:16 74:18
rank 11:3 23:10,10 44:10
rather 21:6 59:5 65:1 71:2
ray 20:6
reaching 56:14
read 30:10,11,11 43:21 66:21 69:19 79:17
real 67:2,2
really 11:18 40:8
reason 10:22 14:16 16:21 17:9 21:11 22:6 32:16 52:17
reasonably 36:13
reasons 16:10 24:21
recall 10:19 11:20 13:11 16:9 47:16,17 52:9,14 70:3,4 71:12 72:11 76:9,16,19
receipt 54:20
received 49.13 52:4 54:15 63:7 71:20
recognize 19:19
recognized 19:20
recollection 63:13
recommendation 16:22
recommendations 20:19 47:8
recommended 7:11 57:10
recommending 8:19 9:1 11:16 20:18
record 54:19 78:21,22 79:18
RECROSS 3:12

REDIRECT 3:12
reduced 80:25
reduction 11:3 12:22
refer 47:2
reference 12:16
referred 10:6
referring 47:1
regarding 14:3 59:19 64:15 70:2
REGIONAL 1:2
regular 44:20
regulations 37:16 44:5 66:21
related 26:20 49:8 57:2 57:4 60:14 67:21 76:21
relates 57.11
relating 66:9
relationship 23:12
relationships 67:22 68:1
relevant 16:14 60:6,8 67:13 78:7
relief 31:9
relies 10:9
relieve 15:14 25:21 26:8 31:6 36:7
relieved 13:6,13 15:20 17:21 21:12 24:8,20 26:14 27:4
relieves 14:4
relieving 18:1 21:13 24:3 28:4 29:1,5,14 30:20 32:8 64.15
rely 76:4
relying 64:1
remained 27:1
remember 11:4,8 47:13 47:20 48:2 53:1,15 71:18 72:3
removal 10:22 11:11 17:10
removing 12:17,20 16:10
repeat 29:8
repeated 25.20
reply 18:13 71:19 78:9
report 12:9 71:15
reported 80:24
reports 72:1
represent 23:13
represents 22.1 80.23
reprimand 63:9
request 9:22 70:19 71:1
require 10 3
required 23:16,19 26:12
requirement 55:13,21
requires 24:18 78:3
Resources 56:16
respect 17:15 27:20 49:11 77:22
respective 1:22
respond 60:1,6
response 62:4 70:19,22
responsibilities 15.21 28:21 30:3,4 64:19
responsibility 5:2 7:18 8:4 14:10 16:4 19:4 23:7,8,13,15 27:9 28:18 29:4,16 30:1 44:10 50:18 66:8
responsible 13:17,19 13:22 15:11 17:17 19:2 26:15 39:11 44:5 55:3 59:9 65:11 66:20
rest 41:9
result 60:22
resulted 57:15
resulting 19:14
retirement 14:19
returned 26:4
returning 32:7
review 8:3 10:3,8 20 20 21:20 23:2,3 40:19 48:22 49:14 56:11 61:11 79:7
reviewed 48:6
reviewer 7:11
reviewing 60:19
revised 44:3 46:13 47:1 47:2,15
rewarded 35:8
Richardson 25:22 26:9 36:8
right 11:7 13:2 17:8 25:19 28:13 31:22 42:2 43:5 46:1,21,22 48:9 54:3 56:1,3 71:21 72:2 75:12 76.5 78:19
risen 61:13
road 42:20
ROBERT 1 5 2:22
role 7:3,15,17 28:20
room 69:13
rotate 43:1
rotated 42:11,14
rules 35:16 44:4 66:15 66:17

S

S 4:1
same 17:18 21:1 23:11 29:4 46:3 55:7,18,21 59:10 64:21 66:18
sanctions 36:11
saw 16:1 18:21 19:18 30:10
saying 25:13 29:3 53:1 74.6
says 36:13 37:14 50:22 74:14
Scott 73:2,8 74:13
screen 18:5
screening 16:12
seal 62:19,20
search 63:19
second 19:1 25:4 47:4 58:6 78:17
secure 27:2
security 26:21 44:3,11 44:17 45:7 46:14 50:13,16,22 51:5,5 56:13 57:14 59:14,17 59:19 60:4,22 61:7 62:2,8,13
see 7:10 8:1 16:2 31:2 36:3 37:11 57:13 72:15 74:8
seems 21:14,18 61:18
seen 20:1 24:18
sees 36:4
sends 74:5
senior 19:5 27:10,14
sense 24:13 31:13 43:9 51:8 65:3
sensitivity 39:10
sent 49:7 50:6 53:3
sergeant 12:10,14 14:17,19 18:12,16 19:3,12 20.15 21:3,8 23:5,6 24:17 25:8 27:10 28:19 29:2,2,21 30:12,13 31:1,12 32:1 33:6,16 35:14,18,20 36:4 39:15 40:9 41.17,20 42:7,8,9,11 43:8,16,18 45:15 50:4 54:7 57:11 64:20,22 65:5,16
sergeants 41:12,22 42:3 59:3
sergeant's 35:13 39:20 40:13 42:19
serve 42:18
served 36:11
services 15:15 51:6 78:3
set 19:10,11 70:21
sets 18:19
seven-day 62:17
several 36.7
severe 62:12
severely 44:6
shoes 38:7
show 43:22
sidewalk 63:3
sign 54:14
signature 51:7 79:21
signed 53:11 54:19
significant 62:14
signs 50:22
similar 57:4
simply 21:13,14 32:20 43:6
since 4:21 17:22 67:7
sir 9:8 25:18 52:15 64:17
sit 37:5 59:6
sits 72:10
situation 16:1,2 18:21 18:22 19:1,2 20.17 23:5 29:21 40:6 57:3 58:1
small 42:15
smallest 34:7
some 10:22 27:18 29:13 32:11,16 43·7 73 21 79:3
somebody 29:1 65:4
someone 5:20 7:12 35:12
something 5:10 15:16 26:13 48:7,12 49:20 59:6
somewhere 29:10
Sonja 73:2,8 74:12
sorry 6:21 8:14 12:21 17:5 53:14,17 70:5 79:14
sort 58:16 63:14
space 16:3
speak 25:8,13
special 45:20 73:3 74:12 75:14
specific 14:22 20:13 30:6 39:2 47:18 64:7 67·21
specifically 56:17
specificity 31:10
speculate 30.9
speculating 29:20 34:10
speculation 21:6 34.10
speculative 22:21
spell 4:11
SR 1:5
standard 19:11 22:4 27:15 42:7 43:18 55:19
standards 18:19 35:4,6 35:7,9 57·2 65:6,7
stands 22:6
State 4:10
stated 13:10,12 25:15 31:10 47:19 51:19
statement 46:6 49:21 50:7 53:5 57:21
statements 45:10 47:17 49:1,16 72:4
States 1:1 41:7 67:9
status 35:3
step 19:9 59:3
steps 34:3 59:4
Steven 68:17,22 70:2,9 70:10 73:7,10
Stevie 56:20 61:20
still 21:3 28:3 54:9 63:18
Street 1:20 2:6,15
streets 63:14
strict 14:9
strictly 37:3 44:11
subordinate 8:20
sufficient 31:8 36:22 37:11 64:3
suggested 32:12
suggesting 37:4 68:6
supervision 40 10
supervisor 18:12,15 19:10 22:5,7 23:8 32:3 33:17 41:5 65:13 72:18 78:3
supervisory 20.15 21:2 22:15,18 29:2,15 39:20 40:9,13 42:19 43:8 44:8
suppliers 59:20
support 5:22 6:6
suppose 34·19,22
supposed 7:8 33:18 53:19 62:18 71:8 74:13
sure 4:12 6:2,8 7:20 11:5 18:11 23:21 25:1 26:22 27:11 28:19 29.4,16 65:14 65:21 67:17 70:15,21 78:18 79:9,12,16
surprised 77:19
surrounding 16:5 19:5
suspension 11 3,11 12 22 47:12 62:17
sustainment 16:22 39:13
sworn 4:6
systems 1:1 46:16 74:20

T

tab 70:3
TABLE 3:10
tabs 70:6

take 23:15 34:3 40:1,4 59:3 63:10 69:17 75:6 77:11
taken 12:5 19:13,17 20:9 36:5 59:13 60:20 77:14
takes 27:11
taking 18:5
talk 37:8 72:15 77:4
talked 47:3 73:19
talking 20:22 34:9 35:15 37:3 46:15 66:2 68:13
talks 22:17
telephone 25:21 73:14 74:7
tell 53:8,21 55:17
telling 24:9 55:1
temporarily 35:12
temporary 20:15
terms 16:12 18:14 67:10
testified 4:7 12:10 14:17 24:7 25:10,14 54:8
testimony 13:9 14:2,15 24:4 30:11 79:10
Thank 12:21 69:21
their 7:14 11:16 19:22 35:2 47:10 62:3,4 65:20
thing 25:4
things 14:17 33:16 38:10 52:8 58:17
think 21:5 23:18 24:16 24:22 30:1 32:5 34:10 35:22 37:6,16 39:14 65:9,10 72:22 74:5 75:10 78:17
thinking 18:8 22:3 31:2
Thirty-odd 70:6
thoroughly 63:20
thought 25:9 47:1 70:20
three 54:7
through 20:4,5 41:21 56:17 57:20 63:19
time 11:5 16:3,7 17:19 18:11 19:7,13 21:2,9 21 10 23:6,11 30:7,13 32:1,22 33:18 35:20 38:14,21 39:15 40:5 40:18 43:8 45:15 49:21 50:4 51:2,20 55:18 60:15 66:19 75:1 76:17,20 78:9
times 71:14
title 77:1
today 30:3 40:8 58:1,17 71:8
together 75:8,15
told 48:17,20 51:21 53:2,17 56:19 57:5
tour 58:17
trained 68:5
training 67:8,21 68:10
transcribed 79:9
transcript 79:8 80:6
transpired 25:2 34:8
treasures 41:6
trespassed 20:10
trigger 31:15
triggered 43:15
truck 62:19,20
true 14:1 27:8 41:15 42:4 47:20 48:21 52:21 53:5 54:22 61:17,18
trust 44:6 51:19 79:10
truth 55:17
try 71:9
trying 72:5 77:20
turn 5:14 6:6
turned 38:8,13
turns 73:13
two 13:7,20 17:16,20 18:5 19:6,18 22:1 25:6,15 26:16 27:21 29:17 30:22 31:3,11 31:16,16 32:8 36:22 39:2 54:6 56:22
types 46:3 62:7
typewriting 80:25

U

unauthorized 33:13 38:21 60:11
unaware 76:17
unbecoming 39:16
under 8:17 12:10 15:5 18:9 20:13,20 26:8 37:2 45:20 64:2 72:13 76:5
undermined 44:6
understand 5:16 6:8 7:20 14:8,11 15:12,13 16.6 17:14,22 18:3,13 23:21 25:1,19 26:9,10 29:7 31:9,17 32:15,20 35:10 37:22 38:1,3 41:11,19 42:10 46:2 46:22 49.3,16 52 6 54:4 56:3 61:2,3 63:11 77:7
understanding 7 8 13:15 37:8 58 15 68:10
understands 66:19
Understood 67:1
uniform 54:7 66:14 78:2
uniformed 32:14
unit 41:13
United 1:1 41:7 67:9
unless 20:12 58:8
unlikely 8:21
unread 66:21
until 50:12,21 73:1,18
updated 47:20
use 74:21 75:7
used 13:10 24:4 69:8 72:9
U.S 68.14,16 71:16 72:7,11 73:9,20 74:6 76:10,13,18 78:4

V

v 1:7
validate 55:9
validated 49:5
validating 51:18
Van 57:19 59:9
vendors 59:20 60:10
vernon 9:5,6,17 11:1 11:21 12:1 48:1,17 49:3 52:20 53:7,17 56:6,7 73:17 77 18,20
version 50:1
versus 11:17 15:3
very 33:20 66:3,4 73:22
veteran 14:18
Vicki 56:21 61:20
video 62:21
view 12:14 15:4
views 7:14 23:22
violate 66:17
violated 37:15
violation 40:17
violations 56:13 57:14 61:16 62:2,8

W

waive 79:10
walk 24:20
want 12:9 25:1 36:18 44:14 54:3 71:3
wanted 6:20,22 25:4 33:1 69:19
wants 36:4
Washington 1:2,14,20 2:7,16 63:15
Washinton 80:18
wasn't 6:21 28 5 30:21 43:16,18 77:20
way 22:13 28:18 32:10 35:19 36:17 38:18 42:18 43:12 51:18 61:14
ways 24:17
week 54:8 72:19
Weese 57:18
well 6:9 11:9 14:8 17:11 21:11 22:13 23:20 25:10,14 29:20 31:17 33:21 34:22 38:20 41:18,21 42:17 44:18 45:19 54:18 55:14 61:11 62:6 63:17 77:13
went 52:11 63:4 68:14 72:6,18 77:17 78:21 78:22
were 1:21 7:4 13:7,20 18:6 20:3,4,7,14 21:8 22:6,15 25:6,16 26:2 26:16 27:17 28:3,10 28:22 29:3,9 32:6,8 32:11,14 34:1 35:21 38:10,17 39:15 43:9 43:13 45:7 47:1,6,15 47:19 48:6,16,21 52:10,12,21 55:10 56:19,22 57:14 58:17 62:1 63:14 68:12,21 72:5 73:22 76:17 78:9
weren't 43:12
we'll 24:21 63:10,21 78:17,19 79:12
we're 63:18 66:2 68:13 74:15 79:18
while 8:3 13.7
whispered 48:1,11
white 1:5 2:22 10:18 11:1 12:18 13:7,13 15:3,20 18:2,2,9,11 18:12 19:3,12,17 20:14 21.1,20 22:5,15 23:5 24:2,7,22 25:5,8 25:20 26:3,6,8,13 27:4,18 28:5,13 29:2 29:9,15 30:13,19,21 31.1 32.1,6,9,21 33:6 33:17 34.3,7,12,14 36:3 37:15 38:15 39:15 42:6 45:15 47:6 48.18 49:11 50:1,3,4 53:18 54:19 56:8 57:11 65:17 67:13 78·7,16
White's 16:15 38:7 61:21
wish 43.22 79:11
witness 3:12 4:5 16:17 16:21 23:1 59:22 60:5 70:9,13,16 78:8 78:18 79:5
witnesses 71:7
women 13:7 25:6
words 13:10 14:5 24:5 43:9 74:14
work 68:13
working 75:13
worry 34:1
wouldn't 22:7 29:19
writing 28:13
written 40:7
wrong 36:16

X

X 19:1,1,1 20:5
X-ray 46:20

Y

yeah 11:16 29:9 48:3 61:19 69:16 71:6
year 72.22 73:1
years 36:12 40:2
yellow 69:22

1

100 58:8
13 1:13 80:14
14 11:2
14-day 47:11
15 36:6
17th 4:21
18th 2:6
1901 2:6
1988 55:22

2

2:33 4:2
20009 2:7
2005 4:22
2006 47:9
2007 1:13 55:22 80:14
202 2:8,17
20401 2:16
23rd 47.8
232-1907 2:8
24-year 14:18

3

30 36:5

4

4 3:16 44:21 45:17,18 45:22 46:7,8 56:13 57:14,18,20 58·7 59:15,21 60:11 62:9 62·14
4(m) 69:13 70:21,22
4:02 78:21
4:04 79 1

Page 88

| | | | | |
|---|---|---|---|---|
| 4:40 79:19 | | | | |
| 44 13:4;17,21 15:21 | | | | |
| 16 6,12 17 18 26:16 | | | | |
| 27:18 29:6 30 18 | | | | |
| 37:36 38:22 44:4,13 | | | | |
| 44 17;18 45:8 47:9,15 | | | | |
| 50:2 51:12,16,16 | | | | |
| 52:12 53:19 54:10,21 | | | | |
| 63:2 | | | | |
| 41's 45:12 | | | | |

**5**

512-0200 2:17

**7**

732 1:19 2:15

Neal R. Gross & Co., Inc.
(202) 234-4433

Transcript of: **Robert White**

**Date:** August 10, 2007
**Volume:**

**Case:** White v. U.S. GPO

Neal R. Gross & Co., Inc.
Phone: 202-234-4433
Fax: 202-387-7330
Email: info@nealrgross.com
Internet: www.nealrgross.com

---

Page 1

UNITED STATES OF AMERICA
MERIT SYSTEMS PROTECTION BOARD
WASHINGTON REGIONAL OFFICE

```
-------------------------X
In the Matter of:          :
                           :
ROBERT O. WHITE, SR.       :
                           :
      Appellant,           :
v.                         :Docket No.
                           :DC-0752-07-0729-I-1
GOVERNMENT PRINTING        :
OFFICE ,                   :
                           :
      Agency.              :
-------------------------X
```

                         Friday, August 10, 2007
                         Washington, DC

DEPOSITION OF:

ROBERT O. WHITE, SR.
called for examination by the counsel for the
Appellant  pursuant to notice of deposition at
the Government Printing Office, 732 North
Capitol Street, N.W., Washington, DC 20401

when were present on behalf of the of the
respective parties:

---

Page 2

APPEARANCES:

On Behalf of the Appellant:

      J. MICHAEL HANNON, ESQ.

of:   Hannon Law Group, LLP
      1901 18th Street, N.W.
      Washington, DC 20009
      (202) 232-1907

On Behalf of the Agency:

      NEAL H. FINE, ESQ.
of:   Government Printing Office
      732 North Capitol Street, N.W.
      Washington, D.C. 20401
      (202 ) 512-0200

---

Page 3

TABLE OF CONTENTS

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Robert White, Sr. | 4 | 81 | 84 | 86 |

Page 4

1          P-R-O-C-E-E-D-I-N-G-S
2   WHEREUPON,
3          ROBERT O. WHITE, SR.
4   was called as a witness by and on behalf of
5   the Appellant and, having first been duly
6   sworn, was examined and testified as follows:
7          MR. HANNON:  Good morning, Mr.
8   White, the court reporter has sworn you in.
9   Before we get going, I'd like to just go
10  through a little bit of a -- a few statements
11  here.
12         I've called the deposition today
13  and the process is that I ask you questions
14  and you give answers to the questions to the
15  best of your ability.  The testimony is being
16  taken under oath and you are aware of what
17  that means, so --
18         THE WITNESS:  Yes.
19         MR. HANNON:  So the court reporter
20  would like you to give verbal answers to the
21  question which I'm going to ask you, and so
22  instead of nodding your head or shaking it, to

Page 5

1   indicate yes or no.  Do you understand?
2          THE WITNESS:  Yes.
3          MR. HANNON:  If you don't
4   understand my questions, please ask me to
5   repeat them or to rephrase the questions, and
6   I will do so.  This is important because if
7   you answer a question to which you don't
8   understand the answer, the record will only
9   show that you sufficiently understood my
10  question to answer.  Under those
11  circumstances, it creates a problem for both
12  parties that we can avoid this problem, if you
13  don't understand questions and you don't
14  understand the answers.
15         All you have to do is ask me to
16  rephrase a question and I'll be happy to do
17  so.  Understood?
18         THE WITNESS:  Yes.
19         MR. HANNON:  The last thing is
20  that each party finish asking and answering
21  questions, and without talking over because
22  that causes the reporter problems.  I won't

Page 6

1   interrupt you if you promise not to interrupt
2   me.
3          THE WITNESS:  Yes.
4          MR. HANNON:  These aren't
5   microphones.  These are just so she can hear
6   them.
7          THE WITNESS:  Oh, okay.
8          MR. HANNON:  Okay.  And just let
9   me ask you three things.  Are you aware of any
10  reason why you can't give truthful or accurate
11  testimony this morning?
12         THE WITNESS:  no.
13         MR. HANNON:  You're not taking any
14  medication which might impair your ability to
15  remember things accurately or testify
16  truthfully?
17         THE WITNESS:  No.
18         MR. HANNON:  Are you being treated
19  for any mental illness or defect which might
20  impair your ability to give truthful or
21  accurate testimony?
22         MR. FINE:  Objection.  He's not

Page 7

1   going to answer that question.
2          MR. HANNON:  So there's going to
3   be a defense to certain questions?
4          MR. FINE:  No.  I instruct him not
5   to answer the question on the grounds that his
6   mental history or physical health, even, is
7   not something that you are permitted to delve
8   into.  He's already told you that he's
9   competent to answer your questions.
10         MR. HANNON:  All right.  Then
11  let's start at the top.
12     EXAMINATION BY COUNSEL FOR APPELLANT
13         BY MR. HANNON:
14     Q    As I understand it, you were hired
15  in 1998 by the Government Printing Office?
16     A    That's correct.
17     Q    And then you were removed by the
18  Office of Personnel Management for false
19  information on your application; is that
20  correct?
21     A    That was the charge; yes.
22     Q    And that was later settled and you

Page 8

```
 1    were rehired by GPO in April of 2001; correct?
 2        A    Yes.
 3        Q    And you were later promoted -- no;
 4    you were hired by GPO in 2002.  I'm sorry.
 5        A    2000.
 6        Q    And then you were promoted to
 7    corporal in 2001?
 8        A    Yes.
 9        Q    Could you explain the duties of a
10    corporal in the control room.
11        A    In the control center -- and I
12    have to refer to the old control center
13    because I have not been assigned, I haven't
14    worked in the new control center yet.  But
15    they're pretty much the same.  Basically, we
16    monitor the alarm system, the fire alarm
17    system, the water flow systems, the key card
18    systems.  We dispatch officers to assignments,
19    to emergency situations, and miscellaneous
20    assignments.  We keep a running log of the
21    daily activities in the control center, and we
22    carry out the orders and requests of the
```

Neal R. Gross & Co., Inc.
(202) 234-4433

Page 9

```
 1    supervisor of the shift.
 2        Q    Now there's three computers in the
 3    control center; is that correct?  There's the
 4    main one, where you use it for doing the daily
 5    log.
 6        A    Daily log.
 7        Q    And then there's one that
 8    monitors, I guess alarms.
 9        A    The alarms.
10        Q    And one that monitors --
11        A    The key card system.
12        Q    The key cards.  Now the key cards
13    are used over at Building 4?
14        A    The key cards are used at various
15    locations throughout the building to access
16    certain rooms or areas; yes.
17        Q    At Building 4 they use the key
18    card system?
19        A    Well, if you're talking about now
20    as opposed to when the alleged incident
21    happened, when the alleged incident occurred,
22    October 29th, they weren't using the key card
```

Neal R. Gross & Co., Inc.
(202) 234-4433

Page 10

```
 1    system.  It had just come into inception.
 2        Q    Okay.
 3        A    The system that is in use now,
 4    where they take the ID card such as this, and
 5    they swipe it and the picture shows up, that
 6    was just coming into inception, and all of the
 7    employees didn't have this card.  The
 8    employees who worked on the first floor in the
 9    warehouse, they didn't have this card.
10              They were bringing a number of
11    employees from this building over to the
12    Building 4 to train, in order -- they had this
13    card at the time.  In fact, the police and
14    upper management were the first, I think, to
15    get this card.
16        Q    So it made identification then of
17    employees more complicated for you, or people
18    entering the building, rather, more
19    complicated?
20              THE WITNESS:  Well, one of the
21    problems was because during the inception and
22    just prior to of the new -- this system being
```

Neal R. Gross & Co., Inc.
(202) 234-4433

Page 11

```
 1    put in, more duties and responsibilities were
 2    placed on an officer in Building 4, without
 3    additional help, and the way that the system
 4    was designed, it wasn't the best.
 5              For instance, you had three
 6    cameras or screens to monitor, one of which
 7    was 16 feet away from the desk.  That was the
 8    monitor for the x-ray machine.  You had
 9    another screen on the desk that would monitor
10    the picture of the individuals, and then
11    there's a four split screen right above the
12    desk that you monitor for various locations,
13    and that has a strobe, and it has an audible
14    alert when someone comes through a door.
15              So you have to monitor this, you
16    have to monitor a screen that's 16 feet away
17    from you, you have to monitor the pop-up
18    screen, and you have the telephones that you
19    have to monitor and other things.  But it's
20    almost impossible for one person to do it
21    effectively.
22        Q    So it's a, from what I'm
```

Neal R. Gross & Co., Inc.
(202) 234-4433

Page 12

```
 1   understanding then, you've got a lot of duties
 2   and it would be distracting, then, to have
 3   people talking to you while you're trying to
 4   do those duties?
 5        A    Well, it could very well be; yes.
 6   And then you also have to operate buzzers for
 7   the doors, because when a person comes in,
 8   they can't access upstairs area or downstairs
 9   area unless you have a buzzer to buzz them
10   through.
11        Q    Okay.  And the buzzer's behind the
12   desk there?
13        A    Desk.
14        Q    Okay.  We'll call it main
15   computer, for lack of a better term, the one
16   that you kept the daily log on.
17        A    Okay.  Now that's in the control
18   center.  That's not the --
19        Q    Right; in the control center.
20   that was used to -- you kept a running account
21   of the day's activities?
22        A    Yes.
```

Page 13

```
 1        Q    And you would send -- did you use
 2   that to send e-mails or messages to your
 3   supervisors about problems?
 4        A    Not really.  That computer, that
 5   was in the control center, was sort of limited
 6   as far as the programs.  Now, for instance, I
 7   couldn't receive e-mails on that computer
 8   there.
 9        Some things, if i wanted to send,
10   if I wanted to notify a supervisor on the
11   Blackberry, I'd have to go out of the control
12   center and go to either the supervisor's
13   computer or another computer in the office to
14   send the messages.
15        Q    If you wanted to send -- like
16   there's a form I've seen for like overtime
17   approval.  How would you send that?
18        A    The overtime attendance, the T&A,
19   and all was done on the supervisor's computer
20   in the lieutenant's office.  That's where I
21   did my -- and that's where I was showed to do
22   it, and that's where I did.
```

Page 14

```
 1        Q    Okay.  But that was an e-mail that
 2   you were sending from the supervisor's office?
 3        A    It was a form.  It was a form
 4   that, various forms that are on the systems
 5   there, and for time and attendance, is a form,
 6   you bring it up on the computer, you fill it
 7   in, and then you would send it to -- it was
 8   going to Commander Packet at that time.
 9        Q    I mean, you didn't fax it.  You
10   sent it by e-mail, then, the template --
11        A    Either that, yeah, or took it by
12   hand.
13        Q    Okay.  And so you were doing that
14   as a corporal back in what?  2001?
15        A    No.  Well, in 2001, yeah.  I
16   wasn't doing the time and attendance at that
17   time.
18        Q    No, but the overtime --
19        A    I wasn't doing overtime --
20        Q    Not overtime.  You weren't doing
21   overtime?
22        A    No.
```

Page 15

```
 1        Q    Okay.
 2        A    No.  Basically what I was doing
 3   was formulating that running log and at the
 4   end a the day, I would print it out and give
 5   it to the shift supervisor, and he would
 6   review it and sign it.  I wasn't signing that
 7   anyway.
 8        Q    Okay.  That answered my next
 9   question.  Did the running log then get signed
10   by the OIC?
11        A    Yes.
12        Q    And then you were detailed to a
13   supervisory position as of August 28, 2006?
14        A    Yes.
15        Q    That was for 89 days?
16        A    Yes.
17        Q    Now I notice in your application
18   for the job, very impressive resume, you were
19   a correctional major, a supervisor at the
20   penitentiary Rockridge, correct?
21        A    Yes.
22        Q    And you had several hundred, as I
```

**Page 16**

```
1   recall, employees reporting to you?
2        A    Yes.
3        Q    Now it says that -- you say in
4   here, in the resume, you had duties for
5   overseeing the process established on the
6   shift conforms to division and correctional
7   directives, facility directives, and the
8   direct orders of the facility administrative
9   official.  So these were what?  Various
10  operating procedures, orders that you had
11  developed or somebody else had developed?
12       A    These were procedures, most that
13  had been developed; however, from time to
14  time, upon review of procedures, we would
15  institute new procedures and oftentimes I
16  would participate in that; yes.  Or if I saw
17  whereby a particular procedure didn't fit the
18  operation, for whatever reason, then certainly
19  I would review it and make change and submit
20  them to my supervisor.
21       Q    Okay.  And then these procedures
22  bound the, I guess, the prison guards and
```

**Page 17**

```
1   other supervisors?
2        A    Well, just like any other
3   procedures.  Procedures are a mere guide.
4   Procedures are a mere guide; okay?  It's to
5   guide the individual towards a certain task,
6   and I don't think I can compare the prison
7   system to GPO.
8        Q    Oh, I understand.  But I mean, did
9   the officers have certain procedures that they
10  followed, you know, in regard to --
11       A    Okay.
12       Q    -- in regard to what they did on a
13  daily basis.  They were supposed to check
14  this, they would check that.  That kind of
15  thing.
16       A    To be very frank with you, the
17  prison system is a far more structured system
18  than GPO police department.
19       Q    Okay.  That would help.
20       A    And the rules -- yes -- the rules
21  and regulations there are more specific to
22  duties there.  They're not germane, because
```

**Page 18**

```
1   you're working in various sections.  You know,
2   your duties may vary, drastically, from one
3   shift to another because of the hours of
4   operation and what's going on.
5        But the general rules and
6   regulations, they are very -- much more job-
7   specific than --
8        Q    I understand.  Did you always hold
9   your officers responsible for following those
10  orders and procedures?
11       A    Yes, we did.  But at the same
12  time, we -- again, in that particular, work
13  environment, the things that happen, that are
14  just unimaginable, sometimes, and do officers
15  sometimes deviate from the written rule
16  regulation?  Yes.  Because the situation
17  dictates that they had to.  It may be a life-
18  threatening situation be it an inmate, an
19  employee, a unforeseen situation they had
20  there, so --
21       Q    Okay.  And did you always take
22  discipline for those violations of those --
```

**Page 19**

```
1        A    No.
2        Q    No.
3        A    No.
4        Q    When wouldn't you take discipline
5   for violation of a procedure?
6        A    If, in fact, an officer deviated
7   from the regular procedure, and upon
8   investigation, you found that there were
9   mitigating circumstances, then the officer
10  wasn't disciplined.
11       Q    Okay.  When you became a corporal
12  in 2001, was this the first time that you used
13  a computer?
14       A    It wasn't, no, the first time I
15  used a computer; no.
16       Q    I notice you were an adjunct
17  professor at Compton State, so I assume you
18  used a computer there?
19       A    Yes.
20       Q    That was for what? developing your
21  courses, communicating with students, other
22  professors?
```

Page 20

```
1       A     Yes.
2       Q     And you'd been a professor at
3  Compton State for how long?
4       A     Roughly six years.
5       Q     Okay.  Six years from today.  So
6  around 2001, you -- or you'd been one as --
7       A     For a period of six years.
8       Q     Okay.  And I believe you have your
9  own laptop computer?
10      A     Yes.
11      Q     And how long have you had that?
12      A     Several years.
13      Q     Okay.  I assume you use that for
14 e-mail?
15      A     Today?
16      Q     Yeah.
17      A     I've not yet.
18      Q     And since you've gotten it?  Since
19 you've had that laptop, have you used it for
20 e-mail?
21      A     I do now; today.
22      Q     Yeah.  Well, you said you bought
```

Page 21

```
1  it several years ago.  So 2001, were you using
2  a laptop or a personal computer for e-mail?
3       A     When I did my lesson plans, I did
4  most of my lesson plans at home.  I didn't e-
5  mail my lessons plans to students.
6       Q     But did you e-mail with
7  professors?
8       A     No.
9       Q     You didn't use e-mail at all?
10      A     No.  And just like this facility,
11 there was some time before we really got
12 computers, where we were actually e-mailing
13 around.  Like this was a closed system, here,
14 up until two or three years ago, and the
15 facility, I rarely -- I dealt with hard copy
16 communications, basically.
17      Q     Okay.  Now in regard to the post
18 orders, wouldn't it be true that the duties
19 and responsibilities for all the posts that
20 are covered entrances are the same?  Screening
21 visitors, employees, checking IDs, preventing
22 introduction of contraband?
```

Page 22

```
1       A     Germane; yes.
2       Q     Now back in August of 2006, I
3  think it's August 23rd, you received an e-mail
4  from Mr. LaMont Vernon in regard to proposed
5  changes to the post orders.  Do you recall
6  receiving that?
7       A     That's inaccurate.  No.  I did
8  not.
9       Q     You did not receive it?
10      A     No.
11      Q     Did you look at e-mail then, in
12 2006?
13      A     I did look at e-mails but not on a
14 daily basis and with respect to e-mails, they
15 are sent in bulk for everyone, and no e-mail
16 was sent to me specifically to review a post
17 order.
18      Q     Well, I believe it was sent to you
19 and about three or four other people?
20      A     It was not sent directly to me.
21 If so, I didn't get it; no.
22      Q     Okay.
```

Page 23

```
1       A     Because I think it -- the letter
2  indicated that it was sent, and Corporal
3  Hardwick and I had reviewed it, something.
4  And that wasn't true.
5       Q     All right.  So the e-mail of
6  August 23rd from LaMont to you and five or six
7  other people, six post orders for review,
8  you're saying you never saw it?
9       A     I did not review it.  No, sir.
10      Q     Okay.
11            MR. HANNON:  I'm sorry, Neal,
12 which document?  You're looking at a document.
13 Which document number are you looking at?
14            MR. FINE:  It was the Agency's
15 response 4M.
16            MR. HANNON:  In the response to
17 production of documents?
18            MR. FINE:  No, the response to the
19 Judge's order.
20            MR. HANNON:  Okay.  Thank you.
21            BY MR. FINE:
22      Q     Did you ever tell Mr. Vernon not
```

