UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

ROBERT O. WHITE, SR.,                  )
                                        )
        Plaintiff,                      )
                                        )
    v.                                  )        Civil Action No. 08-1138 (RCL)
                                        )
ROBERT C. TAPELLA,                      )
Public Printer of the United States,    )
                                        )
        Defendant.                      )
_____    )

MEMORANDUM OPINION

I.     INTRODUCTION

This case is a mixed case appeal of a Merit Systems Protection Board ("MSPB") decision, in which plaintiff Robert O. White, Sr. alleges that (1) race discrimination motivated the underlying decision of the U.S. Government Printing Office (GPO) to discipline him for failure to observe post orders, in violation of Title VII, 42 U.S.C. § 2000e, *et seq.* (Count One); and (2) the MSPB's decision was arbitrary and capricious or otherwise violated the standards of review enumerated in 5 U.S.C. § 7703(c) (Count Three).[1]   Before the Court is defendant's Motion [52] for summary judgment.  Upon consideration of the Motion, the opposition [54], the reply [57], the entire record in this case, and the applicable law, the Court will GRANT defendants' Motion.  The Court will explain its reasoning in the analysis that follows.

---

[1] Count Five of the Complaint, styled as a "Declaration of Rights," appears to be a request for a declaratory judgment and merges with Counts One and Three because the relief sought under that general claim would duplicate any relief available under the specific claims advanced in Counts One and Three.

## II.   BACKGROUND

### A.  Factual Background

Beginning in 1998, plaintiff Robert O. White, Sr. served as a police officer at the Security Services Division of the U.S. Government Printing Office ("GPO"), in its Uniformed Police Branch.   Plaintiff White is African-American.   In August 2006, White received an 89-day temporary appointment to a Supervisory Police Officer (Sergeant) position.   White served as Acting Sergeant on each shift he worked during the 89-day term of his temporary appointment.

On October 29, 2006, White served as officer in charge of the first shift (7 a.m. to 3 p.m.) and supervised four subordinate officers.   As officer in charge, White completed the first shift report, which is included in the daily activity log—a chronological account of events that occurred throughout the day at various posts in GPO's facilities.   The log entry for October 29 at 7 a.m. reflected that White instructed subordinate officers that all vehicles and persons entering the facility are to be inspected or screened and that all personnel are to possess the proper identification.

After completing the first shift, White worked eight hours of overtime duty on the second shift (3 p.m. to 10 p.m.) and was assigned to Post 32, but also roved between posts to relieve other officers when they took breaks.   When Officer Darnelle Everett—White's subordinate— took a meal break from Post 41 at 5:20 p.m., White covered the post and radioed headquarters of that fact.

Post 41 is located inside a secure facility known as Building IV at 735 North Capitol Street, N.E., Washington, D.C.   The post is to be staffed by a single GPO officer who is responsible for enforcing post orders, a series of directives designed to ensure the safety and security of that post.   White's first-line supervisor, LaMont Vernon, e-mailed plaintiff a draft

version of a revised order for Post 41 on August 23, 2006 at 2:15 p.m.  The revised Post Order

41 was officially adopted on October 20, 2006, and thereafter guided the conduct of all GPO

officers assigned to Post 41.

Pursuant to that order, the officer stationed at Post 41 is "responsible for the

identification, inspection, and control of all persons, *e.g.*, GPO employees, visitors, contractors,

messengers, vendors, other Government Agency employees, etc. entering and departing through

the lobby area."  Def.'s Mot. [19] for Summ. J., Ex. K ("Post Order 41"), at 2.  Post Order 41

also charged the officer assigned with "detecting and preventing the loss or damage of

government and personal property, preventing the introduction of explosive or incendiary

devices, illegal firearms, illicit drugs, all alcoholic beverages or other contraband that enter the

U.S. Government Printing Office, Passport Building Complex."  *Id.*  All visitors to Post 41 must

be escorted at all times, provide identification, and sign a register logging their entry and

departure times.  *Id.* at 5.