Page 24

```
1   to send you email, that you didn't use your
2   email?
3        A    No.
4        Q    I'm sorry, the answer is no?
5        A    No.
6        Q    Okay.  Now in August of 2006, were
7   you using email on a regular basis?
8        A    No, because I have a problem with
9   my email, receiving it.  As a matter of fact,
10  I was put in the position on August 28th and
11  it was -- it was either August 28th or shortly
12  thereafter, I had Ms. Sebold to come down and
13  she straightened my computer out because I
14  could receive mail as I run it.  Yesterday, I
15  think it was, or the day before, again, I
16  couldn't receive.
17       Sergeant Daily wanted me to
18  perform a task, taking a test, a security
19  evaluation on the computer and he sent it to
20  me and I didn't receive it.  He sent it a
21  second time from his blackberry and sent a
22  text.  I didn't receive it.  I had to go to a
```

Page 25

```
1   supervisor's computer and it didn't come on at
2   that time either.  And then I think some 10 or
3   15 minutes later, it popped up.  I think
4   there's not only my system, because of the age
5   of the computers that we had and the amount of
6   information that are on the computers for
7   years, I think it's a problem.  It's my
8   understanding that we are supposed to be
9   getting new computers.  They've been ordered
10  and they're supposedly setting them up.  This
11  just happened yesterday or the day before.
12       Q    So it was just a delay.  But back
13  in August are you saying you weren't able to
14  send or receive emails at all, for how long a
15  period of time was that?
16       A    It was for some time.  I can't
17  recall how long it was.  The systems, they
18  work sometimes and then they don't.  The
19  systems are old.  They're old.  It's not just
20  me. There are other offices that have the same
21  problem.
22       Q    Did you notify your supervisors to
```

Page 26

```
1   put in a repair order?
2        A    We notify them.  We get them
3   repaired, the same as we do, but they still go
4   out.  The -- our systems were old when we got
5   them.  They were old and we've had them
6   reconfigured, where they try to -- but
7   they're old and that's why we're getting new
8   systems now.
9        Q    And so you're saying Ms. Sebold
10  came down on or around August 28th.  How do
11  you remember that particular date, August
12  28th?
13       A    Because that was the day that I
14  started as the sergeant position.
15       Q    I see.
16       A    You see, I had to be set up to
17  receive certain information on that level from
18  Mr. Vernon and others.  Regular officers don't
19  have access to the same information the
20  supervisors have information to.  So she had
21  to come down and set my computer up.
22       Q    Okay.
```

Page 27

```
1        A    As a regular officer, I wouldn't
2   be able to get into to do payroll and doing
3   schedules and that kind of thing.
4        Q    In your request for admissions the
5   first time you said after August 28th, then
6   you took a class in --
7        A    Yes, the Outlook Program.
8        Q    Outlook class.  Was that the first
9   class you took in --
10       A    I took an intro class some time
11  before, but I didn't really get that much out
12  of it.
13       Q    You took an introductory class in
14  2005 as I understand it?
15       A    Something like that.
16       Q    The class you took then in 2006
17  was an intermediate class?
18       A    Yes.  I have to say again too,
19  heretofore until that particular time until
20  Chief Monroe came and you can check my trainer
21  records, we didn't get the training.  There
22  were only one or two people that got training.
```

Page 28

```
1   I would put in for training for computers and
2   I was always -- I'd get approved and then I'd
3   get denied for one reason or another.
4            And when you look at my training
5   schedule, my training as far as computers have
6   been during the time that Chief Monroe came.
7   Prior to that --
8       Q    Right, you took an introductory
9   course to Word in October of 2004.
10      A    Okay.
11      Q    You took an introduction to
12  Windows or you took an introduction to Word on
13  October 26, 2004.  You took introduction to
14  Windows, October 27th, 2004.  An introduction
15  to Access that next week on November 2nd.  And
16  you took -- the next day you took intermediate
17  Excel.
18      A    Yes, but the other problem with
19  that when you get the chance to take the
20  courses you're using it, so you're not
21  proficient at it.  I mean it's the same as
22  checking emails.  Did you check your emails.
```

Page 29

```
1   Yes, and when you check your emails and leave
2   out of the office, or I don't want you in the
3   office, if I'm on foot patrol or if I'm in a
4   car, you know.  I don't want you guys hanging
5   around the office.  So even though I took the
6   courses, if you yourself personally don't use
7   the guides, you're going to lose it.
8       Q    Now was your email working in
9   October of 2006?
10      A    I don't know.
11      Q    You're saying you don't know?
12      A    I don't know.
13      Q    You don't recall whether you were
14  able to send or receive in 2006?
15      A    In 2006 --
16      Q    October of 2006, I'm sorry.
17      A    I can say that in August of 2006,
18  Ms. Sebold came down and straightened --
19      Q    I'm talking October.  In October,
20  were you able to receive emails, send emails?
21      A    I don't know.  I don't know.
22      Q    You don't remember?
```

Page 30

```
1       A    I don't remember.
2       Q    Let me show you a document.  It's
3   a screen print of his sent folder.  I
4   apologize for the small print there.
5            MR. HANNON:  Is this part of your
6   document production?
7            MR. FINE:  No.
8            MR. HANNON:  How come?  Is this
9   something you're relying on in the case?
10           MR. FINE:  It's to refresh his
11  recollection.
12           MR. HANNON:  No, it's a document
13  that should have been produced to us before
14  the deposition.
15           MR. FINE:  It's just a document of
16  emails.  They have nothing to do with this
17  case.
18           MR. HANNON:  Then why are you
19  asking him questions about it?
20           MR. FINE:  Well, he said he
21  couldn't remember whether he was able to send
22  emails in October of 2006.
```

Page 31

```
1            MR. HANNON:  Are there any other
2   documents that you're going to use in the
3   deposition that haven't been produced to us?
4            MR. FINE:  There's the transcript
5   of courses that we just talked about.  And the
6   daily police log I believe you provided that.
7            MR. HANNON:  Emails?
8            MR. FINE:  And there's an email,
9   there are exhibits that I'll be submitting to
10  the Judge for submission.
11           (Pause.)
12           MR. HANNON:  The document you just
13  handed him is marked as Exhibit 4.  Is that
14  for this deposition?
15           MR. FINE:  No, it's going to be
16  for the hearing.
17           MR. HANNON:  So you marked this
18  for the hearing, but didn't produce it to us?
19  Is that correct?
20           MR. FINE:  That's correct.
21           MR. HANNON:  And is there a reason
22  why?
```

Page 32

1          MR. FINE:  I said it doesn't
2    pertain to the charges except for the issue of
3    email.  Once I received your answers to the
4    request for admissions when Officer White then
5    stated he wasn't using email and I had to look
6    into those issues.
7          That was not stated in your oral
8    or written reply that you had any email
9    problems.  I read those over very carefully.
10   No mention of an email problems in those.
11   That doesn't come up until your responses to
12   the interrogatories when we had this claim
13   that his emails weren't working and that Ms.
14   Sebold had to look into this.
15         MR. HANNON:  Mr. Fine, my position
16   is that this document and the others that
17   you're using in this deposition should have
18   been produced in response to our request for
19   production of documents and/or identified in
20   response to our answers to interrogatories.
21   And what you're doing here is sandbagging, but
22   in order to --

Page 33

1          MR. FINE:  You can raise those --
2          MR. HANNON:  Excuse me, let me
3    finish.  In order to proceed with the
4    deposition, we'll take our time and examine
5    these documents and I'd like to see all of the
6    documents that you intend to use in this
7    deposition that I haven't seen before we get
8    to their use.
9          And for the record what we're
10   talking about which is Exhibit 4 has a cover
11   page which is an email of Wednesday, August
12   8th at 11:39 a.m. from Bart Hill to you, Mr.
13   Fine.  It says "Neal, this is a snapshot of
14   his sent folder.  It certainly shows that he
15   was sending email prior to 10/29.  Would you
16   like to see these emails?  Bart."
17         In any event, may I see the other
18   documents now so I can look at them before we
19   get to them.
20         MR. FINE:  The other documents we
21   have is the transcript concerning the course
22   that he's taking.  And I'll think about these

Page 34

1    other ones.  Duty assignment log you've
2    already got.  You put that into your
3    responses.
4          MR. HANNON:  Okay.
5          BY MR. FINE:
6      Q    Now back to this sent category.
7    Does this refresh your recollection, Mr.
8    White?
9          MR. HANNON:  I'm sorry, excuse me.
10   Is this the only document you're going to give
11   me that's marked as Exhibit 2?
12         MR. FINE:  As of this point, yes.
13         MR. HANNON:  So you don't intend
14   to use any other documents that haven't been
15   produced?
16         MR. FINE:  This morning or at the
17   hearing?
18         MR. HANNON:  Well, you need to
19   produce any documents that you're going to use
20   at the hearing that you have in your
21   possession --
22         MR. FINE:  Those are being sent

Page 35

1    to the Administration Law Judge as per her
2    direct --
3          MR. HANNON:  Mr. Fine, you have to
4    respond to our discovery requests.
5          MR. FINE:  Why did your discovery
6    required every email that Mr. White ever sent?
7          MR. HANNON:  I required you to
8    produce all of the documents that you're going
9    to rely upon in this proceeding.
10         MR. FINE:  And that's a continuing
11   --
12         MR. HANNON:  Obligation.
13         MR. FINE:  Obligation, right.
14         MR. HANNON:  That you have.
15         MR. FINE:  And these documents
16   just came to light.  You can see this email is
17   August 8th.
18         MR. HANNON:  Why didn't you give
19   them to me before the deposition?
20         MR. FINE:  I'm giving them to you
21   now.
22         MR. HANNON:  Okay, but you only

1  gave me two, number two and number four and
2  you told me that there are others that you
3  have that you may not give me.
4         MR. FINE:  All right, and the duty
5  assignment, you don't need, daily log, rather.
6         MR. HANNON:  I accept your
7  representation that I provided it to you.
8         MR. FINE:  We'll provide it and
9  then there won't be any -- you're getting a
10 copy of this today.
11        MR. HANNON:  Thank you.
12        MR. FINE:  They're all being
13 mailed to you.
14        MR. HANNON:  Exhibit 5 is a six-
15 page document and Exhibit -- these are all
16 part of 5, all three of these documents?
17        MR. FINE:  Yes.
18        MR. HANNON:  Okay.
19        MR. FINE:  And Exhibit 3 would be
20 a two-page document.
21        MR. HANNON:  Are these all the
22 documents -- I'm sorry, you're not done.

1         MR. FINE:  Two was the transcript.
2  Four will be email from Mr. Hill.  Five, I
3  just gave you.  And one was the daily activity
4  log from October 29, 2006.  You've got all
5  five now.
6         MR. HANNON:  Thank you.  Are these
7  the ones that you put in the mail today, all
8  of them?
9         MR. FINE:  Yes.
10        MR. HANNON:  Keep in mind --
11        MR. FINE:  Per the Judge's orders
12 that we submit our exhibits today that weren't
13 already submitted.
14        MR. HANNON:  I understand, but
15 keep in mind that if you mail it to me today,
16 I won't have it by the telephone conference on
17 Monday, but now I do.  So I'm glad I asked.
18        BY MR. FINE:
19    Q    Back to Exhibit 4 now.
20        MR. HANNON:  I still want a chance
21 to look at them before you ask any questions.
22 Which one?

1         BY MR. FINE:
2     Q    A two-page email, first page is
3  from Mr. Hill to me.  It's your sent items.
4  You'll notice down at the bottom you've got
5  sent items on October 26, 2006 and October 17,
6  2006 and a number on on October 17th and the
7  15th, 14th, 12th.
8         And the email that you received
9  from Mr. Vernon was on October 20th.  I
10 believe you had stated previously you had
11 never received that?
12    A    Not that I recall.
13    Q    I'm sorry, I couldn't hear you.
14    A    Not that I can recall.
15    Q    Okay.  All right, let's move on.
16 Going back to October 29th, the day in dispute
17 here.  You were the -- you had been made an
18 acting sergeant since August, right?
19    A    Yes.
20    Q    So you were Officer-in-Charge on
21 the first shift on that Sunday?
22    A    Yes.

1     Q    Now the daily activity log that I
2  just gave to your counsel it says at the
3  beginning at 0700 "all officers were
4  instructed to remain alert at all times,
5  report any suspicious activity or persons they
6  may encounter or observe.  Any activity not
7  covered by instruction, the officer is to
8  report immediately to the OIC.  All vehicles
9  and persons entering the facility are to be
10 inspected, indoor screened.  All persons must
11 produce proper identification as well as
12 parking decal."
13        So you made that statement as the
14 OIC?
15    A    I reviewed the statement.  The
16 officer in the control center at that time was
17 Officer Beard formulated it, the log.  I
18 reviewed the log at the end of the shift.
19    Q    Well, but it says all officers
20 were instructed.  Are you saying Beard
21 instructed the officers or you instructed the
22 officers?

Page 40

```
 1      A    No, no.  This is a format that is
 2 used on a daily basis in the control center.
 3 The control center operator types this.  The
 4 OIC reviews it at the end of the shift.
 5      Q    But it says "all officers were
 6 instructed."  Are you saying nobody instructed
 7 any officers, this is a lie?
 8      A    We do this in roll call, okay?  We
 9 instruct the officers, yes, verbally, in roll
10 calls.
11      Q    So in roll call, all officers were
12 instructed in accordance with these five lines
13 here?
14      A    Yes.
15      Q    By you?
16      A    Yes.
17      Q    That's what I asked.  Okay.  When
18 you had roll call that morning, did you make
19 any exceptions as to when people weren't to be
20 inspected or screened or checked for
21 identification?
22      A    No.
```

Page 41

```
 1      Q    And it applied to all the posts, I
 2 assume?
 3      A    Yes.
 4      Q    Now second shift, as I understand
 5 it, you agreed to work overtime?
 6      A    No.
 7      Q    No?
 8      A    No, I didn't.
 9      Q    Well, you worked overtime.
10      A    I was drafted.
11      Q    But you were the OIC, so when you
12 said do we have anybody volunteering for
13 overtime, did you raise your own hand?
14      A    No, I was drafted.  We have a
15 list, a rotating list and I should not have
16 been drafted because supervisors aren't
17 drafted to work and supervisors do not work
18 posts.
19      Q    Did you call anybody in from the -
20 - did you order somebody to work from the
21 first shift to work second shift?  I believe
22 that's what the contract provides.
```

Page 42

```
 1      A    Yes, I did.
 2      Q    Who did you order?  That would
 3 have been draft, too, correct?
 4      A    That would have been draft, too,
 5 yes.
 6      Q    Okay.
 7      A    But because I was in acting
 8 capacity, I was next on the list and there was
 9 another officer under me who was eligible for
10 the draft and I was drafted and I was placed
11 on a post, a regular officer's post.
12 Supervisors do not work posts.
13      Q    But you could have said I'm a
14 supervisor now, I'm going to draft somebody
15 else?
16      A    I was reminded from time to time I
17 was an acting supervisor.
18      Q    But you considered yourself a
19 supervisor?
20      A    Yes, I did.
21      Q    And there were no limitations on
22 your scope of authority, were there?
```

Page 43

```
 1      A    Somewhat, yes.
 2      Q    What were the limitations?
 3      A    Well, for a period of time they
 4 sent another supervisor over to work with me
 5 supposedly because I was only in an acting
 6 capacity.  And of course, when that supervisor
 7 came over, he virtually took charge and I
 8 basically worked operations outside of the
 9 facility.  But as a general rule, supervisors
10 are not drafted and supervisors do not work
11 posts.
12      Q    The contract overtime procedure
13 doesn't cover supervisors?
14      A    And I think --
15      Q    Is that a yes?  You were nodding.
16      A    No, it doesn't.
17      Q    Right.
18      A    But it was a peculiar situation
19 that all of us were placed in that were put in
20 an acting capacity.  I still have to adhere to
21 some of the same responsibilities, duties, as
22 a nonsupervisor.
```

1    Q    Nobody -- did anyone grieve in the
2  bargaining unit that you took their overtime
3  that day?
4    A    No.  Nobody wanted it.
5    Q    The second shift then you were
6  still a sergeant, but you were working Post
7  32, I believe it is.  Is that what it's
8  called?
9    A    Yes.
10    Q    And Sergeant Wilson then became
11  Officer-in-Charge?
12    A    Yes.
13    Q    And Post 32 was called the roving
14  post, is that what it is?
15    A    It's working the front desk and
16  you're relieved of a post.
17    Q    And there was only five officers
18  present that first shift to that day?
19    A    I would imagine, whatever is
20  reflected here.
21    Q    There was Sergeant Wilson, Oldach,
22  White, Everett, and Richardson.  One, two,

1  three, four, five, correct?
2    A    Yes.  Now it's true that when you
3  relieve an officer for lunch or whatever other
4  purposes on their post, you perform the full
5  range of duties in that post, don't you?
6    A    Yes.
7    Q    All right, now at approximately
8  5:30 you went to provide, went to Post 41 to
9  provide meal break for Officer Everett, is
10  that correct?
11    A    Yes.
12    Q    And the contract provides you get
13  30 minutes for break?
14    A    Yes.
15    Q    Did Mr. Everett tell you where he
16  was going to eat?
17    A    No.
18    Q    Did he say how long he would be
19  away?
20    A    No.
21    Q    Did you say take as long as you
22  want?

1    A    No.
2    Q    Did Sergeant Wilson rather say
3  take as long as you want?
4    A    I have no idea.
5    Q    But you're not aware of him being
6  granted more than 30 minutes?
7    MR. HANNON: Objection.
8    MR. FINE:  I'm sorry, what?
9    THE WITNESS:  I don't know.  I
10  don't know what transpired between he and
11  Sergeant Wilson.
12    BY MR. FINE:
13    Q    Now when you got to Post 41, did
14  you check the binder with the post orders?
15    A    Did I check the binder?
16    Q    Right.
17    A    No.
18    Q    Okay.  Did you conduct an
19  inventory of all the keys as stated in the
20  post orders?
21    A    I don't have keys.  Well, yeah,
22  the two key sets we have, but one key set was

1  in the drawer.
2    Q    Okay, did you sign the key control
3  log?
4    A    I can't recall.
5    Q    Was the metal detector working?
6    A    Yes.
7    Q    And the x-ray machine?
8    A    It wasn't working for a while.  I
9  got it up to work.  What happens, if the
10  machinery in the computer systems, if they
11  aren't used for a while, they go into a sleep
12  mode.  Nobody -- I think three or four people
13  were there that day working upstairs and
14  evidently the equipment hadn't been operating
15  for a while, but I did finally get the system
16  up.
17    (Pause.)
18    Q    Now the post orders for Post 41
19  state that the officer shall physically check
20  and verify that each employee has their GPO
21  credentials and access key card after entering
22  the building.

Page 48

```
 1            MR. HANNON:  Which post orders are
 2  you referring to?
 3            MR. FINE:  Post orders dated
 4  October 20th, 2006.
 5            MR. HANNON:  Okay, as long as
 6  we're clear.
 7            THE WITNESS:  Those were not the
 8  post orders on the post at that time.
 9            BY MR. FINE:
10       Q    You said you didn't check the post
11  order book.
12       A    That's right.
13       Q    So you don't really know whether
14  they were there that day because you didn't
15  check the book; is that correct?
16       A    Well, when I did check the post
17  orders and I xeroxed the post orders, I
18  xeroxed the ones that were on the post that
19  were given me by the officer on the post.
20       Q    Now, these post orders were issued
21  by Mr. Vernon on October 20th, 2006.
22            MR. HANNON:  You're asking him?
```

Page 49

```
 1            MR. FINE:  I haven't finished my
 2  question.
 3            MR. HANNON:  I'm sorry.
 4            BY MR. FINE:
 5       Q    And they were sent, according to
 6  the e-mail to all the officers on the GPO
 7  patrol or --
 8            MR. HANNON:  I object to the form
 9  of the question.  Foundation.
10            MR. FINE:  Well, the foundation is
11  the e-mail shows it was sent to all officers
12  of the GPO Uniform Police Branch.
13            MR. HANNON:  No, it doesn't.  The
14  document that you have shows an attachment.
15  That's all it shows.  It doesn't include the
16  attachment, and the e-mail was distributing a
17  number of post orders for comment.
18            MR. FINE:  No, on October 20th, it
19  was stated that it was sent to --
20            MR. HANNON:  Are you talking about
21  October 20th?
22            MR. FINE:  Yes, October 20th,
```

Page 50

```
 1  right.
 2            MR. HANNON:  What document are you
 3  referring to?
 4            MR. FINE:  J.
 5            MR. HANNON:  4J?
 6            MR. FINE:  Right.  No, that's the
 7  post order.  The e-mail was 4N, I'm sorry.
 8            MR. HANNON:  4 what, N as in
 9  Nancy?
10            MR. FINE:  Yeah, 4 M, I'm sorry.
11            MR. HANNON:  4 M is an e-mail of
12  August --
13            MR. FINE:  August 23rd.
14            MR. HANNON:  -- 23rd.
15            MR. FINE:  And there's also
16  an e-mail, the second page then is an e-mail
17  sent Friday October 20th to all of the
18  officers.  It says, "These post orders shall
19  be only rescinded through the issuance of
20  subsequent post orders", and it has the post
21  orders as attachments.
22            MR. HANNON:  Where does it show
```

Page 51

```
 1  there was attachments?  Down at the bottom
 2  PO41?  It says --
 3            MR. FINE:  Yes.
 4            MR. HANNON:  It says pdf?
 5            MR. FINE:  Right, post orders for
 6  32, 35 and 41, through pdf were attached to
 7  it.
 8            MR. HANNON:  Okay.
 9            MR. FINE:  They were sent to all
10  GPO officers.
11            MR. HANNON:  Well, the e-mail
12  speaks for itself.
13            MR. FINE:  Okay, now --
14            MR. HANNON:  Excuse me.  There's
15  no evidence in the document that the post
16  order that you're referring to is the
17  attachment.
18            BY MR. FINE:
19       Q    Are you saying, Mr. White, that
20  you've never received this e-mail with these
21  attachments?
22       A    I've never reviewed -- I never
```

Page 52

```
1   reviewed that post order is what I'm saying.
2        Q      Did you ever see the one that was
3   issued on October 20th.
4        A      I saw it after I returned to work
5   from administrative leave.
6        Q      Were you ever told by any officers
7   that there were new post orders issued?
8        A      Yes.
9        Q      And when?
10       A      I received a telephone call when I
11  was on administrative leave.
12       Q      So you're saying that not until
13  October 30th were you aware that there were
14  new post orders?
15       A      When I was on administrative
16  leave, I received a telephone call and I was
17  told that the post orders had been switched on
18  Post 41 and 42.
19       Q      Okay.
20              MR. HANNON:  Let me for the record
21  state that 4M, the e-mail we've been talking
22  about, was not produced in response to our
```

Page 53

```
1   discovery requests before either the oral
2   hearing or the written presentation in which
3   Officer White was disciplined and that is
4   going to be one of our contentions on appeal
5   is that we were not provided with all of the
6   information upon which the decision was made.
7   And there are other documents that you've
8   produced today for the first time that not
9   only should have been produced in connection
10  with Officer White's proceeding but also with
11  respect to Darnell Everett's proceeding.
12              BY MR. FINE:
13       Q      Now, the post order for 41 that
14  was prior to the one that was issued on
15  October 20th, 2006, that states that, "An
16  officer is responsible for controlling all
17  persons, GPO employees, visitors, contractors,
18  et cetera, entering and departing through the
19  area, detecting and preventing the loss or
20  damage of Government personal property,
21  preventing the introduction of explosive,
22  incendiary devices, illegal firearms, elicit
```

Page 54

```
1   drugs, narcotics, all alcoholic beverages or
2   other contraband into the GPO".  Is that
3   correct?
4        A      Yes.
5        Q      And that's what we agreed to
6   before basically the same responsibility for
7   every entrance post?
8              MR. HANNON:  Objection to the form
9   of the question.
10             BY MR. FINE:
11       Q      Yes or no?
12       A      Yes.
13       Q      Yes, okay.  Are you aware of any
14  exceptions to that responsibility that's
15  stated here?
16       A      Yes, there are.
17       Q      Well, it's not stated here in this
18  post order, what would be the exception?
19       A      Well, it's been an accepted rule
20  when I know police officers have visitors, the
21  visitor very seldom in the time will sign in.
22  I've had visitors and Epley's (phonetic) wife
```

Page 55

```
1   will come down, other officers' family members
2   or friends would come down, former officers
3   from here would come down.  Often times they'd
4   come into the operations or go in the back and
5   have lunch.  They would allow -- officers
6   sometimes would stop and visit other officers
7   that had worked here before, so those aren't
8   written in the post order.  It happens.  It
9   happens sometimes in here and it's happening
10  now.
11       Q      Okay, so you're saying for police
12  officers, you don't have to follow the rules?
13       A      No, I'm not saying that.  I didn't
14  say that.
15       Q      The example you gave was that
16  police officers would have visitors and family
17  friends and they would come down and wouldn't
18  follow the rules that are stated here that
19  you're responsible for patrolling all persons,
20  visitors, et cetera?
21       A      Well, sir, that was the system
22  that was operating when I got here and that
```

Page 56

1   supervisors allow and that is the system that
2   operates today.
3       Q    Now, it says on page 2 of this
4   post order, "To reduce the risk of introducing
5   illegal firearms and weapons, the officers
6   shall perform the following duties; screen all
7   incoming visitors in line with instructions
8   contained in Chapter 5, screen all visitors
9   entering the GPO through this post".
10      A    Yes.
11      Q    Now, did that not apply to
12  visitors?
13      A    Yes, it does.
14      Q    Okay, I'm sorry, what?
15      A    Yes, it does.
16      Q    Yes, it does?  Okay.  And now at
17  the bottom of that page, "Visitors to Building
18  4 must be escorted at all times.  Notify the
19  second floor supervisor/receptionist to come
20  to the lobby.  All other visitors must first
21  report to the main police office (732 North
22  Capitol Street)".

Page 57

1       A    Yes.
2       Q    That's this building?
3       A    Yes.
4       Q    The main office is downstairs?
5       A    Yes.
6       Q    And there's a register log for
7   visitors to sign in?
8       A    Yes.
9       Q    Now, when someone walks through
10  the metal detector at Building 4, and if
11  they're carrying metal, does an alarm go off?
12      A    Yes.
13      Q    Is it one that produces noise or
14  lights go on, what it is it?
15      A    Both.
16      Q    Both?
17      A    Uh-huh.
18      Q    All right, as I understand it,
19  there's lights on the side, red lights,
20  probably four or five feet high, maybe longer,
21  they go off when someone walks through with
22  metal?

Page 58

1       A    Yes.
2       Q    And the procedure is then you hand
3   wand them, is that the correct term?
4       A    Yes.
5       Q    And that's supposed to be done for
6   everybody that comes into the building?
7       A    Supposed to be, yes.
8       Q    Okay.
9       A    But it's not.
10      Q    I'm sorry, what?
11      A    But it is not.
12      Q    It is not?
13      A    No.
14      Q    Now, back to October 29th, Officer
15  Everett returned at I believe it's 6:13 p.m.,
16  about 43 minutes after he left for his mean
17  break; is that correct?
18      A    Yes.
19      Q    Did you tell him he was late for
20  coming back by 13 minutes?
21           MR. HANNON:  I object to the form
22  of the question, there being no foundation.

Page 59

1           MR. FINE:  He was the person at
2   the post, an acting Sergeant --
3           THE WITNESS:  No, not in that
4   capacity, sir.
5           BY MR. FINE:
6       Q    I think we went through this at
7   your oral reply.  You agreed on asked that
8   question by Mr. Landrau that you were an
9   acting Sergeant for 89 days, not from 9:00 to
10  3:00.  While you were on duty, you were acting
11  Sergeant.
12      A    Not on that shift, sir, no.
13      Q    Back to my question.  Did you say
14  to him, "You're late by 13 minutes"?
15           MR. HANNON:  Objection to the form
16  of the question.  Mr. Fine, there's no
17  foundation that he was late.
18           BY MR. FINE:
19      Q    The contract, Mr. White, says you
20  get 30 minutes for a meal.
21      A    It's not unusual on the weekends
22  for --

**Page 60**

1    Q    I'm asking a question --

2         MR. HANNON:  He can answer your

3    question, sir.

4         MR. FINE:  He's not answering my

5    question.  My question was a specific yes or

6    no question.

7         BY MR. FINE:

8    Q    Does the contract provide that you

9    get 30 minutes for a meal?

10   A    Per the contract --

11   Q    That was my question.  I didn't

12   ask anything else.  When he came back into the

13   lobby, is it not true that he was accompanied

14   by two females?

15   A    There were people -- there were

16   employees coming in during that time because

17   people came in to work, started coming in to

18   work.  When Everett came back, I asked him,

19   "What took you so long".  He stood at the

20   gate, he said, "Ma'am, go ahead, I've got it".

21   I then -- I saw Everett through, I got my hat,

22   I told him that the machine had been down.  I

**Page 61**

1    got it back up and I left because I was being

2    called by Sergeant Wilson to go to 50.  I was

3    being called by Oldach to relieve him for a

4    bathroom break and I left the building.

5    Q    Okay.

6    A    I was properly relieved.

7    Q    But when Officer Everett came

8    back, there was two women, one identified as

9    Wanda and one identified later as Ms. Porter,

10   that came with him.

11   A    Okay.

12   Q    Do you agree?

13   A    There were two -- there were two

14   people behind him.

15   Q    Okay, did you check the

16   identification of those two people?

17   A    No, I did not because when I left

18   the --

19        MR. HANNON:  Just answer his

20   question.

21        BY MR. FINE:

22   Q    I asked whether you checked the

**Page 62**

1    identification.

2    A    No.

3    Q    No.  When they walked through the

4    x-ray machine, the lights went off; is that

5    correct?

6    A    I don't remember.

7    Q    I'm sorry.

8    A    I don't remember.

9    Q    You don't remember.  You weren't

10   looking then?

11   A    Officer Everett --

12        MR. HANNON:  Answer his question.

13        THE WITNESS:  I don't recall.  I

14   was gathering up my things and giving Officer

15   Everett some information about the computer.

16        BY MR. FINE:

17   Q    So when the lights went off on the

18   -- did you hand screen the two women, either

19   of the two women?

20   A    No.

21   Q    I'm sorry?

22   A    No.

**Page 63**

1    Q    No.  Did you check the

2    identification of either of the women?

3    A    No.

4    Q    So you're still inside the post.

5    Officer Everett has two people with him who

6    have set off the alarm.  And so it's your

7    contention that you had no obligation at that

8    point in time to follow any rules?

9         MR. HANNON:  Objection, excuse me.

10   I'm going to object to the form of the

11   question.  You can answer it if you can.

12        THE WITNESS:  I was properly

13   relieved and I was in route following the

14   orders of my supervisor to report to the next

15   post and relieve that person.

16        BY MR. FINE:

17   Q    You were still on duty then for

18   that shift, correct?

19   A    Yes.

20   Q    All right.  And you were still in

21   the lobby of Post 41 when these two people

22   came in; is that correct?

**Page 64**

1   A   Yes.

2   Q   Okay.  And it's correct that you

3 didn't take any steps to determine if either

4 woman possessed any contraband materials.

5   A   Sir, I was properly relieved and I

6 was following the instructions of my

7 supervisor to go to the next post.

8   Q   I asked you a question.  Did you

9 take any steps to determine if either woman

10 possessed any contraband materials?

11   A   No.

12   Q   No.  At your oral reply, there was

13 a transcript made.  Are you still affirming

14 everything you said at that oral reply?

15   A   I don't have it before me.

16   Q   Well, your counsel has it.  Is

17 there something on second recollection that

18 you decided you weren't telling the truth at

19 the oral reply?

20   A   I don't know about not telling the

21 truth about anything.

22   Q   Okay, so that everything you said

**Page 65**

1 at the oral reply then we can assume is true.

2   A   I don't have it before me to

3 refer.

4   Q   You never reviewed it.

5   A   That was some months ago, yes.

6   Q   Did your -- are you aware whether

7 your counsel submitted corrections in his

8 written reply when he submitted that to that

9 transcript?

10   A   I'm uncertain at this point.  I

11 don't know.

12   Q   Did you receive a copy of your

13 written reply?

14   A   Yes.

15   Q   Okay.  Were there corrections to

16 the transcript in that oral reply, in that

17 written reply?

18   A   I don't -- I can't recall.

19   Q   Okay.  Now, at page 18 of your

20 oral reply transcript, you are talking about

21 your contacting Sergeant Wilson on the radio

22 and asked for relief on Post 50 and then you

**Page 66**

1 were asked by counsel why did you do that.

2 "Because the situation -- first of all, we

3 were so short my biggest concern was I had an

4 officer who was injured".  So you considered

5 yourself then a supervisor.  One of your men,

6 you believed, was injured.

7   A   You don't have to be a supervisor

8 to be concerned about an injured officer.