According Post Order 41, Post 41 is an especially sensitive location because Building IV

houses a secure area in which sensitive and controlled printed items, including blank Department

of State passports, are produced.  *Id.* at 5.  The access control area—that is, the space between

the lobby and the entry door to the secured sections of Building IV—was equipped with a

magnetometer and an x-ray machine for screening visitors and their possessions.  *Id.* at 2–3.  The

right-hand vertical support of the magnetometer bears a strip of red indicator lights, which

activate when a metallic object passes through the magnetometer to indicate the approximate

location of the metallic object concealed on the individual entering the access control area.  *Id.* at

3.  The order requires all persons entering Building IV to pass through the magnetometer and

requires that the officer on duty "pay particular attention to the Red Indicator light strip located

on the right side of the detector" when screening persons entering the access control area.  *Id.* at 2–3.

Post Order 41 further provides that if a person passing through the magnetometer activates the red indicator lights, the officer must stop the person and, after directing him or her to a location away from the magnetometer, rescreen the person using a hand-held magnetometer. *Id.* at 3.   Officers assigned to Post 41 must ensure that "[a]ll parcels, packages, suitcases, containers, purses, [gym bags] or any other item capable of carrying clothing and equipment [are] screened by x-ray machine prior to entry.  All items are to be placed on the x-ray machine conveyor belt for screening."  *Id.* at 3–4.

Post 41 is equipped with a stationary video camera pointed toward the magnetometer, x-ray machine, and the entrance to the access control area of the post and records a video image of all persons entering and leaving Building IV through Post 41.  Post 41 is also furnished with a podium that is equipped with computer monitors within the sight line of the officer on duty.  A button controlling access to the entry door to the secured sections of Building IV is adjacent to the podium and can be used without requiring the officer to leave the post.  While at the podium, the officer also has access to a console controlling the operation of two turnstile barrier arms positioned between the lobby of Building IV and the magnetometer.  When activated, the barrier arms swing from an open, vertical position to a closed, horizontal position blocking entry to the access control area of the post.  The access control area is considered a secure area.

When White relieved Officer Everett on October 29, 2006 at 5:20 p.m., White assumed responsibility for observing and maintaining the security procedures of Post Order 41.  Part of White's responsibilities as the Post 41 duty officer included the physical inspection and verification of each GPO employee's credentials and access key card.  Post Order 41 at 2.  When

non-GPO employees visit Building IV, the post orders require that White refer them to the main GPO visitor processing facility located at 732 North Capitol Street. *Id.* Non-GPO employees without identification are not allowed in the lobby or the access control area of Building IV. *Id.*

The events that transpired during White's assignment to Post 41 on the evening of October 29, 2006 were recorded by a stationary camera mounted at the post. *See* Def.'s Mot. [19] for Summ. J., Ex. L. At approximately 6:06 p.m., a female acquaintance of Everett entered the lobby of Building IV carrying a white plastic bag. Porter briefly moved in the direction of the magnetometer and looked into the access control area of Post 41, but stopped, did not proceed through the magnetometer, and then left the lobby. Minutes later, at approximately 6:14 p.m., Everett, his female acquaintance, and a second woman entered the lobby of Building IV and approached the turnstile barrier arms between the lobby and the magnetometer.

When Everett returned, White told Everett that he had to relieve another officer, and Everett responded, "I've got it." AR109; AR128–29; AR132. White then used the console controls to lower the turnstile barrier arms, admitting Everett and the two women into the secure area of the post without further screening. With White standing behind the officer's podium inside the access control area, Everett and the two women proceeded through the magnetometer, triggering the red indicator lights. At this time, Everett was holding a cup and a white plastic bag. In the video, both women with him were wearing coats, and one appeared to be carrying a purse over her left shoulder.