9 There was an officer that was injured.

10   Q   But you said, "I had an officer".

11 You didn't say, "There was an officer".

12   A   There was an officer, a fellow

13 officer, I was told, that was injured and we

14 were short and the officer was not getting any

15 assistance.  I have an obligation as a fellow

16 officer to render aid to that officer because

17 no one else was except Cordie (phonetic) who

18 actually did get there.

19   Q   Now, at your oral reply you made

20 the statement at page 48 in response to a

21 question from Mr. Landrau, "I feel that those

22 officers were assigned to various areas

**Page 67**

1 throughout the GPO proper are responsible for

2 their post areas".  Do you still stand by that

3 statement?

4   A   Repeat that.

5   Q   "I feel that those officers who

6 are assigned to various areas throughout the

7 GPO proper are responsible for their post

8 areas".

9        MR. HANNON:  May he see it so he

10 understands the context of what he said?

11        MR. FINE:  Okay.  Right there,

12 (indicating).

13        (Witness proffered document.)

14        THE WITNESS:  Yes, until they are

15 relieved from their post, yes.

16        BY MR. FINE:

17   Q   So while you're on shift, if I

18 understand it, and if you see some -- a

19 violation of a GPO rule or regulation, do you

20 believe you're responsible for dealing with

21 it?

22   A   Yes.

Page 68

1    Q    Any time during that eight-hour
2    shift.
3    A    Yes, and when you're relieved from
4    your -- yes.
5    Q    Now, in your answers to your
6    interrogatories, you say you were a union
7    representative from 2003 to 2005.
8    A    I believe it covered that period
9    of time.  And at the same time, even if you're
10   not a union rep, if an employee wishes you to
11   accompany them on a union matter, then we do
12   that also --
13   Q    Okay.
14   A    -- whether or not you're still in
15   the union capacity as the representative or
16   not.  An employee has a right to choose the
17   individual that they want to represent them.
18   Q    But the question was, you were
19   supposed to list the offices you held in the
20   FOP Lodge Number 1 during the past six years
21   and you stated you were a union representative
22   from 2003 to 2005.  My question is, what

Page 69

1    official position did you hold in FOP Lodge 1
2    between 2003 and 2005?
3    A    I believe that was the time frame
4    and at that time I accompanied officers for
5    grievances and for administrative meetings
6    with supervisors.
7    Q    Now, isn't that what a steward
8    does?
9    A    Yes.
10   Q    Were you a steward are you
11   claiming?
12   A    For a period of time, yes.
13   Q    But there's no record of you being
14   an official union steward.  Why is that?
15   A    I have no idea.
16   Q    The contract states that, "Union
17   officials/representatives will be recognized
18   upon written notification by the union to the
19   appropriate employer office".
20   A    Uh-huh.
21   Q    Okay, now the memorandum sent but
22   Alvin Hardwick, who is he?

Page 70

1    A    He's the Chairman.
2    Q    Chairman, it lists Chairman, Vice
3    Chairman, Secretary, Treasurer and then a
4    steward for Shift 1, 2 and 3.
5    A    Uh-huh.
6    Q    That's dated 8/16/2005.  Your name
7    isn't on that list.
8    A    Well, they change.
9    Q    So you weren't the steward then,
10   according to Alvin Hardwick.
11   A    They change from time to time.
12        MR. HANNON:  Now are you saying
13   that only a steward can be a representative in
14   a grievance proceeding?
15        MR. FINE:  Yes.
16        MR. HANNON:  You are?
17        MR. FINE:  Yes, that's what the
18   contract says.
19        BY MR. FINE:
20   Q    Now, the memo that was sent by
21   Alvin Hardwick, 3/7/2005, your name is not
22   listed as a steward for Shift 1, 2 or 3.

Page 71

1    A    Again, they change from time to
2    time.
3    Q    Right.  Memo that was sent by Mr.
4    Hardwick on 10/8/2003, your name is not listed
5    as a steward for Shift 1, 2 or 3, nor as an
6    officer.
7    A    Mr. Fine, you know, that I had --
8        MR. HANNON:  Answer his question.
9        THE WITNESS:  Okay.  The only
10   thing I can say is they change from time to
11   time.  I don't know why my name is not on
12   there.
13        BY MR. FINE:
14   Q    The memorandum sent on January
15   18th, 2003 from Mr. Hardwick to at that point,
16   Mr. -- the Director of Labor Relations and to
17   Commander, your name is not listed there as a
18   union representative.
19   A    Okay.
20   Q    Nor in 2002.  We have to go all
21   the way back to January 31st, 2001, shop
22   steward for Shift 1, Robert O. White, that was

Page 72

```
1   you?
2         A     That's me.
3         Q     Okay.  So in response to the
4   question of name the office, length of term
5   and duties, your statement that you were a
6   union representative from 2003 to 2005 is not
7   correct, because you weren't listed as a union
8   representative in accordance with the contract
9   or the memorandum sent by the union president,
10  correct?
11        A     I don't know about those lists but
12  I certainly did serve and I've appeared before
13  you --
14        MR. HANNON:  Can we have a moment?
15  Neal, do you happen to where the designation
16  of representative form is for Mr. White?
17        MR. FINE:  I'm sorry.  What do you
18  mean "designation representative form"?
19        MR. HANNON:  In his case, the
20  designation of representative form that he
21  filed in his disciplinary matter?
22        MR. FINE:  It would be in that --
```

Page 73

```
1   You received a copy of the case file and it
2   would be in there probably near the back, I
3   recall.  I would have to go get the case file.
4   I don't have it with me.  It's back in my
5   office.
6         MR. HANNON:  I'm just going by my
7   recollection that the designation of
8   representative form says that you may
9   designate a representative of your choice and
10  it could be a union official or other
11  representative.
12        MR. FINE:  Right.  For an adverse
13  action because that's --
14        MR. HANNON:  Or an attorney.
15        MR. FINE:  Right.  For an adverse
16  action because that's what the law provides.
17        MR. HANNON:  So that --
18        MR. FINE:  But on an ordinary
19  grievance that's not involving an adverse
20  action, the Agency does not recognize anybody
21  but a designated union representative.  That's
22  why that provision is in the contract.
```

Page 74

```
1         MR. HANNON:  I just want to make
2   sure that the two of you aren't talking past
3   one another because he has as you know acted
4   as a designated representative.
5         MR. FINE:  The law provides you
6   can choose anybody you want.  You can choose
7   the union representative.  You can use a
8   lawyer.  You can choose the person sitting
9   next to you because that's what the law
10  provides.
11        MR. HANNON:  His answer to the
12  interrogatory is that he's served as a
13  representative.
14        MR. FINE:  No, it says -- The
15  question was "List each office you've held in
16  the Fraternal Office of Police during the past
17  six years."  The answer that was provided by
18  Appellant was "Appellant was a union
19  representative."
20        MR. HANNON:  Okay.
21        MR. FINE:  Not a personal
22  representative.  Appellant was a union
```

Page 75

```
1   representative.
2         MR. HANNON:  That's fine.
3         MR. FINE:  Okay.  So I think we've
4   beaten this one to death.
5         DIRECT EXAMINATION (Cont'd.)
6         BY MR. FINE:
7         Q     Let me see.  You've changed your
8   admissions here.
9         Now Question 4 which was asking
10  you to admit or deny that on October 29th you
11  left Post 41 at 6:41 p.m. without absolutely
12  knowing that the two guests, Porter and Wanda,
13  were employees and your response is still that
14  you deny, that you left there without knowing
15  if they were GPO employees.
16        A     Sir, when we relieve each other,
17  when we are properly relieved, we relieve each
18  other.  We don't check to see who is who or if
19  a visitor is an employee because we move onto
20  our other post and we're not required by the
21  post order to stand there and check to see who
22  is who.  I was properly identified.  The office
```

Page 76

```
 1    acknowledged that I left and complied with the
 2    supervisor's order.
 3         Q    I believe it says in the post
 4    orders "Officer responsible for controlling
 5    all persons, GPO employees, visitors."  Now
 6    the word "all" do you interpret that word to
 7    mean something less than each and every?
 8         A    Sir, I answered the question as I
 9    properly relieved --
10         Q    No, my question is how do you
11    interpret the -- How are we defining the word
12    "all"?  Let's look it up in the dictionary
13    since you seem to think the word "all" means
14    something less than each and every.
15         A    I'm quite familiar with the
16    definition.
17         Q    Just -- You're quite familiar with
18    the definition of the word "all."
19              MR. HANNON:  Just let him ask the
20    question.
21              (Pause.)
22              BY MR. FINE:
```

Page 77

```
 1         Q    Now the dictionary I'm using,
 2    Webster's II New Riverside University
 3    Dictionary defines all as "each and every
 4    one."  You would agree that's a definition for
 5    the term "all."
 6         A    It's applicable, yes.
 7         Q    I'm sorry.
 8         A    Yes.
 9         Q    Yes.  Okay.  So the paragraph A of
10    the post order of 41 says, "Officer
11    responsible for controlling all persons, GPO
12    employees, visitors."  So it would be "all
13    persons, all visitors."
14              MR. HANNON:  Which order are you
15    referring to?
16              MR. FINE:  The one that you
17    identified as Exhibit No. 1 in your oral
18    reply, the one that precedes the one that's
19    issued on October 20.
20              BY MR. FINE:
21         Q    Okay.  So we're back to the
22    question of you're denying that you knew
```

Page 78

```
 1    whether when you left if the two guests were
 2    GPO employees.
 3         A    No, I didn't.
 4         Q    I'm sorry.  I don't understand the
 5    response.
 6         A    Repeat your question.
 7         Q    The question was admit or deny
 8    that on October 29th you left GPO Post 41 at
 9    6:41 p.m. without absolutely knowing if the
10    two guests (Porter and Wanda) of Officer
11    Everett were GPO employees.
12         A    Yes, I didn't know who they were.
13    No.
14         Q    You didn't know who they were.
15         A    No.
16         Q    Okay.  Question 7, admit or deny
17    that the GPO police officer assigned to Post
18    41 is responsible for the identification,
19    inspection and access control of all visitors,
20    vendors, packages, parcels and miscellaneous
21    items entering the Government Printing Office
22    Passport Coast Guard Building and you say you
```

Page 79

```
 1    deny that.  You don't -- You contend that
 2    you're not responsible for the inspection and
 3    control of the packages and visitors of
 4    Building 41.
 5         A    Sir, I was properly relieved from
 6    my duties.
 7         Q    That's not my question here.  The
 8    question is are you responsible as for Post 41
 9    for control and inspection of packages and
10    visitors to Post 41.
11         A    Yes, the officer is.
12         Q    All right.  Question 8, admit or
13    deny that the GPO police officer assigned to
14    Post 41 is required to physically check and
15    verify that each employee has their GPO
16    credentials and access key card after entering
17    the building and that all other visitors are
18    to be referred to main GPO at 732 North
19    Capitol Street and you deny that.  Right?  Are
20    you saying that you're not -- that the police
21    officer assigned to Post 41 is not responsible
22    for checking GPO credentials?
```

Page 80

```
1       A       The assigned officer, yes, is.
2       Q       Okay.
3               (Pause.)
4               MR. FINE:  All right.  We'll get
5   you a copy of that.  Perhaps Counsel can help
6   me on this issue.  At the oral reply at page
7   19, you say, and I'm going to hand you a copy
8   that I've marked as ROW Exhibit No. 1
9   described as Post 41 orders on October 29,
10  2006, but I have that as -- You marked that
11  ROW 2 and this is ROW 1.  I want to make sure
12  you were referring to the old one versus the
13  new one as No. 1 and 2.
14              MR. HANNON:  Are you asking me
15  whether the transcript accurately states one
16  or two?
17              MR. FINE:  Well, you said I'm
18  marking as ROW 1 Exhibit 1 described as post
19  orders of October 29, 2006 and then on the
20  next page in Exhibit No. 2 the post order
21  dated is October 20, 2006.
22              MR. HANNON:  I don't -- I'm not --
```

Page 81

```
1   I can't answer your questions about what
2   transpired in the transcript.
3               MR. FINE:  All right.  Then I have
4   no other questions at this point.
5               CROSS EXAMINATION
6               BY MR. HANNON:
7       Q       Officer White.
8       A       Yes.
9       Q       Did you escort me into the
10  building today?
11      A       Yes sir.
12      Q       And what security entrances did we
13  use?
14      A       Post 22, 50 and 22.
15      Q       And for the first post, that's the
16  one located in the parking lot.  Correct?
17      A       Yes.
18      Q       And that post is manned by whom?
19      A       Officer Curtis I think is there
20  today.
21      Q       Was that a sworn officer?
22      A       Yes.
```

Page 82

```
1       Q       And did that officer know who I
2   was?
3       A       I explained to him.
4               MR. FINE:  I object.  How would
5   you be able to testify as to what Officer
6   Curtis knows.
7               MR. HANNON:  I'll use your words.
8               BY MR. HANNON:
9       Q       Did Officer Curtis absolutely know
10  that I was an authorized guest?
11      A       I informed him that you would be
12  coming and who you were.
13      Q       Did he check my I.D.?
14      A       No.
15      Q       And who manned the next security
16  station that we entered?
17      A       There is a security guard at Post
18  22.
19      Q       And is that a GPO officer or
20  contract security guard?
21      A       Contract security guard.
22      Q       And did that contract security
```

Page 83

```
1   guard absolutely know who I was?
2       A       No.
3       Q       Why?
4       A       I told him that I was accompanying
5   you.
6       Q       And did that security guard check
7   my I.D.?
8       A       No.
9       Q       And is that common?
10      A       Yes, it is.
11      Q       And is it common to eat on post?
12      A       Oh yes.
13      Q       And do supervisors know that
14  uniform officers eat on post?
15      A       Yes.
16      Q       Is that particularly true on the
17  weekends?
18      A       Yes.
19      Q       Are there any written procedures
20  for the manner in which an officer is to
21  relieve another at a particular post?
22      A       No.
```

Page 84

```
 1        Q    Are you aware of any changes in
 2   the procedures for relieving another from a
 3   post that have been instituted since this
 4   incident?
 5        A    No.
 6        Q    And today, do uniform GPO officers
 7   man the Post 41?
 8        A    No.
 9        Q    Who is there now?
10        A    Two contract security guards.
11        Q    Are there any uniform GPO officers
12   now assigned to Building 4?
13        A    No.
14             MR. HANNON:  Can I see those two
15   exhibits from the --
16             MR. FINE:  The post orders.
17             MR. HANNON:  Those two, yes.  RW-1
18   and RW-2.
19             (Pause.)
20             MR. HANNON:  I don't have any more
21   questions.
22             REDIRECT EXAMINATION
```

Page 85

```
 1             BY MR. FINE:
 2        Q    Officer White, did you advise --
 3   Who is the OIC today?
 4        A    Sargent Dailey is on duty.
 5        Q    Did you advise Officer Dailey that
 6   Officer Curtis had violated the post orders?
 7        A    Officer Curtis --
 8        Q    I asked you a question.  Now it's
 9   a yes or no question.
10        A    Did he violate -- No, I did not.
11        Q    So when Officer Curtis violated
12   the post orders by allowing Mr. Hannon in to
13   GPO without identification you didn't advise
14   Sargent Dailey that he had violated the rules?
15        A    Sir, it's common practice.
16        Q    I asked you a question.  Just yes
17   or no.
18        A    No.
19        Q    Okay.  Did you advise Sargent
20   Dailey that the contract guard did not follow
21   the rules and allowed a visitor, (aside) two
22   minutes Bob, and allowed somebody into the GPO
```

Page 86

```
 1   without proper identification?
 2        A    No.
 3        Q    All right.  Did Mr. Hannon go
 4   through the metal detector when he walked
 5   through Post 22?
 6        A    Yes, he did.
 7        Q    Okay.  Did the alarm go off?
 8        A    No, it didn't I don't think.
 9   Well, he had keys.
10             MR. FINE:  All right.  No other
11   questions.  Do you want to take a five minute
12   break here?
13             MR. HANNON:  I just have one more
14   question and then a statement.
15             RECROSS EXAMINATION
16             BY MR. HANNON:
17        Q    Officer White, are you aware of
18   any uniform officer ever being disciplined for
19   advising someone manning a security post that
20   the individual accompanying them is with them?
21        A    Never.
22        Q    Therefore, did not produce I.D.
```

Page 87

```
 1        A    Never.
 2             MR. HANNON:  Okay.  The statement
 3   that I have to make is that Exhibit 3 that you
 4   just produced to me today, I'll give copies of
 5   these exhibits to the reporter to be part of
 6   the transcript, has never been produced either
 7   in Officer Everett's disciplinary proceeding
 8   or in Officer White's disciplinary proceeding
 9   and in reviewing a number of documents that
10   were produced in response to our request for
11   production of documents, Tab 9, there is a
12   whole series of emails and statements from
13   Assistant United States Attorney Steven
14   Kaufman, K-A-U-F-M-A-N, and Special Agent
15   Sonja, S-O-N-J-A, Scott of the GPO Office of
16   Investigations that were copied to Mr. Fine
17   beginning, I believe, on December 11, 2005
18   indicating that Mr. Fine and others had been
19   in contact with the Assistant United States
20   Attorney Mr. Kaufman who had been the
21   individual to whom Officer Everett was sent to
22   paper the case against Ms. Porter.
```

And among these emails is one from Mr. Fine to Assistant U.S. Attorney Kaufman on December 11, 2006. Part of that email, Mr. Fine says, we would "wish to charge him with a lack of candor" asking Mr. Kaufman to produce a statement or affidavit regarding the events at the papering and the email says from Mr. Fine that he would "prefer to discuss in a phone call."

And then after Mr. Kaufman responds and a number of emails, there's an email of January 3, 2007 from Mr. Fine.

MR. FINE: That's Exhibit 3.

MR. HANNON: Yes.

MR. FINE: So it's --

MR. HANNON: Part of the exhibit.

MR. FINE: So it's not a surprise and you were given this.

MR. HANNON: Excuse me. It's also part of Exhibit 3 and the email states "We now have a good case for lack of candor in Everett. Be sure to include failure to

cooperate and advise AUSA of details and facts of arrest."

These documents which were obviously relied upon in both Officer White's disciplinary proceeding wherein Mr. Landrow imposed the discipline that we're now appealing were never provided to us until the receipt of Mr. Fine's request for production of documents. It's obvious that the Inspector General relied upon this information in the report and none of that information was produced as part of the report which we had to request in discovery in both Mr. White's case and Mr. Everett's case.

And the oral hearings actually had to be postponed because that report wasn't produced even though it was relied up by Mr. Landrow and in both cases, we were not provided the discovery that we requested and it's absolutely clear that this information was relied upon in both Mr. Everett's case and Mr. White's case by the deciding official and

was not produced to us in advance. I just wanted to make a record of that and we're going to have to decide what action to take.

Officer White would like to read before the transcript becomes final. Thank you. I'm done.

MR. FINE: I'm done. Off the record.

(Whereupon, the taking of deposition in the above-entitled matter was concluded at 11:35 a.m., signature having NOT been waived.)

CERTIFICATE

This is to certify that the foregoing transcript in the matter of:

Deposition of Robert White

Date: Friday, August 10, 2007

Place: Washington, D.C.

represents the full and complete proceedings of the aforementioned matter, as reported and reduced to typewriting.

Neal Gross

Page 92

A

**ability** 4:15 6:14,20
**able** 25:13 27:2 29:14 29:20 30:21 82:5
**about** 9:19 13:3 22:19 30:19 31:5 33:10,22 49:20 52:22 58:16 62:15 64:20,21 65:20 66:8 72:11 81:1
**above** 11:11
**above-entitled** 90:10
**absolutely** 75:11 78:9 82:9 83:1 89:20
**accept** 36:6
**accepted** 54:19
**access** 9:15 12:8 26:19 28:15 47:21 78:19 79:16
**accompanied** 60:13 69:4
**accompany** 68:11
**accompanying** 83:4 86:20
**accordance** 40:12 72:8
**according** 49:5 70:10
**account** 12:20
**accurate** 6:10,21
**accurately** 6:15 80:15
**acknowledged** 76:1
**acted** 74:3
**acting** 38:18 42:7,17 43:5,20 59:2,9,10
**action** 73:13,16,20 90:3
**activities** 8:21 12:21
**activity** 37:3 39:1,5,6
**actually** 21:12 66:18 89:15
**additional** 11:3
**adhere** 43:20
**adjunct** 19:16
**Administration** 35:1
**administrative** 16:8 52:5,11,15 69:5
**admissions** 27:4 32:4 75:8
**admit** 75:10 78:7,16 79:12
**advance** 90:1
**adverse** 73:12,15,19
**advise** 85:2,5,13,19 89:1
**advising** 86:19
**affidavit** 88:6
**affirming** 64:13
**aforementioned** 91:16
**after** 27:5 47:21 52:4 58:16 79:16 88:10
**again** 18:12 24:15 27:18 71:1
**against** 87:22
**age** 25:4
**Agency** 1:11 2:15 73:20
**Agency's** 23:14
**Agent** 87:14
**ago** 21:1,14 65:5
**agree** 61:12 77:4
**agreed** 41:5 54:5 59:7
**ahead** 60:20
**aid** 66:16
**alarm** 8:16,16 57:11 63:6 86:7
**alarms** 9:8,9
**alcoholic** 54:1
**alert** 11:14 39:4
**alleged** 9:20,21
**allow** 55 5 56:1
**allowed** 85:21,22
**allowing** 85:12
**almost** 11:20
**already** 7:8 34:2 37:13
**Alvin** 69:22 70:10,21
**always** 18:8,21 28:2
**AMERICA** 1:1
**among** 88:1
**amount** 25:5
**and/or** 32:19
**another** 11:9 13:13 18:3 28:3 42:9 43:4 74:3 83:21 84:2
**answer** 5:7,8,10 7:1,5,9 24:4 60:2 61:19 62:12 63:11 71:8 74:11,17 81:1
**answered** 15:8 76:8
**answering** 5:20 60:4
**answers** 4:14,20 5:14 32:3,20 68:5
**anybody** 41:12,19 73:20 74:6
**anyone** 44:1
**anything** 60:12 64:21
**anyway** 15:7
**apologize** 30:4
**appeal** 53:4
**appealing** 89:7
**APPEARANCES** 2:4
**appeared** 72:12
**Appellant** 1:8,18 2:6 4:5 7:12 74:18,18,22
**applicable** 77:6
**application** 7:19 15:17
**applied** 41:1
**apply** 56:11
**appropriate** 69:19
**approval** 13:17
**approved** 28:2
**approximately** 45:7
**April** 8:1
**area** 12:8,9 53:19
**areas** 9:16 66:22 67:2,6 67:8
**around** 20:6 21:13 26:10 29:5
**arrest** 89:2
**aside** 85:21
**asked** 37:17 40:17 59:7 60:18 61:22 64:8 65:22 66:1 85:8,16
**asking** 5:20 30:19 48:22 60:1 75:9 80:14 88:5
**assigned** 8:13 66:22 67:6 78:17 79:13,21 80:1 84:12
**assignment** 34:1 36:5
**assignments** 8:18,20
**assistance** 66:15
**Assistant** 87:13,19 88:2
**assume** 19:17 20:13 41:2 65:1
**attached** 51:6
**attachment** 49:14,16 51:17
**attachments** 50:21 51:1 51:21
**attendance** 13:18 14:5 14:16
**attorney** 73:14 87:13 87:20 88:2
**audible** 11:13
**August** 1:13 15:13 22:2 22:3 23:6 24:6,10,11 25:13 26:10,11 27:5 29:17 33:11 35:17 38:18 50:12,13 91:8
**AUSA** 89:1
**authority** 42:22
**authorized** 82:10
**avoid** 5:12
**aware** 4:16 6:9 46:5 52:13 54:13 65 6 84:1 86:17
**away** 11:7,16 45:19
**a.m** 33:12 90:11

B

**back** 14:14 22:2 25:12 34:6 37:19 38:16 55:4 58:14,20 59:13 60:12,18 61:1,8 71:21 73:2,4 77:21
**bargaining** 44:2
**Bart** 33:12,16
**basically** 8:15 15:2 21:16 43:8 54:6
**basis** 17:13 22:14 24:7 40:2
**bathroom** 61:4
**Beard** 39:17,20
**beaten** 75:4
**became** 19:11 44:10
**becomes** 90:5
**before** 4:9 21:11 24:15 25:11 27:11 30:13 33:7,18 35:19 37:21 53:1 54:6 55:7 64:15 65:2 72:12 90:5
**beginning** 39:3 87:17
**behalf** 1:21 2:6,15 4:4
**behind** 12:11 61:14
**being** 4:15 6:18 10:22 34:22 36:12 46:5 58:22 61:1,3 69.13 86:18
**believe** 20:8 22:18 31:6 38:10 41:21 44:7 58:15 67:20 68:8 69:3 76:3 87:17
**believed** 66:6
**best** 4:15 11:4
**better** 12:15
**between** 46:10 69:2
**beverages** 54:1
**biggest** 66:3
**binder** 46:14,15
**bit** 4:10
**blackberry** 13:11 24:21
**BOARD** 1:1
**Bob** 85:22
**book** 48:11,15
**both** 5:11 57:15,16 89:4 89:13,18,21
**bottom** 38:4 51:1 56:17
**bought** 20:22
**bound** 16:22
**Branch** 49:12
**break** 45:9,13 58:17 61:4 86:12
**bring** 14:6
**bringing** 10:10
**building** 9:13,15,17 10:11,12,18 11:2 47:22 56:17 57:2,10 58:6 61:4 78.22 79:4 79:17 81:10 84:12
**bulk** 22:15
**buzz** 12:9
**buzzer** 12:9
**buzzers** 12:6
**buzzer's** 12:11

C

**call** 12:14 40:8,11,18 41:19 52:10,16 88:9
**called** 1:18 4:4,12 44:8 44:13 61:2,3
**calls** 40:10
**came** 26:10 27:20 28 6 29:18 35:16 43:7 60:12,17,18 61:7,10 63:22
**cameras** 11:6
**candor** 88:5,21
**capacity** 42:8 43:6,20 59:4 68:15
**Capitol** 1:19 2.20 56:22 79:19
**car** 29:4
**card** 8 17 9:11,18,22 10:4,7,9,13,15 47:21 79:16
**cards** 9:12,12,14
**carefully** 32:9
**carry** 8:22
**carrying** 57:11
**case** 30:9,17 72:19 73:1 73:3 87:22 88:21 89:13,14,21,22
**cases** 89:18
**category** 34:6
**causes** 5:22
**center** 8:11,12,14,21 9:3 12:18,19 13:5,12 39:16 40:2,3
**certain** 7:3 9:16 17:5,9 26:17
**certainly** 16:18 33:14 72:12
**CERTIFICATE** 91:1
**certify** 91:2
**cetera** 53:18 55:20
**Chairman** 70:1,2,2,3
**chance** 28:19 37:20
**change** 16.19 70:8,11 71:1,10
**changed** 75:7
**changes** 22:5 84:1
**Chapter** 56:8
**charge** 7:21 43:7 88:4
**charges** 32:2
**check** 17:13,14 27:20 28:22 29:1 46:14,15 47:19 48:10,15,16 61:15 63:1 75:18,21 79:14 82:13 83:6
**checked** 40:20 61:22
**checking** 21:21 28:22 79:22
**Chief** 27:20 28:6
**choice** 73:9
**choose** 68:16 74:6,6,8
**circumstances** 5:11 19:9
**claim** 32:12
**claiming** 69 11

Neal R. Gross & Co., Inc.
(202) 234-4433

Page 93

**class** 27 6,8,9,10,13,16 27:17
**clear** 48:6 89:20
**closed** 21:13
**Coast** 78:22
**come** 10:1 24:12 25:1 26:21 30:8 32:11 55:1,2,3,4,17 56:19
**comes** 11:14 12:7 58:6
**coming** 10:6 58:20 60:16,17 82:12
**Commander** 14:8 71:17
**comment** 49:17
**common** 83:9,11 85:15
**communicating** 19:21
**communications** 21:16
**compare** 17:6
**competent** 7:9
**complete** 91:15
**complicated** 10:17,19
**complied** 76:1
**Compton** 19:17 20:3
**computer** 12:15 13:4,7 13:13,13,19 14:6 19:13,15,18 20:9 21:2 24:13,19 25:1 26:21 47:10 62:15
**computers** 9:2 21:12 25:5,6,9 28:1,5
**concern** 66:3
**concerned** 66:8
**concerning** 33:21
**concluded** 90:11
**conduct** 46:18
**conference** 37:16
**conforms** 16:6
**connection** 53:9
**considered** 42:18 66:4
**contact** 87:19
**contacting** 65:21
**contained** 56:8
**contend** 79:1
**contention** 63:7
**contentions** 53:4
**CONTENTS** 3:10
**context** 67:10
**continuing** 35:10
**contraband** 21:22 54:2 64:4,10
**contract** 41:22 43:12 45:12 59:19 60:8,10 69:16 70:18 72:8 73:22 82:20,21,22 84:10 85:20
**contractors** 53:17
**control** 8:10,11,12,14 8:21 9:3 12:17,19 13:5,11 39:16 40:2,3
47:2 78:19 79 3,9
**controlling** 53:16 76.4 77:11
**Cont'd** 75:5
**cooperate** 89:1
**copied** 87:16
**copies** 87:4
**copy** 21:15 36:10 65:12 73:1 80:5,7
**Cordie** 66:17
**corporal** 8:7,10 14:14 19:11 23:2
**correct** 7:16,20 8:1 9:3 15:20 31:19,20 42:3 45:1,10 48:15 54:3 58:3,17 62:5 63:18,22 64:2 72:7,10 81:16
**correctional** 15:19 16:6
**corrections** 65:7,15
**counsel** 1:18 7:12 39:2 64:16 65:7 66:1 80:5
**course** 28:9 33:21 43:6
**courses** 19:21 28:20 29:6 31:5
**court** 4:8,19
**cover** 33:10 43:13
**covered** 21:20 39:7 68:8
**creates** 5:11
**credentials** 47:21 79:16 79:22
**CROSS** 3:12 81:5
**Curtis** 81:19 82:6,9 85:6,7,11

D

**Dailey** 85:4,5,14,20
**daily** 8:21 9:4,6 12:16 17:13 22:14 24:17 31:6 36:5 37:3 39:1 40:2
**damage** 53:20
**Darnell** 53:11
**date** 26:11 91:8
**dated** 48:3 70:6 80:21
**day** 15:4 24:15 25:11 26:13 28:16 38:16 44:3,18 47:13 48:14
**days** 15:15 59:9
**day's** 12:21
**DC** 1:13,19 2:12
**DC-0752-07-0729-I-1** 1:9
**dealing** 67:20
**dealt** 21:15
**death** 75:4
**decal** 39:12
**December** 87:17 88:3
**decide** 90:3
**decided** 64:18
**deciding** 89:22
**decision** 53:6
**defect** 6:19
**defense** 7:3
**defines** 77:3
**defining** 76.11
**definition** 76:16,18 77:4
**delay** 25:12
**delve** 7:7
**denied** 28:3
**deny** 75:10,14 78:7,16 79:1,13,19
**denying** 77:22
**departing** 53:18
**department** 17:18
**deposition** 1:15,18 4:12 30:14 31:3,14 32:17 33:4,7 35:19 90:10 91:4
**described** 80:9,18
**designate** 73:9
**designated** 73.21 74:4
**designation** 72:15,18 72:20 73:7
**designed** 11:4
**desk** 11:7,9,12 12:12,13 44:15
**detailed** 15:12
**details** 89:1
**detecting** 53:19
**detector** 47:5 57:10 86:4
**determine** 64:3,9
**developed** 16:11,11,13
**developing** 19:20
**deviate** 18:15
**deviated** 19:6
**devices** 53:22
**dictates** 18:17
**dictionary** 76:12 77:1,3
**direct** 3:12 16:8 35:2 75:5
**directives** 16:7,7
**directly** 22:20
**Director** 71:16
**disciplinary** 72:21 87:7 87:8 89:5
**discipline** 18:22 19:4 89:6
**disciplined** 19:10 53:3 86:18
**discovery** 35:4,5 53:1 89:13,19
**discuss** 88:8
**dispatch** 8:18
**dispute** 38:16
**distracting** 12:2
**distributing** 49:16
**division** 16:6
**Docket** 1:8
**document** 23:12,12,13 30:2,6,12,15 31:12 32:16 34:10 36:15,20 49:14 50:2 51:15 67:13
**documents** 23 17 31:2 32:19 33:5,6,18,20 34:14,19 35:8,15 36 16,22 53:7 87:9,11 89:3,9
**doing** 9:4 14.13,16,19 14:20 15:2 27:2 32:21
**done** 13:19 36:22 58:5 90:6,7
**door** 11:14
**doors** 12:7
**down** 24:12 26:10,21 29:18 38:4 51:1 55:1 55:2,3,17 60:22
**downstairs** 12:8 57:4
**draft** 42:3,4,10,14
**drafted** 41:10,14,16,17 42:10 43:10
**drastically** 18:2
**drawer** 47:1
**drugs** 54:1
**duly** 4:5
**during** 10:21 28:6 60:16 68:1,20 74:16
**duties** 8:9 11:1 12:1,4 16:4 17:22 18:2 21:18 43:21 45:5 56:6 72:5 79:6
**duty** 34:1 36:4 59:10 63:17 85:4
**D.C** 2:21 91:11