Both White and Everett were under the assumption that when Everett told White, "I've got it," Everett became responsible for Post 41 and White was relieved. *See* AR109; AR128–29; AR132. White said that he expected Everett to properly inspect the two women pursuant to Post Order 41, as he thought Everett had assumed responsibility for the post. Therefore, contrary to

the requirements imposed by Post Order 41, White did not: (1) x-ray the contents of the woman's purse or the coats worn by either woman; (2) use the hand-held magnetometer to inspect further the person of either woman after each triggered the red indicator lights; (3) ask either woman to provide him with identification; or (4) require either woman to sign the entry and departure register. Instead, White exited the access control area at approximately 6:14:40 p.m.

On February 6, 2007, LaMont Vernon, GPO Chief of Security Services and White's first-line supervisor, sent White a letter proposing a 14-day suspension for White and a demotion from his position as Lead Police Officer for failing to properly inspect the two women who arrived with Everett, in violation of Post Order 41. *See* Def.'s Mot. [19] for Summ. J., Ex. M. After receiving White's oral and written response to the proposal, Rafael Landrau, Deputy Chief Human Capitol Officer, sustained the charges and imposed the suspension and demotion. *See id.*, Ex. N. White was demoted and suspended without pay from May 27, 2007 through June 9, 2007 and returned to duty and pay status on June 10, 2007. *Id.*, Ex. O.

### B. Procedural History

White appealed his reduction in grade and suspension to the Washington Regional Office of the Merit Systems Protection Board ("MSPB") on June 20, 2007, and alleged that he was discriminated against on the basis of his race and for his union activity. On September 7, 2007, the ALJ upheld the discipline imposed by the GPO. On March 14, 2008, the MSPB issued an Opinion and Order affirming the ALJ's findings that White's affirmative defenses of harmful error and reprisal for union activity had failed, but vacated that portion of the ALJ's decision addressing White's affirmative defense of race discrimination. *See id.*, Ex. P. On remand, after White was granted leave for discovery of possible information on comparators, the ALJ again found that White's preliminary proof of race discrimination was insufficient. The ALJ also

concluded that the penalty imposed by the GPO was reasonable and entitled to deference.  *See id.*, Ex. Q.  White then filed the instant mixed-case appeal pursuant to 42 U.S.C. § 2000e-5.

On June 24, 2009, Judge Robertson dismissed White's claims of unlawful retaliation (Count Two) and emotional distress (Count Four).  On April 15, 2010, Judge Robertson denied defendant's initial summary judgment motion [19] and granted the parties leave to complete further discovery on the comparator issue related to White's race discrimination claim.  ECF No. 23.  After further discovery, defendant has renewed its motion for summary judgment.

## III.   LEGAL STANDARDS

### A.  Summary Judgment

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  The standard requires more than the existence of *some* factual dispute: "the requirement is that there be no *genuine* issue of *material* fact."  *Anderson*, 477 U.S. at 247–48 (1986).  A fact is material if, under the applicable law, it could affect the outcome of the case.  *Id.*  A dispute is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  Also, because "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge," the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.

A non-moving party, however, must establish more than "the existence of a scintilla of evidence" in support of its position.  *Id.* at 252.  Furthermore, it may not rely solely on allegations or conclusory statements.  *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

To avoid summary judgment, the non-moving party must present specific facts that could enable a reasonable jury to find in its favor. *Id.* However, if the evidence presented is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50.

### B. District Court Review of Mixed Cases

A mixed case is one involving "an adverse personnel action subject to appeal to the MSPB coupled with a claim that the action was motivated by discrimination" and is guided by the procedures set forth in 5 U.S.C. § 7702. *Butler v. West*, 164 F.3d 634, 638 (D.C. Cir. 1999). In mixed cases that present both adverse personnel actions and discrimination claims, courts treat the claims as a single unit, but apply different standards of review. *Hayes v. U.S. Gov't Printing Office*, 684 F.2d 137, 139 (D.C. Cir. 1982). Under the Civil Service Reform Act of 1978 ("CSRA"), Pub. L. No. 95-454, 92 Stat. 1111 (codified as amended in sections of 5 U.S.C. (1996)), district courts review appeals of MSPB decisions on the administrative record, holding unlawful and setting aside any agency action, findings, or conclusions found to be "(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence." 5 U.S.C. § 7703(c). However, the CSRA creates an exception for claims of discrimination, which are filed under § 717 of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16(c) (2006), and are reviewable *de novo*. 5 U.S.C. § 7703(c).