E

**e** 21:4
**each** 5:20 47:20 74:15 75:16,17 76:7,14 77:3 79:15
**eat** 45:16 83:11,14
**effectively** 11:21
**eight-hour** 68:1
**either** 13:12 14:11 24:11 25:2 53:1 62:18 63:2 64:3,9 87:6
**elicit** 53:22
**eligible** 42:9
**email** 24:1,2,7,9 29:8 31:8 32:3,5,8,10 33:11,15 35:6,16 37:2 38:2,8 88:3,7,12,20
**emails** 25:14 28:22,22 29:1,20,20 30:16,22 31:7 32:13 33:16 87:12 88:1,11
**emergency** 8.19
**employee** 18:19 47:20 68:10,16 75:19 79:15
**employees** 10:7,8,11,17 16:1 21:21 53:17 60:16 75:13,15 76:5 77:12 78:2.11
**employer** 69:19
**encounter** 39:6
**end** 15:4 39:18 40:4
**entered** 82:16
**entering** 10:18 39:9 47:21 53:18 56:9 78:21 79:16
**entrance** 54:7
**entrances** 21:20 81:12
**environment** 18:13
**Epley's** 54:22
**equipment** 47:14
**escort** 81:9
**escorted** 56:18
**ESQ** 2:8,18
**established** 16:5
**et** 53:18 55:20
**evaluation** 24:19
**even** 7:6 29:5 68:9 89:17
**event** 33:17
**events** 88:7
**ever** 23:22 35:6 52:2,6 86:18
**Everett** 44:22 45:9,15 58:15 60:18,21 61:7 62:11,15 63:5 78:11 87:21 88:22
**Everett's** 53:11 87:7 89:14,21
**every** 35:6 54:7 76:7,14 77:3
**everybody** 58:6
**everyone** 22:15
**everything** 64:14,22
**evidence** 51:15
**evidently** 47:14
**examination** 1:18 7:12 75:5 81:5 84:22 86:15
**examine** 33:4
**examined** 4:6
**example** 55:15
**Excel** 28:17
**except** 32:2 66:17
**exception** 54:18
**exceptions** 40:19 54:14
**excuse** 33:2 34:9 51:14

Neal R. Gross & Co., Inc.
(202) 234-4433

Page 94

63:9 88:19
**exhibit** 31:13 33:10 34:11 36:14,15,19 37:19 77:17 80:8,18 80:20 87:3 88:13,16 88:20
**exhibits** 31:9 37:12 84:15 87:5
**explain** 8:9
**explained** 82:3
**explosive** 53:21
**e-mail** 14:1,10 20:14,20 21:2,6,9 22:3,11,15 23:5 49:6,11,16 50:7 50:11,16,16 51:11,20 52:21
**e-mailing** 21:12
**e-mails** 13:2,7 22:13,14

F

**facility** 16:7,8 21.10,15 39:9 43:9
**fact** 10:13 19:6 24:9
**facts** 89:1
**failure** 88:22
**false** 7:18
**familiar** 76:15,17
**family** 55:1,16
**far** 13:6 17:17 28:5
**fax** 14:9
**feel** 66:21 67:5
**feet** 11:7,16 57:20
**fellow** 66:12,15
**females** 60:14
**few** 4:10
**file** 73:1,3
**filed** 72:21
**fill** 14:6
**final** 90:5
**finally** 47:15
**fine** 2:18 6:22 7:4 23 14 23:18,21 30:7,10,15 30:20 31:4,8,15,20 32:1,15 33:1,13,20 34:5,12,16,22 35:3,5 35:10,13,15,20 36:4,8 36:12,17,19 37:1,9,11 37:18 38:1 46:8,12 48:3,9 49:1,4,10,18 49:22 50.4,6,10,13,15 51:3,5,9,13,18 53:12 54:10 59:1,5,16,18 60:4,7 61:21 62:16 63:16 67:11,16 70:15 70:17,19 71:7,13 72:17,22 73:12,15,18 74:5,14,21 75:2,3,6 76.22 77.16,20 80 4 80.17 81 3 82:4
84:16 85:1 86.10 87:16,18 88:2,4,8,12 88:13,15,17 90:7
**Fine's** 89:8
**finish** 5:20 33:3
**finished** 49:1
**fire** 8:16
**firearms** 53:22 56.5
**first** 4:5 10:8,14 19:12 19:14 27:5,8 38:2,21 41:21 44:18 53:8 56:20 66:2 81:15
**fit** 16:17
**five** 23:6 37:2,5 40:12 44:17 45:1 57:20 86:11
**floor** 10:8 56:19
**flow** 8:17
**folder** 30:3 33:14
**follow** 55:12,18 63:8 85:20
**followed** 17:10
**following** 18:9 56:6 63:13 64:6
**follows** 4:6
**foot** 29:3
**FOP** 68:20 69:1
**foregoing** 91:2
**form** 13:16 14:3,3,5 49:8 54:8 58 21 59:15 63:10 72:16,18 72:20 73:8
**format** 40:1
**former** 55:2
**forms** 14:4
**formulated** 39:17
**formulating** 15:3
**found** 19:8
**foundation** 49:9,10 58:22 59:17
**four** 11:11 22:19 36:1 37:2 45:1 47:12 57:20
**frame** 69:3
**frank** 17:16
**Fraternal** 74:16
**Friday** 1:13 50:17 91:8
**friends** 55:2,17
**from** 10:11 11:7,17,22 14:2 16:13 18:2,15 19:7 20:5 22:4 23:6 24:21 26:17 33:12 37:2,4 38:3,9 41:19 41:20 42 16 52 5 55:3 59:9 66:21 67:15 68:3,7,22 70 11 71:1,10,15 72:6 79 5 84:2,15 87:12 88:1,7 88:12
**front** 44:15
**full** 45:4 91:15

G

**gate** 60:20
**gathering** 62:14
**gave** 36:1 37:3 39:2 55:15
**general** 18:5 43:9 89:10
**germane** 17:22 22:1
**getting** 25:9 26:7 36:9 66:14
**give** 4:14,20 6.10,20 15:4 34:10 35:18 36:3 87:4
**given** 48:19 88:18
**giving** 35:20 62:14
**glad** 37:17
**go** 4:9 13:11,12 24:22 26:3 47:11 55:4 57:11,14,21 60:20 61:2 64:7 71:20 73:3 86:3,7
**going** 4:9,21 7:1,2 14:8 18:4 29:7 31:2,15 34:10,19 35:8 38:16 42:14 45:16 53:4 63:10 73:6 80:7 90:3
**good** 4:7 88:21
**gotten** 20:18
**Government** 1:9,19 2:19 7:15 53:20 78:21
**GPO** 8:1,4 17:7,18 47:20 49:6,12 51:10 53:17 54:2 56:9 67:1 67:7,19 75:15 76:5 77:11 78:2,8,11,17 79:13,15,18,22 82:19 84:6,11 85:13,22 87:15
**granted** 46:6
**grievance** 70:14 73:19
**grievances** 69:5
**grieve** 44:1
**Gross** 91:22
**grounds** 7:5
**Group** 2:10
**guard** 78:22 82:17,20 82:21 83:1,6 85:20
**guards** 16:22 84:10
**guess** 9:8 16:22
**guest** 82:10
**guests** 75:12 78:1,10
**guide** 17:3,4,5
**guides** 29:7
**guys** 29:4

H

**H** 2:18
**hand** 14:12 41:13 58:2 62:18 80:7
**handed** 31:13
**hanging** 29:4
**Hannon** 2:8,10 4:7,19 5:3,19 6:4,8,13,18 7:2 7:10,13 23:11,16,20 30:5,8,12,18 31:1,7 31:12,17,21 32:15 33:2 34:4,9,13,18 35:3,7,12,14,18,22 36:6,11,14,18,21 37:6 37.10,14,20 46:7 48:1 48:5,22 49:3,8,13,20 50:2,5,8,11,14,22 51:4,8,11,14 52:20 54:8 58:21 59:15 60:2 61:19 62:12 63:9 67:9 70:12,16 71:8 72:14,19 73:6,14 73:17 74:1,11,20 75:2 76:19 77:14 80.14,22 81:6 82:7,8 84:14,17 84:20 85:12 86:3,13 86:16 87:2 88:14,16 88:19
**happen** 18:13 72:15
**happened** 9:21 25:11
**happening** 55:9
**happens** 47:9 55:8,9
**happy** 5:16
**hard** 21:15
**Hardwick** 23:3 69:22 70:10,21 71:4,15
**hat** 60:21
**having** 4:5 90.11
**head** 4:22
**health** 7:6
**hear** 6.5 38.13
**hearing** 31:16,18 34:17 34:20 53:2
**hearings** 89:15
**held** 68:19 74:15
**help** 11:3 17:19 80:5
**her** 35:1
**heretofore** 27:19
**high** 57:20
**Hill** 33:12 37:2 38.3
**him** 7:4 30:19 31:13 46:5 48:22 58:19 59 14 60:18,22 61 3 61:10,14 63:5 76:19 82:3,11 83:4 88:4
**hired** 7.14 8.4
**history** 7:6
**hold** 18:8 69:1
**home** 21:4
**hours** 18:3
**hundred** 15:22

I

**ID** 10:4
**idea** 46:4 69:15
**identification** 10:16 39:11 40:21 61:16 62:1 63:2 78:18 85:13 86:1
**identified** 32:19 61:8,9 75:22 77.17
**IDs** 21:21
**II** 77:2
**illegal** 53:22 56:5
**illness** 6:19
**imagine** 44:19
**immediately** 39.8
**impair** 6:14,20
**important** 5:6
**imposed** 89:6
**impossible** 11:20
**impressive** 15.18
**inaccurate** 22:7
**incendiary** 53:22
**inception** 10 1,6,21
**incident** 9:20,21 84:4
**include** 49:15 88:22
**incoming** 56.7
**indicate** 5:1
**indicated** 23:2
**indicating** 67 12 87:18
**individual** 17:5 68:17 86:20 87:21
**individuals** 11:10
**indoor** 39:10
**information** 7:19 25:6 26:17,19,20 53:6 62:15 89:10,11,20
**informed** 82:11
**injured** 66:4,6,8,9,13
**inmate** 18:18
**inside** 63:4
**inspected** 39:10 40:20
**inspection** 78:19 79:2,9
**Inspector** 89:9
**instance** 11:5 13:6
**instead** 4:22
**institute** 16:15
**instituted** 84:3
**instruct** 7:4 40:9
**instructed** 39:4,20,21 39:21 40:6,6,12
**instruction** 39:7
**instructions** 56:7 64:6
**intend** 33:6 34:13
**intermediate** 27:17 28:16
**interpret** 76:6,11
**interrogatories** 32:12

Neal R. Gross & Co., Inc.
(202) 234-4433

Page 95

32:20 68:6
**interrogatory** 74:12
**interrupt** 6:1,1
**intro** 27:10
**introducing** 56:4
**introduction** 21:22 28:11,12,13,14 53:21
**introductory** 27:13 28:8
**inventory** 46:19
**investigation** 19:8
**Investigations** 87:16
**involving** 73:19
**issuance** 50:19
**issue** 32:2 80:6
**issued** 48:20 52:3,7 53:14 77:19
**issues** 32:6
**items** 38:3,5 78:21
**I.D** 82:13 83:7 86:22

J

**J** 2:8 50:4
**January** 71:14,21 88:12
**job** 15:18 18:6
**Judge** 31:10 35:1
**Judge's** 23:19 37:11
**just** 4:9 6:5,8 10:1,6,22 17:2 18:14 21:10 25.11,12,19 30:15 31:5,12 35:16 37:3 39:2 61:19 73:6 74:1 76:17,19 85:16 86:13 87:4 90:1

K

**Kaufman** 87:14,20 88:2,5,10
**keep** 8:20 37:10,15
**kept** 12:16,20
**key** 8:17 9:11,12,12,14 9:17,22 46:22,22 47:2 47:21 79:16
**keys** 46:19,21 86:9
**kind** 17:14 27:3
**knew** 77:22
**know** 17:10 18:1 29:4 29:10,11,12,21,21 46:9,10 48:13 54:20 64:20 65:11 71:7,11 72:11 74:3 78:12,14 82:1,9 83:1,13
**knowing** 75:12,14 78:9
**knows** 82:6
**K-A-U-F-M-A-N** 87:14

L

**Labor** 71:16
**lack** 12:15 88:5,21
**LaMont** 22:4 23:6
**Landrau** 59:8 66:21
**Landrow** 89:5,18
**laptop** 20:9,19 21:2
**last** 5:19
**late** 58:19 59:14,17
**later** 7:22 8:3 25:3 61:9
**law** 2:10 35:1 73:16 74:5,9
**lawyer** 74:8
**leave** 29:1 52:5,11,16
**left** 58:16 61:1,4,17 75:11,14 76:1 78:1,8
**length** 72:4
**less** 76:7,14
**lesson** 21:3,4
**lessons** 21:5
**let** 6:8 30:2 33:2 52:20 75:7 76:19
**letter** 23:1
**let's** 7:11 38:15 76:12
**level** 26:17
**lie** 40:7
**lieutenant's** 13:20
**life** 18:17
**light** 35:16
**lights** 57:14,19,19 62:4 62:17
**like** 4:9,20 13:15,16 17:2 21:10,13 27:15 33:5,16 90:4
**limitations** 42:21 43:2
**limited** 13:5
**line** 56:7
**lines** 40:12
**list** 41:15,15 42:8 68:19 70:7 74:15
**listed** 70:22 71:4,17 72:7
**lists** 70:2 72:11
**little** 4:10
**LLP** 2:10
**lobby** 56:20 60:13 63:21
**located** 81:16
**locations** 9:15 11:12
**Lodge** 68:20 69:1
**log** 8:20 9:5,6 12:16 15:3,9 31:6 34:1 36:5 37:4 39:1,17,18 47:3 57:6
**long** 20:3,11 25:14,17 45:18,21 46:3 48:5 60:19
**longer** 57:20
**look** 22:11,13 28:4 32:5 32:14 33.18 37:21 76:12
**looking** 23:12,13 62:10
**lose** 29:7
**loss** 53:19
**lot** 12:1 81:16
**lunch** 45:3 55:5

M

**M** 50:10,11
**machine** 11:8 47:7 60:22 62:4
**machinery** 47:10
**made** 10:16 38:17 39:13 53:6 64:13 66:19
**mail** 21:5 24:14 37:7,15
**mailed** 36:13
**main** 9:4 12:14 56:21 57:4 79:18
**major** 15:19
**make** 16:19 40:18 74:1 80:11 87:3 90:2
**man** 84:7
**management** 7:18 10:14
**manned** 81:18 82:15
**manner** 83:20
**manning** 86:19
**marked** 31:13,17 34:11 80:8,10
**marking** 80:18
**materials** 64:4,10
**matter** 1:5 24:9 68:11 72:21 90:10 91:3,16
**may** 18:2,17 33:17 36:3 39:6 67:9 73:8
**maybe** 57:20
**Ma'am** 60:20
**meal** 45:9 59:20 60:9
**mean** 14:9 17:8 28:21 58:16 72:18 76:7
**means** 4:17 76:13
**medication** 6:14
**meetings** 69:5
**members** 55:1
**memo** 70:20 71:3
**memorandum** 69:21 71:14 72:9
**men** 66:5
**mental** 6:19 7:6
**mention** 32:10
**mere** 17:3,4
**MERIT** 1:1
**messages** 13:2,14
**metal** 47:5 57:10,11,22 86:4
**MICHAEL** 2:8
**microphones** 6:5
**might** 6:14,19
**mind** 37:10,15
**minute** 86:11
**minutes** 25:3 45:13 46:6 58:16,20 59:14 59:20 60:9 85:22
**miscellaneous** 8:19 78:20
**mitigating** 19:9
**mode** 47:12
**moment** 72:14
**Monday** 37:17
**monitor** 8:16 11:6,8,9 11:12,15,16,17,19
**monitors** 9:8,10
**Monroe** 27:20 28:6
**months** 65:5
**more** 10:17,18 11:1 17:17,21 18:6 46:6 84:20 86:13
**morning** 4:7 6:11 34:16 40:18
**most** 16:12 21:4
**move** 38:15 75:19
**much** 8:15 18:6 27:11
**must** 39:10 56:18,20

N

**N** 50:8
**name** 70:6,21 71:4,11 71:17 72:4
**Nancy** 50:9
**narcotics** 54:1
**Neal** 2:18 23:11 33:13 72:15 91:22
**near** 73:2
**need** 34:18 36:5
**never** 23:8 38:11 51:20 51:22,22 65:4 86:21 87:1,6 89:7
**new** 8:14 10:22 16:15 25:9 26:7 52:7,14 77:2 80:13
**next** 15:8 28:15,16 42:8 63:14 64:7 74:9 80:20 82 15
**nobody** 40:6 44:1,4 47:12
**nodding** 4:22 43:15
**noise** 57:13
**none** 89:11
**nonsupervisor** 43:22
**North** 1:19 2:20 56:21 79:18
**nothing** 30:16
**notice** 1:18 15:17 19:16 38:4
**notification** 69:18
**notify** 13:10 25:22 26:2 56:18
**November** 28:15
**number** 10:10 23:13 36:1,1 38:6 49:17 68:20 87:9 88:11
**N.W** 1.19 2:11,20

O

**O** 1:6,17 4:3 71:22
**oath** 4:16
**object** 49:8 58:21 63:10 82:4
**Objection** 6:22 46:7 54:8 59:15 63:9
**obligation** 35:12,13 63:7 66:15
**observe** 39:6
**obvious** 89:9
**obviously** 89:4
**occurred** 9:21
**October** 9:22 28:9,13 28:14 29:9,16,19,19 30:22 37:4 38:5,5,6,9 38:16 48:4,21 49:18 49:21,22 50:17 52:3 52:13 53:15 58:14 75:10 77:19 78:8 80:9,19,21
**off** 57:11,21 62:4,17 63:6 86:7 90:7
**office** 1:2,10,19 2:19 7:15,18 13:13,20 14:2 29:2,3,5 56:21 57:4 69:19 72:4 73:5 74:15,16 75:22 78:21 87:15
**officer** 11:2 19:6,9 27:1 32:4 39:7,16,17 42:9 45:3,9 47:19 48:19 53:3,10,16 58:14 61:7 62:11,14 63:5 66:4,8 66:9,10,11,12,13,14 66:16,16 71:6 76:4 77:10 78:10,17 79:11 79:13,21 80:1 81:7,19 81:21 82:1,5,9,19 83:20 85:2,5,6,7,11 86:17,18 87:7,8,21 89:4 90:4
**officers** 8:18 17:9 18:9 18:14 26:18 39:3,19 39:21,22 40:5,7,9,11 44:17 49:6,11 50:18 51:10 52:6 54:20 55:1,2,5,6,12,16 56:5 66:22 67:5 69:4 83:14 84.6,11
**officer's** 42:11
**Officer-in-Charge** 38:20 44:11
**offices** 25:20 68:19

Neal R. Gross & Co., Inc.
(202) 234-4433

official 16:9 6:9 1,14 73:10 8:9 22
official/representati... 67:17
Often 5:5 3
Oftentimes 16:15
Oh 6:7 17:8 83:12
OIC 15:10 39:8,14 40:4 41:11 85:5
okay 6:7,8 10:2 12:11 12:14,17 14:1,15 15:1 15:8 16:21 17:4,11,19 18:21 19:11 20:3,8,13 21:17 22:22 23:10,20 24:6 26:22 28:10 34:4 35:22 36:18 38:15 40:8,17 42:6 46:18 47:2 48:5 51:8 51:13 52:19 54:13 55:11 56:14,16 58:8 61:5,11,15 64:2,22 65:15,19 67:11 68:13 69:21 71:9,19 72:3 74:20 75:3 77:9,21 78:16 80:2 85:19 86:7 87:2
ok 8:12 25:19 29:16,4 26:5,7 80:12
Odack 44:21 61:3
Once 32:3
one 9:4,7,10 10:20 14:6 13:20 12:15 18:2 20:6 27:22 28:3 37:3 37:22 44:22 46:22 52:2 53:4,14 57:13 61:8,9 66:5,17 74:3 75:4 77:4,16,18,18 80:12,13,15 81:16 86:13 88:1
ones 34:1 37:7 48:18
only 5:8 25:4 27:22 36:10 35:22 43:5 44:17 50:19 53:9 70:13 71:9
onto 75:19
operate 22:6
operates 56:2
operating 16:10 47:14 55:22

P
packages 78:20 79:3,9
Packet 14:4
page 33:11 36:15 38:2 50:16 56:3,17 65:19 56:21 74:16 78:17 79:13,20
popped 25:3
pop-up 11:17
Porter 61:9 75:12
particular 16:17 18:12 26:11 27:19 83:21
particularly 83:16
parties 1:22 5:12
party 3:20
Passport 78:22
part 60:20 74:2,16

patrol 29:3 49:7
patrolling 55:19
Pause 31:11 47:17
76:21 80:3 84:19
payroll 27:2
pdf 51:4,6
peculiar 43:18
peculiarities 15:20
people 10:17 12:3 22:19 23:7 27:22 40:19 47:12 60:15,17 84:13,16 87:3,16 85:3 86:13,16 perform 24:18 45:4
Perhaps 80:5
period 20:7 25:15 43:3 68:8 69:12
permitted 7:2
person 11:20 12:7 59:1 63:15 74:8
personal 21:2 53:20 74:21
personally 2:6
Personnel 7:18
persons 39:5,9,10 53:17 55:19 76:5 77:11,13 78:16,18,21 84:2

photo 33:2
phone 88:9
phonetic 14:22 66:17
physical 7:6
physically 47:19 79:14
Physician 11:10
Place 91:11
placed 11:2 42,10 43:19
plan 25:4 28:3 please 5:4 point 34:12 63:8 65:10 71:15 81:4
police 10:13 17:18 31:6 49:12 54:20 55:11,16 55:21 74:12 78:17 79:13,20
popped 25:3
pop-up 11:17
Porter 61:9 75:12 78:16,18 82:1
position 11:13 24:10 26:14 32:15 60:1
possessed 44:3,10
possession 34:21
prior 10:22 28:15 29:17 31:21
professors 19:22 21:7
proffered 67:13
proliferat 28:21
Program 27:7
programs 13:6
promise 6:1
promised 8:5
proper 39:11 67:1,7
78:1
properly 61:6 65:12 64:5 75:17,22 76:9 73:5
property 53:20
proposed 72:4
PROTECTION 1:1 provide 36:8 65:8,9 60:8
provided 31:6 36:7 53:5 74:17 69:7,19
provides 41:22 45:12 73:16 74:5,10
prordans 73:22
purposes 45:4
pursuant 1:18 put 11:1 24:10 26:1 28:1 34:2 37:7 43:19 P-R-O-C-E-E-D-I-N-... 3:1 pc 58:15 75:11 78:9

Q
question 4:21 5:7,10,16 7:1,5 15:9 49:2,9 54:9 56:22 59:8 13:16 60:1,3,5,8,11 61:20 62:12 63:11 64:8 65:19 77:22 71:8 72:4 76:15 79:9 81:8 reproduces 33:1 34:3 questions 4:13,14 5:4,5 5:13,21 7:3,9 50:19 57:21 81:1,4 84:1,21 quite 76:15,17

R
radio 65:21
raise 13:1 41:13
range 45:5
rarely 21:15
rather 10:18 36:5 46:2
read 32:9 90:4
really 13:4 21:11 27:11 45:2
reason 6:10 16:18 28:3 71:21
recall 19:17 20:2

R
repair 26:1
repaired 26:3
repeat 5:5 67:4 78:6
rephrase 5:5,16
reply 32:8 59:7 64:12 64:14,19 65:1,8,15,16 65:17,20 66:15 77:18 80:6
report 39:5,8 56:21
Rockridge 15:20
Roger 66:4,9 77:17
room 8:10
rooms 7:16
routing 41:15
Roughly 20:4
router 66:13
rowing 44:13
RIOW 80:8,11,11,18
rule 18:15 43:9 54:19
77:6 79:18
rules 17:20,20 18:3
32:20 33:2 44:8 79:4
running 8:20 12:20
15:9 9:9
RW-1 54:17
RW-2 84:18

S
same 8:15 18:11 21:20 23:20 28:3,19 28:21 43:21 54:6 68:9
sandbagging 32:21
Sargeant 85:4,16,19
saw 16:16 23:8 52:4
60:2,1
shaking 4:22
shift 9:1 15:5 16:6 18:3 29:11 29:20 40:6
41:4,21,21 44:5,18
59:12 63:18 67:17
68:2,6,8 69:6
sheet 54:5
show 71:20
short 66:3,14
sho 54:9 31:2 52:19
showed 13:21
shows 10:5 33:14 49:11
49:14,15
side 57:19
sign 40:3 54:17
sign-in 40:3
signals 8:19
signature 19:22 28:18
76:13 84:1
situation 69:21,10,14

73:12,15 79:12,19
80:4 81:3 86:3,10
risk 56:4
Riverside 77:2
Robert 16:17 3:14 4:3
64:14,19 65:8,15,16
65:17,20 66:15 77:18
Rockridge 15:20
roll 40:8,9,11,18
role 13:16 33:7
sedoin 34:21
send 13:1,2,9,14,15,17
14:7 20:15 34:2,2
55:19 63:1,11,12,16
Roughly 20:4
router 66:13
sent 14:10 22:15,16,18
22:20 23:2 24:19,22
24:21 30:3 36:14
36:6,22 35:6 38:5,7
38:18 44:6,10,21 64:2
41:16 44:8 54:17 85:18
88:4,6,12 45:1,2,15
43:15,18 46:1 85:4
47:13 49:8 51:4,15
52:10,20 54:6 56:14
60:9

security 24:18 81:12
82:15,17,20,22
83:6 84:10 86:19
sec 26:15,16 53:5,16,17
35:16 52:5 67:9,18
78:7,18,21 86:16
seems 76:13
sense 13:16 19:17 25:3
25:16 27:10 45:21
62:15 65:5 67:18
scheme 5:4
scored 13:19 14:15,17
18:6 87:2
somebody 16:13 41:20
42:13 80:8,13,17
somehow 41:14,15 41:18
77:4
scene 21:3 24:1 24:4
29:16 34:5 35:6,22
38:13 46:9,19 3 50:7
50:10 56:14 57:16,17
58:16 68:22
sort 13:5
soul 13:11
space 53:12
Special 87:14
specific 17:21 18:7 66:5
specifically 22:16
split 11:11
sr 16:17 8:14 4:3
stand 67:2 75:21
started 26:16 60:17
state 19:17 20:3 47:19
69:22
stated 32:5,7 38:10
46:19 49:9 56:17
55:18 68:21
statement 37:13
56:20 67:1,7,22
58:14 87:2 88:5
stations 8:19 20:7
station 62:16
steam 9:21
Steven 87:13
steward 69:7,10,14
70:4,9,12,22 71:1,14
71:3,17
stop 55:6
straightened 24:13

29:18
Street 1:19 2:11,20
56:22 79:19
strobe 11:13
structured 17:17
students 19:21 21:5
submission 31:10
submit 16:19 37:12
submitted 37:13 65:7,8
submitting 31:9
subsequent 90:20
sufficiently 5:9
Sunday 38:21
supervisor 9:1 13:10
13:14 15:7 38:4 16:8
42:17,19 43:4,6 63:14
64:7 66:5,7
supervisors 13:3 17:1
25:22 26:20 41:16,17
42:12 43:9,10,13 64:1
45:15 63:13
supervisory 15:13
supervisor's 13:12,19
14:2 25:1 76:2
supervisor/reception...
56:19
supposed 17:13 25:8
58:5,7 68:19
supposedly 25:10 43:5
sure 74:2 80:11 88:22
surprise 88:17
suspicious 39:5
swipe 10:5
switched 52:17
sworn 4:6,8 81:18
system 8:16,17 9:11
10:1,3,22 11:3 17:7
14:4 28:17 19:16 4:8
47:15 50:21 56:1
system 1:1 8:17,18
14:4 25:17 19:16 4:8
47:10
S-O-N-J-A 87:15

T
Tab 87:11
TABLE 3:10
take 10:18 19:21 11:4
28:19 33:4 65:21
46:3 64:3,9 86:11
takes 4:16
taking 6:13 24:18
33:22 90:9
talked 31:5
talking 3:21 9:19 12:3
29:19 33:10 9:20
32:16 65:20 74:2
task 17:5 24:18

telephone 37:16 52:10
52:16
telephones 11:18
tell 23:22 45:15 58:10
telling 64:18,20
template 14:10
term 12:15 58:3 72:4
77:5
test 24:18
testified 4:6
testify 6:13 82:5
testimony 4:15 6:11,21
test 24:22
Thank 23:20 36:11
37:6 90:5
their 33:8 44:2 45:3
47:20 67:2,2,5 19:3
they'd 55:3
thing 5:19 17:15 27:3
71:10
things 6:19,15 11:18
13:9 18:14 62:14
28:16 19:22 45:3
think 10:14 17:6 22:3
23:1 24:15 25:2,3,7
32:22 43:14 47:12
59:5 75:3 76:11
81:19 86:8
though 29:5 89:17
threatening 18:18
three 6:9 9:21 11:5
21:14 22:19 36:16
45:1 47:12
through 4:10 11:14
12:10 50:19 51:6
59:16 60:21 62:3 86:4
86:5
throughout 9:16 67:1,6
time 10:13 14:5,8,16,17
16:13,14 18:12 19:12
19:14 21:11,21 24:21
25:2,15,16 27:6,10,19
19:22,11 21:14 22:1
28:5,13 40:6 51:22
45:6,21 46:16 47:4
47:10 41:18 51:13,18
65:4 76:7 80:18,18
uniform 49:12 83:14
84:6,13 86:18
uninteresting 18:14
union 68:6,10,11,15,21
69:14,16,18 71:18
76:6,7,9 73:10,21
74:7,18,22
unique 44:20
United 1:1 87:13,19
University 77:2
unless 12:9
until 23:8 17:19,19
72:11 22:12 67:19
89:7
unusual 39:21
upset 11:1
upstairs 12:8 47:13
15:4 69:10,14 23:4
32:5 47:8 89:6

training 27:21,22 28:1
28:4,5
transcript 31:4 33:21
37:1 64:13 64:9,16,20
80:15 81:2 87:6 90:5
90:11,15
transpired 46:10 81:2
Treasurer 70:3
treated 6:18
true 31:18 23:4 45:2
60:13 65:1 83:16
truthful 66:8,21
truthfully 6:16
try 26:6
trying 12:3
two 21:14 27:22 36:1,1
37:1 44:22 46:22
60:14 61:8,13,13,16
62:18,19 63:3,21 74:2
75:12 78:1,10 80:16
90:14 88:17 83:19
two-page 36:20 38:2
types 40:3
typewriting 91:17
T&A 13:18

U
Uh-huh 57:17 69:20
70:5
uncertain 65:10
under 4:16 5:10 67:9
undersized 5:1,4,8,13
5:17 78:2
understand 5:6 28:17
27:14 37:14,41,4
37:18 5:18
understanding 12:1
25:8
understands 67:10
understood 5:9,17
unforeseen 18:19
uniform 49:12 83:14
84:6,13 86:18
uninteresting 18:14
union 68:6,10,11,15,21
69:14,16,18 71:18
76:6,7,9 73:10,21
74:7,18,22
unique 44:20
United 1:1 87:13,19
University 77:2
unless 12:9
until 23:8 17:19,19
72:11 22:12 67:19
89:7
unusual 39:21
upset 11:1
upstairs 12:8 47:13
15:4 69:10,14 23:4
32:5 47:8 89:6

V
varions 9:14 11:12 14:4
16:9 18:1 66:2 26:7
vary 18:2
vehicles 39:8
vendors 78:20
verbal 4:20
verbally 40:9
verify 47:20 79:15
Version 22:4 23:22
20:18 38:9 45:21
versus 80:12
very 12:5 15:16 17:16
18:18 61:6 62:12
vs 13:1 85:20
vicinity 17:21
violated 85:6,11,14
violation 19:5 67:19
violations 18:22
virtually 43:17
visit 55:6
visitor 54:21 75:19
voice 27:2
voluntarily 90:11

W
waived 90:12
waked 89:4
we're 26:7 33:9 48:6
walks 57:9,21
ward 56:3
Wanda 61:9 75:12
70:17
wanted 54:21 29:20
45:22 83:4 69:17
74:1,6 80:11 86:11,17
wasted 13:9,10,15
waved 41:15,17
Washington 1:23,19
2:12,21 91:1
way 41:14 14:5,16,19
69:6 33:2 69:20
we'd 24:1 29:9
week 28:15
weekends 59:21 83:17
well 9:19 10:20 12:3,5
14:15 17:2 20:22
22:18 30:20 34:18
39:11,19 41:9 43:1
46:21 48:16 49:10
50:16 51:6 55:18 62:6
64:16 70:8 80:17
87:6
went 45:8,8 59:6 62:4
62:17
were 1:21 7:14,17 8:13
9:4,6 10:10,14 11:1
14:2,13 17:1,2,16 18:6
16:12 17:13 19:8
26:16 39:6 40:2 41:7
41:19,22 42:2 43:7,15
44:2 61:6,13 62:16
65:18 66:3,4,17,22
66:22 67:6 70:19 74:3

25:3
water 8:17
way 11:3 71:21
weapons 56:5
Webster's 77:2
Wednesday 33:11
week 28:15
weekends 59:21 83:17
well 9:19 10:20 12:3,5
14:15 17:2 20:22
22:18 30:20 34:18
39:11,19 41:9 43:1
46:21 48:16 49:10
50:16 51:6 55:18 62:6
64:16 70:8 80:17 87:6

46:11 61:2 65:21
Windows 28:12,14
wish 86:4
wishes 68:10
witness 3:12 4:8,18 5:2
5:18 6:3,7,12,17
10:20 46:9 48:7 59:3
59:1 63:18 62:2,13
89:17
woman 64:4,9
women 61:8 62:18,19
62:2
word 28:9,12 76:6,6,11
76:13,18
words 82:1
work 18:12 35:8 41:5
41:17,17,20,21 42:14
43:4,10 49:9 52:9
67:17 78:18
worked 8:14 10:8 41:9
41:13 43:21
working 18:1,2,8
32:15 44:6,15 67:3,18
worse 74:22
would 6:19 14:16 28:19
27:1 35:17 37:13
38:13,20 39:9,19 40:5
45:18 5:19 53:15
58:16,18 67:14 71:4
83:19
wrap 8:19
wrong 56:2
wrote 83:22 84:20
W-A-N-D-A 61:10
W-A-R-D 56:4

X
X 1:5,12
xeroxed 48:17,18
x-ray 11:9 75:6,7

Y
yeah 14:11,15 20:16,22
21:14 25:7 68:20
34:4
years 20:4,5,7,17 24:1
21:14 25:7 68:20
34:5
yesterday 24:14 25:11

0
0700 39:3

1
1:68 20:6,9 70:4,22
72:1,2 77:17 80:8,11
80:13,18
10 1:13 25:2 91:8
10 11:13 91:8

1525:3
15th 38:7
16:15 25:21 25:19
17 38:7
17th 38:6
18 64:19
18a 1:19
19:11,9 91:17 85:19
1900 27:7
1901 2:11
1998 7:15

2
2 34:11 56:3 70:4,22
75:5 80:13,18
2000 27:3
2001 8:15 16:14,15
19:12 20:6 21:1
71:21
2002 8:4 71:20
2003 68:7,22 69:2
71:12,19
2004 28:13,14
2005 68:6,22
2006 28:19 21:12
2007 1:13 86:19 91:8
2008 91:9,17
2009 2:12
22 64:19
240 11:10
26:18 64:19
265 64:12
27 1:16
27th 1:16
28 15:1
28:18 64:19

3
3 26:3 28:13
3.05 69:2
30 68:7 91:19
304 64:12
3rd 91:9
32 34:13 35:16
35 31:6

4
43:14 9:13,17 10:12
13:2,13 15:13,19
37:19 45:14 46:5
58:18 57:10 75:9
86:1,2
43 80:5
4335 15:19
4N 90:7
45 43:8 67:17 81:18
46 68:20

5
5 36:14,16 56:8
5.90 45:8
500 45:6 80:16
509:9
514 32:1
52 88:6

6
6:13 58:15
6:41 75:11 78:9

7
7 78:16
732 1:19 2:20 56:21

8
8 79:12
81st 33:12,13,15,17
83:10
84 3:14
86:3,14
87 15:15 93:9

9
9 87:11
9:00 59:9

# EXHIBIT 7

## INTEROFFICE MEMORANDUM

TO:        J. MICHAEL HANNON, HANNON LAW GROUP, LLP

FROM:    ALVIN HARDWICK, CHAIRMAN GPO/FOP LABOR COMMITTEE

SUBJECT:  INFORMATION REQUEST DISPARITY OF DISCIPLINE

DATE:     8/20/2007

This is a listing of GPO Police officers who are active in the Union, meaning they regularly attend meetings and participate in activities, such as representing members in meetings with management, filing grievances, and other functions as necessary.