A federal employee advancing a mixed case must exhaust both the administrative remedies associated with Title VII cases and those established for challenging adverse personnel actions under the CSRA. *Butler*, 164 F.3d at 638. Exhaustion can be accomplished by pursuing both claims before the MSPB. *Id.* at 638 n.6. During the MSPB appeal, an ALJ takes evidence

and makes findings of fact and conclusions of law, which become final unless challenged. *Id.* at 638–39.   Either party can petition for review of those findings, and if the petition is denied, the original decision becomes final. *Id.* If the full Board grants the petition, however, its resolution of the matter becomes the final decision when issued, at which point a complainant may proceed to the EEOC or to district court. *Id.* at 639.

## IV.   ANALYSIS

White has appealed both the MSPB's decision to uphold the disciplinary measures imposed by the GPO and the MSPB's dismissal of his race discrimination claim.  The GPO now moves for summary judgment on both of these issues.

### A.  MSPB Decision to Uphold Disciplinary Measures

"When reviewing a decision of the MSPB, this Court will reverse the Board's determination if it concludes that the decision was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law'; if it was 'obtained without procedures required by law, rule, or regulation being followed'; or, if it is 'unsupported by substantial evidence.'"  *Horn v. U.S. Dep't of Army*, 284 F. Supp. 2d 1, 10–11 (D.D.C. 2003) (citing 5 U.S.C. § 7703(c)). However, the administrative record makes clear that the MSPB's findings affirming White's suspension and reduction in grade were supported by substantial evidence and were in no respect arbitrary and capricious.

### 1.  *MSPB's Finding that the GPO Proved by a Preponderance of the Evidence that White Violated Post Order 41*

First, the administrative record properly supports the MSPB's finding that the GPO proved by a preponderance of the evidence that White violated Post Order 41.  The ALJ found that while White was in charge of Post 41 he allowed two unauthorized visitors—the women accompanying Everett—to pass through the magnetometer, which activated upon their entry into

the secure access area of the post.  *See* Def.'s Mot. [19] for Summ. J., Ex. H at 3.  Contrary to

Post Order 41, White then failed to screen either unauthorized visitor with the hand-held

magnetometer, scan a purse using the x-ray machine, or verify their possession of valid GPO

identification badges.  *Id.*  White also failed to refer the women to the main visitor registration

center at 732 North Capitol Street, as required by the post order.  *Id.*  White admitted that he did

not perform any of these requirements of Post Order 41.

In finding that White violated post orders, the MSPB rejected White's claim that White

had been properly relieved by Everett and therefore was not responsible for maintaining post

orders.  The ALJ found that at the time Everett announced his intention to assume control over

the post by stating "I've got it," Everett was not immediately capable of exercising actual control

over Post 41.  In making that finding, the ALJ explained that when the two women walked in

behind Everett, they set off the red indicator lights, but Everett did not see the lights because he

had his back to them.  *See* AR1316.  White argues that the MSPB decision was arbitrary and

capricious because it is based on a nonexistent standard, as the ALJ heard testimony that there is

no formal procedure for relieving an officer of a post and that the method of transfer between

White and Everett is an accepted practice.  *See* AR59.  However, the ALJ found that although

Everett's statement, "I've got it," may have been sufficient in other circumstances to relieve

White, in these particular circumstances where two women unknown to White had followed

Everett into the lobby, setting off the indicator lights, the statement was not sufficient because

White was the only officer located within the access control area of Post 41 at the time that the

women entered.  *Id.*  The ALJ noted that "[t]o hold otherwise would be to find that one officer

may relieve another verbally even though he is not in control of the post and able to carry out

post orders, leaving no one in actual control of the post."  *Id.*  The ALJ did not rely on a

nonexistent standard to evaluate White's conduct, but rather drew reasonable inferences from

record testimony—including testimony from White—in concluding that White remained in

control of the post and therefore violated post orders when he failed to screen the women who

followed Everett into Post 41.   Upon review of the record, it is clear that substantial record

evidence existed for the MSPB to uphold the ALJ's finding that White violated post orders.