Each person here listed has also been denied at various times promotions, training opportunities and those who have participated in appeal procedures or hearings. The union believes that these incidents are based on union animus. These attitudes and retaliation towards the Fraternal Order of Police and its union members has existed since 1995 when FOP started representing the police officer here.

Kevin Atkins        Union rep passed over for promotion disciplined for utilization of leave to seek medical attention for service-connected disability.

Collins Bailey      Union rep passed over for promotion, suspended for accidental discharge, proposed action for suspension for allowing other officer to go to rest room.

Steven Bailey       Union rep passed over for promotion.

Charlie Beard       Union rep Passed over for promotion, Terminated for cause involving parking permits, recommended termination for other activities.

William Chandler Active union supporter suspended for parking permit issues, passed over for promotion.

Robert Curtis       Active union supporter passed over for promotion, suspended for mishap with passports falling off truck in the city.

Alvin Hardwick Union President passed over for promotion, reprimanded for serving a summons on the former chief's girlfriend. Recommended for two-week suspension for voicing opinion to co-worker, and levity after roll call.

Abdula Jackson Union Secretary passed over for promotion, admin leave for 8 month after having altercation with former chief's girl friend, recommended suspension for leave usage, repeated pay discrepancies and shortages after returning to duty. Contention of worker comp injury claim.

Paul Talbert        Union Vice- president Passed over for promotion, Admonished for accidental discharge.

Robert White   Union rep passed over for promotions, suspended for cause in current case, recommended suspension for having nametag askew on uniform.

James Oldach    Active union member, suspended for cause on several occasions, last chance agreement for alleged sleeping on duty. Passed over for promotions.

This document only references a few of the incident which have occurred at the GPO personnel not listed are no longer employed at the GPO.

August 20, 2007

MEMORANDUM

TO:        Hannon Law Group, LLP

FROM:      Paul Talbert, Vice-Chair *PJ*
           FOP Police Labor Committee
           United States Government Printing Office

RE:        Information Regarding Union Members and Disparity of Discipline

**Executive Board Members**

Officer Abdula Jackson, Secretary

Officer Jackson continues to have problems regarding her leave balances and management has been negligent in working with her to review her time to ensure that it reflects proper leave balances.

Officer Jackson is constantly harassed about her leave status and light duty assignments. She requested transfer to another section but this request has not been responded to. Further, Officer Jackson has not received full pay for several months due to the leave discrepancy.

Officer Charlie Beard Jr., Chief Shop Steward

Officer Beard was terminated due to allegations that he falsified a parking permit. However, he prevailed in the case against him and was reinstated to duty but at a lower rank and pay. Prior to his termination, he was a Corporal but was reinstated as a Private. Each time the Corporal position becomes available, management alleges that Officer Beard is unqualified notwithstanding the fact that he held this position prior to his wrongful termination.

**Members in Good Standing**

Officer William Chandler

Officer Chandler was suspended for utilizing the transit subsidy and having a parking permit which he paid for. He was advised that if he paid back the cost of the transit subsidy, the matter would be closed. Officer Chandler paid the amount due, however, he was suspended for approximately 10 days despite management's representation that no action would be taken against him.

2

## Officer Corey Richardson

Management proposed to suspend Officer Richardson for five days due to allegations that he left his post of duty without prior approval in violation of post orders and procedures. These allegations were proved false and Officer Richardson was not suspended. However, management continued to harass him about this incident.

## Officer Collins Bailey, Jr.

Management proposed to suspend Officer Bailey for five days due to allegations that he lied to his supervisor regarding the whereabouts of Officer Richardson (case described above). These allegations were proved false and Officer Bailey was not suspended. However, management continued to harass him about this incident.

## Officer Florence Ray

Officer Ray was approved for light duty status and continues to be harassed by management regarding when she will be able to return to full duty status.

## Officer Robert White, Sr.

Officer White was suspended and reduced in rank due to allegations that he failed to inspect visitors' badges and packages. He continues to be harassed about this incident.

## Officer Robert Curtis*

Management proposed to suspend Officer Curtis for several days due to allegations that he left his post without prior approval. Officer Curtis was, in fact, suspended. He has not, however, been subject to ongoing harassment by management.

## Officer James Oldach, Jr.*

Officer Oldach was accused of sleeping at the main desk. Officer Oldach was suspended for several days for this behavior. He has not, however been subject to ongoing harassment by management.

*These officers are Caucasian. They have been disciplined by management but, unlike the African-American officers, they have not been subject to ongoing harassment.

## PRODUCTION OF DOCUMENTS – Item 1

| GPO Case Number | Complainant's Name | Date Filed | Department/Division Where Allegations Arose | Bases and Issues Raised | Alleged Responsible Official If Identified | Status |
|---|---|---|---|---|---|---|
| 03-37 | Manuel J. Rivera | 09-24-03 | Administrative Support Uniformed Police Branch | Race (Hispanic) Non-selection | Gregory Gilbert | FAD 12-12-03 |
| 03-31 | William Chandler | 08-13-03 | Administrative Support Protective Services Group | Sex (Male), Age (54) Non-Selection #03-063 | Gregory Gilbert | Accepted 10-20-03 |
| 03-12 | Robert White | 01/21/03 | Administrative Support Uniformed Police Branch | Race (Black) and Age (55) Harassment Non-selection #02-182 | Raymond Garvey Gregory Gilbert Stephen Packard | FAD 4-9-03 |
| 03-06 | Edwin Shellman | 11-19-02 | Administrative Support Uniformed Police Branch | Race (Black) | Michael DiMario Raymond Garvey | Settlement 3-11-03 |
| 03-02 | Michael A. Gallante | 10-21-02 | Administrative Support Uniformed Police Branch | Race (White) Non-selection #02-051 | Raymond Garvey | Closed – Withdrawn 11-5-02 |
| 02-28 | Charles Beard | 04-29-02 | Administrative Support Uniformed Police Branch | Race (Black) and Reprisal Proposed Removal | | Closed - Settled |
| 02-09 | Knita Jacson | 12-11-01 | Administrative Support Uniformed Police Branch | Sex (female), Harassment/Working Conditions Non-selection #01-124 & 180 | | Under Review |
| 01-30 | Elois A. Carter | 09-12-01 | Administrative Support Administrative Service Group | Age (56) Non-selection #01-081 | Raymond Garvey | FAD 8-12-03 |
| 01-29 | Marc L. Riffle | 09-10-01 | Administrative Support Uniformed Police Branch | Race (White) Harassment | Alvin Hardwick John Chisholm Gregory Gilbert | Pending EEOC Hearing |
| 01-26 | Billy S. Stokes | 08-09-01 | Administrative Support Uniformed Police Branch | Race (African American) Proposed Discipline (Suspension) | Steven Cross | Closed – Final Agency Decision |
| 01-19 | Stephen J. Packard | 03-27-01 | Administrative Support Uniformed Police Branch | Sex (male), Race (White) Harassment | Gregory Gilbert | Closed – Withdrawn 10-17-02 |
| 01-11 | Vernell M. Benjamin | 12-19-00 | Administrative Support Uniformed Police Branch | Sex (F), Race (Black), Disability Harassment | Stevin Cross Stephen Packard Sandy Posey | Pending EEOC hearing |

Information on Alleged Responsible Officials is provided only if the complainant identified a responsible official on the original complaint form.

## PRODUCTION OF DOCUMENTS -- Item 1 - CONTINUED

| GPO Case Number | Complainant's Name | Date Filed | Department/Division Where Allegations Arose | Bases and Issues Raised | Alleged Responsible Official If Identified | Status |
|---|---|---|---|---|---|---|
| 00-42 | Keith C. Ladd | 07-19-00 | Administrative Support Uniformed Police Branch | Race/Color (Black) Harassment | | Pending EEOC Hearing |
| 00-14 | Keith Ladd | 03-?-00 | Administrative Support Protective Services Group | Race/Color (Black) T&A, Clothing Reimbursement, etc | | Pending EEOC Hearing |
| 00-05 | Keith C. Ladd | 12-06-99 | Administrative Support Protective Services Group | Race (Black) Proposed Removal | Michael Galante Raymond Garvey Neal Fine | Pending EEOC Hearing |
| 00-02 | Hartwell W. Allen | 10-19-99 | Administrative Support Protective Services Group | Race (Hispanic) Non-selection | | Closed -- Final Agency Decision |
| 99-17 | Keith C. Ladd | 08-25-99 | Administrative Support Protective Services Group | Race (Black) Harassment | | Pending EEOC Hearing |
| 99-04 | Ralph J. Ohlsen | 12-10-98 | Administrative Support Protective Services Group | Reprisal Harassment | | Closed -- Final Agency Decision |
| 98-13 | Keith B. Williams | 09-24-98 | Administrative Support Protective Service Group | Race (Black), Disability (physical) Discipline | | Closed -- Final Agency Decision |
| 98-07 | Gregory J. Gilbert | 03-09-98 | Administrative Support Protective Service Group | Race (Black), Color (Black) Non-selection | | Closed -- EEOC Decision |
| 98-06 | Tommie L. Wheeler | 01-25-98 | Administrative Support Protective Service Group | Race (Black), Color (Black) Non-selection | | Closed EEOC Decision |
| | | | | | | |
| | | | | | | |
| | | | | | | |

Information on Alleged Responsible Officials is provided only if the case is currently active, and the complainant identified a responsible official on the original complaint form.

## PRIVATE MEDICAL INFORMATION

| Officer | Race | Sex | Medical Impairment | EEOC Status[1] |
|---------|------|-----|--------------------|----------------|
| Officer 1 | Black | Female | OWCP[2] Knee injury | None |
| Officer 2 | White | Female | Personal Illness | None |
| Officer 3 | Black | Male | Personal Illness | EEOC Alleged RMO |
| Officer 4 | Black | Male | Work (not GPO) Related Neck Injury | EEOC Complainant |
| Officer 5 | White | Male | OWCP Knee/Back Injuries | EEOC Complainant |
| Officer 6 | Black | Male | Personal Illness | EEOC Witness |
| Officer 7 | Black | Male | Personal Illness | EEOC Complainant |
| Officer 8 | Black | Male | Back Injury | None |
| Officer 9 | White | Male | OWCP Psychological Diagnosis | EEOC Alleged RMO |
| Officer 10 | Black | Female | OWCP Psychological Diagnosis | EEOC Complainant |
| Officer 11 | White | Male | Vision, Protein in Urine | None |
| Officer 12 | Black | Male | Blood Pressure & Problems with Urinalysis | None |
| Officer 13 | Black | Male | Vision | None |
| Officer 14 | Black | Male | Elevated Pulse Rate | None |
| Officer 15 | White | Male | Diabetic | None |
| Officer 16 | Hispanic | Male | Diabetic | EEOC Complainant |
| Officer 17 | Black | Male | OWCP back injury | None |
| Officer 18 | Black | Male | Diabetic | None |
| Officer 19 | Black | Male | Diabetic | None |
| Officer 20 | Black | Male | Diabetic | None |
| Officer 21 | Black | Male | Possible Diabetic | None |
| Officer 22 | Black | Male | Psychological Diagnosis | None |

---

[1]    EEOC status is from 1998 through September 24, 2003.

[2]    OWCP indicates GPO Office of Worker's Compensation claimant.

**MVO LOG FOR POLICE OFFICERS FROM 1998-2004**
**FROM GPO OCCUPATIONAL HEALTH DIVISION USING MEDICAL SECTION RECORDS**

| Name | Date | Passed Initial Test Requiring No Intervention | Disqualified 30 Days | Reason | Retested or Dres. Note | Date Passed | Known H/O Diabetes |
|---|---|---|---|---|---|---|---|
| Officer 7 | 03/27/00 | Yes (RBS 152mg/dl) | | | | | Yes |
| Officer 11 | 08/29/99 | | 08/29/99 (Letter) | Eye | 11/24/99 with Glasses | 12/11/99 | No |
| | 02/11/03 | | 02/11/03 | UA (+ Protein) | Repeat UA on 02/12/04 | 02/12/03 | |
| Officer 12 | 10/11/00 | | 7 Days (Letter) | BP & UA | 11/03/00 | 11/03/00 | No |
| Officer 13 | 07/22/03 | Yes | Yes | Eye (Letter Requested x2) | 12/08/03 Eye Screen Repeated | 12/08/03 | No |
| Officer 14 | 10/23/00 | Yes | 10/23/00 (Letter) | Elevated Pulse Rate | | 10/24/00 by Posey | No |
| Officer 15 | 01/12/00 01/07/03 | Yes | 01/12/00 | Positive UA glu/ke (233mg/dl) | 02/23/00 | 05/16/00 | Yes (New Diagnosis) |
| Officer 16 | 10/27/98 | Yes (137 BS) | | | | | Yes |
| Officer 18 | 05/19/03 | Yes | | | | | Yes |

MVO LOG FOR POLICE OFFICERS FROM 1998-2004
FROM GPO OCCUPATIONAL HEALTH DIVISION USING MEDICAL SECTION RECORDS

| Name | Date | Passed Initial Test Requiring No Intervention | Disqualified 30 Days | Reason | Retested or Drs. Note | Date Passed | Known H/O Diabetes |
|---|---|---|---|---|---|---|---|
| Officer 19 | No MVO | | | | | | Yes |
| Officer 20 | 01/13/99 & 03/12/02 | Yes | | | | | Yes |
| Officer 21 | 03/18/02 | Yes | | | | | ? No |
| Benjamin, Vernell | 06/20/00 | | Yes (Letter Requested 6/20/00 & 10/12/00) | Positive UA for Glucose Elevated BS (362mg/dl) | 10/31/00 | 11/06/00 | Yes |
| Cross, Steven | 09/28/00 | Yes | | | | | No |
| Packard, Stephen | 09/28/00 | Yes | | | | | No |
| Atkins, Kevin | 03/27/00 | Yes | | | | | No |
| Bailey, Collins | 03/31/00 | Yes | | | | | No |
| Allen, Hartwell | 09/10/98 & 10/01/02 | Yes | | | | | No |

2

## MVO LOG FOR POLICE OFFICERS FROM 1998-2004
## FROM GPO OCCUPATIONAL HEALTH DIVISION USING MEDICAL SECTION RECORDS

| Name | Date | Passed Initial Test Requiring No Intervention | Disqualified 30 Days | Reason | Retested or Drs Note | Date Passed | Known H/O Diabetes |
|---|---|---|---|---|---|---|---|
| Beard, Charlie | 11/03/98 &12/20/02 | Yes | | | | | No |
| Chandler, William | 07/08/03 | Yes | | | | | No |
| Bailey, Steven | No MVO on record | | | | | | No |
| Allen, Hartwell | 09/10/98 &10/01/02 | Yes | | | | | No |
| Childs, Carl A. | 02/11/03 | Yes | | | | | No |
| Dailey, A'Justus | No MVO since 1997 | Yes | | | | | No |
| Evans Tyrone | 02/29/00 | Yes | | | | | No |
| Oldach, James | 05/26/00 & 04/18/03 | Yes | | | | | No |
| Felsburg, Daniel | 05/09/03 | Yes | | | | | No |

3

**MVO LOG FOR POLICE OFFICERS FROM 1998-2004**
**FROM GPO OCCUPATIONAL HEALTH DIVISION USING MEDICAL SECTION RECORDS**

| Name | Date | Passed Initial Test Requiring No Intervention | Disqualified 30 Days | Reason | Retested or Drs Note | Date Passed | Known H/O Diabetes |
|---|---|---|---|---|---|---|---|
| Ray, Florence | No MVO | | | | | | No |
| Gray, Sherman | 08/20/98 & 03/15/02 | Yes | | | | | No |
| Griffin, Phillip | 01/22/99 | Yes | | | | | No |
| Bennett, Gregory | 05/23/03 &07/23/03 | Yes | | | | | No |
| Hardwick, Alvin | 09/17/03 | Yes | | | | | No |
| Everett, Darnelle | 10/22/02 | Yes | | | | | No |
| Kirby, Jimale | 05/23/03 &07/23/03 | Yes | | | | | No |
| James, Edgar | 03/11/02 | Yes | | | | | No |
| Gilbert, Gregory | 06/14/00 | Yes | | | | | No |

4

## MVO LOG FOR POLICE OFFICERS FROM 1998-2004
### FROM GPO OCCUPATIONAL HEALTH DIVISION USING MEDICAL SECTION RECORDS

| Name | Date | Passed Initial Test Requiring No Intervention | Disqualified 30 Days | Reason | Retested or Drs Note | Date Passed | Known H/O Diabetes |
|---|---|---|---|---|---|---|---|
| McConnell, Gregory | 05/15/98 & 3/15/02 | Yes | | | | | No |
| Jackson, Abdula | No MVO | | | | | | No |
| Morris, John | 06/16/00 | Yes | | | | | No |
| Epley, Paul | 06/14/03 | Yes | | | | | No |
| Tisdale, Carl | 05/02/01 | Yes | | | | | No |
| Williams, Keith | No MVO | | | | | | No |
| Ruth, Vincent | 2/11/03 | Yes | | | | | No |
| Spencer, Darren | 06/09/00 | Yes | | | | | No |
| Williams, George | 09/28/00 | | | | | | No |

MVO LOG FOR POLICE OFFICERS FROM 1998-2004
FROM GPO OCCUPATIONAL HEALTH DIVISION USING MEDICAL SECTION RECORDS

| Name | Date | Passed Initial Test Requiring No Intervention | Disqualified 30 Days | Reason | Retested or Drs Note | Date Passed | Known H/O Diabetes |
|---|---|---|---|---|---|---|---|
| Stokes, Bily | No MVO | | | | | | No |
| Turner, Sabrina | 02/01/02 | Yes | | | | | No |
| Walker, Theodore | 07/22/03 | Yes | | | | | No |
| Richardson, Corey | 02/01/02 | Yes | | | | | No |
| Washington Marvin | 01/13/00 & 02/27/03 | Yes | | | | | No |
| Turner, Paul | 02/01/02 | Yes | | | | | No |

6

# EXHIBIT 8

t025120009

# UNITED STATES GOVERNMENT PRINTING OFFICE

## OFFICE OF INSPECTOR GENERAL

## OFFICE OF INVESTIGATIONS

### ADMINISTRATIVE REPORT OF INVESTIGATION

### CONCERNING

Darnelle Everett, PR# 29253
Police Officer
Uniform Police Branch
U.S. Government Printing Office
732 North Capitol Street N.W.
Washington, D.C. 20401

Robert White, PR# 96505
Acting Sergeant
Uniform Police Branch
U.S. Government Printing Office
732 North Capitol Street N.W.
Washington, D.C. 20401

This report contains sensitive law enforcement material and is the property of the U.S. Government Printing Office, Office of Inspector General (GPO OIG). This report and its contents may not be duplicated or distributed without written permission from the GPO OIG. This report is FOR OFFICIAL USE ONLY, and its disclosure to unauthorized persons is strictly prohibited and may subject the disclosing party to liability.

2025120009

# OFFICE OF INVESTIGATIONS
## OFFICE OF INSPECTOR GENERAL
### UNITED STATES GOVERNMENT PRINTING OFFICE
### WASHINGTON, DC  20401

**TITLE:** Darnelle Everett, PR# 29253        **Case File Number:** 10070007A
Robert White, PR# 96505          **Status:**            Referred
Alleged Employee Misconduct      **Date:**              November 14, 2006

**REFERENCE (S):**

1.          Post Order 41

2.          GPO Instruction 655.1, entitled:  Employee Conduct

3.          GPO Instruction 655.3A, entitled: Standards of Conduct

4.          GPO Instruction 655.8, entitled Employee Handbook

**LOCATION OF INVESTIGATION:**  Washington, DC

**REPORT PREPARED BY:**

SONJA L. SCOTT
Special Agent

**REPORT REVIEWED BY:**

JEFFREY W. McABOY
Special Agent in Charge

**REPORT APPROVED BY:**

RONALD J. KOCH
Assistant IG for Investigations

**REPORT CONCURRED BY:**

J. ANTHONY OGDEN
Acting Inspector General

2

2025120009

# TABLE OF CONTENTS

NAMES OF SUBJECTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . pg. 4

SUMMARY OF INVESTIGATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . pg. 6

LIST OF MEMORANDUM OF INTERVIEWS. . . . . . . . . . . . . . . . . . . . . . . . . . . . pg. 14

LIST OF MEMORANDUM OF RECORDS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . pg. 25

LIST OF EXHIBITS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . pg. 27

2025120009

**NAME OF SUBJECT 1:**

**Darnelle Everett, PR# 29253** described as:

| | |
|---|---|
| Race | African American |
| Date of Birth | September 23, 1964 |
| Sex | Male |
| Height | Est. 5 foot six inches |
| Weight | Est. 175 pounds |
| Eyes | Brown |
| Hair | Black |
| Payroll Number | 29253 |
| Occupation | Police Officer Uniform Police Branch GPO |
| Telephone | (W) 202-512-1320 |

2025120009

**NAME OF SUBJECT 2:**

**Robert White, PR# 96505 described as:**

| | |
|---|---|
| Race | African American |
| Date of Birth | October 5, 1947 |
| Sex | Male |
| Height | Est. 6 Foot |
| Weight | Est. 190 pounds |
| Eyes | Brown |
| Hair | Black |
| Payroll Number | 96505 |
| Occupation | Police Officer Uniform Police Branch GPO |
| Telephone | (W) 202-512-1320 |

5

2025120009

# SUMMARY OF INVESTIGATION

On October 30, 2006, Mr. Lamont Vernon, Chief Security Officer, informed the Office of
Investigations (OI), Office of the Inspector General (OIG), U.S. Government Printing Office
(GPO) of the following information:

> On October 29, 2006, at approximately 6:00 p.m., a security breach occurred at Post 41
> within Building 4 (the Passport/Postcard Building). Officer Darnelle Everett (SUBJECT
> EVERETT) escorted two females, neither of whom are GPO employees, into the
> Building 4 lobby. Acting Sergeant (Sgt.) Robert White (SUBJECT WHITE) allowed the
> two females to enter without verifying identification or otherwise requiring proper
> screening. The females walked through the magnetometer, but their bags and book bags
> were not screened by the x-ray machine. SUBJECT WHITE then left the post to
> SUBJECT EVERETT. SUBJECT EVERETT and one female, identified as Monique
> Porter, left the post to walk outside where they apparently argued. SUBJECT EVERETT
> was then allegedly assaulted by Ms. Porter. SUBJECT EVERETT was outside for
> approximately 20 minutes while the other female stood unsupervised on Post 41 and
> pushed the security buttons allowing GPO employees to enter the building.

Vernon provided the OI with a detailed synopsis of the activity that was captured by digital video
recorders (DVR) from a camera within Building 4 and one outside Building 4. **(EXHIBIT A –
pg 28)**

On October 30, 2006, the OI reviewed the DVR recordings of the lobby of Building 4 and the
outside of Building 4. The detailed synopsis at Exhibit A appears to be an accurate account of
the Subjects' Building 4 activity. The video showed that at 18:13 (6:13 P.M.), SUBJECT
WHITE was on Post 41 in the front lobby of Building 4 when SUBJECT EVERETT entered.
SUBJECT EVERETT walked through the magnetometer carrying a soda cup and bags of what
appeared to be food. Two black females walked behind him. One was carrying a purse; the
other was not carrying anything. None of the packages were placed in the x-ray machine for
screening. SUBJECT WHITE and SUBJECT EVERETT then appeared to speak to each other.
After approximately 30 seconds, SUBJECT WHITE removed his hat from the desk and walked
out of Building 4. At 18:15, SUBJECT EVERETT and Porter exited the building leaving the
other female identified only as "Wanda" at Post 41. SUBJECT EVERETT and Porter returned 4
minutes later at 18:19. They appeared to have a discussion in front of the desk at Post 41, exit
Building 4 and return again. At 18:24, SUBJECT EVERETT and Porter exit the building again,
and Wanda once more is left alone at Post 41. Over the next several minutes, a total of four
employees would enter Building 4. Each employee placed their bags on the x-ray machine,
walked through the magnetometer, and passed in front of Post 41 to the doors that lead to the
production area of Building 4. Although Wanda was not in view of the camera during most of
this time, it is reasonable to conclude that she was behind the desk which was not visible by the
camera view. At 18:35, Wanda was seen in front of the desk drinking a soda and talking to an
unknown individual not visible in the camera. At 18:38, Wanda was seen exiting the lobby of
Building 4. At 18:47, Wanda was seen with SUBJECT EVERETT and Officer Cory Richardson
as they entered the lobby of Building 4. Wanda retrieved her purse and exited Building 4.

2025120009

Video obtained from the outside camera facing Building 4 showed SUBJECT EVERETT, Porter, and Wanda walk across North Capitol Street toward Building 4 at 18:11. Porter and SUBJECT EVERETT appeared to be in a conversation, and Porter slapped and pushed him several times as they walked. The video later showed two figures struggling outside Building 4 at approximately 18:26.

Review of the video revealed that SUBJECT EVERETT was away from Post 41 on two occasions, initially for 4 minutes and later for 23 minutes, for a total of 27 minutes. During the time SUBJECT EVERETT was off Post, a person unrelated to the GPO was at Post 41 in Building 4 by herself. During that time, four employees entered the building, passed through security and entered the production area via the secure doors. It should be noted that employees gaining access to the production area are controlled by the officer assigned to Post 41. Therefore, it is reasonable to conclude that "Wanda" released the door locking mechanism allowing these employees to gain access. (MOR – pg 26)

On October 30, 2006, Officer Corey Richardson was interviewed by the OI. He provided the following:

> On October 29, 2006, at 18:25, he was relieved from his post in Lot 50 by SUBJECT WHITE. Within a minute, he received a radio transmission from SUBJECT EVERETT stating that SUBJECT EVERETT had a disorderly person at Post 41. Richardson radioed to Sgt. William Wilson that he was going to assist and ran to Building 4. There he saw SUBJECT EVERETT struggling with a black female outside Building 4. Richardson assisted SUBJECT EVERETT in handcuffing the individual. He then radioed to the Control Center that SUBJECT EVERETT had been assaulted and was bleeding. White ran to Building 4. U.S. Capitol Police (USCP) and Metropolitan Police Department (MPD) units arrived. During this time, the female (Porter) kept yelling that she and SUBJECT EVERETT were "crackheads" and that they had a relationship in the past. Richardson left Building 4 to go to USCP to assist with the arrest and booking of Porter. The following day, Richardson and SUBJECT EVERETT spoke to an Assistant United States Attorney (AUSA). The AUSA "no papered" or dismissed the case because Wilson was not present to swear to a document, and SUBJECT EVERETT reportedly changed his story on several occasions while speaking with the AUSA. Richardson heard SUBJECT EVERETT tell the AUSA that he had not had a relationship with Porter, but then told the AUSA that he had filed for a restraining order against her in 2004. Richardson stated that he was embarrassed by SUBJECT EVERETT's conversation with the AUSA because SUBJECT EVERETT changed his story regarding his relationship with Porter several times. Richardson felt as though SUBJECT EVERETT made him, SUBJECT EVERETT, and the agency look foolish to the AUSA. (MOI – pg 15)

On October 30, 2006, Sgt. William Wilson was interviewed and he provided the following information:

> On October 29, 2006, the evening shift had five police officers working: SUBJECT EVERETT, SUBJECT WHITE, Wilson, Richardson, and James Oldach. Oldach was in a light duty capacity and was watching the cameras. He was not carrying a weapon and

2025120009

could not be placed on post. At 18:25, SUBJECT EVERETT radioed for assistance for a disturbance outside Building 4. Wilson advised Oldach to call "911." Richardson radioed and said that he was responding. Within a few minutes, Richardson radioed that SUBJECT EVERETT had been assaulted. At that time, a Security Aid came to the lobby of 732 North Capitol Street where Wilson was standing post. Wilson then left to go to the incident. When he arrived, a female (Porter) was handcuffed and yelling that SUBJECT EVERETT better get his story straight and that she and SUBJECT EVERETT smoked crack together in the past. Wilson spoke to SUBJECT EVERETT, and SUBJECT EVERETT told him that Porter brought him a sandwich, but when he would not let her in the building, she became angry and hit him. Porter was then taken to USCP for arrest and booking. Wilson learned that the case was "no papered" or dismissed the following day. Wilson learned that it was dismissed because he was not present to swear to a document. **(MOI – pg. 16)**

On October 31, 2006, the OI interviewed Acting Sgt. Robert White (SUBJECT WHITE). He was given his Non-Custodial Federal Employee Advice and Consent Form (Garrity Warning) and his Waiver of Union Rights (Weingarten) which he acknowledged **(EXHIBIT B – pg. 29)** and he provided the following information:

On October 29, 2006, he was assigned to "rove" and relieve officers from their posts. SUBJECT EVERETT was the first to be relieved at approximately 5:30 p.m. After half an hour, Wilson called SUBJECT WHITE to ask where SUBJECT EVERETT was, because others needed breaks. SUBJECT EVERETT then arrived at Building 4. SUBJECT EVERETT walked through the magnetometer with two females behind him. SUBJECT WHITE stated that the females were carrying bags that appeared to have food. He did not recognize the females, but believed they could have been GPO employees and their badges could have been covered with the bags. SUBJECT EVERETT said "I got it man" meaning that he was taking over the post. SUBJECT WHITE picked up his hat and left the building to relieve other officers. SUBJECT WHITE then relieved Richardson who was standing post in Lot 50. Within a few minutes of standing post, SUBJECT WHITE heard a call from SUBJECT EVERETT saying he had an unruly person at Post 41. Richardson radioed that he was going to assist. SUBJECT WHITE later found out that it was one of the two females that he had seen enter the building with SUBJECT EVERETT earlier who allegedly assaulted SUBJECT EVERETT. **(MOI – pg. 17)**

On October 30, 2006, the OI interviewed Mr. Darrell Spriggs, Printing Plant Worker and he provided the following information:

He arrived to work on October 29, 2006 at 18:20 and saw a woman yelling at SUBJECT EVERETT in front of Building 4. Spriggs entered the building and saw a female sitting at Post 41 by herself. He told her "You are not supposed to be back there." He added that the supervisors would be angry if they saw her there. She informed him that a supervisor was aware of her presence. He then asked "Can you hit the button to let me in?" and pointed at the button within Post 41 that opens the interior door to allow employees to enter the production area of Building 4. She pressed the button and he went upstairs to probe in. He informed Brian Weese, Group Chief, Passports, that an

unauthorized person was at Post 41. Weese later went downstairs to see what was
happening. After five minutes, Spriggs left Building 4 through the lobby. At that time,
the female who he previously witnessed yelling at SUBJECT EVERETT was handcuffed
and yelling that GPO Police were nothing but "crack smokers." **(MOI- pg. 18)**

On October 30, 2006, the OI interviewed Ms. Rose Bates, Bookbinder, and she provided the
following information:

On October 29, 2006 at approximately 18:25, she walked up to Building 4 and saw two
GPO police officers that she recognized as SUBJECT EVERETT and Richardson, trying
to get handcuffs on a female. The officers were telling the female to calm down. Bates
went inside the lobby of Building 4 and saw a female sitting at Post 41 by herself. Bates
showed her badge to the female who then pushed the button to open the security door to
the production area. Bates could not recall seeing her before, but assumed she was a
security assistant. Bates went upstairs and informed Weese of the incident outside. Bates
went downstairs again after five minutes to move her car. The female was no longer at
the desk and Sergeant William Wilson was on post. She went outside and the female was
in handcuffs and yelling that GPO Police were all "crackheads." At that time,
officers from the MPD and the CP were present. **(MOI – pg. 19)**

On October 31, 2006, the OI interviewed Mr. Brian Weese, Group Chief, Passports, and he
provided the following information:

On October 29, 2006, he arrived at Building 4 at 6:00 p.m. At that time, SUBJECT
WHITE was on post. At approximately 6:30 p.m., two employees, Spriggs and Bates,
informed him that there was an incident outside the building involving the police. Weese
went downstairs to the lobby. He saw no one at the police desk (Post 41) in the Building
4 lobby. He walked through the front door and saw a black female standing next to
SUBJECT EVERETT on the front stoop. Another black female was handcuffed and
sitting on the stone railing. Weese stated that he had seen the black female (Wanda), who
was not in handcuffs standing next to SUBJECT EVERETT, approximately four other
times recently. Weese stated that she has sat next to SUBJECT EVERETT at the police
desk and pushed the button allowing employees to enter the building. She also has sat at
the desk alone on occasion when SUBJECT EVERETT is standing outside the building.
Weese never confronted her because he thought she was a security aid. **(MOI – pg. 20)**

On November 1, 2006, the OI interviewed Officer Darnelle Everett (SUBJECT EVERETT.) He
was given his Non-Custodial Federal Employee Advice and Consent Form (Garrity Warning)
and his Waiver of Union Rights (Weingarten) which he acknowledged. **(EXHIBIT C – pg. 30)**
Officer Abdullah Jackson served as his union representative. The interview was audio taped and
the OI maintains the original and a copy of this tape. He provided the following information:

On October 29, 2006, SUBJECT EVERETT began his shift at 3:00 P.M. and was
assigned to Post 41 at Building 4. Acting Sgt. Robert White relieved him for lunch, but
SUBJECT could not recall the time. SUBJECT EVERETT left Building 4 to walk
around. He was near 732 North Capitol Street NW when he saw his friend "Wanda" who

2025120009

works at the Phoenix Hotel on North Capitol Street walking towards him. She had called him earlier and told him that she would bring him some food. She then handed him a bag of food and a soda. He then saw a female named Monique Porter crossing North Capitol Street westbound.