### 2.   MSPB's Finding that White was not Subject to Harmful Procedural Error

Second, the MSPB correctly rejected White's claim that the GPO failed to timely produce

documents on which it relied in proposing the challenged disciplinary actions.   Although White

claims that he was prejudiced by the GPO's withholding of the Inspector General's report and

investigation until two months after the disciplinary decision was made, White has not shown

*how* he was prejudiced.   White offered no evidence to support his claim that the GPO Inspector

General's Office withheld relevant documents, nor did White show that any withheld material

would have caused the GPO to reach a different conclusion had it provided the material to

White.   Ex. H at 6.   The fact that Judge Robertson previously held that the ALJ impermissibly

limited White's right to discovery has no bearing on the validity of the MSPB's finding

regarding these documents.   Given the lack of any supporting evidence for White's claim, the

Court upholds the MSPB's finding that White failed to meet the burden of proof necessary to

support his claim of harmful procedural error.

### 3.   MSPB's Finding that White was on Notice of Revised Post Order 41

Third, the MSPB properly found that White was on notice of the revised Post Order 41,

contrary to White's claim that he was not aware of the revised order.   Post Order 41 was issued

by the GPO's Chief Security Officer on October 20, 2006 and therefore governed the conduct of

officers assigned to Post 41 on October 29, 2006, the date of the events at issue in this case.   *See*

Ex. K at 1.  In the Complaint, White claims that the MSPB erred because the revised orders were promulgated but never properly implemented, and points out that Post Order 41 had not yet been physically replaced at the post on October 29.  The MSPB found that on August 23, 2006, White had received an e-mailed copy of the post orders that were eventually issued on October 20. Although White testified that he does not read his e-mail, there was substantial evidence before the MSPB regarding White's level of computer usage and skill to support the finding that White did in fact receive the e-mailed copy of Post Order 41.  *See* Exs. I, J.

Even if the revised post orders issued on October 20 had not yet come into force on October 29, White failed to present any evidence to the MSPB that the orders issued on October 20 differed in any material respect, for purposes of the adjudicated violations he faced, from the previous version of the orders.  Both versions of Post Order 41 contained materially similar requirements that the officer on duty: (1) control all persons entering and departing Building IV; (2) prevent loss or damage to government and personal property; (3) prevent introduction of explosive or incendiary devices, illegal firearms, illicit drugs, narcotics, all alcoholic beverages, and other contraband; (4) inspect the identification badges and credentials of all GPO employees entering Building IV; (5) use the magnetometer to screen incoming visitors; (6) use the hand-held wand magnetometer to screen incoming visitors if necessary; and (7) order all visitors to report to the GPO's Main Police Office at 732 North Capitol Street.  *See* Exs. K, U.[2]  The Court

---

[2] White points out that the former Post Order 41 required officers to leave the access control area and patrol the exterior of the building every twenty minutes.  *See* Ex. U.  According to White, this exterior patrol requirement is significant because it contradicts the ALJ's finding that Everett could not have been in control of Post 41 when he stated "I've got it" as he passed through the magnetometer.  Under the standard applied by the ALJ, White argues, the former Post Order 41 required an officer to relinquish control of the post every twenty minutes.  However, the fact that officers were previously required to patrol the exterior of the building is immaterial because it still requires officers to screen Building IV entrants at Post 41 and does not preclude an officer from returning to a position behind the access control area—where White was positioned when Everett and his two female companions entered Building IV on October 29, 2006—before allowing entrants to proceed through the magnetometer and screening them as per the applicable post orders.

therefore upholds the MSPB's finding that White was aware of revised Post Order 41 on October 29, 2006.