He has had problems with Porter in the past. They dated for a few months in 1995. Since that time, she vandalized his house and vehicle on four different occasions. He filed for a restraining order against her in Prince George's County, Maryland in 2004. She stayed away from him for a year. In January 2006, she assaulted him in his residence in Prince George's County, Maryland. Her court date for that incident was on October 17, 2006. He believes that she did not contest the facts, but the judgment was "nolle prosequi" meaning it was not prosecuted. He was not certain of the reason.

He, Wanda, and Porter crossed North Capitol Street going eastbound together. He needed to get back to his post because his break was over. While they were walking, Porter began yelling to him "who is she?" as she pointed to Wanda. SUBJECT EVERETT purposely stayed in between the two of them because he did not know what Porter would do to Wanda. He walked into Building 4 and they followed him. He saw SUBJECT WHITE at the post and told him that he would take over the post, and SUBJECT WHITE left Building 4. SUBJECT EVERETT showed Wanda a chair and asked her to sit down next to the post. He then walked Porter out the door. He believes he and Porter followed White out the door. He intended on returning to the post desk immediately, but remained outside a few minutes conversing with Porter. She then followed him back into the building twice. He immediately escorted her outside twice.

The last time, they got to the doorway, Porter began getting loud and hit him across his face cutting his nose and lip. SUBJECT EVERETT called on the radio stating that he had a "disorderly" on Post 41. Sergeant William Wilson called back and instructed SUBJECT EVERETT to call 911. He did not call 911, but began struggling with Porter to place handcuffs on her. Within five minutes, Officer Richardson arrived and assisted him in placing handcuffs on Porter. Shortly thereafter, USCP and MPD officers arrived. Wilson also arrived on the scene. While Porter was handcuffed and sitting on the stone border outside Building 4, she was yelling that she used "crack" cocaine with SUBJECT EVERETT. SUBJECT EVERETT stated that he has never used "crack" cocaine or any other illegal drugs and has no idea why she was making these allegations. SUBJECT EVERETT gave verbal statements to USCP before they took Porter for booking. She was released the following morning on her own recognizance. The United States Attorneys Office did not prosecute the case because SUBJECT EVERETT and Porter had a previous relationship.

SUBJECT EVERETT described Wanda as a friend that he met in the summer of 2006. He does not know her last name or what shift she works at the Phoenix Hotel. Occasionally, she would call him and tell him that she had a break and would come see him. She would talk to him for a few minutes while he was walking the perimeter of the GPO buildings or come to Post 42 behind the Passport Building. She never visited him on Post 41 inside the Passport Building. He added that he rarely works Post 41 because it

2025120009

is Officer Charles Sturgis' normal post. On October 29, 2006, he was assigned that post because Sturgis was not working. SUBJECT EVERETT took Wanda into the lobby and asked her to sit there so that she would be away from Porter. SUBJECT EVERETT did not intend on being outside the building for more than a minute and did not show Wanda how to operate the equipment on Post to allow employees to enter the building. SUBJECT EVERETT did not believe he did anything wrong regarding this incident. He attempted to remove Porter from Building 4, but she returned several times. She then assaulted him and he had to remain outside to restrain and handcuff her. SUBJECT EVERETT could not answer why Porter and Wanda were allowed into Building 4 except that he wanted Wanda away from Porter, and that the thought the door was going to close behind him and keep her out of the building. He also could not explain why he did not return to post after Richardson, USCP and MPD had the situation under control. **(MOI – pg. 21)**

SUBJECT EVERETT wrote two statements regarding this incident. The first statement was written for USCP. The second was written at Wilson's request because Wilson felt the first statement was too vague. **(EXHIBIT D – pg 31)**

On November 2, 2006, the OI interviewed Ofc. Charles Sturgis regarding the security breach incident at Building 4 on October 29, 2006 and he provided the following information:

> Sturgis was not present during the October 29, 2006 evening shift when the security breach occurred.

> SUBJECT EVERETT informed him in the past, but he could not recall when, that he had problems with a female and had filed a restraining order against her. Sturgis stated that on occasion, SUBJECT's sisters would visit him on post for a minute and get his car keys to borrow his vehicle. Sturgis had never seen any other females visit SUBJECT EVERETT on post. SUBJECT EVERETT worked various posts and would often relieve Sturgis on Post 41 in Building 4 when Sturgis needed a lunch break.

> Sturgis stated that the same female that was arrested on October 29, 2006, was arrested the following night, October 30, 2006, by the MPD. She stood behind the gate at Lot 50 and yelled that she wanted to see SUBJECT EVERETT. The GPO Police Officers on duty asked her to leave, but she would not so the MPD arrived and arrested her. Sturgis was not certain what officers were on post that night. **(MOI – pg. 24)**

On November 1, 2006, the OI reviewed the Post Orders for Post 41 which were revised as of October 20, 2006. The post orders described Post 41 as a "fixed post" staffed by one GPO Police Officer. The officer is responsible for "the identification, inspection, and controlling of all persons, e.g. GPO employees, visitors, contractors, messengers, vendors, other Government Agency employees etc. entering and departing through the lobby area, detecting and preventing the loss or damage of government and personal property, preventing the introduction of explosive or incendiary devices, illegal firearms, illicit drugs, all alcoholic beverages or other contraband that enter the U.S. Government Printing Office, Passport Building Complex."

Among other relevant provisions, the Orders further provide that:

- The GPO Officer "shall physically check and verify" that each employee has the proper credentials and access key card.

- All persons will proceed through the metal detector and must remove all metal objects for screening. If an indicator light turns red, the person must be subject to secondary screening with the handheld magnetometer.

- All parcel, packages, containers, purses, or other items "shall be screened by x-ray machine prior to entry. All items are to be placed on the x-ray machine conveyor belt for screening."

With respect to the subject Building 4 incident on October 29, 2006, both SUBJECT WHITE and SUBJECT EVERETT failed to:

- Physically check and verify the credentials or otherwise verify the identify of the two females entering the Building 4 lobby.
- Ensure that the two females place any bags or other metal objects on the x-ray machine for screening.
- Scan the two females with the hand magnetometer once they walked through the metal detector causing the alarm to activate.

Additionally, SUBJECT EVERETT allowed a non-employee visitor to sit at Post 41 alone for approximately 27 minutes and to assume the duties of the Post while he attended to personal business. Post 41 is a critical Post and has the primary responsibility of securing access to the production area of blank passports, considered among the most valuable credential in the world. Loss or compromise to the blank passports or materials could cause serious harm and have significant security ramifications. This is in part why the post orders require the post to be secured only by a GPO Police Officer. **(EXHIBIT E – pg 32)**

In addition to the Post Order violations noted, SUBJECTS EVERETT and WHITE also appear to have violated GPO Instructions. Among them, Instruction 655.1(d) provides that "Employees must remain in the work area. If it is necessary to leave this area for any reason, get the supervisor's permission to do so." In the present matter, SUBJECT EVERETT left Post 41 for 27 minutes without receiving a supervisor approval. Also, Instruction 655.8 provides limitations on visitors to GPO. SUBJECT EVERETT did not obtain permission for visitors to Building 4, and more specifically, did not obtain permission to have them at his Post while on duty.

Finally, Instruction 655.3A contemplates high standards of honesty, integrity, impartiality, and conduct by GPO employees to assure the performance of GPO's business. Employees are expected to avoid any actions which could reflect adversely on the GPO or which would jeopardize the employee's fitness for duty or effectiveness in dealing with other employees or with the public. Section 5 provides that employees should avoid any action which would result in or created the appearance of giving preferential treatment to any person, impeding government efficiency or economy, losing complete independence or impartiality, or affecting adversely the

2025120009

confidence of the public in the integrity of the Government. Here, SUBJECTS EVERETT and WHITE were not impartial and appeared to provide preferential treatment to non-employees in a highly secure area of GPO operations. The actions resulted in undermining the security of Post 41 and of Building 4, and placed at risk the confidence of the public in GPO operations, more specifically, secure production of the blank U.S. Passports.

2025120009

04:(    p.m.    03–12–2007     15/48

## LIST OF MEMORANDUM OF INTERVIEWS

**Page 15 - MOI RE:**       Ofc. Corey Richardson dated, October 30, 2006

**Page 16 - MOI RE:**       Sgt. William Wilson dated, October 30, 2006

**Page 17 - MOI RE:**       Acting Sgt. Robert White (SUBJECT) dated, October 31, 2006

**Page 18 - MOI RE:**       Mr. Darrell Spriggs dated, October 30, 2006

**Page 19 - MOI RE:**       Ms. Rose Bates dated, October 30, 2006

**Page 20 - MOI RE:**       Mr. Brian Weese dated, October 31, 2006

**Page 21 - MOI RE:**       Ofc. Darnelle Everett (SUBJECT) dated, November 1, 2006

**Page 24 - MOI RE:**       Ofc. Charles Sturgis dated, November 2, 2006

2025120009

**Office of the Inspector General**
**Office of Investigations**
**U.S. Government Printing Office**

**MEMORANDUM OF INTERVIEW**

Case File Number:                              10070007A

DATE:                                          October 30, 2006
TIME:                                          3:25 p.m.
PLACE:                                         OIG/OI Interview Room

INTERVIEWEE:                                   Corey Richardson
                                               Police Officer
                                               Uniform Police Branch,
                                               U.S. Government Printing,
                                               732 North Capitol Street N.W.,
                                               Washington D.C. 20401

Interviewer(s):                                SA Sonja Scott

On October 30, 2006, Officer Corey E. Richardson, Police Officer, Uniform Police Branch, US
Government Printing Office (GPO) was interviewed by Special Agents of the Office of
Investigations, the Office of Inspector General, GPO regarding the security breach incident at
Building 4 on October 29, 2006. Richardson provided the following information:

On October 29, 2006, at 1825, he was relieved from his post in Lot 50 by White. Within
a minute, he received a radio transmission from Everett stating that Everett had a
disorderly person at Post 41. Richardson radioed to Sgt. William Wilson that he was
going to assist and ran to Building 4. There he saw Everett struggling with a black
female outside Building 4. Richardson assisted Everett in handcuffing the individual. He
then radioed to the Control Center and the other officers that Everett had been assaulted
and was bleeding. SUBJECT WHITE then ran over to Building 4, and Capitol Police
and Metropolitan Police arrived. During this time, the female (Porter) kept yelling that
she and Everett were "crackheads" and that they were in a relationship in the past.
Richardson left Building 4 to go to the Capitol Police to assist with the arrest and booking
of Porter. The following day, Richardson and Everett spoke to an Assistant United States
Attorney (AUSA) regarding the case. The AUSA apparently "no papered" the case
because Wilson was not present to swear to a document and Everett reportedly changed
his story on several occasions while speaking with the AUSA. Richardson heard Everett
tell the AUSA that he had not had a relationship with Porter, but then told the AUSA that
he had a restraining order placed on her in 2004. Richardson stated that he was
embarrassed by Everett's conversation with the AUSA and had to leave the room.
Richardson felt as though Everett made him, Everett, and the agency look foolish to the
AUSA.

15

2025120009

04:0    p.m.    03-12-2007    17/48

# Office of the Inspector General
## Office of Investigations
### U.S. Government Printing Office

## MEMORANDUM OF INTERVIEW

Case File Number:                          10070007A

DATE:                                      October 30, 2006
TIME:                                      3:55 p.m.
PLACE:                                     OIG/OI Interview Room

INTERVIEWEE:                               William H. Wilson Jr
                                           Sergeant
                                           Uniform Police Branch
                                           U.S. Government Printing,
                                           732 North Capitol Street N.W.,
                                           Washington D.C. 20401

Interviewer(s):                            SA Sonja Scott
                                           SA Lloyd Rawls

On October 30, 2006, Sergeant William Wilson was interviewed by Specials Agents of the Office of Investigations, Office of Inspector General, U.S. Government Printing Office regarding the security breach incident at Building 4 on October 29, 2006. He provided the following information:

> On October 29, 2006, the evening shift had five police officers working. They were Wilson, Everett, Richardson, SUBJECT WHITE, and James Oldach. Oldach was in a light duty capacity and was watching the cameras. He was not carrying a weapon and could not be placed on post. At 1825, Everett called on the radio requesting assistance for a disturbance outside Building 4. Wilson called Oldach and said to call "911." Richardson radioed and said that he was responding. Within a few minutes, Richardson called on the radio and said that Everett had been assaulted. At this time, a Security Aid came to the lobby of 732 North Capitol Street where Wilson was standing post. Wilson then left to go to the incident. When he arrived, a female (Porter) was handcuffed and yelling that Everett better get his story straight and that she and he smoke crack together. Wilson spoke to Everett, and Everett told him that Porter brought him a sandwich, but when he would not let her in the building, she became angry and hit him. Porter was then taken to Capitol Police for arrest and booking. Wilson learned that the case was "no papered" the following day. Wilson learned that it was no papered because he was not present to swear to a document. Wilson added he would have been there had he known that he was needed.

**Form OI-11 (Rev 6/20/2005)**

2025120009

# Office of the Inspector General
## Office of Investigations
### U.S. Government Printing Office

## MEMORANDUM OF INTERVIEW

Case File Number:                         10070007A

DATE:                                     October 31, 2006
TIME:                                     7:00 a.m.
PLACE:                                    OIG/OI Interview Room

INTERVIEWEE:                              Robert O. White
                                          Acting Sergeant
                                          Uniform Police Branch
                                          U.S. Government Printing,
                                          732 North Capitol Street N.W.,
                                          Washington D.C. 20401

Interviewer(s):                           SA Sonja Scott
                                          SA Lloyd Rawls

On October 31, 2006, Sergeant (Sgt.) Robert White (SUBJECT), Uniform Police Branch, US Government Printing Office (GPO) was interviewed by Special Agents of the Office of Investigations, the Office of Inspector General, GPO regarding the security breach incident at Building 4 on October 29, 2006. He was given his Non-Custodial Federal Employee Advice and Consent Form (Garrity Warning) and his Waiver of Union Rights (Weingarten) which he acknowledged. White provided the following information:

On October 29, 2006, he was assigned to "rove" and relieve officers from their posts. Everett was the first to be relieved at approximately 5:30 p.m. After half an hour, Wilson called him to ask where Everett was, because others needed breaks. Everett then arrived at Building 4. Everett walked through the magnetometer with two females behind him. He reported the females were carrying bags that appeared to have food. He did not recognize the females, but believed they could have been GPO employees and their badges could be covered with the bags. Everett said "I got it man" meaning that he was taking over the post. SUBJECT picked up his hat and left the building to relieve other officers. SUBJECT then relieved Richardson who was standing post in Lot 50. Within a few minutes of standing post, SUBJECT heard a call from Everett saying he had an unruly person at Post 41. Richardson radioed that he was going to assist. SUBJECT later found out that it was one of the two females that he had seen enter the building with Everett earlier who allegedly assaulted Everett.

**Form OI-11 (Rev 6/20/2005)**

2025120009

04:0    p.m.    03-12-2007    19/48

### Office of the Inspector General
### Office of Investigations
### U.S. Government Printing Office

## MEMORANDUM OF INTERVIEW

Case File Number:                          10070007A

DATE:                                      October 30, 2006
TIME:                                      6:50 p.m.
PLACE:                                     OIG/OI Interview Room

INTERVIEWEE:                               Darrell A. Spriggs
                                           Printing Plant Worker
                                           Passport Section, Plant Operations,
                                           U.S. Government Printing,
                                           732 North Capitol Street N.W.,
                                           Washington D.C. 20401

Interviewer(s):                            SA Sonja Scott
                                           SA Lloyd Rawls

On October 30, 2006, Darrell Spriggs, Printing Plant Worker, Passport Section, Plant Operations, US Government Printing Office (GPO) was interviewed by Special Agents of the Office of Investigations, the Office of Inspector General, GPO regarding the security breach incident at Building 4 on October 29, 2006. Spriggs provided the following information:

He arrived to work on October 29, 2006 at 1820 and saw a woman yelling at Everett in front of Building 4. Spriggs entered the building and saw a female sitting at Post 41 by herself. He told her "You are not supposed to be back there." He added that the supervisors would be angry if they saw her there. She informed him that a supervisor was aware of her presence. He then asked "Can you hit the button to let me in?" and pointed at the button within Post 41 that opens the interior door to allow employees to enter the production area of Building 4. She pressed the button and he went upstairs to probe in. He informed Brian Weese, Group Chief, Passports, that an unauthorized person was at Post 41. Weese later went downstairs to see what was happening. After five minutes, Spriggs went down to Building 4 lobby and outside. At this time, the female who he previously witnessed yelling at Everett was handcuffed and yelling that GPO Police are nothing but crack smokers.

Form OI-11 (Rev 6/20/2005)

18

04:0   p.m.   03-12-2007   20/48

2025120009

### Office of the Inspector General
### Office of Investigations
### U.S. Government Printing Office

## MEMORANDUM OF INTERVIEW

| | |
|---|---|
| Case File Number: | 10070007A |
| DATE: | October 30, 2006 |
| TIME: | 7:30 p.m. |
| PLACE: | OIG/OI Interview Room |
| | |
| INTERVIEWEE: | Rose M. Bates |
| | Bookbinder |
| | Passport Section, Plant Operations |
| | U.S. Government Printing, |
| | 732 North Capitol Street N.W., |
| | Washington D.C. 20401 |
| | |
| Interviewer(s): | SA Sonja Scott |
| | SA Lloyd Rawls |

On October 30, 2006, Ms. Rose Bates, Bookbinder, Passport Section, Plant Operations, US Government Printing Office (GPO) was interviewed by Special Agents of the Office of Investigations, the Office of Inspector General, GPO regarding the security breach incident at Building 4 on October 29, 2006. Bates provided the following information:

> On October 29, 2006 at 1825, she walked up to Building 4 and saw two GPO police officers that she recognized as Officers Darnelle Everett and Corey Richardson trying to get handcuffs on a female. The officers were telling the female to calm down. Bates went inside the lobby of Building 4 and saw a female sitting at Post 41 by herself. Bates showed her badge to the female who then pushed the button to open the security door to the production area. Bates could not recall seeing her before, but assumed she was a security assistant. Bates went upstairs and informed Weese of the incident outside. Bates went downstairs again after five minutes to move her car. The female was no longer at the desk and Sergeant William Wilson was on post. She went outside and the female was now in handcuffs and yelling that the GPO Police were all "crackheads." At this time, the Metropolitan Police Department, the Capitol Hill Police Department were present.

**Form OI-11 (Rev 6/20/2005)**

2025120009

04:0    p.m.    03-12-2007    21 /48

**Office of the Inspector General**
**Office of Investigations**
**U.S. Government Printing Office**

**MEMORANDUM OF INTERVIEW**

Case File Number:                                  10070007A
DATE:                                              October 31, 2005
TIME:                                              6:30 a.m.
PLACE:                                             OIG/OI Interview Room

INTERVIEWEE:                                       Brian A. Weese
                                                   Group Chief
                                                   Passport Section, Plant Operations
                                                   U.S. Government Printing,
                                                   732 North Capitol Street N.W.,
                                                   Washington D.C. 20401

Interviewer(s):                                    SA Sonja Scott
                                                   SA Lloyd Rawls

On October 31, 2006, Mr. Brian Weese, Group Chief, Passport section, Plant Operations, US
Government Printing Office (GPO) was interviewed by Special Agents of the Office of
Investigations, the Office of Inspector General, GPO regarding the security breach incident at
Building 4 on October 29, 2006. Weese provided the following information:

> On October 29, 2006, he arrived at Building 4 at 6:00 p.m. At that time, White was on
> post. At approximately 6:30 p.m., two Passport employees, Darrell Spriggs and Rose
> Bates, informed him that there was an incident outside the building involving the police.
> Weese was afraid one of his employees may not be able to get in the building if the police
> were all involved with an incident outside the building so he went downstairs. He saw no
> one at Post 41 in the Building 4 lobby. He walked through the front door and saw a black
> female standing next to Everett on the front stoop. Another black female was handcuffed
> and sitting on the stone railing. Weese stated that he had seen the black female, who was
> not in handcuffs standing next to Everett (Wanda), approximately four other times
> recently. Weese stated that she sits next to Everett at Post 41 and hits the button allowing
> employees to enter the building. She also sits at the desk alone on occasion when Everett
> is standing outside the building. Weese never confronted her because he thought she was
> a security aid.

**Form OI-11 (Rev 6/20/2005)**

20

2025120009

04:C    p.m.    03-12-2007    22/48

# Office of the Inspector General
## Office of Investigations
## U.S. Government Printing Office

## MEMORANDUM OF INTERVIEW

Case File Number:                        10070007A

DATE:                                    November 1, 2006
TIME:                                    1:00 p.m.
PLACE:                                   OIG/OI Interview Room

INTERVIEWEE:                             Darnelle Everett
                                         Police Officer
                                         Uniform Police Branch
                                         U.S. Government Printing,
                                         732 North Capitol Street N.W.,
                                         Washington D.C. 20401

Interviewer(s):                          SA Sonja Scott
                                         SA Lloyd Rawls

On November 1, 2006, Mr. Darnelle Everett (SUBJECT) was interviewed by the Office of Investigations, Office of Inspector General, US Government Printing Office regarding the security breach incident at Building 4 on October 29, 2006. He was given his Non-Custodial Federal Employee Advice and Consent Form (Garrity Warning) and his Waiver of Union Rights (Weingarten) which he acknowledged. Officer Abdullah Jackson served as his union representative. The interview was audio taped and the OI maintains a copy of this tape. He provided the following information:

SUBJECT has been employed as a Police Officer for the GPO since 1998. He has had no disciplinary problems at the GPO. He works the second shift and his supervisor is Sergeant William Wilson.

On October 29, 2006, SUBJECT began his shift at 3:00 P.M. and was assigned to Post 41 at Building 4 (the Passport Building.) Acting Sergeant Robert White relieved him for lunch, but SUBJECT could not recall the time. SUBJECT left Building 4 to walk around. He was near 732 North Capitol Street NW when he saw his friend "Wanda" who works at the Phoenix Hotel on North Capitol Street walking towards him. She had called him earlier and told him that she would bring him some food. She then handed him a bag of food and a soda. He then saw a female names Monique porter crossing North Capitol Street westbound.

He has had problems with Porter in the past. They dated in 1995 for a few months. Since that date, she has vandalized his house and vehicle on four different occasions. He

21

2025120009

04:(   .p.m.   03-12-2007        23/48

placed a restraining order on her and she stayed away from him for a year. In January 2006, she assaulted him in his residence in Prince George's County, Maryland. Her court date was on October 17, 2006. He believes that she did not contest the facts, but the judgment was "nolle prosequi" meaning it was not prosecuted. He was not certain of the reason.

He, Wanda and Porter crossed North Capitol Street going eastbound together. He needed to get back to his post because his break was over. While they were walking, Porter began yelling to him "who is she?" as she pointed to Wanda. SUBJECT purposely stayed in between the two of them because he did not know what Porter would do to Wanda. He walked into Building 4 and they followed him. He saw White at the post and told him that he would take over the post, and White left Building 4. Everett had Wanda sit down next to the post and walked Porter out the door. He believes he and Porter followed White out the door. He intended on returning to the post desk immediately, but remained outside a few minutes conversing with Porter. She then followed him back into the building twice and he escorted her outside twice.

The last time, they got to the doorway, Porter began getting loud and hit him across his face cutting his nose and lip. SUBJECT called on the radio stating that he had a "disorderly" on Post 41. Sergeant William Wilson called back and said to call 911. He then began struggling with Porter to place handcuffs on her. Within five minutes, Officer Corey Richardson arrived and assisted him in placing handcuffs on Porter. Shortly thereafter, the Capitol Hill Police Department (CHPD) and the District of Columbia Metropolitan Police Department (MPD) arrived. Wilson also arrived on the scene. While Porter was handcuffed and sitting on the stone border outside Building 4, she was yelling statements like she did crack with SUBJECT. SUBJECT stated that he has never done crack cocaine or any other illegal drugs and has no idea why she was saying that. She also told him and Richardson that she was pregnant while they were handcuffing her. SUBJECT gave verbal statements to the CHPD before they took Porter to the CHPD for booking. She was released the following morning on her own recognizance. The United States Attorneys Office no papered the case because SUBJECT and Porter had a previous relationship. The attorney told SUBJECT that he had never seen a case like this before.

SUBJECT described Wanda as a friend that he met in approximately three months ago in the summer of 2006. He does not know her last name or what shift she works at the Phoenix Hotel. Occasionally, she will call him and tell him that she has a break and will come see him. She will talk to him for a few minutes while he is walking the perimeter of the GPO buildings or come to Post 42 behind the Passport Building. She has never visited him on Post 41 inside the Passport Building. He added that he rarely works Post 41 because it is Officer Charles Sturgis' normal post. On October 29, 2006, he was assigned that post because Sturgis was not working. SUBJECT took Wanda into the lobby and asked her to sit there so that she would be away from Porter. SUBJECT did not intend on being outside the building of more than a minute and did not show Wanda how to operate the equipment on Post to allow employees to enter the building. SUBJECT did not believe he did anything wrong that evening. He attempted to remove Porter from Building 4, but she returned several times. She then assaulted him and he

had to remain outside to restrain and handcuff her. Everett had difficulty answering why she and Wanda were allowed into Building 4 except that he wanted Wanda away from Porter, and that the thought the door was going to close behind him and keep her out of the building. He also could not explain why he did not return to post after Richardson, the CHPD and MPD had the situation under control.

**Form OI-11 (Rev 6/20/2005)**

2025120009

04:C    p.m.    03-12-2007    25/48

**Office of the Inspector General**
**Office of Investigations**
**U.S. Government Printing Office**

**MEMORANDUM OF INTERVIEW**

Case File Number:                          10070007A

DATE:                                      November 2, 2006
TIME:                                      3:00 p.m.
PLACE:                                     OIG/OI Interview Room

INTERVIEWEE:                               Charles E. Sturgis
                                           Police Officer
                                           Uniform Police Branch
                                           U.S. Government Printing,
                                           732 North Capitol Street N.W.,
                                           Washington D.C. 20401

Interviewer(s):                            SA Sonja Scott
                                           SA Nathaniel Brown

On November 2, 2006, Officer Charles Sturgis was interviewed by the Office of Investigations, Office of Inspector General, U.S. Government Printing Office regarding the security breach incident at Building 4 on October 29, 2006 and he provided the following information:

   Sturgis was not present during the October 29, 2006 evening shift when the security breach occurred. He had heard from Officer Everett and other officers that a female came to Building 4 and got into an argument with Everett and hit him. He also heard that she was yelling about Everett doing crack cocaine with her. Sturgis does not believe that Everett had ever used crack cocaine or any other cocaine, and said that Everett does not even drink alcohol.

   Everett informed him that he had problems with a female and had a restraining order on her. Sturgis stated that on occasion, Everett's sisters will visit him on post for a minute and get his car keys to borrow his vehicle. Sturgis has never seen any other females visiting Everett on post. Everett works various posts and will often relieve Sturgis on Post 41 in Building 4 when Sturgis needs a lunch break.

   Sturgis stated that the same female that was arrested on October 29, 2006, was arrested the following night, October 30, 2006, by the District of Columbia Metropolitan Police Department (DCMPD). She was standing behind the gate at Lot 50 and was yelling that she wanted to see Everett. The GPO Police Officers on duty asked her to leave, but she would not so the DCMPD arrived and arrested her. Sturgis was not certain what officers were on post that night.

2025120009

04:0   p.m.   03-12-2007    26/48

## LIST OF MEMORANDUM OF RECORDS

**Page 26 - MOR RE:**　　　　　　　Digital video recordings of GPO Building 4,
October 29, 2006, 6:00 – 7:00 p.m
North Capitol Street NW
Washington, D.C. 20401

2025120009

04:    ; p.m.    03-12-2007    27/48

### Office of the Inspector General
### Office of Investigations
### U.S. Government Printing Office

## MEMORANDUM FOR THE RECORD

Case File Number:                              10070007A

Date:                                          October 30, 2006

Special Agents:                                SA Sonja Scott
                                               SA Lloyd Rawls

On October 30, 2006, the OI reviewed the security tapes of the lobby of Building 4 and the
outside of Building 4. The video showed that at 1813 (6:13 P.M.), White was on Post 41 in the
front lobby of Building 4 when Everett entered. Everett walked through the magnetometer
carrying a soda cup and bags of what appeared to be food. Two black females walked behind
him. One was carrying a purse; the other was not carrying anything. White and Everett then
appeared to speak to each other. After approximately 30 seconds, White removed his hat from
the desk and walked out. At 1815, Everett and Porter exited the building leaving the other
female identified only as "Wanda" at Post 41. Everett and Porter returned 4 minutes later at
1819. They appeared to have a heated discussion in front of the desk at Post 41. At 1824,
Everett and Porter exit the building, and Wanda is left alone at Post 41. The tape then showed
four employees entering Building 4. These employees placed their bags on the x-ray machine,
walked through the magnetometer, and passed in front of Post 41 to the doors that lead to the
production area of Building 4. Although Wanda was not in view of the camera during most of
this time, it is reasonable to conclude that she was behind the desk which was not visible by the
camera view. At 1835, Wanda was seen in front of the desk drinking a soda and talking to an
unknown individual not visible in the camera. At 1838, Wanda was seen exiting the lobby of
Building 4. At 1847, Wanda was seen with Everett and Officer Cory Richardson as they entered
the lobby of Building 4. Wanda retrieved her purse and exited Building 4.