### 4.  MSPB's Finding that the GPO's Disciplinary Measures were Reasonable

Fourth, the MSPB properly concluded that the disciplinary measures taken against White—demotion and 14-day suspension—were not arbitrary and capricious.  "The Court 'must defer to the agency's determination of disciplinary action unless the penalty is so harsh and unconscionably disproportionate to the offense that it amounts to an abuse of discretion.'"  *Adair v. Solis*, 742 F. Supp. 2d 40, 66 (D.D.C. 2010) (quoting *Allen v. U.S. Postal Serv.*, 466 F.3d 1065, 1071 (Fed. Cir. 2006)).   In reviewing the disciplinary action taken against White, the MSPB took into account all relevant factors supporting the decision to suspend and demote White and correctly found that the nature of the discipline imposed was proportionate to the gravity of White's misconduct.  Officer Landrau, the deciding official, testified that White's misconduct was especially egregious given the national security sensitivity of Building IV, which houses a secure facility that produces blank passports.  Ex. H at 12.  Landrau further testified that his decision was based on the fact that White occupied a supervisory position at the time of his misconduct.  *Id.*  White offered no evidence to contradict Landrau's testimony or to show that the penalty was disproportionate to penalties imposed on others for similar offenses. The Court therefore finds that the MSPB correctly upheld the GPO's decision to impose a reduction in pay and 14-day suspension for White's misconduct, as this disciplinary action was neither disproportionately harsh nor unconscionable.

### B.  Employment Discrimination Claim

Review of the MSPB's ruling on an employment discrimination claim is *de novo*.  5 U.S.C. § 7702(c); *Hayes v. U.S. Gov't Printing Office*, 684 F.2d 137, 139 (D.C. Cir. 1982).  Title

VII of the Civil Rights Act makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  Ordinarily, courts examine Title VII claims under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S 792 (1973).  The D.C. Circuit has determined that at the summary judgment stage of a Title VII disparate-treatment suit such as this, "where an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, . . . the district court must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?" *Brady v. Office of Sergeant at Arms,* 520 F.3d 490, 494 (D.C. Cir. 2008).

A Title VII plaintiff has the burden of proving that the defendant's proffered non-discriminatory reason for the employment decision is a pretext.  *Morgan v. Fed. Home Loan Mortgage Corp.*, 328 F.3d 647, 654 (D.C. Cir. 2003).  This burden can be met by, *inter alia*, showing that the reason offered by the defendant is false, or by presenting sufficient evidence to permit a reasonable fact finder to conclude that the employer's proffered explanation is "unworthy of credence."  *Beyah v. Dodaro*, 666 F. Supp. 2d 24, 32 (D.D.C. 2009) (citing *Montgomery v. Chao*, 546 F.3d 703, 707 (D.C. Cir. 2008) and *Desmond v. Mukasey*, 530 F.2d 944, 962 (D.C. Cir. 2008)).  However, when the employer's proffered explanation is reasonable in light of the evidence, "there ordinarily is no basis for permitting a jury to conclude that the

employer is lying about the underlying facts, and summary judgment is appropriate." *Beyah*, 666 F. Supp. 2d at 31 (citations and quotations omitted).

In this case, White belongs to a protected class under Title VII—he is African-American—and has suffered adverse employment action—suspension and reduction in rank. The GPO has asserted a legitimate, non-discriminatory reason for the adverse employment action: White violated Post Order 41, thereby compromising the safety and security of Building IV because White remained in control of Post 41 when Everett and his two female companions walked through the magnetometer and as Acting Sergeant, White was responsible for ensuring that Everett complied with the post orders. The Court therefore turns to the central issue: whether White has produced evidence sufficient for a reasonable jury to find that the GPO's stated reason for White's suspension and demotion was not the actual reason and that the GPO intentionally discriminated against White based on his race.

### 1. Pretext

White claims that the GPO's proffered justification for the adverse employment action is pretextual. A plaintiff may demonstrate pretext by showing that the defendant's non-discriminatory reason for the adverse personnel action is untrue. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 143 (2000). Although there must be evidence from which a reasonable fact finder could not only disbelieve the proffered justification but also to affirmatively believe there was a discriminatory motive, a juror may "infer the ultimate fact of discrimination from the falsity of the employer's explanation." *Id.* at 147.