Video obtained from the outside camera facing Building 4 showed Everett, Porter, and Wanda
walk across North Capitol Street toward Building 4 at 1811. Porter and Everett appeared to be in
a conversation, and Porter slapped and pushed him several times as they walked. The video later
showed two figures struggling outside Building 4 at approximately 1826, but the picture quality
is poor.

Review of the video revealed that Everett was off Post on two occasions, initially for 4 minutes
and later for 23 minutes, for a total of 27 minutes. During the time Everett was off Post, a person
unrelated to the GPO was at Post 41 in Building 4 by herself. During this time, four employees
entered the building, passed through security and entered the production area via the secure
doors.

**Form OI-12 (Rev 6/20/2005)**

2025120009

04:(    , p.m.    03-12-2007      28/48

## LIST OF EXHIBITS

**Page 28 –EXHIBIT A:**                  Videotape synopsis prepared by Lamont Vernon of
                                          Building 4 on October 29, 2006 from 18:05 (6:05
                                          P.M.) to 18:32 (6:32 P.M.)

**Page 29 –EXHIBIT B:**                  SUBJECT WHITE's Non-Custodial Federal
                                          Employee Advice and Consent Form (Garrity
                                          Warning) and his Waiver of Union Rights
                                          (Weingarten) dated, October 31, 2006

**Page 30 –EXHIBIT C:**                  SUBJECT EVERETT's Non-Custodial Federal
                                          Employee Advice and Consent Form (Garrity
                                          Warning) and his Waiver of Union Rights
                                          (Weingarten) dated, November 1, 2006

**Page 31 –EXHIBIT D:**                  Two separate statements written by SUBJECT
                                          EVERETT regarding the incident.  One statement is
                                          dated October 29, 2006.  The other statement
                                          written for the US Capitol Hill Police is
                                          is undated.

**Page 32 –EXHIBIT E:**                  Post Orders for Post 41 in Building 4

2025120009

# EXHIBIT A

2025120009                                                    O    :33 p.m.    03-12-2007    30 /48

*This picks up*
*while I.H was*
*relieving Ofc*
*Everett*

# POST 41/SECURITY VIOLATIONS
## OCTOBER 29, 2006

### DVR 5

1805    Sgt. White on phone
1806    Suspect, (Monique R. Porter), apparently looking for Ofc. Everett with white bag in hand.
1807    Suspect Porter left, par placed back in up position

1813    Ofc. Everett with white bag, 1-Suspect Porter, 1-Friend Wanda, bar is in the up position. ***Sgt. White lowers the bar and lets all three into Post lobby area.

1814    Sgt. White gets hat and departs the lobby area with Ofc. Everett and two females present in post area.
1815    Ofc. Everett exits through door, Suspect Porter went out through bars, Friend Wanda at desk.
1819    Ofc. Everett enters, stops and points toward desk as if giving directions to Friend Wanda. The bars are lowered, Ofc. Everett enters with Suspect Porter following.
1820    The bars were lowered and raised apparently by Friend Wanda.
1820    Ofc. Everett and Suspect Porter at desk, Friend Wanda not visible behind desk.
1821    Pfc. Everett and Suspect. Porter exit door and outer door to outside front of Post 41. Leaving Friend Wanda behind desk.
1821    Suspect Porter comes in with Ofc. Everett, forcing bar down with Ofc. Following behind.
1822    Suspect Porter grabs sandwich. Ofc. Everett and Suspect Porter appears to be arguing back and forth.
1824    Suspect Porter walks into male employee while exiting through security bars with Ofc. Everett walks outside to front of post 41.

1827    Three GPO employees are observed entering separately and were let inside by Friend Wanda or interior door was open.
1829    GPO employee, "Rose", came in, used card, goes up stairs
1834    "Rose", with GPO male employee went outside then came back inside
1835    Male employee and Friend Wanda hold conversation at desk.
1838    Friend Wanda exits lobby to post 41
1846    Supervisor in pass port section comes down, looks out window, goes outside and comes back, goes out of camera view.
1847    Friend Wanda enters with Ofc. Richardson and Ofc. Everett, bars are lowered, apparently by Supervisor.
1848    Friend Wanda gets her bag, etc., and leaves through front door.

1848    Sgt. Wilson is observed coming inside exterior door to Post 41.

2025120009

## DVR 2

1807    Suspect Porter comes outside building 4 and stands around waiting.

1810    Suspect Porter walks west across N. Capitol Street toward 732.

1811    Suspect Porter, Ofc. Everett and Friend Wanda stop at southwest corner of Jackson Alley waiting to cross street going toward building 4.

1813    All three subjects enter building 4, Post 41.

1821    Ofc. Everett and a subject exit, (not clear)

1826    Ofc. Everett and Suspect Porter observed struggling outside building 4.

1828    Ofc. Richardson is observed running across the street toward Post 41, outside to assist Officer Everett.

1830    Sgt. Wilson comes to front of Post 41 to assist with disturbance.

1832    1st Capitol Police Cruiser arrives on scene.  2nd CPD unit arrives 20 seconds later.

# EXHIBIT B

2025120009                                                    0.   .17 p.m.    03-12-2007        33/48

## FEDERAL EMPLOYEE
## ADVICE AND CONSENT FORM (Non-Custodial)

YOU MUST UNDERSTAND YOUR RIGHTS BEFORE YOU ARE ASKED ANY QUESTIONS OR
BEFORE YOU MAKE ANY STATEMENTS.

### WARNING

- This is a request for your voluntary cooperation. No legal process has been served upon you.

- You have the right to remain silent if your answers may tend to incriminate you. If you do
  decide to answer questions or make a statement, you may stop answering at any time.

- Anything you say may be used as evidence against you both in an administrative proceeding
  or any future criminal proceeding involving you.

- If you refuse to answer the questions posed to you on the ground that the answers may tend
  to incriminate you, you cannot be discharged solely for remaining silent.

### ACKNOWLEDGMENT/WAIVER

I ___Robert White___, have read this statement of my rights and/or it has been read to me and I
understand what my rights and obligations are. I am willing to answer questions. I understand and know
what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has
been used against me.

___10/21/07___   ___7:00___   ___(signature)___
Date              Time          Interviewee's Signature

I certify that I have explained the above statement of rights to

___Robert White___, and that the acknowledgment/waiver was voluntarily executed

on this ___31st___ day of ___October 200x___, at ___7___ (A.M.) (P.M.).

___(signature)___                    ___Special Agent___
Investigator's Signature                   Title

___(signature)___                    ___Special Agent___
Signature of Witness                        Title

Form OI-7 (Rev 04/23/98)

04:0      p.m.     03–12–2007          34/48

# U.S. GOVERNMENT PRINTING OFFICE
## OFFICE OF INSPECTOR GENERAL
## OFFICE OF INVESTIGATIONS

### ACKNOWLEDGEMENT OF UNION REPRESENTATION

DATE: __10/31/06__

I, ___Robert White___, Payroll Number ___96505___

___Acting Sergeant___, ___Uncovered Police Branch___
(Duty Position)                                   (Section/Division/Department)

have been advised by ___Sonja Scott___ of ___OIG___
                              (Investigator)

of my right to have a union representative present during my interview on this date, and I have (Declined) (Accepted) such representation.

_____
(Signature of Interviewee and Date)

_____        ___Special Agent___
Investigator's Signature                          Title

_____        ___Special Agent___
Signature of Witness                               Title

_____        _____
Signature of Union Representative               Title
    (If Applicable)

Form OI-11 (Rev 04/23/98)

2025120009

# EXHIBIT C

2025120009

04:0    .p.m.    03-12-2007    36/48

## FEDERAL EMPLOYEE
## ADVICE AND CONSENT FORM (Non-Custodial)

YOU MUST UNDERSTAND YOUR RIGHTS BEFORE YOU ARE ASKED ANY QUESTIONS OR
BEFORE YOU MAKE ANY STATEMENTS.

### WARNING

- This is a request for your voluntary cooperation. No legal process has been served upon you.

- You have the right to remain silent if your answers may tend to incriminate you. If you do decide to answer questions or make a statement, you may stop answering at any time.

- Anything you say may be used as evidence against you both in an administrative proceeding or any future criminal proceeding involving you.

- If you refuse to answer the questions posed to you on the ground that the answers may tend to incriminate you, you cannot be discharged solely for remaining silent.

### ACKNOWLEDGMENT/WAIVER

I _Darnell Everett_, have read this statement of my rights and/or it has been read to me and I understand what my rights and obligations are. I am willing to answer questions. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

_11-1-06_      _1313_      _Danelle Smith_
Date            Time            Interviewee's Signature

I certify that I have explained the above statement of rights to

_Darnelle Everett_, and that the acknowledgment/waiver was voluntarily executed

on this _11th_ day of _Nov_, 19 _2006_, at _1:10_ (A.M.) (P.M.)

_signature_                           _Spec Agent_
Investigator's Signature              Title

_signature_                           _Special Agent_
Signature of Witness                  Title

Form OI-7 (Rev 04/23/98)

2025120009

04:0    p.m.    03-12-2007        37/48

## U.S. GOVERNMENT PRINTING OFFICE
## OFFICE OF INSPECTOR GENERAL
## OFFICE OF INVESTIGATIONS

### ACKNOWLEDGEMENT OF UNION REPRESENTATION

DATE: _11-1-06_

I, _DANIELLE EVERETT_____, Payroll Number _29253_

_GPO POLICE_____,        _UPB_____
(Duty Position)                    (Section/Division/Department)

have been advised by _Sara Scott_____ of ____OIG__
(Investigator)

of my right to have a union representative present during my interview on this date, and I have (Declined) (Accepted) such representation.

_D.E_

_____ _1/10-06_
(Signature of Interviewee and Date)

_____     _Special Agent_____
Investigator's Signature          Title

_____     _Special Agent_____
Signature of Witness              Title

_____     _Acting Vice Chairman_
Signature of Union Representative   Title
(If Applicable)

Form OI-11 (Rev 04/23/98)

2025120009

# EXHIBIT D

31

2025120009

## STATEMENT

I DARNELLE EVERETT EMPLOYED IN GPO POLICE MAKE THIS STATEMENT , THAT ON OCTOBER 29,2006 AT APPROXIMATELY 1815 HRS. RETURNED TO POST # 41 WITH A FRIEND (WANDA)WHO CAME TO EAT LUNCH WITH ME SHE HAD ALREADY CHECKED IN AT 732 AND WENT THROUGH SECURITY, ENROUTE TO BLDG #4 AUNEXPECTED VISITOR(MONIQUE) WHO I HAD PREVIOUS RESTRAINING ORDER IN MD CAME TO SEE ME THAT I DID NOT KNOW WAS COMING , WAS LEAVING BLDG # 4 WE MET IN THE CENTER OF NORTH CAPITAL STREET, WHICH WE WALKED BACK TO BLDG.# 4, I THEN WENT INSIDE WITH MY GUEST TO LET SGT (WHITE) KNOW I WAS BACK MS. PORTER JUST FOLLOWED US IN I THEN ASKED HER TO LEAVE AND I ESCORTED HER TO THE DOOR, WHILE STANDING IN THE DOORWAY SHE SAID SHE LEFT SOMETHING IN THE BAG THAT SHE GAVE ME, SO I WENT TO RETREIVE IT AND SHE FOLLOWED ME AGAIN INSIDE I GOT HER PACKAGE AND SHE WAS TOLD TO GO. AFTER I ESCORTED HER OUT THE DOOR SHE STARTED GETTING LOUD . I CALLED CONTROL AND SAID THAT I HAD A DISORDERLY AT 1820 AND WAS TOLD TO CALL 911, AT THAT TIME WHILE CLOSING THE DOOR SHE SWUNG AND HIT ME IN THE NOSE AND THE LEFT SIDE OF MY FACE AND ATTEMPTED TO FLEE, I CALLED FOR BACK-UP AND TO AFFECT AN ARREST I HAD TO STEP OUT OF THE BUILDING MEANWHILE MY LUNCH GUEST SAT AT THE DESK NOT KNOWING WHAT WAS HAPPENING OUTSIDE, OFC RICHARSON ARRIVED AT 1830 AND HELP TO APPREHEND SUSPECT AFTER ABOUT 5 MINUTES OF RESISTANCE . 1840 ENGINE #3 RESPONDED , USCP ON SCENE AT 1837,
MPD AT 1845, TRANSPORTED SUBJECT TO CAPITAL HILL LOCK-UP AT 1905. STATEMENT IN REFERENCE TO IR# 06-334.

DARNELLE EVERETT

29 OCT 06  0055

MAR-17-2005 19:26 FROM:CAP POLICE    2022230568    TO:2022256430    P.1

| CP 319 (5-86) | **UNITED STATES CAPITOL POLICE**<br>WASHINGTON, D.C.<br>**COMPLAINANT/WITNESS STATEMENT** | 1. CAPITOL FILE NUMBER |
|---|---|---|

| 2. NATURE OF INVESTIGATION | 3. COMPLAINT NO. |
|---|---|
| ASSAULT ON POLICE / DISORDERLY | |

| 4. STATEMENT OF: (Last, First, Middle) | 5. DOB | 6. SEX |
|---|---|---|
| EVERETT    DARNELL | 9-23-84 | M |

| 7. HOME ADDRESS | 8. HOME PHONE |
|---|---|
| 2116 NORTH AVOIR LANE, TEMPLE HILLS, MD    20748 | 301 630-7611 |

| 9. EMPLOYMENT (Occupation and Location) | 10. BUSINESS PHONE |
|---|---|
| GPO 732 N. CAP ST. N.W.    FED POLICE | 202 512-1320 |

| 11. LOCATION STATEMENT TAKEN | 12. NAME OF OFFICER TAKING STATEMENT (If other than block 14 include signature) | 13. DATE/TIME STARTED |
|---|---|---|

14. STATEMENT

ON 29 OCT 06, AT APPROXIMATELY 1800-1900 HRS. I OFC EVERETT WAS ASSAULTED BY MONIQUE PORTER WHILE ON MY JOB AT BLG # 4 OF GPO, MS. PORTER WAS ASKED TO LEAVE THE PREMISES WHEN SHE BECAME LOUD AND BOISTOUS, SHE THEN SWUNG AND HIT OFC EVERETT IN THE NOSE AND MOUTH, OFC EVERETT THEN CALLED ON THE RADIO FOR BACK-UP, OFC RICHARDSON ARRIVED ON THE SCENE AND THEY WERE ABLE TO TAKE MS PORTER INTO CUSTODY. AT 1920 HRS WHILE BEING TRANSPORTED TO CAPITAL POLICE LOCKUP MS PORTER WAS MAKING THREATS AND BEING DISORDERLY

| 15. | I HAVE READ THIS STATEMENT GIVEN BY ME OR HAVE HAD IT READ TO ME. I FULLY UNDERSTAND IT AND CERTIFY THAT IT IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE AND RECOLLECTION, I UNDERSTAND THAT MAKING A FALSE STATEMENT IS PUNISHABLE BY CRIMINAL PENALTIES.<br><br>SIGNATURE OF PERSON GIVING STATEMENT | 16. DATE/TIME ENDED |
|---|---|---|
| | | 17. |
| | | PAGE __ OF __ PAGES |

| 18. OFFICER OBTAINING THE SIGNATURE IN BLOCK 15: | 19. PERSON WITNESSING THE SIGNATURE IN BLOCK 15: |
|---|---|
| (Name and Signature) | (Name and Signature) |

2025120009

# EXHIBIT E

2025120009                                    04:0    p.m.    03-12-2007       42 /48

---

# United States Government Printing Office Police (USGPOP)
# Post Order 41

| Subject: Post 41 | Date: 20 October 2006 |
|---|---|
| | Submitted By: Chief Security Officer |

**Purpose** - The purpose of this Order is to outline the duties and responsibilities of the USGPOP Officer assigned to Post 41.

**Scope** - The operational measures listed allow USPGPO Officers actions that are professional and timely. This order provides for the efficiency and safety of the USGPOP Officer as well as GPO employee's.

**I. Instructions** - Post 41 is a fixed post located in Building IV, 735 North Capital Street, NE. staffed by one USGPOP Officer responsible for the identification, inspection, and access control of all employees, visitors, vendors, packages, parcels and miscellaneous items that enter the U.S. Government Printing Office Passport/Postcard Building. The Uniform Police Branch Post Orders are issued pursuant to the authority of GPO Instruction 825.5F Rules and Regulations Governing Buildings and Grounds, dated 22 July 2003.

- **Equipment** - All required equipment including keys, radios, weapons, post orders and ammunition will be issued to the USGPOP Officer prior to commencing their duty assignment.

  o **Keys** - The USGPOP Officer on each relief and shift, shall conduct an inventory of all keys to ensure that they are available. The Officer will sign the Key Control Log for the following keys assigned to Post 41:

    - Patrol Keys D-100 ● D-209 ● D-302
    - Desk Keys (2)
    - Stairway/Elevator 55 & Stairway/Elevator 56 Alarm Keys
    - Crash Bar Alarm Key #100

  o **Duty/Special Equipment** – Is the responsibility of the USGPOP Officer and shall be issued and adhered to in accordance with USGPOP "Clothing & Equipment" General Orders Series 1100 (GOS).

1

2025120009                                                    04:  .5 p.m.    03-12-2007          43 /48

 

 

- o  <u>Weapons and Ammunition</u> - Shall be issued in accordance with Special Order 1, Exhibit C, paragraph 2. Each USGPOP Officer shall sign the weapons' log in the presence of the Officer in Charge (OIC) when the weapon is drawn from the storage container and initial the log when the weapon is returned to the container.

- o  <u>Security Equipment</u> – Personnel screening duties at this fixed post will be conducted by a USGPOP Officer and will be accomplished through the use of the following security equipment:

  - ▪ Smiths X-Ray Machine
  - ▪ Garrett Hand Held Magnetometer
  - ▪ Meteor 200 Metal Detector
  - ▪ Motorola HT 1000 Hand Held Radio

- • **Duties –**

  - o  Post 41, Lobby Building IV is a fixed post staffed by one USGPOP Officer responsible for the identification, inspection, and controlling of all persons, e.g. GPO employees, visitors, contractors, messengers, vendors, other Government Agency employees, etc. entering and departing through the lobby area, detecting and preventing the loss or damage of government and personal property, preventing the introduction of explosive or incendiary devices, illegal firearms, illicit drugs, all alcoholic beverages or other contraband that enter the U.S. Government Printing Office, Passport Building Complex.

  - o  The USGPOP Officer shall physically check and verify that each employee has their GPO credentials (s) and access key card card after entering the building. All other visitors are to be referred to Main GPO at 732 North Capitol Street. NOTE: See attachments for entry credentials.

  - o  All other forms of identification cards not previously listed may be granted entry when authorized by the OIC or Shift Supervisor.

  - o  Employees that present GPO ID cards to the USGPOP Officer that are expired shall have that ID card confiscated. Confiscated cards will be turned over to the Control Center.

- • **Prohibited Items** - The USGPOP Officer at Post 41 shall prevent the following items from being introduced into the GPO Complex:

  - o  Alcoholic Beverages

  - o  Drugs and Drug paraphernalia

  - o  Dangerous Weapons (knives, guns, razor, flammable liquids, Explosives etc)

  - o  Unauthorized Equipment

    o   Solicitor Bills or Flyers

    o   Camera's and or video equipment (unless authorized by the Office of the Public Printer)

- **Communications** – The GPO Police Control Center shall maintain positive communications with the Shift supervisor and USGPOP Officers through the use of their issued Motorola hand held radio or the pos telephone. The Control Center Telephone number is 3-2978 and the Supervisor's numbers are 2-1319/2-1320/3-2976.

## II.  Operational Procedures

- **Walk through Metal Detector** – To reduce the risk of introducing illegal firearms weapons and explosive devices into the GPO, the Officer shall perform the following duties:

    o   Operate an Archway Metor 200 metal detector and a hand held metal detector to screen all incoming visitors in line with instructions contained in Chapter V. Special Orders.

        ▪   All persons entering through the Post 41 will proceed through the Meteor 200 Metal Detector.  Prior to entering the metal detector archway, have the person remove all metallic objects and place them in the screening hold tray.  After removing all metal objects have the person proceed slowly through the detector. If a person walks through and the indicator lights turn red, stop the person, direct them to a spot away from the archway and re-screen with a hand held magnetometer.  The USGPOP Officer shall pay particular attention to the Red Indicator light strip located on the right side of the detector.

    o   Hits on check – If an employee walks through and the indicator lights turn red, stop the person, direct them to a spot away from the archway and re-screen with a hand held magnetometer.

- **Hand Held Magnetometers**

    o   Procedures - When needed, persons entering through the Post 41 shall be screened by the Garrett Handheld magnetometer. Screening will be done in a straight-line motion approximately 4 to 6 inches away from the body. The front is checked first and then the rear using the same straight-line motion. At no time will the USGPOP Officer screen a person using the curvature of the body.

    o   Hits on check- if magnetometer gives off an alert tone during screening, try to locate the source of the alert. Ask if the employee has any other metal objects on the body.  If they have forgotten to remove any metallic objects, have that person place the object into the screening bold tray and re-screen.

2025120009

- **X-Ray Machine**

    o Procedures - All parcel, packages, suitcases, containers, purses, gymbags or any other item capable of carrying clothing and equipment shall be screened by x-ray machine prior to entry. All items are to be placed on the x-ray machine conveyor belt for screening.

    o Actions on Discovery - If a USGPOP Officer detects a suspicious object on the monitor screen, he or she shall direct the employee to open the bag or parcel for inspection. If the employee refuses, immediately contact the GPO Police Control and request a Police supervisor. If a USGPOP Officer views an object that appears to be a knife, gun or some type of Improvised Explosive Device, stop the bag or parcel inside of the x-ray machine, turn off monitor to prevent viewing and announce to the employee that you have a "malfunctioning x-ray machine". Contact GPO Police Control and repeat that you have a malfunctioning x-ray machine and a supervisor and backup officers will be dispatched to that location.

- **Computer Identification System** - The computer located at the front desk of Post 41 is a identification computer that is part of a "discrete system" and no unauthorized CD's, DVD's, games or floppy's will be loaded, or attempted to be loaded or inserted into this system. The insertion of a corrupted source could cause a system failure, resulting in the need to repair or replace the entire system. No GPO Police Officers are authorized at any time to insert or load CD's, DVD's games or floppy's disk into the Post 41 Identification Computer system.

- **Disturbances and Emergencies** - In the event that an emergency or some type of disturbance occurs that affects the U.S. Government Printing Office, all USGPOP Officer shall remain at their assigned post and await further instructions from GPO Police Control Center or a GPO Police supervisor.

- **Roving Patrols** - On Saturday, Sunday and holidays, if the Production Department is not working, patrols will be conducted every four (4) hours by Officers assigned to each of the three shifts. NOTE: The facility will locked during these patrols.

    o If the Production Department is working, the OIC will conduct at least one patrol. The OIC will notified the Control Center of the time that the patrol is to begin. Because the 2nd floor (Passport and Post Card Sections) is secured and alarmed when production is not in operation, it is not necessary to check this floor unless there is an alarm or other emergency.

    o Check the locks on elevators 55 and 56 to ensure that they are locked. While on patrol, the Officer will be alert to any suspicious activity such as illegal use of drugs, possession of alcoholic beverages and/or gambling transactions.

    o The Control Center is to be notified when the patrol is finished and the Officer has returned to Post 41.

4

- **Secured Area** - The 2nd floor area of Building IV is a secured area where sensitive and controlled printed items are produced. The area is protected and all permanently assigned GPO employees must enter through a turnstile by use of a magnetic Cardkey badge. No other persons, including other GPO employees, may enter this area without making prior arrangements and signing in with the 2nd floor receptionist who will issue a temporary Cardkey badge to official visitors and other GPO employees. To ensure stringent enforcement of these security procedures, the Officer assigned to Post 41 shall perform the following functions:

  o Employees - Inspect the GPO identification badges of all employees entering the building IV via Post 41.

  o Visitors - Visitors to building IV must be escorted at all times. Notify the 2nd Floor supervisor or receptionist on 20760 or 21599 to come to the lobby and escort all visitor(s) to the 2ndfloor area.

  o Others - All other visitors must first report to the Main Police Office (732 North Capitol Street).

- **Alarms** - If an alarm from one of the secure areas in Building IV should activate in the USGPOP central control on Saturday, Sunday, and holidays, the Officer at Post 41 shall be notified by the OIC and instructed to secure the front door of Building IV and proceed to the area where the alarm activated and investigate the matter. Simultaneously, Officer(s) from the USGPOP Office will also respond. If an alarm is activated on a normal workday, Officers from the USGPOP Office will respond. The Officer at Post 41 will remain at his/her post.

- **Building Service Branch** - The Officer will unlock Room 200, 2nd floor, Building IV, for Industrial Cleaning Branch (ICB) personnel to clean the area. The Officer will subsequently check to ensure that both doors are locked upon departure of the ICB personnel. Periodic checks will be conducted to ensure that these doors are locked at all times when the area is unoccupied.

- **Pregnant Employee's** - If a female employee has medical certification that excludes her from screening by a stand-up Archway metal detector that employee shall be screened with a hand held wand.

- **Physically Challenged Persons** - All persons that are not GPO employees that are physically challenged shall wait at Post 41 for assistance by a Supervisor or Officer or GPO Escort. Individuals with crutches, wheelchairs, or motorized carts will be scanned with a hand wand scanner.

- **Very Important Persons (VIP's)** - All executives or high ranking government official that may inadvertently show up at Post 41, the USGPOP Officer shall contact the Control Center and report that there is an VIP at that location and request that the Shift Supervisor or OIC respond. The VIP will be asked to standby while the OIC or the Shift supervisor

5

are called to respond to that location to escort the VIP where they will be greeted by their point of contact.

- **Suspicious Activity** - The USGPOP Officer shall report all activities or persons that are suspicious in nature or exhibit suspicious actions to the GPO Police Control Center.

- **Property Passes** - The USGPOP Officer shall have all persons departing the U.S. Government Printing Office with equipment surrender a properly filed out property pass and check for authorized signatures. NOTE: Signatures will be verified by calling the supervisor.

- **Lost/Found Property** - Property that is lost, recovered or found by USGPOP Officers shall be reported to the GPO Police Control Center. The Control Center shall dispatch a Police Office to take charge of the property and intiate a Chain-of-Custody Receipt with two witness signatures.

- **All Other Conditions** - The USGPOP Officer will contact the GPO Supervisors or the Control Center by radio or telephone for things not covered by instructions in this order.

- **Flying the U.S. Flag** - The U.S. flag is flown between the hours of sunrise and sunset. The Officer assigned to either shift 3 or shift 1 will raise the flags in front of Building IV at sunrise. Two Officers from shift 2 will lower the flags at sunset. The OIC will arrange for the raising and lowering of the United States Flag.

## III. Administration

- **Duty Hours** – Duty hour for Post 41 will be will be staffed 24 hours a day, seven days a week. The Chief Security Officer or his designee will determine the duty hours for Post 41.

- **Non Working Hours** - On those occasions when there are no employees working in the building, i.e., the agency is closed for a holiday or there is no work scheduled during a weekend that would involve Building IV, this post will be closed. All doors will be locked, and the CCTV system will be used to observe the various areas of the building.

  o GPO personnel assigned to Building IV who request entrance into the building after normal duty hours, Saturday, Sunday, and holidays, for the purpose of going to their locker, etc., will be escorted at all times.

- **Briefing** - Post briefings for USGPO Officers will take place prior to going on duty and will be conducted by a GPO Police supervisor. The supervisors shall be responsible for the level of familiarity and knowledge of this post.

- **Uniform** - The uniform for GPO USGPOP Officer will be clean and serviceable. NOTE: Refer to General Order 1100, Clothing and Equipment, for further guidance.

6

2025120009

- **Telephones** - Telephones located at the posts are for official use only and are not to be used for personal matters unless for an emergency. Telephone calls of a personal nature should be made while the Officer is on break. Officers shall inform their family, friends, etc., that emergency telephone calls are to be placed through the shift supervisor and Command Center. Personal and unofficial telephone and/or cell phone calls are prohibited while on post unless for a verified emergency.

- **Eating/Smoking on Duty** - The consumption of food and smoking while on Post is prohibited. Police Officer posts are exposed to the general public as well as the GPO work force; therefore, the consumption of food and smoking while on post reflects poorly on the professional image desired of all Uniform Police Branch Officers. NOTE: Beverages may be consumed to maintain hydration.

- **Reading on Duty** - Reading, writing, and/or studying are not permitted while on duty, except as required in connection with the Officer's assigned duties. Therefore, newspapers, magazines, books, laptops, video games etc., are prohibited from being on post.

- **Break** - USGPO Officers will be authorized 30-minute paid lunch break. NOTE: USGPOP Officers are on-duty during lunch breaks and must respond to emergency situations.

By Order of

**LaMont R. Vernon, Chief Security Officer**
**U.S. Government Printing Office Police**

**Attachments:**
1. Employee Badge
2. Supervisor Badge
3. Executive Badge
4. Contractor Badge
5. Visitor Badge
6. Key Accountability Log

7

# EXHIBIT 9

# UNITED STATED GOVERNMENT PRINTING OFFICE

# UNIFORMED POLICE BRANCH
### DAILY ACTIVITY LOG# 302

| SUNDAY, OCTOBER 29, 2006 | | SHIFT ONE |
|---|---|---|
| TIME | ACTIVITIES | PFC.C.S.BEARD, JR |

0700   Shift one on duty.(0) CMD (0) Lt. ( 1 ) Sgt. ( 0 ) Cpl. (4 ) Officers reported for duty.

0700   All officers were instructed to remain alert at all times and to report any Suspicious activity or persons they may encounter, or observe. Any activity not covered by instruction the officer is to report immediately to the OIC. All vehicles and persons entering the facility are to be inspected and or screened all personnel are to possess the proper identification as well as parking decal.

## DUTY ASSIGNMENTS

| OIC | Sgt. White |
|---|---|
| Post 41 | Pfc. Evans |
| Post 50 | Pfc. Richardson |
| CC | Pfc. Beard |
| Post 32 | Pfc. Bailey |

9 Officers on Day-off   Packard, Epley, Griffin, Dailey, Turner, Chandler, Curtis, Jackson, James and Tisdale

0- Officers – Annual Leave

0- Officers-  Sick Leave

0- Officers - on overtime

0- Officers - on military

0- Officers - Administrative

0700   Sgt. White reports firearm count is (19) 9mm in Shift one gun locker.

0700   The Wales System is no longer in use.

0752   Pfc. Bailey assigned to Post 32 reports PKI checked normal.

0800    Pfc. Beard assigned to Post 34 observed passport employee working in building 4 and all exterior area's check by security camera and viewed normal.

0850    U.S. Capitol Police requested check of capitol radio in control center. Activate unit as direct and unit reset.

0900    Mr. Lewis reports that he entering the GPO Credit Union to work and will be inside the location for several hours.

0910    Pfc. Beard assigned to Post 34 requested 10-7, relieved by Pfc. Bailey. Pfc. Beard 10-8 at 0917 hours.

0915    Received fire pump alarm for building 3, zone 1A, and basement area 1.

0945    Pfc. Richardson assigned to Post 50 requested 10-7, relieved by Pfc. Bailey. Pfc. Richardson 10-8 at 1000 hours.

1230    Pfc. Beard assigned to Post 34 requested 10-7 lunch, relieved by Pfc. Bailey. Pfc. Beard 10-8 at 1255 hours.

1300    Pfc. Richardson assigned to Post 50 requested 10-7 lunch, relieved by Pfc. Bailey. Pfc. Richardson 10-8 at 1335 hours.

1336    Pfc. Bailey reports check of the basement in building four normal.

1400    Pfc. Beard assigned to Post 34 checked interior and exterior area's check by security camera and all area viewed checked normal.

1500    All DAT tapes, cameras, master keys, radios, and other police operational equipment have been turned over to 2nd Shift Supervisors.