However, there is no record evidence to support White's argument of pretext. The record makes clear that White's violation of Post Order 41 on the evening of October 29, 2006 was the sole reason for the disciplinary actions the GPO took against White. White himself admitted that

he failed to verify whether the two women who entered Post 41 had GPO identification, screen them with the hand-held magnetometer after the walk-through magnetometer was triggered, or inspect a purse carried by one of the women either visually or using an x-ray scanner.  Ex. P at 3; Ex. E at 168–70.  Furthermore, the security camera footage plainly demonstrates that only White had control of Post 41 at the time of the events in question.  At the moment of the visitors' unauthorized entry, only White had physical control over the console at the officer's podium used to admit visitors.  Only White was in a position to observe the x-ray machine and the magnetometer and to react accordingly when the unauthorized visitors triggered the red indicator lights.  And as the senior officer at the post, only White was responsible for ensuring that post orders were maintained.  Contrary to White's contentions, White was not relieved when Everett said "I've got it" to White when Everett was on the other side of the turnstile arms.  In fact, Everett made the statement when he was physically restrained from exercising control over Post 41 because he was standing on the far side of the turnstile arms.  Moreover, it was White who admitted the two unauthorized visitors into the access control area of Post 41 by using the console to lower the turnstile arms.  When the two unauthorized visitors passed through the magnetometer, it was White who saw that the red indicator lights had been triggered—not Everett, whose back was to the machine.

As the only officer in control of the post and fully able to observe it, and as the senior officer present, White had a duty to follow post orders, to maintain the security of the facility, and to screen the unauthorized visitors.  There is no evidence in the record to support White's argument that White's failure to do all of these things was only a pretext for the adverse employment action that the GPO took against him.

16

2.   *Similarly Situated Employees*

A plaintiff can also raise an inference of intentional discrimination sufficient to defeat summary judgment by showing that he was similarly situated to an employee who was not a member of the protected class and that the plaintiff was treated more harshly than the similarly situated employee.  *Banks v. District of Columbia*, 498 F. Supp. 2d 228, 234 (D.D.C. 2007). "For employees to be similarly situated, all of the relevant aspects of their employment situations must be nearly identical."  *Evans v. Holder*, 618 F. Supp. 2d 1, 11 (D.D.C. 2009) (internal quotations and citations omitted).  If a comparator employee does not hold the same position as the plaintiff, the comparator is not similarly situated.  *Banks v. District of Columbia*, 498 F. Supp. 2d 228, 234 (D.D.C. 2007).  The plaintiff and the comparator employee must also be charged with offenses of "comparable seriousness."  *Holbrook v. Reno*, 196 F.3d 255, 261 (D.C. Cir. 1999).  And in order to establish valid comparator evidence, the plaintiff must point to a similarly situated employee outside of a protected class who committed comparable offenses but who was punished less severely by the same deciding official.  *See Cabrera v. United States*, 2009 WL 1582585, at *5 (Fed. Cir. June 8, 2009).

Here, White has failed to present valid comparator evidence to the Court.  In a chart labeled "Comparator Employees" appended to the Complaint, White lists five GPO employees, only two of whom, Officers Charles Beard and Phillip Griffin, were disciplined by the same deciding official who disciplined White.  Compl. Ex. 4.  However, Beard and Griffin's offenses—"[i]nsubordination and insolent behavior; false statement; failure to follow orders" and "[l]ack of candor during Investigation," respectively—are not substantially similar to those White committed.  Moreover, Beard and Griffin are both African-American, but White must

adduce evidence of disparate treatment with respect to a member of a non-protected class.  *See Banks*, 498 F. Supp. 2d at 234.[3]