Sgt Robert White
OIC 1st Shift

# DAILY ACTIVITIES

## SUNDAY, OCTOBER 29, 2006 _____ SHIFT TWO
## TIME       ACTIVITIES                    ENTERED   BY PFC. OLDACH

**SHIFT TWO ON DUTY:       (0) LT. (1) SGT (0) CPL. (1) OFC (1) LD**

<u>Post Assignments:</u>

| | |
|---|---|
| OIC. | Lt. Cross |
| SGT. | Sgt. Shaw |
| SGT. | Sgt. Wilson |
| Control Room | Unmanned |
| Control Room #2 | Pfc. Oldach |
| Post # 31 | Unmanned |
| Post # 32 | Sgt. White |
| Post # 41 | Pfc. Everett |
| Post # 42 *(Closed @ 1700 hrs)* | Unmanned |
| Post # 50 | Pfc. Richardson |
| Post # VP-1 | Unmanned |
| Post # VP-2 | Unmanned |
| Post # SD | Unmanned |
| Post # FP-1 | Unmanned |
| Post # FP-2 | Unmanned (Closes *Post # 35 @ 1900hrs.)* |

5 Officer (s) on Day Off (Lt. Cross, Sgt. Shaw, Pfc's Ray, Ruth, Waller)
1 Officer (s) - Annual Leave (Pfc. Sturgis)
0 Officer (s) - EAL /call in
0 Officer (s) - Sick Leave/ call in (Cpl. Gordon)
0 Officer (s) - Extended Sick Leave
0 Officer (s) - Scheduled Sick Leave
0 Officers (s) - Admin. Leave
2 Officer (s) - Limited Duty (Pfc. Oldach, on duty 8 hrs, Pfc. Ray, on duty 6 hrs)

Sgt. White and Pfc. Richardson are working 8hrs O/T due to manpower.

1500       Sgt. Wilson reports firearm count is 13 9mm in second shift

weapons locker.

1520    A radio check with all Post's is L/C, Post's 22, 41, and 50 all AED's on site.

# DAILY ACTIVITIES

**SUNDAY, OCTOBER 29, 2006**        **SHIFT TWO**
**TIME**     **ACTIVITIES**        **ENTERED   BY PFC. OLDACH**

1720    Sgt. White reports he is 10-7 at Post 41 for meal break.

1815    Sgt. White is 10-8 from Post 41.

1820    Sgt. White is 10-7 meal at Post 50.

1825    Pfc. Everett reports a Disorderly in front of BLDG 4. 911 has dispatched. Operator 5821.

1830    Pfc. Richardson on scene, requested EMS for Pfc. Everett, stated Pfc. Everett has been assaulted and injured.

1905    Informed by Sgt. Wilson USCP will Transport, Pfc. Everett will take the arrest for

1920    Sgt. White is 10-8 from Post 50.

1930    Sgt. White will be at Post 50, Pfc. Richardson is enroute to assist Pfc. Everett.

2000    Sgt. Wilson assigned IR # 06-334, Assault on Police Officer.

2120    Pfc. Everett is out at Post 41; Sgt. Wilson is enroute to USCP Headquarters for paperwork.

2150    Sgt. Wilson is out at 732.

2250    All DAT TAPES, cameras, keys, radios, and other Police

Equipment have been turned over to Third Shift Supervisors.

Sgt. William H. Wilson, OIC SHIFT TWO _____
**UNITED STATES GOVERENMENT PRINTING OFFICE**
**UNIFORM POLICE BRANCH**

| **SUNDAY, 29 OCTOBER 2006** | | **SHIFT THREE** |
|---|---|---|
| **TIME:** | **ACTIVITY:** | **PFC. BENNETT** |

2300         SHIFT THREE ON DUTY: (1) LT (1) SGT (0) CPL (4) PFC

2300         Roll call conducted by Lt. Washington. The color of the day is Prosper.

Post Assignment:

| LT | Lt. Washington |
|---|---|
| SGT | Sgt. Hardwick |
| Post 34 | Pfc. Bennett |
| Post 31 | Unmanned |
| Post 32 | Pfc. Atkins |
| Post 41 | Pfc. McConnell |
| Post 50 | Pfc. Gautt |
| VP-72 | Unmanned |
| SD | Unmanned |
| FB 1 | Unmanned |

(5) Officer (s) Day Off:          Sgt. Rivera, Pfc. C. Bailey, Pfc. Benjamin,
                                  Pfc. Spencer, Pfc. G. Williams

(0) Officer (s) Annual Leave:
(0) Officer (s) Sick Leave:
(0) Officer (s) EAL:
(0) Officer (s) Admin Leave:
(0) Officer (s) Military Duty:
(0) Officer (s) Detailed:

2315         Control conducted radio check, all units acknowledged.

2348         Pfc. Bennett conducted a CCTV system check. All camera position
             viewed normal on the monitor.

2350         Sgt. Hardwick conducted a post inspection at 41.

0100         Sgt. Hardwick relieved Post 50 for 10-7E.

| 0107 | Pfc. Bennett assigned to Police Control checked interior and exterior area's check by security camera and all area viewed checked normal. |
| 0200 | Sgt. Hardwick relieved Post 41 for 10-7E. |

## SUNDAY, 29 OCTOBER 2006                    SHIFT THREE

| TIME: | ACTIVITY: | PFC. BENNETT |
|---|---|---|
| 0251 | Pfc. McConnell reported building 4 all normal. There are employees working on the second floor. | |
| 0449 | Cmdr. Packard is on site. | |
| 0526 | Pfc. McConnell posted the U.S. Flags. | |
| 0527 | Pfc. Chandler opened Post 35, area is now operational. | |
| 0539 | Ms. Caudle opened the Disbursement Office. | |
| 0545 | Mr. Vernon is on site. | |
| 0550 | Ms. Austin opened the credit union. | |
| 0701 | All Police related equipment was turned over to shift one. | |

LT WASHINGTON, OIC
SHIFT THREE

# EXHIBIT 10

From: "Scott, Sonja L." <sscott@gpo.gov>
Subject: **FW: INCIDENT AT POST 41**
Date: December 11, 2006 8:53:32 AM EST
To: "Fine, Neal H." <nfine@gpo.gov>

Neal - see the e-mail below. The AUSA is Steve Kaufman at 202-353-8138.
Tell me if you want me to contact him or if you are going to contact him
directly. Sonja

-----Original Message-----
From: Vernon, LaMont R.
Sent: Monday, December 11, 2006 8:45 AM
To: Scott, Sonja L.
Subject: FW: INCIDENT AT POST 41

See the below email, thanks!

LaMont R. Vernon
Director of Security
United States Government Printing Office
U.S. Government Printing Office
732 North Capitol Street NW
Washington, DC 20401
WK: (202) 512-1103
Cell: (202) 351-8179

-----Original Message-----
From: Packard, Stephen J.
Sent: Monday, December 11, 2006 8:32 AM
To: Vernon, LaMont R.
Subject: FW: INCIDENT AT POST 41

FYI

Stephen J. Packard

Commander, Police Branch

From: "Scott, Sonja L." <sscott@gpo.gov>
Subject: **FW: Everett case**
Date: January 3, 2007 7:39:36 AM EST
To: "Koch, Ronald J." <rkoch@gpo.gov>, "Fine, Neal H." <nfine@gpo.gov>

Gentlemen - I located the AUSA that Everett spoke to on 10/30/06
regarding the assault in front of Building 4. He has a very good
recollection of his meeting w/ Everett. He told me last week that he is
very busy today, but we can call him on Thursday or Friday. Sonja

-----Original Message-----
From: SteveKman@aol.com [mailto:SteveKman@aol.com]
Sent: Saturday, December 30, 2006 2:01 PM
To: sscott@gpo.gov
Cc: tim.kelly@usdoj.gov; marisa.demeo@usdoj.gov;
Steven.Kaufman@usdoj.gov
Subject: Re: Everett case

I remember this case pretty well, because it seemed clear rather quickly
to me that this officer was, at best, trying to game the criminal
justice system -- or, at worst, telling outright lies -- about his
ex-girlfriend in order to "get" her. I would need to review his report
to refresh my recollection about the details; however, I seem to recall
the officer was papering the case as the victim, and he did not have a
supervisor present -- something that we almost never permit. He was
vague and evasive about some of the essential facts. I remember asking
him to step out of the papering office for a moment so I could have a
sanity check with one or two of my colleagues -- I know that AUSA Tim
Kelly was present and I believe that AUSA Marisa Demeo might have been
there for some of the time, too -- and he/they agreed that something was
very fishy.

As for the specifics, I recall that he made it seem like he had an
unplanned run-in with his ex-girlfriend outside of his work site. He
said that she had given him a bag, which he brought into the GPO without
searching (for weapons, explosives, or other contraband). Also, he made
it seem like she tried to force her way into the GPO, leading to an
altercation and her arrest. When I spoke to a supervisor by phone (a
male who I believe had the title "commander"), I found out that there
was a videotape showing the officer inviting her inside with a third

person, and the three of them had lunch together. I was shocked at a
sworn law enforcement officer compromising his integrity (which would
probably render him useless as a law enforcement official, because this
conduct could potentially have to be disclosed to the defense in any
future prosecutions as Lewis/Giglio information), so I no-papered the
case and called the commander again.

If you have any other questions, please call me at my office at
704-338-3117.

-- Steve

In a message dated 12/28/2006 9:41:43 AM Eastern Standard Time,
sscott@gpo.gov writes:

Mr. Kaufman - I worked on an administrative - employee misconduct case
against Officer Darnell Everett. Officer Everett and Officer Richardson
spoke to you on 10/30/06 regarding an assault at the Government Printing
Office. I would like to ask you a couple of questions. I understand
that another AUSA was also present, but I do not have his name or
telephone #. Please call me. Thank you. Sonja

Sonja L. Scott

Special Agent

United States Government Printing Office

Office of Investigations,

Office of the Inspector General

732 North Capitol Street, N.W.

Washington, D.C. 20401

202.512.2010 x31150

202.512.1352 (fax)

From:  Neal Fine <nfine@gpo.gov>
Subject:  **Fwd: Everett case**
Date:  January 3, 2007 9:29:20 AM EST
To:  "Stefanie G. Weathers" <sweathers@gpo.gov>
Cc:  Vicki Barber <vbarber@gpo.gov>, "LaMont R. Vernon" <lvernon@gpo.gov>

We now have a good case for lack of candor in Everett. Be sure to include failure to cooperate and advise AUSA of details and facts of arrest.

Begin forwarded message:

**From:** "Scott, Sonja L." <sscott@gpo.gov>
**Date:** January 3, 2007 7:39:36 AM EST
**To:** "Koch, Ronald J." <rkoch@gpo.gov>, "Fine, Neal H." <nfine@gpo.gov>
**Subject: FW: Everett case**

Gentlemen - I located the AUSA that Everett spoke to on 10/30/06 regarding the assault in front of Building 4. He has a very good recollection of his meeting w/ Everett. He told me last week that he is very busy today, but we can call him on Thursday or Friday. Sonja

-----Original Message-----
From: SteveKman@aol.com [mailto:SteveKman@aol.com]
Sent: Saturday, December 30, 2006 2:01 PM
To: sscott@gpo.gov
Cc: tim.kelly@usdoj.gov; marisa.demeo@usdoj.gov;
Steven.Kaufman@usdoj.gov
Subject: Re: Everett case

I remember this case pretty well, because it seemed clear rather quickly to me that this officer was, at best, trying to game the criminal justice system -- or, at worst, telling outright lies -- about his ex-girlfriend in order to "get" her. I would need to review his report to refresh my recollection about the details; however, I seem to recall the officer was papering the case as the victim, and he did not have a supervisor present -- something that we almost never permit. He was vague and evasive about some of the essential facts. I remember asking him to step out of the papering office for a moment so I could have a sanity check with one or two of my colleagues -- I know that AUSA Tim Kelly was present and I believe that AUSA Marisa Demeo might have been there for some of the time, too -- and he/they agreed that something was very fishy.

As for the specifics, I recall that he made it seem like he had an unplanned run-in with his ex-girlfriend outside of his work site. He said that she had given him a bag, which he brought into the GPO without searching (for weapons, explosives, or other contraband). Also, he made it seem like she tried to force her way into the GPO, leading to an altercation and her arrest. When I spoke to a supervisor by phone (a male who I believe had the title "commander"), I found out that there was a videotape showing the officer inviting her inside with a third person, and the three of them had lunch together. I was shocked at a sworn law enforcement officer compromising his integrity (which would probably render him useless as a law enforcement official, because this conduct could potentially have to be disclosed to the defense in any future prosecutions as Lewis/Giglio information), so I no-papered the case and called the commander again.

If you have any other questions, please call me at my office at 704-338-3117.

-- Steve

In a message dated 12/28/2006 9:41:43 AM Eastern Standard Time, sscott@gpo.gov writes:

Mr. Kaufman - I worked on an administrative - employee misconduct case against Officer Darnell Everett. Officer Everett and Officer Richardson spoke to you on 10/30/06 regarding an assault at the Government Printing Office. I would like to ask you a couple of questions. I understand that another AUSA was also present, but I do not have his name or telephone #. Please call me. Thank you. Sonja

Sonja L. Scott

Special Agent

United States Government Printing Office

Office of Investigations,

Office of the Inspector General

732 North Capitol Street, N.W.

Washington, D.C. 20401

202.512.2010 x31150

202.512.1352 (fax)

_____
Neal Fine
Special Assistant to General Counsel for Labor and Employment Matters
U.S. Government Printing Office
202-512-0200
202-512-0076 (fax)

From: Neal Fine <nfine@gpo.gov>
Subject: **GPO Police Officer**
Date: December 11, 2006 12:04:40 PM EST
To: skman@aol.com
Cc: Drew Spalding <dspalding@gpo.gov>, Sonja Scott <sscott@gpo.gov>

December 11, 2006

Dear Mr. Kaufman;

I am advising the GPO Human Capitol office on the case of GPO Police Office Darnell Everett. On October 29, Officer Everett was involved in a altercation with a Ms. Porter while he was on duty. He sought to charge Ms. Porter with assault. I have been advised by Ms. Sonja Scott Senior Special Investigator for the GPO Inspector General's Office that you were the AUSA assigned to paper the case. Apparently after trying to question Officer Everett you determined that he made inconsistent and possibly false statements during the interview so that he would not be credible in a hearing and therefore you declined to paper the case.

We are in the process of drawing up charges in this matter and wish to charge him with lack of candor. I need your assistance in the form of an affidavit or affirmation as the events of that night. I hope that you will assist me in this matter. I would prefer to further discuss this issue in a phone call. I can be reached at 202-512-0200.

Sincerely,
Neal Fine

_____
Neal Fine
Special Assistant to General Counsel for Labor and Employment Matters
U.S. Government Printing Office
202-512-0200
202-512-0076 (fax)

United States Government Printing Office

732 North Capitol Street, NW

Washington, DC 20401

Phone:  202-512-1329

Fax:  202-512-1650

-----Original Message-----
From: Packard, Stephen J.
Sent: Monday, October 30, 2006 2:23 PM
To: Vernon, LaMont R.
Subject: INCIDENT AT POST 41

On Monday, October 30, 2006, at approximately 1400 hours, Mr. Steve
Kaufman, AUSA, office phone # 202-353-8138, spoke with me regarding this
case.  Mr. Kaufman, who was assigned as a papering attorney, said he
spoke to Officer Everett and that the officer made substantial false
statements during their conversation.  Mr. Kaufman said the officer
should not be a federal police officer under title 18 because was not
forth coming with the truth of what happened and that it was the first
time he had to have a police officer leave his office so he could
consult with another attorney who was present.  The other attorney
agreed with Mr. Kaufman that the officer was evading telling the
complete truth.  Mr. Kaufman said he felt like he was cross-examining
someone on the stand trying to get the truth to come out.  Mr. Kaufman
consulted with his supervisor who agreed with him that the case should
be no papered.

*SKmor@aol.com*

Stephen J. Packard

Commander, Police Branch

United States Government Printing Office

732 North Capitol Street, NW

From: "Scott, Sonja L." <sscott@gpo.gov>
Subject: **FW: Everett case**
Date: January 10, 2007 3:06:40 PM EST
To: "Fine, Neal H." <nfine@gpo.gov>

-----Original Message-----
From: SteveKman@aol.com [mailto:SteveKman@aol.com]
Sent: Saturday, December 30, 2006 2:01 PM
To: sscott@gpo.gov
Cc: tim.kelly@usdoj.gov; marisa.demeo@usdoj.gov;
Steven.Kaufman@usdoj.gov
Subject: Re: Everett case

I remember this case pretty well, because it seemed clear rather quickly
to me that this officer was, at best, trying to game the criminal
justice system -- or, at worst, telling outright lies -- about his
ex-girlfriend in order to "get" her. I would need to review his report
to refresh my recollection about the details; however, I seem to recall
the officer was papering the case as the victim, and he did not have a
supervisor present -- something that we almost never permit. He was
vague and evasive about some of the essential facts. I remember asking
him to step out of the papering office for a moment so I could have a
sanity check with one or two of my colleagues -- I know that AUSA Tim
Kelly was present and I believe that AUSA Marisa Demeo might have been
there for some of the time, too -- and he/they agreed that something was
very fishy.

As for the specifics, I recall that he made it seem like he had an
unplanned run-in with his ex-girlfriend outside of his work site. He
said that she had given him a bag, which he brought into the GPO without
searching (for weapons, explosives, or other contraband). Also, he made
it seem like she tried to force her way into the GPO, leading to an
altercation and her arrest. When I spoke to a supervisor by phone (a
male who I believe had the title "commander"), I found out that there
was a videotape showing the officer inviting her inside with a third
person, and the three of them had lunch together. I was shocked at a
sworn law enforcement officer compromising his integrity (which would
probably render him useless as a law enforcement official, because this

conduct could potentially have to be disclosed to the defense in any future prosecutions as Lewis/Giglio information), so I no-papered the case and called the commander again.

If you have any other questions, please call me at my office at 704-338-3117.

-- Steve

In a message dated 12/28/2006 9:41:43 AM Eastern Standard Time, sscott@gpo.gov writes:

Mr. Kaufman - I worked on an administrative - employee misconduct case against Officer Darnell Everett. Officer Everett and Officer Richardson spoke to you on 10/30/06 regarding an assault at the Government Printing Office. I would like to ask you a couple of questions. I understand that another AUSA was also present, but I do not have his name or telephone #. Please call me. Thank you. Sonja

Sonja L. Scott

Special Agent

United States Government Printing Office

Office of Investigations,

Office of the Inspector General

732 North Capitol Street, N.W.

Washington, D.C. 20401

202.512.2010 x31150

202.512.1352 (fax)

From: "Hawkins, Tracy C." <thawkins@gpo.gov>
Subject: **RE: FOP**
Date: May 22, 2007 12:00:46 PM EDT
To: "Fine, Neal H." <nfine@gpo.gov>

Hi Neal,

White has NOT been a union official in years.

Tracy

> -----Original Message-----
> **From:** Fine, Neal H.
> **Sent:** Tuesday, May 22, 2007 10:50 AM
> **To:** Hawkins, Tracy C.; Frazier, Michael
> **Subject:** FOP
>
> good morning,
>
> Could you tell me if Robert White is currently and officer in FOP lodge 1 or was in the past year? - in his oral reply they are alleging "union busting"
>
> thanks
> neal
>
> _____
> Neal Fine
> Special Assistant to General Counsel for Labor and Employment Matters
> U.S. Government Printing Office
> 202-512-0200
> 202-512-0076 (fax)

**Epley, Paul D.**

| | |
|---|---|
| **From:** | Vernon, LaMont R. |
| **Sent:** | Wednesday, August 23, 2006 2:15 PM |
| **To:** | Bennett, Gregory P.; Oldach, James C. Jr.; White, Robert O. Sr.; Everett, Darnelle E. |
| **Cc:** | Hardwick, Alvin E. II; Aldustus Dailey (E-mail); C. Steven Cross (E-mail); Manuel J. Rivera (E-mail); Marvin B. Washington (E-mail); Paul D. Epley (E-mail); Stephen J. Packard (E-mail); William H. Wilson (E-mail) |
| **Subject:** | Post Orders for Review |

    

Post 35.doc    Post 41.doc    Pos: 42 .doc    Post 50.doc    Post FP-1 .doc    Post 32 .doc

Shift Post Order Reps,

Please provide comments/recommendations to me NLT 1200 on 30 Aug, thank you for your time and support!!!

**LaMont R. Vernon**
**Director of Security**
**United States Government Printing Office**
**U.S. Government Printing Office**
**732 North Capitol Street NW**
**Washington, DC 20401**
**WK: (202) 512-1103**
**Cell: (202) 351-8179**

**Vernon, LaMont R.**

---

| | |
|---|---|
| **From:** | Vernon, LaMont R. |
| **Sent:** | Friday, October 20, 2006 1:04 PM |
| **To:** | La Tora, Peter D.; Vernon, LaMont R.; Allen, Hartwell W. Jr.; Atkins, Kevin R.; Bailey, Collins L. Jr.; Bailey, Steven D.; Beard, Charlie S. Jr.; Benjamin, Vernell M.; Bennett, Gregory P.; Chandler, William R.; Cross, C. Steven; Curtis, Robert L.; Dailey, Aldustus; Epley, Paul D.; Evans, Tyrone K.; Everett, Darnelle E.; Gautt, Terry L.; Gordon, Norman E.; Griffin, Philip B.; Hardwick, Alvin E. II; Jackson, Abdula L.; James, Edgar A.; McConnell, Gregory A.; Oldach, James C. Jr.; Packard, Stephen J.; Queen, Richard; Ray, Florence M.; Richardson, Corey E.; Rivera, Manuel J.; Ruth Sr., Vincent M.; Shaw, Tony E.; Spencer, Darren L.; Sturgis, Charles E.; Talbert, Paul; Tisdale, Carl J.; Turner, Sabrina D.; Waller, Theodore; Washington, Marvin B.; White, Robert O. Sr.; Williams, George K.; Williams, Keith B.; Wilson, William H. |
| **Subject:** | GPO Post Orders |

These Post Orders shall only be rescinded through the issuance of a subsequent orders and supersedes the GPO Post Orders/825.12 dated 01 Oct 97.

Post Order # 34, Control Center, will be completed NLT 3 Nov, sorry for the delay...

   

PO 42.pdf (2 MB)   PO 50.pdf (3 MB)

Thank you to all the Officers who participated and provided input in the Thank

**LaMont R. Vernon**
**Director of Security**
**United States Government Printing Office**
**U.S. Government Printing Office**
**732 North Capitol Street NW**
**Washington, DC 20401**
**WK: (202) 512-1103**
**Cell: (202) 351-8179**

# EXHIBIT 11

GPO 655.4A
July 27, 1979
PSA

# UNITED STATES GOVERNMENT PRINTING OFFICE
## Washington, D.C.   20401

Government Printing Office Instruction 655.4A

## Subject: Corrective Actions

1. *Purpose.* To inform employees of general guidelines and penalties used by the Agency in processing corrective actions.

2. *Cancellation.* This Instruction supersedes GPO Instruction 655.4, Subject: Corrective Actions, dated February 27, 1973.

3. *References.* Employees should thoroughly familiarize themselves with all regulations governing their conduct. The greater portion of these are found in GPO Instruction 655.1, Employee Conduct, dated February 23, 1973; GPO Instruction 655.2B, Indebtedness Policy, dated December 4, 1974; GPO Instruction 655.3, Standards of Conduct for Government Printing Office Officers and Employees, dated February 23, 1973; and GPO Instruction 670.13, Employee Safety Responsibilities, dated December 1, 1972. Other material is contained in the Employee Handbook, the Digest of Leave Regulations, and in various other Instructions. Employees should consult their supervisors for further information and details.

4. *Applicability*

   a. The corrective action penalties and guidelines described in this Instruction are applicable only to permanent employees who have completed a probationary period and employees who have completed 1 year of current continuous employment under other than a temporary appointment limited to 1 year or less. Probationary and temporary employees are not covered by these guidelines.

   b. Probationary employees may be separated in accordance with provisions of GPO Instruction 610.3A, Probationary Period, dated September 29, 1976.

   c. Temporary employees may be separated by submitting an appropriate SF–52, Request for Personnel Action, through channels, to the Employment Branch.

5. *Introduction*

   a. The purpose of discipline is to correct the offending employee and maintain discipline and morale among other employees. It is the GPO policy to impose the minimum penalty that can reasonably be expected to achieve these objectives.

   b. In all corrective action cases, the principle of like penalties for like offenses will normally apply. To assist in this objective, the Schedule of Offenses and Penalties will be used as a guide. Since the Schedule may not meet the specific circumstances in all situations, strict application is not mandatory. The list is not intended to cover every possible type of infraction. Penalties for infractions which are not listed will be consistent with those of offenses of comparable seriousness as specified in the Schedule.

6. *Range of Penalties.* The majority of offenses listed are not considered serious enough to warrant removal, but instead call for verbal warnings or letters of warning. Serious misconduct, including such things as violence or theft, may call for removal for a first infraction. Repeated violation of regulations by an employee may also warrant a more severe penalty than the one listed in the table, which may include demotion.

7. *Appeal Rights.* An employee who receives a verbal warning, a letter of warning, or a suspension of 14 calendar days or less may request review of the matter by his or her Division head or may file a grievance under either GPO Instruction 680.1, Employee Grievance Procedure, dated August 30, 1971, or under the Joint Negotiated Grievance Procedure, as applicable. When employees are given a final letter of decision regarding a demotion, separation, or suspension for more than 14 calendar days, they will be fully advised of their appeal rights and grievance rights.

8. *Time Limitations*

   a. An employee's past disciplinary record will influence the severity of the corrective action taken for a current offense. A history of infractions may result in a more severe penalty for a current violation than one which is recommended in the Schedule of Offenses and Penalties.

GPO 655.4A
July 27, 1979
PSA Attachment

## SCHEDULE OF OFFENSES AND PENALTIES

| Types of offenses | Range of penalties, warnings to removals | | |
|---|---|---|---|
| | First infraction | Second infraction | Third infraction |
| **ATTENDANCE** | | | |
| 1. Unauthorized absence from duty: | | | |
| *a.* Failure to report for duty without prior approval and/or without an excuse acceptable to supervisors. | Verbal warning.... | Verbal warning.... | Letter of warning to removal. |
| *b.* Leaving post of duty without prior approval and/or without an excuse acceptable to supervisors. | Verbal warning.... | Verbal warning.... | Letter of warning to removal. |
| 2. Recurring tardiness (more than one disapproved entrance pass within any 6-month period, GPO Form 2022).. | Verbal warning.... | Verbal warning.... | Letter of warning to removal. |
| **SAFETY** | | | |
| 3. Failure to report accident or injury to oneself............... | Verbal warning.... | Verbal warning.... | Letter of warning to removal. |
| 4. Violation of regulations where safety of persons or property is endangered thereby. | Verbal warning to removal. | Verbal warning to removal. | Letter of warning to removal. |
| 5. Smoking in unauthorized places | | | |
| *a.* Safety of persons or property not endangered............. | Verbal warning.... | Verbal warning.... | Letter of warning to removal. |
| *b.* Safety of persons or property endangered................. | Verbal warning to removal. | Letter of warning to removal. | Removal. |
| 6. Operation of Office-owned motor vehicles: | | | |
| *a.* Violation of traffic laws of any State or political subdivision while operating an Office motor vehicle. | Verbal warning.... | Verbal warning.... | Letter of warning to removal. |
| *b.* Use of or authorizing the use of an Office motor vehicle for other than official purposes. | 30 day suspension to removal. | Removal. | |
| *c.* Carelessness or negligence while operating an Office motor vehicle or power truck. | Verbal warning to removal. | Letter of warning to removal. | Removal. |
| *d.* Unauthorized use of an industrial power truck, persons or property not endangered. | Verbal warning.... | Verbal warning.... | Letter of warning to removal. |
| *e.* Unauthorized use of an industrial power truck, persons or property endangered. | Verbal warning to removal. | Letter of warning to removal. | Removal. |
| *f.* Authorizing the use of an industrial power truck without required permit. | Verbal warning.... | Verbal warning.... | Letter of warning to removal. |
| **ATTENTION TO DUTY** | | | |
| 7. Loafing: Willful idleness or deliberate failure to be at work on the task assigned. | Verbal warning.... | Verbal warning.... | Letter of warning to removal. |
| 8. Unnecessary interference with the work of other employees— This includes unauthorized visiting in the Office by an employee while off duty. | Verbal warning.... | Verbal warning.... | Letter of warning to removal. |
| 9. Sleeping during working hours: | | | |
| *a.* Safety of persons or property not endangered........... | Verbal warning.... | Verbal warning.... | Letter of warning to removal. |
| *b.* Safety of persons or property endangered................ | Verbal warning to removal. | Letter of warning to removal. | Removal. |
| 10. Failure to carry out orders: | | | |
| *a.* Failure to carry out work assignments or instructions of supervisors. | Verbal warning.... | Verbal warning to removal. | Letter of warning to removal. |
| *b.* Excessive delay in carrying out work assignments or instructions of supervisors. | Verbal warning.... | Verbal warning.... | Letter of warning to removal. |
| 11. Careless or unsatisfactory workmanship: | | | |
| *a.* Carelessness or negligence in performance of duties, resulting in injury, spoilage, or waste of material. | Verbal warning.... | Verbal warning to removal. | Letter of warning to removal. |
| *b.* Delay in production................................. | Verbal warning.... | Verbal warning to removal. | Letter of warning to removal. |
| 12. Failure to perform the duties of one's position in a satisfactory manner. | Verbal warning to removal. | Letter of warning to removal. | Removal. |
| **PERSONAL CONDUCT** | | | |
| 13. Intoxication: | | | |
| *a.* Reporting for duty under the influence of intoxicating liquors or being on duty under the influence of intoxicating liquors. | Verbal warning.... | Verbal warning to removal. | Letter of warning to removal. |

"Suspensions may be recommended in lieu of removal."

A–1

GPO 655.4A
July 27, 1979
PSA Attachment

## SCHEDULE OF OFFENSES AND PENALTIES—Continued

| Types of offenses | Range of penalties, warnings to removals | | |
|---|---|---|---|
| | First infraction | Second infraction | Third infraction |
| b. Selling of intoxicating liquors on premises occupied by the Office or possession of intoxicating liquors on premises occupied by the Office. | Verbal warning to removal. | Letter of warning to removal. | Removal. |
| 14. Gambling: | | | |
| a. Betting or gambling on premises occupied by the Office..... | Verbal warning to removal. | Letter of warning to removal. | Removal. |
| a. Promotion of gambling on premises occupied by the Office.. | Letter of warning to removal. | Removal. | |
| 15. Fighting or creating a disturbance among fellow employees..... | Letter of warning to removal. | Removal. | |
| 16. Falsehood—Intentional misstatement or concealment of material fact in connection with work, employment, or in any record, work report, report, investigation, or other proceedings. | Verbal warning to removal. | Letter of warning to removal. | Removal. |
| 17. Disrespect or use of insulting or abusive language............ | Verbal warning.... | Letter of warning.. | Removal. |
| 18. Divulging unclassified information without proper authority.... | Verbal warning.... | Letter of warning to removal. | Removal. |
| 19. Divulging restricted, confidential, secret, or top secret information without proper authority. | Removal. | | |
| 20. Unethical use of official authority or information............ | Verbal warning.... | Letter of warning to removal. | Removal. |
| 21. Immoral or indecent conduct: | | | |
| a. Any improper conduct which violates common decency or morality. | Verbal warning to removal. | Letter of warning to removal. | Removal. |
| b. Use of obscene language............................... | Verbal warning.... | Letter of warning to removal. | Removal. |
| 22. Careless loss or damages to Government property, tools, equipment. | Verbal warning to removal. | Letter of warning to removal. | Removal. |
| 23. Theft—Actual or attempted theft of Government property, tools, or equipment or property of other employees. | Letter of warning to removal. | Removal. | |
| 24. Malicious damage: To Government property or to property of other employees. | Letter of warning to removal. | Removal. | |
| 25. Indebtedness—Lack of good faith in paying financial obligations; such as failure without good cause to make or to live up to arrangements to pay a debt that the employee admits he or she owes or that is supported by court judgment, or that represents a tax or other financial obligation to the U.S. Government or to State and local government. | Verbal warning to removal. | Verbal warning to removal. | Letter of warning to removal. |
| 26. Unhygienic personal habits or practices which cause annoyance or jeopardize the health of coworkers. | Verbal warning.... | Verbal warning.... | Letter of warning to removal. |
| 27. Political activities prohibited by law or regulations........... | Removal. | | |
| 28. Notoriously disgraceful conduct (including but not confined to civil court convictions). | Letter of warning to removal. | Removal. | |
| 29. Violation of "no strike" affidavit........................ | Removal. | | |
| 30. Misappropriation of funds............................... | Removal. | | |
| 31. Threatening bodily harm to a supervisor or fellow employee... | Verbal warning to removal. | Letter of warning to removal. | Removal. |
| 32. Striking or attempting to strike a supervisor or fellow employee. | Letter of warning to removal. | Removal. | |
| 33. Using Government material or equipment for private purposes.. | Verbal warning to removal. | Letter of warning to removal. | Removal. |
| 34. Asking, accepting, or receiving bribes of any kind with the intent of having one's decision on any official matter influenced thereby. | Letter of warning to removal. | Removal. | |
| 35. Bringing into the buildings, or having while in the buildings, any dangerous weapon. | Letter of warning to removal. | Letter of warning to removal. | Removal. |
| 36. Violation of Federal laws or regulations of the Office of Personnel Management or the Merit Systems Protection Board.. | Verbal warning to removal. | Letter of warning to removal. | Removal. |
| 37. Bringing into the buildings, possession, consumption, use, or sale, while in the buildings, of any narcotic. | Verbal warning to removal. | Letter of warning to removal. | Removal. |
| 38. Violation of agency regulations......................... | Verbal warning to removal. | Verbal warning to removal. | Letter of warning to removal. |

"Suspensions may be recommended in lieu of removal."

A–2