White does present evidence of an incident in which Agency Counsel Neal Fine found Officer James Oldach, a Caucasian, asleep at a post with a book in his hand and demanded that he be terminated.  *See* Pl.'s Opp. [54], Ex. 10.  Oldach was proposed for removal, but the GPO held the decision in abeyance for two years pending his cooperation with a Last Chance Agreement.  *Id.*  Even though Oldach was charged with an offense of comparable seriousness, White's argument that Oldach did not receive any discipline for his misconduct is a misrepresentation of the Last Chance Agreement that Oldach signed.  According to the Last Chance Agreement, Oldach's retention of his employment at the GPO was contingent upon his successful compliance with the terms of the agreement, which included adherence to post orders and waiver of his right to contest his removal for the charges.  *See* Ex. 10.  Regardless, White cannot allege that he is similarly situated to Oldach because they did not hold the same positions—White was a Lead Police Officer at the time of the conduct at issue, whereas Oldach was an officer who was not in a supervisory position.  *See Banks*, 498 F. Supp. 2d at 234.

### 3.  *Discriminatory Atmosphere*

White also seeks to defeat summary judgment by presenting evidence that a discriminatory atmosphere existed at the GPO.  *See Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994) (explaining that one way a plaintiff can defeat summary judgment is to show "that the

---

[3] White also claims that the GPO is not entitled to summary judgment because GPO has not presented evidence of a Lead Police Officer who violated post orders and was *not* disciplined.  He supports this contention by citing affidavits and testimony from deciding officials at the GPO that support the GPO's representation that it cannot identify any instances of comparator employees who were not disciplined for misconduct comparative to White's. The Court will not rehash this dispute between the parties, as it was already decided during discovery.  *See* Mem. Order [44], Aug. 3, 2011.  While the Court previously granted White leave to conduct further discovery on the issue of comparator employees who were not disciplined for comparative misconduct, the Court will not second-guess the GPO's representation—after the close of discovery on this issue—that the claimed instances of undisciplined misconduct simply did not occur.

employer has discriminated against other members of his protected class or other protected categories of persons"). To do so, White presents testimony from Sergeant Aldustus Dailey and Officer Oldach expressing their generalized opinions about the fairness or disparity of the disciplinary process at the GPO. However, this testimony is only vague opinion evidence and does not give rise to an inference of discrimination. In a deposition, plaintiff's counsel asked Dailey whether in his opinion he had observed a disparity of penalties between African-American officers and white officers and supervisors. Def.'s Opp. [54], Ex. 1 at 50. Dailey responded:

> If how you're going to discipline somebody is left entirely up to the individual, you're always going to have problems. There have to be parameters that govern how and when and to what severity somebody should be disciplined. That shouldn't be left up to how a person may or may not feel or how a person may or may not view an officer or in my case a supervisor. If you don't have those things in place there's always going to be a wide range of things that go on as far as discipline is concerned, and they might get into the realm of the personal. If you have strict policies and procedures in place, that very rarely happens. That's been my opinion. That's been my case. It just very rarely happens.

*Id.* at 50–51. Dailey further testified that he has "occasionally" seen a difference in penalties imposed based on race, but cited no specific incidents to illustrate this claimed disparity. *Id.* at 51. In a similarly vague fashion, Oldach testified that although he originally thought the GPO was harsh on him, he has come to hold the opinion that African-American officers are not disciplined in the same way as white officers are disciplined. Ex. 3 at 28–29. While both Dailey and Oldach testified that they perceive inconsistencies in GPO's discipline of African-American and white officers, these generalized opinions are not enough to create a genuine issue of material fact regarding the GPO's discriminatory treatment of other members of White's protected class.

Accordingly, the Court finds that White has not presented sufficient evidence for a reasonable jury to find that the GPO's asserted non-discriminatory reason for disciplining White—his failure to follow Post Order 41—was a pretext and that the GPO intentionally discriminated against White on the basis of his race.

## V.      CONCLUSION

For the foregoing reasons, the Court will GRANT defendant's Motion [52] for summary judgment and enter judgment as a matter of law in favor of defendant.  This case is therefore DISMISSED WITH PREJUDICE.


Signed by Royce C. Lamberth, Chief Judge, on July 11, 2012.